DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, New York  10017
Telephone:  (212) 450-4000
Facsimile: (212) 450-3800
John Fouhey, Esq. (JF 9006)
Marshall S. Huebner, Esq. (MH 7800)
Benjamin S. Kaminetzky, Esq. (BK 7741)

Attorneys for Debtors and
 Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**In re:**

**DELTA AIR LINES, INC., et al.,**

**Debtors.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**Chapter 11 Case No.**

**05-_____ (    )**

**(Jointly Administered)**

**DECLARATION OF EDWARD H. BASTIAN PURSUANT
TO RULE 1007-2 OF THE LOCAL BANKRUPTCY RULES
OF THE SOUTHERN DISTRICT OF NEW YORK AND IN
SUPPORT OF DEBTORS' INFORMATIONAL BRIEF
<u>IN SUPPORT OF FIRST DAY MOTIONS</u>**

Edward H. Bastian, declares and says:

1.      I am Executive Vice President-Finance & Chief Financial Officer ("CFO") of Delta Air Lines, Inc.  I was first employed by Delta (as defined below) in October 1998 as Vice President of Finance and Controller, and I was promoted to the position of Senior Vice President-Finance & Controller in February 2000.  I left Delta in January 2005 and became CFO of Acuity Brands, Inc.  After approximately two months as CFO of Acuity Brands, Inc., I returned to Delta as CFO in July 2005.  In this capacity, I am familiar with Delta's day-to-day

operations, business and financial affairs.  I am authorized to submit this declaration in support of the Debtors' (as defined below) petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

2. I submit this declaration pursuant to rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**") in support of the Debtors' Informational Brief and petitions and various contemporaneously filed requests for relief in the form of motions and applications (the "**First-Day Pleadings**"), as well as to assist the Court and other interested parties in understanding the circumstances that compelled the commencement of these chapter 11 cases.  I have reviewed the First-Day Pleadings and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' business and to the success of the Debtors' reorganization.

3. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon experience, knowledge, and information concerning the operations of the Debtors and the airline industry as a whole.  If called upon to testify, I would testify competently to the facts set forth in this declaration.  Unless otherwise indicated, the financial information contained herein is unaudited and provided on a consolidated basis for Delta.

### Commencement of Reorganization Proceedings

4. On the date hereof (the "**Petition Date**"), Delta Air Lines, Inc. and those of its subsidiaries that are debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"[1] and, together with their non-debtor subsidiaries, "**Delta**" or

---

[1] The Debtors are the following entities:  ASA Holdings, Inc.; Comair Holdings, LLC; Comair, Inc.; Comair Services, Inc.; Crown Rooms, Inc.; DAL Aircraft Trading, Inc.; DAL Global Services, LLC; DAL Moscow, Inc.;

2

"the Company") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5. Part I of this declaration describes the Debtors' business and the circumstances leading up to the filing of these chapter 11 cases and is offered in connection with the Informational Brief and various first day motions. Part II provides additional information required under Local Rule 1007-2.

## I. Nature of the Debtors' Business and a Statement of the Circumstances Leading to the Debtors' Filing Under Chapter 11

### A. The Debtors' Business

6. Debtors constitute one of the largest commercial airline networks in the world. Formed as a small crop dusting company 76 years ago, Delta has grown to become a global leader in commercial aviation that employs over 60,000 dedicated individuals and offers more than 7,500 daily flights to 502 destinations in 88 countries on Delta, Song, Delta Shuttle, the Delta Connection carriers, and its worldwide partners.

7. In 1987, Delta strengthened its position by merging with Western Air Lines, becoming the nation's fourth-largest airline, and the fifth-largest airline in the world. In addition, in 1989, Delta formed an alliance with Swissair and Singapore Airlines, Ltd., increasing its global presence. In 1991, Delta purchased Pan American World Airways'

---

Delta AirElite Business Jets, Inc.; Delta Air Lines, Inc.; Delta Benefits Management, Inc.; Delta Connection Academy, Inc.; Delta Connection, Inc.; Delta Corporate Identity, Inc.; Delta Loyalty Management Services, LLC; Delta Technology, LLC; Delta Ventures III, LLC; Epsilon Trading, Inc.; Kappa Capital Management, Inc.; Song, LLC; and Transquest Holding, Inc.

3

transatlantic routes and its East Coast Shuttle.  In 2004, Delta carried approximately 110 million passengers, making it the world's second-largest passenger airline.

**B.      Delta's Efforts to Reduce its Costs and Avoid Bankruptcy**

8.      In the first quarter of 2001, Delta posted a net loss of $133 million, as compared with a net income of $217 million in the first quarter of 2000.  Delta's performance deteriorated even further in the second quarter, with a net loss of $90 million as compared to a net income of $460 million in 2000.  In total, from January 1, 2001 through June 30, 2005, Delta's net losses totaled approximately $10 billion.

9.      Over the past few years, through employee sacrifice, innovative productivity enhancements, and cost cutting, Delta has undertaken to restructure its operations and reduce its costs outside of chapter 11.  Even prior to the tragic events of 9/11, Delta began reducing its costs and improving its competitive performance through a series of strategic initiatives.

10.      These measures included:  (1) implementing an early phase-out of 19 aircraft from scheduled service to adjust fleet capacity to demand and improve fleet efficiency; (2) initiating a hiring freeze; (3) reallocating aircraft to routes with greater profit potential; and (4) lowering advertising, consulting and contractor costs.

11.      The events of 9/11 hastened this process and Delta instituted another series of cost-saving measures.  As a first step, Delta reduced its scheduled capacity by 16 percent.  In addition, Delta reduced its staffing levels, with the large majority of these reductions being individuals who elected to participate in one of Delta's voluntary staffing reduction programs (e.g., early retirement, severance, or leave of absence).

12.      Delta also eliminated travel agent base commissions for tickets sold in the United States and Canada, which reduced passenger commission expenses.  Finally, Delta was

4

able to cut contract work, aircraft maintenance materials volume, advertising expenditures, passenger service expenses and professional fees. All told, during 2002, Delta cut costs by $1 billion.

### 1. Delta's Profit Improvement Initiative

13.     Despite these actions, Delta recorded a substantial loss in 2002. Responding to these results and the changed economic environment, Delta developed the Profit Improvement Initiative ("PII"), a program designed to assist the airline in both lowering its costs and increasing its revenues. PII included 17 different initiatives designed to improve profitability throughout Delta's organization.

14.     Through the PII, the Company focused on virtually every area within its control to reduce costs. In addition, capital investment was delayed or cancelled, and technological improvements were implemented. To date, Delta's PII has been effective in reducing costs and increasing revenues. In 2003, as the PII began to be phased in, Delta achieved an additional $1.2 billion per year in benefits from PII initiatives alone.

15.     The most noteworthy of these savings came from: (1) transforming the passenger check-in process to utilize more self-service options like automated ticketing kiosks, DeltaDirect phones, and check-in via Delta's Internet website; (2) utilizing new crew scheduling technology for flight attendants; (3) restructuring operations at Delta's DFW and Salt Lake City hubs; (4) changing the pension, health care, and other benefits provided to Delta's non-pilot employees; and (5) entering into a marketing alliance with Continental and Northwest, which includes mutual code sharing and reciprocal frequent flyer and airport lounge access arrangements.

**2.      In the Fall of 2004, Delta Narrowly Avoided Filing For Chapter 11**

16.     Despite these efforts, as Delta entered 2003 it continued to face enormous challenges due to low fares throughout the industry and a cost structure that was higher than those of many of its competitors. Specifically, Delta needed to renegotiate its collective bargaining agreement ("CBA") with its pilots, represented by the Air Line Pilots Association, International ("ALPA"), to reduce its industry-leading pilot costs. The CBA, which was the most generous pact in U.S. aviation history, was signed in June 2001, just weeks before the events of 9/11 and at the very end of a cycle of prosperity for the legacy carriers.

17.     In the first nine months of 2004, Delta's operating losses totaled $1.05 billion and its cash and cash equivalents and short term investments declined from $2.71 billion to $1.45 billion. Even a 10 percent pay cut and other reductions for its non-pilot workforce, announced in September 2004, was not enough to forestall chapter 11 preparations.

18.     In the fall of 2004, Delta was still saddled with the highest pilot costs in the industry. Delta's September 2004 quarter pilot CASM was approximately 50 percent higher than the legacy carrier average (excluding Delta) and 75 percent higher than the average for LCCs. Delta's mounting losses and high cost structure contributed to a rapid erosion of its cash position. Delta's cash and cash equivalents and short-term investments declined from $2.71 billion on December 12, 2003 to $1.45 billion on September 9, 2004. This rapidly declining cash position prompted a need to achieve substantial cost savings.

19.     Delta was narrowly able to avert bankruptcy because, among other things, in late October 2004 ALPA agreed to a new contract to provide Delta with $1 billion in long-term annual cost savings. The agreement included a 32.5 percent reduction to base pay rates and certain benefit changes such as reduction in vacation pay, increased cost sharing with respect to

6

medical benefits, amendment of the defined benefit pension plan to stop service accrual as of December 31, 2004, and the establishment of a defined contribution pension plan as of January 1, 2005.

20. The agreement with its pilots, plus substantial pay, benefit, and job reductions for all other employees, permitted Delta to obtain the remaining cornerstones of a proposed out-of-court restructuring. In November 2004, Delta entered into new arrangements with GE Commercial Finance ("GE") and American Express Travel Related Services Company, Inc. ("AMEX") that provided a critical $1.1 billion in incremental liquidity. Also in November 2004, Delta exchanged approximately (1) $372 million of secured debt due in 2005 and 2006 for newly issued secured debt that pays higher interest and matures up to three years later; and (2) $135 million of unsecured 7.7 percent notes due in 2005 for a like principal amount of newly-issued unsecured 8 percent notes due in 2007 and approximately 5.5 million shares of common stock.

21. Delta likewise completed agreements to defer $112 million in debt obligations, due in 2004 through 2006, to later years.

22. Delta concluded that there were sufficient anticipated benefits from these actions for the Company to achieve financial viability by way of an out-of-court restructuring. In particular, Delta determined that the Company was in a position to obtain by the end of 2006 $5 billion in annual benefits from its out-of-court business plan (as measured against a 2002 baseline). Annual benefits, although primarily comprised of cost reductions, include both revenue enhancements and cost savings.

### 3.     Delta Implements Its Out-of-Court Transformation Plan

23.     In September 2004, Delta announced its Transformation Plan, a comprehensive program intended to create a simplified, more efficient customer-focused airline.

24.     The Transformation Plan called for Delta to achieve approximately $5 billion in annual benefits through cost reductions and revenue improvements by the end of 2006 (as compared to 2002).  By the end of 2004, Delta had already achieved approximately $2.3 billion of the $5 billion in targeted benefits under the previously implemented PII.

25.     The new agreement with ALPA, noted above, was a component of the Transformation Plan, as were significant savings from non-pilot employees.  Specifically, the Transformation Plan called for $350 million in annual savings from non-pilot salary and benefit reductions.  This included:  (1) an across the board 10 percent pay reduction for executives as well as supervisory, administrative and frontline employees; (2) increases to the shared cost of healthcare coverage; (3) the elimination of a healthcare coverage subsidy for non-pilot employees who retire after January 1, 2006; and (4) reduced vacation time.

26.     The remaining Transformation Plan benefits come primarily from operational improvements.  These include technology and productivity enhancements such as improvements in airport processes, maintenance and distribution efficiency, overhead reductions, and the elimination of 6,000 to 7,000 non-pilot jobs.  Some of these initiatives are described below.

### (a)     "Operation Clockwork"

27.     In January 2005, Delta introduced "Operation Clockwork," a redesign of Delta's Atlanta operation from a banked to a continuous hub in order to increase systemwide capacity with the same number of aircraft, improve reliability, and reduce congestion.  The

change, the largest single-day service transformation in Delta's history, will initially provide Delta with the equivalent of 19 additional aircraft a day and expected benefits of approximately $50 million per year. Already, the changes have served to reduce aircraft turnaround time to slightly more than 50 minutes.

### (b) De-hubbing of DFW

28. In January 2005, Delta de-hubbed its DFW operation and redeployed aircraft used in that market to grow its other hub operations, as well as to offer new destinations and expanded frequencies in key cities such as New York City and Orlando. The Company projects that its decision will provide it with $100 million benefit by 2006. Under the de-hubbing plan, Delta reduced its daily flights at DFW from 256 to just 21.

### (c) SimpliFares

29. In January 2005, Delta expanded its SimpliFares program aimed at meeting the increasingly competitive pricing of LCCs such as AirTran and JetBlue. SimpliFares marks a fundamental change in Delta's pricing structure that is intended to better meet customer needs, simplify the business, and assist Delta in achieving a lower cost structure.

30. Under SimpliFares, Delta lowered unrestricted fares on some routes by as much as 50 percent, reduced the number of fare categories, implemented a fare cap, and eliminated the Saturday night stay requirement that existed for certain fares. Delta expects that once SimpliFares is fully effective, it will provide net benefits to the Company by stimulating incremental traffic, improving productivity, and increasing customer usage of delta.com, its lowest cost distribution channel.

31. Several changes have recently been made to SimpliFares to generate incremental revenue. In July 2005, Delta raised the caps for its one-way fares by $100. This is

expected to increase revenue by approximately $35 million annually. In early September, Delta also made changes to the flexible stay rules, adding a 3 night minimum or Saturday night stay requirement on the lower fare levels in many markets. This change will provide an estimated $30 to $35 million annual benefit.

### (d) Outsourcing Heavy Maintenance

32. On March 29, 2005, Delta announced that it would outsource the heavy maintenance required for 70 percent of its mainline fleet. Combined with efficiencies from consolidating certain maintenance work from Tampa to Atlanta, this change is expected to provide Delta with total savings of approximately $240 million over five years. By outsourcing heavy maintenance on 353 aircraft, Delta was able to reduce approximately 800 maintenance jobs.

### 4. Delta Took Significant Steps To Increase Its Liquidity

33. In addition to its Transformation Plan, Delta took significant actions to increase its liquidity.

### (a) GE & AMEX Deals Restructured

34. Last November, Delta entered into two key financing agreements, one with GE and the other with AMEX, to provide Delta with $1.1 billion in additional liquidity. In June 2005, Delta renegotiated certain terms in the agreements. The original agreements included a covenant requiring Delta to meet certain earnings levels. If Delta had not been able to renegotiate the covenant, the repayment of the loans may have been accelerated, which would have created a significant liquidity crisis.

**(b)      ASA Sale**

35.     Delta agreed in mid-August to sell its wholly-owned subsidiary Atlantic Southeast Airlines ("ASA") to SkyWest Airlines ("SkyWest") for $425 million and negotiated the return of $50 million in advance deposits from its aircraft supplier. The transaction closed on September 8, 2005, with SkyWest paying $350 million to Delta at closing. An additional $125 million, is payable to Delta upon the earlier of (i) the assumption by Delta of the ASA and SkyWest Delta Connection agreements in a chapter 11 proceeding; or (ii) four years after the closing of the transaction. SkyWest is entitled to retain the $125 million if Delta rejects either the ASA or SkyWest Airlines Delta Connection agreements in a chapter 11 proceeding prior to the fourth anniversary of the closing of this transaction.

**5.      Delta's High Cost of Fuel, Its Heavy Debt Burden, Its Pension Obligations, and the Weakened Industry Revenue Environment Have Outpaced Delta's Transformation Plan Achievements**

**(a)      The High Cost of Fuel**

36.     As of June 30, 2005, Delta had achieved approximately *85 percent* of these benefits and was ahead of schedule to meet its goal of $5 billion in financial improvements by the end of 2006. Nonetheless, rising fuel costs at unpredicted and extraordinarily high levels have substantially outpaced these benefits. Despite doing everything it could to preserve its liquidity, Delta is now left with no alternative but to seek the protections and flexibilities afforded by the Bankruptcy Code.

37.     On January 3, 2005, the price for a barrel of crude oil on the spot market was $42.12. On August 30, 2005 the crude oil price closed at $69.81 per barrel, an astonishing 66 percent increase. Similarly, the "crack spread," or the incremental charge by refineries of jet fuel over the cost of crude oil, has recently soared.

11

38. In the second quarter of 2005, Delta's consolidated fuel expense increased 58 percent, or $385 million, compared to the second quarter of 2004, with approximately $365 million of this increase resulting from higher fuel prices. For purposes of comparison, Delta's average fuel price per gallon was $1.57 in the first eight months of 2005, compared to just 67 cents in calendar year 2002. For every one cent increase in its average annual fuel price, Delta's mainline fuel expense increases approximately $25 million per year.

39. The unexpected increase in the cost of fuel has offset the benefits of the Transformation Plan, and as a result forced an immediate liquidity crisis. Delta's out-of-court business plan was premised on paying an average of $1.22 per gallon for jet fuel in 2005. Delta's projected price of $1.22 per gallon for 2005 was a realistic assessment at the time given where the forward curve stood at January 1, 2005.

40. Given the currently unparalleled increase in the price of oil, however, Delta has instead paid an average of $1.51 per gallon during the first six months of the year. In contrast, Delta's average fuel price per gallon was $1.16 in 2004, $0.82 in 2003, and $0.67 in 2002. In addition, Hurricane Katrina knocked out refineries from which Delta receives approximately 500,000 barrels of jet fuel per month, or 20 to 25 percent of its Atlanta fuel consumption. This situation is bound to cause Delta even higher fuel prices for the foreseeable future.

41. The high cost of fuel has been the primary driver of Delta's steadily eroding cash position during 2005. Delta's cash and cash equivalents and short-term investments has declined from $2.7 billion at December 31, 2003, to $1.2 billion at August 31, 2005. In the eight months ending August 31, 2005, Delta's cash and cash equivalents and short-term investments fell by 33 percent, from $1.8 billion to $1.2 billion.

**(b)      Delta's Heavy Debt Burden**

42.      Delta's substantial losses have forced it to incur a significant amount of indebtedness and other obligations. As of June 30, 2005, Delta had approximately $14.1 billion of total indebtedness including capital lease obligations, as well as minimum rental commitments with a present value of approximately $6.4 billion under non-cancelable operating leases with initial or remaining terms in excess of one year.

**(c)      Delta's Unfunded Pension Liability Poses a Significant Liquidity Risk**

43.      Delta, like other legacy carriers American Airlines, Northwest and Continental, sponsors tax qualified defined benefit plans for its employees. Benefits under these plans are generally based on an employee's final average salary and service, or in some cases, a percentage of salary.[2] Based on interest rates currently in use, Delta projects that it will be required to contribute approximately $2.6 billion to its qualified defined benefit plans from 2006 to 2008.

**(d)      Delta Needs To Improve Its Revenues**

44.      Although Delta's revenue passenger miles ("RPMs"), or traffic, rose 9 percent in the first six months of 2005, compared to the same period in 2004, passenger revenue increased only 5 percent due to a 4 percent decrease in passenger mile yield on a year-over-year basis. For the June 2005 quarter, passenger mile yield declined 1 percent as compared to the same period a year ago.

---

[2] Although Delta froze service under the benefit formula for pilots effective December 31, 2004, much of the costs attributable to the pilot defined benefit plan relate to service prior to December 31, 2004. In addition, in exchange for freezing service under the plan, Delta agreed to implement a defined contribution plan for pilots, the cost of which is approximately $80 to $85 million per year (which is in addition to the qualified defined benefit plan contribution). Finally, because pilot compensation often exceeds the Internal Revenue Code limitation on amounts that can be taken into account for determining benefits from qualified plans, Delta also pays from its general assets approximately $75 million per year to retired pilots in non qualified benefits.

13

**C.    Delta's In-Court Business Plan to Restore Profitability and Competitive Strength**

45.    Delta is in the process of finalizing its In-Court Business Plan ("Business Plan"). Pursuant to the Business Plan, Delta must generate significant free cash flow to enable debt reduction and capital investment, create positive returns for shareholders, and ensure a stable and rewarding career opportunity for employees. To achieve these goals, Delta must provide outstanding customer service, pursue profitable growth, and repair its balance sheet.

**1.    Delta Will Increase Its Revenues Wherever Feasible**

46.    Delta has lost pricing power in a majority of large domestic markets and will soon face competition in many of its small connecting routes. To improve its revenues, Delta anticipates that it will be able to grow its nominal yields by approximately 3.2 percent annually, supported by capacity reductions and network initiatives. Delta also plans to increase its load factor from 76.6 percent in 2005 to 77.6 percent by 2007 by better matching customer demand with flight offerings.

47.    Delta plans to use chapter 11 to reconfigure its fleet and network footprint in a manner that will enhance its revenues. First, Delta will seek to simplify and streamline its fleet by removing four aircraft types by the end of 2006, so that only seven mainline aircraft types will remain. Second, Delta plans to deploy smaller aircraft on many of its routes so that it utilizes the proper-sized aircraft for the route it is flying. Third, Delta will continue to right-size its hub operations. Fourth, Delta plans to increase its capacity on international routes with greater profit potential.

48.    As part of their ongoing efforts to reduce costs and maximize fleet flexibility, the Debtors have identified certain leases for aircraft, engines, propellers, and other related equipment and certain subleases that no longer fit into the Debtors' business plan and, are

14

no longer profitable to the Debtors. Rejection of these leases and subleases is in the best interests of the Debtors' estates and creditors and constitutes a proper exercise of the Debtors' sound business judgment.

### 2.  Delta Has Identified Requisite and Attainable Cost Savings

49. By 2006, Delta expects to have achieved $5 billion in annual benefits from Transformation Plan initiatives. Delta is also in the process of conducting another focused review of its network operations and cost structure and expects to generate approximately $1 billion in additional annual benefits by 2008, with 60 percent of the goal to be achieved by the end of 2006. The expansion of the Transformation Plan will cut costs by reducing less-efficient fleet types, adjusting the network footprints to reflect the current competitive environment, outsourcing select functions, and reducing corporate overhead.

50. A number of these initiatives have already been launched. On September 7th, Delta announced that effective December 1st, it will right-size its operations at Cincinnati-Northern Kentucky International Airport, its second-largest hub, to better match service to local passenger demand and to optimize the balance between local and connecting traffic. In addition, Delta also announced that its fall and winter schedules will have new or expanded service to 41 international destinations throughout its global network. These changes come as Delta also announced an increase in point-to-point flying and the addition of new Delta Connection carriers and routes. Delta will also need to reduce further its labor and retiree costs in order to compete.

## II.  Information Required by Local Rule 1007-2

51. Local Bankruptcy Rule 1007-2 requires certain information related to the Debtors, which is set forth below.

15

52. Although the Debtors have not engaged in any substantive discussions with any ad hoc committees in 2005, they have been contacted by counsel purporting to represent ad hoc committees of various creditor groups. These committees are (1) a group of creditors, including trade creditors and other non-bondholders, represented by John Wm. Butler, Jr. of Skadden, Arps, Slate, Meagher & Flom LLP, (2) a group of holders of unsecured bonds, represented by Dennis Dunne of Milbank, Tweed, Hadley & McCloy LLP and (3) a group of secured aircraft lenders represented by Peter Schellie of Bingham McCutchen LLP. The Debtors, through their counsel, provided certain confidential filing-related information to counsel for these committees on the day of the Debtors' chapter 11 filings.[3]

53. Set forth in Schedule 1 attached hereto is a list of the names and addresses of the creditors holding the thirty largest unsecured claims, excluding insiders, and where available, the name of the person familiar with the Debtors' account. This list also includes the amount of each claim, and if appropriate, an indication whether the claim is contingent, unliquidated, disputed, or partially secured, subject to the Debtors' rights to dispute the actual validity of any claims.

54. Set forth in Schedule 2 attached hereto is a list of the names and addresses of the Debtors' creditors holding the five largest secured claims. This list includes the amount of each claim, a brief description of the type of collateral securing the claim, an estimate of the value of the collateral and whether the claim or lien is disputed, subject to the Debtors' rights to dispute the actual validity of any claims.

55. A summary of the consolidated assets and liabilities of Delta as of June 30, 2005 is set forth in Schedule 3 attached hereto.

---

[3] Required pursuant to Local Rule 1007-2(a)(3).

56. Set forth in Schedule 4 attached hereto is a list of the number and classes of shares of stock, debentures, and other securities of Delta that are publicly held and, to the extent available, the number of holders thereof. Schedule 4 separately lists the shares of stock, debentures, and other securities of Delta held by each of the Debtors' officers and directors and the amounts so held.

57. As indicated in Schedule 5, the Debtors have property that is in the possession of various other persons, including maintenance providers, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledgees, assignees of rents, secured creditors, or agents. For example, the Debtors maintain various cash accounts with other persons or entities, including reserves with their workers' compensation carrier as set forth on the schedule. The Debtors also have a reversionary interest in funds they have placed into trust and escrow accounts to ensure payment of duly authorized pre- and post-petition taxes, fees and charges to various government and airport agencies. In addition to these properties referenced above and listed on Schedule 5, on any given day and in the ordinary course of business, property of the Debtors is likely to be in the possession of various other persons or entities in a manner that does not affect the Debtors' ownership interests in that property. In light of the constant movement of this property, providing a comprehensive list of property in the possession of another would be impractical if not impossible.

58. Set forth in Schedule 6 attached hereto is a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their business.

59. Set forth in Schedule 7 attached hereto is the approximate location of the Debtors' substantial assets, the location of their books and records, and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States.

60. Set forth in Schedule 8 attached hereto is the nature and present status of each action or proceeding, pending or threatened, against the Debtors where a judgment against the Debtors or a seizure of their property is imminent.

61. Set forth in Schedule 9 attached hereto are the names of the individuals who comprise the Debtors' existing senior management, a description of their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

62. The estimated amount of weekly payroll, on a consolidated basis, to be paid to employees (exclusive of officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors and financial and business consultants retained by the Debtors, for the thirty (30) day period following the filing of the Debtors' chapter 11 petitions is set forth in Schedule 10 attached hereto.

63. Set forth in Schedule 11 attached hereto are the estimated cash receipts and disbursements, net cash gain or loss, and unpaid obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the thirty (30) day period following the filing of the Debtors' chapter 11 petitions.

I respectfully request that all of the relief requested in the First Day Pleadings be granted and such other further relief as may be just.

I, the undersigned officer of Delta Air Lines, Inc., declare under penalty of perjury that the foregoing is true and correct.

New York, New York
Dated: _____ __, 2005

By: /s/ Edward H. Bastian
Name: Edward H. Bastian
Title: Executive Vice President-Finance &
Chief Financial Officer