DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 450-6539
John Fouhey, Esq. (JF 9006)
Marshall S. Huebner, Esq. (MH 7800)
Benjamin S. Kaminetzky, Esq. (BK 7741)

Attorneys for Debtors and
 Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                              :
                                                    :
                                                    :   **Chapter 11 Case No.**
                                                    :
**DELTA AIR LINES, INC., et al.,**                  :   **05-_____ (    )**
                                                    :
                                                    :
**Debtors.**                                        :   **(Jointly Administered)**
                                                    :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTORS' MOTION PURSUANT TO SECTIONS 105(a), 362(d) AND 365(a) OF THE BANKRUPTCY CODE AND RULE 6006 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR ORDER (i) APPROVING ASSUMPTION OF INTERLINE AGREEMENTS, CLEARINGHOUSE AGREEMENTS, ARC AGREEMENTS, BILLING AND SETTLEMENT PLAN AGREEMENTS, CARGO AGREEMENTS, AND UATP AGREEMENT, (ii) AUTHORIZING DEBTORS TO HONOR PREPETITION OBLIGATIONS RELATED TO SKYTEAM ALLIANCE AGREEMENTS, US CARGO SALES JOINT VENTURE AGREEMENT, DOMESTIC ALLIANCE AGREEMENTS, CODE SHARE AGREEMENTS, GDS AGREEMENTS, TRAVEL AGENCY AGREEMENTS, CARGO AGENCY AGREEMENTS, IN-TO PLANE SERVICE COMPANY CLAIMS, TECHNICAL SERVICES SALES AGENT AGREEMENTS, THE ATPCO AGREEMENT, FOREIGN DEEDS OF UNDERTAKING AND THE SAFI ARRANGEMENT AND (iii) MODIFYING THE AUTOMATIC STAY SOLELY TO THE EXTENT NECESSARY TO EFFECTUATE THE INTENDED RELIEF**

Delta Air Lines, Inc. ("**Delta**") and those of its subsidiaries that are debtors and debtors in possession (collectively, the "**Debtors**"),[1] respectfully represent:

## Background

1.      On the date hereof (the "**Petition Date**"), each Debtor commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have filed a motion seeking joint administration of these chapter 11 cases.

2.      Additional information about the Debtors' business and the events leading up to the Petition Date can be found in the Declaration of Edward H. Bastian, Executive Vice President and Chief Financial Officer of Delta, which is incorporated herein by reference.

## Jurisdiction

3.      This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and may be determined by the Bankruptcy Court.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The Debtors are the following entities:  ASA Holdings, Inc.; Comair Holdings, LLC; Comair, Inc.; Comair Services, Inc.; Crown Rooms, Inc.; DAL Aircraft Trading, Inc.; DAL Global Services, LLC; DAL Moscow, Inc.; Delta AirElite Business Jets, Inc.; Delta Air Lines, Inc.; Delta Benefits Management, Inc.; Delta Connection Academy, Inc.; Delta Corporate Identity, Inc.; Delta Loyalty Management Services, LLC; Delta Technology, LLC; Delta Ventures III, LLC; Epsilon Trading, Inc.; Kappa Capital Management, Inc.; and Song, LLC.

## **Relief Requested**

4.      The airline business is an interdependent industry that relies upon a network of agreements governing virtually all aspects of air travel and airline operations. Without agreements for coordination between airlines and airline services, efficient service by the airline industry to the traveling public would be virtually impossible. Among other things, these agreements facilitate cooperation among airlines for such critical activities as making reservations and transferring passengers, baggage, freight and mail between airlines.  Certain services under these agreements, such as the clearinghouse functions and nationwide reservation services, are the equivalent of industry wide cooperative services in that there is no readily available alternative.  The clearinghouse functions provide for the settlement of obligations that are owed among airlines and other travel-related entities that participate in the clearinghouses.  Any failure in the continuity of these relationships may well result in irreparable harm to the Debtors' ability to maintain their loyal customer base and essential relationships with their various tour operators, cargo agents and travel agents, clearinghouses, other airlines and certain other business entities essential to the preservation of the going concern value of the Debtors' business.

5.      Consequently, by this motion (the "**Motion**") the Debtors request approval pursuant to section 365 of the Bankruptcy Code to assume the Interline Agreements, the Clearinghouse Agreements, the ARC Agreements, the BSP Agreements, the Cargo Agreements, and the UATP Agreement (each as defined herein and, collectively, the "**Assumed Contracts**").  The Debtors also request authority to honor certain prepetition obligations and to continue honoring, performing and exercising their respective rights and obligations (whether prepetition or postpetition) in the ordinary course of business

and in accordance with the SkyTeam Alliance Agreements, the US Cargo Sales Joint Venture Agreement, the Domestic Alliance Agreements, the Code Share Agreements, the GDS Agreements, the Travel Agency Agreements, the Cargo Agency Agreements, the In-to Plane Service Company Claims, the ATPCO Agreement, the Foreign Deeds of Undertaking and the SAFI Arrangement (all as defined herein and, collectively, the "**Prepetition Obligations**"). Many of the Prepetition Obligations arise pursuant to executory contracts. The Debtors have not yet decided whether to assume or reject these executory contracts.

6. Finally, as set forth below, certain of the Assumed Contracts and the Prepetition Obligations provide for an ongoing mutual billing and settlement and adjustment process that necessarily entails continuing submission of billings to the Debtors and continuing setoffs of obligations owed to and obligations owed by the Debtors. The Debtors also request that the Court modify the automatic stay extant under section 362(a) of the Bankruptcy Code solely to the extent necessary to enable the counterparties to participate in routine billings and settlements in accordance with these Assumed Contracts and the Prepetition Obligations.

I.    **The Assumed Contracts**

A.    **The Interline Agreements**

7. Interline Agreements take two principal forms: multilateral and bilateral. Under a multilateral agreement, each signatory agrees to a similar interline relationship with each other signatory. In contrast, under bilateral agreements, two carriers typically contract directly for a reciprocal interline relationship.

8. The Debtors are parties to several multilateral agreements with or administered by the International Air Transport Association ("**IATA**"), including the

IATA Membership Agreement, the Interline Traffic Participation Agreement – Passenger, the Multilateral Interline Traffic Agreement – Passenger, Multilateral Agreements for Passenger and Cargo Interline Charges – United States, the Air Traffic Conference Interline Traffic Agreement – Passenger, and the Air Traffic Conference Interline Air Cargo Procedures Agreement (collectively, the "**IATA Agreements**").  The Debtors are also parties to the Air Transport Association of America ("**ATA**") membership application/agreement, the ATA Interline Traffic Agreement – Passenger, the 1995 Amendatory Agreement for the Exchange of Dishonored Check Data, the ATA Airline Freight Traffic Agreement and the Spec 2000 Participation Agreement (the "**ATA Agreements**") and to numerous bilateral interline agreements with other airlines relating to ticketing, baggage-handling and other services (the "**Bilateral Agreements,**" a list of which is attached hereto as Exhibit A,[2] and together with the IATA Agreements and the ATA Agreements, the "**Interline Agreements**").

9.      Under the typical interline agreement, one airline authorizes another airline to issue tickets for transportation by the authorizing airline.  These agreements enable airlines and travel agents to issue a single ticket that can be used for travel on more than one airline.  Interline Agreements also allow airline passengers whose flights are late or canceled to use their tickets with another airline for a substitute flight.  Most major airlines participate in interline agreements with other airlines because of the tremendous operating efficiencies obtained through their use.

_____

[2] The large number of Bilateral Agreements between the Debtors and other interline participants makes it extremely difficult to identify each and every Bilateral Agreement to which the Debtors are party. Accordingly, on Exhibit A the Debtors have listed each of the Bilateral Agreements they have been able to identify.  The Debtors wish to assume, and ask that the Court order the assumption of, any and all of their Bilateral Agreements whether or not listed on Exhibit A.

10.     Interline Agreements also facilitate the purchase of tickets through travel agents.  Interline Agreements allow travel agents and airlines to issue tickets with itineraries that involve more than one airline.  If an interline agreement were not in place, a traveler buying a ticket directly from an airline would be issued a ticket only for those segments of the itinerary that involve that airline, even though the desired itinerary might necessitate the use of a second airline.  Similarly, if the traveler sought to buy a ticket from a travel agent and no interline agreement were in place, the travel agent would be required to write separate tickets for each segment that involves distinct airlines, making it significantly less convenient for the travel agent to sell flights on an airline not part of the interline system.

11.     Interline Agreements allow passengers' luggage to be transferred from one airline to another.  By way of example, absent an interline agreement, a Delta passenger connecting to a United Airlines flight in Atlanta, Georgia, would have to retrieve his luggage at the Delta terminal at Hartsfield-Jackson airport, take it to the United Airlines terminal, and re-check it there.  This would be inefficient and time-consuming for passengers.  In a similar fashion, Interline Agreements allow for the efficient handling of cargo between airlines.  Airlines also agree to provide the Debtors with ground handling, special maintenance and skycap services pursuant to Interline Agreements.  These arrangements obviate extraneous cargo handling and the need to have separate personnel and facilities devoted to these services at each airport to which the Debtors fly.

12.     Some Interline Agreements expire every seven days and are renewed by an exchange of communications before their stated expiration date, unless they are cancelled by the Debtors, or the other party cancels them or allows them to expire.  The

Debtors are also a party to certain Interline Agreements that have an indefinite term but can be terminated on written notice periods varying from three to thirty days.  Currently, many bilateral interline agreements (including some to which the Debtors are party) automatically terminate every few days or weeks unless renewed by both parties.  In the case of Interline Agreements of short duration, these expirations will occur over the next few days or weeks.

13.  The Debtors' continued ability to enforce the Interline Agreements is critical to the Debtors' ability to continue operating their business.  The Debtors cannot afford the risk of any of the counterparties to the Interline Agreements questioning the Debtors' willingness or ability to continue participating in the Interline Agreements. Even the slightest interruption in the Debtors' ability to seamlessly integrate their ticketing, passenger, cargo and other services with those of other airlines could be disastrous to the Debtors' business.

14.  The Debtors request approval under section 365(a) of the Bankruptcy Code to assume the Interline Agreements, to renew and continue Interline Agreements, and to cure any defaults thereunder, including permitting interline creditors to complete mutual pre- and postpetition recoupments and offsets.  The assurance of uninterrupted participation under the Interline Agreements is critical to the Debtors' operations.

15.  The Debtors settle their obligations under the Interline Agreements through the Clearinghouses monthly, as described below.  The Debtors believe that they are not in default under any of the Interline Agreements. To the extent any defaults exist under any of the Interline Agreements, however, the Debtors have provided adequate assurance of future performance, required under section 365(b)(1)(C) of the Bankruptcy

Code, in that the Debtors have met or will meet all of their current obligations to these entities and expect to meet all of their future obligations. The Debtors have more than sufficient cash on hand and expect to have access to postpetition borrowings under a debtor in possession facility to satisfy all of their ongoing obligations under the Interline Agreements.

### B. The Clearinghouse Agreements

16. The Debtors and other participating carriers settle their mutual payment obligations arising under many of the Interline Agreements through clearinghouses: the IATA Clearinghouse (the "**ICH**"); and the Airlines Clearing House, Inc. (the "**ACH**", and together with the ICH, the "**Clearinghouses**"). The ACH conducts settlements primarily for participating airlines based in the United States and other countries in the Western Hemisphere. The ICH conducts settlements primarily for airlines that are based elsewhere. As a participant in the Clearinghouses, the Debtors settle interline obligations with other ACH participants through ACH and settle interline obligations with ICH participants through ACH and ICH as part of an interclearance process administered by the Clearinghouses. The Debtors' participation in the Clearinghouses is governed by agreements with each of the Clearinghouses, including the International Air Transport Association-Airlines Clearing House, Inc. Interclearing House Agreement and the Agreement Relating to Settlement of Interline Accounts through Airlines Clearing House, Inc. (the "**Clearinghouse Agreements**"). The Clearinghouse Agreements also include a recently executed agreement among the Debtors, IATA and ACH to provide, among other things, a reserve to protect IATA and the participants in the Clearinghouses and the BSPs (as defined herein), and to assure continued orderly processing and settlement of obligations under the IATA Agreements and sales and refunds made by travel agents.

17.     Monthly, each Clearinghouse aggregates billings from its participants to the Debtors, and from the Debtors to other participants, and calculates a net balance.  For any given month, based upon the net balance of the billings, the Debtors may be required to make net payments to the other participants in the Clearinghouses, or the Debtors may be entitled to receive net payments from the other participants in the Clearinghouses.

18.     Settlement among ACH participants for billings attributable to transactions in any given month occurs on or about the 28th calendar day of the month immediately following the transaction month.  Settlement among ICH participants for billings attributable to transactions in any given month normally occurs in the second week of the second month following the transaction month.  Clearinghouse settlements are based on un-audited (and in some cases estimated) billings.  As a result, billings that have been settled through the Clearinghouses remain subject to audit and adjustments under rejection/chargeback, rebilling and dispute resolution procedures set forth in applicable Clearinghouse rules.

19.     During 2004, the Debtors made cumulative net settlement payments of approximately $271 million through ACH and $183 million through ICH.  The Debtors are typically net debtors under the Clearinghouse Agreements because the Debtors and their agents issue more interline tickets for transportation on other airlines than do other airlines and their agents for transportation on the Debtors' flights.

20.     The Debtors request approval under section 365(a) of the Bankruptcy Code to assume the Clearinghouse Agreements and cure any defaults thereunder in the ordinary course of business, including permitting interline creditors to complete mutual prepetition and postpetition offsets with respect to the Interline Agreements.  The

Clearinghouse Agreements are critical to the Debtors' business operations. The Debtors' inability to preserve the Clearinghouse Agreements would render it impossible for the Debtors to settle payment obligations to other airlines arising under, among other agreements, many of the Interline Agreements. The assurance of uninterrupted participation under the Clearinghouse Agreements is essential to the Debtors' operations.

21. The Debtors believe that they are not in default under any of the Clearinghouse Agreements. To the extent any defaults exist under any of the Clearinghouse Agreements, however, the Debtors have provided adequate assurance of future performance, required under section 365(b)(1)(C) of the Bankruptcy Code, in that the Debtors have met or will meet all of their current obligations to these entities and expect to meet all of their future obligations. The Debtors have more than sufficient cash on hand and expect to have access to postpetition borrowings under a debtor in possession facility to satisfy all of their ongoing obligations under the Clearinghouse Agreements. As described in paragraph 16 above, the Debtors have also provided a reserve to assure orderly processing and settlement of obligations under the Clearinghouse Agreements.

## C. ARC Agreements

22. The Debtors are a party to certain agreements involving the Airlines Reporting Corporation (the "**ARC**"). The ARC relationship is comprised of two types of agreements. The first is the carrier services agreement (the "**Carrier Services Agreement**"), which is an agreement between the ARC and the Debtors. The second is the agent reporting agreement ("**Agent Reporting Agreement**", and together with the Carrier Services Agreement, the "**ARC Agreements**"), which is an agreement between the ARC, the parties to the Carrier Services Agreement and certain travel agents. The

Carrier Services Agreement was recently amended to provide, among other things, a deposit from the Debtors to adequately protect ARC for the continued orderly processing and settlement of sales and refunds made by travel agents.

23.     The ARC serves as a clearinghouse and enables the refund claims of, and commissions owed to, travel agencies to be offset against the funds owed to airlines from travel agencies.  The ARC submits travel agency-generated credit card sales to Debtors' various credit card processors, and contemporaneously notifies Debtors of such sales.

24.     The majority of travel agents located in the United States are members of the ARC.  The ARC is the mechanism through which travel agents and airlines settle accounts for tickets sold, accepted for exchange, or refunded by travel agents.  Under the ARC Agreements, a participating travel agent's obligations to an airline are netted against the travel agent's claims against the airline, and the net amounts due to the airline and from the travel agent are paid in lump sums.

25.     The Debtors are net creditors of travel agents through the ARC, as they have consistently been owed more money through the ARC than they owe travel agents for commission adjustments and ticket refunds.

26.     If the Debtors are not permitted to assume their obligations under the ARC Agreements, the ARC might suspend offsets of prepetition travel agency refund claims that have not been processed before the Petition Date.  As more specifically explained below, the Debtors request that the Court modify the automatic stay to the extent necessary to permit the ARC to follow its normal procedures for settling accounts.

27.     The continuation of offsets pursuant to the ARC Agreements will help to preserve travel agency remittances to the Debtors.  Furthermore, if the ARC Agreements

are not assumed and the offset arrangements are not honored, the Debtors believe that travel agents — even those not owed any refunds on the Petition Date — will not remit the full amount of their receipts from postpetition sales.  The travel agents may do this in order to establish, by self-help, reserves against the possibility that they will subsequently be asked by their customers to make refunds of prepetition tickets.

28.     The Debtors must maintain the confidence of travel agencies so that the agents will continue to sell the Debtors' services to the traveling public.  The Debtors' assumption of the ARC Agreements is essential to the Debtors' ability to conduct business with travel agents.  The sales revenue generated by these travel agents pursuant to the ARC Agreements far exceeds the aggregate prepetition claims under these agreements.

29.     For the reasons stated, the Debtors request approval pursuant to section 365(a) of the Bankruptcy Code to assume the ARC Agreements and cure any defaults thereunder, including the completion of any mutual offsets.  The Debtors settle with the ARC weekly and do not believe that they are in default under any of the ARC Agreements.  To the extent any defaults exist, however, the Debtors have provided adequate assurance of future performance, required under section 365(b)(1)(C) of the Bankruptcy Code, in that the Debtors have met or will meet all of their current obligations to these entities and expect to meet all of their future obligations.  The Debtors have more than sufficient cash on hand and expect to have access to postpetition borrowings under a debtor in possession facility to satisfy all of their ongoing obligations to these entities.  Moreover, since the Debtors are net creditors of travel agents through

the ARC, adequate assurance of future performance by the Debtors should not include an obligation to show a financial ability to perform.

### D. The BSP Agreements

30.     The Debtors also participate in certain IATA billing and settlement plan regions (the "**BSPs**"), which facilitate international sales transactions similar to those domestic sales transactions facilitated by the ARC Agreements. BSPs are organized to facilitate sales by foreign travel agents of the Debtors' transportation services and are the means by which payments for tickets sold by foreign travel agents are settled. In addition to the BSPs, the Debtors appoint international travel agents through the IATA Passenger Agency Agreement (plus separate addenda in some cases) (collectively, the "**IATA Passenger Agency Agreements**"). Similar to the ARC Agent Reporting Agreement, the IATA Passenger Agency Agreements create a vertical principal/agency relationship between the Debtors and certain international travel agents. Debtors participate in these BSPs through a contract with IATA called the "**BSP/IATA Agreement**". Settlement is facilitated through an agreement with the IATA Currency Clearing Service (together with the BSP/IATA Agreement and the IATA Passenger Agency Agreements, the "**BSP Agreements**").

31.     The BSPs serve as clearinghouses and enable refund claims of, and commissions claimed by, foreign travel agencies to be offset against funds owed to airlines from foreign travel agencies. The BSPs submit foreign travel agency-generated credit card sales to Debtors' various credit card processors and contemporaneously notify Debtors of such sales. Under the BSP Agreements, a participating foreign travel agent's obligations to an airline are netted against the travel agent's claims against the airline,

and the net amounts due to the airline and from the foreign travel agencies are paid in lump sums.

32.     The Debtors are net creditors of foreign travel agents through the BSPs. The Debtors are consistently owed more money through the BSPs than they owe foreign travel agents for adjustments and ticket refunds.

33.     If the Debtors are not allowed to assume their obligations under the BSP Agreements, parties to the BSP Agreements could attempt to suspend offsets of prepetition travel agency refund claims that have not been processed before the Petition Date.  As more specifically explained below, the Debtors request that the Court modify the automatic stay to the extent necessary to permit parties to the BSP Agreements to follow their normal procedures for settling accounts.

34.     Permitting these offsets will generate substantial additional foreign travel agency remittances to the Debtors.  Furthermore, if the BSP Agreements are not assumed and the offset arrangements honored, the Debtors believe that foreign travel agents — even those not owed any refunds on the Petition Date — will not remit the full amount of their receipts from postpetition sales.  The foreign travel agents may do this in order to establish, by self-help, a reserve against the possibility that they will subsequently be asked by their customers to refund prepetition tickets.  To the extent that these foreign travel agents are beyond the Court's reach, absent assumption the Debtors may be unable to command the foreign travel agents' continued performance under their contracts with Debtors.

35.     The Debtors must also sustain the confidence of the foreign travel agencies so that foreign travel agents will continue to sell the Debtors' services to the

traveling public.  The Debtors' assumption of the BSP Agreements is essential to the Debtors' ability to conduct business with foreign travel agents.  The sales revenue generated by these travel agents pursuant to the BSP Agreements far exceeds the aggregate prepetition claims under these agreements.

36.     For the reasons stated, the Debtors request approval pursuant to section 365(a) of the Bankruptcy Code to assume the BSP Agreements and cure any defaults thereunder, including the completion of any mutual offsets.  The Debtors do not believe that they are in default under any of the BSP Agreements.  To the extent any defaults exist pursuant to any of the BSP Agreements, however, the Debtors have provided adequate assurance of future performance, required under section 365(b)(1)(C) of the Bankruptcy Code, in that the Debtors have met or will meet all of their current obligations to these entities and expect to meet all future obligations.  The Debtors have more than sufficient cash on hand and expect to have access to postpetition borrowings under a debtor in possession facility to satisfy all of their ongoing obligations to these entities.  Moreover, since the Debtors are net creditors of foreign travel agents through the BSP Agreements, adequate assurance of future performance by the Debtors should not include an obligation to show a financial ability to perform.

E.     **Cargo Agreements**

37.     The Debtors are party to various agreements with cargo sales agents (the "**Cargo Agents**"), pursuant to which Cargo Agents sell the Debtors' cargo services. These Cargo Agents are customarily entitled to a commission or other compensation on account of their services, and such sales are reported to Cargo Network Services Corp. a/k/a CASS-USA ("**CNS**") in the United States and internationally through various Cargo Agency Settlement Systems ("**CASS**") regions.  The Debtors are parties to certain

executory contracts with CNS (the **"CNS Agreements"**) and with IATA for each CASS region in which the Debtors participate (the **"CASS Regions"**), which are the means by which the Debtors' sales of cargo services by cargo intermediaries in the United States and abroad are reported and the Debtors' accounts with numerous cargo intermediaries are settled.  In 2004, the Debtors received net payments through CNS totaling approximately $66 million.  The Debtors on average owe approximately $2,800 per month to the various CASS, and payments are generally one month in arrears.  However, the amount of the Debtors' revenue processed through the various CASS each year totals approximately $73 million.  Because these agreements are critical to the Debtors' ability to sell their services, it is essential that the Debtors continue to participate in CNS and the various CASS.

38.     The Debtors are also parties to the Multilateral Interline Traffic Agreement – Cargo (the "**Cargo Interline Agreements**"), and the Multilateral Agreements for Interline Cargo Claims (the "**Interline Cargo Claims Agreements**", and together with the Cargo Interline Agreements, the "**Cargo Payment Agreements**").  The Cargo Payment Agreements establish the structure of Debtors' cargo relationships with other airlines and their agents and the relevant payment terms.  Without the Cargo Payment Agreements, the Debtors would not be able to operate their cargo business.  Therefore, the costs associated with the Cargo Payment Agreements are far outweighed by the revenue generated by the Debtors' cargo business.

39.     The Debtors request approval pursuant to section 365 of the Bankruptcy Code to assume the CNS Agreements, the agreements for the CASS Regions,  and the Cargo Payment Agreements (together, the **"Cargo Agreements"**) and to cure any

defaults thereunder, including the completion of any mutual offsets. The Debtors do not believe that they are in default under any of the Cargo Agreements. To the extent any defaults exist in connection with any of the Cargo Agreements, the Debtors have provided adequate assurance of future performance, required under section 365(b)(1)(C) of the Bankruptcy Code, in that the Debtors have met all of their obligations to these entities and expect to meet all such obligations in the future. The Debtors have more than sufficient cash on hand and expect to have access to postpetition borrowings under a debtor in possession facility to satisfy all of their ongoing obligations to these entities.

### F. The UATP Agreement[3]

40. The Universal Air Travel Plan (the "**UATP**") is a program under which participating "contractor" airlines, including the Debtors, issue "UATP Cards" or "Air Travel Cards" (the "**UATP Cards**") to corporate subscribers, whose personnel can use the cards to pay for tickets and other travel services purchased through participating airlines ("**ticketors**") and through travel agents. Under the Amended and Restated UATP Participation Agreement among Universal Air Travel Plan, Inc., Delta and other UATP participants (the "**UATP Agreement**"), the Debtors both issue UATP Cards and honor UATP Cards.

41. Each airline that is a ticketor or contractor under the UATP Agreement (collectively, the "**UATP Participants**") is responsible for administering its own UATP program including subscriber account approval, card issuance, billing, servicing and collection of payments from subscribers.

---

[3] Contemporaneously herewith, the Debtors filed a motion pursuant to section 107(b) of the Bankruptcy Code and rule 9018 of the Federal Rules of Bankruptcy Procedure for authority to file certain executory credit card agreements under seal to protect the confidentiality of the terms and conditions of those agreements. Consequently, the UATP Agreement at Exhibit B to this Motion has been filed under seal.

42.     Information on ticket purchases charged to the UATP Card is processed through the Air Travel Card Acquiring Network ("**ATCAN**").  ATCAN electronically gathers information on sales charged to the UATP Card and consolidates the information for reporting to the respective UATP Participants.

43.     The Debtors collect directly from their subscribers for all charges made on the UATP Cards the Debtors issue.  UATP participants settle with one another through the ACH and/or ICH processes described in paragraphs 17-18 above.  For example, when a passenger purchasing a ticket issued by United Airlines charges that ticket with a UATP Card issued by Delta, United Airlines, as the ticketor, will bill and collect from Delta, as the contractor, through ACH.  Similarly, when a passenger purchasing a ticket issued by Delta charges the ticket on a UATP Card issued by United Airlines, Delta, as the ticketor, will bill and collect from United Airlines, as the contractor, through ACH.  As of June 30, 2005, the Debtors' outstanding UATP receivables due from subscribers totaled approximately $21 million.  Total UATP charges collected from subscribers over the last twelve months ending June 30, 2005 were approximately $210 million.  The Debtors' participation in UATP accounts for approximately 1.5% of all of the Debtors' ticket sales paid for with credit cards.

44.     The Debtors' participation in UATP is a significant source of passengers and revenue for the Debtors.  Therefore, the Debtors request authority to assume the UATP Agreement, and cure any defaults thereunder.[4]  The Debtors do not believe that

---

[4] The UATP Agreement is an executory contract that can be assumed under section 365(b), rather than a financial accommodation contract that may not be assumed under section 365(c)(2).  *See In re United Airlines, Inc.*, 368 F.3d 720 (7th Cir. 2004) (holding that a credit card processing agreement that is substantially similar to the UATP Agreement is not a financial accommodation contract as that term is used in section 365(c)(2), and may therefore be assumed pursuant to section 365(a)); *see also In re Thomas B. Hamilton Co.*, 969 F.2d 1013 (11th Cir. 1992).

they are in default under the UATP Agreement. To the extent any defaults exist under the UATP Agreement, however, the Debtors have provided adequate assurance of future performance, required under Section 365(b)(l)(C) of the Bankruptcy Code, because the Debtors have met all of their obligations to these entities and expect to meet all such obligations in the future. Further, the Debtors have more than sufficient cash on hand and expect to have access to postpetition borrowings under a debtor in possession facility to satisfy all of their ongoing obligations to such entities.

## II.    The Prepetition Obligations

45.    The Debtors are parties to numerous other agreements including the SkyTeam Alliance Agreements, US Cargo Sales Joint Venture Agreement, Domestic Alliance Agreements, Code Share Agreements, GDS Agreements, Travel Agency Agreements, Cargo Agency Agreements, In-To Plane Service Company Claims, the ATPCO Agreement, Foreign Deeds of Undertaking and the SAFI Agreement (each as more fully described herein). These agreements are essential to the Debtors' business. Should the Debtors fail to pay prepetition obligations owed to the parties pursuant to the foregoing agreements, these parties may refuse or delay continuing to do business with the Debtors. If the Debtors were to lose these relationships, their revenue and reputation would suffer and their ability to continue to operate within the airline industry and, thus, reorganize, would be in jeopardy. The Debtors believe that if they are not authorized to pay prepetition obligations relating to these agreements in the ordinary course of business, the counterparties may have no incentive to continue to provide services to the Debtors or may attempt unilateral self-help measures to protect their interests. Regardless of whether such actions are legally proper, any disruption in the Debtors' businesses, even for a short time, would be catastrophic. As a result, it is essential that the Debtors be

authorized, but not directed, to pay the prepetition obligations arising under the foregoing agreements in the ordinary course of business.

A.   **The SkyTeam Alliance Agreements and US Cargo Sales Joint Venture Agreement**

46.    Prior to the Petition Date, the Debtors entered into a series of bilateral and multilateral agreements (the "**SkyTeam Alliance Agreements**") with eight carriers: Air France, AeroMexico, Korean Air, CSA Czech Airlines, Alitalia, Continental Airlines, Northwest Airlines and KLM Royal Dutch Airlines (the "**SkyTeam Alliance**") for cooperative marketing efforts. The SkyTeam Alliance Agreements provide numerous benefits to the Debtors and their customers, including reciprocal code share arrangements, the ability of the Debtors' customers to accrue and redeem frequent flyer miles on flights of other SkyTeam Alliance members, reciprocal airport lounge access and cargo services. The Debtors generate approximately $209 million per year as a result of being a member of the SkyTeam Alliance.

47.    The Debtors also, along with SkyTeam Alliance participants Air France and Korean Air (together with the Debtors, the "**Members**") in August 2001 entered into an agreement (the "**US Cargo Sales Joint Venture Agreement**") to jointly form a limited liability company (the "**JV**") to exclusively market all U.S. export air freight capacity of the Members.  The purpose of the JV is to combine the Members' existing network and sales strengths in order to increase service offerings, enhance revenue opportunities, reduce costs and improve competitiveness in the U.S. export air freight industry.  The JV acts as the exclusive general sales agent of each of the Members in the United States for their respective U.S. export freight capacity; thus, the Debtors rely on

the JV as sole sales agent for U.S. export (excluding Canada) air freight capacity. The Debtors' employees who previously performed these functions solely for the Debtors have been seconded to the JV in order to perform these same functions for the benefit of all three of the Members. Without the JV providing these services, the Debtors would be at substantial risk of losing significant amounts of revenue from the lack of U.S. export cargo sales. For the twelve months ending June 30, 2005, the JV, as Debtors' U.S. export air freight sales agent, generated approximately $78.1 million in air freight revenue for the Debtors.

48.     By this Motion, the Debtors seek authority, but not direction, to pay prepetition obligations under the SkyTeam Alliance Agreements and the US Cargo Sales Joint Venture Agreement and to continue honoring the SkyTeam Alliance Agreements and the US Cargo Sales Joint Venture Agreement in the ordinary course of business.

**B.     Domestic Alliance Agreements**

49.     Prior to the Petition Date, the Debtors entered into a series of bilateral and multilateral agreements with Continental Airlines, Inc. and Northwest Airlines, Inc. (the "**DL/CO/NW Alliance Agreements**") and Alaska Airlines, Inc. (together with Continental and Northwest, the "**Domestic Alliance Airlines**") for cooperative marketing efforts (the agreement with Alaska Airlines and the DL/CO/NW Alliance Agreements together the "**Domestic Alliance Agreements**"). The Domestic Alliance Agreements provide numerous benefits to the Debtors and their customers, including reciprocal code share arrangements, the ability for the Debtors' customers to accrue and redeem frequent flyer miles on flights of the Domestic Alliance Airlines and have reciprocal airport lounge access. The Debtors generate in excess of $90.9 million per year as a result of the

Domestic Alliance Agreements. Accordingly, the Debtors seek authority, but not direction, to pay prepetition obligations under the Domestic Alliance Agreements and to continue honoring the Domestic Alliance Agreements in the ordinary course of business.

### C. Code Share Agreements

50. The Debtors have air service agreements (the "**Code Share Agreements**") with certain commuter and other airlines, other than the SkyTeam Alliance Airlines and the Domestic Alliance Airlines, including, but not limited to, Air Jamaica, Avianca, China Airlines, China Southern, El Al Israel Airlines, Horizon, Royal Air Moroc, and South African Airways (collectively, the "**Code Share Airlines**"), whereby such airlines offer air transportation of passengers and/or cargo between certain airports and the Debtors' hub airports.

51. Continuing the Debtors' relationships with the Code Share Airlines is vital to the Debtors' operations because those relationships enable the traveling public to make convenient connections at the Debtors' hubs for, among other things, various international flights and smaller domestic destinations. Without such connections, the Debtors would be unable to maintain acceptable levels of passengers and cargo traffic. Certain of the financial obligations to the Code Share Airlines are paid through the Clearinghouses. The average net passenger revenue per month for the twelve months ending June 30, 2005 under the Code Share Agreements is approximately $3.23 million (this number represents the passenger revenue generated by passengers flying the Code Share Airlines which is retained by the Debtors, less the payments made by the Debtors to the Code Share Airlines). Additionally, the Debtors realize valuable connecting revenue from the Code Share Agreements, which is generated by passengers connecting from a Code Share Airline flight to a Delta flight. The revenue generated by the Code

Share Agreements far outweighs the costs of the agreements. Accordingly, the Debtors seek authority, but not direction, to pay prepetition obligations under the Code Share Agreements and to continue honoring the Domestic Alliance Agreements in the ordinary course of business.

**D.    GDS Agreements**

52.    The Debtors are parties to several participation carrier agreements with various global distribution systems (the "**Global Distribution Systems**"), including Worldspan, Sabre, Amadeus Global Travel Distribution, Galileo, Topas, Axxess, INFINI, Abacus and others (the "**GDS Participation Carrier Agreements**"). Global Distribution Systems are computer systems, networks and databases that store, process and distribute information about available passenger air transportation. The Global Distribution Systems enable travel agents to accept and record bookings of those services from remote locations. In addition to storing information, the Global Distribution Systems also allow travel agents to make and confirm reservations, price and issue tickets automatically, and do the travel agencies' internal accounting.

53.    Airline ticket sales made through travel agents comprise approximately 70% of Debtors' air passenger transportation sales volume. Almost all travel agents in the United States subscribe to Global Distribution Systems.

54.    If the Debtors did not have access to the Global Distribution Systems, travel agents, in order to book tickets on the Debtors' airlines, would have to independently look up the flight, call the Debtors, write the ticket manually and complete the related accounting unassisted. The amount of effort involved in completing such a reservation would make it infeasible for travel agents to sell tickets on Debtors' airlines. The obligations incurred under the GDS Participation Carrier Agreements are paid

through the Clearinghouses.  For the six months ending June 30, 2005, the Debtors on average owed approximately $32 million per month pursuant to the GDS Participation Carrier Agreements.  The Global Distribution Systems' monthly charges are paid through the Clearinghouses, generally two months after the charges are incurred (e.g., charges for June are paid in August).

55.     Because the vast majority of the Debtors' air passenger transportation volume is derived from sales that are processed through Global Distribution Systems, these systems are crucial to the Debtors' business and the Debtors request the authority to pay all prepetition obligations under the GDS Participation Carrier Agreements.

### E.     Travel Agency Agreements

56.     The continued support of travel agents, both traditional and online, is essential to the Debtors' successful reorganization.  The Debtors are parties to various agreements related to their travel agency network, including:  (a) backend incentive agreements, (b) volume-based incentive agreements, (c) point-of-sale agreements, (d) block seat agreements, (e) online agency agreements, (f) opaque channel agreements, (g) general sales agents agreements and (h) the supplier link agreement.

57.     Consistent with most other airlines, the Debtors sell their tickets directly and through travel agents.  During the previous year, approximately 70% of all the Debtors' tickets sales were made by travel agents.  In the past, the Debtors generally paid travel agents a base commission payment for each ticket sold based on a percentage of the ticket price up to a pre-set maximum amount.  However, the Debtors essentially eliminated the base commission incentive structure and established a system based upon backend performance-based payments.  By early 2002, substantially all domestic travel agents with which the Debtors have agreements had been switched to performance-based

backend incentive payments (the "**Backend Incentive Agreements**"). Further, the Debtors generally no longer pay a base commission to travel agents located outside the United States and Canada for sales of tickets for travel originating in the United States and Canada.

58.     Under these agreements, the travel agency is required to establish the Debtors as a preferred air carrier and actively promote the Debtors' services. In turn, the agency is entitled to a quarterly incentive award, paid directly by the Debtors to the agency in arrears after the close of the applicable calendar quarter, based upon their performance (measured by assessing actual versus projected sales) during the quarter.

59.     Certain foreign and online travel agents are also parties to agreements with the Debtors which provide volume-based incentives (the "**Volume-Based Incentive Agreements**"). Under these Volume-Based Incentive Agreements, the travel agency is entitled to a quarterly incentive award, paid directly by the Debtors to the agency in arrears after the close of the applicable calendar quarter, based upon the travel agency's achieving a revenue growth target for the applicable period.

60.     Debtors pay travel agents under Backend and Volume-Based Incentive Agreements quarterly. Incentive payments are generally made directly to the agents by the Debtors in the second month following the close of the applicable quarter. For example, incentives for the quarter ending March of 2005 were paid in May of 2005. The Debtors estimate that for the 1st quarter of 2005, their obligation under the Backend Incentive Agreements and Volume-Based Incentive Agreements was approximately $20 million. However, the revenue generated from the travel agencies with Backend and

Volume-Based Incentive Agreements during the 1st quarter of 2005 was approximately $1.37 billion.

61.     A smaller number of the travel agencies with which the Debtors have agreements are potentially entitled to certain bonus payments (the "**Point-of-Sale Agreements**").  The Point-of-Sale Agreements are normally in addition to the backend and volume-based payments provided above.  These bonuses are normally provided only for specific origination and destination pairings that are targeted in order to achieve certain goals, such as improving the Debtors' performance on underperforming routes, and are provided to certain travel agencies based upon the geographic market in which the specific travel agency operates.

62.     The Debtors also have agreements pursuant to which certain travel agents and other parties have the right to sell blocks of seats on certain flights (the "**Block Seat Agreements**").  These parties fall into four general categories: (a) cruise line operators, (b) group travel providers, (c) European tour operators and (d) charter flight groups.  The Block Seat Agreements with cruise line operators cover flights to and from locations from which cruises embark.  During the prime cruise travel season, Block Seat Agreements with cruise line operators account for a significant volume of seats.

63.     The Debtors have agreements with CheapTickets, Expedia, Travelocity and Orbitz (the "**Online Agency Agreements**"), for sales of Debtors' tickets over the Internet.[5]  Under the Online Agency Agreements, the online agencies are entitled to transaction fees for each ticket sold, which vary by agency.  The online agencies also agree to pay the Debtors' Global Distribution Systems fees in exchange for access and

---

[5] The Online Agency Agreement with Orbitz is known as the "Airline Charter Associate Agreement."

authority to sell the Debtors' fares that are available over the Internet. These agreements substantially reduce Debtors' Global Distribution Systems fees.

64.     Additionally, the Debtors sell tickets through certain "opaque" online travel agents, such as Priceline.com and Hotwire (the "**Opaque Channel Agreements**"). Under the Opaque Channel Agreements, the Debtors sell certain tickets, generally "distressed" inventory, to the online travel agents, who in turn sell to the public based on time of travel and origination and destination information, without revealing the name of the carrier. The online travel agent retains the difference between the Debtors' sale price and the price the online travel agent receives from its customer.

65.     Settlements under the Point-of-Sale Agreements, Block Seat Agreements, Online Agency Agreements and Opaque Channel Agreements are weekly, on Wednesday, through ARC, and are made 10 days in arrears. For example, payments due for a week ending on Sunday are settled on the second Wednesday that follows. For the first and second quarters of 2005, commissions paid under these agreements averaged approximately $879,510 per week. While commissions for these two quarters totaled approximately $22.9 million, the revenue generated from the travel agencies with Point-of-Sale Agreements, Block Seat Agreements, Online Agency Agreements and Opaque Channel Agreements during the first and second quarters of 2005 was in excess of $4.57 billion.

66.     The Debtors have sales representation agreements with various entities known as general sales agents ("**GSAs**") under which the Debtors have made each GSA its exclusive sales agent in a particular geographic region (the "**GSA Agreements**"). The purpose of the GSA Agreements is to allow the Debtors to sell tickets in foreign locations