DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, New York  10017
Telephone:  (212) 450-4000
Facsimile: (212) 450-6539
John Fouhey, Esq. (JF 9006)
Marshall S. Huebner, Esq. (MH 7800)
Benjamin S. Kaminetzky, Esq. (BK 7741)

Attorneys for Debtors and
  Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| In re: | : |
|  | : |
|  | : **Chapter 11 Case No.** |
|  | : |
| **DELTA AIR LINES, INC., et al.,** | : **05-17923 (pcb)** |
|  | : |
|  | : **(Jointly Administered)** |
| **Debtors.** | : |
|  | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## DEBTORS' MOTION PURSUANT TO SECTIONS 363(b) 365(a), 1107(a) AND 1108 OF THE BANKRUPTCY CODE AND RULE 6006 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR AUTHORIZATION TO ASSUME AND AMEND THE AMEX AGREEMENTS

Delta Air Lines, Inc. ("**Delta**") and those of its subsidiaries that are

debtors and debtors in possession in these proceedings (collectively, the "**Debtors**"),[1]

respectfully represent:

---

[1] The Debtors are the following entities:  ASA Holdings, Inc.; Comair Holdings, LLC; Comair, Inc.; Comair Services, Inc.; Crown Rooms, Inc.; DAL Aircraft Trading, Inc.; DAL Global Services, LLC; DAL Moscow, Inc.; Delta AirElite Business Jets, Inc.; Delta Air Lines, Inc.; Delta Benefits Management, Inc.; Delta Connection Academy, Inc.; Delta Corporate Identity, Inc.; Delta Loyalty Management Services, LLC; Delta Technology, LLC; Delta Ventures III, LLC; Epsilon Trading, Inc.; Kappa Capital Management, Inc.; and Song, LLC.

## Background

1.      On September 14, 2005 (the "**Petition Date**"), each Debtor commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have filed a motion seeking joint administration of these chapter 11 cases.

2.      Additional information about the Debtors' business and the events leading up to the Petition Date can be found in the Declaration of Edward H. Bastian, Executive Vice President and Chief Financial Officer of Delta, which is incorporated herein by reference.

## Jurisdiction

3.      The Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and may be determined by the Bankruptcy Court.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

4.      By this motion (the "**Motion**"), the Debtors seek authorization to assume the Amex Agreements (as defined below) as set forth on Exhibit A attached hereto, as amended by that Modification Agreement, dated September 15, 2005, by and among American Express Travel Related Services Company, Inc. ("**Amex**"), American Express Bank, F.S.B. ("**FSB**"), Delta Air Lines, Inc. ("**Delta**") and Delta Loyalty Management Services, LLC ("**DLMS**") (the "**Modification Agreement**") as set forth on Exhibit I attached hereto**,** pursuant to sections 363(b) and 365(a) of the

Bankruptcy Code and rule 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").[2]

      5.        Delta currently is a party to several agreements with Amex (the "**Amex Agreements**"):

    I.   The Airline Card Service Agreement, dated as of January 1, 2001 (together with all extensions, renewals, amendments, supplements, addenda (including the addenda dated October 22, 2004 and November 29, 2004), modifications, substitutions and replacements thereto and thereof) (collectively, the "**Card Service Agreement**").

    II.   The Delta® American Express® Co-Branded Credit Card Program Agreement, dated as of January 1, 2001 (together with all extensions, renewals, amendments, supplements (including the Co-Branded Supplement), addenda (including the addendum dated October 22, 2004), modifications, substitutions and replacements thereto and thereof) (collectively, the "**Co-Branded Card Agreement**").

    III.   The Membership Rewards Agreement, dated as of January 1, 2001 (together with all extensions, renewals, amendments, supplements (including the MR Supplement), addenda (including the addendum dated October 22, 2004), modifications, substitutions and replacements thereto and thereof) (collectively, the "**MR Agreement**").

    IV.   The Corporate Purchasing Card Account Agreement, dated December 1, 2001 (together with all extensions, renewals, amendments, supplements, addenda, modifications, substitutions and replacements thereto and thereof) (collectively, the "**Purchasing Card Agreement**").

    V.   The Multinational Corporate Card Account Agreement, dated as of December 1, 2002 (together with all extensions, renewals, amendments, supplements, addenda, modifications, substitutions and replacements thereto and thereof) (collectively, the "**Corporate Card Agreement**").

---

[2] Contemporaneously herewith, the Debtors filed a motion pursuant to section 107(b) of the Bankruptcy Code and rule 9018 of the Federal Rules of Bankruptcy Procedure for authority to file the Amex Agreements and the Modification Agreement under seal to protect the confidentiality of the terms and conditions of these agreements.

VI. The Crown Room Club Agreement, dated as of January 1, 2003 (together with the Addendum thereto).

VII. The Super Premium Card Partner Agreement, dated as of May 10, 1999 (together with the Addendum thereto).

**The Card Service Agreement**

6. Pursuant to the Card Service Agreement, Delta and Amex, among other things, permit Amex cardmembers ("**Cardmembers**") to charge goods and services on their Amex cards, including goods and services yet to be performed by Delta. The Card Service Agreement provides that, under certain circumstances, Amex is entitled to reimbursement from Delta for payments made to Delta for charges and Cardmembers are entitled to credits, and Amex is entitled to recoup, offset and deduct in the ordinary course of business the amount of such reimbursements and credits from sums otherwise payable to Delta. The underlying commercial terms of the Card Service Agreement are highly confidential.

7. In addition, under the terms of the Card Service Agreement, Amex is entitled to withhold payments owed by Amex to Delta to protect its financial exposure with respect to the Card Service Agreement upon the occurrence of certain conditions.

8. Because a majority of transactions involving the Amex Card are processed electronically, the Debtors normally receive payment from Amex on a timely and regular basis. In 2004, sales on Amex Cards accounted for approximately $6.11 billion, or 45 percent, of Delta's total credit card sales. The Debtors' reorganization efforts will be impeded without the revenues currently received pursuant to the Card Service Agreement.

**Co-Branded Card Agreement and the MR Agreement**

9.        Pursuant to the Co-Branded Card Agreement, the Debtors granted Amex and its affiliates the sole right to issue Amex Cards branded with the Delta logo (the "**Co-Branded Cards**") under the Delta/American Express SkyMiles Credit Card Program (the "**Co-Branded Program**").  Pursuant to the MR Agreement, the Debtors participate in the American Express Membership Rewards Program (the "**Membership Rewards Program**").

10.        Under the Co-Branded Program, holders of Co-Branded Cards (the "**Co-Branded Cardholders**") earn frequent flier miles ("**Miles**") under the Debtors' frequent flier program (the "**SkyMiles Program**") for every dollar charged using the Co-Branded Card.  Amex instructs the Debtors to post the corresponding Miles to the Co-Branded Cardholder's SkyMiles Program account, and Amex pays the Debtors a set amount monthly for each Mile the Debtors so post.  The Co-Branded Cardholder can then redeem the Miles for travel with the Debtors and certain other companies that participate in the SkyMiles Program.

11.        The Membership Rewards Program is a loyalty program run by Amex.  Under the Membership Rewards Program, Amex awards points to Membership Rewards Program members ("**Members**") for the use of certain Amex Cards other than the Co-Branded Card.  Members can redeem the points for various awards issued by Amex and other participants in the Membership Rewards Program.  One option available to a Member is to redeem Membership Rewards Program points for Miles, as the Debtors are participants in the Membership Rewards Program pursuant to the MR Agreement.  When a Member requests such an exchange, Amex deducts the points from the Member's Membership Rewards Program account, and instructs the

Debtors to post the corresponding Miles into the Member's SkyMiles Program account. Amex pays the Debtors a set amount monthly for each Mile the Debtors so post. The Member can then redeem the Miles for travel with the Debtors and certain companies that participate in the SkyMiles Program.

12.     Amex pays the Debtors hundreds of millions of dollars annually pursuant to the Co-Branded Card Agreement and the MR Agreement. These two agreements provide a substantial net benefit to the Debtors' business and are an important component of the Debtors' branding and customer loyalty initiatives. Failure to maintain these arrangements, and the revenue they provide, could seriously hamper the Debtors' reorganization efforts.

**Purchasing Card Agreement and Corporate Card Agreement**

13.     Amex and certain of the Debtors are parties to the Purchasing Card Agreement and the Corporate Card Agreement, pursuant to which Amex issues commercial card products which enable the Debtors' employees to charge business-related travel and entertainment expenses, and allow the Debtors to procure goods and services from third-party vendors, which are used in the ordinary course of the operation of the Debtors' business. These commercial card accounts are important to the Debtors' cash management and accounting functions. These cards are deeply embedded in the Debtors' daily operations and are used to purchase, among other things, spare engine parts and other maintenance needs, often on an emergency basis. Loss of the cards would seriously disrupt the Debtors' daily operations and inconvenience customers.

**Crown Room Club Agreement and Super Premium Card Partner Agreement**

14.     Amex and certain of the Debtors are also parties to the

Crown Room Club Agreement and the Super Premium Card Partner Agreement. Under the Crown Room Club Agreement, the Debtors provide access to Delta Crown Room clubs to holders of certain Amex Cards. Amex pays Delta a fixed fee for each such visit, as provided in the Crown Room Club Agreement. Pursuant to the Super Premium Card Partner Agreement, the Debtors extend privileges accorded under the Gold Medallion level of the SkyMiles Program to holders of "super premium" Amex Cards. Amex pays the Debtors a set fee for each holder of such Amex Cards so enrolled as a Gold Medallion level participant in the SkyMiles Program. The Crown Room Club Agreement and the Super Premium Card Partner Agreement result in significant revenue for the Debtors and increase brand loyalty.

**The November 2004 Advance Payment Transaction: the Supplements**

15.     In November 2004, as part of a complex consensual restructuring of Delta's financial affairs, the Debtors and Amex entered into a transaction (the "**Advance Payment Transaction**") whereby (i) pursuant to the supplement to the Co-Branded Card Agreement (the "**Co-Branded Supplement**") and the supplement to the MR Agreement (the "**MR Supplement**"), each dated as of November 30, 2004 (together, the "**Supplements**"), Amex paid $500 million (the "**Advance Payments**") to Delta as an advance payment for the purchase price of Miles to be purchased by Amex in the future under the Co-Branded Card Agreement and the MR Agreement, (ii) certain of Delta's subsidiaries (in such capacity, the "**Guarantors**"), executed guaranties of Delta's "Obligations" (as such term is defined in the Supplements) in favor of Amex for the benefit of Amex and FSB[3] (the "**Guaranties**") (iii) pursuant to certain security

---

[3] FSB only executed the Co-Branded Supplement because it is a party to the Co-Branded Card Agreement and will only be a party to the Modification Agreement in such capacity. FSB has no obligations under the

agreements (collectively, the "**Security Agreements**"), Delta, DLMS and the Guarantors granted to Amex liens, offset rights, recoupment rights, and security interests in certain of their assets (as described with greater specificity below, the "**Pre-Petition Collateral**") as security for their Obligations to Amex, including Obligations arising pursuant to the Co-Branded Card Agreement, the MR Agreement and the Card Service Agreement or otherwise arising in respect of the Advance Payment Transaction and (iv) Amex received the right to award a significant number of additional Miles to Cardholders at the Debtors' expense.

16.     Also in November 2004, Delta entered into that certain Credit Agreement, dated as of November 30, 2004 (the "**Credit Agreement**") with General Electric Capital Corporation as Revolving Facility Administrative Agent, Term Loan Administrative Agent, Collateral Agent and Lender ("**GE Capital**"), and the financial institutions from time to time lenders party thereto (the "**Pre-Petition Lenders**").  Delta's obligations under the Credit Agreement were guaranteed by certain of its domestic subsidiaries.  The Credit Agreement provided for maximum borrowings of $630 million under a $330 million term loan and a $300 million revolving line of credit (the "**Pre-Petition Credit Facility**").  As of the Petition Date, there was approximately $480 million outstanding under the Pre-Petition Credit Facility.

17.     The Pre-Petition Collateral consists of two separate groups of assets.  The *first* group of assets is comprised, excluding certain specified assets, of (a) substantially all of the assets of DLMS related to the Co-Branded Card Agreement and the MR Agreement or the SkyMiles Program, including without limitation, payment

Co-Branded Supplement and has no obligations under the Modification Agreement by virtue of its execution of such documents.

intangibles and rights under the Co-Branded Card Agreement and the MR Agreement, and (b) all right, title and interest of Delta in the Co-Branded Card Agreement and the MR Agreement and the Card Service Agreement (subject to the provisions of section 6 of that certain Intercreditor Agreement by and between Amex and GE Capital dated as of November 30, 2004 (the "**Intercreditor Agreement**")) (collectively, the "**SkyMiles Collateral**"). The *second* group of assets is comprised of substantially all of the Guarantors' assets other than (i) the SkyMiles Collateral, (ii) assets that were encumbered as of November 30, 2004 and (iii) other specified excluded assets (collectively, the "**Pre-Petition Credit Facility Collateral**").

18. The Pre-Petition Collateral secured both the Advance Payment Transaction and the Pre-Petition Credit Facility. Pursuant to the Intercreditor Agreement, among other things, Amex and GE Capital agreed that as between themselves, (i) in and with respect to the SkyMiles Collateral, Amex would have senior and prior lien priority with respect to the Advance Payment Transaction and the Card Service Agreement, and GE Capital as Collateral Agent would have junior and subordinate lien priority with respect to the Pre-Petition Credit Facility, and (ii) in and with respect to the Pre-Petition Credit Facility Collateral, GE Capital as Collateral Agent would have senior and prior lien priority with respect to the Pre-Petition Credit Facility, and Amex would have junior and subordinate lien priority with respect to the Advance Payment Transaction.

19. The Advance Payment Transaction anticipated the possibility that, notwithstanding the additional liquidity provided to the Debtors by the Advance Payment Transaction and the Pre-Petition Credit Facility, Delta might need to seek relief

under the Bankruptcy Code, and accordingly the parties pre-negotiated the nature of their consent to certain of the terms of debtor-in-possession financing and adequate protection that would be sought from the bankruptcy court in such event. Pursuant to the Supplements and the Intercreditor Agreement, Amex agreed that it would consensually subordinate its junior and subordinate interests in the Pre-Petition Credit Facility Collateral by an agreed-upon sum subject to certain conditions, including the Debtors' assumption of the Co-Branded Card Agreement and the MR Agreement (each as amended by the Supplements) and the Card Service Agreement (as amended by the "Chapter 11 Addendum to the Card Service Agreement" in the form attached to the Co-Branded Supplement as Exhibit VIII thereto) pursuant to final order of the Court.

**Amending the Amex Agreements: The Modification Agreement**

20. On September 9, 2005, Amex began establishing a special cash reserve by withholding payments owed by Amex to Delta under the Card Service Agreement (the "**Special Cash Reserve**").

21. After intense negotiations, which included Amex agreeing to irrevocably subordinate all of its liens in certain substantial collateral to the DIP Facility (as defined below), conditioned upon, among other things, assumption of the Amex Agreements, the parties agreed to enter into the Modification Agreement, whereby Amex agrees, *inter alia*, to (i) suspend withholding payments into the Special Cash Reserve under the Card Service Agreement after the seventh day of Delta's bankruptcy case, and recommence the funding of the Special Cash Reserve up to $350 million in the aggregate (inclusive of amounts held as of the seventh day of the case) only if the order attached

hereto has not become final and non-appealable by October 11, 2005,[4] (ii) release the entire amount of the Special Cash Reserve upon the satisfaction of certain specified conditions, including the order in the form attached hereto (the "**Order**") becoming final and non-appealable and (iii) amend the trigger events giving rise to Amex's rights to establish cash reserves under the Card Service Agreement pursuant to the Chapter 11 Addendum to the Card Service Agreement as set forth on Schedule 3(a)(1) of the Modification Agreement attached hereto as Exhibit I.

        22.        In addition, pursuant to the Modification Agreement, Amex has irrevocably agreed to subordinate all of its liens in certain substantial collateral to a secured debtor-in-possession financing facility with, among others, GE Capital in an amount not to exceed $1.7 billion (the "**DIP Facility**") upon the entry of the Order and the interim authorization of the Amex DIP Loan (defined below).  Pursuant to the DIP Facility, approximately $480 million of the proceeds thereof is to be used to repay the Pre-Petition Credit Facility in full, and approximately an additional $500 million of the proceeds thereof is to be used to repay the Advance Payments in full.  Contemporaneous with the repayment of the Advance Payments, Amex will make a loan of $350 million to Delta (the "**Amex DIP Loan**"), the payments with respect to such repayment and loan to be made on a net basis, and such loan will be repaid in accordance with the Co-Branded Supplement and MR Supplement, each as amended by the Modification Agreement.

        23.        The Debtors' ability to obtain the DIP Facility is greatly facilitated by Amex's consent to subordinate all of its liens in certain substantial

---

[4] The Special Cash Reserve is without prejudice and subject to Amex's other rights to hold cash reserves if Amex otherwise has rights to do so under the Card Service Agreement, as amended by the Chapter 11 Addendum to the Card Service Agreement, which rights remain separate and independent of the parties' agreements with respect to the Special Cash Reserve.

collateral,[5] and Amex's agreement to so consent is contingent upon the entry of the Order

and the interim authorization of the Amex DIP Loan. Amex's consent to subordinate all

of its liens in certain substantial collateral in favor of the DIP Facility in an amount not to

exceed $1.7 billion avoids the cost and uncertainty of litigation – which prevents an

exceedingly serious risk to this entire estate – before the Court with respect to "priming",

valuation and adequate protection under section 364 of the Bankruptcy Code and

substantially enhances the Debtors' reorganization prospects at the critical early stage of

the bankruptcy case. The Debtors cannot survive without substantial incremental

financing and the complex transactions being presented to the Court provide the Debtors

with sufficient finding to execute their business plan in chapter 11.

### Executory Contracts Are Assumed
### Pursuant to Debtor's Business Judgment

24.     Section 365(a) of the Bankruptcy Code provides that a debtor in

possession, "subject to the Court's approval, may assume . . . any executory contract or

unexpired lease of the debtor." 11 U.S.C. § 365(a). It is clear that the Amex Agreements

are executory contracts under section 365 because both parties have continuing

obligations to perform under the contracts.

25.     In addition, the only two federal Courts of Appeal that have

adjudicated the issue have held that a credit card processing agreement is not a financial

accommodation contract and can therefore be assumed under section 365(c)(2). *See In re*

*United Airlines, Inc.*, 368 F.3d 720, 724 (7th Cir. 2004) (holding that a credit card

---

[5] Amex will continue to maintain its first priority lien on the SkyMiles Collateral, and nothing in the DIP Facility shall prejudice or impair any of Amex's contractual, legal and equitable rights arising under the Amex Agreements (including without limitation Amex's right to establish cash reserves under the Card Service Agreement, as amended by the Modification Agreement), except as specifically agreed to by Amex and ordered by the Court.

processing agreement is not a financial accommodation contract within the meaning of section 365(c)(2) and therefore can be assumed pursuant to section 365(a)); *see also In re Thomas B. Hamilton Co., Inc.*, 969 F.2d 1013, 1020-22 (11th Cir. 1992) (concluding that a credit card processing agreement does not constitute a contract to extend financial accommodations); *In re Best Products, Inc.*, 210 B.R. 714, 718 (Bankr. E.D. Va. 1997) (relying on *In re Thomas B. Hamilton Co., Inc.* and concluding that a traditional credit card agreement does not constitute a financial accommodation).[6]

26.      The standard to be applied by a court in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which is premised upon the debtor's business judgment that assumption would be beneficial to its estate. *See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures)*, 4 F.3d 1095, 1099 (2d Cir. 1993). "More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

27.      Upon finding that a debtor has exercised its sound business judgment in determining that assumption of an agreement is in the best interests of its estate, the Court should approve the assumption under section 365(a) of the Bankruptcy Code. *See, e.g., In re Child World, Inc.*, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992); *In re*

---

[6]  Although it could be argued that there are significant distinctions between the Card Service Agreement and a merchant processing agreement, Delta submits that for the purposes described herein the Card Service Agreement should be considered assumable.  Although it does not in any way concede that the decisions cited above were correctly decided or should in any event be applied to the Card Service Agreement, Amex supports the relief sought by this Motion.

*Ionosphere Clubs, Inc.*, 100 B.R. 670, 673 (Bankr. S.D.N.Y. 1989); *In re TS Indus., Inc.*, 117 B.R. 682, 685 (Bankr. D. Utah 1990); *In re Del Grosso*, 115 B.R. 136, 138 (Bankr. N.D. Ill. 1990).

28.     In other large, complex chapter 11 cases involving debtors that rely on credit card sales for a substantial portion of their revenue, courts have routinely granted the debtor authorization to assume their agreements with credit card companies upon the commencement of a chapter 11 case.  *See, e.g., In re Hawaiian Airlines*, *Inc.*, Case No. 03-00817 (Bankr. Haw. Mar. 21, 2003); *In re UAL Corp., et al.*, Case No. 02-48191 (Bankr. N.D. Ill. Dec. 9, 2002); *In re US Airways Group, Inc., et al.*, Case No. 02-83984 (Bankr. E.D. Va. Aug. 11, 2002); *In re Trans World Airlines, Inc.*, Case No. 01-00056 (Bankr. D. Del. Jan. 12, 2001).

### The Debtors' Business Judgment Dictates<br>the Assumption of the Amex Agreements

29.     Pursuant to their best business judgment, the Debtors have determined that the assumption of the Amex Agreements, as amended by the Modification Agreement, is in the best interests of the Debtors and their estates.  Nearly half of all credit card sales made by Delta are processed under the Card Service Agreement.  In addition, Amex pays the Debtors hundreds of millions of dollars annually pursuant to the Co-Branded Card Agreement and the MR Agreement.  The Debtors' reorganization efforts will be hampered without the revenues currently received pursuant to the Amex Agreements.  Any interruption in the Amex arrangements would adversely affect an important source of revenue to the detriment of all parties in interest.

30.     The Amex Agreements are the result of labored negotiations and contain terms favorable to the Debtors.  Given their current financial condition, if the

Debtors were to reject the Amex Agreements, it is unlikely that they could negotiate terms as favorable as those under the existing agreements. Moreover, the Debtors have an established history dealing with Amex and operating under new agreements with different credit card companies or other entities at this precarious time in the Debtors' chapter 11 cases could cause unnecessary and detrimental interruptions to the Debtors' cash flow.

31.     When assuming an executory contract, section 365(b) of the Bankruptcy Code requires the debtor to cure any defaults under the contract or provide adequate assurance that it will promptly cure these defaults. 11 U.S.C. § 365(b)(1)(A). If there has been a default, the debtor must also provide adequate assurance of future performance under the contract. 11 U.S.C. § 365(b)(1)(C). Section 365(b) provides:

> (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of the assumption of such contract or lease, the trustee –
>
>> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>>
>> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>>
>> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

32.     The Debtors do not believe they have any uncured defaults under the Amex Agreements, other than the so-called *ipso facto* defaults, which are not required to be cured under section 365(e)(1) of the Bankruptcy Code.

33.     Nonetheless, assuming *arguendo* there are uncured defaults under the Amex Agreements, the Debtors are prepared both to cure them and to provide adequate assurance of future performance under section 365(b)(1)(C) of the Bankruptcy Code.  Because the Debtors' generate substantial revenue from the Amex Agreements, Amex is more than adequately assured that it is within the Debtors' self-interest to continue to perform under those agreements.  Should it be necessary, however, the Debtors are prepared to provide additional evidence as to adequate assurance at any hearing held with respect to any objection to the relief requested herein.

34.     For these reasons, it is in the Debtors' business judgment to assume the Amex Agreements, as amended by the Modification Agreement.  This assumption will bolster the vital partnership between the Debtors and Amex and ensure the continued patronage from the Debtors' paying customers and the corresponding revenue stream.  The assumption is also a precondition to the Debtors' ability, consensually as to Amex, to close its $1.7 billion DIP Facility.

**Amending the Amex Agreements**

35.     The Debtors seek authority, in their sole discretion, to amend the Amex Agreements in accordance with the Modification Agreement.

36.     Section 363(b)(1) of the Bankruptcy Code empowers the Court to allow the debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Debtors' decisions to use, sell or lease assets outside the ordinary course of business must be based upon the sound business judgment of the debtor.  *See In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a section 363(b) application must find from the

evidence presented before him a good business reason to grant such application); *see also Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that standard for determining a section 363(b) motion is "good business reason").

37.     The business judgment rule is satisfied where "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Committee of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). In fact, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Courts in this district have consistently and appropriately been loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence, and will uphold a board's decisions as long as they are attributable to any "rational business purpose." *In re Integrated Res. Inc.,* 147 B.R. at 656.

38.     The Debtors submit that amending the Amex Agreements in accordance with the Modification Agreement represents a sound exercise of the Debtors' business judgment and is justified under section 363(b) of the Bankruptcy Code. Under the Modification Agreement, Amex agrees to release the entire amount of the Special

Cash Reserve upon the satisfaction of certain specified conditions, including the Order

becoming final and non-appealable. In addition, the Modification Agreement allows the

Debtors to obtain substantial debtor-in-possession financing.

### The *Ipso Facto* Clauses Contained in the Amex Agreements<br>Are Unenforceable Under Section 365(e)(1) of the Bankruptcy Code[7]

39.     The Amex Agreements contain provisions to the effect that they

may be terminated or modified by Amex either (i) upon the Debtors' insolvency or

financial distress or (ii) upon the Debtors' filing of a petition for reorganization under

chapter 11 of the Bankruptcy Code. In drafting the Bankruptcy Code, Congress

expressly recognized in section 365(e)(1) the widespread use of such clauses in many

commercial agreements, as well as the threat that such provisions would pose to the

public policy favoring reorganization. Congress therefore left no doubt that these so-

called *ipso facto* clauses would be unenforceable pursuant to section 365(e)(1):

> (a)     Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on --
>
> (i)     the insolvency or financial condition of the debtor at any time before the closing of the case;
>
> (ii)     the commencement of a case under this title; or
>
> (iii)     the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

11 U.S.C. § 365(e)(1).

---

[7]  Amex does not join in the legal characterization of the Amex Agreements set forth in the following two paragraphs and reserves the right to contest such legal characterization in this or any other legal forum should it ever become necessary.

40.     The legislative history is equally clear that such clauses are not to be enforced as they "frequently hamper . . . rehabilitation efforts."  H.R. Rep. No. 595, at 348 (1977); S. Rep. No. 989, at 59 (1978).  Therefore, it is the Debtors' belief that Amex cannot enforce the *ipso facto* clauses in the Amex Agreements, nor terminate the Amex Agreements based on the Debtors' filing of these chapter 11 cases.

## The Order

41.     The Debtors seek authority through the Order to assume the Amex Agreements as set forth on Exhibit A attached hereto, as amended by the Modification Agreement, as set forth on Exhibit I attached hereto.

42.     The Debtors were unable to give all parties prior notice pursuant to Bankruptcy Rules 6006 and 9014.[8]  To satisfy the notice and hearing requirements of Bankruptcy Rules 6006 and 9014, the Debtors respectfully request that this Court grant the relief requested by this Motion, provided that the Debtors comply with the notice provisions set forth herein.  Within one (1) business day of the entry of an Order, the Debtors shall serve a copy of the Order and this Motion on (i) the Office of the United States Trustee for the Southern District of New York, (ii) those creditors holding the thirty largest unsecured claims against the Debtors' estates, (iii) those creditors holding the five largest secured claims against the Debtors' estates, (iv) Amex and (v) GE Capital (collectively, the "**Notice Parties**").  The Debtors submit that, pursuant to Bankruptcy Rules 6006 and 9014, such notice to the foregoing parties shall be sufficient.

---

[8] A proceeding to approve assumption of an executory contract is a contested matter requiring reasonable notice and opportunity for hearing.  *See* Bankruptcy Rule 6006(a) ("A proceeding to assume, reject or assign an executory contract . . . is governed by Rule 9014."); Bankruptcy Rule 9014 ("In a contested matter . . . relief shall be requested by the motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought.")

43.     The deadline to file an objection ("**Objection**") to the Motion shall be 4:00 p.m. (prevailing Eastern Time) on the date that is ten (10) days after entry of the Order (the "**Objection Deadline**"). The Debtors submit that the foregoing satisfies rules 6006-1(a) and 9006-1 of the Local Bankruptcy Rules for the Southern District of New York. An Objection shall be considered timely if it is (i) filed with the Court, One Bowling Green, New York, New York 10004-1408 and (ii) actually received by (a) the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Greg M. Zipes, Esq., (b) attorneys for the Debtors, Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017, Attn: Marshall S. Huebner, Esq., (c) counsel for any official committee then-appointed in these cases, (d) counsel to the agent for the Debtors' post-petition lenders, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: George A. Davis and (e) counsel for American Express Travel Related Services Company, Inc., Hahn & Hessen LLP, 488 Madison Avenue, New York, New York 10022, Attn: Jeffrey L. Schwartz and Joshua I. Divack, on or before the Objection Deadline.

44.     Unless otherwise ordered by the Court, a reply to an Objection may be filed with the Court and served on or before 12:00 p.m. prevailing Eastern Time on the day that is at least two (2) business days before the date of the applicable hearing.

45.     If no Objections are timely filed and served as set forth herein, the Debtors shall, on or after the Objection Deadline, submit to the Court a final order granting the authority to assume the Amex Agreements, as amended pursuant to the Modification Agreement, which order shall be submitted and may be entered with no

further notice or opportunity to be heard afforded to any party, and the assumption shall

be approved *nunc pro tunc* to the Petition Date.  If an Objection is timely filed, a hearing

will be held to consider the assumption of the Amex Agreements, as amended by the

Modification Agreement, at a date and time to be established by the Court.

46.        The foregoing notice procedures satisfy due process and the

strictures of Bankruptcy Rule 9014 by providing the counterparties with a notice and an

opportunity to object and be heard at a hearing.  *See, e.g., In re Drexel Burnham Lambert*,

160 B.R. 729, 733 (S.D.N.Y. 1993) (indicating that an opportunity to present their

objections satisfies due process);  *In re Colorado Mountain Cellars, Inc.*, 226 B.R. 244,

246 (D. Colo. 1998) (noting that a hearing is not required to satisfy Bankruptcy Rule

9014).  Furthermore, the proposed notice procedures protect the due process rights of the

parties in interest without unnecessarily exposing the Debtors' estates to unwarranted

administrative expenses.

### Waiver of Memorandum of Law

47.        Because the relevant issues of law have been presented herein, the

Debtors respectfully request that the Court waive the requirement that the Debtors file a

separate memorandum of law in support of this Motion.

### Notice

48.        No trustee, examiner, or creditors' committee has been appointed

in these chapter 11 cases.  The Debtors have served notice of this Motion on (i) the Office

of the United States Trustee for the Southern District of New York, (ii) those creditors

holding the five largest secured claims against the Debtors' estates, (iii) those creditors

holding the thirty largest unsecured claims against the Debtors' estates, (iv) Amex and (v)

GE Capital (collectively, the "**Notice Parties**").

49.     No previous request for the relief sought herein has been made by

the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request the Court grant the

Debtors the relief requested herein and such other and further relief as is just and proper.


Dated:  September 15, 2005
          New York, New York

By:     /s/ Marshall S. Huebner
        John Fouhey, Esq.  (JF 9006)
        Marshall S. Huebner, Esq.  (MH 7800)
        Benjamin S. Kaminetzky, Esq. (BK 7741)
        DAVIS POLK & WARDWELL
        450 Lexington Avenue
        New York, New York  10017
        Telephone:  (212) 450-4000
        Fax:  (212) 450-6539

        Attorneys for Debtors and
         Debtors in Possession

<u>**EXHIBIT A**</u>

- The Airline Card Service Agreement, dated as of January 1, 2001 (together with all extensions, renewals, amendments, supplements, addenda (including the addenda dated October 22, 2004 and November 29, 2004), modifications, substitutions and replacements thereto and thereof) (collectively, the "**Card Service Agreement**").

- The Delta® American Express® Co-Branded Credit Card Program Agreement, dated as of January 1, 2001 (together with all extensions, renewals, amendments, supplements (including the Co-Branded Supplement), addenda (including the addendum dated October 22, 2004), modifications, substitutions and replacements thereto and thereof) (collectively, the "**Co-Branded Card Agreement**").

- The Membership Rewards Agreement, dated as of January 1, 2001 (together with all extensions, renewals, amendments, supplements (including the MR Supplement), addenda (including the addendum dated October 22, 2004), modifications, substitutions and replacements thereto and thereof) (collectively, the "**MR Agreement**").

- The Corporate Purchasing Card Account Agreement, dated December 1, 2001 (together with all extensions, renewals, amendments, supplements, addenda, modifications, substitutions and replacements thereto and thereof) (collectively, the "**Purchasing Card Agreement**").

- The Multinational Corporate Card Account Agreement, dated as of December 1, 2002 (together with all extensions, renewals, amendments, supplements, addenda, modifications, substitutions and replacements thereto and thereof) (collectively, the "**Corporate Card Agreement**").

- The Crown Room Club Agreement, dated as of January 1, 2003.

- The Super Premium Card Partner Agreement, dated as of May 10, 1999 (together with the Addendum thereto).

**<u>EXHIBIT B</u>**

The Airline Card Service Agreement, dated as of January 1, 2001 (together with all extensions, renewals, amendments, supplements, addenda (including the addenda dated October 22, 2004 and November 29, 2004), modifications, substitutions and replacements thereto and thereof).

FILED UNDER SEAL

## EXHIBIT C

The Delta® American Express® Co-Branded Credit Card Program Agreement, dated as of January 1, 2001 (together with all extensions, renewals, amendments, supplements (including the Co-Branded Supplement), addenda (including the addendum dated October 22, 2004), modifications, substitutions and replacements thereto and thereof).

FILED UNDER SEAL

**<u>EXHIBIT D</u>**

The Membership Rewards Agreement, dated as of January 1, 2001 (together with all extensions, renewals, amendments, supplements (including the MR Supplement), addenda (including the addendum dated October 22, 2004), modifications, substitutions and replacements thereto and thereof).

FILED UNDER SEAL

**EXHIBIT E**

The Corporate Purchasing Card Account Agreement, dated December 1, 2001 (together with all extensions, renewals, amendments, supplements, addenda, modifications, substitutions and replacements thereto and thereof).

FILED UNDER SEAL

## EXHIBIT F

The Multinational Corporate Card Account Agreement, dated as of December 1, 2002 (together with all extensions, renewals, amendments, supplements, addenda, modifications, substitutions and replacements thereto and thereof).

FILED UNDER SEAL

## EXHIBIT G

The Crown Room Club Agreement, dated as of January 1, 2003.

FILED UNDER SEAL

## EXHIBIT H

The Super Premium Card Partner Agreement, dated as of May 10, 1999 (together with the Addendum thereto).

FILED UNDER SEAL

## EXHIBIT I

Modification Agreement, dated September 15, 2005, by and among American Express Travel Related Services Company, Inc., American Express Bank, F.S.B., Delta Air Lines, Inc. and Delta Loyalty Management Services, LLC.

FILED UNDER SEAL

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                         :

**In re:**                        :
                         :
                         :   **Chapter 11 Case No.**

**DELTA AIR LINES, INC., et al.,**      :
                         :   **05-17923 (pcb)**
                         :

                         :   **(Jointly Administered)**
**Debtors.**                        :
                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## ORDER PURSUANT TO SECTIONS 363(b),
## 365(a), 1107(a) AND 1108 OF THE BANKRUPTCY CODE AND
## RULE 6006 OF THE FEDERAL RULES OF BANKRUPTCY
## PROCEDURE AUTHORIZING DEBTORS TO ASSUME AND AMEND
## THE AMEX AGREEMENTS

        Upon the motion dated September 15, 2005 (the "**Motion**")[1] of Delta Air

Lines Inc., and those of its subsidiaries that are debtors and debtors in possession in these

proceedings (collectively, the "**Debtors**"),[2] pursuant to sections 363(b), 365(a), 1107(a)

and 1108 of the Bankruptcy Code and rule 6006 of the Bankruptcy Rules, for

authorization to assume certain agreements with American Express Travel Related

Services Company, Inc. ("**Amex**"), a list of which is attached to the Motion as Exhibit A

(the "**Amex Agreements**"), as amended by the Modification Agreement, a copy of which

is attached to the Motion as Exhibit I, and upon consideration of the Declaration of

Edward H. Bastian Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the

---

[1] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to it in the Motion.

[2] The Debtors are the following entities: ASA Holdings, Inc.; Comair Holdings, LLC; Comair, Inc.; Comair Services, Inc.; Crown Rooms, Inc.; DAL Aircraft Trading, Inc.; DAL Global Services, LLC; DAL Moscow, Inc.; Delta AirElite Business Jets, Inc.; Delta Air Lines, Inc.; Delta Benefits Management, Inc.; Delta Connection Academy, Inc.; Delta Corporate Identity, Inc.; Delta Loyalty Management Services, LLC; Delta Technology, LLC; Delta Ventures III, LLC; Epsilon Trading, Inc.; Kappa Capital Management, Inc.; and Song, LLC.

Southern District of New York (the "**Local Rules**") in Support of First-Day Motions and Applications, dated as of the Petition Date; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334 and the Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the requested relief being a core proceeding the Bankruptcy Court can determine pursuant to 28 U.S.C. § 157(b)(2); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the Office of the United States Trustee for the Southern District of New York, those creditors holding the five largest secured claims against the Debtors' estates and those creditors holding the thirty largest unsecured claims against the Debtors' estates, and it appearing that no other or further notice need be provided; and the relief requested in the Motion being in the best interests of the Debtors and their estates and creditors; and the Court having reviewed the Motion and having held a hearing with appearances, testimony and/or offers of proof of parties in interest noted in the transcript thereof (the "**Hearing**"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor, the Court hereby makes the following findings of fact and conclusions of law under Bankruptcy Rules 7052 and 9014:[3]

---

[3] Any finding of fact constitutes a finding of fact even if it is stated as a conclusion of law, and any conclusion of law constitutes a conclusion of law even if it is stated as a finding of fact.

1.     Notwithstanding any rights it might otherwise have under the Bankruptcy Code, Bankruptcy Rules, applicable non-bankruptcy law or contract, Amex has irrevocably consented to the subordination of all of its liens in certain substantial collateral in favor of a DIP Facility of not more than $1.7 billion, conditioned upon the entry of this Order and the interim authorization of the Amex DIP Loan.

2.     Amex is holding a substantial cash reserve under the Card Service Agreement, from funds otherwise payable to the Debtors, arising out of Cardholders' pre-petition purchases of goods and services from the Debtors, which reserve Amex has agreed to release upon the Order becoming final and non-appealable.

3.     Amex's agreement to subordinate all of its liens in certain substantial collateral is contingent upon the entry of this Order and the interim authorization of the Amex DIP Loan.  Amex's consent to subordinate all of its liens in certain substantial collateral in favor of the DIP Facility in an amount not to exceed $1.7 billion avoids the cost and uncertainty of litigation before the Court with respect to "priming", valuation and adequate protection under section 364 of the Bankruptcy Code and materially enhances the Debtors' reorganization prospects at the critical early stage of the bankruptcy case.

4.     The Debtors' assumption of the Amex Agreements is fair and reasonable, reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, supported by reasonably equivalent value and fair consideration and in the best interest of the Debtors' estates.

Based upon all of the foregoing, it is hereby:

ORDERED that the relief requested in the Motion is granted, conditioned only upon the entry of the interim order authorizing the DIP Facility; and it is further

ORDERED that the Debtors have authority to assume the Amex Agreements, as amended by the Modification Agreement, pursuant to sections 363(b) and 365(a) of the Bankruptcy Code, and the Debtors are authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers and to take any and all actions reasonably necessary or appropriate to perform all obligations contemplated under the Amex Agreements, as amended by the Modification Agreement; and it is further

ORDERED that the Debtors' reorganization efforts will be impeded without the revenues currently received pursuant to the Card Service Agreement; and it is further

ORDERED that the Co-Branded Card Agreement and the MR Agreement provide a substantial net benefit to the Debtors' business and that failure to maintain these obligations could seriously hamper the Debtors' reorganization efforts; and it is further

ORDERED that the Purchasing Card Agreement and the Corporate Card Agreement are important to the Debtors' cash management and accounting functions and their loss would cause serious disruption to the Debtors' operations; and it is further

ORDERED that the Crown Room Club Agreement and the Super Premium Card Partner Agreement result in significant revenue for the Debtors; and it is further

ORDERED that it is in the best interests of the Debtors and their estates to

assume the Amex Agreements, as amended by the Modification Agreement; and it is further

ORDERED that amending the Amex Agreements pursuant to the Modification Agreement represents a sound exercise of the Debtors' business judgment and is justified under section 363(b) of the Bankruptcy Code; and it is further

ORDERED that within one (1) business day of the entry of this Order (the "**Order**"), the Debtors shall serve a copy of the Order and the Motion on (i) the U.S. Trustee, (ii) those creditors holding the thirty largest unsecured claims against the Debtors' estates, (iii) those creditors holding the five largest secured claims against the Debtors' estates, (iv) Amex and (v) GE Capital (collectively, the "**Notice Parties**"); and it is further

ORDERED that any objection to the relief requested in the Motion on a permanent basis must, by 4:00 p.m. (prevailing Eastern Time) on the tenth (10th) day after the date hereof, be (i) filed with the Court, One Bowling Green New York, New York 10004-1408, and (ii) actually received by (a) the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Greg M. Zipes, Esq.; (b) attorneys for the Debtors, Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017, Attn: Marshall S. Huebner, Esq.; (c) counsel for any official committee then-appointed in these cases, (d) counsel to the agent for the Debtors' post-petition lenders, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: George A. Davis and (e) counsel for American Express Travel Related Services Company, Inc., Hahn & Hessen LLP, 488 Madison Avenue,

New York, New York 10022, Attn: Jeffrey L. Schwartz and Joshua I. Divack; and it is further

ORDERED that a reply to an Objection may be filed with the Court and served on or before 12:00 p.m. prevailing Eastern Time on the day that is at least two (2) business days before the date of the applicable hearing; and it is further

ORDERED that if no Objections are timely filed and served as set forth herein, the Debtors shall, on or after the Objection Deadline, submit to the Court a final order granting the relief requested in the Motion, *nunc pro tanc* to the Petition Date, which order shall be submitted and may be entered with no further notice or opportunity to be heard afforded to any party; and it is further

ORDERED that if an Objection is timely filed, a hearing will be held on _____ _____, 200[ ] at ___:___ __.m. to consider the assumption of the Amex Agreements, as amended by the Modification Agreement; and it is further

ORDERED that the notice procedures satisfy Bankruptcy Rules 6006 and 9014, and Local Rules 6006-1(a) and 9006-1 by providing the counterparties with a notice and an opportunity to object and be heard at a hearing; and it is further

ORDERED that the requirement pursuant to Local Rule 9013-1(b) that the Debtors file a memorandum of law in support of the Motion is hereby waived; and it is further

ORDERED that the effect of this Order shall survive the conversion, dismissal and/or closing of these chapter 11 cases, appointment of a trustee herein, confirmation of a plan of reorganization, and/or the substantive consolidation of these chapter 11 cases with any other case or cases; and it is further

ORDERED that, based upon the record presented to the Court, this Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution of this Order.

Dated: _____ _____, 2005
      New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE