Daniel H. Golden (DG-5624)
Lisa G. Beckerman (LB-9655)
David H. Botter (DB-2300)
AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue
New York, New York 10022-2524
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

Attorneys for the Official Committee of Unsecured
Creditors of Delta Air Lines, Inc., et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
                                  :

In re:                            :          Chapter 11
                                  :

DELTA AIR LINES, INC., et al.,      :          Case No. 05-17923 (PCB)
                                  :

                      Debtors.   :          (Jointly Administered)
------------------------------------------------------------x

**NOTICE OF MOTION OF THE**
**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**OF DELTA AIR LINES, INC., _ET AL._ FOR AUTHORITY TO PROSECUTE**
**CERTAIN ANTITRUST CLAIMS ON BEHALF OF THE DEBTORS' ESTATES**

PLEASE TAKE NOTICE that a hearing on the attached Motion of the Official

Committee of Unsecured Creditors of Delta Air Lines, Inc., _et al._ for Authority to Prosecute

Certain Antitrust Claims on Behalf of the Debtors' Estates (the "Motion") will be held before the

Honorable Prudence Carter Beatty, United States Bankruptcy Judge, on January 19, 2006 at

2:30 p.m. (Eastern Time), or as soon thereafter as counsel may be heard, in the United States

Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House,

One Bowling Green, New York 10004-1408 (the "Bankruptcy Court").

PLEASE TAKE FURTHER NOTICE that responses or objections, if any, to the Motion must comply with the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, must be set forth in a writing describing the basis therefore and must be filed with the Court electronically in accordance with General Order M-242, as amended by General Order M-269, by registered users of the Court's electronic case filing system (the User's Manual for the Electronic Case Filing System can be found at www.nysb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties in interest, on a 3-1/2 inch disk, preferably in Portable Document Format (PDF), Word Perfect or any other Windows-based word processing format (with a hard copy delivered directly to Chambers) and served in accordance with the Order Approving Notice, Case Management and Administrative Procedures, entered by the Court on October 6, 2005, upon each of the following: (i) counsel to the Creditors' Committee, Akin Gump Strauss Hauer & Feld LLP, 590 Madison Avenue, New York, New York 10022-2524, Attn.:  Daniel H. Golden, Esq. and David H. Botter, Esq.; (ii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn.:  Gregory Zipes, Esq.; (iii) attorneys for Debtors, Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017, Attn.:  Marshall S. Huebner, Esq.; (iv) conflicts counsel to the Debtors, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, NY  10038, Attn: Lawrence M. Handelsman, Esq.; (v) aircraft counsel to the Debtors, Debevoise & Plimpton LLP, 919 Third Avenue, New York, NY  10022, Attn: Richard F. Hahn, Esq.; (vi) the Securities and Exchange Commission, 100 F Street, NE, Washington, D.C. 20549, Attn: Michael A. Berman and 3 World Financial Center, New York, NY  10281, Attn: Nathan Fuchs; (vii) the Internal Revenue Service, 290 Broadway, New York, NY  10008, Attn: Sid Brown; and (viii) Bankruptcy Services LLC, 757 Third Avenue, New York, NY

10017, Attn: Robert Saraceni (collectively, the "Core Parties"), so as to be received not later than

**4:00 p.m.** on **January 12, 2006**.  Only those responses and objections, if any, made in writing

and timely filed and received will be considered at the hearing.  Any such response must state

with specificity the reason or reasons why the relief requested in the Motion should not be

granted.

Dated: New York, New York
      December 29, 2005

**AKIN GUMP STRAUSS HAUER & FELD LLP**

    /s/   David H. Botter

    Daniel H. Golden (DG-5624)
    Lisa G. Beckerman (LB-9655)
    David H. Botter (DB-2300)
    590 Madison Avenue
    New York, New York 10022-2524
    (212) 872-1000

    Attorneys for the Official Committee of Unsecured
    Creditors of Delta Air Lines, Inc., <u>et al</u>.

Daniel H. Golden (DG-5624)
Lisa G. Beckerman (LB-9655)
David H. Botter (DB-2300)
AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue
New York, NY 10022
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

Counsel for the Official Committee of Unsecured
Creditors of Delta Air Lines, Inc., et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                                    :
In re:                                              :         Chapter 11
                                                    :
DELTA AIR LINES, INC., et al.,                      :         Case No. 05-17923 (PCB)
                                                    :
                                     Debtors.       :         (Jointly Administered)
-------------------------------------------------------------x

### MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF DELTA AIR LINES, INC., *ET AL.* FOR AUTHORITY TO PROSECUTE CERTAIN ANTITRUST CLAIMS ON BEHALF OF DEBTORS' ESTATES

The Official Committee of Unsecured Creditors (the "Creditors' Committee") of Delta

Air Lines, Inc. ("Delta") and its affiliated debtors in the above-captioned chapter 11 cases

(collectively, the "Debtors"), by and through its undersigned counsel, hereby moves (the

"Motion") this Court for entry of an order pursuant to sections 105, 1103 and 1109 of chapter 11

of title 11 of the United States Code (the "Bankruptcy Code") authorizing the Committee to

pursue certain actions under the Sherman Antitrust Act, 15 U.S.C. §§ 1-7 (the "Sherman Act")

and any and all other applicable antitrust law (the "Antitrust Claims") on behalf of the Debtors'

estates.  In support of the Motion, the Creditors' Committee respectfully states as follows:

# PRELIMINARY STATEMENT

"*No tail left behind*." This was the negotiating strategy and veritable mantra of an ad hoc committee of beneficial holders of indebtedness (the "Ad Hoc Committee") in eighty-nine aircraft (the "Aircraft," and together with related equipment, engines and documentation, the "Aircraft Equipment") as they negotiated leases, rates, terms and conditions for the use of such Aircraft Equipment (the "New Aircraft Agreements") by the Debtors. The Ad Hoc Committee, consisting of 59 institutions, gave the Debtors two options – either accept simultaneous, en masse repossession of the Aircraft Equipment by the members of the Ad Hoc Committee and endure the financial debacle that would ensue, or accept the New Aircraft Agreements on terms dictated by the Ad Hoc Committee, despite the negative impact of such terms on the Debtors' estates. Given this Hobson's choice, the Debtors "chose" to accept the New Aircraft Agreements. In so doing, the Debtors handed the Ad Hoc Committee a major victory: allowing its members to avoid (i) negotiating with respect to individual Aircraft Equipment, and (ii) competing with one another. Thus, by acting in unison, the Ad Hoc Committee was able to extract from the Debtors above-market lease rates and onerous terms and conditions. By this collective and collusive effort, the Ad Hoc Committee was able to force the Debtors to agree to continue operating certain uneconomical aircraft that would have been abandoned under the Debtors' original fleet plan – thus ensuring that, regardless of market conditions, "no tail [was] left behind."

The Ad Hoc Committee's conduct – specifically, its members' concerted refusal to deal with Delta on an individual basis, its collective threat to repossess the Aircraft, its imposition of onerous terms and conditions, and its members' sharing of competitive information among themselves – is the type of business conduct categorically forbidden by the antitrust laws.

Indeed, such conduct is so antithetical to federal antitrust policies that it constitutes a *per se* violation of the Sherman Act. *E.g., NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998); *FTC v. Indiana Federation of Dentists*, 476 U.S. 447 (1986); *Arizona v. Maricopa County Medical Society*, 457 U.S. 332 (1982) (holding that horizontal group boycotts and agreements to fix prices are so antithetical to the antitrust laws that they are typically condemned without further examination).

This profound antitrust problem was not lost on the Ad Hoc Committee or its counsel. To the contrary, while it collusively demanded a sweetheart deal from the Debtors, the Ad Hoc Committee forced the Debtors to agree in writing that they would not assert any antitrust claims against the Ad Hoc Committee. Faced with the threat of en masse repossession of 89 Aircraft, which could cripple its operations, Delta had no choice but to acquiesce to these demands.

Delta's coerced waiver of its antitrust claims against the members of the Ad Hoc Committee and its "willingness" to accept onerous and above-market lease rates, terms and conditions adversely impacts the Debtors' estates, the course of these Chapter 11 cases and the interests of unsecured creditors. As a result, the Creditors' Committee is now required to seek authority of this Court to protect the assets of the bankruptcy estates by prosecuting the antitrust claims in Delta's place.

## BACKGROUND

### The Ad Hoc Committee Stipulation and Ad Hoc Committee Motion

1.      On November 14, 2005, the sixty-day period established by section 1110 of the Bankruptcy Code (the "Section 1110 Period") expired in these cases. Thus, in the absence of an election under section 1110(a) of the Bankruptcy Code or an agreement under section 1110(b), aircraft lessors are free to demand the surrender and return of their aircraft under section 1110(c)

of the Bankruptcy Code. None of the Aircraft Equipment controlled by the Ad Hoc Committee was subject to 1110(a) elections or 1110(b) agreements upon expiration of the Section 1110 Period.

2.      Following the expiration of the Section 1110 Period, on December 5, 2005, the Debtors filed a: (1) Stipulation Regarding 1110(b) Extension with the Bank of New York ("BNY"), as Indenture Trustee, and Wells Fargo Bank Northwest, N.A. ("Wells"), as Security Trustee (the "Ad Hoc Committee Stipulation"), and (2) Motion for Order Approving a Term Sheet and an Extension of Section 1110 Deadlines and Authorizing Agreement to Restructure Transactions Affecting Eighty-Nine Aircraft and Associated Engines, Equipment and Documents (the "Ad Hoc Committee Motion").

3.      The Ad Hoc Committee Stipulation covers eighty-nine Aircraft falling into two categories – eighty aircraft subject to the provisions of Bankruptcy Code section 1110 (the "1110 Aircraft Equipment") and nine aircraft that do not fall within the purview of section 1110 since such aircraft came into service before October 22, 1994 (the "Non-1110 Aircraft Equipment"). In total, the Aircraft Equipment consists of thirty-two Model MD-88 aircraft, thirty-four Model 757-232 aircraft, eighteen Model 767-332 aircraft and five Model 767-332ER aircraft.

4.      The Ad Hoc Committee Stipulation establishes terms by which BNY, as indenture trustee, Wells, as security trustee, and the Ad Hoc Committee (collectively, the "Aircraft Parties") agree: first, to extend the Section 1110 Period with respect to the 1110 Aircraft Equipment, and second, to refrain from exercising any rights to seek adequate protection of the Ad Hoc Committee's interests in the Non-1110 Aircraft Equipment during the extended Section 1110 Period. Under the terms of the Ad Hoc Committee Stipulation, the Section 1110 Period was extended through and including December 16, 2005 (the "Extension Period"), and further

extended until January 17, 2005 if certain conditions, which are set forth in the Ad Hoc Committee Stipulation, are met.[1]

5.  Pursuant to the Ad Hoc Committee Motion, the Debtors seek (i) authority to execute and perform their obligations under a Restructuring Term Sheet (the "Term Sheet") that was negotiated with the Ad Hoc Committee regarding transactions related to the Aircraft Equipment, (ii) authority to further extend the Section 1110 Period provided under the Ad Hoc Committee Stipulation, (iii) approval of the method of calculating prepetition unsecured claims on the terms set forth in the Term Sheet, and (iv) authority to negotiate, execute and perform under definitive agreements implementing the terms of the Term Sheet.

**The Debtors' Waiver of Antitrust Claims**

6.  In a letter to the Debtors dated November 3, 2005 (the "Letter Agreement"), the Ad Hoc Committee indicated that its members intended to make a proposal to Delta "as a group" and "as a package" regarding multiple aircraft, but would do so only in reliance upon certain written representations by the Debtors.  Specifically, the Letter Agreement states that, as a condition to negotiations with the Ad Hoc Committee, Delta (i) agreed that it would not assert that collective negotiation by the Ad Hoc Committee raises antitrust issues, concerns, or implications, and (ii) did not object to the Ad Hoc Committee's members desire to discuss

---

[1] Because the Ad Hoc Committee's Stipulation and Motion were filed and scheduled for hearing without any input from the Creditors' Committee, the Creditors' Committee had to negotiate an adjournment of the Ad Hoc Committee Motion.  This resulted in the filing of the Supplement to Stipulation Regarding Section 1110(b) Extension with the BNY, as Indenture Trustee, and Wells, as Security Trustee (the "Supplemental 1110(b) Stipulation") on December 15, 2005, which embodied the terms the Creditors' Committee was required to agree to in order to obtain an appropriate adjournment of the Ad Hoc Committee Motion.  Pursuant to the Supplemental 1110(b) Stipulation: (a) the hearing with respect to the Ad Hoc Committee motion was adjourned to January 19, 2006; (b) the 60-day period provided for in section 1110(a)(2) of the Bankruptcy Code was extended until 11:59 p.m. (ET) on February 3, 2006; and (c) the Debtors will pay, on or before January 13, 2006 (i) an additional half month's retainer to The Bank of New York, as indenture trustee with respect to the 1110 Aircraft Equipment, Wells Fargo Northwest, N.A. as security trustee with respect to the Non-1110 Aircraft Equipment and their advisors; and (ii) the "second rent payment" and an additional payment of one-half of certain rent amounts, described in the Ad Hoc Committee Stipulation.

among themselves "information regarding the various lease rates, terms, conditions, and strategies regarding the various aircraft in Delta's entire fleet. . . ." despite the confidential and proprietary nature of such terms. A copy of the fully executed Letter Agreement is attached hereto as Exhibit A.

7.     Despite the clearly outside the ordinary course of business nature of the Letter Agreement and the fact that the Letter Agreement purports to waive potentially valuable estate claims, the Debtors have neither sought nor obtained this Court's approval of the Letter Agreement.

## RELIEF REQUESTED

8.     Pursuant to this Motion, the Creditors' Committee seeks entry of an order, in the form of the proposed order attached as Exhibit B , granting the Creditors' Committee leave, standing and authority to prosecute the Antitrust Claims against the members of the Ad Hoc Committee.

## ARGUMENT

I.     **THE CREDITORS' COMMITTEE SHOULD BE GRANTED AUTHORITY TO PURSUE THE ANTITRUST CLAIMS.**

   A.     **This Court Can Grant The Creditors' Committee Authority To Prosecute The Antitrust Claims.**

9.     Bankruptcy Code section 105(a) provides that the Court may issue any order necessary or appropriate to carry out the provisions of the Bankruptcy Code. 11 U.S.C. § 105(a). Further, section 1109(b) of the Bankruptcy Code provides that the Creditors' Committee is a party in interest that may appear and be heard on any issue in these chapter 11 cases. 11 U.S.C. § 1109(b). As noted in *In re STN Enterprises*, 779 F.2d 901, 904 (2d Cir. 1985), sections 1103(c)(5) and 1109(b) imply "a qualified right for creditors' committees to initiate suit with the approval of the bankruptcy court." The practice of authorizing the prosecution of actions by

creditors' committees upon a showing that such prosecution is in the interests of the debtor's estate is nearly universally recognized.  *Adelphia Communications Corp., et al. v. Bank of America, N.A. (In re Adelphia Communications Corp.)*, 330 B.R. 364, 373 (Bankr. S.D.N.Y. 2005) (internal citations omitted).

### B.    Authority To Prosecute Should Be Granted Because There Are Colorable Antitrust Claims Against The Ad Hoc Committee.

10.    In *STN*, the Second Circuit established a test to determine whether a committee should be granted authority to bring a suit on behalf of the debtor.  *STN,* 779 F.2d at 905.  The *STN* test provides that bankruptcy courts should grant such authority when: (1) the committee presents a colorable claim for relief that, upon appropriate proof, would support a recovery; and (2) the debtor has unjustifiably failed to bring suit or has abused its discretion in not suing.  *Id.*; *see Glinka v. Murad (In re Housecraft Indus. USA, Inc.)*, 310 F.3d 64 (2d Cir. 2002); *Adelphia*, 330 B.R. at 374; *In re Ashford Hotels, Ltd.*, 226 B.R. 797, 804 (Bankr. S.D.N.Y. 1998), *appeal dismissed*, 235 B.R. 734 (S.D.N.Y. 1999) (permitting bank to prosecute claims where creditor standing was the "only hope" for providing benefit to the estate).[2]

11.    To prevail at this stage, the Creditors' Committee need not prove it will ultimately prevail on the Antitrust Claims, and this Court need not conduct a mini-trial.  Rather, the Creditors' Committee must only establish that the Antitrust Claims are "colorable."  *STN,* 779 F.2d at 905.  This is a "relatively easy [standard] to meet."  *Adelphia*, 330 B.R. at 376; *see*

---

[2] Courts in other Circuits regularly permit interested parties like the Creditors' Committee to prosecute claims on behalf of the estate.  *See, e.g., Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir.) (en banc), *cert. dismissed*, 540 U.S. 1001, *cert. dismissed*, 540 U.S. 1002 (2003); *Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.)*, 66 F.3d 1436 (6th Cir. 1995) (permitting creditor to prosecute avoidance action); *Campana v. Pilavis (In re Pilavis)*, 233 B.R. 1, 3-4 (Bankr. D. Mass. 1999) (relying on *STN* to grant standing in action); *U.S.A./FmHA v. Indi-Bel, Inc. (In re Williams)*, 167 B.R. 77, 82 (Bankr. N.D. Miss. 1994) (granting creditor standing to maintain action on behalf of estate); *First Alabama Bank v. Shelby Motel Group, Inc. (Matter of Shelby Motel Group, Inc.)*, 123 B.R. 98, 103-04 (N.D. Ala. 1990) (relying on *STN* in reversing denial of motion for standing to being claims).

*Official Committee of Unsecured Creditors of Grand Eagle Companies, Inc. v. ASEA Brown Boverie, Inc. (In re Grand Eagle Companies, Inc.)*, 310 B.R. 79, 95-96 (Bankr. N.D. Ohio 2004), *report accepted in part and rejected in part*, 313 B.R. 219 (N.D. Ohio 2004) (because "it would be inappropriate to expect the committee to be able to present its entire case to the court at this early state," the committee need only provide the court with "some minimal evidentiary basis for its allegations.").[3] As demonstrated below, the Creditors' Committee has colorable Antitrust Claims against the members of the Ad Hoc Committee.

12.     To establish a violation of Section 1 of the Sherman Act, a plaintiff must "allege a combination or some form of concerted action between at least two legally distinct economic entities that constituted an unreasonable restraint of trade either per se or under the rule of reason." *PrimeTime 24 Joint Venture v. National Broadcasting Co.,* 219 F.3d 92, 103 (2d Cir. 2000) (quotations and citation omitted). "In addition, a plaintiff must independently show 'antitrust injury'. . . to ensure that 'a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior.'" *Id.* (quoting *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)). The facts amply support both allegations here.

13.     At issue here is a "per se" restraint of trade. The per se category includes activities that are "so plainly anticompetitive and so often lack any redeeming virtue that they are conclusively presumed illegal without further examination under the rule of reason . . . ." *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1, 8 (1979) (internal

---

[3] The analysis is similar to that applied in assessing a motion to dismiss a complaint for failure to state a claim. *E.g.*, *Official Committee of Unsecured Creditors of the Debtors v. Austin Fin. Svcs., Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 508 (Bankr. S.D.N.Y. 1999); *In re iPCS, Inc.*, 297 B.R. 283, 291 (Bankr. N.D. Ga. 2003); *Official Committee of Unsecured Creditors of America's Hobby Center, Inc. v. Hudson United Bank (In re America's Hobby Center, Inc.)*, 223 B.R. 275, 280 (Bankr. S.D.N.Y. 1998).

quotations omitted); *see FTC v. Indiana Federation of Dentists*, 476 U.S. 447 (1986); *Arizona v. Maricopa County Medical Society*, 457 U.S. 332 (1982). "[A]greements among competitors to fix prices on their individual goods or services are . . . within [this] per se category." *Broadcast Music, Inc.*, 441 U.S. at 8. So are horizontal group boycotts. *E.g., PrimeTime 24,* 219 F.3d at 102 (citing *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135-36); *Fashion Originators' Guild of America, Inc. v. FTC*, 312 U.S. 457, 467-68 (1941). When a group of competitors refuses to deal on an individual basis with a business in need of its services, it engages in a "group boycott" or "concerted refusal to deal" in violation of the Sherman Act. *See ABA Antitrust Section, Antitrust Law Developments* 104-114 (5th ed. 2002), and cases cited therein.

14.     There can be no doubt the Ad Hoc Committee's conduct qualifies under this definition as a *per se* Sherman Act violation. The horizontal competitors who make up the Ad Hoc Committee are colluding to fix prices on contracts for the use of the Aircraft on a going-forward basis and using the threat of a group boycott to exact above-market terms. To be more specific, section 365 of the Bankruptcy Code allows a debtor to reject contracts that it deems unfavorable in light of present market conditions. *See* 11 U.S.C. § 365(a) ("the trustee, subject to the court's approval, may . . . reject any executory contract or unexpired lease of the debtor."); *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 954-55 (2d Cir. 1993) ("The main purpose of Section 365 is to allow a debtor to reject executory contracts in order to relieve the estate of burdensome obligations while at the same time providing a means whereby a debtor can force others to do business with it when the bankruptcy filing might otherwise make them reluctant to do so") (quotations omitted).[4]

---

[4] Section 1110 of the Code – the provision that applies specifically to aircraft leases – fully reflects, and indeed augments, the principle of section 365 in the airline context. Although section 1110(a)(2) grants the debtor a 60-day window in which to retain possession of aircraft by curing past defaults and by agreeing to perform the lease

15.     Under section 365 of the Bankruptcy Code, Delta has the legal right to reject its existing leases, *i.e.*, it can unilaterally shed itself of *all future obligations* to each individual lessor, providing Delta with the option of reentering the marketplace or retaining its leased property on terms that reflect appropriate exposure to market forces.  Members of the Ad Hoc Committee, who are horizontal competitors in the aircraft leasing market, should therefore be competing against each other to have Delta retain their planes by offering competitive prices for their future use.  Instead, they have colluded to fix forward-going prices by, *inter alia*, insisting on collective negotiations and "group" or "package" all or nothing proposals involving multiple aircraft.   The Ad Hoc Committee's conduct thus amounts to a horizontal agreement among competitors to fix prices combined with a threatened group boycott or refusal to deal – a classic per se violation of the Sherman Act.

16.     The Debtors' estates will suffer antitrust injury as a result of the Ad Hoc Committee's anticompetitive conduct because it will deplete the assets of the estates in a manner antithetical to bankruptcy law.  Succumbing to pressure from the Ad Hoc Committee, Delta has agreed to pay above-market lease rates and conceded to onerous terms and conditions in the New Aircraft Agreements.  For example:

---

in the future, nothing in section 1110 requires the debtor to do so.  Like any other debtor, an airline in bankruptcy may choose to reject an unfavorable lease.  In addition, the debtor is deemed by law to have rejected a lease if the debtor fails to comply with the conditions of subsection (a)(2) and the lessor simply makes a written demand for return of the aircraft covered by the lease.  11 U.S.C. § 1110(c)(2).  Thus, once the initial 60-day period has passed, neither the debtor nor the lessor can enforce the pre-existing lease, and the debtor is entirely free to lease from, and the lessor is entirely free to lease to, someone else.

Here, the section 1110(a)(2) period has been extended by agreement under section 1110(b).  As a result, the lessors' repossession rights have not fully ripened and the contracts at issue are still subject to assumption or reinstatement pursuant to the conditions specified in section 1110.  This does not, however, materially alter the analysis.  If the Sherman Act prohibits the Ad Hoc Committee's collusive conduct after the expiration of the section 1110(a)(2) period, then the Ad Hoc Committee cannot avoid liability by colluding to force an extension of the section 1110(a)(2) period as provided in section 1110(b).  Common sense dictates that lessors should not be able to circumvent the Sherman Act simply by using the power they gain through collusion to force a section 1110(b) extension before engaging in anticompetitive behavior.

- *Inclusion of Suboptimal Aircraft.*  The Term Sheet contemplates that Debtors will retain a number of Aircraft not included in their initial fleet plan.  The imposition of these Aircraft on the Debtors harms them operationally by saddling them with suboptimal wide-body aircraft that are inconsistent with their fleet plan.

- *Unreasonable Liquidated Damages Provisions.*  The Ad Hoc Committee has used its illegal leverage to ensure that any future termination of the New Aircraft Agreements will be extremely difficult, time consuming, and costly to the Debtors' estates.  If the Debtors reject the New Aircraft Agreements, or abandon or return Aircraft Equipment, they must provide at least four months' advance notice of the effective date of any such rejection or return.  Additionally, the Debtors will be obligated to continue to make payments for the rejected or returned Aircraft Equipment (at the rates agreed upon in the Term Sheet) during that four month notice period *and* for an additional eight months after the notice period.[5]  In other words, the Debtors will be unable to reject any leases or return any Aircraft Equipment without incurring the financial obligation under such lease for a full year following the decision to reject the lease or return the Aircraft.  Moreover, should the Debtors default under the Term Sheet or any of the definitive documents entered into pursuant to the Term Sheet, they will likewise be required to incur the financial obligation for such lease for a full year.

- *Additional Cost of Return Conditions.*  Under the original Aircraft Agreements, a large number of the Aircraft would be returned at their quarter-life (meaning that the time- and cycle-controlled components on the Aircraft will have only one-quarter of the hours and cycles remaining before such components are required to be replaced).  The Term Sheet now requires the Aircraft to be returned at their half-life rather than at their quarter-life (in effect, doubling the value of the Aircraft's maintenance status at the time of return).  The Ad Hoc Committee thereby extracted a very significant benefit from the Debtors:  The resulting cost from changing the 25% remaining useful life to a half life on the airframes, engines, landing gear and APU will be approximately (i) $2.25 million per 767 aircraft, (ii) $2.65 million per 757 aircraft and (iii) $1.25 million per MD-88 aircraft, for a total potential cost of $181,850,000.  Another way to look at this is that the Debtors have been forced to materially increase the residual value of the Aircraft, when returned to various members of the Ad Hoc Committee, over that which would have been required under the original leases.

- *Calculation of Unsecured Prepetition Claims.*  The Term Sheet sets forth a detailed formula by which unsecured prepetition claims for transactions involving members of the Ad Hoc Committee are to be calculated.  This formula will likely provide the members of the Ad Hoc Committee with greater unsecured claims

---

[5] The Term Sheet also provides for more onerous terms as to the physical condition in which any rejected or abandoned Aircraft Equipment must be returned, based on the aircraft's model type than was provided for in the existing Aircraft Agreement.

than they would be entitled to under the original Aircraft Agreements, to the severe detriment of other unsecured creditors of the Debtors' estates.[6]

- *Non-1110 Aircraft*.  The Ad Hoc Committee has forced the Debtors to treat the nine Non-1110 Aircraft as though these aircraft qualified for section 1110's statutory protections.

- *Payment of Ad Hoc Committee's Advisors' Fees*.  The Ad Hoc Committee even forced the Debtors to agree to fund the fees and expenses the Ad Hoc Committee incurs in this bankruptcy proceeding in connection with the negotiation, documentation and implementation of the Term Sheet.  To date, these fees total approximately $2.4 million, plus additional, ongoing and uncapped fees and expenses for two law firms and three aircraft advisors in addition to those of the Trustee.

17.     If Delta's agreement with the Ad Hoc Committee is approved, it will cause antitrust injury to the Debtors' estates and to its other creditors because the Ad Hoc Committee will have imposed substantially more onerous terms and conditions for the use of the Aircraft than would have been obtained but for the collusive conduct of the Ad Hoc Committee, thereby depleting the value of the Debtors' estates.

**C.     The Seventh Circuit's Opinion in *United Airlines*, on which the Ad Hoc Committee seems to have pinned its hopes, does not obviate the Antitrust Claims at issue here.**

18.     The Ad Hoc Committee appears to be relying on the result in *United Airlines, Inc. v. U.S. Bank N.A.*, 406 F.3d 918, *stay granted*, 409 F.3d 812 (7th Cir.) *cert. dismissed sub nom. Official Comm. of Unsecured Creditors v. U.S. Bank N.A.*, 126 S. Ct. 508 (2005) to justify its anticompetitive conduct.  But the opinion provides scant analytic support for immunizing the Ad Hoc Committee from the normal scope of antitrust laws.  In *United Airlines*, the Seventh Circuit overturned bankruptcy court rulings that effectively enjoined airplane lessors from repossessing their airplanes from United Airlines ("United") after that airline went into bankruptcy and

---

[6] The Creditors' Committee is still analyzing the ultimate impact of the agreed-upon formula upon the recovery that will be available to other unsecured creditors of these estates.

defaulted on its lease payments. 406 F.3d at 924-25. The court ruled that Bankruptcy Code section 1110 divests bankruptcy judges of the power to enjoin lessors from repossessing planes from a bankrupt airline, even if the lessors have wielded the threat of repossession as part of a coordinated strategy to raise renegotiated lease payments over the levels that would otherwise pertain, and even if such a coordinated strategy violates federal antitrust law. *Id*. The court's ruling regarding the bankruptcy court's lack of power to enjoin repossession, however, has nothing to do with whether United had valid antitrust claims against colluding lessors. Although the Seventh Circuit ruled in the alternative that "United's adversary action, accusing the lessors of violating the antitrust laws by engaging in joint negotiation, is legally untenable," 409 F.3d at 812, this aspect of the litigation was not the focal point of the court's opinion and received such short shrift that the court's holding – which is contrary to both Second Circuit case law and the purpose of the Bankruptcy Code – is of extremely limited precedential value.

1. **The Seventh Circuit's Flawed Sherman Act Analysis Fails To Support Denial Of The Motion For Authorization To Prosecute Antitrust Claims Here.**

19. The Seventh Circuit's opinion is flawed in three respects. First, the court ignored United's rights under section 365 and treated the collusive conduct of the aircraft lessors as a typical compromise of a past debt. Because United was entitled to reject the original contracts, the negotiation at issue actually involved *future* obligations, and not, as the court presumed, the compromising of past debts. Second, even if the lessors could be deemed to be colluding only with respect to payment of existing obligations, it is doubtful that such conduct was shielded from Sherman Act liability. Third, the court erred by concluding that collusive efforts to fix prices are acceptable in the context of bankruptcy, because bankruptcy "often is described as a collective proceeding among lenders." 406 F.3d at 921.

### a.    The case did not involve a typical compromise of past debt.

20.    The Seventh Circuit treated the lessors' collusive renegotiation as nothing more than a coordinated effort by a group of creditors reaching an accommodation with a debtor. 406 F.3d at 921 (citing, *inter alia*, *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1052-53 (2d Cir. 1982)). But this treatment ignores chapter 11's statutory regime. In a typical renegotiation, both parties to a contract are legally bound to fulfill their obligations throughout the life of the contract. But in bankruptcy, chapter 11 debtors are relieved from fulfilling their *future* obligations pursuant to section 365 of the Bankruptcy Code. Accordingly, any negotiation with respect to future lease terms is, in effect, a negotiation over a *new* contract, not an old one. Collusive bargaining over forward-going leases is thus a classic Sherman Act violation of a horizontal agreement among competitors to fix prices combined with a threatened group boycott or refusal to deal.

21.    Although not a bankruptcy case, the Second Circuit's opinion in *PrimeTime 24* supports this analysis. There, the court held that, while the Sherman Act does not prohibit creditors from taking some types of concerted action to enforce existing legal rights, competitors may not join together to "limit their individual freedom of action" with respect to *future* dealing with a business entity. 219 F.3d at 103. Applying this principle, the court held that plaintiff PrimeTime had stated a viable antitrust claim when it alleged that the National Association of Broadcasters had engaged in a campaign to discourage network affiliates from entering into separate licensing negotiations with PrimeTime. According to the court, "[a]lthough coordinated efforts to enforce copyrights against a common infringer may be permissible, copyright holders may not agree to limit their individual freedom of action in licensing future rights to such an infringer before, during, or after the lawsuit." *Id.* at 102-103. This kind of horizontal agreement among competitors amounted to a "classic per se violation of the Sherman Act." *Id.* at 102.

22.     The *PrimeTime* analysis is controlling here.  Certainly the Ad Hoc Committee, like other creditors, can act jointly to press damage claims against the estate.  But it is an entirely different story when they, like the copyright holders in *PrimeTime,* join forces to insist on higher, non-competitive terms and conditions for the future use of goods that they are entirely free to sell elsewhere.  Inside of bankruptcy or out, that conduct is prohibited by the Sherman Act.

>    **b.      Even assuming *arguendo* that such collusion was limited to the compromise of an existing debt, it is not shielded from antitrust liability.**

23.     *PrimeTime* also clarified the Second Circuit's earlier opinion in *Sharon Steel*, on which the Seventh Circuit relied heavily in *United Airlines* when rejecting United's antitrust claims.  As the *PrimeTime* decision makes clear, although competitors may sometimes cooperate in trying to collect on existing debts, they do not remotely enjoy immunity from the antitrust laws when they act collusively with regard to existing obligations.

24.     *Sharon Steel*, which, like *PrimeTime 24*, was authored by Judge Winter, involved the cooperative efforts of three creditor financial institutions to protect their separate rights to repayment from a trust that was in the process of liquidating and distributing proceeds to shareholders.  The creditors sent the trust a joint letter demanding that the debtor establish a reserve fund out of which the repayments would be made.  In subsequent litigation, the trust claimed that this joint effort violated the antitrust laws.  The Second Circuit rejected this claim as bordering on "frivolous" because it was "not anti-competitive" for the creditors to agree to take a common position regarding the trust's alleged breach of its bond agreements.  *Sharon Steel*, 691 F.2d at 1052.  Absent such cooperation, the court noted, each of the creditors would likely have been forced to take the more drastic step of suing to stop the distribution of proceeds by the liquidating trust – an action that would have served no one's interest.  As a general matter, the court observed that mutual forbearance by creditors often serves the common interest of creditors

and debtors without harm to consumer interests. And with respect to the particular facts of that case, this substitution of cooperation and compromise in lieu of litigation in no way injured the trust. *Id*.

25.     In discussing *Sharon Steel*, however, the *PrimeTime 24* court observed that the result would have been different there if the collusion had harmed lawful competition. 219 F.3d at 99. *Sharon Steel* involved a circumstance where "the sharing of costs or other coordinated activity avoids wasteful duplication of effort and has no discernible effect on lawful competition." *Id*. But *Sharon Steel* provides no shield for anticompetitive behavior. Accordingly, even if framed as a renegotiation of current obligations, the conduct of the lessors in *United Airlines* or the Ad Hoc Committee here violates the Sherman Act because it *does* have a "discernible effect on lawful competition." *Id*. The members of the Ad Hoc Committee have banded together with the express purpose and effect of depriving the Debtors of the benefits of current market conditions – specifically competition in the aircraft leasing market – with the result of exacting onerous lease terms. Indeed, the very point of their collusion is to replace one above-market price agreement (the current leases) with another above-market price agreement (the collusively negotiated new leases). In these circumstances, the discussion in *Sharon Steel* countenancing cooperation among creditors with respect to enforcing contractual rights simply does not apply – and, given the anti-competitive purpose and effect of the Ad Hoc Committee's actions, the Sherman Act does.[7]

---

[7] *Falstaff Brewing Corp. v. New York Life Ins. Co.*, 513 F. Supp. 289 (N.D. Cal. 1978), a case often cited alongside *Sharon Steel*, illustrates the point. In *Falstaff*, the district court rejected a Sherman Act claim in which a debtor company challenged the actions of various lenders who had jointly negotiated a pro-rata payment sharing agreement in exchange for extending the terms of certain loan agreements with the debtor. In dismissing the antitrust claim, the district court recognized that the banks at issue were not competitors with each other or with other institutions to supply the debtor with more credit. They were merely cooperating to secure that credit which had already been extended under terms that had already been negotiated – and, thus, the cooperation had no anticompetitive effect. *Id*. at 293. Here, by contrast, absent the Ad Hoc Committee's collusive approach, the

### c.   The Bankruptcy Code does not immunize collusive conduct from Sherman Act liability.

26.     The Seventh Circuit concluded that bankruptcy law somehow carves out immunity from Sherman Act liability for anti-competitive conduct like that of the Ad Hoc Committee.  But neither the Bankruptcy Code generally nor section 1110 specifically contain any language explicitly immunizing aircraft creditors from Sherman Act liability, and it is well-established that implied repeal of antitrust protection is disfavored.  The Supreme Court has recognized that the antitrust laws "are as important to the preservation of economic freedom . . . as the Bill of Rights is to the protection of our fundamental civil freedoms."  *United States v. Topco Assoc., Inc.*, 405 U.S. 596, 610 (1972).  In keeping with this view, the Court has stated that implied exclusions for private anticompetitive conduct are "disfavored, much as are repeals by implication."  *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 636 (1992) (describing limits on state-action immunity).

27.     Even absent a presumption against implied repeal, limiting the Sherman Act in this context would not further the purposes of the bankruptcy laws – indeed, it would thwart them.  The Ad Hoc Committee's conduct is squarely at odds with the general purpose of the Bankruptcy Code to preserve assets of the debtor and with the specific purpose of section 365 to permit the debtor to gain the benefit of current market conditions by rejecting existing contracts when they are onerous.  The Ad Hoc Committee's collusive conduct has forced Delta to enter into forward-going lease agreements containing onerous liquidated damages provisions, expanded return condition liability, and other provisions it would not have agreed to absent the Ad Hoc Committee's ability to threaten Delta with en masse repossession of all 89 Aircraft,

---

members would be competing with each other to determine which members would continue to supply Delta with aircraft.  Indeed, one of the most onerous provisions of Delta's agreement with the Ad Hoc Committee is the requirement that Delta continue leasing some aircraft it would otherwise take out of service.

including five 767-300ER aircraft that are critical to Delta's expanded international operations. By acting collectively and collusively, the Ad Hoc Committee threatened Delta with the immediate repossession of 89 Aircraft, leaving Delta with little choice but to cut the best deal it could.

28.     Section 1110 does not authorize such collusive conduct.  This section was designed to promote the market for aircraft financing by giving aircraft financiers greater certainty with respect to their ability to repossess aircraft in the event of an airline bankruptcy. Jason J. Kilborn, *Thou Canst Not Fly High With Borrowed Wings: Airline Finance and Bankruptcy Code Section 1110*, 8 Geo. Mason L. Rev. 41 (1999).  To this end, section 1110 gives aircraft financiers significant relief from the automatic stay provision, section 362.  If an airline does not make an election under section 1110(a) and cure defaults within an initial 60-day period, absent an agreement under section 1110(b), section 1110(c) gives the secured creditor of the aircraft a near-absolute right of repossession.  As the court observed in *United Airlines*, this provision "makes credit available on better terms when air carriers shop for financing in the first place."  406 F.3d at 924.  But nothing in section 1110 suggests a congressional intent to give the aircraft financiers a right not only to repossess aircraft quickly but also to band together to threaten repossession in a manner calculated to inflict the most harm on the debtor.

29.     Finally, the Seventh Circuit's notion that collective activity among creditors is immunized from antitrust concerns because bankruptcy "often is described as a collective proceeding among lenders," 406 F.3d at 921, is overbroad.  The fact that bankruptcy is characterized by group efforts by creditors to collect on pre-petition debts cannot possibly launder or preserve from scrutiny all collective efforts under the umbrella of Chapter 11.  Taken to its logical extreme, the Seventh Circuit's decision in *United Airlines* would permit virtually all

of a bankrupt entity's creditors (aircraft financiers, real estate lessors, fuel suppliers, etc.) to band

together and force terms on the debtor. That cannot be the law. When collective efforts harm

competition and injure the estate and its remaining creditors, the courts should not hesitate to

condemn them.

> **2.** **The Seventh Circuit's Application Of The *Noerr-Pennington* Doctrine To The Lease Negotiations In *United Airlines* Also Fails To Support Denial Of The Motion For Authority To Prosecute Antitrust Claims Here.**

30.      The Seventh Circuit's ruling that the *Noerr-Pennington* doctrine shielded

colluding lessors from antitrust scrutiny in the United Airlines bankruptcy, *United Airlines*, 406

F.3d at 921, 925, cannot sustain a *Noerr*-based objection to this motion for authorization to

pursue antitrust claims here. The *Noerr-Pennington* doctrine limits the reach of the Sherman

Act's broad proscriptions against anti-competitive conduct in light of First Amendment concerns

and principles of inter-governmental comity. *Noerr* immunity shields private parties from

antitrust scrutiny for bona fide efforts to persuade government decision makers, including courts,

to take actions that restrain competition. *See Eastern R.R. Presidents Conf. v. Noerr Motor*

*Freight, Inc.*, 365 U.S. 127 (1961) (immunity for concerted petitioning for anticompetitive

legislation); *California Motor Transport Co. v. Trucking Unltd.*, 404 U.S. 508, 510-11 (1972)

(extending immunity from antitrust liability to encompass petitioning directed at "state and

federal agencies and courts"). Petitioning immunity under *Noerr*, as the Supreme Court

explained in *City of Columbia v. Omni Outdoor Adver., Inc.,* 499 U.S. 365 (1991), reflects a

judicial determination, rooted in the First Amendment right to petition and in the need for

deference, on the part of antitrust tribunals, to other governmental decision makers, that federal

antitrust laws should not be construed to "regulate the conduct of private individuals in seeking

anticompetitive action from the government." *Id.* at 380.

31.     In *United Airlines*, the Seventh Circuit found, on the record developed by the

Bankruptcy Court in that case, that collusive negotiating tactics on the part of United's aircraft

lessors would not harm competition unless the leases that those tactics produced were approved

by the courts.  406 F.3d at 425.  In the Seventh Circuit's view, the need for the colluding lessors

to obtain judicial approval before the renegotiated leases could restrain competition meant that

any antitrust injury could be attributed only to government action (that is, to judicial approval of

the renegotiated leases) rather than to collusion among the aircraft lessors.  *Id.* at 421 (*Noerr*

applies because "[c]ollective renegotiation succeeds only if the court approves").  The Seventh

Circuit further found that the entire course of the colluding lessors' efforts to secure judicial

approval, extending even to their initial decision to negotiate on a collective basis, qualified as

*Noerr*-protected petitioning conduct.[8]

32.     The Seventh Circuit's *Noerr* ruling lacks a persuasive justification for treating

collusion in aircraft lease renegotiations as a form of protected petitioning conduct.  The Ad Hoc

Committee is unquestionably entitled to *Noerr* immunity for its good faith efforts to persuade

---

[8]  As a threshold matter, the Seventh Circuit's *Noerr* analysis fails to provide a basis for denying the
Creditors' Committee authority to pursue antitrust claims in this case because the central premise of the Seventh
Circuit's *Noerr* analysis – that judicial approval of collusively negotiated leases was a precondition to the
manifestation of any antitrust injury – is inapplicable here.  It is impossible to determine, based on the current record
in this case, whether collusion among the members of the Ad Hoc Committee will result in antitrust injury only if
the Court approves the fruits of that collusion.  The Creditors' Committee believes, as noted above, that further
factual development will establish that the collusive tactics of the Ad Hoc Committee in this case have *already*
caused antitrust injury, and that some portion of this injury will persist whether or not this Court refuses to approve
the collusively renegotiated lease terms.

*Noerr* immunity generally does not extend to private conduct that restrains competition through its direct
effect on actions "in the marketplace," even if that conduct is primarily intended to elicit governmental action.
*Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 503 (1988) (where conduit manufacturers co-opted
private standard setting process in order to establish anti-competitive building materials standard, *Noerr* immunity
extended only to injuries resulting from governmental adoption of anticompetitive standard); *see FTC v. Superior
Court Trial Lawyers Ass'n*, 493 U.S. 411, 414-19 (1990) (no immunity for criminal defense counsel who
collectively refused to accept court appointments until legislature raised compensation rates; *Noerr* unavailable to
private parties using restraint on competition as means of influencing government).  Accordingly, if the Creditors'
Committee can show that the Ad Hoc Committee's collusive tactics have operated as a direct restraint on
competition, *Noerr* will be inapplicable to at least some of the antitrust injury at issue.  *United Airlines,* 406 F.3d at
925 (*Noerr* "cannot be used to shelter joint activity that creates monopoly prices independent of any decision by a
court or agency" (citing *In re Brand Name Prescript. Drugs Antitrust Litig.*, 186 F.3d 781, 789 (7th Cir.1999))).

this Court (and relevant appellate tribunals) to approve renegotiated lease agreements obtained through use of a collusive negotiating strategy.  *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 55-62 (1993).  Thus, the Seventh Circuit was clearly correct to observe that "businesses are entitled under the *Noerr-Pennington* doctrine to act jointly when presenting requests to courts and agencies."  *United Airlines,* 406 F.3d at 921.  But immunity for this core petitioning conduct – the act of seeking judicial approval – is insufficient to protect collusion among otherwise competitive aircraft lessors.  To escape Sherman Act scrutiny, the lessors must also enjoy petitioning immunity for collusion that precedes any request for judicial approval.

33.     In *PrimeTime 24*, the Second Circuit rejected a *Noerr* defense to an antitrust claim based on a "concerted refusal to deal" that resembled in important respects the collusive bargaining at issue here.  Plaintiff PrimeTime, a satellite television service, alleged that television broadcasters had undertaken a campaign to ensure that none of their group would enter into negotiations to license broadcast programming to the satellite service.  *PrimeTime 24*, 219 F.3d at 95-97, 102.  The broadcasters argued that their collective refusal to deal amounted to a collective rejection of an offer by the satellite service to settle litigation arising under a federal statute that was designed to make broadcast programming available by satellite where traditional broadcast signals are inadequate, and that this concerted settlement position was qualified as protected petitioning activity under *Noerr*.  *Id*. at 102.  The Second Circuit rejected this argument because, among other reasons, *Noerr* does not immunize all collective action relating to disputes in litigation.  The Second Circuit reasoned that "although coordinated efforts to enforce copyrights against a common infringer may be permissible, copyright holders may not agree to limit their individual freedom of action in licensing future rights to such an infringer before,

21

during, or after the lawsuit."  *Id.* at 102-03 (citing *Broadcast Music, Inc.*, 441 U.S. at 19 (no

immunity for consent decree entered into with the Department of Justice or for the acts of private

parties contemplated by that decree)); *see United States v. Singer Mfg. Co.*, 374 U.S. 174 (1963)

(Sherman Act reached anticompetitive scheme that included use of settlement agreement in

patent infringement litigation to pool patent rights for anticompetitive purposes).[9]

34.    In any event, the question whether collusion among creditors engaged in

negotiations with a bankrupt debtor can constitute *Noerr*-protected petitioning conduct has no

bearing on the central antitrust issue in this case.  Even if horizontal collusion by creditors in

negotiations with a bankrupt debtor could qualify as a form of protected petitioning conduct, the

resulting petitioning immunity could not justify judicial approval of anticompetitive agreements

obtained by means of the collusion.  *Noerr* immunity for colluding creditors would provide, at

most, protection from antitrust scrutiny for their petitioning conduct.  *Noerr* simply does not

address the fundamental antitrust question in this case:  whether the Bankruptcy Code creates an

implied exemption from the Sherman Act proscription against horizontal collusion.  As set forth

above, lease renegotiations between bankrupt airlines and aircraft lessors are not exempt from

the Sherman Act's per se prohibition on horizontal collusion.  Petitioning immunity for efforts

by collaborating creditors to secure judicial approval for their renegotiated agreements cannot

---

[9]    The Second Circuit's analysis in *Primetime24* is also consistent with the Supreme Court's recognition that anticompetitive conduct, even if closely connected to petitioning activities, is not entitled to *Noerr* immunity when undertaken without government approval, *Allied Tube*, 486 U.S. at 509-10; *Superior Court Trial Lawyers Ass'n*, 493 U.S. at 414-19; *see also In re Tamoxifen Citrate Antitrust Litig.*, 429 F.3d 370, 401 (2d Cir. 2005) (noting that petitioning immunity may not shield agreements among competitors respecting the timing of filings to trigger statutory extension period for drug patents, since *Noerr* "does not authorize anticompetitive *action* in advance of the [the] government's adopting the industry's anticompetitive proposal" (emphasis retained, internal quotation marks omitted)), and with recent appeals court determinations that *Noerr* immunity fails to shield even some settlement agreements where anticompetitive effects are sufficiently severe, *e.g., Andrx Pharm., Inc. v. Biovail Corp.*, 256 F.3d 799, 819 (D.C. Cir. 2001) ("private settlement agreement resolving [ ] patent infringement litigation by substituting a market allocation agreement . . . would not enjoy *Noerr-Pennington* immunity").

alter the Sherman Act prohibition that requires rejection of those agreements if they are found to be anticompetitive.  In other words, if the renegotiated leases to which Delta agreed are anticompetitive and unlawful, the lessors cannot escape antitrust review of those leases merely by asking a court to approve them.

**D.      The Debtors Have Unjustifiably Refused to Prosecute the Antitrust Claims.**

35.      The Second Circuit in *STN* held that where a colorable claim exists that, if proven, would support a recovery to the estate, a debtor's refusal to prosecute such a claim is unjustified.[10]  *STN*, 779 F.2d at 905; *Adelphia*, 330 B.R. at 374, n. 19.  To determine whether such an action would be beneficial to the debtor's estate, *STN* requires the court to perform a cost-benefit analysis to determine whether the costs to the estate in pursuing the action would be outweighed by the potential gain should the action be successful.  *STN*, 779 F.2d at 905.  As with the colorability prong of the *STN* test, the court should not hold a mini-trial on the likelihood of success of the claim.  Instead, the court need only "assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce."  *Id.* at 906.

36.      The Antitrust Claims that the Creditors' Committee seeks authority to bring have substantial value to these estates.  The Debtors stand to save millions of dollars, with comparatively minimal expenditure of legal fees to pursue the action, should the Antitrust Claims result in the Term Sheet being set aside.  A new round of negotiations with Delta's aircraft lessors *individually,* subject to normal market forces and untainted by the collusion and anticompetitive conduct of the Ad Hoc Committee, will undoubtedly yield both leasing rates and

---

[10] On December 9, 2005, counsel to the Creditors' Committee requested that the Debtors assign to the Creditors' Committee any action against the Ad Hoc Committee under the Sherman Act or other applicable antitrust law.  To date, the Debtors have failed to respond to such request.

related terms and conditions commensurate with current market conditions.  This will not only save the Debtors millions of dollars, but will also provide them with more operational flexibility and an aircraft fleet of their own choosing.  These benefits far outweigh the costs that will be incurred in litigating these claims.[11]  Additionally, if the Term Sheet is approved, much of the discovery regarding the Antitrust Claims will have already taken place in the context of the litigation over the Term Sheet and the focus will turn to the appropriate calculation of damages to the estates from the collusive conduct of the members of the Ad Hoc Committee.  As the analysis above makes clear, there is a sufficient likelihood of success on the merits of these claims to justify the Creditors' Committee's pursuit of these claims.

37.     Moreover, the assessment of whether the Debtors' decision not to pursue the Antitrust Claims against the Ad Hoc Committee was justified cannot be separated from the Ad Hoc Committee's underlying coercive conduct.  The Debtors' agreement to forego their Antitrust Claims was obtained by the Ad Hoc Committee at economic gunpoint – specifically the Ad Hoc Committee's collusive threat to repossess eighty-nine aircraft.  When a debtor's decision not to prosecute legal claims is itself the result of unlawful coercion, it necessarily follows that the decision is "unjustified" under *STN*.  *See, e.g., Flintkote Co. v. Lysfjord*, 246 F.2d 368, 375-76 (9th Cir. 1957) (supplier's decision to yield to threats by conspiring distributors who demanded that supplier refuse to deal with non-conspirators "was [not] a lawful exercise of the supplier's business judgment"); *Hellenic Lines, Ltd. v. Louis Dreyfus Corp.,* 372 F.2d 753, 757 (2d Cir. 1967) (agreement may not be enforceable if induced by a "'wrongful threat . . . [that] precludes [the contracting party] from exercising free will and judgment . . . .'"); *see also Endrex Exploration Co. v. Pampell¸* 97 B.R. 316, 322-23 (N.D. Tex. 1989) (chapter 11 debtor's

[11] We note that much of the legal fees and expenses associated with discovery related to the Antitrust Claims will already have been incurred in connection with litigation over the Term Sheet.

agreement was not valid if made pursuant to "wrongful threats that were of such a character as to destroy [the debtor's] free agency"). Accordingly, the Court should authorize the Creditors' Committee to pursue these valuable Antitrust Claims.

## WAIVER OF MEMORANDUM OF LAW

38. Because the relevant facts and law are detailed herein, the Creditors' Committee respectfully requests that the Court waive the requirement that the Creditors' Committee file a separate memorandum of law in support of the Motion, but the Creditors' Committee reserves the right to file a supplement to the Motion and file a brief in reply to any objection to this Motion.

## NOTICE

39.     Consistent with the procedures described in the Court's Order Approving Notice, Case Management and Administrative Procedures entered on October 6, 2005 (the "Case Management Order"), this Motion has been served on the Core Parties (as that term is defined in the Case Management Order).  In light of the nature of the Motion, the Creditors' Committee submits that no other and further notice be given and that the notice provided of the Motion is sufficient.

## NO PRIOR REQUEST

40.     No prior application for the relief sought in this Motion has been made to this or any other court in connection with these chapter 11 cases.

## CONCLUSION

For the reasons set forth above, the Creditors' Committee respectfully submits that this Court (a) enter an order granting the Motion and (b) grant the Creditors' Committee such other relief as is just, fair and equitable.

Dated: New York, New York
        December 29, 2005

                                    **AKIN GUMP STRAUSS HAUER & FELD LLP**

                                    ___/s/ David H. Botter_____

                                    Daniel H. Golden (DG-5624)
                                    Lisa G. Beckerman (LB-9655)
                                    David H. Botter (DB-2300)
                                    590 Madison Avenue
                                    New York, New York 10022
                                    Telephone: (212) 872-1000
                                    Facsimile: (212) 872-1002

                                    Attorneys to the Official Committee of Unsecured
                                    Creditors of Delta Air Lines, Inc., et al.

# EXHIBIT A

Peter D. Schellie
Direct Phone: (202) 778-3190

November 3, 2005

Bingham McCutchen LLP
Suite 800
1120 20th Street, NW
Washington, DC
20036-3406

202.778.6150
202.778.6155 fax

bingham.com

Boston
Hartford
London
Los Angeles
New York
Orange County
San Francisco
Silicon Valley
Tokyo
Walnut Creek
Washington

**Via Email**

Richard F. Hahn, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022

**Re: Delta Air Lines, Inc.**

Dear Richard:

We and you are writing and countersigning this letter on behalf of our respective clients, the Ad Hoc Committee of Aircraft Creditors (the "Ad Hoc Committee") and Delta Air Lines, Inc. and its chapter 11 airline affiliates ("Delta"), to reflect certain acknowledgments by Delta upon which the Ad Hoc Committee is relying as we enter into discussions regarding Delta's restructuring proposals.

Delta hereby acknowledges that (i) our clients comprise a group of beneficial holders (the "Holders") of debt secured by certain aircraft leased to, or owned by, Delta under various financing arrangements (we have provided you with a confidential list of holders and aggregate debt amounts per aircraft, which we will update from time to time at your request), (ii) the Holders are parties to or beneficiaries of aircraft agreements entered into freely by Delta pre-petition without any past or present allegations of anticompetitive conduct by the Holders, (iii) Delta is now asking certain Holders to voluntarily impair or modify these agreements in lieu of asserting their full contractual rights, and rights under the Bankruptcy Code, to terminate Delta's interests in the aircraft, (iv) the Holders we represent have organized as the Ad Hoc Committee, (v) members of the Ad Hoc Committee desire to discuss freely with their advisors and among themselves information regarding the various lease rates, terms, conditions, and strategies regarding the various aircraft in Delta's entire fleet with an emphasis on the various aircraft in which the Holders have an interest, (vi) in response to the proposal from Delta, the Ad Hoc Committee will be making a proposal to Delta "as a group" and "as a package" regarding multiple aircraft, (vii) not all Holders have an interest in every aircraft that would be included in such group or package proposal, but the Holders share common interests in some issues involving Delta's aircraft, (viii) the Holders are willing to engage in the discussion of restructuring Delta's obligations, but will do so only and expressly in reliance upon Delta's representation that (A) Delta does not object to the organization of the Ad Hoc Committee and its collective negotiation as to existing transactions, (B) the Ad Hoc Committee's organization to pursue these negotiations with Delta may be

beneficial to Delta, its estate and the Ad Hoc Committee, and (C) Delta does not believe and will not assert that the formation of the Ad Hoc Committee raises antitrust issues or that collective negotiation as to existing transactions raises antitrust issues, concerns or implications, and (ix) this acknowledgment extends to the benefit of any indenture trustee who engages us as special counsel to such indenture trustee and the Holders or who takes direction from a majority of the Holders under the applicable indentures.

Bingham McCutchen LLP
bingham.com

In addition, Delta acknowledges and agrees that the members of the Ad Hoc Committee are our clients. If we have communications with members of the Ad Hoc Committee entitled to the protections of the attorney-client privilege, Delta will not contend that the attorney-client privilege has been waived (or that the attorney-client privilege is otherwise unavailable) on the ground that the individual members of the Ad Hoc Committee do not share common interests.

To reflect your agreement on the points set forth in the immediately preceding paragraph, please execute the acknowledgment below on behalf of Delta and return your acknowledgment to me.

Yours very truly,

Peter D. Schellie

Enclosures

ACKNOWLEDGED AND AGREED:

Name: Richard Hahn

Date: Nov 3, 2005

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
                                            :
In re:                                      :          Chapter 11
                                            :
DELTA AIR LINES, INC., et al.,              :          Case No. 05-17923 (PCB)
                                            :
                              Debtors.      :          (Jointly Administered)
------------------------------------------------------------x

## ORDER GRANTING MOTION OF THE
## OFFICIAL COMMITTEE OF UNSECURED CREDITORS
## OF DELTA AIR LINES, INC., *ET AL.* FOR AUTHORITY TO PROSECUTE
## <u>CERTAIN ANTITRUST CLAIMS ON BEHALF OF THE DEBTORS' ESTATES</u>

Upon the motion dated December 29, 2005 (the "Motion") of the Official Committee of

Unsecured Creditors (the "Creditors' Committee") of the above-captioned debtors and debtors in

possession (the "Debtors") for an order granting the Creditors' Committee authority to prosecute

certain antitrust claims on behalf of the Debtors' estates; and this Court finding that colorable

Antitrust Claims[1] against the members of the Ad Hoc Committee exist and that the Debtors have

unjustifiably failed to prosecute such Antitrust Claims; and finding that adequate notice of the

Motion having been given; and it appearing that no other notice need be given; and the relief

requested in the Motion being in the interests of the Debtors and their estates and creditors; and

the Court having reviewed the Motion and having held a hearing with appearances of parties in

interest noted in the transcript thereof (the "Hearing"); and the Court having determined that the

legal and factual bases set forth in the Motion and at the Hearing establish just cause for the

relief granted herein; and upon all of the proceedings had before the Court and after due

deliberation and sufficient cause appearing therefore, it is

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

**ORDERED,** that the relief requested in the Motion is hereby approved; and it is further

**ORDERED,** that the Creditors' Committee is granted leave, standing and authority to prosecute the Antitrust Claims against the members of the Ad Hoc Committee.


Dated: _____, 2005
    New York, New York


_____
**UNITED STATES BANKRUPTCY JUDGE**