DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Telephone: (212) 909-6000
Facsimile: (212) 909-6836
Michael E. Wiles (MW 0962)
Joseph P. Moodhe (JM 6068)
Richard F. Hahn (RH 5391)

Special Aircraft Attorneys for Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
**In re:**                                                                :
:        **Chapter 11 Case No.**
**DELTA AIR LINES, INC. et al.,**[1]              :
:        **05-17923 (ASH)**
:
:        **(Jointly Administered)**
:
:
:
:

**DEBTORS' OBJECTION TO MOTION OF OFFICIAL COMMITTEE OF
UNSECURED CREDITORS FOR AUTHORITY TO PROSECUTE CERTAIN
ANTITRUST CLAIMS ON BEHALF OF THE DEBTORS' ESTATES**

     Delta Air Lines, Inc. ("**Delta**"), and those of its subsidiaries that are debtors and debtors in possession in these proceedings (collectively, the "**Debtors**"), submit this objection (this "**Objection**") to the Motion of the Official Committee of Unsecured Creditors for Authority to Prosecute Certain Antitrust Claims On Behalf of Debtors' Estates (the "**Motion**"), and respectfully state as follows:

---

[1]    The Debtors are the following entities: ASA Holdings, Inc.; Comair Holdings, LLC; Comair, Inc.; Comair Services, Inc.; Crown Rooms, Inc.; DAL Aircraft Trading, Inc.; DAL Global Services, LLC; DAL Moscow, Inc.; Delta AirElite Business Jets, Inc.; Delta Air Lines, Inc.; Delta Benefits Management, Inc.; Delta Connection Academy, Inc.; Delta Corporate Identity, Inc.; Delta Loyalty Management Services, Inc.; Delta Technology, LLC; Delta Ventures III, LLC; Epsilon Trading, Inc.; Guardant, Inc.; Kappa Capital Management, Inc.; Omicron Reservations Management, Inc.; and Song, LLC.

22107664v5

**Preliminary Statement**

1. The Official Committee of Unsecured Creditors (the "**Creditors' Committee**") seeks an order of this Court granting it leave, standing and authority to prosecute certain actions under the Sherman Antitrust Act, 15 U.S.C. §§ 1-7 (the "**Sherman Act**"), and any and all other applicable antitrust laws on behalf of the Debtors' estates. The antitrust claims the Creditors' Committee wishes to pursue allegedly result from the negotiation of a term sheet (the "**Term Sheet**") by the Debtors and an ad hoc committee of beneficial holders of indebtedness (the "**Ad Hoc Committee**") relating to the financing of 88 aircraft in the Debtors' mainline aircraft fleet.[2] The Debtors oppose the Committee's motion for three principal reasons.

2. First, the legal theory on which the Creditors' Committee relies has been repeatedly rejected by courts, including the Second Circuit Court of Appeals, in the most categorical terms. *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982) (describing as "bordering on the frivolous" a contention that the antitrust laws forbid creditors to coordinate their positions in bankruptcy). Less than a year ago, on facts that the Creditors' Committee implicitly concedes are indistinguishable from the ones at hand, Judge Frank Easterbrook, one of the nation's leading antitrust jurists, described the claims on which the Creditors' Committee relies as "thin to the point of invisibility". *United Airlines, Inc. v. U.S. Bank N.A.*, 406 F.3d 918, 924, *stay granted*, 409 F.3d 812 (7th Cir.), *cert. dismissed sub nom. Official Committee of Unsecured Creditors v. U.S. Bank N.A.*, 126 S. Ct. 508 (2005).

---

[2] The Term Sheet, and the "Debtors' Motion for Order Approving Term Sheet and an Extension of Section 1110 Deadlines and Authorizing Agreements to Restructure Transactions Affecting Eighty-Nine Aircraft and Associated Engines, Equipment and Documents" (the "**Term Sheet Motion**"), originally covered 89 aircraft, but one aircraft (a Boeing 767-332 aircraft with the FAA registration number N116DL) has been returned by the Debtors in response to a demand for "surrender and return" under Section 1110(c) of the Bankruptcy Code and is no longer subject to the Term Sheet.

3.  Second, far from benefiting the Debtors' estates, pursuit of these antitrust claims would have devastating consequences for the Debtors. Beyond the high cost of litigating the antitrust claims to a final judgment—a matter accorded scant attention in the Motion— prosecution of these claims (in lieu of approving the transactions provided for in the Term Sheet) would leave the Debtors defenseless under Section 1110 of the Bankruptcy Code against the repossession of 88 aircraft. The Creditors' Committee itself states in the Motion that the repossession of these aircraft could "cripple [the Debtors'] operations" and result in a "financial debacle". Motion at Preliminary Statement.

4.  Third, as the Debtors will show at the hearing on the Term Sheet Motion, the center piece of the Creditors' Committee's argument—the contention that the relief it seeks must be granted to "protect the assets of the bankruptcy estates" from an abusive transaction that was "dictated" by the Ad Hoc Committee—grossly mischaracterizes both the negotiations between the Debtors and the Ad Hoc Committee and the merits of the agreement reached. The transactions embodied in the Term Sheet were not dictated by the Ad Hoc Committee. They are the result of long and strenuous negotiations during which, as in most negotiations, both sides made substantial concessions. Nor are the terms of the agreement "onerous". In fact, consummation of the transaction provided for in the Term Sheet will generate substantial savings for the Debtors.

## Background

### A. Negotiations Between the Debtors and the Ad Hoc Committee

5.  The Ad Hoc Committee is comprised of holders of aircraft indebtedness that participate in leases and financing transactions involving 88 of the aircraft in Delta's current fleet (such aircraft being hereafter referred to as the "**Aircraft**"). The Aircraft include 32 MD-88 aircraft, 34 Boeing 757-232 aircraft, 17 Boeing 767-332 aircraft and 5 Boeing 767-332ER

3

aircraft. Pursuant to leases and other financing arrangements that relate to the Aircraft (collectively, the "**Aircraft Agreements**") with various indenture and security trustees (the "**Financing Parties**"), Delta has the right to use the Aircraft, all engines, appliances and related parts and equipment, and all records, logs and documents relating thereto (collectively, the "**Aircraft Equipment**").

6. Although the Aircraft were the subject of a number of different leases and financings transactions, the Debtors believe that many of the members of the Ad Hoc Committee have interests in more than one Aircraft. In addition, The Bank of New York acts as the indenture trustee in all but a few of the underlying transactions.

7. On September 27, 2005, the Debtors received a letter from Bingham McCutchen LLP, counsel to the Ad Hoc Committee (the "**Bingham Letter**"), providing preliminary information concerning the aggregate holdings of the members of the Ad Hoc Committee and setting forth the conditions under which the Ad Hoc Committee would be prepared to negotiate with the Debtors. A copy of the Bingham Letter is attached hereto as Exhibit A. These conditions included:

- Delivery of a wide range of information, including "Delta's business plan, fleet plan, route information, maintenance information, [and] financial information" to the advisors to the Ad Hoc Committee; and

- Satisfactory arrangements to pay the advisors to the Ad Hoc Committee for work done (including prior to the commencement of the cases) and to be done.

Subsequently, at an initial meeting between the Debtors and certain members of the Ad Hoc Committee on October 20, 2005, this list of conditions was expanded to include an acknowledgement by the Debtors that the members of the Ad Hoc Committee would work together as a group in negotiating with the Debtors.

4

22107664v5

8. A number of the proposed conditions were in whole or in part unacceptable to the Debtors. The Debtors were (and continue to be) unwilling to share confidential fleet plans and route information with the Ad Hoc Committee. In addition, the Debtors were concerned about the scope and timing of the undertakings with respect to payment of fees sought by the Ad Hoc Committee.

9. The Ad Hoc Committee's request that the Debtors agree to the formation of the Ad Hoc Committee did not, however, cause the Debtors significant concern. The permissibility of such collective negotiation by aircraft financiers had recently been extensively litigated in the bankruptcy of United Airlines, Inc., and the Debtors had consulted closely with counsel concerning the issue.

10. On November 3, 2005, Debevoise & Plimpton LLP, special aircraft counsel to the Debtors, countersigned a letter from Bingham McCutchen LLP (the "**Antitrust Letter**"), acknowledging, *inter alia*, that the Ad Hoc Committee would respond to proposals by the Debtors "as a group" and that the Debtors did not object to "the organization of the Ad Hoc Committee and its collective negotiation as to existing transactions". A copy of the Antitrust Letter is attached hereto as Exhibit B.

11. Immediately after the execution of the Antitrust Letter, the Debtors received a proposal from the Ad Hoc Committee and intensive negotiations between the Debtors and the Ad Hoc Committee commenced. These negotiations continued over the next three weeks in person (including a marathon meeting on November 17, 2005) and via telephone and email, culminating on November 20, 2005 in the agreement in principle that was eventually embodied in the Term Sheet.

**B.     The Term Sheet**

12.    The Term Sheet modifies the terms under which the Debtors will have the right to use the Aircraft in a variety of respects and sets forth other agreements that have been reached. Among other things, the Term Sheet provides for: (1) reductions in the rents paid by the Debtors; (2) new lease terms and renewal options; (3) specification of return conditions that will apply should Delta decide to reject or abandon any of the Aircraft Equipment and at the end of the lease term; (4) descriptions of the manner by which the amounts of the prepetition unsecured claims with respect to these transactions will be calculated; and (5) extension of the Section 1110 period, if applicable, for the Aircraft Equipment.  The Term Sheet also includes provisions regarding the payment of certain fees of advisors to the Financing Parties and the Ad Hoc Committee.  More specifically:

    **1.     Reduced Rents**

13.    The Term Sheet drastically reduces the rents payable by the Debtors – by an aggregate of more than $200 million per year when compared to the existing Aircraft Agreements.  The modified payment terms vary based on the Aircraft's model and the year it was manufactured.  In addition, some of the agreed-upon payments are to be deferred.  Delta has agreed to pay interest on the deferred payments at the rate of LIBOR plus 4.50%.

    **2.     Duration**

14.    The Term Sheet changes the terms of the Aircraft Agreements so that the new leases will have terms ranging from five to eight years from November 4, 2005, with differences being based on the Aircraft model.  Within these parameters, the Debtors have discretion to set the term of the new lease for each Aircraft.  The Term Sheet also permits the renewal of some, but not all, of the new leases after the expiration of the original terms.

### 3. Termination Obligations

15. The Ad Hoc Committee originally insisted that Delta assume the new leases that are to be documented as part of the Term Sheet. Delta opposed this request. The Term Sheet resolves this issue by providing that Delta may reject Aircraft Agreements or abandon Aircraft Equipment and may return Aircraft Equipment that is subject to the Aircraft Agreements if Delta complies with certain termination obligations (the "**Termination Obligations**"). The Termination Obligations require Delta to provide at least four months' notice of the effective date of any such rejection or return. During these four months, Delta will be entitled to continue to use the Aircraft Equipment, and will be obligated to continue to make payments for the rejected or returned Aircraft Equipment (at the rates agreed upon in the Term Sheet). At the giving of the notice, Delta must pay any unpaid deferred payments. In addition, at the time of the Aircraft Equipment return, Delta must make a payment equal to an additional eight months of payments at the rates agreed upon in the Term Sheet.

### 4. Return Conditions

16. The Term Sheet provides detailed specifications as to the physical condition in which any rejected or abandoned Aircraft Equipment must be returned, based on the Aircraft's model type. These conditions were designed to conform to normal requirements for operating leases of comparable length.

### 5. Calculation of Unsecured Claims

17. The Term Sheet describes, in detail, how unsecured prepetition claims with respect to the transactions in which members of the Ad Hoc Committee are involved are to be calculated. However, this mechanism binds only the Debtors; it does not affect the rights of the

7

Creditors' Committee or any other party to object to any claims made by the members of the Ad Hoc Committee.

### 6.     Extension of 1110 Period

18.    The Term Sheet provides for a further extension of the 60-day period for all purposes under Section 1110 of the Bankruptcy Code with respect to the relevant Aircraft Equipment to which Section 1110 applies.

### 7.     Fees and Expenses

19.    Finally, the Term Sheet provides that Delta will pay certain reasonable fees and expenses of the Financing Parties and the Ad Hoc Committee related to aspects of the pending bankruptcy proceeding relevant to the interests of the Financing Parties and the members of the Ad Hoc Committee and the negotiation, documentation and implementation of the Term Sheet. The terms and scope of the payment of these fees and expenses are described in detail in a separate letter agreement that is attached to the Term Sheet Motion in redacted form.

### Applicable Legal Standard

20.    In *In re STN Enterprises*, 779 F.2d 901 (2d Cir. 1985), the Second Circuit established a two-pronged test for determining if and when an official committee of unsecured creditors should be granted authority to bring a suit on behalf of a debtor.  First, the committee must present "a colorable claim or claims for relief that on appropriate proof would support a recovery".  *Id*. at 905.  Assessment of the claims asserted by the committee does not require a "mini-trial".  However, it does require some assessment of the claims' legal merits.  In applying *STN Enterprises*, courts have regularly held that the first prong of the *STN Enterprises* test requires that the claims be sufficient to survive a motion to dismiss for failure to state a claim. *See, e.g., In re KDI Holdings, Inc.,* 277 B.R. 493, 508 (Bankr. S.D.N.Y. 1999); *In re America's Hobby Center, Inc.*, 223 B.R. 275, 280 (Bankr. S.D.N.Y. 1998).

21. The second prong of the *STN Enterprises* test requires that the court "examine, on affidavit and other submission, by evidentiary hearing or otherwise, whether an action asserting such claims(s) is likely to benefit the reorganization estate." *STN Enterprises*, 779 F.2d at 905. Here the court must perform a "cost-benefit analysis" to determine whether the costs to the estate in pursuing the action would be outweighed by the potential gain should the action be successful. The court must also assure itself that there is "sufficient likelihood of success" to justify the anticipated costs. *Id*. at 906.

22. In assessing the costs associated with pursuing an action, courts have naturally focused on attorneys' fees, and in *STN Enterprises* the Second Circuit stated that "fee arrangements should not only be made a matter of record but should be carefully examined by the court as it makes [its] determination." *Id.* at 905. The courts, however, have also weighed other, indirect costs in their analysis, including "whether prosecution of the litigation would impede the Debtors' reorganization." *In re Adelphia Communications Corp*., 330 B.R. 364, 383 (Bankr. S.D.N.Y. 2005).

## Argument

### I. The Creditors' Committee's Antitrust Claims Are Untenable Under Controlling Case Law

23. The Creditors' Committee's proposed antitrust claims are deficient as a matter of law for two reasons. First, under well-settled law, coordination among similarly situated creditors for the purpose of restructuring existing debt does not implicate competition or markets as contemplated by the antitrust laws. Second, the proposed claims are barred by the *Noerr-Pennington* doctrine, which immunizes from antitrust liability joint government-petitioning conduct such as Delta's and the Ad Hoc Committee's petitioning this Court for the approval of the Term Sheet.

9

### A. The Antitrust Laws Do Not Bar Collective Negotiations By Similarly Situated Creditors

24. The claim the Creditors' Committee seeks to litigate is the same claim advanced by United Airlines, and rejected, just a few months ago in *United Airlines, Inc. v. U.S. Bank N.A.*, 406 F.3d at 918. In that case, United argued that secured bondholders violated the Sherman Act by negotiating as a group with respect to the terms of their lease agreements with United and by refusing to negotiate separately on a transaction-by-transaction basis. United alleged that this conduct amounted to illegal price-fixing because it allegedly affected the future terms and prices on which aircraft would be available to United.

25. Based on United's allegations, the Bankruptcy Court for the Northern District of Illinois initially enjoined the bondholders (through trustees representing them) from repossessing their planes pursuant to Section 1110 of the Bankruptcy Code. After the District Court refused to hear the appeals of what it described as the non-final orders, the bondholders sought a writ of mandamus from the Seventh Circuit Court of Appeals. The Seventh Circuit Court of Appeals accepted the appeal, and flatly rejected United's antitrust claim.

26. The Seventh Circuit opinion was written by one of the country's leading antitrust jurists, Judge Frank Easterbrook. The Court held that United's "antitrust claim is thin to the point of invisibility." *Id.* at 924. "Competition comes at the time loans are made," Judge Easterbrook stated, and "cooperation in an effort to collect as much as possible of the amounts due under competitively determined contracts" – the cooperation that the Ad Hoc Committee is accused of here – "is not the sort of activity with which the antitrust laws are concerned." *Id.* at 921. Put another way: "Negotiating discounts on products *already* sold at competitive prices is not a form of monopolization." *Id.* at 925. (emphasis in original).

10

27.     The Creditors' Committee seeks to make claims that are virtually identical to the claims made in the United Airlines case. It attempts to distinguish Judge Easterbrook's decision by arguing that the antitrust "aspect of the litigation was not the focal point of the court's opinion and received such short shrift that the court's holding . . . is of extremely limited precedential value." Motion at ¶18. However, the Creditors' Committee in the United Airlines case attempted to make that same argument, and that argument, too, was flatly rejected by the Court of Appeals. When the Creditors' Committee in the United Airlines case sought to force United to continue to prosecute the antitrust claims, the Seventh Circuit issued a second decision to enforce its mandate. *See United Airlines, Inc. v. U.S. Bank N.A.*, 409 F.3d 812, 813 (7th Cir. 2005). In that decision, Judge Easterbrook confirmed that the prior antitrust ruling was not *dicta;* that it was an alternative and sufficient ground for denial of the injunction; and that the prior decision stands for the controlling proposition that "United's adversary action, accusing the lessors of violating the antitrust laws by engaging in joint negotiation, is legally untenable." *Id.* at 813.

28.     The Creditors' Committee also argues that the Seventh Circuit's decision in *United* is "contrary . . . to Second Circuit case law." Motion at ¶18. However, the leading case in the Second Circuit is *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, which similarly rejected a contention that the antitrust laws outlaw efforts by creditors to coordinate their positions in bankruptcy. In fact, Judge Easterbrook cited to the *Sharon Steel* decision as support for his ruling in United Airlines. *See United Airlines, Inc. v. U.S. Bank N.A.*, 406 F.3d at 918 (citing *Sharon Steel v. Chase Manhattan Bank, N.A.,* 691 F.2d at 1052-53).

29.     In *Sharon Steel*, a company claimed that a group of indenture trustees had allegedly conspired in violation of section 1 of the Sherman Act to declare a default under

11

existing debts and to force a redemption of outstanding debentures. The court in *Sharon Steel* rejected the antitrust claim and held that the "Indenture Trustees were faced with a common breach of indenture agreements by UV and their seeking to arrive at, and arriving at, a common position as to that breach is not anti-competitive." *Id. at* 1052. If "creditors were forced to act individually," the Court held, "each would be compelled to resort to the most extreme action available in order to protect its individual interest." *Id*. "Mutual forbearance," on the other hand, reduced losses to creditors and transaction costs. *Id*. The Court concluded that there was "no anti-competitive purpose or effect in such concerted activity" on existing debt. *Id*.

30. The only other court that has addressed this issue reached the same conclusion. *See Falstaff Brewing Corp. v. New York Life Insurance Co*., 513 F. Supp 289 (N.D. Cal. 1978). *Falstaff* involved loans to Falstaff made by two insurance companies and four national banks. Falstaff encountered financial trouble, and the parties agreed upon the pro rata sharing of Falstaff's loan payments. *Id*. at 290. Later, Falstaff attempted to prepay the loans to the national banks (which had higher interest rates), without proportional payments to the insurance companies. *Id*. at 292. Falstaff claimed that the lenders' demand for proportional payments was illegal price fixing under the antitrust laws. *Id*.

31. The Falstaff Court determined first that the lenders could not be accused of engaging in any unlawful restraint of trade because they "were not competing with . . . other institutions to offer or to supply [the Plaintiff] with more credit, but were attempting to secure that credit which they had already extended, the terms of which had already been negotiated." *Id*. at 293. "This," the Court held, "is the opposite of price-fixing." *Id.* at 293-94. Furthermore, the Court held that "workout arrangements" such as these "are "long-standing and accepted means of avoiding bankruptcy. For such arrangements to succeed all the lenders must mutually

12

agree to forbearance and no major lender will commit to such forbearance unless all of them do." *Id*. Thus, the Court was "persuaded that they constitute a long accepted method of avoiding bankruptcy; and that as such they are reasonable, and not violative of the antitrust laws." *Id*. at 294.

32. The Creditors' Committee argues that this Court should disregard all of the foregoing cases. They argue that debtors are "relieved from fulfilling their future obligations pursuant to section 365 of the Bankruptcy Code," and "any negotiation with respect to future lease terms" is therefore "negotiation over a new contract." Motion at ¶ 20. Of course, the same was true in *United*, and the Seventh Circuit flatly rejected the argument. *United Airlines, Inc. v. U.S. Bank N.A.*, 406 F.3d at 924. "As best we can make out," Judge Easterbrook held, "what United means by 'future terms and prices on which they . . . make aircraft available' is how much *less* than the contract price the lessors and lenders are willing to accept to forbear from repossessing planes now in United's hands." *Id*. at 925 (emphasis in original). United, like the Creditors' Committee in this case, was objecting to "collaboration among creditors to formulate a position about how much of a haircut to accept," *id.*, and that conduct simply is not a violation of the antitrust laws.

33. The Creditors' Committee also relies heavily on *Primetime 24 Joint Venture* v. *National Broadcasting Co*., 219 F. 3d 92 (2d Cir. 2000), but that case is inapposite. There, a group of competing copyright holders (television stations) conspired to jointly negotiate licenses for future use of their programming by a satellite service. The Court held that the concerted actions of the copyright holders constituted a horizontal agreement among competitors that was a "*per se* antitrust violation." *Id.* at 102-03. But *Primetime 24* diverges form the situation here on

13

the most critical point – the license holders in *Primetime 24* were not renegotiating existing obligations, as is the case with Delta and the Ad Hoc Committee.

34. The Creditors' Committee's final argument is against a straw man – the proposition "that neither the Bankruptcy Code generally nor section 1110 specifically contain language explicitly immunizing aircraft creditors [who engage in collusive conduct] from Sherman Act liability." Motion at ¶ 26. But this is not the Debtors' argument, nor is it what the Seventh Circuit decided. The case law says – and the Debtors maintain – that the negotiation by a debtor of discounts from existing contractual obligations to various creditors does not constitute a "market," or a form of "competition," to which the antitrust laws apply. Thus, there is no antitrust violation even where, as in *United*, *Sharon Steel* and *Falstaff*, there is an explicit and acknowledged agreement among creditors regarding the renegotiation of existing commitments. Similarly, joint efforts to restructure debt obligations after the Debtors' default and bankruptcy filing do not give rise to a new round of competition governed by the antitrust laws.

**B.   The Ad Hoc Committee Is Also Immune From Antitrust Challenge Under the *Noerr-Pennington* Doctrine**

35. The *Noerr-Pennington* doctrine provides a separate basis for denying the Creditors' Committee's Motion. The *Noerr-Pennington* doctrine immunizes from the antitrust laws collective action by competitors in jointly petitioning the government even if the result of the government's conduct would have anticompetitive effects. *See Eastern R.R. Pres. Conf. V. Noerr Motor Freight*, 365 U.S. 127 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965). *Noerr-Pennington* applies not only to petitioning of legislatures, but also to the judicial system. *See Prof'l Real Estate Investors v. Columbia Pictures Indus.*, 508 U.S. 49 (1993). The petitioning process falls under the *Noerr-Pennington* doctrine even if the petitioning is

14

unsuccessful. *See id.* at 54 (any suit brought with probable cause is immune). So long as the adjudicative process is being used to press legitimate claims, joint efforts to do so are immunized from antitrust liability even if the aim or effect of "doing so is to eliminate competition." *Razorback Ready Mix Concrete Co. v. Weaver*, 761 F.2d 484, 487 (8th Cir. 1985).

36. The Debtors and the Ad Hoc Committee are negotiating under the umbrella of this bankruptcy proceeding a settlement that will result in cost savings of hundreds of millions of dollars. The aim of the entire process of negotiations between the Debtors and the Ad Hoc Committee has been towards submitting a final term sheet to this Court for its approval prior to implementation of any agreement between the parties. Indeed, the settlement and Term Sheet cannot take effect without this Court's approval; in other words, the entire process of negotiation and eventual settlement between the Debtors and the Ad Hoc Committee has no economic effect absent petitioning this Court for approval. *See Reynolds v. Commissioner of Internal Revenue*, 861 F.2d 469, 473 (6th Cir. 1988) ("In bankruptcy proceedings ... any compromise between the debtor and his creditors must be approved by the court as fair and equitable.") The fact that any injury to competition here requires the imprimatur of this Court makes the entire negotiating process immune under the *Noerr-Pennington* doctrine – regardless of whether the petitioning is successful. *See Noerr*, 365 U.S. at 135-136.

37. Again, *United* is directly on point. The Court held that "[n]egotiations on reductions to be taken in bankruptcy, when the buyer cannot pay all of its debts, are common and lawful, under the *Noerr-Pennington* doctrine . . . . " *United Airlines, Inc. v. U.S. Bank N.A.*, 406 F.3d at 925. The Creditors' Committee contends that *Noerr* should not apply to the so-called collusive negotiation tactics of the Ad Hoc Committee. Motion at ¶ 31, n8. However, the cooperation in negotiation that the Creditors' Committee derides as collusive has effect only if

15

the negotiated terms are approved by the Court. As the Seventh Circuit held, "[c]ollective renegotiation succeeds only if the court approves." *United Airlines, Inc. v. U.S. Bank N.A.*, 406 F.3d at 921, *citing California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508. Accordingly, the *Noerr-Pennington* doctrine applies.

38.     Once more, the Creditors' Committee relies upon *PrimeTime 24*, but again that case does not support its position. 219 F.3d 92.[3] Defendants broadcasters in *PrimeTime 24* argued that their coordinated refusal to negotiate licenses with the plaintiff amounted to the rejection of a settlement offer in a litigation, and was therefore afforded *Noerr-Pennington* immunity. *Id.* at 102. The Court rejected defendants' argument because plaintiff's offers of licensing deals predated the litigation, and therefore defendants' anticompetitive conduct was not solely related to settling the litigation. *Id.* at 102. Here, the negotiations between the Debtors and the Ad Hoc Committee took place entirely within the context of the bankruptcy proceedings. Further, and more importantly, any settlement in *PrimeTime 24* would not have required court approval, whereas this Court must approve the Term Sheet agreed to by the Debtors and the Ad Hoc Committee.[4]

---

[3] As an initial matter, the *PrimeTime 24* Court's *Noerr-Pennington* analysis focused on the so-called "sham" exception to the doctrine, which applies where meritless legal proceedings are brought for the purpose of injuring a competitor. *Id.* at 101. The Creditors' Committee does not allege that the exception applies here.

[4] The Creditors' Committee also incorrectly relies on *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988), and *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990). Motion at ¶ 33, n9. Those cases involved defendants who violated the antitrust law as a *means* to obtain favorable outcomes from government bodies, which the Creditors' Committee does not allege is the case here. *Trial Lawyers*, 493 U.S. at 425 (lawyers engaged in a group boycott to force the District of Columbia to raise the lawyers' hourly rates); *Allied Tube*, 486 U.S. at 500 (steel companies conspired to exclude PVC conduits from private association's code in order to influence statutory codes).

22107664v5

## II. Pursuit of the Antitrust Claims Would Cause Substantial Damage to the Debtors' Estates

39.     The Motion does not purport to estimate the actual costs of pursuing antitrust claims.  The Creditors' Committee asserts that litigation costs will be "comparatively minimal" because "discovery regarding the Antitrust Claims will have already taken place in the context of the litigation over the Term Sheet."  Motion at ¶ 36.  However, this is a dubious proposition.

40.     More importantly, the Motion is entirely silent concerning the indirect costs of the proposed litigation.  All but nine of the Aircraft qualify for the protections of Section 1110 of the Bankruptcy Code.  Section 1110(a)(1) of the Bankruptcy Code provides in part:

> [T]he right of a secured party with a security interest in equipment [of the type described in Section 1110(a)(3)] . . . or of a lessor or conditional vendor of such equipment, to take possession of such equipment in compliance with a security agreement, lease, or conditional sale contract, and to enforce any of its other rights or remedies, under such security agreement, lease, or conditional sale contract, to sell, lease, or otherwise retain or dispose of such equipment, is not limited or otherwise affected by any other provision of this title or by any power of the court

The only exceptions are (a) if the Debtors agree, before the expiration of the first 60 days after a bankruptcy filing, to cure defaults and to comply with the terms of the underlying security agreements, or (b) if the deadline for making such an agreement has been extended with the agreement of the relevant secured parties or lessors.  *See* 11 U.S.C. § 1110(a)(2).

41.     The 60-day period with respect to the Aircraft, as extended by prior stipulations between the Debtors and the Financing Parties, will expire at 11:59 P.M. on February 17, 2006.  Inasmuch as the rental rates set forth in the Aircraft Agreements substantially exceed market rates (by more than $200 million per year in the aggregate), an election to cure defaults and to perform all obligations under the Aircraft Agreements is not a viable option for the Debtors.

42.     In addition, if the 60-day period, as extended, should expire, the Financing Parties will be free to repossess the Aircraft.  Pursuant to Section 1110, this right of the Financing

17

Parties "is not limited or otherwise affected by any other provision of [the Bankruptcy Code] or by any power of the court." 11U.S.C. § 1110(a)(1). In fact, in a portion of Judge Easterbrook's opinion in *United Airlines* conveniently ignored by the Creditors' Committee, the Seventh Circuit held that even where the antitrust laws have been violated the violation cannot serve as the basis for an injunction against repossession of aircraft equipment pursuant to Section 1110 of the Bankruptcy Code. *United Airlines, Inc. v. U.S. Bank N.A.*, 406 F.3d at 924.

43. As a result, a decision to pursue an antitrust suit, in preference to the negotiated transaction embodied in the Term Sheet, would leave the Debtors fully exposed to the loss of 79 aircraft—a substantial portion of their mainline fleet. The sudden loss of even a few of these Aircraft could significantly disrupt the Debtors' operations. Loss of any material portion of the Aircraft could—in the Creditors' Committee's own words—"cripple" the Debtors. Motion at Preliminary Statement.

44. In essence, the Creditors' Committee advocates that the Debtors risk their operational stability on a highly speculative legal claim that has been rejected by every court that has considered it to date. Such a tradeoff should be rejected out of hand.

### III. Alleged Antitrust Injury

45. The Creditors' Committee contends that the terms of the Term Sheet reflect "antitrust injury" resulting from the Ad Hoc Committee's anticompetitive conduct. In fact, however, the Term Sheet represents a significant step forward for the Debtors. Far from being "above-market" as contended in the Motion, the new rental rates compare favorably to prevailing market rates and represent an aggregate savings of over $200 million per annum relative to the existing rates under the Aircraft Agreements.

22107664v5

46. As the Debtors will show at the hearing on the Term Sheet Motion, the Motion's characterization of other terms and conditions in the Term Sheet as "onerous" reflects a similar misunderstanding of either the market or the transaction.

- *Alleged Inclusion of Suboptimal Aircraft*. The Debtors always anticipated retaining the wide-body aircraft of which the Creditors' Committee complains if attractive lease terms could be negotiated.

- *Allegedly Unreasonable Liquidated Damages Provisions*. The Termination Obligations are substantially less onerous than a full assumption of the leases and substantially less expensive than the liquidated damages for early termination originally sought by the Ad Hoc Committee or typically required in aircraft leasing transactions.

- *Alleged Additional Cost of Return Conditions*. Because of the Debtors' ability to set unilaterally the specific lease term for each Aircraft and to exercise where appropriate renewal options at the end of the lease term, the return conditions to which the Creditors' Committee objects will not impose significant additional costs on the Debtors. These return conditions were also central to the Debtors' ability to negotiate the substantial reduction in rental rates reflected in the Term Sheet.

- *Calculation of Unsecured Prepetition Claims.* The Creditors' Committee fails to explain its objection to the formula set forth in the Term Sheet. The Creditors' Committee is free (as are other parties in interest) to object to the claim amounts on which the Debtors and the Ad Hoc Committee have agreed, so there is no substance to the Creditors' Committee's complaint about this provision.

- *Non-1110 Aircraft*. Contrary to the Creditors' Committee's assertion, the Term Sheet does not treat non-1110 Aircraft as if they qualified for Section 1110 protection. The rental rates negotiated for these Aircraft compare favorably to market rates for similar aircraft.

47. Further details will be provided at the hearing that is scheduled to commence on February 13, 2005.

19

22107664v5

**Conclusion**

  For the foregoing reasons, the Debtors respectfully request that this Court deny the relief sought in the Motion, and that the Court grant such other and further relief as the Court may deem just and proper.

Dated: New York, New York  Respectfully submitted,
    January 27, 2006

            By: /s/ Richard F. Hahn
               Michael E. Wiles (MW 0962)
               Joseph P. Moodhe (JM 6068)
               Richard F. Hahn (RH 5391)
               DEBEVOISE & PLIMPTON LLP
               919 Third Avenue
               New York, New York  10022
               Telephone:  (212) 909-6000
               Fax:  (212) 909-6836

               Special Aircraft Attorneys for Debtors and
               Debtors in Possession