**BINGHAM MCCUTCHEN LLP**

399 Park Avenue

New York, NY 10022-4689

(212) 705-7000

Michael J. Reilly (Pro Hac Vice)

F. Mark Fucci (Pro Hac Vice)

Ronald J. Silverman (RS - 7762)

Mark M. Elliott (ME - 0840)

   -and-

Three Embarcadero Center

San Francisco, CA 94111

(415) 393-2000

Alfred C. Pfeiffer (Pro Hac Vice)

Attorneys for the Ad Hoc Committee
 of Senior Secured Holders

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| -------------------------------------------------------- | x | |
| | : | |
| **In re:** | : | **Chapter 11 Case No.** |
| | : | |
| **DELTA AIR LINES, INC., et al.,** | : | **05-17923 (ASH)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |
| -------------------------------------------------------- | x | |

**OBJECTION OF THE SENIOR SECURED HOLDERS TO**
**THE MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**OF DELTA AIRLINES, INC. *ET AL.* FOR AUTHORITY TO PROSECUTE**
**CERTAIN ANTITRUST CLAIMS ON BEHALF OF THE DEBTORS' ESTATES**

The senior secured holders of aircraft indebtedness (the "Senior Secured Holders")

organized as an ad hoc committee (the "Ad Hoc Committee"), by and through its undersigned

counsel, submit this Objection to the Motion of the Official Committee of Unsecured Creditors

(the "Creditors Committee") of Delta Air Lines, Inc. ("Delta"), *et al.* for Authority to Prosecute

Certain Antitrust Claims on Behalf of Debtors' Estates (the "Creditors Committee Motion"). In

support of the instant objection, the Senior Secured Holders respectfully state as follows:

## I.  PRELIMINARY STATEMENT

The collective restructuring of Delta's existing obligations pursuant to a court approval

process is not prohibited by the antitrust laws.

The antitrust claims the Creditors Committee proposes are nearly identical to claims this

Circuit previously characterized as "border[ing] on the frivolous," *Sharon Steel Corp. v. The*

*Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1052 (2d Cir. 1982), the Seventh Circuit recently

concluded are "thin to the point of invisibility," *United Airlines, Inc. v. U.S. Bank, N.A.*,

406 F.3d 918, 924 (7th Cir. 2005) ("*United I*"), and "legally untenable," *United Airlines, Inc. v.*

*U.S. Bank, N.A.*, 409 F.3d 812, 813 (7th Cir. 2005) ("*United II*," together with United I,

"*United*"), and another court termed "the very opposite of price-fixing." *Falstaff Brewing Co. v.*

*New York Life Ins. Co.*, 513 F. Supp. 289, 293 (N.D. Cal. 1978).  The courts resoundingly agree -

- coordination among creditors regarding renegotiations of existing contract obligations does not

pose any antitrust concerns and, in fact, is pro-competitive.  This is especially true given the

absolute right of repossession conferred by Bankruptcy Code Section 1110 upon the Senior

Secured Holders if Delta fails to honor those existing obligations in full according to their

existing terms.  The Creditors Committee responds by criticizing the reasoning of these cases,

but they are well-reasoned and there is no basis for this Court to ignore them.

The Supreme Court's well-established *Noerr-Pennington* doctrine is also applicable here,

affording the Senior Secured Holders immunity from prosecution under the antitrust laws.  *See*

*United Mine Workers v. Pennington*, 381 U.S. 657 (1965); *Eastern R.R. Pres. Conf. v. Noerr*

*Motor Freight of Am., Inc.*, 365 U.S. 127 (1961).  The *Noerr-Pennington* doctrine recognizes the

constitutional rights of the Senior Secured Holders to join together and petition this Court for

approval of the Negotiated Restructuring without fear of prosecution under the antitrust laws.

Therefore, in addition to case law directly refuting the Creditors Committee's purported claims

of anti-competitive conduct, they cannot prosecute as a matter of law because the underlying activity is immune from the antitrust laws under the *Noerr-Pennington* doctrine.

The flaws in the Creditors Committee's proposed claims run much deeper than just *Sharon Steel* and *United*, and *Noerr-Pennington* immunity. The Creditors Committee could not present a colorable claim even in the absence of all that clear precedent, because the Creditors Committee does not and cannot present any of the necessary elements that define a legally cognizable relevant market where the alleged anticompetitive behavior could do any harm. It also cannot show any actual harm to competition, consumers, or anyone else, required to create standing to bring an antitrust claim -- in any market -- in the first place.

In the end, the Creditors Committee Motion appears to be motivated not by any genuine claims that Delta and the Senior Secured Holders acted improperly in jointly negotiating, but rather from frustration at not having been part of those negotiations. This concedes the invalidity of its motion -- as the Creditors Committee, like the Ad Hoc Committee, recognizes the value of joint negotiations. The Creditors Committee represents a collective body of widely disparate and unrelated contract parties who hold unsecured claims. The Ad Hoc Committee is comprised of holders of cross-over interests in many of Delta's aircraft. The two committees just happen to represent different collective constituencies with different collective goals, but that does not make one set of collective negotiations more or less valid than the other.

The Creditors Committee Motion is nothing more than an effort by the Creditors Committee to impose its will on and substitute its business judgment for Delta. The determination to defeat the Delta-Senior Aircraft Holder agreement is no substitute for a valid legal theory. Because the Creditors Committee has not come close to demonstrating the existence of a colorable antitrust claim, there is nothing for the Creditors Committee to prosecute

and this Court should deny its motion. Indeed, the law on this point is so clear and unanimous that it is uncertain why the prosecution of the Creditors Committee Motion is anything other than a waste of the estates' assets -- and would not pass the Rule 11 standard of the Federal Rules of Civil Procedure.

## II.  SUMMARY OF OBJECTION

1.      The Senior Secured Holders hold senior secured economic interests in a substantial portion of Delta's leased and financed mainline aircraft fleet, which includes:  eighty-eight aircraft consisting of MD-88s, B-757s, B-767s and B-767ERs (collectively, the "Subject Aircraft").  Most of the Senior Secured Holders hold cross-interests in multiple aircraft within each of the four model types.  Delta and the Senior Secured Holders have worked together to negotiate certain terms of restructurings with respect to the Subject Aircraft for which Delta currently seeks Court approval (the "Negotiated Restructuring").

2.      Section 1110 of the Bankruptcy Code ("Section 1110"), among other statutes and case law, governs the relationship between the Senior Secured Holders and Delta.  *See* 11 U.S.C. § 1110.  Section 1110 specifically defines the rights Delta has with respect to many of its leased and financed aircraft.  Under Section 1110, Delta may continue to use such aircraft only if Delta fully complies with the existing lease or financing obligations or reaches a consensual restructuring agreement with the affected party for each aircraft.  If Delta fails to do so, the Senior Secured Holders have a statutory right to demand return of the aircraft.  *See* 11 U.S.C. § 1110(c).  Delta must comply with such demands.

3.      At a very early stage in its bankruptcy, Delta requested that the Senior Secured Holders lower the rents and debt obligations that Delta owes regarding the Subject Aircraft.  The Senior Secured Holders agreed to make substantial monetary concessions in Delta's favor if such concessions were negotiated and implemented in a collective and final manner that would yield a

long-term solution for both sides.  The Senior Secured Holders and Delta sought to avoid

protracted, expensive and inefficient negotiations on an individual plane-by-plane basis with

respect to each of the eighty-eight different aircraft.  To that end, the contract counterparties

engaged in collective, arms-length negotiations on a comprehensive basis that involved the

leases for all of the Subject Aircraft to craft an agreement that would allow Delta to continue to

satisfy its restructured obligations and operate the Subject Aircraft.  Hard bargaining by both

sides produced the mutually beneficial Negotiated Restructuring in a very short time-frame.[1]  As

a result, Delta has assured itself -- at an early stage for an airline bankruptcy -- that it will be able

to continue using a critical portion of its mainline fleet on substantially reduced terms.  The

economic benefit Delta has secured as a result of these collaborative negotiations is significant:

Delta will realize cash flow savings on the subject aircraft in excess of $1 billion (on a present

value basis over the life of the deal), translating into a savings in excess of 50% across the

Subject Aircraft.

4.      Nonetheless, the Creditors Committee objects to the Negotiated Restructuring.

The Creditors Committee seems to appreciate that the Negotiated Restructuring will be approved

because it is certainly within Delta's sound business judgment.  The Creditors Committee's

request for authority to sue the Senior Secured Holders for alleged antitrust violations is nothing

more than a back-door attempt to block the approval of the Negotiated Restructuring.  If the

Creditors Committee Motion achieves its objective, it will be detrimental to the estate and

potentially fatal to Delta's ability to reorganize and emerge from bankruptcy.

5.      The Creditors Committee Motion for authority to pursue antitrust claims must be

denied because the Creditors Committee cannot satisfy the two-prong standard the Second

---

[1] The Negotiated Restructuring is the subject of the Delta Motion for Order Approving a Term Sheet and an Extension of Section 1110 Deadlines and Authorizing Agreements to Restructure Transactions Affecting Eighty-Nine Aircraft and Associated Engines, Equipment and Documents (the "Delta Motion").

Circuit established in *Unsecured Creditors Committee of Debtor STN Enters., Inc. v. Noyes* (*In re STN Enters.*), 779 F.2d 901 (2d Cir. 1985). The *STN* standard requires a determination that (1) the claims to be asserted are colorable and (2) the debtor unjustifiably failed to bring claims that will result in a recovery and will benefit the estate. *STN*, 779 F.2d at 905. The Creditors Committee cannot satisfy either prong.

6.     First, as discussed in detail below, well established precedent in the Second and Seventh Circuits hold that the negotiations between Delta and the Senior Secured Holders to restructure existing obligations pursuant to a court approval process plainly are not prohibited by the antitrust laws. *See generally Sharon Steel Corp. v. The Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982); *United Airlines, Inc. v. U.S. Bank N.A.*, 406 F.3d 918 (7th Cir. 2005). In addition, the *Noerr-Pennington* doctrine affords the parties complete immunity from antitrust claims that are based on collective action in a judicial setting such as bankruptcy. Finally, even if those legal barriers did not exist, the Creditors Committee still does not and cannot allege the basic elements necessary for the type of claim it asserts: (1) a cognizable relevant market within which the alleged activity has an anticompetitive effect, and (2) any such anticompetitive effect. Thus, the first prong of the *STN* test is not met.

7.     Second, should this Court allow the Creditors Committee to pursue its antitrust claims, the Negotiated Restructuring will dissolve, thus destroying $1 billion of savings accomplished by this settlement. As a result, the alleged antitrust injury would be avoided *ab initio*, and no litigation recovery could result. If the Court does not approve the Negotiated Restructuring and it is not consummated, the Senior Secured Holders likely will exercise their statutory rights to demand the return of many aircraft in order to achieve the timely recovery of their investments. Delta has acknowledged this would be a disaster for the carrier. Thus, not

only would antitrust litigation yield no recovery for the estate, it would risk severe damage to the estate -- hardly the benefit to the estate required by the second prong of *STN*.

8.      Ultimately, no antitrust activity or injury has occurred.  Rather, the Delta estate has *gained* $1 billion in cash flow savings and a solid footing for its reorganization.  The Creditors Committee simply wants more.  If the Creditors Committee achieves its goal, it hopes to scuttle the deal and win more savings in yet a second negotiation -- but they turn a blind eye to the much greater risk of losing the savings and the aircraft.  The Bankruptcy Code and public policy encourage creditors  to negotiate collectively with the debtor.  That will not happen if creditor groups such as the Senior Secured Holders must operate under fear of potential antitrust prosecution.  Indeed, they would be wiser to exit the field and moot the allegations forever.

### III. <u>OBJECTION</u>

**A.      The Creditors Committee Motion Fails To Pass Muster Under The Two-Pronged *STN* Test**

9.      The Creditors Committee asks this Court to grant it authority to prosecute antitrust claims against the Senior Secured Holders for their having collectively reached agreement with Delta on the Negotiated Restructuring.  Both the Senior Secured Holders and Delta oppose the Creditors Committee Motion.

10.      The standard that governs the Creditors Committee's request for authority to prosecute estate actions -- in this case, purported antitrust claims -- is not disputed.  In *STN*, the Second Circuit sets forth the standard governing whether an official creditors' committee may bring an action on behalf of the estate where the debtor has not brought and will not bring such action.  *See STN*, 779 F.2d at 905.  The Second Circuit articulated a two-prong standard.  First, the action must present "a colorable claim or claims for relief that on appropriate proof would support a recovery . . . ."  *Id.*  Second, even if the action presents such a colorable claim for

relief, the court must determine whether the debtor unjustifiably failed to bring such action by

examining "whether an action asserting such claim(s) is likely to benefit the reorganization

estate." *Id.* In conducting its examination, this Court may only grant the Creditors Committee

Motion if it has assured itself that "there is a sufficient likelihood of success to justify the

anticipated delay and expense to the bankruptcy estate that the initiation and continuation of

litigation will likely produce." *Id.* at 906. As discussed below, granting the Creditors

Committee Motion would throw away a $1 billion settlement and, instead, allow the Creditors

Committee to prosecute its meritless antitrust claims, which would harm -- not benefit-- the

Debtors' estates. The Creditors Committee Motion should be denied.

**B.      The Proposed Antitrust Claims Are Meritless And Are Not Colorable**

11.      The proposed antitrust claims fail at every conceivable level. The claims are

contrary to well-settled precedent directly on point, would be immune as related to judicial

activities under the *Noerr-Pennington* doctrine, and do not meet basic antitrust pleading

requirements.

**a.      The Creditors Committee's Proposed Claims Are Contrary To Well-Established Precedent**

**(i)      Case law in this Circuit and elsewhere uniformly holds that collective creditor negotiations do not raise any antitrust concerns**

12.      The law in this Circuit is well settled that "concerted activity" among creditors in

renegotiations of existing financial obligations does not raise antitrust concerns. *Sharon Steel*,

691 F.2d at 1052. In *Sharon Steel* this Circuit relied in part on *Falstaff*, which held that a group

of six lenders collectively agreeing to proposed repayment terms on pre-existing debt "did not

constitute price-fixing" and was "not violative of the antitrust laws." *Falstaff*, 513 F. Supp.

at 293-94. *Sharon Steel* is directly on point, remains controlling law in this Circuit and has been

followed elsewhere. Most recently, in a case involving a near-identical collaboration of aircraft

contract counterparties collectively bargaining with United Airlines during its bankruptcy

proceedings, the Seventh Circuit relied upon *Sharon Steel* in rejecting United Airlines' antitrust

claim, even where the group of aircraft financiers was "*insisting* that the debtor deal with them

collectively about *all* 175 leased airplanes." *United I*, 406 F.3d at 921 (emphasis added). The

case law uniformly holds that the Creditors Committee cannot craft any colorable Sherman Act

claim stemming from the Senior Secured Holders' collective renegotiations of existing leases

with Delta.

        **(ii)       Collective creditor renegotiations are pro-competitive and cannot
              cause anticompetitive harm**

        13.      Any assessment of the competitive effects of the Senior Secured Holders' conduct

must start with Section 1110, which specifically contemplates and addresses the unique

circumstances facing commercial airlines and their contract counterparties. Section 1110 creates

an unassailable right for aircraft creditors to repossess the equipment should a bankrupt airline

fail to cure defaults, perform existing contracts, or renegotiate acceptable terms, within 60 days

of filing for bankruptcy. *See* 11 U.S.C. § 1110; *see also United II*, 409 F.3d at 813 (granting

mandamus to immediately dissolve injunction barring repossession). This statutory mechanism

is pro-competitive -- it facilitates financing by aircraft equipment lenders who otherwise might

be discouraged from funding aircraft by the prospect of an airline's potential bankruptcy. As the

*United I* court noted, the statutory repossession rights are necessary because "it is exactly this

prospect that makes credit available on better terms when the air carriers shop for financing in

the first place." *United I,* 406 F.3d at 924. But the provision is hardly one-sided:

Section 1110's repossession rights are necessary to ensure that *both* sides to the deal "have

access to competitive markets". *See United I*, 406 F.3d at 925. The Senior Secured Holders are

not forced to deal with one specific airline and *vice versa*.

14.     In the spirit of Section 1110, the Senior Secured Holders and Delta reached an agreement that allows the Senior Secured Holders to continue to collect on obligations due them -- albeit at substantial discount -- and allows Delta to continue to operate the aircraft without any interruption to its service.  The interests of both parties are advanced, not harmed, as a result of the Negotiated Restructuring.  This is the precise outcome Section 1110 contemplates.  In fact, this Circuit has observed that this type of "[m]utual forebearance by creditors . . . may be in the interests of both debtors and creditors in that it maximizes repayment and gives the debtor a chance of survival."  *Sharon Steel*, 691 F.2d at 1052.[2]

15.     In the context of airline bankruptcy negotiations, "[o]nly if potential sellers and lenders conspire to set the price at which [the airline] can acquire *replacement* aircraft would there be a genuine antitrust problem . . . ."  *United I*, 406 F.3d at 925-26 (emphasis in original).[3] Here, the Creditors Committee has not made, and cannot make, such a showing.  Delta was not in the market for additional aircraft to add to its operation and was not competing with other airlines looking to bolster their fleets.  The Senior Secured Holders are counterparties on *existing* leases and loans with Delta.  They were not competing to offer additional aircraft -- quite the contrary, the Senior Secured Holders were negotiating *reductions* on *pre-existing* deals.  The *United I* court summed up why these facts render any antitrust claims untenable:  "Negotiating discounts on products *already* sold at competitive prices is not a form of monopolization.

---

[2] The rights conferred by Section 1110 also make clear that there is no risk of competitive harm from creditors joining together in their negotiations with Delta.  The statute is specifically designed to encourage collective renegotiation and "it does not matter whether . . . the lessors are engaged in strategic behavior.  The statute gives them that entitlement, treating aircraft different from other assets."  *United I*, 406 F.3d at 924.

[3] That same rule applies outside the Section 1110 context, and even in non-bankruptcy settings.  In *Falstaff*, the court considered whether an agreement between lenders to share *pro rata* any debt payments by the distressed borrower constituted price fixing.  In fact, the collaborators in *Falstaff* had different rights and interests in respect to their outstanding credit issued to Falstaff Brewing.  There, the court noted that the collaborating lenders "were not competing with the banks or other institutions to offer or to supply Falstaff with more credit, but were attempting to secure that credit which they had already extended, the terms of which had already been negotiated.  This is in fact *the very opposite* of price-fixing."  *Falstaff*, 513 F. Supp. at 293 (emphasis added).

Negotiations on reductions to be taken in bankruptcy, when the buyer cannot pay all of its debts, are common and lawful . . . ." *United I*, 406 F.3d at 925 (emphasis in original). Yet, the Creditors Committee tries to work around this clear statement of the law by asking this Court to make counter-factual assumptions regarding a hypothetical decision on Delta's part that it "reject" the aircraft leases. Thus, in the bankruptcy context there is no antitrust harm stemming from Delta and the Senior Secured Holders' negotiations over existing obligations.

> **b.    The Creditors Committee's Attempts To Circumvent The Settled Law Are Unavailing**

16.    The Seventh Circuit has decided that the collective conduct of the lessors in *United* did *not* violate the Sherman Act. *United I*, 406 F.3d at 924-25. Most parties, faced with such precedent, would agree there is no basis for an antitrust claim here. Not the Creditors Committee. The Creditors Committee anoints itself the overseer of the Seventh Circuit, and declares that "even if framed as a renegotiation of current obligations, the conduct of the lessors in *United Airlines* or the [Senior Secured Holders] here violates the Sherman Act . . . ." Creditors Committee Motion at 16. There is no reason the Senior Secured Holders' conduct violates the Sherman Act either. To the contrary, this Circuit's controlling authority in *Sharon Steel*, the Seventh Circuit's decision in *United*, as well as the established precedent of *Falstaff,* preclude any finding of a colorable antitrust claim here.

> **(i)    *United*, *Sharon Steel* and *Falstaff* are directly on point**

17.    The Creditors Committee makes very little effort to distinguish the decisions in *United*, *Sharon Steel* or *Falstaff*, which are all directly applicable to this case. Instead, it largely argues that those decisions were somehow flawed, and second guesses what the proper outcome should have been. Its attempts to do so are unpersuasive.

18.    The facts the Seventh Circuit considered in *United I* are virtually the same as

those presented in this matter.[4]   United Airlines, a chapter 11 debtor, claimed a group of creditors

who financed leases of United Airlines aircraft violated the Sherman Act "by coordinating their

efforts" and "by insisting that the debtor deal with them collectively about all 175 leased

airplanes."  *United I*, 406 F.3d at 921.  United Airlines attempted to argue that the group had

unlawfully used its collective power to exert undue pressure on the airline to agree to certain

terms that it otherwise may have been able to improve upon had the creditors acted individually.[5]

*Id*.  Here, the Creditors Committee offers the same flawed argument that the Senior Secured

Holders' coordinated effort to deal collectively with Delta regarding the Subject Aircraft has

somehow resulted in Delta being forced into a "sweetheart deal" that Delta could have otherwise

improved upon had each of the Senior Secured Holders acted on their own.  Creditors Committee

Motion at 3.  The Seventh Circuit rejected those notions, noting that "[c]oordination is especially

common in bankruptcy, which often is described as a collective proceeding among lenders"

because "lenders may be too diffuse to protect their own interests."  *United I*, 406 F.3d at 921

(internal citations omitted).[6]

     19.    The policy in favor of collective negotiations clearly extends to more than just the

---

[4] If anything, the facts in *United* were arguably more in favor of allowing prosecution than those here, because United Airlines sought to prosecute the antitrust claims on its own behalf, alleging that the creditors had violated the Sherman Act to its detriment.  Here, Delta supports the agreement it has reached with the Senior Secured Holders, and opposes the Creditors Committee Motion.

[5] The briefing in *United* also offers an important perspective on what could have happened had the Senior Secured Holders not collaborated, and what could happen should this Court give credence to the Creditors Committee's antitrust assertions.  In the United Airlines bankruptcy, the airline spent valuable months dancing in circles with individual aircraft financiers without being able to even begin to discuss any sort of definitive agreements that would move the bankruptcy forward.  It was not until the group of lenders "coalesced" that the parties were logistically able to begin negotiating terms that would prevent aircraft financiers from exercising their unassailable forfeiture rights under Section 1110.  *See* Objection Of Debtors To Motion Of The Official Committee Of Unsecured Creditors For Leave To Prosecute Claim On Behalf Of The Debtors at 6-7, In re UAL Corp., et al., Case No. 02-B-48191 (Jointly Administered) (Docket #7075) (Bankr. N.D. Ill.).

[6] The outcome of hypothetical individual negotiations between Delta and the Senior Secured Holders would be extremely uncertain, could vary from deal to deal, and would not necessarily be beneficial to the Debtor overall, compared the Negotiated Restructuring.

Creditors Committee.  Bankruptcy Code section 503(b)(3)(D) specifically allows for a

"committee representing creditors or equity security holders other than a committee appointed

under section 1102" to seek an administrative expense claim for substantial contribution in a

bankruptcy case.  Moreover, "nothing in section 1102 prohibits creditors or equity security

holders from forming additional committees" that are not officially appointed under section

1102.  *See* 7 Collier on Bankruptcy, ¶ 1102.06 (15th ed. rev. 2005).  Indeed, Collier recognizes

that:  "Unofficial committees may be advantageous to various groups of creditors or equity

security holders because the committee's constituents can choose their own members."  *Id.*; *see*

*also* Fed. R. Bankr. P. 2019 (Rule 2019 applies to "every entity or committee representing more

than one creditor" except committees appointed under section 1102 or 1104).  Clearly, then,

bankruptcy law recognizes the value of collective negotiating entities such as the Ad Hoc

Committee.

20.    In its motion, United Airlines attempted to create an improvised exception to

Section 1110 and the basic principles of antitrust law by arguing that the circumstances were

somehow different because the negotiations were "with respect to *future* terms and prices on

which they would make aircraft available . . . ."  *United I*, 406 F. 3d at 924 (internal citations

omitted).  The Creditors Committee makes a similar argument.  Without citation to any

authority, the Creditors Committee asserts that "chapter 11 debtors are relieved from fulfilling

their *future* obligations pursuant to section 365 of the Bankruptcy Code.  Accordingly, any

negotiation with respect to future lease terms is, in effect a negotiation over a *new* contract not an

old one.  Collusive bargaining over forward-going leases is thus a classic Sherman Act

violation . . . ."  Creditors Committee Motion at 14.  However, the Creditors Committee's

arguments are based on a wanton mischaracterization of the nature of a debtor's obligations with

respect to leases.

21.     First, a debtor may renegotiate and amend *existing* leases with the consent of the
counterparty.  Indeed, that is what the Debtors expressly seek to do pursuant to the Delta Motion.
Here, Delta does not seek to enter into new leases for different aircraft, rather it seeks to continue
existing leases for the Subject Aircraft with modifications.  Second, even where a debtor desires
to reject leases, it is well settled in the Second Circuit that such rejection means that the existing
lease is deemed breached, *not terminated*.  *See*, *e.g.*, *Medical Malpractice Ins. Assoc. v. Hirsch*
(*In re Lavigne*), 114 F.3d 379, 386-87 (2d Cir. 1997); *In re Enron Corp.*, 330 B.R. 387, 391
(Bankr. S.D.N.Y. 2005); *see also* 11 U.S.C. § 365(g).  As a result of such breach, the debtor is
not exonerated from its obligations in respect to the rejected lease.  To the contrary, the debtor is
responsible for damages and other obligations it owes the contract counterparty under the
rejected lease.

22.     In *United I*, as here, the negotiations did not involve the acquisition of aircraft
new to the carrier's fleet.  Instead, in both cases, the negotiations involve only aircraft already in
use under pre-existing leases and loans.  Holding that collective renegotiations over aircraft
already covered by mutually agreed upon and pre-existing contracts somehow violates the
antitrust laws "would not be a sensible means of vindicating the rule against cartelizing the sale
of new planes."  *United I*, 406 F.3d at 925.  The Seventh Circuit ultimately found that United
Airlines' claims, which mirror the Creditors Committee's claims here, were "thin to the point of
invisibility."  *Id.* at 924.  A short time later, the Seventh Circuit directed the bankruptcy court to
dismiss these claims.  *United II*, 409 F.3d at 813.

23.     Like *United*, the Second Circuit's decision in *Sharon Steel* is controlling because
the negotiations considered and approved in *Sharon Steel* are closely analogous to those at issue

here.[7]  The Second Circuit concluded that "[w]hile the present case does not involve an insolvent

corporation, the same considerations apply."  *Sharon Steel*, 691 F.2d at 1052.  The Seventh

Circuit relied upon *Sharon Steel* in rejecting antitrust claims in the context of airline bankruptcy

proceedings.  *See United I*, 406 F.3d at 924 ("[C]reditors are entitled to negotiate jointly in

bankruptcy, as *Sharon Steel* holds.").

24.    In *Sharon Steel*, the creditors feared breach of several indenture agreements when

Sharon Steel's board "approved a liquidation plan which was wholly imprecise as to when or

how [the debtor's] public debt was to be satisfied."  *Sharon Steel*, 691 F.2d at 1052.  In response,

a group of indenture trustees collaborated to "arrive at . . . a common position as to that

breach . . . ."  *Id*.  Sharon Steel's ultimate allegations are indistinguishable from those of the

Creditors Committee.  Sharon Steel argued that the creditors' collaboration on a common

position as to the terms of supplemental indentures violated the Sherman Act, and suggested that

it would be able to obtain more favorable terms if the group of creditors were disbanded and

forced to act individually.  *Id*. at 1047, 1052.  The Second Circuit rejected that argument.  In

considering the ramifications of breaking up a collaboration of such creditors, this Circuit

concluded that, if forced to act individually, each creditor "would be compelled to resort to the

most extreme action available in order to protect its individual interest.  Such an action, however,

might well drive the debtor out of business thereby eliminating any opportunity for it to work out

of present difficulties and ultimately satisfy the debts."  *Id.* at 1052.

25.    The *Sharon Steel* prophecy applies here, given Delta's current state of affairs.  In

this case, the Senior Secured Holders collaborated to propose and arrive at, common terms upon

which Delta can continue to satisfy its obligations and operate the Subject Aircraft pursuant to

---

[7] This case should be even less receptive to antitrust claims than *Sharon Steel* because there, the negotiations did not arise in the context of a bankruptcy but were merely private loan workout negotiations and, thus, did not enjoy *Noerr-Pennington* immunity.

leases between the Senior Secured Holders and Delta.  The Creditors Committee suggests Delta

would be in a better position had it been able to negotiate independently with each Senior

Aircraft Holder.  Creditors Committee Motion at 2, 10-12.  But Delta cannot -- and does not

want to -- maintain the current lease terms.  Thus, if each of the Senior Secured Holders were

forced to deal with Delta individually, Delta would face the risk of a race among the Senior

Secured Holders to exercise their absolute right to repossess at least a substantial number of the

eighty-eight aircraft currently in use.  That would almost certainly eliminate "any opportunity"

for Delta to "work out of present difficulties".  *See Sharon Steel*, 691 F.2d at 1052.

26.    Consequently, as this Circuit predicted in *Sharon Steel*, the collaborative

negotiations resulting in $1 billion in savings have *helped* Delta survive, which begs the

question:  where is the injury?  This Circuit ultimately found that, although there was "little

question that the [creditors] engaged in concerted activity" the moving party had "not shown any

anti-competitive purpose or effect injurious to consumer welfare."  *Id.*  The court went on to

specifically say that, contrary to harming the parties to such negotiations, "[j]oint activity by

creditors facing a debtor is commonly in the interests of all parties."  *Id.* (citing *Falstaff Brewing

Corp. v. New York Life Insurance Company*, 513 F. Supp. 289 (N.D. Cal. 1978)).

27.    *Falstaff* also arose outside the bankruptcy context, but again proves wholly

instructive.  Falstaff Brewing (the borrower) was dealing with a financial meltdown.  In an

attempt to prevent the bankruptcy of Falstaff Brewing, a group of its creditors reached an

agreement among themselves to share *pro rata* any payments received from Falstaff Brewing on

their outstanding loans, rather than allowing Falstaff Brewing to pay off some before others.

*Falstaff*, 513 F. Supp. at 290-91.  Falstaff Brewing, just like the Creditors Committee, alleged

that the group of creditors' collaborative approach to collecting prepayments violated the

Sherman Act.  The court dismissed the allegations, holding that the workout arrangements were "reasonable and not violative of the antitrust laws." *Id.* at 294.

28.   *Falstaff* rejected arguments quite similar to those the Creditors Committee makes here.  For example, Falstaff Brewing alleged it should have had the right to pick and choose among the lenders based on their individual offers, and decide which loans it did and did not repay depending on the favorability of the terms.  *Id.* at 291.  Here, the Creditors Committee argues that Delta is somehow harmed because the Senior Secured Holders' collaboration precludes Delta from selecting which aircraft it will and will not keep in operation -- in other words, Delta cannot decide, on an individual basis, which leases it will and will not continue to perform.  That is false.  Delta had and has the absolute right to pick which leases to assume and which to reject.  Delta did, in fact, reject some leases.  Delta cannot, however, escape the consequences of that choice -- including the risk that the lessor group rejected on one lease may no longer feel willing to renegotiate another lease Delta does not want to reject.  In any event, *Falstaff* expressly rejected the argument that preventing such "picking and choosing" somehow constituted price fixing because the collaborating creditors "were attempting to secure that credit which *they had already extended*, the terms of which had already been negotiated." *Id.* at 294 (emphasis added).  The same is true here, where the Senior Secured Holders came together to renegotiate the terms and secure repayment of aircraft leases they have already extended to Delta.  The *Falstaff* court went on to hold that the arguments like those the Creditors Committee makes constitute "the very opposite of price fixing." *Id.* at 293; *see also United I*, 406 F.3d at 925 ("[C]ollaboration among creditors to formulate a position about how much of a haircut to accept" is not an antitrust violation).

29.   The holdings of *Falstaff* and *Sharon Steel*, and the Seventh Circuit's conclusions

in the recent, nearly identical *United* case are directly on point and demonstrate that the Creditors

Committee cannot present any colorable antitrust claim.

### (ii)    *PrimeTime 24* is inapposite.

30.    The Creditors Committee bases its evasion of *United*, *Sharon Steel*, and *Falstaff*

on a case that does not apply here at all, *PrimeTime 24 Joint Venture v. National Broadcasting

Co.*, 219 F.3d 92 (2nd Cir. 2000).  In *PrimeTime 24* a group of broadcast networks with no other

contractual relationship or statutory obligations to PrimeTime 24 (a group of satellite television

providers) collectively refused to license their broadcast content to PrimeTime 24.  The Creditors

Committee claims *PrimeTime 24* holds that "competitors may not join together to 'limit their

individual freedom of action' with respect to *future* dealing with a business entity."  Creditors

Committee Motion at 14 (internal citation omitted).  That proposition has no significance here,

and *PrimeTime 24* is inapplicable for several reasons, including:  (1) the parties were not

creditors or debtors with pre-existing obligations to one another, a key aspect to the negotiations

and applicable precedent here; (2) no party to the litigation had entered bankruptcy or was in any

other sort of financial struggle necessitating renegotiation of financial obligations; and (3) the

court explicitly pointed out that the concerted efforts in *PrimeTime 24* involved a group of

broadcast networks' refusal to deal *prior* to other litigation and should not be interpreted as part

of a resolution of past disputes or existing obligations.  *See PrimeTime 24*, 219 F.3d at 102-03.

31.    The Creditors Committee's attempt to contort *PrimeTime 24* into precedent

supporting its proposed antitrust claims rests upon a fundamental mischaracterization of the

negotiations between Delta and the Senior Secured Holders.  The Creditors Committee attempts

to distort the negotiations as bargaining over future obligations and contract terms on a "going-

forward basis," rather than the renegotiation of pre-existing obligations, helps its claims.

Creditors Committee Motion at 9.  This argument is plainly false.  The Senior Secured Holders

already have binding agreements in place with Delta and, as lease creditors, they have absolute

contractual and statutory rights to stand on the existing terms of the leases and loans, or to

repossess the Subject Aircraft.  Delta and the Senior Secured Holders are not alleged to have

negotiated about any other aircraft, apart from those already under contract.  The Senior Secured

Holders' collaboration has resulted in a Negotiated Restructuring offering Delta substantial

discounts and deferrals, even though the Senior Secured Holders have a clear right under

Section 1110 to insist on the full performance of existing terms of the leases and loans, or to

repossess the Subject Aircraft.

        32.      *PrimeTime 24* recognized the benefits of such collaboration, noting that the

"sharing of costs or other coordinated activity avoids wasteful duplication of effort and has no

discernible effect on lawful competition."  *PrimeTime 24*, 219 F.3d at 99.  The court was careful

to distinguish its holding from situations such as *United* (and the facts here), stating that the

Sherman Act has "been read not to prohibit parties with common legal rights -- for example

creditors -- from engaging in coordinated efforts to enforce those rights."  *Id.* (internal citation

omitted); *see also Newman v. Universal Pictures*, 813 F.2d 1519, 1522-23 (9th Cir. 1987)

(rejecting Sherman Act Section 1 claim based on alleged "conspiracy" among film studios to

interpret pre-existing film contracts in a consistent manner).  Consequently, the Creditors

Committee's reliance upon *PrimeTime 24* is misguided and its attempt to frame the negotiations

here as "forward looking" or concerning "future obligations" is baseless.

        **c.**      **The Negotiations Between Delta and the Senior Secured Holders Also Enjoy
*Noerr-Pennington* Immunity from Prosecution Under the Antitrust Laws**

        33.      Although the collective bankruptcy negotiations at play here do not constitute

activity that gives rise to a colorable claim under the antitrust laws, the *Noerr-Pennington*

doctrine would *immunize* such activity from the antitrust laws in any event.  It is well established

that competitors who collectively act to petition the government in order to achieve a desired result are immunized from liability under the antitrust laws. *See United Mine Workers v. Pennington*, 381 U.S. 657 (1965); *Eastern R.R. Pres. Conf. v. Noerr Motor Freight*, 365 U.S. 127 (1961). Parties who associate with one another, even if competitors, in order to enact change or advocate a position to the government (including the courts) must be immune from the antitrust laws in order to preserve their constitutional rights to free speech and association. To hold otherwise would strip Delta and the Senior Secured Holders of their ability to exercise those rights.

34.    The applicability of the *Noerr-Pennington* doctrine extends to all branches of government: administrative, legislative and judicial. The doctrine's protection extends to a broad range of activities involving the judicial system and is not limited to petitioning the legislature. *See generally Professional Real Estate Investors v. Columbia Pictures Indus.*, 508 U.S. 49 (1993). The petition process falls under the *Noerr-Pennington* doctrine, regardless of the end result. *See id.* at 54 (implying any suit brought with probable cause is immune). Immunity attaches to the parties because they have worked together in an effort to obtain this Court's approval, regardless of whether the Negotiated Restructuring is ultimately approved. Under the same circumstances, *United I* noted that "businesses are entitled under the *Noerr-Pennington* doctrine to act jointly when presenting requests to courts and agencies." *United I*, 406 F.2d at 921. Thus, the *Noerr-Pennington* doctrine affords immunity from antitrust prosecution to the entire process.

35.    Litigation activity is also immune under *Noerr-Pennington* even if the ultimate intent of petitioning is anti-competitive – which here it is not. *Razorback Ready Mix Concrete Co. v. Weaver*, 761 F.2d 484, 487 (8th Cir. 1985) ("[I]nvocation of adjudicative process to press

legitimate claims is protected even though its purpose in doing so is to eliminate competition.").

Courts have granted *Noerr-Pennington* immunity where the party seeking it has acted in a purely

selfish manner. *See City of Columbia v. Omni Outdoor Adver., Inc.,* 499 U.S. 365, 380 (1991)

(noting the fact that the petitioning party's "motives are selfish is irrelevant."). Here, however,

there are no such concerns, because the collaboration is pro-competitive and is, in fact, allowed

and encouraged by the Bankruptcy Code, which has a long history of promoting group

negotiations and settlement creditor claims.

36.    In particular, the *Noerr-Pennington* doctrine affords immunity to settlement

negotiations undertaken as part of a resolution of economic matters. The Supreme Court held

that it would be "destructive of the rights of association and of petition" to hold that parties

violate the antitrust laws when they "use the channels and procedures of . . . courts to advocate

their causes and points of view respecting resolution of their business and economic interest *vis-

à-vis* their competitors." *See California Motor Transport Co. v. Trucking Unlimited*,

404 U.S. 508, 510-11 (1972). The case law uniformly holds that efforts to settle existing

litigation disputes are protected activity under *Noerr-Pennington*. *See, e.g., A.D. Bedell

Wholesale Co. v. Philip Morris, Inc.*, 263 F.3d 239, 250-59 (3d Cir. 2001); *Campbell v. Chicago*,

823 F.2d 1182, 1185-87 (7th Cir. 1987); *PTI, Inc. v. Philip Morris, Inc.*, 100 F. Supp. 2d 1179,

1193 (C.D. Cal. 2000). As the cases above show, settlement immunity applies even where no

court approval of the settlement is required.[8] Here, however, the entitlement to immunity is, if

anything, even stronger because -- by the agreement's terms and according to Section 1110 and

case law -- any compromise between Delta and the Senior Secured Holders must be approved by

---

[8] This also puts to rest the Creditors Committee's attempt to draw an artificial distinction between the request to approve a settlement -- which even the Creditors Committee admits is immune conduct -- and the actual negotiation of the settlement. Creditors Committee Motion at 20-21. No court recognizes such a distinction, and it would render the settlement immunity meaningless.

the Bankruptcy Court. *See* Delta Motion Ex. A at 7; *see also* Bankruptcy Code Sections 1110(a)(2) & 1110(b) (for agreements reached under Section 1110); Fed. R. Bankr. P. 9019(a) ("On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement"); *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 424 (1968) ("[I]t is essential that every important determination in reorganization proceedings receive the 'informed, independent judgment' of the bankruptcy court."). Delta and the Senior Secured Holders have properly sought this Court's "informed, independent judgment" and it is precisely because the Creditors Committee fears the outcome that they raise these spurious antitrust issues.

37.    By collectively negotiating the Negotiated Restructuring before this Court, the parties have engaged in immune activity meant to advocate resolution of the status of the aircraft leases and loans in response to Delta's bankruptcy -- an essential component to their respective businesses and economic interests. Even if the concerted activity of the Senior Secured Holders were otherwise anticompetitive -- and it is not -- it would be immunized from antitrust liability under the *Noerr-Pennington* doctrine because Delta and the Senior Secured Holders were acting jointly to present the Negotiated Restructuring to this Court for approval.

38.    In sum, the law is longstanding and unanimous that no antitrust claims arise from alleged "concerted activity" among creditors renegotiating the terms of pre-existing agreements with debtors. There can be no colorable or meritorious antitrust claims because the activities in question have taken place in the context of an ongoing bankruptcy proceeding (in which this Court must approve the Negotiated Restructuring before it becomes effective) and are immune from antitrust liability under the *Noerr-Pennington* doctrine.

> **d.      The Creditors Committee Does Not Establish The Necessary Elements Of A Colorable Antitrust Claim In Any Event**

39.      Even if the Creditors Committee could avoid the bars imposed by *United I*,

*Sharon Steel* and *Falstaff*, and even if no immunity applied, the Creditors Committee still cannot

state -- much less prove -- the most basic elements necessary to allege a colorable antitrust claim.

40.      As a threshold matter, any colorable Sherman Act Section 1 ("Section 1")

antitrust claim must "show (1) a contract, combination or conspiracy; (2) *in restraint of trade*; (3)

affecting interstate commerce."  *Maric v. St. Agnes Hosp. Corp.*, 65 F.3d 310, 313 (2d Cir.

1995), *cert. denied,* 516 U.S. 1115 (emphasis added).  The negotiations admittedly involve a

contract and affect interstate commerce.  But the Creditors Committee cannot show the Senior

Secured Holders' actions were "in restraint of trade."  The Supreme Court has held that only

*unreasonable* restraints of trade are illegal under Section 1.  *Standard Oil v. United States*, 221

U.S. 1, 60-80 (1911); *see also Northwest Wholesale Stationers, Inc. v. Pacific Stationery and

Printing Co.*, 472 U.S. 284, 289 (1985) ("[E]very commercial agreement restrains trade.

Whether this violates § 1 of the Sherman Act depends on whether it is adjudged an *unreasonable*

restraint.").  Courts can apply two standards to determine whether actions are "in restraint of

trade":  either the activities constitute *per se* violations or they violate the Rule of Reason

standard, which involves a determination of whether the conduct has an anticompetitive effect in

a relevant market, as discussed below.  *See National Soc'y of Prof'l Eng'rs v. United States*, 435

U.S. 679, 689-90 (1978).  The Creditors Committee's claim fails as a matter of law, under either

standard.

> **(i)      The Creditors Committee cannot show a *per se* restraint of trade**

41.      Despite the case law squarely on point demonstrating the absence of

anticompetitive effects flowing from the concerted activity in this case, the Creditors Committee

nonetheless posits that the Senior Secured Holders' conduct is a *per se* violation of the Sherman

Act. Nonsense. The Supreme Court explicitly limits *per se* classification to a narrow group of

practices that are recognized to have a "pernicious effect on competition and lack . . . any

redeeming virtue . . . ." *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5 (1958). Indeed,

courts only apply the *per se* rule in situations where the effects of an alleged restraint are so

universally understood to be anticompetitive that they are immediately recognizable, such as

naked price fixing. *See White Motor Co. v. United States*, 372 U.S. 253, 263 (1963) (must be

considerable "judicial experience" showing the challenged restraint has "no purpose except

stifling of competition"); *see also Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 58-

59 (1977) (cautioning that any "departure from the rule-of-reason standard must be based upon

demonstrable economic effect rather than . . . formalistic line drawing"); *United States v. Topco

Assocs.*, 405 U.S. 596, 607-608 (1972) ("It is only after considerable experience with certain

business relationships that courts classify them as *per se* violations of the Sherman Act."). The

Rule of Reason applies unless courts have widely considered a certain type of behavior and

decidedly classified such behavior as a *per se* restraint on trade.

42.     The Creditors Committee provides no cases finding the activity in question as

unlawful, much less a *per se* restraint on trade. The omission is understandable since there is no

"judicial experience" in which the courts have found joint creditor negotiations to be "naked

restraints" or actions with "no purpose except stifling of competition." To the contrary, the only

courts to examine this type of alleged restraint have uniformly rejected antitrust claims against

the coordinated activities of creditors. For this reason alone, the Creditors Committee's attempt

to assert that the Senior Secured Holders' collaboration was a *per se* restraint because it

somehow fixed the price on the leases for the Subject Aircraft fails.[9]

43.    Further, otherwise illegal restraints, such as price fixing, are not *per se* illegal if they are integral to an arrangement that generates pro-competitive efficiencies.  *See Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1, 19-23 (1979) (rejecting application of the *per se* rule to blanket licenses between competitors because such restraints were essential if the product was to be available at all).  The collective bargaining between Delta and the Senior Secured Holders resulted in pro-competitive results through efficiency gains and reduced negotiating and borrowing costs (not to mention the benefit to consumers as a whole, because Delta has been able to keep the Subject Aircraft in operation during the process).  In *Sharon Steel*, this Circuit examined this very aspect of the type of group negotiations that have occurred here:

> Joint activity by creditors facing a debtor is commonly in the interest of all parties.  If creditors were forced to act individually, each would be compelled to resort to the most extreme action available in order to protect its individual interest.  Such an action, however, might well drive the debtor out of business thereby eliminating any opportunity for it to work out of present difficulties and ultimately satisfy the debts.  Mutual forebearance by creditors, therefore, may be in the interest of both debtors and creditors in that it maximizes repayment and gives the debtor a chance of survival.

*Sharon Steel*, 691 F.2d at 1052 (internal citation omitted).  The benefits of coordination among creditors is not limited to the parties in interest.  Addressing whether collective negotiations injure consumers, this Circuit concluded that "[t]o the contrary, by reducing both losses to

---

[9] The Creditors Committee's attempt to obtain the benefit of the *per se* rule by framing the Senior Secured Holders' actions as a group boycott is also unavailing.  Even if this case arguably involved a group boycott, there is no greater reason for departing from a Rule of Reason analysis on this ground than there is on the unreasonable restraint of trade claim.  Here, the pro-competitive effects of the group renegotiations have resulted in efficiencies far eclipsing any anti-competitive effects, regardless of whether the Creditors Committee's attempts to label them as "unreasonable restraints" or a "group boycott."  Such sensationalist vocabulary is no substitute for reasoned analysis of the applicable precedents.

creditors and the transaction costs resulting from bankruptcy, such activity reduces the costs of

borrowing and the costs of doing business, all of which is to the consumer's advantage."  *Id.*

44.     The hard bargaining between Delta and the Senior Secured Holders was in good

faith, at arm's length, and resulted in the parties agreeing to the Negotiated Restructuring across

all Subject Aircraft.  Delta avoided wasting significant amounts of time and resources, and

risking the loss of all or a substantial portion of the Subject Aircraft that would have resulted

from individual negotiations over each aircraft.  In addition, the increased time required to secure

each aircraft could easily have led to one or more Senior Secured Holders unilaterally exercising

their rights under Section 1110(c) to repossess at-risk aircraft.  One such demand could trigger a

"run" on the airline for other airplanes, as each Senior Aircraft Holder attempts to "protect its

individual interest" -- one of the dangers contemplated in *Sharon Steel*.  *See id*.  Such a depletion

of Delta's fleet would seriously hamper its ability to continue serving its customers and, indeed,

jeopardize its ability to continue operating and to reorganize.

45.     In sum, the Senior Secured Holders' collaboration is both within the bounds of --

and supported by -- the law, and is ultimately pro-competitive.  It cannot constitute a *per se*

restraint on trade.

### (ii)     The Creditors Committee cannot state a Rule of Reason claim

46.     The Creditors Committee also cannot state a claim under the Rule of Reason

standard.  Under the Rule of Reason, the Creditors Committee must show that the "challenged

action has had an *actual* adverse effect on competition as a whole in the relevant market . . . ."

*Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Associates*, 996 F.2d 537, 543 (2d Cir.

1993).  "As an initial matter, the [Creditors Committee] must demonstrate that the defendant

conspirators have 'market power' in a particular market for goods or services."  *United States v.*

*Visa U.S.A., Inc.*, 344 F.3d 229, 238 (2d Cir. 2003).  The Creditors Committee, however, has

failed to identify either a relevant market in which to frame its naked assertions, or any *actual* adverse effect on competition within any such market.  The Creditors Committee cannot do so and its claims must fail under a Rule of Reason analysis.

a)      **The Creditors Committee must but cannot define a meaningful relevant market**

47.      As a starting point for this (or any) antitrust analysis, the plaintiff must define a cognizable relevant market.  *See, e.g., Visa U.S.A.*, 344 F.3d at 238 (must show relevant market for exclusive dealing claims); *PepsiCo Inc. v. Coca-Cola Co.*, 315 F.3d 101, 109 (2d Cir. 2002) (must show relevant market for restraint of trade claims); *CDC Techs., Inc. v. IDEXX Laboratories, Inc.*, 186 F.3d 74, 80 (2d Cir. 1999) (must show relevant market for exclusive dealing claims); *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995) (must show relevant market for restraint of trade claims); *Capital Imaging*, 996 F.2d at 543 (must show relevant market for restraint of trade claims).  Anticompetitive conduct cannot exist in a vacuum -- in order to have a colorable antitrust claim, a "detailed market analysis" is required under the Rule of Reason.  *U.S. v. Brown Univ. in Providence in State of R.I.*, 5 F.3d 658, 668-69 (3rd Cir. 1993); *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993) (antitrust violations cannot be found "without any proof of the relevant market or a realistic probability that the defendants could achieve monopoly power in that market.").

48.      It is impossible to see how the Creditors Committee could define a relevant market in which the Senior Secured Holders allegedly engaged in anticompetitive behavior.  The relevant product market must include "all reasonable substitutes for the product," regardless of who sells or buys them.  *Jefferson Parish Hosp. Distribs. No. 2 v. Hyde*, 466 U.S. 2, 37 n.7 (1984) (O'Connor, J., concurring).  Assuming for a moment (as the Creditors Committee contends) that Delta and the Senior Secured Holders were negotiating *future* lease obligations,

the market must be broadly defined to include all aircraft financing.  There is no suggestion

(much less any facts alleged or on the record) that the Senior Secured Holders can exert any

cognizable market power in a manner that would negatively affect competition or consumers

within that hypothetical market.

49.    Alternatively, the Creditors Committee may contend, as United Airlines did, that

the market is limited to those aircraft already under contract and flying Delta's colors.  That

would fail, for at least two reasons.  First, if the market is limited to aircraft already under

contract, that refutes the Creditors Committee's claim that the parties were negotiating new

leases, rather than renegotiating old arrangements.  Second, markets cannot be defined solely in

terms of those products or customers currently under contract, for to do so improperly equates

contract power with market power.  *See, e.g., Hack v. President and Fellows of Yale College*,

237 F.3d 81, 86 (2d Cir. 2000) (rejecting proposed market definition "because it is clear that

[plaintiffs'] focus is upon a contractually created class of consumers . . . ."); *Maris Distr. Co. v.

Anheuser-Busch, Inc.*, 302 F.3d 1207, 1221 (11th Cir. 2002) (noting that several Circuits "have

cautioned against placing too much weight on the existence of contract power when defining

relevant markets and determining whether defendants possess market power."); *Queen City

Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997) ("[N]o court has defined a

relevant product market with reference to the particular contractual restraints on the plaintiff.").

In short, a market defined in terms of those who have chosen to lend to Delta cannot stand, as a

matter of law.

50.    Because the Creditors Committee cannot define a cognizable relevant market,

there can be no colorable antitrust claim.

b)  **The Creditors Committee cannot show adverse effects on competition**

51.    In addition to defining a relevant market, the Creditors Committee must show that the "challenged action has had an *actual* adverse effect on competition as a whole in the relevant market . . . ." *Capital Imaging*, 996 F.2d at 543 (emphasis in original); *see also Visa U.S.A.*, 344 F.3d at 238 (Plaintiffs "must demonstrate that within the relevant market, the defendant's actions have had substantial adverse effects on competition, such as *increases* in price, or *decreases* in output or quality.").  Under this analysis, "whether the ultimate finding is the product of presumption or actual market analysis, the essential inquiry remains the same -- whether or not the challenged restraint enhances competition." *NCAA v. Board of Regents of the Univ. of Okla.*, 468 U.S. 85, 104 (1984).  The Creditors Committee has failed to state that the challenged restraint has an adverse effect, even though it bears the burden of showing substantial anticompetitive effect.  *See, e.g., United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 374 n.5 (1967).

52.    Again, the Creditors Committee is doomed by its inability to identify a cognizable relevant market.  If the Creditors Committee defines a broad relevant market (for example, the overall market for aircraft financing), it cannot show any adverse effect to competition within that market.  The Creditors Committee merely argues that Delta is limited in its options for financing the Subject Aircraft, but does not allege any other effects.  The Sherman Act is concerned with effects on *market-wide* competition, rather than harm to one firm.  Indeed, this Circuit has held that an antitrust plaintiff's claims fail under the Rule of Reason when the plaintiff "fail[s] to come forward with any evidence that defendants' actions adversely affected service, quality, or price *market-wide*." *K.M.B. Warehouse*, 61 F.3d at 128 (emphasis added).  It is difficult to imagine how the Creditors Committee intends to show such market-wide effects

when it has failed even to address the existence of aircraft financings outside the Delta

reorganization.

      53.     If a plaintiff is unable to show an *actual* adverse effect, it "must at least establish

that defendants possess the requisite market power" necessary to adversely affect competition

market-wide.  *Capital Imaging*, 996 F.2d at 546.  The Creditors Committee has not even

suggested a basis for market power in the overall aircraft financing market.  The only arguable

"power" the Creditors Committee can suggest is limited to the Delta relationship, and the power

Senior Secured Holders' members may have derived from the pre-existing leases.  Once again,

however, *contract* power is not sufficient to establish *market* power under the Sherman Act.  *See*

*Hack*, 237 F.3d at 85 ("Economic power derived from contractual arrangements affecting a

distinct class of consumers cannot serve as the basis of a monopolization claim."); *see generally*

p. 28, above.

      54.     The Creditors Committee cannot show that the effort of the Senior Secured

Holders to reach a collective approach to renegotiation and cash reductions on existing lease

terms and debt with Delta has had any restraint on trade within a relevant market that would

create a colorable Section 1 claim.  As the moving party, it is the Creditors Committee's burden

to show the existence of a colorable antitrust claim.  Yet, it has failed to allege the simplest of

elements necessary for any colorable antitrust claim:  a relevant market, unreasonable restraint of

trade within that market, and harm to market-wide competition.

**C.**      **The Creditors Committee Cannot Show That Its Claims Will Benefit The Estate**

      55.     The Creditors Committee Motion also fails the second prong of the *STN* test.

Under this prong, the Creditors Committee must show that the proposed claims will support a

recovery for the estate and that the bringing of such claims will likely benefit the estate.  *See*

*STN*, 779 F.2d at 905.  The Creditors Committee has not made either showing, much less both.

56.    The estate will be unable to recover anything if this Court grants the Creditors

Committee authority to prosecute antitrust claims.  If this Court somehow concludes that

approval of the Negotiated Restructuring would constitute ratification of antitrust violations, it

cannot approve the Negotiated Restructuring in the first instance and the antitrust claims would

be moot.  Likewise, if the Creditors Committee were granted authority to prosecute antitrust

claims, it would chase away the deal and the aircraft.  Even though the Senior Secured Holders

could choose to remain in place, fight and win the battle as many did in United, such a strategy

would delay and place a tremendous strain on Delta's reorganization.  Thus, under either

scenario, the terms and effect of the Negotiated Restructuring would evaporate, and no injury

could possibly occur.  If there is no injury, any action brought by the Creditors Committee would

yield no recovery.  *STN* emphasizes that any purported antitrust action must "support a

recovery."  *STN*, 779 F.2d at 905.  Because the facts here do not support any antitrust recovery,

the Creditors Committee fails to satisfy the *STN* test.

57.    Of course, this analysis reveals the underlying purpose of the Creditors

Committee Motion:  a tactic for collateral objection to the Delta Motion to approve the

Negotiated Restructuring.  The Creditors Committee will have its day in court to challenge

Delta's sound business judgment in agreeing to the Negotiated Restructuring and the Court will

or will not grant its approval.  In either event, there is no need, and no place, for the Creditors

Committee Motion.  This Court's decision -- one way or the other -- regarding the Delta Motion

to approve the Negotiated Restructuring, will moot the Creditors Committee Motion.

58.    The Creditors Committee Motion fails the second prong of *STN* for another

significant reason.  If the Creditors Committee Motion is granted, many, if not all, of the Senior

Secured Holders likely will exercise their lawful right to demand return of aircraft in order to

timely recover their investments.  As the Creditors Committee acknowledges, "section 1110(c)

gives the secured creditor of the aircraft a near-absolute right of repossession."  Creditors

Committee Motion at 18; *see also United I*, 406 F.3d at 924 (analyzing Section 1110(a) and

holding that "courts can not prevent aircraft lessors or secured lenders from repossessing their

collateral"); *Interface Group-Nevada, Inc. v. Trans World Airlines, Inc.* (*In re Trans World

Airlines, Inc.*), 145 F.3d 124 at 137-38 (3d Cir. 1998) (upon the expiration of the Section 1110

limited 60-day stay period, a secured party may enforce its near-absolute right of repossession of

collateral unless the debtor (i) cures all outstanding defaults from the underlying financing

agreement and agrees to perform all future obligations under the agreements (11 U.S.C.

§ 1110(a)(2)(A)); or (ii) reaches other consensual agreement with its counterparty).

59.    If a significant number of the Senior Secured Holders exercise their Section 1110

rights to repossess aircraft and recover their investment by re-leasing or reselling aircraft to third-

parties, the result for Delta and its estate will be, in Delta's own words, "a disaster."

60.    Thus, the Creditors Committee's prosecution of antitrust litigation will not only

fail to yield any recovery for the estate, it will harm it substantially.  Such litigation will produce

no benefit to the estate.  In the view of Judge Gerber in *Adelphia Commc'n Corp. v. Bank of

America, N.A.* (*In re Adelphia Commc'n Corp.*), 330 B.R. 364 (Bankr. S.D.N.Y. 2005), this

second prong of the *STN* standard is the most important one:  "whether the litigation would

maximize the value of the debtor's estates . . . is the factor of the greatest importance" and "gets

to the nub of the issue . . . ."  *Adelphia*, 330 B.R. at 383 & n.55.

61.    The implications of granting the Creditors Committee's Motion are stark and

crystal clear.  Allowing prosecution of meritless antitrust claims would likely erase $1 billion of

cash savings, restructured aircraft leases, and a chance for Delta to create a solid foundation to its

reorganization.  This would put the estate to a no-win decision: pay leases in full or risk losing

the planes.  For this most important reason, the Creditors Committee Motion must be denied.

## IV.  **CONCLUSION**

WHEREFORE, the Senior Secured Holders respectfully request that the Creditors

Committee Motion be denied and the Court grant such other and further relief as the Court

deems just and proper.


New York, New York
Dated:  January 27, 2006


By:     s/ Ronald J. Silverman
        Ronald J. Silverman (RS - 7762)

        BINGHAM MCCUTCHEN LLP
        399 Park Avenue
        New York, NY  10022-4689N
        (212) 705-7700
        Michael J. Reilly (Pro Hac Vice)
        F. Mark Fucci (Pro Hac Vice)
        Ronald J. Silverman (RS-7762)
        Mark M. Elliott (ME - 0840)

         -and-

        Three Embarcadero Center
        San Francisco, CA 94111
        (415) 393-2000
        Alfred C. Pfeiffer (Pro Hac Vice)

        Attorneys for the Ad Hoc Committee
         of Senior Secured Holders