AKIN GUMP STRAUSS HAUER & FELD LLP
Daniel H. Golden (DG-5624)
David H. Botter (DB-2300)
590 Madison Avenue
New York, NY 10022
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

Edward P. Lazarus (*pro hac vice* pending)
L. Rachel Helyar (*pro hac vice* pending)
2029 Century Park East Suite 2400
Los Angeles, California 90067
(310) 229-1000 (Telephone)
(310) 229-1001 (Facsimile)

Counsel for the Official Committee of Unsecured
Creditors of Delta Air Lines, Inc., et al.

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| DELTA AIR LINES, INC., et al., | : | Case No. 05-17923 (ASH) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |

-------------------------------------------------------------x

### REPLY OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
### OF DELTA AIR LINES, INC., *ET AL.* TO OBJECTIONS TO MOTION TO
### PROSECUTE CERTAIN ANTITRUST CLAIMS
### ON BEHALF OF DEBTORS' ESTATES

The Official Committee of Unsecured Creditors (the "Official Committee") of Delta Air

Lines, Inc. ("Delta") and its affiliated debtors in the above-captioned chapter 11 cases

(collectively, the "Debtors"), by and through its undersigned counsel, hereby replies to the

Objections filed by Delta and the Ad Hoc Committee of Senior Secured Holders of Aircraft

Indebtedness (the "Ad Hoc Committee") to the Committee's Motion for Authority to Prosecute

Certain Antitrust Claims (the "Motion") under the Sherman Antitrust Act, 15 U.S.C. §§ 1-7 (the "Sherman Act") and any and all other applicable antitrust law (the "Antitrust Claims") on behalf of the Debtors' estates.

## PRELIMINARY STATEMENT

The objections of the Debtors and the Ad Hoc Committee (collectively "Respondents") are replete with threats and umbrage, but do nothing to diminish the unmistakable validity of the Official Committee's Motion for leave to prosecute certain Antitrust Claims. This Motion – which need only state a "colorable" antitrust theory – rests on a few simple and irrefutable premises.

First, sections 365 and 1110 of the Bankruptcy Code (the "Code") provide the airline debtor with a window of time in which it may assume existing airplane leases, reject those leases, or negotiate new lease agreements with its existing lessors or on the open market. The purpose of this statutory regime is to permit the debtor to relieve itself of unfavorable leases and to gain the benefit of prevailing market rates on a going-forward basis. The effect of this regime is to turn aircraft lessors into competitors, each seeking to avoid being left with idle aircraft in a difficult leasing market, and each vying to remain among those lessors whose aircraft will be included in the debtor airline's fleet plan.

Second, the airline lessors who make up the Ad Hoc Committee have colluded to evade this competitive process. Their motto: "No Tail Left Behind" captures the idea. By forcing Delta to deal with them on an all or nothing basis, the Ad Hoc Committee has forced Delta to continue leasing aircraft – including aircraft it would otherwise have abandoned – on onerous and above-market terms.

Third, such collusion among competitors to obtain supra-competitive prices for their services and to require "everyone or no one" negotiations are classic per se violations of the

2

Sherman Act. *See, e.g., NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998); *NCAA v. Board of Regents*, 468 U.S. 85, 107-08 (1984).

Respondents try to escape this inexorable logic through a series of emphatic but readily debunked misstatements.

It is simply not true that the Offiical Committee has failed to make out a colorable antitrust claim because it has not defined the relevant market. This is not required of claims for per se violations of the Sherman Act (as alleged here), nor is it required even of rule of reason claims when (as here) actual adverse effects are pleaded. *See, e.g., FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 460-61 (1986).

Nor is it true that the reasoning of *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982), and *Falstaff Brewing Co. v. New York Life Ins. Co.*, 513 F. Supp. 289 (N.D. Cal. 1978), undermines, much less forecloses, the Antitrust Claims here. These cases stand for the unexceptional proposition (with which the Official Committee has no quarrel) that creditors may in some instances coordinate to enforce "common legal rights." But creditors may do so only when this coordination does not deprive the debtor "of the benefits of free competition," *Sharon Steel*, 691 F.2d at 1053, "has no discernable effect on lawful competition," *PrimeTime 24 Joint Venture v. Nat'l Broadcasting Co.*, 219 F.3d 92, 99 (2d Cir. 2000), or when creditors "[are] not competing" with each other or other institutions "to supply [the debtor] with more credit, but [are] attempting to secure that credit which they had already extended," *Falstaff*, 513 F. Supp. at 293.

Here, the Ad Hoc Committee is comprised of airplane lessors who, in contrast to the creditors in *Sharon Steel* and *Falstaff*, remain direct competitors for the Debtors' business. Section 365 of the Code ensures this by setting up a competitive environment in which Delta has

3

the right (albeit not without accompanying risk) to pick and choose which aircraft to keep in their fleet. The Ad Hoc Committee, far from being a benign force for working out past debt, is the instrument by which these should-be competitors seek to deny the Debtors the benefit of the competition contemplated by sections 365 and 1110. Accordingly, *Sharon Steel* and *Falstaff*, which deal with typical workouts by non-competitors of pre-existing unsecured debts, have no application to the Antitrust Claims at issue here.

Nor can the Ad Hoc Committee evade the antitrust laws by making grandiose claims that its concerted action has saved the Debtors a billion dollars, or using the scare tactic that, absent collusion, creditors would engage in a destructive "race to repossess" their planes. To begin with, the billion dollar figure is simply an assertion (unsupported in the record), and one that has no place in evaluating whether the Official Committee has stated colorable Antitrust Claims. This evaluation, akin to the consideration of a motion to dismiss, takes all the putative plaintiff's allegations as true. In any event, the proper focus is not on any dollar amount considered in the abstract, but rather on whether the Ad Hoc Committee wrested above-market terms from the Debtors (whatever the alleged savings). The Official Committee has alleged such extraction of above-market terms to the tune of over a hundred million dollars – a more than sufficient assertion of antitrust injury.[1]

---

[1] The arguments set forth in the Objection of the Official Committee of Unsecured Creditors to the Motion of Delta Airlines, Inc., *et al.* for Order Approving a Term Sheet and an Extension of Section 1110 Deadlines and Authorizing Agreements to Restructure Transactions Affecting Eighty-Nine Aircraft and Associated Engines, Equipment and Documents (the "Official Committee Objection"), filed under seal on January 27, 2006, are fully incorporated herein. Throughout this Reply, which is not filed under seal, the Official Committee will cite to the Official Committee Objection, rather than to the documents cited therein, which are subject to protective orders.

As for the claim that absent antitrust immunity for their collusion, the members of the Ad Hoc Committee would likely repossess many, if not all, of their respective aircraft, this is belied by history and logic. To begin with, section 1110 itself prevents a race to repossession by giving the debtor a minimum 60-day window in which to confirm existing contracts. This sharply distinguishes the present case from *Sharon Steel* and *Falstaff*, in which the courts permitted collective action to collect past debts in part because collective action was preferable to leaving the debtor vulnerable to potentially crippling damages suits by its creditors. Here, section 1110 would ordinarily preclude such vulnerability.

Equally important, simple economics suggests why such a race to repossession is extremely unlikely and explains why no such race occurred in the many pre-United airline bankruptcies in which debtor airlines negotiated individually with aircraft lessors. In contrast to the unsecured creditors in *Sharon Steel* and *Falstaff*, who, absent cooperation, had no way to protect their monetary interest except to file suit, aircraft lessors will always be able to get their planes back. Lessors will exercise their right of repossession, however, only if it makes economic sense. And repossession will make economic sense only if the revenue a lessor can obtain from re-leasing its aircraft plus the transaction costs associated with repossession and re-leasing are greater than whatever new lease rate the lessor could individually negotiate with the debtor. In the current economic climate, as airline experts have now testified, this economic calculus will rarely weigh in favor of repossession – which, no doubt, is one reason the members of the Ad Hoc Committee have banded together to expand their leverage over the Debtors. Indeed, Delta had planned to reject a number of planes belonging to members of the Ad Hoc Committee before threats of collective action forced them to retain these outdated aircraft.

Finally, the *Noerr–Pennington* (petitioning immunity) doctrine affords Respondents no safe harbor for their misdeeds. *Noerr* is inapplicable as a matter of law under Second Circuit precedent that precludes petitioning immunity for collusion, under the guise of settlement, to alter the terms of competition for future rights. Even assuming it were applicable, it has limited significance here. A ruling that construed petitioning immunity expansively to shield the Ad Hoc Committee members from antitrust liability for their collusive conduct in the negotiation of new, anticompetitive aircraft leases would not remove the Sherman Act as a barrier to judicial approval of the anticompetitive leases.

At bottom, Respondents are left with a single reed of support for their position – the Seventh Circuit's opinion in the *United* case. *United Airlines, Inc. v. U.S. Bank N.A.*, 406 F.3d 918, stay granted, 409 F.3d 812 (7th Cir. 2005). But a careful review of this decision and the other applicable caselaw makes clear that the *United* decision – which focuses primarily on the narrow issue of injunctive relief, contains virtually no analysis of the antitrust question, and fails to honor basic principles of antitrust and bankruptcy law – cannot be deemed preclusive of the claims alleged here. Under Second Circuit law, the Official Committee has presented claims that are far more than merely colorable and presumably should have been brought by the Debtors themselves, had not the Ad Hoc Committee used its collusive power to force Delta to waive its antitrust claims when accepting the Ad Hoc Committee's non-competitive terms. That forced waiver only underscores the impropriety of the Ad Hoc Committee's conduct and also satisfies Movants' burden to show that the Debtors have unreasonably declined to pursue these claims themselves.

The Motion should be granted.

## ARGUMENT

## I. THE OFFICIAL COMMITTEE HAS AMPLY MET THE STANDARD FOR A MOTION TO PROSECUTE: IT HAS STATED A "COLORABLE" ANTITRUST CLAIM – THE VERY CLAIM THAT DEBTORS PURPORTED TO WAIVE AT THE INSISTENCE OF THE AD HOC COMMITTEE.

1. To prevail on its Motion, the Official Committee must (1) present a colorable claim for relief that, on appropriate proof, would support a recovery; and (2) demonstrate that the Debtors have unjustifiably failed to bring suit or abused their discretion in not suing. *In re STN Enterprises*, 779 F.2d 901, 904 (2d Cir. 1985). The Official Committee has cleared both hurdles with room to spare.

### A. The Official Committee Has Stated "Colorable" Claims for Violations of the Sherman Act – *i.e.*, Claims Sufficient to Withstand Dismissal at the Pleading Stage.

2. This Court determines whether the Official Committee has stated a "colorable" claim by applying a standard similar to that used in determining whether a complaint survives a motion to dismiss for failure to state a claim. *See, e.g., In re KDI Holdings, Inc.*, 277 B.R. 493, 508 (Bankr. S.D.N.Y. 1999); *In re America's Hobby Center, Inc.*, 223 B.R. 275, 280 (Bankr. S.D.N.Y. 1998); *In re iPCS, Inc.*, 297 B.R. 283, 291 (Bankr. N.D. Ga. 2003); *see In re Grand Eagle Co., Inc.*, 310 B.R. 79, 95-96 (Bankr. N.D. Ohio 2004), *report accepted in part and rejected in part*, 313 B.R. 219 (N.D. Ohio 2004) (standard is minimal because a creditors' committee should not be required to prove its case before it has had the opportunity to conduct discovery).[2]

---

[2] The Ad Hoc Committee has strenuously resisted providing the Official Committee with information it seeks. For example, despite requests for the specific holdings information for each of the individual institutions who comprise the Ad Hoc Committee, the Official Committee has received only anonymous holdings information with respect to the Ad Hoc Committee aircraft and, therefore, cannot identify the specific interests of the members of the Ad Hoc Committee. This anonymous information was provided to the Official Committee on the condition that it remain confidential and that the information contained therein would not be disclosed.

3.     In ruling on a motion to dismiss, the Court must accept all factual allegations in the complaint as true and draw all inferences in the plaintiff's favor; it may dismiss the complaint only if plaintiff can prove no set of facts, consistent with his allegations, which would entitle him to the relief he seeks. *See, e.g., Halperin v. eBanker USA.com, Inc.*, 295 F.3d 353, 356 (2d Cir. 2002). "'[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

4.     There are no heightened pleading requirements for antitrust cases. *Id.*; *see also Twombly v. Bell Atlantic Corp.*, 425 F.3d 99, 105, 108-11 (2d Cir. 2005). "'[A] short plain statement of a claim for relief which gives notice to the opposing party is all that is necessary in antitrust cases, as in other cases under the Federal Rules.'" *Todd*, 275 F.3d at 198 (quoting *George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 554 (2d Cir. 1977)). As the United States Supreme Court has stressed, "in antitrust cases in particular" – as in motions for leave to prosecute – "'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.'" *George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 139 (2d Cir. 1998) (quoting *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976)).

5.     To state a claim under Section 1 of the Sherman Act, as the Official Committee seeks to do here, a plaintiff must allege that defendants were involved in collusive conduct that effected an unreasonable restraint on interstate trade, *i.e.*, antitrust injury, "together with the factual predicate upon which those assertions are made." *Twombly*, 425 F.3d at 113; *see id.* at 114, 116 ("At the pleading stage, we are concerned only with whether the defendants have 'fair notice' of the claim, and the conspiracy that is alleged as part of the claim, against them"); *see*

*also PrimeTime 24 Joint Venture v. Nat'l Broadcasting Co.*, 219 F.3d 92, 103 (2d Cir. 2000). These elements apply whether the plaintiff alleges conduct that is unreasonable per se or under the rule of reason. *Twombly*, 425 F.3d at 113 n.7.

6.      The Official Committee has met its burden here. As set forth in the Motion and discussed below, the Official Committee asserts that the members of the Ad Hoc Committee colluded to force Delta to negotiate with its members on a group, rather than an individual, basis, thereby depriving Delta of the opportunity to benefit from competition among the individual lessors, as sections 365 and 1110 of the Code contemplate.

7.      This constitutes a classic per se claim of horizontal price-fixing among competitors. Indeed, such a claim is "[f]oremost in the category of per se violations[.]" *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 986 (9th Cir. 2000). "This long-established rule was explained by the Supreme Court in *United States v. Trenton Potteries Co.*, 273 U.S. 392, 397 (1927): 'The aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition.'" *Id.*; *see also NYNEX Corp.*, 525 U.S. at 133; *NCAA v. Board of Regents*, 468 U.S. at 107-08 ("Restrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit.").

8.      The Official Committee also asserts antitrust injury, specifically, that the members of the Ad Hoc Committee used their combined bargaining power and the threat of mass repossession of 88 aircraft, including planes essential to Delta's business, to get Delta's acquiescence to a Term Sheet that includes above-market prices and onerous terms and conditions that no debtor in Delta's place would otherwise have accepted. Motion at 10-12. Indeed, Delta did not accept such disadvantageous terms in dealing with lessors outside the Ad Hoc Committee. *See* Official Committee Objection at 29.

9.     The Official Committee is prepared to plead, *inter alia*, that, Delta retained outdated 767-300 planes that it would have retired but for the Ad Hoc Committee's threat to repossess all 88 of the aircraft owned by its members – and effectively ground numerous other aircraft using engines owned by the Ad Hoc Committee. Official Committee Objection at 21, 28. Instead of rejecting these outdated planes, as it could have under section 365, Delta was forced to keep all but one. It even agreed to pay excessive liquidated penalty damages should it reject any of the remaining 767-300 planes. Official Committee Objection at 23.

10.     In addition, Delta agreed to new return conditions on all 88 aircraft (including the unwanted 767-300 planes) that will burden it with substantial additional costs, Official Committee Objection at 25; agreed to above-market lease rates on many of the aircraft (again, including the outdated 767-300s), *id*. at 28; and agreed to fund all of the Ad Hoc Committee's attorney fees and expenses in these chapter 11 proceedings, *id*. at 31-32.

11.     This is the "sweetheart deal" that the Ad Hoc Committee "offered" Delta. Objection of the Senior Secured Holders to the Motion ("Bingham Objection") at 12. Suffice it to say that the Official Committee has asserted antitrust injury.

12.     The Ad Hoc Committee counters that its conduct could not have injured Delta because Delta saved money under the new leases, compared with the pre-petition leases. Bingham Objection at 5. But the Ad Hoc Committee's bare and unsupported assertion that the new leases save Delta as much as $1 billion over an unspecified number of years by comparison with pre-petition leases is irrelevant – what matters is not how much Delta saved as a result of the negotiations that took place, but how many hundreds of millions of dollars Delta *lost* as a result of the Ad Hoc Committee's collusive conduct, which deprived Delta of its opportunity to bargain with its lessor members individually, and on a competitive basis – a question to be

decided at a later date by the trier of fact. Further, the asserted $1 billion figure is chimerical, because the long-term, pre-petition leveraged leases and the newly agreed upon short-term, operating leases reflect entirely different markets and are thus proverbial "apples and oranges."

13.     In any event, the *degree* to which the Ad Hoc Committee's conduct harmed Delta, and in turn, its other creditors, raises factual questions not at issue at this stage of the proceedings. *Halperin*, 295 F.3d at 356. Accordingly, this Court should disregard the unsupported arguments made by Delta and the Ad Hoc Committee concerning the amount of savings realized by Delta as a result of group negotiations which have nothing to do with the question at issue – whether the Official Committee has stated a colorable claim for per se antitrust violations.

14.     The Ad Hoc Committee next asserts that the Motion fails because it does not allege a relevant market or market power. Bingham Objection at 23-25. But when a per se violation such as horizontal price fixing has occurred, there is no need to define a relevant market, to show that the defendants had power within the market, or to rebut procompetitive arguments at any stage of the proceedings, let alone the pleading stage. *See, e.g., FTC v. Superior Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 435-36 & n.19 (1990); *see Arizona v. Maricopa County Med. Soc.*, 457 U.S. 332, 351 (1982) ("The anticompetitive potential in all price fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some"). Relevant market analysis becomes an issue only in rule of reason cases, and even in those cases, a plaintiff is not required at the pleading stage to describe a relevant market, *Todd*, 275 F.3d at 199-200, or make a showing of market share, *id.* at 206.

15.     Further, the Supreme Court has held, even in a rule of reason case that goes to trial, the absence of "detailed market analysis is not fatal to [a] finding of a violation under the Rule of Reason." *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 460 (1986). As the Court explained, "the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition"; proof of market power is only "a surrogate for detrimental effects." *Id.* at 460-61. If "actual, sustained adverse effects on competition" are found, the conduct can violate the rule of reason "even in the absence of elaborate market analysis." *Id.* at 461; *see id.* at 461-62 (holding that a combination of competitors to withhold information from consumers was sufficiently "likely enough to disrupt the proper functioning of the price-setting mechanism of the market that it may be condemned [under the rule of reason] even absent proof that it resulted in higher prices."). As discussed above, the Official Committee has alleged "actual adverse effects" – *i.e.*, Delta's acquiescence in an agreement full of onerous terms and conditions that harm the Debtors' estates.

16.     In sum, the Motion states Antitrust Claims that are colorable – *i.e.*, that survive a motion to dismiss, whether viewed through the lens of per se or rule of reason analysis.

**B.      The Debtors Unjustifiably Failed to Bring Suit Because the Ad Hoc Committee Insisted They Agree to Waive Any Antitrust Claims.**

17.     The Ad Hoc Committee has the audacity to suggest that Delta's acquiescence to the collusively negotiated agreement and its opposition to the Motion supports denial even more strongly than in the *United* case. Bingham Objection at 12 n.4. What the Ad Hoc Committee omits to mention is that, unlike in *United*, Delta was forced to sign a waiver of its Antitrust

Claims as a condition to negotiations with the Ad Hoc Committee.[3] The Ad Hoc Committee's

tactics on this score only underline the colorable nature of the Antitrust Claims, which it tries to

slough off as frivolous. If the Ad Hoc Committee really believed that such claims "would not

pass the Rule 11 standard," as it states on page 4 of its Objection, it would hardly have taken the

precaution of getting the Debtors to agree not to bring them.

18.     Given this history, there can be no doubt that the Debtors' failure to bring the

Antitrust Claims was unjustified, as it left the interests of their general unsecured creditors

unprotected at the behest of party against whom the claims should be brought.[4]

## II.     RESPONDENTS' OBJECTIONS TO THE OFFICIAL COMMITTEE'S ANTITRUST CLAIMS ARE PREDICATED ON A FUNDAMENTAL MISCHARACTERIZATION OF THE ISSUES.

### A.     Section 365 Is Designed to Allow Debtors to Take Advantage of Current Market Conditions at the Time of Bankruptcy.

19.     Section 365 permits the debtor "to go through [its] inventory of executory

contracts . . . and decide which ones would be beneficial to adhere to and which ones it would be

beneficial to reject." *In re Orion Pictures Corp.*, 4 F.3d 1095, 1098 (2d Cir. 1993); *see* § 365(a)

("the trustee, subject to the court's approval, may . . . reject any executory contract or unexpired

---

[3] The Letter Agreement states that, as a condition to negotiations with the Ad Hoc Committee, Delta (i) would not assert that collective negotiation by the Ad Hoc Committee raised antitrust issues, concerns, or implications, and (ii) did not object to the Ad Hoc Committee's members' desire to discuss among themselves "information regarding the various lease rates, terms, conditions, and strategies regarding the various aircraft in Delta's entire fleet. . . ." despite the confidential and proprietary nature of such terms. *See* Motion at 5-6.

[4] *See Louisiana World Expo. v. Federal Ins. Co.,* 858 F.2d 233, 253 n.20 (5th Cir. 1988) (the Court must determine whether the failure to bring the claim is justified from the perspective of the creditors: "in determining whether a debtor-in-possession's refusal was unjustified, we must look to whether the interests of creditors were left unprotected as a result. As the interests of creditors are imperilled where valid and profitable state law causes of action are neglected by the debtor-in-possession, the unjustified refusal calculus will generally amount to little more than a cost-benefit analysis."); *see also FTC v. Alliant Techsystems, Inc.*, 808 F. Supp. 9, 12 (D.D.C. 1992) (the fact that a victim does not object holds little sway with a Court that must review the legality of an agreement under the antitrust laws, where others may be affected by the illegal conduct); *In re Dalen*, 259 B.R. 586, 605 (Bankr. W.D. Mich. 2001) ("Before a court gives its imprimatur to a settlement through an order or consent judgment, the court should have before it sufficient information to, at a minimum, ascertain that the settlement reached is not illegal, unconstitutional, or against public policy").

lease of the debtor"); *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 954-55 (2d Cir. 1993) ("The main purpose of Section 365 is to allow a debtor to reject executory contracts in order to relieve the estate of burdensome obligations while at the same time providing a means whereby a debtor can force others to continue to do business with it when the bankruptcy filing might otherwise make them reluctant to do so.") (quotations and citations omitted).

20. Under section 365(g), the debtor's rejection of a contract or lease is deemed a pre-petition breach, so that any claim for damages that the nondebtor party to the contract or lease may acquire is treated as a pre-petition claim (to the extent the obligation is not otherwise secured). Accordingly, the lessor or other contracting party falls in line with other unsecured creditors to collect what remains of the estate after secured claims are paid. *In re Orion*, 4 F.3d at 1098 (if the debtor "rejects an executory contract pursuant to § 365, the other party to the rejected contract becomes a general creditor of the estate for any damages flowing from the rejection") (quotations and citation omitted).[5] The reason for this is simple: If a creditor were entitled to force the debtor to comply with an above-market contract following bankruptcy, that creditor would collect the entire benefit of its bargain at the expense of other creditors. This would be completely at odds with the "fresh start" approach of Chapter 11, "a central premise of [which] . . . is that what state law plainly allows as acceptable or 'fair,' as between a debtor and a particular creditor, may be set aside because of its impact on other creditors or on the debtor's chances for a fresh start." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 564 (1994). In accordance with this central premise, section 365 ensures that a party to an executory contract

---

[5] The Ad Hoc Committee suggests in its brief that the obligation to pay damages upon rejection of a contract somehow nullifies the rejection privilege. Bingham Objection at 14. The Ad Hoc Committee fails to acknowledge that the nondebtor party collects only as an unsecured creditor. Accordingly, the right to reject is a meaningful bargaining tool.

will not reap a windfall just because the debtor did not breach its contract before the petition was filed.

21.     Section 1110 of the Code – the provision that applies specifically to aircraft leases – is consistent with the principles behind the Code in general and section 365 in particular. Section 1110 gives aircraft lessors assurance that they will get their planes back in case of airline bankruptcy by shortening the automatic stay period. *See, e.g., In re Trans World Airlines, Inc.*, 145 F.3d 124, 137 (3d Cir. 1998). That is all. Nothing in that section suggests that it is a license for lessors to "cooperate" in order to coerce a better deal with the debtor, as the Ad Hoc Committee claims.

22.     Section 1110 gives the debtor a 60-day post-petition window in which to decide what happens to leased aircraft in its possession. The airline debtor may choose to retain the aircraft by curing defaults and "agree [ing] to perform all obligations of the debtor" under the lease. § 1110(a)(2). Or, like any other debtor, it may reject the lease and seek new lease terms, either from the original lessors or on the open market. *See In re Trans World*, 145 F.3d at 137. If the debtor does not perform an obligation in accordance with the original lease or successfully negotiate a new lease or an extension with the lessor within the section 1110 period, the unilateral power to control disposition of aircraft shifts to the lessor, which is now free to repossess its aircraft. § 1110(a)(1) and (2).

23.     The debtor's right to reject executory contracts and unexpired leases under section 365, during the period allowed by section 1110 (in the case of airline debtors), is critical in situations where – as here – the debtor is a party to above-market contracts or leases, because it gives the debtor additional leverage to negotiate new contracts or leases with the other contracting parties.

24.     Here, the regime established by sections 365 and 1110 should have placed all of Delta's aircraft lessors, including members of the Ad Hoc Committee, into competition for a place in Delta's reduced fleet.  Delta was under no obligation to keep all 88 planes leased from the Ad Hoc Committee's members.  It could have continued to lease or rejected the planes as it saw fit (with the approval of the Bankruptcy Court), or sought replacements for rejected planes on the open market.

25.     Members of the Ad Hoc Committee could have refused to negotiate with Delta and repossessed planes whose lease contracts Delta refused to assume.  But repossession is not the all-attractive proposition that the Ad Hoc Committee implies.  For one thing, there are significant transaction costs associated with repossession, including hangaring, reconfiguring, and repainting planes.  And there are considerable risks.  A lessor would have had to be fairly confident it could find someone willing to buy or lease the repossessed planes at an attractive rate.  Because no one in today's market would agree to pay above-market prices to buy or lease planes, especially outdated ones, individual lessors would in many cases be better off negotiating with the debtor airline to continue leasing its planes at reduced rates.  Official Committee Objection at 28.

26.     In sum, each Ad Hoc Committee member should have competed against the other members in bidding for Delta purchases.  Instead, the Ad Hoc Committee members opted to negotiate as a group because it gave them the power to set the terms they wanted – terms they never could have gotten had they bargained on an individual basis.  *See id.* at 27.  This kind of conduct – collusion by horizontal competitors to avoid competing with one another and impose set prices on another entity – is exactly what the antitrust laws were created to prevent.

27.     The Ad Hoc Committee's position is stunningly broad given the lack of any indication that section 1110 contemplates or sanctions collusive conduct. If the Ad Hoc Committee's position were correct, then every set of service providers or sellers of goods could collude to demand above-market rates from chapter 11 debtors. That cannot be the law.

**B.      Contrary To Respondents' Representations, This Case Does Not Involve A Combination Of Non-Competing Creditors Seeking To Facilitate Collection Of A Common Debt, As In *Sharon Steel* And *Falstaff*.**

28.     The Ad Hoc Committee argues that the Official Committee's claims are "nearly identical" to the claims made by the appellants in *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982), and *Falstaff Brewing Co. v. New York Life Ins. Co.*, 513 F. Supp. 289 (N.D. Cal. 1978) – *i.e.*, that the Official Committee seeks to impose an antitrust grid on what is merely a "coordination among creditors regarding renegotiations of existing contract obligations." Bingham Objection at 2; *see id.* at 8-10, 15-17; *see* Debtors' Objection to Motion ("Delta Objection") at 11-13. Respondents also assert that the Official Committee would have this Court "disregard" both of these cases. Bingham Objection at 11; Delta Objection at 13. Neither of these assertions is remotely accurate. The Official Committee does not disagree with the holdings of *Sharon Steel* or *Falstaff*. Rather, as explained in the Motion, it maintains they are simply inapposite. Motion at 15-16 and fn.7.

29.     Both *Sharon Steel* and *Falstaff* involve the joint efforts of parties to collect on monies owed them by a debtor for whose business they once competed. In *Sharon Steel*, the debtor borrowed money from two different banks. After the debtor defaulted, the banks jointly negotiated an agreement with the debtor to be paid what they were owed, and then jointly sued the debtor when they weren't paid. On these facts, Judge Winter properly found there was "no anti-competitive purpose or effect" behind the lenders' joint activity. 691 F.2d at 1052-53. The lenders were not competing against each other for the current or future sale of any product or

service and the debtor "was in no way . . . deprived of the benefits of free competition." *Id.* at 1053. That is not the case here, where the members of the Ad Hoc Committee are – or should be – competing against each other in negotiating leases with Delta on a going-forward basis.

30. The same analysis applies to *Falstaff.* There, a group of lenders who were owed money from prior loans agreed to share pro rata any payments made by the debtor. The district court rejected the debtor's contention this was an antitrust violation, finding that defendants "were not competing with the banks or other institutions to offer or supply Falstaff with more credit, but were attempting to secure that credit which they had already extended." *Falstaff,* 513 F. Supp. at 293. Again, the debtors were coordinating to collect on past debts, not to avoid competition.

31. The Ad Hoc Committee's argument hinges on its assertion that its collusion was necessary to prevent a "race among [members] to . . . repossess" their planes, just as in *Falstaff* and *Sharon Steel,* cooperation among creditors prevented each creditor from resorting to individual litigation that could have driven the debtor out of business and/or eliminated any opportunity for a workout. Bingham Objection at 15-16, *see also id.* at 26. But this *in terrorem* argument rests on the Ad Hoc Committee's fundamental misunderstanding of the differences between these cases and the one at bar. Here – as the facts and simple economic logic make plain – there would have been no "rush" by the Ad Hoc Committee's members to repossess their planes. In the first place, section 1110 itself prevents a race to repossession by giving the debtor a minimum 60-day window in which to confirm existing contracts. Further, no rational lessor would execute its right to repossess a plane or planes unless it believed it could make a better deal on the open market than it could by negotiating with Delta for a new lease arrangement. Certainly no other airline or aircraft purchaser would have agreed to pay the above-market prices

at which Delta was leasing many of its planes prior to bankruptcy. Notably, many members of

the Ad Hoc Committee, including the member with the most planes at issue, possessed aircraft

that were outdated and of little use – planes that Delta had planned to reject, but which it was

forced to keep when threatened with mass repossession of all 88 planes owned by members of

the Ad Hoc Committee. Official Committee Objection at 20-23.

C. **The Second Circuit Is Not Obliged To Follow The Seventh Circuit's Flawed Opinion In *United Airlines*, And Is Likely To Reach A Different Conclusion Based On Its Own Precedent.**

32. As discussed in the Motion (at 13-23), the Official Committee takes issue with the

Seventh Circuit's opinion in *United Airlines* in several respects: (1) the Court ignored the

airline's rights under section 365 by treating the collusive conduct of the aircraft lessors as a

typical compromise of past debt by non-competing parties; (2) the Court erroneously concluded

that collusive efforts to fix prices are categorically acceptable in the context of bankruptcy,

because bankruptcy "often is described as a collective proceeding among lenders," 406 F.3d at

921; and (3) as discussed in the following section, the Court erroneously applied the *Noerr-*

*Pennington* doctrine to allow petitioning immunity for collusion, under the guise of settlement,

to alter the terms of competition for future rights.

33. While the Official Committee recognizes that the opinion was authored by a

respected judge, it respectfully submits that the Seventh Circuit got it wrong when it ventured

into the uncharted territory where antitrust and bankruptcy law meet. As discussed in the

Motion, the Seventh Circuit improperly inferred from the Bankruptcy Code that creditors are

immune from the antitrust laws, an inference that defies not only logic but also the proscription

against implied repeal of antitrust protection. *See* Motion at 17; *FTC v. Ticor Title Ins. Co.*, 504

U.S. 621, 636 (1992). Implied repeal of antitrust protection is particularly inappropriate here

because there is no conflict between the relevant provisions of the Code and the antitrust laws.

To the contrary, as discussed above, section 365 resolves the tension between the interests of a particular set of creditors on the one hand, and the debtor's estate – and its remaining creditors – on the other, *by establishing a competitive regime* among nondebtor parties to contracts and leases that continue into bankruptcy. Nothing in section 1110 changes that, except that the debtor has a shortened period in which unilaterally to exercise power over aircraft in its possession. Sections 365 and 1110 are thus entirely consistent with the policies motivating antitrust law. The collusive conduct of the Ad Hoc Committee violates both the competitive regime contemplated by section 365 and the competitive interests protected by the antitrust laws.

34.     In a recent case, Judge Winter, who decided *Sharon Steel*, explicitly recognized the distinction between collusive conduct involving competitors and collusive conduct involving former competitors with a common desire to collect on historic debts. In *PrimeTime 24*, 219 F.3d 92 – a case the *United* court did not cite or even acknowledge – Judge Winter held that, while the Sherman Act allows creditors to take some types of concerted action to enforce common rights, it does not permit horizontal competitors to band together to "limit their individual freedom of action" in their dealings with a business entity. *Id.* at 103.

35.     In *PrimeTime 24*, a group of competing copyright holders jointly agreed that one of its members would bargain on behalf of all of them with a prospective licensee, PrimeTime. The group demanded prohibitively high prices from PrimeTime and subsequently agreed to jointly refuse to deal with PrimeTime even though it would have been in the individual interest of each copyright holder to do so. 219 F.3d at 97. Citing *Sharon Steel*, the Court noted that the Sherman Act does not prohibit copyright holders from cooperating in the prosecution of their historic claims against a common copyright infringer. *Id.* at 99. But in their role as competitors

vis-à-vis the alleged infringer, the Court held the copyright owners could not collectively "refuse to deal to prevent competition." *Id.*

36.     The Court further held that insofar as PrimeTime was "seeking to obtain licenses prospectively," the concerted actions of the copyright holders constituted a horizontal agreement among competitors that was a "per se antitrust violation." 219 F.3d at 102-03. "Although coordinated efforts to enforce copyrights against a common infringer may be permissible, copyright holders may not agree to limit their individual freedom of action in licensing future rights to such an infringer before, during, or after the lawsuit." *Id.* at 103.

37.     The same is true here. The Ad Hoc Committee may not collectively decide on the terms or conditions on which they, as a group, will make airplanes available to Delta on a going-forward basis – but that is exactly what they have done. The terms on which a seller will make a product available to a buyer is the essence of competition and the joint negotiation by sellers of those future terms is a patent violation of the antitrust laws.

38.     The Ad Hoc Committee argues that *PrimeTime 24* is inapposite because it does not involve bankruptcy or creditors, and because it did not involve a "resolution of past disputes or existing obligations." Bingham Objection at 18-19; Delta Objection at 13-14. Of course, *Falstaff* and *Sharon Steel* are not bankruptcy cases either. More to the point, the Ad Hoc Committee's argument that *PrimeTime 24* does not apply because it deals with future obligations while this case deals with past and present obligations confounds the issues before this Court. As discussed above, the Ad Hoc Committee members are not just renegotiating a pre-existing obligation. If that were so, they would not be competitors – a characterization that the Ad Hoc Committee does not dispute. In fact, the members are competitors – though they seek to avoid competition – because section 365 of the Code creates a competitive market in which to

negotiate leases from scratch during bankruptcy. The Ad Hoc Committee harps on its members' right to demand full performance of the pre-existing contracts or repossess their planes, but it ignores the *Debtors'* right to reject the contracts. This right to reject puts the lessors in a position where they stand to lose if they do not enter into new contracts that are desirable to the estate. By colluding to escape this competitive posture, they have done just what the Second Circuit says they may not do: they have banded together to "limit their individual freedom of action" in their dealings with a business entity. *PrimeTime 24*, 219 F.3d at 103.

39. The Second Circuit is not bound by the Seventh Circuit's decision in *United*, nor by that Circuit's misreading of the Second Circuit's opinion in *Sharon Steel*. Given the clarification provided by that opinion's author in *PrimeTime 24*, it is not just plausible, but probable, that the Second Circuit will take a hard look at the issues presented here and reach an independent decision on the merits.

D. **Petitioning Immunity Under The *Noerr-Pennington* Doctrine Cannot Defeat The Motion for Leave to Prosecute**

40. Delta and the Ad Hoc Committee assert that petitioning immunity under the *Noerr-Pennington* doctrine supplies an additional rationale for denial of the Motion. They are mistaken on multiple grounds. First, a *Noerr* defense cannot be properly adjudicated on the current record, which lacks needed facts concerning direct and indirect harms to competition. Second, *Noerr* is inapplicable as a matter of law under Second Circuit precedent that precludes petitioning immunity for collusion, under the guise of settlement, to alter the terms of competition for future rights. Third, even if *Noerr* confers antitrust immunity for the Ad Hoc Committee's efforts to convince the bankruptcy court that the Term Sheet is proper, it does not go beyond that to shield the anti-competitive conduct that led to the agreement.

41.     Anticipating that Delta and the Ad Hoc Committee would attempt to invoke petitioning immunity under the *Noerr-Pennington* doctrine as additional grounds for denial of the Motion, the Official Committee explained in the Motion why *Noerr* cannot support this outcome. Neither opposition pleading responds to the reasons elaborated in the Motion.

42.     As a threshold matter, petitioning immunity cannot defeat the request of the Official Committee because facts pertaining to the effects of the collusion by members of the Ad Hoc Committee are insufficiently developed. Motion at 20 fn.8. The Supreme Court has held that even conduct that is unquestionably intended to elicit government action in restraint of competition is not immune from antitrust scrutiny if that conduct also restrains competition through its direct effect on market conduct. Thus, in *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 503 (1988), where steel conduit manufacturers packed a meeting of a private standard-setting association to prevent approval of plastic conduit, the Supreme Court ruled that the steel tube interests could invoke *Noerr* only with respect to antitrust injury resulting from governmental adoption of the association's anticompetitive building code recommendations. More direct harm to competition, resulting from the immediate effect of the anticompetitive model standard on demand for plastic conduit, remained actionable. *Id.*; *see also FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. at 414-19 (lawyers' collusive refusal to accept court appointments is actionable under antitrust law, even if intended to bring about statutory increase in compensation).

43.     The Seventh Circuit recognized that petitioning immunity "cannot be used to shelter joint activity that creates monopoly prices independent of any decision by a court or agency," *United Airlines*, 406 F.3d at 925, but found on the factual record developed before the Bankruptcy Court in that case, that collusion among United's aircraft lessors could not cause any

harm to competition without judicial approval of the leases. Here, by contrast, essential facts pertaining to the direct anticompetitive effects of the collusion still need to be more fully developed. Further, the extent to which the Ad Hoc Committee's collusive tactics have already caused antitrust injury is not yet at issue at this stage of the proceedings, because this Court must accept the Official Committee's assertions as true. Although both Delta and the Ad Hoc Committee purport to rely on *United,* neither acknowledges this fact-dependent limitation on its analysis, which makes its conclusion inapposite at this stage of the case.

44.     The Motion also demonstrated that, in this Circuit at least, petitioning immunity under *Noerr* does not confer carte blanche immunization for anticompetitive collusion merely because the collusion can somehow be connected to a proposal to resolve disputes in litigation. Motion at 21-22. The Second Circuit underscored this point in *PrimeTime 24*, 219 F.3d 92, which squarely rejected a *Noerr* defense to a Sherman Act claim based on a "concerted refusal to deal." There, the antitrust defendants asserted that their collective refusal to deal represented concerted rejection of an offer to settle disputes in litigation, and that their collusion therefore qualified as *Noerr*-protected petitioning conduct. *Id.* at 102. The Second Circuit statement concerning the limits on *Noerr* protection for concerted settlement efforts bears repetition:

> [A]lthough coordinated efforts to enforce copyrights against a common infringer may be permissible, copyright holders may not agree to limit their individual freedom of action in licensing future rights to such an infringer before, during, or after the lawsuit.

*Id.* at 102-03. Here, as in *PrimeTime 24*, the antitrust defendants seek petitioning immunity for collusive conduct that is intended to alter the competitive landscape going forward, not merely to resolve a dispute over the legal significance of past actions. Accordingly, the limitation on petitioning immunity that the Second Circuit articulated in *PrimeTime 24* applies with equal force.

45.     Neither Delta nor the Ad Hoc Committee offers a coherent response to this

analysis.  Delta notes that collusive conduct at issue in *PrimeTime 24* encompassed concerted

rejection of offers that predated litigation.  Delta Objection at 16 (citing *PrimeTime 24*, 219 F.3d

at 102).  But the Second Circuit cited the defendants' collusive rejection of the pre-litigation

offers as an additional reason for denying petitioning immunity.  It gave no indication that, in

spite of the passage quoted above, *Noerr* would have protected the defendants' collusion in

reaching a settlement that restrained competition involving "future rights" if not for the pre-

litigation offers.  Although the Ad Hoc Committee does not specifically discuss the Second

Circuit's rejection of the defendants' *Noerr* defense in that case, it emphasizes the Second

Circuit's recognition that the Sherman Act does not prohibit "'coordinated efforts to enforce'"

common legal rights.  Bingham Objection at 19 (quoting *PrimeTime 24*, 219 F.3d at 99).  But this

approach simply disregards the distinction, made plain by the quoted passage, between collective

enforcement of common legal rights and collusion, under the guise of settlement, to limit

"individual freedom of action" in a manner that restrains competition involving future rights.[6]

---

[6] Both Delta and the Ad Hoc Committee ignore other decisions, cited in the Motion, that recognize similar
restrictions on petitioning immunity in the settlement context.  These include the Supreme Court's ruling that the
Sherman Act applies to anticompetitive schemes that include the use of settlement agreements to pool patent rights
for anticompetitive purposes, *United States v. Singer Mfg. Co.*, 374 U.S. 174 (1963), and the D.C. Circuit's more
recent statement that a "private settlement agreement resolving [ ] patent infringement litigation by substituting a
market allocation agreement . . . would not enjoy *Noerr-Pennington* immunity." *Andrx Pharm., Inc. v. Biovail
Corp. Int'l*, 256 F.3d 799, 819 (D.C. Cir. 2001).

The Ad Hoc Committee cites two federal court decisions extending petitioning immunity to tobacco companies and
State Attorneys General for the negotiations that produced the Master Settlement Agreement resolving state liability
suits against the tobacco companies.  Bingham Objection at 21 (citing *A.D. Bedell Wholesale Company, Inc. v.
Philip Morris Inc.*, 263 F.3d 239 (3d Cir. 2001*); PTI, Inc. v. Philip Morris, Inc.*, 100 F. Supp. 2d 1179 (C.D. Cal.
2000)).  But these negotiations between private defendants and duly designated state officials are plainly different
from the negotiations between the Ad Hoc Committee and Delta.  *See Allied Tube*, 486 U.S. at 499-500 (scope of
*Noerr* immunity is dependent on the nature and context of the challenged activity, including private versus
government status of the actors; heightened immunity applies to government conduct).

46.     Finally, neither Delta nor the Ad Hoc Committee comes to terms with the limited significance of petitioning immunity under *Noerr*, even assuming it applied here. As the Official Committee pointed out in its Motion, the question whether collusion by members of the Ad Hoc Committee in their negotiations with Delta can qualify as *Noerr*-protected petitioning conduct has no bearing on the central antitrust issue in this case. Motion at 22.[7] *Noerr* immunity cannot alter the central proposition of antitrust law established in section C., above – namely, that the Sherman Act requires rejection of anticompetitive aircraft leases negotiated between a bankrupt airline and a consortium of aircraft lessors who have successfully colluded to restrain competition.

---

[7] The logical distinction between petitioning for anticompetitive outcomes and obtaining government action that validly authorizes private conduct in restraint of competition is underscored by the Supreme Court's denial of antitrust immunity to anticompetitive conduct undertaken pursuant to government decisions that fail to provide sufficient authorization. *E.g., FTC v. Ticor Title Ins. Co.*, 504 U.S. 621 (1992) (successful petition for tacit governmental approval of pricing restraints failed to immunize subsequent anticompetitive conduct); *California v. Federal Power Comm'n*, 369 U.S. 482 (1962) (successful petition for FPC approval of merger did not confer antitrust immunity for post-petitioning conduct where Commission lacked authority to resolve antitrust issues); *see also* 1 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 229 at 520-21 (2d ed. 2000) ("[A]lthough a private party is completely immune for seeking the legislation,… *Noerr* provides no shield for the private party's own subsequent market behavior" that is "[i]nadequately authorized or insufficiently supervised" by government decision makers). Even if the collusive negotiating tactics counted as petitioning conduct, petitioning immunity could not justify approval of the resulting anticompetitive agreements. *See Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 233 (2d Cir. 2004) (anticompetitive legislation was not immune from Sherman Act simply because private parties petitioned to have it enacted).

## CONCLUSION

47.     For the foregoing reasons and the reasons stated in the Motion, the Official

Committee respectfully requests that this Court (a) enter an order granting the Motion and (b)

grant the Official Committee such other relief as is just, fair and equitable.

Dated: New York, New York

February 3, 2006

**AKIN GUMP STRAUSS HAUER & FELD LLP**

/s/ Daniel H. Golden

Daniel H. Golden (DG-5624)
David H. Botter (DB-2300)
590 Madison Avenue
New York, NY 10022
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

Edward P. Lazarus (*pro hac vice* pending)
L. Rachel Helyar (*pro hac vice* pending)
2029 Century Park East Suite 2400
Los Angeles, California 90067
(310) 229-1000 (Telephone)
(310) 229-1001 (Facsimile)

Attorneys to the Official Creditors' Committee of
Unsecured Creditors of Delta Air Lines, Inc., et al.