UNITED STATES BANKRUPTCY COURT           **FOR PUBLICATION**

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| DELTA AIR LINES, et al., | : | Case No. 05 B 17923 (ASH) |
| | | (Jointly Administered) |
| Debtors. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**A P P E A R A N C E S :**

**DAVIS POLK & WARDWELL**
**Attorneys for Debtors and Debtors in Possession**
By: Sharon Katz, Esq.
     Marshall S. Huebner, Esq.
     Shaya Rochester, Esq.
**450 Lexington Avenue**
**New York, NY 10017**

**BROAD AND CASSEL**
**Attorneys for the Greater Orlando Aviation Authority**
By: Roy S. Kobert, Esq.
**390 N. Orange Avenue**
**Suite 1100**
**Orlando, FL 32801**

**KRONISH LIEB WEINER & HELLMAN LLP**
**Attorneys for the Greater Orlando Aviation Authority**
By: Richard S. Kanowitz, Esq.
     Brent Weisenberg, Esq.
**1114 Avenue of the Americas**
**New York, NY 10036**

**AKIN GUMP STRAUSS HAUER & FELD LLP**
**Attorneys for the Official Committee of**
  **Unsecured Creditors**
By: Daniel H. Golden, Esq.
     Lisa G. Beckerman, Esq.
     David H. Botter, Esq.
     Shuba Satyaprasad, Esq.
**590 Madison Avenue**
**New York, NY 10022**

**ADLAI S. HARDIN, JR.**

**UNITED STATES BANKRUPTCY JUDGE**

**OPINION DENYING MOTION FOR SETOFF**

The Greater Orlando Aviation Authority ("GOAA") has brought this motion for relief from the automatic stay in order to set off under 11 U.S.C. § 553 certain credits in favor of Delta Air Lines, Inc. and its subsidiaries (collectively, the "Debtors" or "Delta") against rejection damages under 11 U.S.C. §§ 365(g) and 502(g) stemming from a lease with GOAA which Delta has rejected.

As amplified below, I conclude that (1) as a matter of law rejection damages under Sections 365(g) and 502(g) may not be set off against a pre-petition claim or debt and (2) in any event, on the facts present here, the credits in question were not debts or claims that existed or "arose" pre-petition.

**Jurisdiction**

The Court has jurisdiction over this proceeding under 28 U.S.C. §§ 1334(a) and 157(a) and the standing order of referral to Bankruptcy Judges signed by Acting Chief Judge Robert J. Ward on July 10, 1984. This is a core proceeding under 28 U.S.C. § 157(b).

**Background**

Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on September 14, 2005. GOAA is a public body existing under the laws of the State of Florida charged with owning and operating the Orlando International Airport (the "Airport").

On June 1, 1978, Delta and GOAA entered into the Orlando Airline-Airport Lease and Use Agreement (the "Lease"). The Lease is governed by the laws of the State of Florida. The Lease is one of many such leases (collectively, the "Leases") executed by GOAA under which certain signatory airlines (the "Signatory Airlines"), including Delta, pay certain amounts to GOAA on a current, ongoing basis during the GOAA fiscal year ending September 30 for use and occupancy of Airport facilities. The Airport uses these monies to fund its operations.

GOAA is a non-profit organization. Pursuant to the Leases, if the Airport has generated a net revenue surplus by the end of a fiscal year, that surplus is credited after the close of the fiscal year on a *pro rata* basis to each of the Signatory Airlines (the "Credits"). The Leases provide that as soon as practical following the close of each fiscal year, GOAA must give each Signatory Airline a preliminary estimate of that Airline's allocated share of the surplus. The preliminary estimate of Credits for the Fiscal Year ending September 30, 2005 ("FY2005") was provided to all Signatory Airlines, including Delta, on October 28, 2005.

The Credits are just that — credits — with no funds changing hands. The Credits are recognized by GOAA as a journal entry. No check is issued at any time to any of the Signatory Airlines. GOAA has no obligation to pay any money to any Signatory Airline on account of the Credits. The Lease requires GOAA to apply the Credits as an offset against Delta's "Airline fees and charges for the first three months of [the] next succeeding Fiscal Year." Despite this language, it has long been the practice for GOAA to apply the Credits as offsets against amounts owed by the Signatory Airlines during any of the twelve months of the "next succeeding Fiscal Year" in accordance with the wishes of each Signatory Airline. Nothing in the Lease permits Delta to set off Credits in respect of FY2005 against unpaid arrearages for FY2005 — the Lease permits FY2005 Credits to offset Airline fees and charges only in the "next succeeding Fiscal Year."

As of the end of FY2005, GOAA had generated excess revenues entitling Delta to approximately $4.3 million in Credits for FY2005. To date, GOAA has failed to apply Delta's FY2005 Credits as offsets to Delta's FY2006 Airline fees and charges as required under the terms of the Lease.[1] Delta states that it made several requests that GOAA apply the Credits as specified in the Lease and that those requests were not honored.

---

[1] Beginning in November 2005, however, GOAA did apply the FY2005 Credits due to all other Signatory Airlines as they requested, with the exception of Northwest Airlines, which is also a debtor in Chapter 11.

In early December 2005 Delta representatives contacted GOAA to give advance notice of Delta's plan to reject the Lease. Delta asserts that by waiting to file its motion to offset the Credits until after Delta filed its rejection motion, GOAA intentionally withheld property of the estate to set off against contingent debts. GOAA acknowledges that it did not apply the Credits because it anticipated having a substantial claim for rejection damages which it intended to set off against Delta's Credits. On December 22, 2005 Delta filed a motion to reject the Lease under Section 365, which motion was granted by Order entered February 22, 2006.

On January 5, 2006, GOAA filed the instant motion pursuant to Sections 362(d) and 553(a) seeking relief from the automatic stay to set off Credits due Delta in the amount of approximately $2.6 million against GOAA's claims for damages arising from Delta's rejection of the Lease.[2]

GOAA's position is aptly summarized at page 3 of its motion:

". . . GOAA and Delta both have a claim against each other, each is indebted to the other and the relevant claims between the parties arose prior to commencement of these proceedings. Moreover, the parties' claims and debts are valid and enforceable. Accordingly, the GOAA is entitled to exercise its setoff rights pursuant to § 553 of the Bankruptcy Code."

Delta's position is summarized at pages 2-3 of its Objection to GOAA's setoff motion:

"The GOAA's ongoing refusal to refund the Credits to Delta when due violated (and violates) the automatic stay of section 362 of the Bankruptcy Code and is null and void;

"The GOAA has no right under section 553 of the Code and applicable Florida law to set off or withhold the Credits to recover claims for rejection damages that were contingent as of the bankruptcy filing date and are contingent today; and

"As a matter of equity, the GOAA should not now be granted relief from the automatic stay and be permitted to set off the Credits against its alleged claims, including the alleged pre-petition claims."

---

[2] GOAA originally stated that one of the reasons that it did not apply the Credits to FY2006 charges was because Delta owed GOAA approximately $1.7 million for Airport fees and services prior to the commencement of Delta's bankruptcy cases. The parties have settled this issue.

- 4 -

**Discussion**

The statute which governs the outcome of this contested matter is Section 553 of the Bankruptcy Code.  It provides, in pertinent part:

> (a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case. . . .

Two fundamental points must be emphasized to understand the limited effect of this statute as it applies to this controversy.

First, Section 553 applies only to a right to offset mutual debts owing between the debtor and a creditor "that arose before the commencement of the case."  To be entitled to the right to offset preserved by Section 553, each of the "mutual debt owing by such creditor to the debtor" and the "claim of such creditor against the debtor" must be one that "arose before the commencement of the case."

Second, the setoff right to which the statute applies is exclusively a right under non-bankruptcy or state law.  Section 553 does not create a federal right of setoff, nor does it enhance, diminish or otherwise modify any state law right of setoff.  This is made explicit in Section 553 when it states "this title does not affect any right of a creditor to offset" mutual debts owing between creditor and debtor pre-petition.  What the statute makes explicit, the case law uniformly holds. *See, e.g.*, *Citizens Bank of Maryland v. Strumpf,* 516 U.S. 16, 116 S.Ct. 286, 289, 133 L.Ed.2d 258 (1995) ("Although no federal right of setoff is created by the Bankruptcy Code, 11 U.S.C. § 553(a) provides that, with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy."); *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law" . . . "[p]roperty interests are created and defined by state law.  Unless some federal interest requires a different result, there is no

reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."); *In re Myers*, 362 F.3d 667, 672 (10th Cir. 2004) ("Section 553 of the Code simply preserves setoff rights that might otherwise exist under federal or state law . . . the threshold determination is whether an independent right of setoff exists outside of bankruptcy."); *In re Calore Exp. Co., Inc.*, 288 F.3d 22, 43 (1st Cir. 2002) ("Setoff is a creature of the common law, and therefore in most cases a question of state law . . ."); *In re Treco*, 240 F.3d 148, 162 (2d Cir. 2001) (*quoting Strumpf*, "[a]lthough no federal right of setoff is created by the Bankruptcy Code, 11 U.S.C. § 553(a) provides that, with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy."); *United States v. Roth*, 164 F.2d 575, 578 (2d Cir. 1947) (referring to an earlier setoff provision, "this section does not enlarge the doctrine of set-off and cannot be invoked in cases where the general principles of set-off would not justify it" (citation omitted)); *In re Luongo*, 259 F.3d 323, 327 n. 2 (5th Cir. 2001) (*quoting Strumpf,* "[a]lthough no federal right of setoff is created by the Bankruptcy Code, 11 U.S.C. 553(a) provides that, with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy"); *In re Gordon Sel-Wey, Inc.*, 270 F.3d 280, 290 (6th Cir. 2001) ("Although the Bankruptcy Code does not provide an explicit right to setoff, the common law right is generally preserved in bankruptcy." (citation omitted)); *United States v. Maxwell*, 157 F.3d 1099, 1102 (7th Cir. 1998) ("The Bankruptcy Code neither expands nor constricts the common law right of setoff.  Rather, it preserves, with exceptions not relevant here, whatever right exists outside bankruptcy");  *Newbury Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1398 (9th Cir. 1996) ("Section 553 'is not an independent source of law governing setoff; it is generally understood as a legislative attempt to preserve the common-law right of setoff arising out of non-bankruptcy law.'" (*quoting United States v. Norton*, 717 F.2d 767, 772 (3d Cir. 1983)); *In re Patterson*, 967 F.2d 505, 509 (11th Cir. 1992) ("Section 553 does not create a right of setoff . . . substantive law, usually state law, determines the validity of that right."); *In re Bevill, Bresler & Schulman Asset Management Corp.*, 896 F.2d 54, 57 (3d Cir. 1990) ("Section 553

incorporates and preserves in bankruptcy law the right of setoff available at common law."); *Public Service Company of New Hampshire v. New Hampshire Electric Cooperative, Inc. (In re Public Service Company of New Hampshire)*, 884 F.2d 11, 14 (1st Cir. 1989) (the creditor must "possess a valid right of setoff under some applicable provision of either federal or state substantive law; section 553(a) of the Bankruptcy Code . . . is not an independent source of setoff rights" (citations omitted)); *Durham v. SMI Industries Corp.*, 882 F.2d 881, 883 (4th Cir. 1989) ("Section 553 does not create a right of setoff or prescribe the means by which a setoff must be executed in order to be effective . . . [i]t merely preserves any right of setoff accorded by state law."); *In re HAL, Inc.*, 196 B.R. 159, 161 (9th Cir. BAP 1996), *aff'd*, 122 F.3d 851 (9th Cir. 1997) ("Section 553 . . . recognizes in bankruptcy a party's nonbankruptcy right to set off mutual prepetition debts, but does not itself create such a right."); *In re Garden Ridge Corp.*, ___ B.R. ___, 2006 WL 581045 (Bankr. D. Del. 2006) ("Although no federal right of setoff is created by the Bankruptcy Code . . . the threshold question in every case involving an asserted right of setoff is the source and validity of the underlying right" (internal citation omitted)); *In re WorldCom, Inc.*, 304 B.R. 611, 619 (Bankr. S.D.N.Y. 2004) ("While section 553 of the Bankruptcy Code addresses setoff rights, it neither creates any federal statutory right of setoff nor enlarges a party's right of setoff in bankruptcy . . . section 553 merely preserves any right of setoff that exists under nonbankruptcy law"); *In re Tower Environmental, Inc.*, 217 B.R. 933, 937 (Bankr. M.D.Fla. 1997) ("It is generally held that the section limits the application of setoff rights already available under nonbankruptcy law, but that it does not create or expand setoff rights beyond those that exist independently"); *In re Westchester Structures, Inc.*, 181 B.R. 730, 739 (Bankr. S.D.N.Y. 1995) ("[Section 553] merely preserves for the benefit of the creditor, any right to setoff that the creditor had under applicable nonbankruptcy law" (citations omitted)); *In re Aquasport, Inc.*, 155 B.R. 245, 248 (S.D. Fla. 1992) (quoting *Express Freight Lines, Inc. v. Kelly (In re Express Freight Lines, Inc.)*, 130 B.R. 288, 290 (Bankr. E.D. Wis. 1991) ". . . 11 U.S.C. § 553 limits the use of setoff rights already available

under state law, but it does not expand setoff rights to encompass rights that do not otherwise exist under state law"), *aff'd without op.*, 985 F.2d 579 (11th Cir. 1993); *In re McLean Industries, Inc.*, 90 B.R. 614, 618 (Bankr. S.D.N.Y. 1988) ("Section 553 is . . . not an independent source of a right to setoff; rather, it recognizes and preserves, but does not define, the common law right of setoff under non-bankruptcy law" (citations omitted)).

Taken together, these two fundamental points result in one statutory imperative: if no right of setoff under state law existed before commencement of the case, none exists under Section 553.

There is one other jurisprudential precept that informs this decision. Statutes are to be construed and applied in accordance with the plain meaning of the words used by Congress. It is not for the court to ignore what the statute actually says, or to employ strained or imaginative interpretations not consistent with the plain and ordinary usage and meaning of the statutory language. The intent of Congress must be presumed to comport with the plain and ordinary meaning of the words in the statute as Congress wrote it, and it is not for the court to substitute its judgment in the guise of divining Congressional intent through creative "construction." *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 16, 120 S.Ct. 1942, 1949 (2000) (when resolving questions of statutory interpretation, "we begin with the understanding that Congress says in a statute what it means and means in a statute what it says"); *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194, 105 S.Ct. 658, 661 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."); *Lee v. Bankers Trust Co.*, 166 F.3d 540, 533 (2d Cir. 1999) ("It is axiomatic that the plain meaning of a statute controls its interpretation, and that judicial review must end at the statute's unambiguous terms."). Second Circuit Chief Judge John Walker, in an illuminating law review article, quotes the words of Lord Atkinson in stating "[i]f the language of a statute be plain, admitting of only one meaning, the Legislature must be taken to have meant and intended what it has plainly expressed, and whatever it has in clear

terms enacted must be enforced. . . ." John M. Walker, *Judicial Tendencies in Statutory Construction: Differing Views on the Role of the Judge*, 58 N.Y.U. ANN. SURV. AM. L. 203, 205-206 (2001).

The one exception to the plain and ordinary meaning rule may arise in the rare case where the result of a literal application of the statutory language to particular facts is so bizarre and demonstrably counterintuitive that reasonable minds must agree that the statute cannot be construed to mean what it says. *Bob Jones University v. United States*, 461 U.S. 574, 586, 103 S.Ct. 2017, 2025 (1983) ("It is a well-established canon of statutory construction that a court should go beyond the literal language of a statute if reliance on that language would defeat the plain purpose of the statute"); *C.I.R. v. Brown*, 380 U.S. 563, 571, 85 S.Ct. 1162, 1166 (1965) ("Unquestionably the courts, in interpreting a statute, have some scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results or would thwart the obvious purpose of the statute."); *Salute v. Stratford Greens Garden Apartments,* 136 F.3d 293, 297 (2d Cir. 1998) ("The plain meaning of a statute may not be controlling in those rare cases where literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." (internal citations omitted)).

No such exception applies to this controversy. Sections 365(g), 502(g) and 553 deal with the respective rights and obligations of debtors, creditors and counterparties to contracts rejected by the debtor. Congress could have written Section 553 so as to permit offset of rejection claims against pre-petition debts owed to the debtor, or not permit such offset, without doing violence to any overarching policy or objective embodied in the Bankruptcy Code or any cosmic notion of justice or fairness.

With this background, it will be apparent that GOAA's setoff motion must be denied for two entirely separate and independently sufficient reasons.

**I.       Bankruptcy Code rejection damages cannot be offset against a pre-petition debt**

As shown in point II, below, the Credits do not constitute a pre-petition debt owed by GOAA to Delta as a matter of contract and, therefore, state law.  But even assuming, *arguendo,* that the Credits could be considered a debt owing pre-petition by GOAA to Delta, they could not be offset against GOAA's rejection damage claim under Sections 365(g) and 502(g) of the Bankruptcy Code.

The reason is simple.  The rejection damage claim is not "a claim . . . against the debtor that *arose* before the commencement of the case" as a matter of state law.  The rejection claim did not "arise" pre-petition in any sense of the word.  It did not exist pre-petition either as an actual claim or as a contingent claim, any more than the possibility of some future breach of contract claim can be said to "arise" or exist before the actual breach.[3]  Thus, as a matter of temporal fact and as a matter of state law, *there was no claim of GOAA against Delta that "arose" pre-petition* to be offset against Delta's putative or supposed pre-petition claim against GOAA based on the Credits.   Since the cases uniformly recognize that the Bankruptcy Code does not create a right of setoff, and that the only right of setoff preserved under Section 553 is a right that existed under non-bankruptcy state law before the bankruptcy filing, GOAA's claimed setoff must fail.

GOAA's setoff argument rests entirely on Bankruptcy Code Section 365(g), which states in relevant part:  "the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease — (1) . . . immediately before the date of the filing of the petition."  Section 365(g) is implemented for claim allowance purposes by Section 502(g), which provides in relevant part  that a claim arising from rejection "shall be allowed . . . the same as if such claim had arisen before the date of the filing of the petition."  These Bankruptcy Code provisions cannot affect state law rights with respect to setoff, as made clear in the case law cited above, and explicit in Section 553 which states

---

[3]     Obviously every contract might be breached at some future time, but that does not mean that there exists a "contingent" claim for breach before there is any breach.

- 10 -

that "this title [*i.e.*, the Bankruptcy Code] does not affect any right of a creditor to offset" mutual debts arising before bankruptcy under non-bankruptcy state law. To invoke Sections 365(g) and 502(g) to create a right of setoff where none exists under state law would defy this unambiguous language in Section 553. Of course, Congress could have written Section 553 to provide that a creditor's rejection damage claim under Sections 365(g) and 502(g) may be offset against a claim of the creditor against the debtor that arose before the commencement of the case, but it did not do so. Instead, it provided in Section 553 that "this title **[including Sections 365(g) and 502(g)]** does *not* affect any right of a creditor to offset" mutual debts that arose pre-petition under non-bankruptcy state law. If it means anything, this language must mean that Sections 365(g) and 502(g) of "this title" do not affect whatever right or lack of right a creditor had pre-petition to offset against a debtor, so that if a creditor had no offset rights pre-petition, the Bankruptcy Code does not create a right to offset.

Finally, while not controlling, it is worth noting that to construe the interplay of Sections 365(g), 502(g) and 553 so as to benefit a contract counterparty such as GOAA to the detriment of the debtor would turn the policy objective of these provisions on its head. The purpose and effect of Sections 365(g) and 502(g) is to benefit the debtor's estate by relegating the counterparty's breach of contract rejection damage claim to unsecured pre-petition status payable, if at all, in fractional reorganization dollars, rather than treating rejection damage as a post-petition priority administrative claim payable in 100 cent dollars. By contrast, the whole purpose of GOAA's motion is to have its rejection claim paid in 100 cent dollars by offset against the FY2005 Credits, thereby depriving Delta of its contract right under the Lease to offset the FY2005 Credits dollar for dollar against FY2006 Airport fees and charges. Congress did not provide for such a result in Section 365(g), Section 502(g) or Section 553.

It must be noted that this Court's legal conclusion that rejection damage claims cannot be offset under Section 553 against pre-petition debts owed to the debtor is contrary to statements made in two of the leading treatises and by courts in several decisions. *See,* 3 NORTON BANKR. L. & PRAC. 2d

- 11 -

§ 63:4 (2006) (hereinafter "*Norton*"); 5 COLLIER ON BANKRUPTCY § 553.03[1][i] 15th ed. (rev. 2004) (hereinafter "*Colliers*"); *Public Service Company of New Hampshire v. New Hampshire Electric Cooperative, Inc. (In re Public Service Company of New Hampshire)*, 884 F.2d 11, 15 (1st Cir. 1989) ("We acknowledge that, when triggered by a timely postpetition rejection, the relation-back rule serves to transform a future action for breach of an executory contract into a prepetition claim subject to setoff. *See* 11 U.S.C. § 502(g)") (hereinafter "*Public Service*"); *Express Freight Lines, Inc. v. Kelly (In re Express Freight Lines, Inc.)*, 130 B.R. 288 (Bankr. E.D. Wis. 1991) (hereinafter "*Express Freight Lines*"); *In re Mace Levin Associates, Inc.*, 103 B.R. 141 (Bankr. N.D. Ohio 1989) (hereinafter "*Mace Levin*"). As explained below, I am not persuaded by these authorities.

Turning first to the treatises, *Norton* states as follows on the point:

> Operation of Bankruptcy Code provisions other than § 553 may affect whether the debts involved arose prepetition or postpetition. . . . [T]he timely postpetition rejection of an executory contract creates a prepetition claim subject to setoff by the operation of the "relation-back" rule of § 502(g). [FTN 86]

*Norton's* statement that Bankruptcy Code provisions "may affect" whether debts "arose prepetition or postpetition" for Section 553 purposes does not withstand analysis. Both the question of "whether" a debt arose and "when" it arose for setoff purposes are questions of state law which Section 553 expressly states that "this title does not affect." Footnote 86 cites two cases, *In re Public Service*, cited above, and *United States v. Gerth*, 991 F.2d 1428 (8th Cir. 1993). The *Gerth* case had nothing to do with rejection of contracts or rejection damages, but concerned the assumption of executory contracts and concluded that assumption "did not transform ASCS's [pre-petition] obligation to pay into postpetition obligations." 991 F.2d at 1429. The *Gerth* case in no way supports the proposition for which it is cited in *Norton*. Nor does the holding of the other case cited in footnote 86, *Public Service*. The debtor, Public Service, and defendant, New Hampshire Electric Cooperative ("NHEC"), were parties to two pre-petition contracts, a Supply Contract and a Sellback Contract. NHEC owed the debtor substantial

amounts pre-petition under the Supply Contract.  As noted in the First Circuit decision, "NHEC admitted that debt, but refused to pay it, asserting an entitlement to retain the funds as a setoff against damages that might accrue in connection with the Sellback Contract."   84 F.2d at 12-13.  When the debtor commenced the adversary proceeding to compel NHEC to pay its pre-petition debt to the debtor under the Supply Contract, the debtor had neither assumed nor rejected the Sellback Contract, which remained wholly executory.  Since no claim had arisen under state law in favor of NHEC against the debtor with respect to the Sellback Contract, the First Circuit correctly ruled that "we do not believe that [NHEC] has a valid, matured right of setoff."  *Id.*  That Court's *dictum* concerning setoff of a rejection claim, quoted parenthetically following the citation above, is unsupported by either authority or rationale.

> The *Colliers* treatise gives the following analysis:
>
> [C]laims based upon the debtor's rejection of an executory contract or unexpired lease, which are specifically designated as prepetition in nature pursuant to Bankruptcy Code sections 365(g)(1) and 502(g), are eligible for setoff against mutual prepetition debts. [FTN 45]   The essential reasons for this rule are two-fold.
>
> First, the Bankruptcy Code expressly provides that these claims are prepetition in nature, and there is no reason to conclude that Congress did not intend the designation to hold true for setoff purposes.  Second, rejection damage claims are, in reality, prepetition claims that have been specially deferred in their ultimate resolution pending the debtor's decision whether to assume or reject the underlying obligation.   The deferral provides no logical basis for disability under section 553.

To the contrary, there are compelling reasons to conclude that Congress did *not* intend the pre-petition designation in Sections 365(g) and 502(g) to hold true for setoff purposes.  Section 365(g) is implemented in Article 5 only in Section 502(g), providing that for claim allowance purposes a rejection claim shall be allowed "as if such claim had arisen before the date of the filing of the petition."  Congress could have implemented Section 365(g) in Section 553 for setoff purposes, but it did not do so.  Instead, Congress expressly stated in Section 553 that "this title does *not* affect any right of a creditor to offset."  The second leg of the *Colliers* rationale, that "rejection damage claims are, in reality, prepetition claims" is, put

- 13 -

bluntly, without any basis at all in fact or law.  As noted above, a breach of contract claim does not exist under state or federal law as an actual claim or a contingent claim or an unmatured or unliquidated claim or any other kind of claim unless and until there is a breach of the contract.  That elementary postulate is the premise of the actual holding of the First Circuit in the *Public Service* case.

The cases cited in *Colliers* footnote 45 include the First Circuit decision in the *Public Service* case, discussed above, and *In re Spectrum Information Technologies, Inc.*, 190 B.R. 741, 746 (Bankr. E.D.N.Y. 1996).  The *Spectrum* case does not deal with Section 553 or the right of setoff. *Colliers* cited *Spectrum* apparently for the proposition that "[t]he significance of rejection of an unassumed executory contract is that it not only relieves the estate of onerous and burdensome future obligations but it also gives rise to a prepetition general unsecured claim for damages rather than an administrative expense priority, with the concomitant possibility of payment of such general unsecured claims 'in little tiny Bankruptcy Dollars which may be worth only 10 cents in U.S. dollars.'"  The "significance" identified by Chief Judge Duberstein in *Spectrum* is the *only* significance of Sections 365(g) and 502(g) to be found in the Bankruptcy Code.  It bears repeating that Congress could have provided in Section 553 that a rejection claim "shall be treated as if such claim had arisen before the filing" for setoff purposes, as it did for claim allowance purposes in Section 502(g).  But Congress did not do so, and instead said in Section 553 that the Bankruptcy Code "does not affect" state law rights respecting offset.

We have found two cases in which a court has actually held that a rejection claim is to be treated as a pre-petition claim for offset purposes under Section 553, the *Express Freight Lines* decision (cited in *Colliers*) and *In re Mace Levin Associates*.  Both of these cases simply assumed that the pre-petition status accorded to the claim allowance process under Section 502(g) should also be applied for setoff purposes under Section 553.  But neither decision gave any consideration to the language in Section 553 that "this title does not affect any right of a creditor to offset," which on its face precludes the

- 14 -

application of Sections 365(g) and 502(g) of "this title" to the right of offset existing under non-bankruptcy state law which is preserved in Section 553. The anomalous result reached in these two cases is clearly reflected in the exposition of the governing principles of law in the *Express Freight Lines* decision, where the court said ". . . 11 U.S.C. § 553 limits the use of setoff rights already available under state law, *but it does not expand setoff rights to encompass rights that do not otherwise exist under state law*" (130 B.R. at 290, citation omitted and emphasis supplied). The anomaly lies in the fact that the decision clearly does expand the creditor's setoff rights to encompass a right that does not otherwise exist under state law — to wit, the supposed right under Bankruptcy Code Sections 365(g) and 502(g) to treat a rejection claim that in fact arose post-petition "as if such claim had arisen before the filing" for setoff purposes under Section 553. The anomaly is compounded by the fact that Section 553 expressly states that "this title does not affect any right of a creditor to offset."

Lacking any authority of the Second Circuit Court of Appeals for applying Section 553 in a manner which conflicts with the statute as it is written, I decline to follow the *Express Freight Lines* and *In re Mace Levin Associates* decisions.

**II.    The Credits were not a "debt owing" by GOAA to Delta pre-petition**

As noted in the Background section above, the Credits do not constitute "debts owing" by GOAA to Delta and the other Airlines. Under Delta's Lease with GOAA, and presumably the other Leases, GOAA does not "owe" Delta any money at any time, and GOAA never pays any Airline any money on account of the Credits. Thus, the Credits do not constitute a "debt" that is "owing" and cannot be offset against a collateral payment obligation any more than can the value of any other non-debt contractual entitlement.

But even assuming, *arguendo*, that the Credits could be viewed as a sort of "debt owing" by GOAA, the Credits did not "arise" and were not "owing" before the September 30 end of GOAA's

2005 Fiscal Year. Under the Lease, the Credits do not come into existence until the end of GOAA's Fiscal Year. Indeed, as a conceptual matter it cannot be determined whether there will be any Credits until the stroke of midnight on September 30, the cut-off for the receipts, expenditures and accruals comprising the debits and credits which will determine whether GOAA has any surplus income to return to the Airlines in the form of Credits.

In this particular case, Delta filed for bankruptcy two weeks before the close of FY2005. Had Delta filed, say, ten months before September 30, 2005, it becomes quite plain that GOAA could not claim that the FY2005 Credits should be deemed a pre-petition debt that "arose" before the bankruptcy filing. But there is no principled distinction between a filing ten months or two months or two weeks or two days before Fiscal Year end. The fact remains that the Credits are a function of a calculation that cannot be made before the close of the Fiscal Year and therefore cannot exist or "arise" before close of the Fiscal Year.

Of course, the Credits do have significant value, but only to the extent and in the manner granted in the contract. The Lease provides that the Credits must be used solely to defray Airport fees and charges, and only such charges incurred in the "next succeeding Fiscal Year." That is the only offset provided in the Lease and enforceable under state law.

## Conclusion

To grant GOAA's motion seeking to offset the contractual FY2005 Credits against Bankruptcy Code rejection damages, instead of against Airport fees and charges accruing in FY2006 (the "next succeeding Fiscal Year"), would violate the express terms of the Lease, would contravene the explicit language of Section 553 ("this title does not affect any right of a creditor to offset"), and would undermine the objective embodied in Sections 365(g) and 502(g) (to benefit the debtor's estate by treating

rejection damage claims as pre-petition claims rather than dollar-for-dollar administrative claims).  The motion must be denied.

Delta's counsel is ordered to submit an appropriate order denying the motion in accordance with this Opinion within five (5) days.

Dated:  White Plains, NY
March 23, 2006

      /s/ Adlai S. Hardin, Jr.
      U.S.B.J.