UNITED STATES BANKRUPTCY COURT                    **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

In re:                                    :        Chapter 11

DELTA AIR LINES, et al.,                  :        Case No. 05 B 17923 (ASH)
                                                   (Jointly Administered)

                            Debtors.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**A P P E A R A N C E S :**

**PAUL, HASTINGS, JANOFSKY & WALKER LLP**
**Attorneys for Debtors and Debtors in Possession**
**By: John J. Gallagher, Esq.**
**    Robert S. Span, Esq.**
**    Jon A. Geier, Esq.**
**875 15th Street, NW**
**Washington, DC 20005**

**SHAPIRO, BEILLY, ROSENBERG, ARONOWITZ,**
**    LEVY & FOX, LLP**
**Attorneys for International Brotherhood of Teamsters**
**By: Barry I. Levy, Esq.**
**    Barry S. Cohen, Esq.**
**225 Broadway, 13th Floor**
**New York, NY 10007**

**BAPTISTE & WILDER, P.C.**
**Attorneys for International Brotherhood of Teamsters**
**By: Roland P. Wilder, Jr., Esq.**
**    William R. Wilder, Esq.**
**1150 Connecticut Avenue, NW, Suite 500**
**Washington, DC 20036**

**ADLAI S. HARDIN, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

### DECISION AND ORDER ON MOTION TO REJECT
### COLLECTIVE BARGAINING AGREEMENT

Before the Court is a motion by debtor Comair, Inc. ("Comair" or "debtor") to reject its

collective bargaining agreement (the "Flight Attendant Agreement") with its flight attendants represented

by the International Brotherhood of Teamsters (the "IBT" or "Union") under Section 1113 of the

Bankruptcy Code.  The Court held an evidentiary hearing on March 27 and 28, and the following

constitute the Court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

The Court has jurisdiction to hear and determine this core proceeding under 28 U.S.C. §§ 1334(a) and

157(a) and (b)(2) and the standing order of reference to bankruptcy judges dated July 10, 1984 signed by

Acting Chief Judge Robert J. Ward.

### Background

Comair, a wholly-owned subsidiary of debtor Delta Air Lines, Inc. ("Delta"), commenced

this voluntary case under Chapter 11 of the Bankruptcy Code on September 14, 2005, along with Delta

and other affiliates.

Comair is a regional airline.  The regional airline industry generally serves smaller

markets and connects them to larger cities, using aircraft with anywhere from thirty to ninety seats.  Most

regional airlines operate to supplement the service of one or more larger mainline partners under joint

marketing relationships called "code-sharing."  The service provided by a regional carrier is sometimes

referred to as "regional lift."

Comair, like other regional airlines, is a separately certificated air carrier and is

responsible for the operational control and safety of its own aircraft.  However, the scheduling, pricing

and marketing of Comair's flights are controlled by its mainline partner, Delta.  Delta is responsible for

the financing of the Comair fleet of aircraft and, by virtue of a call option, has the power to withdraw

aircraft from Comair operation and place the aircraft with other regional airlines.

Comair currently operates an average of 804 flights each day, all of them under the Delta

Connection program.  "Delta Connection" is the tradename used to identify those regional carriers that

have contracted with Delta to provide regional carrier passenger service under the "DL" code.  In

addition to Comair, there are five other regional airlines flying as Delta Connection carriers:  Atlantic

Southeast Airlines ("ASA"); SkyWest Airlines ("SkyWest"); Chautauqua ("Chautauqua"); Shuttle

America ("Shuttle"); and Freedom Airlines ("Freedom").  Delta has no ownership interest in any of the Delta Connection carriers other than Comair.   All flights operated for Delta by Delta Connection carriers carry the Delta "DL" designator code in the Official Airline Guide and computer reservation systems.

Comair currently provides regional lift for Delta between certain small markets and Delta's operations in Cincinnati, New York, Boston and Washington, DC, as well as point-to-point flying and flying in "combined" markets with Delta mainline for the purpose of increasing the frequency of service offered to the customer.

Comair's relationship with Delta, including its compensation for flying Delta Connection flights, is governed by its Delta Connection Agreement.  The Delta Connection Agreement does not, by its terms, guarantee any amount of flying to Comair.  Under the Delta Connection Agreement, Delta determines where and when the Comair fleet will fly and the fares to be charged, and Delta receives all revenue from the flights.  In return, Delta pays Comair for operating the flights according to a schedule and rate structure.  Currently, 100% of Comair's revenue is provided by Delta pursuant to the Delta Connection Agreement.

Comair has approximately 6,400 employees.  Approximately 3,200 of these are pilots, maintenance employees and flight attendants who are union-represented, with their wages, benefits and work rules established by three separate collective bargaining agreements.  Comair's pilots are represented by the Airlines Pilots Association, International ("ALPA") and their collective bargaining agreement is referred to as the "Pilot Agreement."  Comair's aircraft mechanics and other employees performing a variety of maintenance-related jobs are represented by the International Association of Machinists ("IAM"), and their collective bargaining agreement is referred to as the "Maintenance Agreement."   The IBT was certified as the representative of the Comair flight attendants in August 1996, and the Flight Attendant Agreement became effective July 19, 2002 and becomes amendable July 19, 2008.

The remaining approximately 3,200 of Comair's employees, including agents, ramp workers, office/clerical workers and management employees (supervisors, professionals and executives) are non-union, whose wages, benefits and work rules are and have been established by Comair.

As a group, the flight attendants are at or near the low end of the compensation levels of all Comair employees.   At 970 out of 6,390 employees as of January 31, 2006, the flight attendants represented just over 15% of Comair's work force (Dixon Declaration ¶ 3 chart p. 3), whereas they represented only 10.5% of the total Comair 2005 payroll (Exhibit RR).   By contrast, the pilots accounted for 26.3% of the employees and 43.2% of total Comair 2005 payroll, while the mechanics represented 8.2% of the employees and 8.5% of the total 2005 payroll (same sources).

Under the Flight Attendant Agreement, flight attendant wage rates generally range from $21.70 per hour for flight attendants in the first year to $42.26 for flight attendants with eighteen years or more of seniority.  In 2005, Comair and the IBT negotiated a Letter Agreement establishing a "B scale" wage rate schedule.  Under the B scale, the starting pay of flight attendants hired after June 1, 2005 is $16.50 per hour, and those new-hire flight attendants continue to be paid less than the scale under the Flight Attendant Agreement through the fifth year of work with Comair.  The average seniority level of Comair flight attendants is approximately five years.

The Flight Attendant Agreement also provides for an hourly expense allowance called a "per diem" payment for every hour that a flight attendant is away from base on assigned trips.  The per diem rate in the Flight Attendant Agreement is $1.75 per hour.

In November 2005, as part of the Delta Restructuring Plan, Delta reduced by approximately 3.8% the amount Delta pays Comair to provide regional lift under the Delta Connection Agreement.  Comair's own restructuring necessarily had to accommodate this reduction in its income from Delta, its only source of income.

Comair's Restructuring Plan called for $47.9 million yearly reduction of operating costs (not including aircraft financing costs). Of this amount, $5.6 million was targeted for annual reduction in airport customer service and maintenance support costs. The remaining $42.3 million cost reduction requirement was allocated to both union and non-union labor cost savings.

After the Chapter 11 filing in September 2005, Comair implemented non-union pay cuts ranging from 4% for front-line and hourly employees, 7% for merit employees below the director level, 9% for directors, 10% for officers and 15% for the president. This was in addition to 10% pay cuts for the officers and president in March 2005, and pay freezes for many of the non-union employees for the prior two to five years.

Comair's Restructuring Plan called for reductions totaling $27.2 million in annual collective bargaining agreement costs, allocated $17.3 million from pilots, $8.9 million from flight attendants and $1.0 million from mechanics. To that end, Comair management initiated discussions with each of the three unions in early November 2005. Included in the contract modifications requested of the flight attendants to achieve the $8.9 million target were reductions of $6.8 million in wage scale and $2.1 million savings in per diem, work rules and elimination of funding for the retirement program, coupled with profit sharing in the event the debtor's restructuring proved to be successful. ALPA and IAM agreed to the $17.3 million and $1.0 million cost reductions, respectively, under the Pilot Agreement and the Maintenance Agreement. Comair was not able to reach an agreement with IBT on behalf of the flight attendants.

In January 2006 Comair signed Letters of Agreement for the requested labor cost reductions with ALPA and IAM. However, both Letters of Agreement contained the following clause:

> [A]cceptance and implementation of this Letter of Agreement is contingent upon and shall not become effective until all other employee groups, including management, grant and/or implement the relief provided in the November 1, 2005 restructuring document (Company's confidential Cost Reduction Target).

Comair's pilots and mechanics have ratified these Letters of Agreement, subject to the contingency

clause quoted above.  But since the flight attendants have not agreed to their share of the Restructuring

Plan, the cost reduction Letters of Agreement with ALPA and IAM have not been implemented.

On November 3, 2005 Comair presented its initial bargaining proposal to the IBT.  The

parties met for additional bargaining sessions on November 30, December 1, December 20-22,

January 27, February 2-3, March 9-10, March 15-18, March 22, and several times thereafter.  The IBT

presented an initial bargaining proposal to Comair on December 21.  On December 22 Comair presented

a modified bargaining proposal.  On January 6 Comair sent via email its Section 1113 Proposal to IBT.

On February 3 IBT made a second proposal to Comair.  The trial record includes relatively little

information concerning the specifics of the parties' negotiations which, at the instance of the Court, have

continued subsequent to the conclusion of the trial.  Several limited observations will suffice for purposes

of this decision.

Comair's basic bargaining position proceeds from the undisputed facts that the flight

attendant pay scale and per diem rate of $1.75 under the Delta Connection Agreement are substantially

higher than the pay scales and per diem rates of all of the other five Delta Connection carriers and,

indeed, most if not all of the other regional carriers in the United States.   The flight attendant pay rates

contained in Comair's Section 1113 Proposal are the simple average of the flight attendant pay rates at

the other Delta Connection carriers.  The per diem rate in Comair's Section 1113 Proposal, $1.46 per

hour, arrived at by averaging the per diems of the other Delta Connection carriers, would be higher than

Freedom's per diem rate but lower than the per diem rates of the other Delta Connection carriers.  While

Comair has offered to vary the mix of cost savings amongst pay rates, per diems, work rules, *et cetera*,

all of Comair's proposals from November through the trial have been premised on obtaining $8.9 million in

overall flight attendant cost reductions.  Comair asserts the contention in the Amended Pretrial Order

(¶ 23) that "IBT's February 3, 2006, proposal would achieve approximately $1.89 million or about 25% of the savings allocated for flight attendants under the Restructuring Plan."

Two conclusions regarding the parties' negotiations are apparent from the foregoing. First, Comair has taken the position that its original demand for $8.9 million in cost deductions from the flight attendants is non-negotiable. Second, whatever the union's current position may be, it is apparent that the parties are far apart in their negotiations. The Court was informed on April 17 that negotiations had been terminated.

### Governing Law

Section 1113 of the Bankruptcy Code provides as follows in the relevant subsections (emphasis supplied):

(b)    (1)    Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall —

(A)    *make a proposal* to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those *necessary modifications* in the employees benefits and protections that are *necessary to permit the reorganization* of the debtor and assures that all creditors, the debtor and all of the affected parties are *treated fairly and equitably*; and

(B)    provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2)    During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to *confer in good faith* in attempting to reach mutually satisfactory modifications of such agreement.

(c)    The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that —

(1)    the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

- 7 -

(2)    the authorized representative of the employees has refused to accept such proposal *without good cause*; and

(3)    the *balance of the equities clearly* favors rejection of such agreement.

Section 1113 must surely be one of the most unusual provisions in the Bankruptcy Code or any other statute because of the remarkable degree of subjective discretion which a bankruptcy court must exercise in order to carry out its mandate.  The italicized words and phrases in the foregoing quotation (*viz.,* "necessary" (twice); "fairly and equitably"; "good faith"; "good cause"; "balance of the equities") admit of no precise meaning in common parlance.  We all know in a general or abstract sense the meaning of fairness, good faith and equity, but when it comes down to hard cases reasonable minds will differ over what is just and fair, and the impetus of small or subtle changes in the circumstances may alter one's perspective and conclusions.  Every fact and circumstance is relative to some unspecified and undefinable benchmark in the context of what is necessary, fair and equitable, good faith, good cause, and the balance of the equities.   At the end of the day (or in any event before expiry of the 30-day period in Section 1113(d)(2)), if the parties have not reached a negotiated solution the bankruptcy court must reexamine and weigh the testimony and documents and, considering all of the facts and circumstances and the exigencies bearing upon the interests of all the debtor's competing constituencies, exercise its best judgment in applying the several subjective criteria for decision under Section 1113.  And the irony is that after the court decides the motion and holds that the collective bargaining agreement is rejected, or not rejected, in either event the parties *must* then resume their negotiations and reach an agreement to avoid consequences that should be unacceptable to either side.

Such is the case here.   Hence, we turn to the parties' principal contentions under Section 1113 and the relevant case law.

A.    <u>**"necessary modifications . . . necessary to permit reorganization"**</u>

"[T]he necessity requirement places on the debtor the burden of proving that its proposal is made in good faith, and that it contains necessary, but not absolutely minimal, changes that will enable the debtor to complete the reorganization process successfully." *Truckdrivers Local 807, International Brotherhood of Teamsters, etc. v. Carey Transportation Inc. (In re Carey Transportation Inc.)*, 816 F.2d 82, 90 (2d Cir. 1987). Any specific Section 1113 proposal will be part of a debtor's overall restructuring plan, and "[i]n determining 'necessity', the proposal must be viewed as a whole, and not by its specific elements." *In re Horsehead Indus.,* 300 B.R. 573, 584 (Bankr. S.D.N.Y. 2003) (Bernstein, J.).

Comair argues that its $8.9 million "ask" of the flight attendants is necessary because Comair's labor costs are not competitive with other Delta regional carriers causing Comair to lose flying opportunities to other regional carriers. To bring itself in line with the other regional carriers, Comair asserts that it must cut its controllable costs such as labor (as opposed to flow-through costs, identical across regional carriers, like fuel). Comair's flight attendant pay scale is not competitive with other regional carriers in that Comair flight attendants are paid more than the flight attendants of all the other regional carriers. Comair argues that the flight attendant pay scale is part of the reason that Comair is not competitive in the market.

The IBT argued strenuously in its written submissions that "Comair is a large and successful regional carrier possessing a significant share of strategic regional air flying," that "Comair is a profitable enterprise" and that "Comair's large demanded savings from the Flight Attendants are not needed for it to reorganize given that it is a healthy, viable, regional operation." A related argument, presented through IBT's expert report and testimony, posits that the relevant metric for determining the competitiveness of Comair *vis-a-vis* other regional airlines is not "input cost" (*e.g.*, flight attendant salaries and benefits) but "output cost" per unit of revenue generating capacity, one measure of which is referred

to as "available seat mile" (ASM). Viewed in terms of overall output cost (including, but not limited to, flight attendant costs), Comair's costs per available seat mile (CASM) do not exceed but are quite competitive with other regional carriers. Hence, it is argued that a reduction in one element of output cost (flight attendant compensation) is not "necessary to permit reorganization" of Comair.

To the extent that the Union is asserting that Comair was profitable in 2005 and has no need to reorganize, I reject the position as contrary to the unrebutted evidence. The Department of Transportation Form 41 financial reporting, principally relied upon by the IBT for its argument, does not purport to account for the full financial results of Comair's operations. The evidence (including Exhibit 6 and related testimony) showed that Comair's operations sustained a loss of approximately $120 million for 2005 taking into account the pro rated costs actually incurred by Delta in generating the revenues attributable to the Comair operations. The Union has not contended that Delta's pro rated allocation of revenues and costs to Comair was inappropriate from an accounting point of view, although it has argued that the loss was due to Delta's "own uneconomical mainline costs." But whether or not Delta's costs were "uneconomical" is not the issue. If the Delta costs (whether economical or not) were properly allocated to the Comair operation (and it has not been shown that they were not), the need for Comair's Chapter 11 filing and the necessity for reorganization is clearly established in the record before me.

Nor is it relevant that by any particular measure of so-called "output costs" Comair may be competitive with other regional carriers. As acknowledged by the IBT's expert, it is incumbent on a debtor in bankruptcy to examine every line item in its budget and seek all economies permissible under the Bankruptcy Code. That is particularly true respecting cost elements which are clearly above market, such as the flight attendant compensation.

Finally, prompted by the IBT's repeated written contentions concerning Comair's alleged profitability and competitive strength, I inquired of the Union's counsel during opening statements whether the Union expected to present evidence and argument to prove at trial that reorganization was not

necessary for Comair within the meaning of Section 1113.    Counsel responded that the IBT would not

make that case at the trial, and it did not.

The IBT has argued in the context of Section 1113(b)(1)(A) that the modifications

demanded from the flight attendants are not "necessary" for Comair's reorganization.    At the risk of

oversimplification, the argument asserts in substance (1) that Comair has already achieved almost all of the

cost reductions necessary to a successful reorganization (indeed, all of the labor cost savings except those

demanded from the flight attendants), (2) that gross flight attendant costs represent a very small and stable

portion of Comair's overall budget, and (3) that because $8.9 million is a *de minimis* figure in the context of

Comair's overall budget, it cannot be said to be "necessary to permit reorganization" of Comair as a matter

of simple economics.    This "last man standing" argument, if acceptable as a matter of principle, might

always succeed as a matter of economics in a case where the single bargaining unit that had not reached a

negotiated settlement with a debtor represented a very small percentage of the debtor's budget.

The short answer to the Union contention is that it conflicts with the statute and with the

controlling decisions of the Court of Appeals for the Second Circuit.    The proposal called for in

Section 1113(b)(1)(A) must not only provide for "necessary modifications" that are "necessary to permit

the reorganization;" the proposal must also be one that "assures that . . . all of the affected parties are

treated fairly and equitably."    The Second Circuit has repeatedly held that the requirement of a proposal

that treats all affected parties fairly and equitably means that all of the debtor's cost constituencies must

share in the cost reductions which are necessary to achieve reorganization.    *See, e.g.*, *In re Century

Brass Products, Inc.,* 795 F.2d 265, 273 (2d Cir. 1986) ("The purpose [of the "fairly and equitably"

requirement] is to spread the burdens of saving the company to every constituency while ensuring that all

sacrifice to a similar degree"); *In re Carey Transportation Inc.*, 816 F.2d at 90 ("The purpose of this

provision [Section 1113(b)(1)(A)], according to *Century Brass*, 795 F.2d at 273, 'is to spread the burden of

saving the company to every constituency while ensuring that all sacrifice to a similar degree'"); *In re

Maxwell Newspapers, Inc.,* 981 F.2d 85, 89 (2d Cir. 1992) (Section 1113(b)(1)(A) "requires all affected

parties to compromise in the face of financial hardship"). The legislative history of Section 1113 "strongly suggests that 'necessary' should not be equated with 'essential' or bare minimum." *In re Carey Transportation Inc.*, 816 F.2d at 89. The test of necessity is not a but-for test because "no proposal could ever truly be 'necessary', since any single vital element of a proposal can hardly be necessary if it can be replaced by some alternative not included in the same package." *New York Typographical Union No. 6 v. Royal Composing Room, Inc. (In re Royal Composing Room, Inc.)*, 848 F.2d 345, 348 (2d Cir. 1988). Instead, "the focus should be on the proposal as a whole." *Id.*

Thus, I reject the IBT's contentions that the flight attendants cannot or should not be called upon to accept a proposal merely because their requested sacrifice will not make or break the reorganization. The "last man standing" argument that one relatively minor holdout cost constituency is not economically "necessary" to the reorganization cannot be sustained in the face of the requirement that all affected parties be treated "fairly and equitably" and the correlative requirement of the governing case law that all constituencies, great and small, bear their fair share of the cost of reorganization. The statute does not contemplate that any single group of employees such as the flight attendants will be subsidized by the sacrifices of others.

**B.     "confer in good faith," and the ALPA and IAM contingency clauses**

While subsection (1) of Section 1113(b) requires Comair to "make a proposal" to the IBT, subsection (2) mandates that Comair "shall meet" with the IBT "to confer in good faith in attempting to reach mutually satisfactory modifications" of the collective bargaining agreement.

The question raised here relates to the meaning of the clause "confer in good faith" in the context of Comair's negotiations with the IBT, specifically, the fact that Comair's demand that the flight attendants agree to $8.9 million in cost reductions has been non-negotiable since the demand was first presented to the Union in early November 2005. Comair has asserted that the $8.9 million demand must be non-negotiable because, as a consequence of the contingency clauses in the Letter Agreements signed

with ALPA and IAM in January, the cost reductions agreed to by the pilots and the mechanics cannot become effective unless and until the flight attendants agree to the $8.9 million demand.[1]

Thus, the question presented is whether a debtor can be said to comply with the obligation in subsection (2) of Section 1113(b) to "confer in good faith in attempting to reach mutually satisfactory modifications" when it presents a "proposal . . . for . . . modifications" under subsection (1)(A) which is non-negotiable.

While the Court of Appeals for the Second Circuit does not appear to have expressly confronted this precise issue, that Court has provided some illuminating analysis in its above-cited decision in *In re Carey Transportation Inc.*   A question considered there was "how necessary must the proposed modifications be . . . ?", 816 F.2d at 88. The Second Circuit rejected the notion that "necessary" should be equated with "essential" or "bare minimum."  The Court of Appeals then said:

> Judge Lifland, in the decision below, properly pointed out a second reason for not reading "necessary" as the equivalent of "essential" or bare minimum.  Because the statute requires the debtor to negotiate in good faith over the proposed modifications, an employer who initially proposed truly minimal changes would have no room for good faith negotiating, while one who agreed to any substantive changes would be unable to prove that its initial proposals were minimal. [citation omitted]   Thus, requiring the debtor to propose bare-minimum modifications at the outset would make it virtually impossible for the debtor to meet its other statutory obligations.

816 F.2d at 89.  This analysis clearly suggests that implicit if not explicit in the mandate in subsection (b)(2) to "confer in good faith," or to "negotiate in good faith over the proposed modifications" as the Second Circuit put it, is the willingness to moderate the debtor's initial proposal referred to in subsection (b)(1)(A) and to reach a compromise.  The Second Circuit's 1986 decision in the *Century Brass* case underscores the intent of Congress to place genuine collective bargaining at the core of the process which Congress provided for in Section 1113:

---

[1]  It is not clear to this Court that the contingency clauses to which Comair agreed with the ALPA and the IAM are necessarily susceptible of such an inflexible interpretation as Comair now insists. But that issue is not before the Court on this motion.

> The new law encourages the collective bargaining process as a means of solving a
> debtor's financial problems insofar as they affect its union employees.  Senator Packwood
> observed that it "places the primary focus on the private collective-bargaining process and
> not in the courts." [citation omitted]

795 F.2d at 273.

Of course, there may be circumstances where some aspect of the debtor's Section 1113 proposal must indeed be non-negotiable if reorganization is to be possible.  An example is *In re Royal Composing Room, Inc.*, 848 F.2d 345, cited above.  In that case the debtor was engaged in the printing business specializing in the field of advertising typography.  Technology had revolutionized the printing industry, with traditional linotype machines being replaced by faster, cheaper methods of computer printing.  Although it could adapt to the new technology, the debtor could not overcome the economics of its labor costs.

> Royal was faced with a unionized work force in an industry wherein its new competitors
> were not unionized, resulting in Royal being unable effectively to meet the market price for
> its product.   . . .   The problem was exacerbated by seniority rules — known in the
> industry as "priority" — which obligated Royal to retain its most senior employees, even
> though they were trained on and most qualified for the now-outdated linotype machines.

848 F.2d at 346.  One element of the debtor's Section 1113 proposal was the elimination of the seniority rule known as "priority," which the Second Circuit concluded was a truly "necessary modification," as had Bankruptcy Judge Abram [Beatty] in her opinion below.   *See* the discussion at 848 F.2d at 349-350, under the heading *"The Necessity of Eliminating Priority."*  The priority issue, although only one of many points in dispute, was central to the negotiations.  Because the debtor insisted on eliminating priority, the  union also took the hardline position that priority was non-negotiable, but the union refused to negotiate at all until priority was taken out of the debtor's proposal.   The Court of Appeals, finding that priority elimination was indeed essential to the reorganization and therefore non-negotiable for the debtor, granted the debtor's motion to reject the collective bargaining agreement.

Arguing that the $8.9 million figure is essential to its reorganization and therefore necessarily non-negotiable, Comair lays great stress on the importance of the contingency clauses agreed

upon with the pilots and the machinists unions. The contention is that the contingency clauses render its

Section 1113 proposal non-negotiable because at stake is not merely the $8.9 million demanded from the

flight attendants but the entire $27.2 million required from all three unions. Comair points out that similar

contingency clauses are often employed in Chapter 11 cases and serve the valid purpose of insuring that all

employee constituencies of a debtor share in necessary cost reductions proportionately in accordance with

the "fairly and equitably" standard of Section 1113(b)(1)(A).

       As I have made clear in this decision and in open court during these proceedings, it is my

view that the flight attendants must bear a fair and proportionate share of the cost reductions necessary to

permit a successful reorganization of the debtor, and I have unequivocally rejected the IBT's position to

the contrary. I also have no doubt that contingency provisions designed to preclude a debtor from imposing

cost reductions disproportionately among its various employee constituencies serve a valid purpose and are

frequently employed. However, judging from Exhibits 59-70 annexed to Comair's counsel's letter to the

Court dated April 13, 2006, many if not all of those examples of contingency clauses provided sufficient

flexibility as to (i) permit some give and take and compromise by the debtor, and (ii) leave the ultimate

decision on fairness and proportionality to the court, rather than to the parties.

       And that brings us to the fundamental defect in Comair's arguments based upon the

ALPA and IAM contingency clauses. The structure of Section 1113(b) and (c) requires a debtor to make

a proposal to the union representing those employees covered by the specific collective bargaining

agreement sought to be rejected. That specific proposal, and that union's and the debtor's conduct in

relation thereto, is what must be tested under the subjective criteria set forth in subsections (b) and (c).

Most important, *it is for the Court* to make all determinations with respect to the statutory criteria. The

tacit consequence of Comair's arguments predicated upon the purported exigency created by the ALPA

and IAM contingency clauses would be to usurp the Court's function in judging Comair's non-negotiable

$8.9 million Section 1113 proposal to the IBT. Under the statute and the case law the flight attendants

must bear their fair and proportionate share of the cost of Comair's reorganization, but the flight attendants

are entitled to their own day in court under Section 1113.   It is not acceptable to say that Comair, by

reaching agreement with the pilots and the machinists, can preempt for the flight attendants the

Section 1113 process of proposal, good faith negotiations, and determinations by the Bankruptcy Court of

all issues relating to necessity, fairness, good faith negotiations, good cause and balance of the equities.

The quantum of flight attendant cost reductions is certainly at the heart of the requirement that "all of the

affected parties are treated fairly and equitably."   But that statutory issue is to be judged by the

Bankruptcy Court, and the issue may not be predetermined and foreclosed by Comair's negotiations with

the pilot and machinist unions.   ALPA and IAM represent their own members, not the flight attendants,

and they may not dictate what is fair and equitable for the flight attendants by signing contingency clauses

purporting to bind Comair and the Court.[2]

In short, I reject Comair's argument that the contingency clauses to which it agreed with

the ALPA and the IAM can be given the effect of constraining this Court's judgment and discretion in

applying the subjective criteria prescribed in Section 1113(b) and (c) to determine whether Comair's

motion to reject the Flight Attendant Agreement should be granted or denied.[3]

Having concluded that the ALPA and IAM contingency clauses cannot moot the

Section 1113 process for the flight attendants, let us return to the question whether Comair's non-

negotiable Section 1113 proposal can be said to comport with Comair's mandatory obligation "to confer in

good faith in attempting to reach mutually satisfactory modifications" under subsection (b)(2).   I conclude

that it cannot.  By no standard can the precise figure of $8.9 million be said to constitute a practical

---

[2]    The differing interests as between the pilots and machinists, on the one hand, and the flight
attendants on the other, is amplified in point C, below, concerning a significant disparity in the
treatment of the three unions under the debtor's Restructuring Plan.

[3]    Comair points out that the IBT included a contingency clause in its December 21 proposal and
argues that the IBT should be estopped to argue that the ALPA and IAM contingency clauses
should not be given the effect Comair ascribes to them.  Aside from the fact that the IBT
contingency clause appears to be more flexible than Comair's interpretation of the ALPA and IAM
contingency clauses, the thrust of this Court's holding would apply equally to the IBT
contingency clause.  The point is that one union cannot preempt the right of another union to the
procedures and court determinations prescribed under Section 1113.

necessity or *sine qua non* for the debtor's reorganization when the entire $8.9 million figure represents a

rather minor element of this debtor's reorganization budget.   It is self-evident that a settlement with the

flight attendants at $8.4 million, or $7.9 million or even some lesser figure would have no material impact

on Comair's ability to reorganize.   The precise dollar amount of the debtor's cost recovery from the flight

attendants has no material impact on the "necessary to permit the reorganization" requirement of

subsection (b)(1)(A).

      To summarize, I hold that as a general rule a debtor cannot be said to comply with its

obligation under Section 1113(b)(2) to "confer in good faith in attempting to reach mutually satisfactory

modifications" when it steadfastly maintains that its initial proposal under subsection (b)(1)(A) is non-

negotiable.   As affirmed by then Chief Bankruptcy Judge Lifland and by the Second Circuit in *In re*

*Carey Transportation Inc.*, the evident purpose and objective of Section 1113(b)(2) is to compel the

debtor to negotiate in good faith to reach "mutually satisfactory modifications."   With rare exceptions not

present here, true negotiation necessarily requires compromise in each side's bargaining positions.  When

one side presents a non-negotiable, take-it-or-leave-it proposal, negotiation stalls because there is nothing

of substance to bargain for when one side must bid against itself.

      The negotiations here exemplify the point.  The IBT's February 3 proposal of $1.89 million

in cost reductions was obviously unsatisfactory.   But what incentive was there for the Union to increase

its offer materially in the face of Comair's demand for $8.9 million which was non-negotiatble from the

date it was first tabled in early November.

      The Second Circuit expressed it well in *In re Royal Composing Room, Inc.*, where it

said, commenting on the union's refusal to negotiate at all in the face of the debtor's need to eliminate

priority:

> A union certainly is entitled to adopt a hard-line position, but if, as in this case, the
> union does so, it must recognize the risk inherent in the strategy.  The balance of the
> equities nearly always will tip in favor of the party that seeks to reach a compromise and
> to that end negotiates in good faith.

848 F.2d at 349.   These comments apply to Comair here, especially in light of the express statutory duty "to confer in good faith" imposed on the debtor by Section 1113(b)(2).

### C.      the "fairly and equitably" requirement

Returning now to Section 1113(b)(1)(A), the statute requires that Comair make a proposal to the IBT that "assures . . . that all of the affected parties are treated fairly and equitably. . . ."  As shown in the *Century Brass*, *Carey Transportation* and *Royal Composing* decisions cited and quoted above, the Second Circuit has made clear that this provision requires that all labor cost constituencies contribute a share of the total cost reductions.  The rule in this Circuit is that the debtor's proposal must "spread the burden of saving the company to every constituency while ensuring that all sacrifice to a similar degree."

The key phrase here is "to a similar degree."  "Similar" cannot mean identical — indeed, there are too many subjective variables at play to determine what an identical sacrifice would be for flight attendants as compared, say, with pilots, or mechanics, or executives.  In the end, the Court must fall back on the subjective statutory standard of fair and equitable.

The IBT advances a number of points arising from the negotiations on which it argues that the flight attendants were disadvantaged *vis-a-vis* the other two unions.  These points appear to offer opportunities for compromise which are best left to the negotiating table and need not burden this decision.  But the Union makes one substantial point which must be addressed here.

While the precise figures may be open to some debate, the substantially undisputed facts are that (i) the flight attendants comprised approximately 10.5% of Comair's overall 2005 payroll and (ii) the $8.9 million of annual cost savings demanded by Comair from the flight attendants equates to just over 21% of the total $42.3 million cost reductions allocated to all Comair employees (both union and non-union).   By contrast, the pilots constituted 43.2% of 2005 payroll and they agreed to annual cost savings equating to just under 41% of the total, while the mechanics at 8.5% of 2005 payroll agreed to 2.3% of the total cost savings.

Comair advances justification for this disparate treatment primarily by arguing that, commencing with a selected date, July 18, 2002, the flight attendants have enjoyed substantially higher payroll increases than other employee constituencies (*see* Exhibit 9 and accompanying testimony).  The IBT has identified numerous factual grounds significantly undermining the debtor's analysis on this point (*see, e.g.,* Weintraub Declaration at point II ¶¶ 11-31 and related exhibits).

It is unnecessary to set forth a detailed recitation of the testimonial and documentary evidence pro and con offered by each side at the trial on the issue.  Suffice it to say that I conclude upon all the evidence that Comair has not sustained its burden of demonstrating that its Section 1113 proposal to the flight attendants comports with the requirement of Section 1113(b)(1)(A) and the Second Circuit case law.  As noted above, the word "similar" does not mean identical, and "fairly and equitably" surely admits of differences in treatment where justified by the particular facts of the case.  The facts here do support allocating a greater proportionate share of the belt tightening to the flight attendants, as amplified in point E, below.  But Comair's non-negotiable demand was that the flight attendants contribute twice their *pro rata* share of the cost cuts, while the pilots and mechanics were asked for less than their proportionate shares, based on 2005 compensation.  This wide disparity in treatment, coupled with the significant B scale pay reduction agreed to by the IBT pre-bankruptcy in 2005,[4] and the fact that the flight attendants are at or

---

[4]    The economic significance of the very reduced B scale in the future and even during the current year is evident from the cross-examination testimony of Comair witness Joel Kuplack:

[Q]    Now there has been a reference to a B scale in the flight attendant agreement during this proceeding.  Can you explain what the B scale is?
A    Sure.  Last year when we approached the IBT about concessions for growth last year, where we ended up was with no change to the current flight attendant pay and with a B scale or a new-hire-growth scale for new-hire flight attendants that went into effect last June.
Q    I see.
    And is it accurate to say that the new-hire scale called for an hourly rate of sixteen fifty for the first six months of the new hire flight attendants pay?
A    That's correct.
Q    And then he or she would progress to seventeen fifty for the second six months?
A    That's correct.

Q    And then how long would that pay rate last?
A    Through the fifth year.

(continued...)

near the lowest pay scale of all Comair's employees and therefore the least able to afford severe cuts in

their wages, compel me to the conclusion that I have reached.  It is not "fair and equitable" to ask of the

flight attendants double their *pro rata* share based on their share of employee compensation.


**D.      the refusal to accept "without good cause" requirement**

A requirement for rejection under Section 1113(c) is that the Union "has refused to accept

such proposal without good cause."  The issue, then, is whether the IBT had "good cause" to reject

Comair's Section 1113 proposal.  Note that the question is not whether the Union made a reasonable

proposal or negotiated in good faith — it is solely whether it had good cause to reject Comair's offer.

I have discussed in point C, above, one of the reasonable grounds for the IBT to refuse to

accept the Comair proposal — the disparate share of salary cutbacks demanded in the proposal.

There is another objection to Comair's Section 1113 proposal that the IBT legitimately

asserts as a ground for refusing to accept the proposal.

The $8.9 million annual cost saving is necesssarily a calculation with two factors: (i) the

reductions in pay scale, per diems, *et cetera* and (ii) the universe of flight attendants whose pay and

---

[4](...continued)

> Q        Through the fifth year, all right.   Okay.
> A        Not that specific rate.   But the B scale would continue through their fifth year of
> employment.
> Q        I see.   All right.
>          Now, after the recall of the furloughees you spoke of, will there be more flight
> attendants under the B scale than there are presently active flight attendants under that
> scale?
> A        Yes, until we reach an agreement or until this proceeding takes — this process
> ends.   If we come to a different agreement, that would change.   But, otherwise, we would
> still hire people on the B scale.
> Q        I see.
>          And the union has indicated a willingness to continue that scale, has it not?
> A.        They have.
> (Tr. 2.118-2.119)

benefits are to be reduced. If the number of employees in the equation is *X*, the mathematical scale will produce *Y* total annual cost savings. If the actual number of employees whose pay and benefits are cut is greater than *X*, the total cost savings will be correspondingly greater.

Comair calculated the $8.9 million cost savings demand based on a universe of 818 flight attendants. But the fact is that 818 was not the actual number of flight attendants employed in November 2005, or January 2006, or at the time of trial. As stated in the "Undisputed Facts" section of the Amended Pretrial Order (¶ (7)):

> As of January 31, 2006, Comair employed 970 flight attendants, of whom 106 were furloughed in December 2005-January 2006. On March 3, 2006 Comair sent recall notices to all furloughed flight attendants.

The 818 figure is a fictional or notional number which Comair employed in developing its Restructuring Plan presented to its three unions in early November 2005. The development of the Restructuring Plan and the so-called "steady state" model on which it was based are described in paragraphs 10-12 of the Declaration of Comair's corporate controller, Dan Dixon, and particularly footnote 14, which reads as follows:

> [14] The Company's targeted "ask" from each labor group was developed using a "steady state" model, which is consistent with how the Company has modeled labor costs in prior negotiations with the IBT. The steady-state model here was based on the estimated number of block hours from Comair's revised December 2005 flight schedule, and then annualizing the number of block hours for a twelve (12) month period. The model then implements the target position on Controllable Costs for 40/50-seat and 70-seat aircraft as presented in the Restructuring Plan. The model generated a $42 million gap between Comair current Controllable Costs and the targeted Controllable Costs. Comair then analyzed its crews' (pilots, by aircraft type, and flight attendants) pay rates and per diem rates as compared to the Delta Connection peer group. Attempting to take an equitable approach, Comair calculated the simple average of the hourly rates in effect at the other Connection carriers by aircraft type. Comair deviated away from this methodology only for the 70-seat captain. Applying these proposed rates against the December 2005 steady-state model, and the utilization of pilots and flight attendants necessary to operate that schedule, drove the $17.3 million "ask" from the pilots and the $8.9 million "ask" from the flight attendants.

The precise number of flight attendants employed by Comair whose pay and benefits would be cut to calculate the annual savings from the cutbacks is elusive on the record before me,[5] and the Comair post-trial submission on the point was neither responsive to the Court's question nor illuminating. What is clear from the evidence is that the 818 figure in no way represents the actual universe of flight attendants from which to calculate the cost savings, particularly in light of Comair's acknowledgment of "the fact that there are currently more flight attendants than [818], [and] that Comair has recalled its furloughed flight attendants and hired new hire flight attendants."  (Dixon Supplemental Declaration ¶ 7)

There can be no doubt that Comair's cost savings will materially exceed the $8.9 million target when the salary, per diem and benefit cuts are drawn from a universe of flight attendants that exceeds 818, whether the actual paid and active head count is or will be 864, or 970, or 1,000 (*see*

---

[5]    Comair's witness Kuplack testified on cross-examination:

Q        Is it your testimony you don't know how many flight attendants the carrier needs?
A        As of today, the exact number?
Q        Yes.
A        No, I don't.
Q        When will that become apparent how many flight attendants Comair needs?
A        I don't have all that data sitting in front of me right now.   Every month we look at our needs on a moving-forward basis.
Q        Let's get at it another way.
A        Okay.
Q        At the time of the most recent recall, how many flight attendants were active on the payroll?
A        Approximately 970.
Q        All right.   How many flight attendants were offered recall?
A        A hundred and three.
Q        All right.   So if we were to add 970 and 103, we'd get 1,073.   Would that figure represent the company's needs?
A        No, definitely not.   We didn't — we anticipated that approximately half, and possibly less than half, of the people that we recalled would return to service —
Q        All right.
A        — when we made those projections.
Q        And roughly 1,030 was the anticipated need for flight attendants.   Is that correct?
A        If you take into account the fact that we intend to overstaff due to leaves, attrition based on input from the flight attendants and staffing up for the summer, I suppose that would be true.
(Tr. 2.111-2.112)

Weintrub Declaration ¶¶ 38-41).[6]   Comair's post-trial submission on the point is unconvincing to the Court

for a number of reasons, not the least of which is that it appears to be inconsistent with the testimony of

Comair's witness Kuplack quoted in footnote 5.

Finally, when considering whether the IBT had "good cause" to reject Comair's non-

negotiable proposal, in light of the disproportionate share of the employee sacrifice requested of the flight

attendants and the strong likelihood that the Comair proposal would produce more than $8.9 million in cost

savings, the Union was bound to consider that the flight attendants are at or near the bottom level of

compensation among Comair employees.   Consequently, the impact on the flight attendants of the very

large percentage reductions in compensation will affect the flight attendants more severely than the pilots,

mechanics, executives and other more highly paid Comair employees.

Upon the foregoing, I cannot find on the facts before me that the IBT did not have good

cause to refuse to accept Comair's Section 1113 proposal.

E.        **"balancing the equities"**

Section 1113(c)(3) requires a finding that "the balance of the equities clearly favors

rejection of such agreement."

This provision presents perhaps the most difficult test for the Court to apply.   That is

because Comair's central argument is compelling as a matter of fact and law.   In point of fact, while the

numbers and comparisons may be subject to some debate, it is undisputed on the trial record that Comair's

flight attendants' salary scale (other than the B scale) and per diem rate are substantially higher than the

pay scales and per diem of the flight attendants of the other regional carriers in the United States (*see*

Exhibit M; Exhibits 10, 10A, 12, 12A).   As a matter of law, the Second Circuit has held that pay scales

---

6          For example, 864 is the actual number of flight attendants on the payroll at the end of December
2005 (derived from the January 31, 2006 figure of 970 flight attendants "of whom 106 were
furloughed in December 2005-January 2006.").   The $8.9 million cost reduction figure divided by
the notional 818 "steady state" number of flight attendants equates to $10,880 compensation
reduction per flight attendant.   Multiplying the $10,880 figure by 864, the stipulated actual number
of flight attendants at the end of December 2005, produces total cost savings of $9,400,488 for the
flight attendants as a group.   The stipulated actual number of flight attendants employed at the
present time is substantially higher than 864.

which materially exceed competitive industry standards were among the factors that justified rejection of the collective bargaining agreement in *In re Carey Transportation Inc.*   Central to the finding on the "necessary modifications" requirement, the Court of Appeals said "record evidence indicates that Carey was losing large sums of money, that its Local 807 labor costs (in contrast to other employees' salaries and benefits) were well above industry averages. . . ."  816 F.2d at 90.  The Court of Appeals held that it was not unfair or inequitable to exempt management and non-union employees from pay and benefit reductions where "the court finds that only employees covered by the pertinent bargaining agreements are receiving pay and benefits above industry standards."  816 F.2d at 90-91.

The foregoing does not mean, in my view, that the flight attendant wages and per diem rates must necessarily be reduced to the lowest common denominator or even the median or the average of competitive airlines.  But Comair has made a persuasive showing that substantially narrowing if not eliminating the large gap between its flight attendant costs and those of its competitors must play an important role in its ultimate success or failure as a reorganized entity.

The statute, however, requires a finding that the balance of the equities "*clearly* favors rejection."  Given my findings in point B (concerning the requirement to "confer in good faith"), point C (concerning the "fairly and equitably" requirement) and point D (concerning the requirement of "good cause" for refusal to accept), above, I cannot find that the balance of the equities clearly favors rejection.

### Conclusion

Under Section 1113(c), the Court may grant this motion to reject the Flight Attendant Agreement only upon finding (1) that Comair has made a proposal that fulfills the requirements of subsection (b)(1),   (2) that the IBT refused to accept such proposal without good cause, *and* (3) that the balance of the equities clearly favors rejection of the Agreement.   For the reasons set forth in points C, D and E, above, I have concluded that none of these requirements of Section 1113(c) has been met.  Accordingly, on the record before me I must deny Comair's motion to reject the Flight Attendant Agreement.

Before concluding I should add two points.  First, both sides have made Draconian threats on the record.   The IBT has stated that the flight attendants will strike if the Flight Attendant Agreement is rejected.  Comair, by its own representatives and more bluntly by counsel for the Creditors Committee, has warned that if its demand of the flight attendants is not met, the regional lift now provided by Comair will be shifted by Delta to other carriers and eventually Comair will be forced out of business.  While the Court must be mindful of the needs of a debtor-in-possession and all its constituencies as appropriate under the Bankruptcy Code, a motion to reject under Section 1113 must be resolved by applying the tests articulated in the statute.   Accordingly, I have decided this motion, and will decide any further such motion if made, based solely on the evidence and the statutory merits, without regard whatsoever to threats by either side.

Second, Comair and the IBT must now return to the bargaining table to try to resolve their differences.   If they are unable for any reason to do so, this decision is without prejudice to the making of a new Section 1113(b)(1)(A) proposal and a second motion to reject by Comair.  Given the time already expended in these proceedings, a second motion to reject would be dealt with by the Court on a very expedited basis.

## **ORDER**

Upon the foregoing decision, it is hereby

**ORDERED** that the motion by Comair to reject the Flight Attendant Agreement pursuant to Section 1113 of the Bankruptcy Code is denied.


Dated:  White Plains, NY
        April 26, 2006



                                        _ /s/ Adlai S. Hardin, Jr._____
                                                U.S.B.J.