UNITED STATES BANKRUPTCY COURT  **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
In re:                                                       :
                                                             :   Chapter 11
                                                             :
DELTA AIR LINES, *et al.*,                                   :
                                                             :   Case No. 05 B 17923 (ASH)
                                        Debtors.             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**A P P E A R A N C E S :**

**PAUL, HASTINGS, JANOFSKY & WALKER LLP**
**Attorneys for Debtors and Debtors in Possession**
By: John J. Gallagher, Esq.
    Jon A. Geier, Esq.
    Brendan M. Branon, Esq.
875 15th Street, NW
Washington, DC 20005
        -and-
By: Robert S. Span, Esq.
515 South Flower Street, 25th Floor
Los Angeles, CA 90071

**DAVIS POLK & WARDWELL**
**Attorneys for Debtors and Debtors in Possession**
By: Timothy Graulich, Esq.
450 Lexington Avenue
New York, NY 10038

**SHAPIRO, BEILLY, ROSENBERG, ARONOWITZ,**
    **LEVY & FOX, LLP**
**Attorneys for International Brotherhood of Teamsters**
By: Barry I. Levy, Esq.
    Barry S. Cohen, Esq.
225 Broadway, 13th Floor
New York, NY 10007

**BAPTISTE & WILDER, P.C.**
**Attorneys for International Brotherhood of Teamsters**
By: Roland P. Wilder, Jr., Esq.
    William R. Wilder, Esq.
1150 Connecticut Avenue, NW, Suite 500
Washington, DC 20036

**AKIN, GUMP, STRAUSS, HAUER & FELD, LLP**
**Attorneys for the Unsecured Creditors' Committee**
By: Lisa G. Beckerman, Esq.
    Brian Kilmer, Esq.
590 Madison Avenue, 20th Floor
New York, NY 10022

**ADLAI S. HARDIN, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

**DECISION ON SECOND MOTION**
**TO REJECT COLLECTIVE BARGAINING AGREEMENT**

Before the Court is the second motion of debtor Comair, Inc. ("Comair," "Company" or "debtor") to reject its collective bargaining agreement (the "Flight Attendant Agreement") with its flight attendants represented by the International Brotherhood of Teamsters (the "IBT" or "Union") under Section 1113 of the Bankruptcy Code, 11 U.S.C. § 1113. The Court held an evidentiary hearing on July 10 and 11, 2006 and the following constitute the Court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052. The Court has jurisdiction to hear and determine this core proceeding under 28 U.S.C. §§ 1334(a) and 157(a) and (b)(2) and the standing order of reference to bankruptcy judges dated July 10, 1984 signed by Acting Chief Judge Robert J. Ward.

For the reasons set forth below, the motion is granted.

### The First Motion and Decision

Comair's first motion to reject the Flight Attendant Agreement was denied in this Court's Decision and Order dated April 26, 2006 (the "April 26 Decision"), 342 B.R. 685 (Bankr. S.D.N.Y. 2006). The concluding paragraph of the April 26 Decision stated:

> . . . Comair and the IBT must now return to the bargaining table to try to resolve their differences. If they are unable for any reason to do so, this decision is without prejudice to the making of a new Section 1113(b)(1)(A) proposal and a second motion to reject by Comair. Given the time already expended in these proceedings, a second motion to reject would be dealt with by the Court on a very expedited basis.

The parties did return to the bargaining table but were unable to resolve their differences, resulting in this second motion.

To avoid unnecessary repetition, and because the background recitations and legal and factual analysis contained in the April 26 Decision are both relevant and necessary to understand the factual and legal context for the parties' subsequent negotiations and positions in this motion, the April 26 Decision in its entirety is deemed incorporated herein by reference. Accordingly, I shall begin this Decision with a brief summary of relevant findings concerning the parties' post-April 26 negotiations and deadlock leading to this second motion by the debtor to reject its Flight Attendant Agreement.

**Negotiations after April 26**

The post-April 26 negotiations are described in the declarations and testimony of Joel Kuplack and David Soaper on behalf of Comair, and Connie Slayback and Victoria Gray on behalf of the IBT, and are summarized in Exhibit 100.

The parties conducted four days of negotiations during May commencing May 11. As stated in the Kuplack declaration (¶ 6):

> Comair began the [negotiations] by offering to discuss new "upsides," such as wage increases during the term of the new agreement, that the Company believed would be of substantial value to the Union. This approach was our attempt to reach a consensual agreement with the IBT at the Company's original cost reduction target of $8.9 million and thereby preserve Comair's agreements with ALPA and the IAM. . . . Comair also indicated willingness to discuss the issues of a shorter contract duration and enhancements to the scope clause of the IBT agreement, both of which the IBT had previously identified as important. We were quite clear that preserving the $8.9 million cost reduction target was Comair's preference, because of our hope to avoid re-negotiation of the ALPA and IAM agreements.

The IBT returned with a proposal containing a variety of components which, in Kuplack's words, "represented no movement from the Union's last proposal prior to this Court's decision [and which] Comair valued . . . at $3.7 million per year." *Id.* at ¶ 7. Nevertheless, "[w]hile we remained apart on most of the major issues, the parties did reach agreement in principle on a number of cost-saving work rule and contract modification items discussed in earlier negotiations, including a part-time flight attendant program, airplane tidying, and uniforms." *Id.*

On May 16 Comair presented what has been referred to as a "written supposal," which was "designed to show potential terms on which Comair hoped the parties could agree, consistent with the IBT's stated preference to find savings in work rules and benefits rather than wages. The purpose of the supposal was to show the IBT 'upsides' that we hoped would induce them to agree to $8.9 million in annual flight attendant labor cost reductions." *Id.* at ¶ 10. Comair's May 16 supposal "proposed a pay rate reduction of 8.7%, which was a marked contrast to Comair's earlier Alternative Section 1113 Proposal for a 16.7% [reduction] and Comair's initial Section 1113 Proposal for a 28.5% reduction." *Id.* As stated by Kuplack, Comair "valued its proposal at approximately $4.6 million for work rule and

- 3 -

benefit changes, in addition to the $4.3 million annual savings from the proposed pay scale, thus preserving the Company's cost reduction target of $8.9 million, before consideration of the value of the upsides in the out years." *Id.* at ¶ 12.

On May 18 the IBT responded to Comair's May 16 supposal with a written proposal which Comair valued at $4.9 million. In response, on the afternoon of May 18 Comair tabled a comprehensive proposal which it valued at savings of $8.4 million per year, reducing for the first time its demand for flight attendant cost savings totaling $8.9 million. In response, "[t]he IBT representatives objected that this proposal still requested too much in cost reductions, and expressed their willingness to return to court." *Id.* at ¶ 16.

At a morning meeting on June 6 the IBT representatives presented the Union's third post-April 26 proposal, which Comair valued at $5.1 million savings per year. Comair returned on the afternoon of June 6 with a proposal valued at $8.0 million. On June 7 the parties discussed a revised Comair "Scope" proposal, which was stated to be extremely important to the IBT, which contained "a clause that would (1) require a successor to employ the flight attendants on the Comair seniority list in accordance with the Railway Labor Act, and; (2) prohibit the successor, if it chose to merge the operations, from furloughing any Comair flight attendants for a period of one year as a result of the transaction." Soaper Declaration ¶ 15.

In the words of Comair's David Soaper, "[t]he most productive negotiations to date took place on June 8, 2006." *Id.* at 19. Soaper describes the June 8 negotiations in paragraph 19 of his declaration in a series of subparagraphs denominated: (a) "IBT Proposes 'Framework for Settlement'"; (b) "1:30 p.m. Comair Verbal Proposal"; (c) "5:15 p.m. IBT Makes Handwritten Proposal"; (d) "5:50 p.m. Comair Counterproposal"; (e) "6:25 p.m. IBT Proposal"; (f) [untitled]; (g) "7:50 p.m. Company Proposal"; (h) "8:30 p.m. IBT Mutual Participation Proposal"; (i) "10:10 p.m.: IBT Presents Its 'Final' Proposal.'"

At Comair's request the parties convened again by telephone on the morning of June 14 to enable Comair to respond to the IBT's last proposal of June 8. Comair's June 14 proposal reduced the

value of its proposed cost savings to $7.9 million, including a reduction of only 7.5% in pay rates. The IBT unambiguously rejected Comair's June 14 proposal as a basis for any further negotiations and stated that the Union's June 8 written proposal was its last and final proposal.

### Positions of the Parties

The negotiations between May 11 and June 14 were productive on many issues. Trial Exhibit 111 lists fourteen points on which agreement has been reached between the parties. Some of these points would result in annual savings; others are not susceptible of quantifiable cost reductions but are deemed important to one side or the other.

Despite this progress, negotiations broke down by the end of June 8 when the IBT negotiating team declared that the Union's written proposal of June 8 was its final, non-negotiable offer. Since then the IBT has rebuffed Comair's efforts to continue the negotiations. The apparent catalyst for the Union's decision to declare its June 8 offer non-negotiable was, surprisingly, a proposal by Comair to modify the Flight Attendant Agreement work rules governing so-called continuous duty line[1] scheduling. As noted above, recognizing the importance to the great majority of flight attendants of maintaining pay rates as high as possible, during the post-April 26 negotiations Comair sought to shift the source of flight attendant cost savings from pay rate reductions to economies resulting from benefits and work rule changes. Under existing work rules, continuous duty line scheduling is highly beneficial to and prized by flight attendants because the rules enable a flight attendant to schedule a continuous duty line requiring as little as 22 hours of duty but get full pay credit for 78 hours. There are presently only 77 available continuous duty lines, which are enjoyed by less than ten percent of the most senior flight attendants. Comair had proposed a change in the continuous duty work rules in March, but this was promptly and emphatically rejected by the Union negotiators. In the early afternoon of June 8, seeking to bridge the

---

[1] The term "line" refers to a monthly schedule of flight duty. Flight attendants' rights to select favored "lines" are governed by seniority, so that the longest serving and highest paid flight attendants get first pick.

gap between the parties, Comair again proposed a modest change in the continuous duty work rules[2] as a means of generating approximately $445,000 in annual cost savings in lieu of a larger, across-the-board cut in pay rates. The proposal would affect only 77 of the 970 flight attendants (approximate numbers), without reducing any flight attendant's actual pay.

It appears to have been Comair's proposal to modify the continuous duty work rules that provoked the IBT leadership to declare the Union's June 8 proposal its "final offer" that resulted in the end of negotiations.

Comair's June 14 proposal is valued in rounded numbers at $7,924,000 annual cost savings, comprised of salary and related reductions of $2,908,000, benefits reductions of $915,000 and savings due to work rule changes of $4,101,000.

The IBT's final offer of June 8 is valued at $6,158,000, comprised of salary and related reductions of $2,731,000, benefit reductions of $915,000 and work rule savings of $2,512,000.

**The Principal Points at Issue**

The principal points dividing the parties since June 14 when the Union declared its June 8 offer to be non-negotiable are the following:

- **Pay rates**: Comair proposes a 7.5% reduction, while IBT proposes 7%, an agreed difference of $158,574.

- **Snapback**: IBT insists on a "snapback" of wages to prior contract terms at the end of four years. Comair has proposed a far more modest automatic pay increase at the end of four years.

- **New benefits**: The IBT proposal requires mandatory Company contributions to the 401(k) plan for senior flight attendants, which Comair has rejected because no other Comair employee (unionized or not) receives such a benefit. The cost

---

[2] The work rules change would have raised from 22 hours to 30 hours the minimum duty time needed to earn credit for 78 hours of pay.

of the proposed mandatory contributions would be $55,000, $109,000 and $221,000 in the second, third and fourth years, respectively, and $221,000 annually thereafter.

- **Mutual participation**: The IBT proposal would automatically reopen the IBT agreement with the flight attendants for renegotiation if Comair were to provide wage increases to any other Comair employees during the next four years.

- **Higher valuation of two work rules**: The IBT objected to two work rule changes which had previously been agreed upon (the part-time flight attendant program and the vacation buy-back program) unless Comair would consent to erroneous and unrealistic values for the changes.[3]

- **Flexible line value**: Late in the negotiations the IBT withdrew its prior agreement to various work rule modifications which the parties have referred to collectively under the rubric "flexible line value." The annual savings which would result from the flexible line value work rule modifications would be $1,158,000.

- **Continuous duty lines**: The IBT has rejected Comair's proposed continuous duty line work rules modifications which would result in annual cost savings of $445,000.

There is a purported dispute between Comair and the Union as to the values of their respective proposals in terms of cost savings. But the dispute is more apparent than real. As explained on Trial Exhibit 161 and related testimony of both sides' witnesses, the valuation differences fall into

---

[3] Comair had erroneously calculated the cost savings resulting from the two work rule changes at the time the parties had agreed upon the changes. When Comair called the error to the Union's attention and provided the corrected calculations, the Union withdrew its agreement and objected to the two work rule changes unless the Company would agree to use the erroneous figures in calculating the cost savings, but without stating whether the Union disagreed with the corrected calculations. When Comair proffered evidence at the trial to explain and support the corrected calculations, the Court deferred evidence on the issue until the Union stated its position on the validity of the corrected figures. The Union then withdrew its objection to the two work rule changes in question, accepting the Company's valuation.

05-17923-cgm    Doc 2927    Filed 07/21/06    Entered 07/21/06 11:17:12    Main Document
    Pg 8 of 16


three categories. Category A on Exhibit 161 relates to the "Value of Future Cost Increases Avoided," consisting of the value of the November 2006 pay increase provided for under the Flight Attendant Agreement, IBT's claim for Defined Contribution Plan contributions for January-June 2006 and future B Scale savings, the three categories having a value of $1,481,000. The dispute here relates not to the value of the three items but the starting point for valuing cost reductions. Comair's proposals to all three unions from the outset in November 2005 have called for reductions from the costs paid by Comair as of November 2005 based upon the assumption that pay increases under existing collective bargaining agreements (other than longevity increases) would be superceded under the proposed new agreements. The IBT valuation of cost savings would include post-November 2005 contractual increases. Both may be "correct" proceeding from their separate points of departure. The cost savings recited in the foregoing findings proceed from Comair's point of departure, namely, cost reductions from the cost levels extant in November 2005.

The purported "Valuation Dispute on Two Agreed Work Rule Changes" identified in heading B of Exhibit 161 was resolved at trial when the Union withdrew its objection to Comair's recalculation of the value of agreed work rule changes relating to valuation buy-back and part-time flight attendants (footnote 3, above).

As to item C on Exhibit 161, "Disputed Work Rule Changes," there is no dispute as to the value of the work rule changes ($1,100,000 for flexible line value; $445,000 for continuous duty lines). The dispute is that IBT has refused to accept Comair's proposed work rule changes in respect of these two items.

### Analysis of Comair's June 14 Proposal

Comair's June 14 proposal will be subjected to the same analysis of the requirements mandated by Congress in Section 1113 as that set forth in the April 26 Decision, under the same point headings as the April 26 Decision, but without further discussion of the legal authorities cited in the earlier Decision.

A.  **"necessary modifications . . . necessary to permit reorganization"**

I concluded in the April 26 Decision that

> As acknowledged by the IBT's expert, it is incumbent on a debtor in bankruptcy to examine every line item in its budget and seek all economies permissible under the Bankruptcy Code. That is particularly true respecting cost elements which are clearly above market, such as the flight attendant compensation.

The evidence offered by Comair's airline industry expert witness Jerrold A. Glass in his declaration, direct testimony at trial and Exhibits 155, 156-A, B and C, 157-A, B and C, and 158 dramatically underscore the degree to which the pay rates, work rules and benefits enjoyed by the Comair flight attendants exceed the values in all three categories enjoyed by the flight attendants of other regional airlines in competition with Comair. The specifics of Mr. Glass' analysis and findings may be found in his declaration, testimony and exhibits. Suffice it here to adopt as findings of this Court Mr. Glass' conclusions, as follows (quoting):

- **Comair Has By Far The Highest Wage Rates:** Exhibit 155 shows that Comair's current flight attendant wage rates place Comair at by far the highest wage rates among regional airlines, 0.6 percent to 17.9 percent above the average for other Delta Connection Carriers, 2.9 percent to 39.9 percent above the average for other regional carriers with IBT-represented flight attendants, and approximately 1.5 percent below to 23.6 percent above the average for the other regional carriers reviewed. This Exhibit also shows that under Comair's proposed flight attendant wage rates, Comair's flight attendants would remain the highest paid flight attendants in the regional airline industry by a considerable margin.

- **Comair Has The Least Productive Work Rules:** Exhibits 156-A, 156-B and 156-C show that Comair's current flight attendant work rules related to productivity are almost universally more restrictive and less favorable to the Company than the comparable provisions (or lack thereof) at the other twelve regional air carriers reviewed. Thus, the huge cost disadvantage which Comair faces on wage rates is surely not offset by productivity or work rule advantages. In fact Comair's payroll cost disadvantage is made materially worse by its restrictive work rules.

- **Comair Has The Best Retirement Benefits:** Exhibits 157-A, 157-B and 157-C show that Comair's current flight attendant retirement benefits are among the best available to flight attendants at the twelve regional air carriers reviewed and that Comair's proposed retirement benefits place Comair in the middle range of retirement benefits for regional airline flight attendants.

The competitive disadvantage to Comair of its flight attendant payroll cost in comparison to other regional carriers is dramatically illustrated in Exhibit 140. Comair's annual flight attendant payroll cost is, in rounded numbers, $30,593,000. Compared with the average annual flight attendant costs of the four other Delta Connection carriers, $23,468,000, the cost disadvantage to Comair is $7,125,000, equivalent to over **23%** of Comair's entire flight attendant payroll cost; compared to the industry average for thirteen other regional airlines, $23,114,000, the cost disadvantage is $7,479,000, or **24.4%** of Comair's total flight attendant payroll costs; and compared with the average payroll costs of flight attendants at two regional airlines represented by the IBT, $21,618,000, the cost disadvantage to Comair is $8,975,000, or **29.3%** of Comair's total flight attendant payroll costs.

The necessity for Comair to restructure and bring its costs within reasonable proximity to those of its competitors was well articulated in the declaration and direct testimony of Comair's president, Don Bornhorst. As shown in paragraph 5 of Mr. Bornhorst's declaration, Comair has already lost opportunities to bid for regional lift with Northwest Airlines, Continental Airlines and Midwest Airlines because of the fact that Comair has yet to restructure its uncompetitive costs. Also compelling were the supplemental declarations of Daniel M. Kasper, an independent expert, and Mr. Glass. After referring to the bankruptcies of Atlantic Coast Airlines ("a major regional carrier that was unwilling to lower its rates to meet the changed economic environment") and Mesaba Airlines ("a long time regional affiliate of Northwest Airlines"), Mr. Kasper concluded as follows in paragraph 11 of his declaration:

> 11. In sum, as a debtor in bankruptcy, Delta will seek out the lowest costs for all of its inputs. And fierce competition in the airline industry precludes Delta from paying above-market rates to obtain regional air services — even to regional carriers, like Comair, that are subsidiaries or longstanding affiliates. Since Comair must purchase its non-labor inputs (e.g., aircraft, fuel, etc.) at market rates, it does not have the ability to subsidize above-market labor rates. And since there are a number of independently operated regional carriers — including some that already serve as Delta Connection ("DCI") partners[ ]— that have rates of pay substantially lower than Comair's and, therefore, will be able to provide regional air services profitably at rates substantially lower than Comair's, unless Comair is able to significantly reduce its costs, it is likely that Delta will be forced to replace some or all of the flights currently being operated by Comair with service provided by other, lower cost regional carriers.[ ]

(footnotes omitted). Mr. Glass concludes in paragraph 19 of his declaration:

19. If a regional airline cannot lower its cost structure, it runs the risk of having its flying replaced. Two of the industry leaders in providing low cost lift are Mesa Airlines and Republic Airways, both with highly competitive labor agreements. Competitive realities now dictate that other regional airline labor contracts are now measured against those two air carriers. Having competitive labor agreements is simply a "must" for a regional airline to be able to survive and compete successfully in today's airline industry.

The evidence in the record compels the conclusion that Comair's June 14 proposal satisfies the statutory requirement of Section 1113(b)(1)(A) of a proposal for "necessary modifications . . . necessary to permit reorganization" of this debtor. There can be no doubt that this debtor must significantly reduce its flight attendant costs to compete in the regional airline market.

**B.      The obligation to "confer in good faith"**

The foregoing findings of fact with respect to the negotiations between the parties demonstrate that Comair has complied with its obligation under Section 1113(b)(2) to "confer in good faith in attempting to reach mutually satisfactory modifications of" the Flight Attendant Agreement.

Comair has abandoned its non-negotiable demand for $8.9 million in cost savings and reduced its demand to $7.9 million, a reduction of more than eleven percent, which is substantial and, I conclude, certainly sufficient to satisfy the requirement of "good faith." The Company has attempted to accommodate the financial needs of the great majority of flight attendants by reducing the amount of pay and per diem reductions from $6.8 million out of the original $8.9 million proposal to $2.7 million out of the June 14 $7.9 million proposal. The Company has met the Union's needs with respect to job security and has shown great flexibility in apportioning the non-pay scale cost savings among work rule changes to increase productivity to more competitive levels which would have a minimum effect on minimum numbers of flight attendants.

Comair's refusal to agree to the IBT's June 8 proposal demands with respect to snapback, mutual participation and new benefits does not reflect a lack of good faith bargaining. With respect to the "snapback" demand, I accept Mr. Glass' report that snapbacks are unprecedented in airline concessionary bargaining. It is intuitively inappropriate as a matter of sound business judgment to agree to a provision which would automatically impose upon Comair at the end of four years a cost structure which is uncom-

petitive and unsupportable today without any basis to assume that the economics of the regional airline industry will improve so dramatically in the intervening years as to support wage levels materially higher than they are today.[4]

Equally untenable is the Union's June 8 demand for "mutual participation," under which negotiations with the IBT would automatically reopen in the event Comair found it necessary to provide pay increases to recruit or retain other employee constituencies. The Company must have the flexibility to respond selectively to competition and economic exigencies affecting its employee needs without undermining the stability of its collective bargaining agreements.

Nor did Comair manifest a lack of good faith in refusing to agree to the IBT's "new benefits" demand for mandatory contributions to the 401(k) plan for very senior flight attendants (approximately fifty in number), a benefit which has been extended to no other category of Comair employee.

### C.    The "fairly and equitably" requirement

The concluding clause of Section 1113(b)(1)(A) requires that the debtor's proposal "assures that . . . all of the affected parties are treated fairly and equitably." As stated in the April 26 Decision:

> The rule in this Circuit is that the debtor's proposal must "spread the burden of saving the company to every constituency while ensuring that all sacrifice to a similar degree."
>
> The key phrase here is "to a similar degree." "Similar" cannot mean identical — indeed, there are too many subjective variables at play to determine what an identical sacrifice would be for flight attendants as compared, say, with pilots, or mechanics, or executives. In the end, the Court must fall back on the subjective statutory standard of fair and equitable.

Quoting further from the April 26 Decision:

> As noted above, the word "similar" does not mean identical, and "fairly and equitably" surely admits of differences in treatment where justified by the particular facts of the

---

[4]   The IBT snapback proposal would (i) return flight attendant pay rates to their current levels for flight attendants with two to five years of service, (ii) increase pay rates 3.5% over current levels for flight attendants with six to seventeen years of service, and (iii) increase the most senior flight attendants' (eighteen years of service or higher) pay rates more than 6% above current rates.

> case. The facts here do support allocating a greater proportionate share of the belt tightening to the flight attendants. . . .

Comair's June 14 proposal is materially different from its final Section 1113 proposal considered in the April 26 Decision. The June 14 proposal valued at $7.9 million annual cost savings is a significant reduction from the $8.9 million demand in Comair's original proposal. While this reduction of approximately eleven percent in Comair's total demand is significant, the Company has taken a giant step to accommodate the financial needs of the great majority of the flight attendants by reducing the amount of pay and per diem reductions from $6.8 million out of the original $8.9 million proposal to $2.7 million out of the $7.9 million proposal of June 14. To achieve this the Company has worked creatively with the Union negotiators to achieve cost economies by work rule modifications affecting the least number of flight attendants in ways that have the least effect on the overall population of flight attendants.

The April 26 Decision noted that Comair's initial proposal asked flight attendants, who comprised 10.5% of the Company's 2005 payroll, to contribute 21% of the total $42.3 million cost reductions allocated to all Comair employees. That ratio has changed significantly with Comair's June 14 proposal. The $7.9 million "ask" of the flight attendants equates to 18.6% of the total $42.3 million cost reductions. More important, the Company's $6.8 million pay rate and per diem reduction embodied in the original $8.9 million proposal equated to 16% of the $42.3 million figure, whereas the $2.7 million pay rate and per diem reduction component of Comair's June 14 proposal equates to only 6.4% of the $42.3 million figure.

It is significant that Comair's June 14 proposal would still have left the Comair flight attendants with a pay scale and work rules materially higher and more beneficial than the pay scales and work rules enjoyed by flight attendants at almost all other regional airlines. There is no evidence that any other employee group at Comair enjoys pay rates and work rules which are higher or better than their counterparts at other regional airlines.

Accordingly, I conclude that Comair's June 14 proposal fully comported with the statutory requirement that the flight attendants be treated "fairly and equitably" *vis a vis* the Company's other employee constituencies.

**D.     The IBT's refusal to accept "without good cause"**

Section 1113(c) requires a finding that the Union "has refused to accept such proposal without good cause." On the evidence before me I conclude that the IBT did not have good cause to refuse to accept Comair's proposal of June 14. This conclusion has two basic elements.

First, I have already concluded in points A, B and C, above, that Comair's June 14 proposal meets the statutory requirements of "necessary modifications . . . necessary to permit reorganization," negotiations by the Company "in good faith," and the treatment of flight attendants "fairly and equitably" when compared with Comair's settlements with its other employee constituencies.

Second, I conclude that the IBT's positions on "The Principal Points at Issue" enumerated under that heading, above, whether considered individually or in the aggregate, do not constitute "good cause" to reject the Company's June 14 proposal. Let us consider briefly each of the points at issue.

**Pay rates:** The difference between Comair's June 14 proposal on pay rates (calling for a 7.5% reduction) compared with the IBT's June 8 proposal (calling for a 7% reduction) amounts to $158,574 annually. This relatively minor difference does not justify rejection of the Company's June 14 proposal, particularly in light of the fact that the Company has reduced its original pay and per diem reduction demand from $6.8 million out of the original $8.9 million proposal to $2.7 million out of the June 14 $7.9 million.

**Snapback:** See the discussion above under heading B.

**New benefits:** See the discussion above under heading B.

**Mutual participation:** See the discussion above under heading B.

**Higher evaluation of two work rules:** See footnote 3 and accompanying text, above.

**Flexible line value:** This element of Comair's June 14 proposal can hardly be considered "good cause" not to accept the proposal considering the fact that the Union negotiators had previously accepted the Company's proposal respecting these work rule modifications, which would result in annual cost savings of $1,158,000.

- 14 -

**Continuous duty lines:** As noted above, Comair tabled its proposal for modifications to the continuous duty line work rules on June 8 in order to realize annual cost savings of $445,000 in lieu of the across-the-board pay rate reductions which would be necessary to achieve this economy. The immediate response of the Union leadership was to declare the Union's June 8 proposal "final" and terminate further negotiations. There was no "good cause" for this response. The proposal would affect only 77 out of approximately 970 flight attendants. The proposal was addressed to a striking inefficiency resulting from work rules which enable a small group of the highest paid senior flight attendants to get 78 hours of pay for as little as 22 hours of duty. The proposal was quite modest in its objective to increase productivity by raising the 22-hour minimum to 30 hours for 78 hours of pay. The Local Union's president and chief negotiator, Connie Slayback, justified the Union negotiators' rejection of this proposal and further negotiations on the ground that she feared that the Union membership would refuse to ratify an agreement containing such a proposal. This unsubstantiated premise appears counterintuitive, since the overwhelming majority of flight attendants do not now and never will[5] benefit from the continuous duty line work rules and would presumably prefer a work rule modification which partially ameliorates a gross inefficiency in productivity to a pay rate reduction which would affect every member of the Union.[6]

One more point remains to be made on the question whether the IBT had good cause to reject Comair's June 14 proposal. Both the continuous duty line proposal, which the Union leadership rejected peremptorily, and the flexible line value proposal, which the Union leadership had agreed to but repudiated after the Company tabled the flexible duty lines proposal, were just that — ***proposals***. Neither of these proposals was presented by Comair as a non-negotiable demand, and the Company repeatedly manifested its willingness to continue negotiating both on and after June 14. It was the Union which,

---

[5]  The average tenure of flight attendants is between five and six years, which means that most flight attendants will never achieve the seniority which would enable them to select a continuous duty line.

[6]  It is interesting to note that three of the principal points in dispute provide benefits disproportionately or exclusively to the most senior flight attendants (snapback, a 6% increase available only to 18+ years of service; new benefits, available only to approximately the fifty most senior flight attendants; continuous duty lines, available to the 77 most senior flight attendants bidding).

- 15 -

after receiving the continuous duty line proposal during the afternoon of June 8, declared that the Union's June 8 proposal was "final," and it was the Union that declined further negotiations.

**E.      "balancing the equities"**

Section 1113(c)(3) requires a finding that "the balance of the equities clearly favors rejection of such agreement."

The evidence presented in Comair's first and second motions to reject under Section 1113 has demonstrated beyond doubt that a material reduction in Comair's flight attendant costs is essential to the Company's ability to be successful in the extraordinarily competitive regional airline market of today.  Comair's June 14 proposal was necessary to accomplish that objective and to maintain the Company as a viable enterprise.  The irony is that if the IBT had accepted Comair's June 14 proposal, the Comair flight attendants could have continued to enjoy by far the highest pay rates and the most favorable work rules in the regional airline industry.

Comair's June 14 proposal complies with all of the elements required under Section 1113, and the IBT has not demonstrated good cause for declining to accept the proposal.  On all of the evidence I conclude that the equities clearly favor rejection of the Flight Attendant Agreement.

**Conclusion**

Comair's motion to reject under Section 1113 is granted.  Counsel for the debtor will promptly submit an appropriate order consistent with this Decision.

Dated: White Plains, NY
       July 21, 2006

                                             /s/ Adlai S. Hardin, Jr.
                                                    U.S.B.J.