UNITED STATES BANKRUPTCY COURT                    **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                              :
In re:                                        :
                                              :     Chapter 11
DELTA AIR LINES, INC., *et al.*,              :
                                              :     Case No. 05 B 17923 (ASH)
                               Debtors.       :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

<u>A P P E A R A N C E S</u> :

**PAUL, HASTINGS, JANOFSKY & WALKER LLP**
**Attorneys for Debtors and Debtors-in-Possession**
By: John J. Gallagher, Esq.
     Neal D. Mollen, Esq.
     Brendan M. Branon, Esq.
**875 15th Street, NW**
**Washington, DC 20005**

**COHEN, WEISS & SIMON LLP**
**Attorneys for Air Line Pilots Association, International**
By: James L. Linsey, Esq.
     Peter D. DeChiara, Esq.
     Oriana Vigliotti, Esq.
**330 West 42 Street**
**New York, NY 10036**

**AKIN, GUMP, STRAUSS, HAUER & FELD, LLP**
**Attorneys for the Official Committee of Unsecured**
    **Creditors of Delta Air Lines, Inc., *et al.***
By: Daniel H. Golden, Esq.
     Lisa G. Beckerman, Esq.
     David H. Botter, Esq.
**590 Madison Avenue**
**New York, NY 10022**

**ADLAI S. HARDIN, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

## DECISION ON MOTION TO REJECT
<u>COMAIR PILOTS' COLLECTIVE BARGAINING AGREEMENT</u>

For the third time this year this Court is called upon to decide a motion by debtor Comair,

Inc. ("Comair" or "debtor") to reject its collective bargaining agreement with one of its three unions

under Section 1113 of the Bankruptcy Code, 11 U.S.C. § 1113. This motion seeks to reject the collective

bargaining agreement (the "Pilot Agreement") with Comair's pilots represented by the Air Line Pilots

Association, International ("ALPA"). The first two decisions involved Comair's flight attendants

represented by the International Brotherhood of Teamsters ("IBT"). *See In re Delta Air Lines, Inc., et*

*al.,* 342 B.R. 685 (Bankr. S.D.N.Y. April 26, 2006) and *In re Delta Air Lines, Inc., et al.*, 351 B.R. 67

(Bankr. S.D.N.Y. July 21, 2006).  This opinion will necessarily repeat some of the background and legal

analysis in the April 26 and July 21 decisions.

   The Court held an evidentiary hearing on November 27, 28, 29 and 30, 2006, and the

parties submitted post-trial briefs.   The following constitute the Court's findings of fact and conclusions

of law in accordance with Bankruptcy Rule 7052.

   For the reasons set forth below, I conclude that the motion must be granted.

### Jurisdiction

   The Court has jurisdiction to hear and determine this core proceeding under 28 U.S.C. §§

1334(a) and 157(a) and (b)(2) and the standing order of reference to bankruptcy judges dated July 10,

1984 signed by Acting Chief Judge Robert J. Ward.

### Background

   Comair, a wholly-owned subsidiary of debtor Delta Air Lines, Inc. ("Delta"), commenced

this voluntary case under Chapter 11 of the Bankruptcy Code on September 14, 2005, along with Delta

and other affiliates.

   Comair is a regional airline.  The regional airline industry generally serves smaller

markets and connects them to larger cities, using aircraft with anywhere from thirty to ninety seats.  Most

regional airlines operate to supplement the service of one or more larger mainline partners under joint

marketing relationships called "code-sharing."  The service provided by a regional carrier is sometimes

referred to as "regional lift."

   Comair, like other regional airlines, is a separately certificated air carrier and is

responsible for the operational control and safety of its own aircraft.  However, the scheduling, pricing

and marketing of Comair's flights are controlled by its mainline partner, Delta.  Delta is responsible for

the financing of the Comair fleet of aircraft and, by virtue of a call option or otherwise, has the power to

withdraw aircraft from Comair operation and place the aircraft with other regional airlines.

Comair operates a fleet of 122 50-seat regional jets and 25 70-seat regional jets. It has been operating an average of approximately 800 flights each day, all of them under the Delta Connection program. "Delta Connection" is the tradename used to identify those regional carriers that have contracted with Delta to provide regional carrier passenger service under the "DL" code. In addition to Comair, there are five other regional airlines flying as Delta Connection carriers: Atlantic Southeast Airlines ("ASA"); SkyWest Airlines ("SkyWest"); Chautauqua ("Chautauqua"); Shuttle America ("Shuttle"); and Freedom Airlines ("Freedom"). Delta has no ownership interest in any of the Delta Connection carriers other than Comair. All flights operated for Delta by Delta Connection carriers carry the Delta "DL" designator code in the Official Airline Guide and computer reservation systems.

Comair currently provides regional lift for Delta between certain small markets and Delta's operations in Cincinnati, New York, Boston and Washington, DC, as well as point-to-point flying and flying in "combined" markets with Delta mainline for the purpose of increasing the frequency of service offered to the customer.

Comair's relationship with Delta, including its compensation for flying Delta Connection flights, is governed by its Delta Connection Agreement. The Delta Connection Agreement does not, by its terms, guarantee any amount of flying to Comair. Under the Delta Connection Agreement, Delta determines where and when the Comair fleet will fly and the fares to be charged, and Delta receives all revenue from the flights. In return, Delta pays Comair for operating the flights according to a schedule and rate structure. Currently, 100% of Comair's revenue is provided by Delta pursuant to the Delta Connection Agreement.

Comair has approximately 6,400 employees. Approximately 3,200 of these are pilots, maintenance employees and flight attendants who are union-represented, with their wages, benefits and work rules established by three separate collective bargaining agreements. Of these 3,200 union-represented employees, approximately 1,500 are pilots. As noted at the outset Comair's pilots are represented by ALPA and its flight attendants are represented by the IBT. Comair's aircraft mechanics

and other employees performing a variety of maintenance-related jobs are represented by the International Association of Machinists ("IAM").

The remaining approximately 3,200 of Comair's employees, including agents, ramp workers, office/clerical workers and management employees (supervisors, professionals and executives) are non-union, whose wages, benefits and work rules are and have been established by Comair.

The Pilot Agreement became effective June 22, 2001 after an 89-day strike. The Pilot Agreement increased Comair's pilot costs by 39% over the initial 5-year duration of the Agreement, and it provided the highest pilot pay rates in the regional airline industry.

Concerned with the escalating financial problems confronting both Delta and Comair in the post 9/11 era, Comair sought cost reductions in its employee costs from both unionized and non-union employees and officers in late 2004 and early 2005. Of relevance here, in February 2005 Comair and ALPA signed a letter of agreement ("LOA") modifying the pilot collective bargaining agreement to provide pilot compensation reductions equating to approximately $8 million per year. Even after the February 2005 LOA, Comair pilots remained the highest paid of all Delta Connection pilots. The February 2005 LOA committed Comair to increase by 18 aircraft the size of its fleet, including eight of 70 seats or more, and provided that, if these growth requirements were not met, the compensation concessions would be reversed and compensation rates would "snapback" to pre-February 2005 contract levels effective January 1, 2007.

In November 2005, as part of the Delta Restructuring Plan, Delta reduced by 3.8% the block hour rate Delta pays Comair to provide regional lift under the Delta Connection Agreement. Comair's own restructuring necessarily had to accommodate this reduction in its income from Delta, its only source of income.

Comair's Restructuring Plan called for $47.9 million yearly reduction of operating costs (not including aircraft financing costs). Of this amount, $5.6 million was targeted for annual reduction in airport customer service and maintenance support costs. The remaining $42.3 million cost reduction requirement was allocated to both union and non-union labor cost savings.

- 4 -

After the Chapter 11 filing in September 2005, Comair implemented non-union pay cuts ranging from 4% for front-line and hourly employees, 7% for merit employees below the director level, 9% for directors, 10% for officers and 15% for the president. This was in addition to 10% pay cuts for the officers and president in March 2005, and pay freezes for many of the non-union employees for the prior two to five years.

Comair's Restructuring Plan called for reductions totaling $27.2 million in annual collective bargaining agreement costs, allocated $17.3 million from pilots, $8.9 million from flight attendants and $1.0 million from mechanics. To that end, Comair management initiated discussions with each of the three unions in early November 2005.

After weeks of negotiations ALPA and IAM each agreed to the $17.3 million and $1.0 million cost reductions, respectively, under the pilots' and mechanics' collective bargaining agreements. In January 2006 Comair signed an LOA for the requested labor cost reductions with each of ALPA and IAM. However, both LOAs contained the following clause:

> [A]cceptance and implementation of this Letter of Agreement is contingent upon and shall not become effective until all other employee groups, including management, grant and/or implement the relief provided in the November 1, 2005 restructuring document (Company's confidential Cost Reduction Target).

Comair's pilots and mechanics ratified these LOAs, subject to the contingency clause quoted above.

Comair was not able to reach agreement with its flight attendants. This resulted in Comair's first and second motions to reject the flight attendants' collective bargaining agreement, which were denied and granted, respectively, in this Court's April 26 and July 21 decisions cited at the outset of this opinion. After lengthy negotiations following the July 21 decision, the IBT and Comair reached agreement for flight attendant cost reductions valued at $7.9 million annually, and this was later ratified by the flight attendants.[1]

A significant consequence of Comair's failure to obtain $8.9 million in annual concessions from the flight attendants was that the pilots were entitled to and did repudiate the January 2006

---

[1]    Comair has also reached a final post-petition concession agreement with the IAM.

LOA calling for $17.3 million annual cost savings.   Moreover, the January 2006 pilot LOA contained a waiver of the January 1, 2007 snapback provision, and this waiver is now inoperative because the LOA is inoperative.   Since Comair has been unable to augment its fleet[2] (the condition of avoiding the snap-back), Comair's pilot costs will increase by $8 million annually on January 1.  On the same date, January 1, 2007, approximately $3.5 million in pilot defined contribution plan contributions will become payable which would be eliminated under Comair's Section 1113 proposal.  Thus, in less than two weeks Comair's pilot costs will increase by approximately $11.5 million if agreement is not reached or the Pilot Agreement is not rejected.

### The Negotiations

Negotiations between Comair and ALPA recommenced in August 2006.   Representatives of the parties met or exchanged proposals on three dates in August, eight days in September and three days in October (Exhibit 7).  By the end of October both sides had submitted seven proposals. Comair's seventh proposal, dated October 31, constituted its initial Section 1113 proposal.   ALPA's seventh proposal was also dated October 31.  This motion to reject was dated November 2, and the motion and ALPA's objection are both addressed to the October 31 proposals.   The parties met for further negotiations on November 9, 10, 15 and 16, however, resulting in ALPA's proposal dated November 15 and Comair's final Section 1113 proposal dated November 16.

The parties have reached agreements on numerous issues, including reduction in *per diems*, work rule changes, elimination of the defined contribution plan and a cap on increases in medical costs.  By far the largest source of financial disagreement is reduction in salary scales and related costs.  Other disagreements relate to a work rule concerning deadhead pay, a change in vacation accrual table, elimination of uniform allowance in the third and fourth years, 401(k) match and longevity reinstatement. The most significant non-monetary issue relates to job protection, including ALPA's demands for a no-

---

[2]    In fact, the Comair fleet has recently diminished by twelve 70-seat aircraft, as amplified below.

furlough clause and guarantees by Delta and Comair with respect to the size and composition of Comair's fleet.

Despite some progress, the parties remain far apart in their efforts to reach a settlement. The following table summarizes the annual cost reductions under the ALPA proposal dated November 15 and the Comair proposal dated November 16. As shown on the chart, the aggregate difference in the proposals at the end of four years is approximately $28.1 million.

**Annual Cost Reductions.**[3]

|  | 2007 | 2008 | 2009 | 2010 | Annual Average |
|---|---|---|---|---|---|
| Comair Proposal 11/16/2006 | 14,473,217 | 11,401,800 | 8,801,474 | 5,613,452 | 10,072,486 |
| ALPA Proposal 11/15/2006 | 10,153,427 | 6,092,025 | 1,065,896 | (5,105,997) | 3,051,338 |
| Difference | 4,319,790 | 5,309,775 | 7,735,578 | 10,719,449 | 7,021,148 |

## Discussion

Section 1113 of the Bankruptcy Code provides as follows in the relevant subsections (emphasis supplied):

 (b)  (1)  Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall—

---

[3]  ALPA values the various components of Comair's and its own proposals in a manner radically different from the Comair valuations reflected in this table, although prior to trial ALPA had not shared with Comair the bases for its valuations. Upon my order during the trial that the knowledgeable experts on both sides confer to identify precisely their differences in costing the competing proposals, it appeared that 95% of the parties' differences in valuation turned on conceptual disagreements concerning baselines and assumptions, rather than computation of numbers. The baseline assumptions used for costing purposes are of no real consequence provided that the same baselines and assumptions are used uniformly by both sides. In the interests of such uniformity for analysis beginning with Comair's initial 2004 proposals to its unions, I accept the baselines and assumptions employed in the Company's cost analyses of all the proposals, including its original 2004 proposals to the unions.

(A)    *make a proposal* to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those *necessary modifications* in the employees benefits and protections that are *necessary to permit the reorganization* of the debtor and assures that all creditors, the debtor and all of the affected parties are *treated fairly and equitably*; and

(B)    provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2)    During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to *confer in good faith* in attempting to reach mutually satisfactory modifications of such agreement.

© The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

(1)    the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2)    the authorized representative of the employees has refused to accept such proposal *without good cause*; and

(3)    the *balance of the equities clearly* favors rejection of such agreement.

This Court's views on Section 1113, as guided by the leading Courts of Appeals and other decisions interpreting and implementing the statute, have been set forth in my April 26 and July 21 decisions and need not be repeated at length here. But a few additional observations of a general nature may be helpful to the parties and any reviewing court in understanding the approach taken in deciding the matter now before me.

An unusual if not unique aspect of Section 1113 is that, as noted in the legislative history and the case law, the statute is designed to force the debtor-employer and its unionized labor constituencies to resolve their disputes by agreement by a process of good faith negotiations. In most litigated disputes that are not settled, the court makes a decision which resolves and terminates the parties' dispute. Not so under Section 1113—the court here does not resolve the parties' dispute and cannot set new terms

to govern the parties' relationship.   Only the parties can make a new agreement, and they must resume

negotiations to that end whatever the court's ruling on a Section 1113 motion.

Of course, that is not to say that the court's decision on a Section 1113 motion is

inconsequential.   Quite the contrary, the court must decide whether the existing collective bargaining

agreement will continue to govern the parties during their negotiations, which have been and may be

lengthy, or whether the debtor-employer will have the right to implement a lower cost structure pending

the outcome of the parties' ongoing negotiations to enable it to compete effectively in the marketplace.

It is important to bear in mind the context in which this statute operates.   Section 1113 is

not a labor law, it is a bankruptcy law.   It comes into play only when the employer is a debtor which has

filed a petition under Chapter 11 because, if it does not restructure its affairs, it will fail and there will be

no jobs for the union to protect and enhance.

Because the ultimate objective of a Chapter 11 case is a reorganized debtor which is

financially viable for the long term, the Bankruptcy Code grants to the trustee or debtor-in-possession an

array of powerful tools designed to enable the debtor to restructure its affairs.   Restructuring means

changing or in some cases even eliminating the contractual rights of creditors and contract counter-

parties.   One such tool is Section 365(a), which provides that the trustee or debtor-in-possession, "subject

to the court's approval, may . . . reject any executory contract . . . of the debtor."   By case law the stan-

dard for deciding a motion to reject an executory contract under Section 365(a) is the business judgment

rule, which basically means that if it makes economic sense for the debtor in the judgment of manage-

ment, the motion to reject will be granted.   *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984)

("[T]he traditional 'business judgment' standard [is] applied by the courts to authorize the rejection of the

ordinary executory contract."); *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul &

Pacific R.R. Co.*, 318 U.S. 523, 550 (1943) ("[T]he question whether a lease should be rejected and, if

not, on what terms it should be assumed is one of business judgment."); *Durkin v. Benedor Corp. (In re

G.I. Indus., Inc.)*, 204 F.3d 1276, 1282 (9th Cir. 2000) ("[A] bankruptcy court applies the business

judgment rule to evaluate a . . . rejection decision. . . ."); *In re O.P.M. Leasing Servs., Inc.*, 56 B.R. 678,

682 (Bankr. S.D.N.Y. 1986) ("Although this section does not codify the standard for the rejection of an unexpired lease, a business judgment rule is generally employed."); *In re Stable Mews Assocs., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984) ("The great weight of modern authority applies the business judgment test. Indeed, virtually all recent Bankruptcy Court decisions apply this test. The Supreme Court apparently accepted that test in *[Bildisco]* terming that standard 'traditional.'") (citations omitted).

Congress enacted Section 1113 not to eliminate but to govern a debtor's power to reject executory collective bargaining agreements, and to substitute the elaborate set of subjective requirements in Section 1113(b) and © in place of the business judgment rule as the standard for adjudicating an objection to a debtor's motion to reject a collective bargaining agreement.

The fact that Section 1113 is a bankruptcy law and therefore instinct with the fundamental objectives of Chapter 11 has consequences for the implementation of the statute, as will be apparent in the discussion which follows. In this connection, however, it will be useful to observe at the outset that the focus in a Section 1113 motion is on the *debtor's* Section 1113 proposal, not the union's counter-proposal. Although the negotiating conduct of the union may have some relevance under certain of the statutory tests, Section 1113 does not require or indeed authorize the court to compare and contrast the debtor's and the union's proposals and decide the motion on the basis of the court's view as to which proposal is most appropriate, or equitable, or reasonable. The statute must be applied as it is written, and it is the debtor's proposal which must meet the statutory criteria. If it does, the motion must be granted regardless of the union's proposal.

Consistent with the foregoing and with the analytical approach set forth in this Court's April 26 and July 21 decisions, Comair's final proposal dated November 16, 2006 will be examined under the statutory tests provided in Section 1113.

## A.    <u>"necessary modifications . . . necessary to permit the reorganization"</u>

"[T]he necessity requirement places on the debtor the burden of proving that its proposal is made in good faith, and that it contains necessary, but not absolutely minimal, changes that will enable the debtor to complete the reorganization process successfully." *Truckdrivers Local 807, Int'l Bhd. of*

*Teamsters, etc. v. Carey Transp. Inc. (In re Carey Transp. Inc.)*, 816 F.2d 82, 90 (2d Cir. 1987).   "Thus, in virtually every case, it becomes impossible to weigh necessity as to reorganization without looking into the debtor's ultimate future and estimating what the debtor needs to attain financial health."  *Id.* at 89.  Any specific Section 1113 proposal will be part of a debtor's overall restructuring plan, and "[i]n determining 'necessity,' the proposal must be viewed as a whole, and not by its specific elements."  *In re Horsehead Indus., Inc.,* 300 B.R. 573, 584 (Bankr. S.D.N.Y. 2003) (Bernstein, C.J.).

 As noted by the Second Circuit, the legislative history of Section 1113 "strongly suggests that 'necessary' should not be equated with 'essential' or bare minimum."  *In re Carey Transp. Inc.*, 816 F.2d at 89.  The test of necessity is not a but-for test because "no proposal could ever truly be 'necessary,' since any single vital element of a proposal can hardly be necessary if it can be replaced by some alternative not included in the same package."  *In re Royal Composing Room, Inc.*, 848 F.2d at 348.  Instead, "the focus should be on the proposal as a whole."  *Id.*.   The Second Circuit has held that a "debtor's proposal need not be limited to the bare bones relief that will keep it going."  *New York Typographical Union No. 6 v. Royal Composing Room, Inc. (In re Royal Composing Room, Inc.)*, 848 F.2d 345, 350 (2d Cir. 1988).

 The courts have repeatedly recognized that in judging the "necessity" criterion the focus should be on the long-term economic viability of the reorganized debtor, as opposed to the debtor's short-term economics as they may have evolved during the course of the bankruptcy.  *See, e.g.*, *United Food & Commercial Workers Union, Local 328, AFL-CIO v. Almac's Inc., et al.,* 90 F.3d 1, 6 (1st Cir. 1996) ("Because a plan of reorganization may not be confirmed if it is likely to be followed by liquidation or the 'need for further financial reorganization,' the modifications are proposed with a view to the long-run success of the debtor's business.") (citations omitted); *In re Carey Transp. Inc.*, 816 F.2d at 89–90 ("In making the decision whether to permit the debtor to reject its bargaining agreement, . . . the court must consider whether rejection would increase the likelihood of successful reorganization. . . .  [I]n virtually every case, it becomes impossible to weigh necessity as to reorganization without looking into the debtor's ultimate future and estimating what the debtor needs to attain financial health."); *United Food*

and Commercial Workers Local Union Nos. 455, 408, 540 and 1000 v. Appletree Mkts., Inc. (In re

Appletree Mkts., Inc.), 155 B.R. 431, 440 (S.D. Tex. 1993) ("This court concludes that the Second

Circuit's test for necessity [set forth in *Carey*] is more consistent with the history and purpose of § 1113

and with the realities of a reorganization under Chapter 11. . . .    [C]reditors are not likely to extend

additional funds to a reorganized debtor unless there is a reasonable basis to conclude that the reorgani-

zation will be successful and not merely a prelude to another reorganization or a liquidation."); *In re*

*Valley Steel Prods. Co., et al.*, 142 B.R. 337, 341 (Bankr. E.D. Mo. 1992) ("To hold that 'necessary'

requires minimal changes in the collective bargaining agreement may well result in meaningless and

unsuccessful reorganizations.   It would not be in the best interest of the Debtors, employees or the

creditors to attempt to fine tune the necessary changes to a minimal standard that would greatly enhance

the chances of an unsuccessful reorganization."); *Int'l Union, United Auto., Aerospace and Agric.*

*Implement Workers of Am., UAW and Local 1431 v. Gatke Corp.*, 151 B.R. 211, 213 (N.D. Ind. 1991)

("The Second Circuit's position in Truck Drivers Local 807 v. Carey Transportation is the more

persuasive and better-reasoned approach.  Had Congress intended to adopt [a] . . . bare minimum

requirement, it could have done so.").

   It is self-evident that a debtor's long-term ability to compete in the marketplace for its

product is essential for the viability of any reorganization.  Thus, where the debtor's costs are directly

passed on to its customer those costs must be competitive with the costs of the debtor's competitors.   The

Second Circuit has recognized the necessity of rejection when a debtor's labor costs are higher than those

of its competitors and where the debtor faces "enormous competitive pressure."  *In re Royal Composing*

*Room, Inc.*, 848 F.2d at 350.  The Court of Appeals in *Royal Composing Room* said:  "Royal was faced

with a unionized work force in an industry wherein its new competitors were not unionized, resulting in

Royal being unable effectively to meet the market price for its product."  *Id.* at 346.  The Court went on to

find the Section 1113 proposal necessary because "[t]he Debtor will in the future be faced with enormous

competitive pressure which will require it to have maximum flexibility, including with respect to

utilization of its unionized labor, in order to mold and adapt in a changing business environment."  *Id.* at

350.  To the same effect, in *In re Carey Transp.*, 816 F.2d at 90, the Court of Appeals found that "[e]ach

of the findings pertinent to this inquiry [the "necessary" requirement] . . . is supported by substantial

evidence in the record.   For instance, record evidence indicates that . . . Local 807 labor costs (in contrast

to other employees' salaries and benefits) were well above industry averages . . . ."

      Comair's proof on the issue of necessity was overwhelming.  Although compendious, it

may be summarized here.

      The extraordinary competitiveness of the regional airline industry was discussed in this

Court's July 21 decision in findings equally applicable here, and in the recent decisions in *In re Mesaba

Aviation, Inc.*, 341 B.R. 693 (Bankr. D. Minn. 2006), *rev'd on other grounds*, No. CIV. 06-3041 (MJD),

2006 WL 2739046 (D. Minn. Sept. 13, 2006), *on remand*, No. Bankr. 05-39258 (Bankr. D. Minn.

Oct. 16, 2006) (order granting rejection), and was illumined in the testimony of Comair's expert wit-

nesses, Jerrold Glass and Daniel Kasper.   The key findings on this issue in *Mesaba* were aptly sum-

marized in Comair's initial memorandum (p. 25) as follows:

> The initial *Mesaba* decision describes in detail the economic vise in which major air carriers
> are now placing the regional carriers: "as the mainlines' financial distress became intractable
> after 2001, and in particular as many of them had to seek protection under Chapter 11, they
> turned to their relationships with their regionals as an avenue through which to reduce their
> own costs . . . ."  *Mesaba*, 341 B.R. at 735.  Even though it had an ownership interest in
> Mesaba,[15] Northwest Airlines removed aircraft from Mesaba in order to place them with
> other regional partners offering a better deal.  *Id.* at 707-09, 735-37.  As the court noted,
> "[a]s a regional carrier, [Mesaba] is entirely subject to the good graces of the network
> carriers that would grant it airlink flying under contract.  To land the business on which its
> survival depends, [Mesaba] must meet their demands for financial accommodation as they
> make them."[16]   *Id.* at 739.   The court concluded that "[t]he debtor must maximize its
> projection of fiscal stability in order to make its case on bidding for work from mainline
> carriers," which supported the necessity of a six year duration for reduced labor costs to
> "best promote [Mesaba's] long term financial health by increasing its chances of winning
> such bids."  *Id.* at 742-43.

_____

[15]    Northwest owns 27.5% of Mesaba's parent holding company.  *Mesaba*, 341 B.R. at 703.

[16]    Thus, the *Mesaba* court recognized that the prospect of a shrinking airline is not a threat, but a realistic
statement of predictable business consequences motivated by legitimate business objectives.

      Comair presented lengthy testimony and many exhibits proving that its pilot costs are not

competitive.   ALPA does not dispute that Comair's pilots have long been and are the highest paid in the

industry.   Exhibit 23 best exemplifies this.  Exhibit 23 (updated) contains pilot salary comparisons between Comair and the eleven major regional airlines flying 50-seat jet aircraft and between Comair and the ten major regional airlines flying 70-seat jet aircraft.   To compare apples to apples, the tables compare Comair's actual pilot costs with costs which the Comair pilot population (including seniority) would incur using the actual pilot costs of the competitive regional airlines.  These tables show that with the single exception of Horizon Air (which flies 70-seat but not 50-seat aircraft), Comair has the highest pilot compensation costs of all the regional airlines.   With respect to 50-seat aircraft, the competitive disadvantage to Comair ranges from a low of $682,794 equating to 0.9% of Comair pilot costs (Express Jet) to a high of $9,418,679 equating to 11.8% of Comair's annual costs (Mesa Airline).  The average annual competitive disadvantage to Comair for the 50-seat regional industry as a whole is $4,585,103 equating to 5.7% of Comair annual costs, and the cost disadvantage to Comair compared to the average of the four other Delta Connection carriers is $4,960,591 equating to 6.2% of annual costs.  The numbers are even more dramatic for 70-seat jet aircraft, where the cost disadvantage to Comair compared to the industry average equates to 10.9% of Comair's annual costs and the cost disadvantage to the four other Delta Connection carriers equates to 11.5% of Comair's annual costs.

These material cost disadvantages to Comair will be greatly exacerbated by the $8 million annual cost "snapback" which will become effective January 1, 2007, compounded by Delta's obligation to contribute $3.5 million on January 1, 2007 to the pilot defined contribution plan.

Comair's uncompetitive cost structure unquestionably has been the reason for Comair's inability to attract new regional lift or even to retain its existing fleet of aircraft in the current competitive environment in the regional airline industry.

In August 2003 Comair met with ALPA leadership (including Messrs. Lawson and Tennen) and made a presentation (Exhibit 45) seeking cost reductions in advance of a scheduled "request for proposal" (RFP) by Delta for new aircraft.  Comair management believed that Comair had an excellent opportunity to be awarded the new aircraft.  But both ALPA and IBT refused to negotiate for cost reductions.  As a consequence, in 2004 Delta awarded regional flying utilizing 45 new aircraft to

ASA, Chautauqua and SkyWest, instead of Comair, because Comair's costs were 18% higher than the other Delta Connection carriers. Comair got none.

When Comair and ALPA negotiated the February 2005 pre-petition concession LOA Comair undertook to increase its fleet of aircraft as a condition of maintaining the cost concessions. Its inability to do so will result in the January 1 $8 million snapback.

Comair's President, Don Bornhorst, testified persuasively concerning Comair's uncompetitive cost structure. Under the heading "Comair Has Run Out Of Time To Restructure," he said:

> Comair's pilots are now the *only* group of employees at Comair, or at Delta, who have not agreed to post-petition reductions in their labor costs. As the court has already found in similar proceedings involving Comair's flight attendants, Comair's labor costs are too high and must be restructured. Comair, however, cannot wait any longer to do so. The inability to implement the January 2006 Letter of Agreement with ALPA, and the subsequent deadlock in renewed negotiations with ALPA, have delayed Comair's restructuring and threatens [*sic*] its continued viability. Unless Comair achieves the pilot labor reductions contained in Comair's Section 1113 Proposal, Comair will (I) remain uncompetitive; (ii) be unable to compete effectively for new flying opportunities with Delta or other mainline carriers; and (iii) be at risk of losing its entire 70-seat regional jet fleet and a portion of its 50-seat regional jet fleet to competitors who can provide the same flying at lower cost to Delta.

Concerning competition faced by Comair from other regional carriers, particularly the other four Delta Connection carriers, Mr. Bornhorst said:

> Delta, however, has other Delta Connection carriers with whom it already contracts for services similar to those Comair provides, as well as ample information on the costs of the other regional carriers in the industry. Each of these carriers is obviously eager to increase its share of Delta flying, and Delta — especially Delta in bankruptcy — has an obvious incentive not to pay Comair more for regional flying than Delta could obtain at lower cost elsewhere in the regional industry. Thus, market-based costs have a bearing on the rate established in the DCA [Delta Connection Agreement] because Delta will not and cannot pay above-market rates and will not and cannot allow its costs for regional flying to exceed the revenues attributable to the regional flying.

Mr. Bornhorst also testified concerning Comair's unsuccessful efforts during 2006 to compete for regional lift from Northwest Airlines, Continental Airlines and Midwest Airlines. He stated:

> It was clear to these carriers, as it was to me, that — absent restructuring Comair's labor costs, especially pilot labor costs, Comair would not be competitive with the other RFP [request for proposal] respondents.

Shawn Anderson, Delta's Vice President of Delta Connection, gave this testimony in his November 1, 2006 trial Declaration:

Moreover, Delta may place into service additional large 70-seat regional jets–and even larger RJs with up to 76 seats. Delta would have to consider placing these new aircraft at Comair's competitors and "grow" the competitors instead of placing such valuable assets at Comair where they would produce less profit.

. . . If Comair does not obtain the labor cost reductions it seeks, then its cost structure will not be competitive with the other Delta Connection carriers. In this industry, and at this time, having an uncompetitive cost structure will mean that Comair will have no opportunity for growth, and, indeed, will mean that Comair cannot survive as a viable regional airline. Simply put, unless Comair can reduce its controllable costs to competitive levels, it does not make business sense to continue Comair flying for Delta.

. . . If Comair can restructure itself so that its controllable costs are competitive, Delta should be able to increase, rather than decrease, the flying it contracts to Comair. This would mean that Comair would have an opportunity to grow, rather than shrink. With growth would come new job opportunities, and reduced unit costs, as more junior employees are added, and reduced unit overhead costs as the same facilities and overhead could be used to perform more flying.

. . . I am familiar with Comair's restructuring plans, including its plan to reduce its controllable costs–both labor and non-labor. If Comair is able to restructure in accordance with its restructuring plans, I believe that Comair will be able to perform Delta Connection flying at a competitive price. Accordingly, I believe that the labor cost reductions in Comair's business plan are necessary–indeed, essential–to Comair's successful restructuring.

In July and August 2006 Delta submitted to Comair and other, competing regional airlines a series of RFPs for new and existing flying, in various categories or "bundles" of flying, including some of the aircraft currently flown by Comair. Comair submitted proposals in all categories. None of Comair's proposals has been accepted by Delta. Mr. Anderson had this to say in his November 1 Declaration about Comair's proposals:

In Comair's case, my initial review of the bid submissions indicates that one or more viable competitors have underbid Comair by a substantial amount on the 70-seat flying. Indeed, Comair's bid on the 70-seat flying is among the highest of all the 70-seat bids. Thus, absent a material change in Comair's bid, Comair's bid on the 70-seaters will not be competitive.

. . . In addition, multiple viable competitors have presented bids for the 50-seat flying that are substantially lower than Comair's bid. Thus, based on my initial review, I believe Comair's bid on the 50-seaters is not as competitive as other bids. However, Comair has also recently informed us that, in the event it loses a significant portion of its 70-seaters, its costs on the 50-seaters would increase and its previous bid would not accurately reflect its costs. In that event, Comair's bid would become even more uncompetitive.

Mr. Anderson's November 1 testimony was prescient. On November 21, 2006 Delta notified Comair that it had awarded and will transfer twelve 70-seat aircraft from Comair's fleet to

- 16 -

SkyWest, another Delta Connection carrier.[4]   This loss of nearly half its 70-seat fleet will further increase Comair's cost disadvantage to its competitors, as noted in Mr. Anderson's testimony quoted just above, and as explained in the testimony of Comair's expert Jerrold Glass.[5]

Comair's share of Delta Connection flying has declined from 52% in 2000 to 32% today, not counting the imminent loss of the twelve aircraft to SkyWest.  On December 31, 2003 Comair's fleet consisted of 156 aircraft.  Today, three years later, Comair's fleet consists of 135 active aircraft (122 50-seat, 13 70-seat) after the loss of 12 70-seat jets to SkyWest.  Comair's demonstrated inability to compete for regional lift from other major airlines and its dramatic loss of Delta Connection market share (despite Delta's obvious incentive to favor its wholly-owned subsidiary) can only be explained by Comair's uncompetitive cost structure and the hard economics of competition.

To summarize the evidence, there can be no dispute as to the following critical facts bearing on the issue of necessity:

- **Pay rates**:  Comair's pilot pay rates are the highest in the regional airline industry.  As shown on Exhibit 23 and numerous other exhibits, Comair's competitive disadvantage to other regional airlines, and in particular to other Delta Connection airlines, is substantial and uniform except for Horizon Air.  The seniority of Comair's pilots, which is high for a regional airline, also results in a competitive disadvantage for Comair.

- **Retirement benefits**:  As shown in the testimony of Comair's expert, Jerrold Glass, Comair's current pilot retirement benefits "are among the best, if not the best in the regional airline industry," and Comair is one of only two regional carriers offering both a defined contribution plan and a 401-K plan.

---

[4]

The twelve aircraft comprised about half of Delta's 70-seat fleet, which is the most desirable and profitable portion of Comair's entire fleet.  Delta's letter to Comair explained that its "bid for this flying was not as competitive as several other carriers."  Although Delta thereby satisfied an independent contractual provision in the agreement by which it had sold ASA to SkyWest, I accept the testimony of Shawn Anderson to the effect that Delta's primary motivation for the transfer was that SkyWest's proposal was more competitive than Comair's proposal, and that Delta's obligation to SkyWest with respect to only six (not twelve) 70-seat aircraft was not a pressing concern for Delta within any time in the near future.

[5]

After noting that Comair has a more senior pilot workforce than other regionals, Mr. Glass testified:

> Unfortunately, in the event of a downsizing of the airline, the company's pilot unit labor costs will increase, as junior pilots are furloughed and more senior pilots remain.  For example, if all 25 of its 70-seat aircraft are removed from the airline, depending on attrition, one could see more than 200 pilots furloughed.  Since the most junior first officers would lose their job, nearly all first officers with less than 4 years of service could be furloughed, resulting in a higher average wage rate per pilot than even exists today.

- **Work rules**: As shown on Comair Exhibit 36-A, 59 out of 96 Comair work rules are more favorable to its pilots (and therefore less competitive for Comair) than comparable work rules of other regional carriers, and only twelve out of 96 of the comparable work rules are less favorable to Comair pilots and therefore more favorable to Comair than competitive carriers.

- **Competition for regional lift**: Despite Comair's economic incentive and efforts to increase its fleet of aircraft and attract additional regional lift, Comair has failed to do so. Comair's share of Delta Connection business has plummeted from 52% to 32%. In three years its fleet has shrunk from 156 to 135 active aircraft, after the recent loss of nearly half (twelve out of twenty five) of its most desirable 70-seat aircraft to a competing Delta Connection carrier.

- **The January 1, 2007 snapback**: The $8 million snapback and the $3.5 million contribution to defined contribution plan, effective and due in less than two weeks, will materially increase Comair's competitive cost disadvantage.

Comair's expert witness Daniel Kasper provided a comprehensive analysis of the competition and prices in the legacy and regional airline industries since 9/11. The following excerpts from the summary conclusions in his direct testimony are of particular importance here:

- . . . [T]he divergence in profitability between legacy carriers and their regional partners proved unsustainable in the harsh competitive environment facing legacy carriers, and as a consequence, virtually every legacy carrier has either rejected in bankruptcy or renegotiated high cost regional airline contracts in order to lower the cost of their regional flying to prevailing market levels.

- These competitive and cost pressures have even forced legacy carriers that historically obtained their regional lift almost exclusively from wholly or partially owned regional affiliates (e.g. Northwest, Continental, Delta) to shift flying to lower cost regionals. For example, Continental recently withdrew approximately one-quarter of its regional flying from its former subsidiary ExpressJet and awarded it to Chautauqua, a lower cost regional carrier. Similarly, Northwest recently put out a competitive tender covering all of the regional jet flying currently being provided by its traditional (and exclusive) regional partners, Mesaba and Pinnacle.

- . . . Given its own severe financial problems, Delta cannot afford to pay above-market rates to any of its major suppliers, including those providing regional air services. Unless Comair is able to provide regional capacity to Delta at more competitive, market-based rates, Delta will find it necessary to shift regional flying away from Comair and could be forced to terminate its longstanding relationship with Comair.

- . . . In a nutshell, Comair has no realistic alternative but to reduce its costs if it hopes to survive.

- In sum, without significant cost reductions–including substantial labor cost savings from its pilots–Comair is unlikely to survive the dramatic changes transforming the airline industry. But if Comair can achieve its targeted cost savings, the Company should be able to retain–and possibly expand–its contract flying for Delta and potentially other airlines, as well.

ALPA did not endorse or recommend the Comair demand for a 17.3% pilot cost reduction which was ultimately embodied in the January 2006 LOA. But in a January 2006 communication to its members (Exhibit 42, p. 4) ALPA did explain to its members the realities of competition in the regional airline industry in language quite consistent with Mr. Kasper's conclusions:

> The "host" (mainline) carrier actually mandates that the individual carrier meets specified "controllable" cost parameters for service items such as labor. You may have already heard the term "mark to market." "Mark to market" is a requirement that the contracted carrier pay no more than comparable market pricing for the particular item, i.e., service, they provide. In our case this means that Comair must not pay over the "market" price for crew cost.

> . . . With Delta in bankruptcy, they are, naturally, attempting to drive all their costs, including what they pay for feed. By lowering that "feed" cost, they have simultaneously lowered the labor cost at the DCI carriers. Since our current CBA has higher pay rates (for instance), in order to meet this "mark to market" Comair is required to lower our crew cost in order to compete with the other DCI providers, failure to do so violates the CBA and places our ability to compete as a DCI carrier at risk.

> . . . With Delta in bankruptcy, we find ourselves in a scenario with extremely limited options. For Comair to continue, management must achieve a cost structure that meets this "mark to market" parameter.

ALPA's January 2006 letter to the pilots clearly acknowledged the facts (1) that Comair pilots enjoy "higher pay rates," (2) that to meet the "mark to market" competitive standard "Comair is required to lower our crew cost in order to compete with the other DCI providers" and (3) that "[f]ailure to do so . . . places our ability to compete as a DCI carrier at risk." The incontestable facts show that ALPA's January 26 letter to the pilots was correct, and that Comair has not been able to compete successfully as a regional carrier during 2006, having lost 12 of its 25 70-seat aircraft to a competing Delta Connection carrier in November and having failed in its efforts to solicit business from three other mainline carriers.

In the face of all this evidence, ALPA now objects to Comair's Section 1113 proposal (which would entail far more modest concessions than agreed to by ALPA and the pilots in the January 2006 LOA) relying upon the following arguments:

A.      Comair has become profitable without the Section 1113 relief it seeks.

B.      Comair does not need to obtain additional new flying to reorganize successfully.

C.    Delta's threat to dismantle Comair does not establish necessity, particularly since
Delta, as Comair's owner, has good business and legal reasons not to carry out the
threat.

With respect to the "profitable" contention, it must be noted preliminarily that the notion of "profit" in the accounting and compensation system employed by Delta/Comair (the model which has become the norm in the regional airline industry) is not a reliable index for assessing even the current economic vitality, let alone the future prospects of a regional carrier such as Comair.   The mainline carrier, Delta, pays virtually all the costs of operation and a specified or pre-fixed mark-up or "profit" to the regional carrier, Comair.  As ALPA explained to its Comair pilots in the January 2006 communication (Exhibit 42, p. 4):

> Delta receives all revenue for each passenger Comair carries on a specific flight.  That flight
> has a specific cost for each block hour.   Provided Comair complies with the set cost
> structure, Delta will then pay Comair a guaranteed percentage of "profit" for operating that
> flight.   In addition, should the overall operation exceed specific predetermined parameters,
> Delta will pay a bonus percentage.

It is thus apparent that Comair's current and projected "profit" is a function of the accounting/compensation method conventionally employed by Delta/Comair and the other mainline regional carriers, and that such "profit" is not a useful metric to determine the requirement of "necessity" under Section 1113(b)(1)(A).  Comair may be able to report a "guaranteed percentage of 'profit'" (quoting ALPA, Exhibit 42), but if Comair's uncompetitive cost structure precludes it from retaining the aircraft and flying it receives from Delta (let alone competing for regional lift from other mainline carriers), it ultimately cannot succeed.

In its "profit" argument ALPA contrasts a $120 million loss for 2005 with a projected profit of $50 million for 2006.  But as shown in the direct testimony of Delta's witness Edward Bastian, these figures relate to Delta's profit/loss accounting, not Comair's.  He said:

> In 2005, Delta suffered a loss of $120 million on its Comair regional flying; in 2006, recent positive
> trends in revenue and fuel prices lead us to project that Comair will be profitable for the year ($50
> million pre-tax income)–but will still have higher costs than other regional air carriers which Delta
> could engage to provide the same flying capacity at lower total cost to Delta.

* * *

> . . . When all the costs of the Comair flying are measured against the revenues received from such flying, the Comair regional flying resulted in a loss of $120 million in 2005, and is currently projected to result in a pre-tax profit of $50 million for 2006.

Mr. Bastian then explained why these figures will not guarantee Comair's ability to retain Delta's regional lift.

> . . . While this represents an improvement, it is by no means a sufficient improvement, because other regional carriers are able to offer the same capacity as is provided by Comair at materially lower costs.

> . . . For Delta to be a successful competitor, it must be competitive in every area of its business, including the price it pays for regional flying. Delta cannot afford to purchase regional flying capacity from Comair at costs higher than are available in the open market.

ALPA's blithe assertion that "Comair does not need to obtain additional new flying to reorganize" and its cavalier dismissal of Delta's manifest intent to place its regional lift based on competitive costs as mere "threat" have an *Alice in Wonderland* ring in the face of the real world *facts* confronting the airlines and particularly Comair in a post-9/11 world. Comair's competitive disadvantage to other regional carriers is a fact. That the January 1 $8 million snapback will result in a huge increase in that competitive disadvantage is a fact. Comair's enormous loss of Delta Connection market share (32%, down from 52%), its loss effective in February of twelve 70-seat jets to a Delta Connection competitor, the reduction in its fleet from 156 three years ago to 135 as of February, and its inability to compete for regional lift from other mainline carriers are matters of fact, not threat. There is no evidentiary support in the trial record, and no intuitive or logical basis, for ALPA's optimistic conjecture that Delta will not continue to divert new flying opportunities and existing Comair regional lift to other regional airlines if Comair's pilot costs remain way over market.

The "necessary" standard in Section 1113(b)(1)(A) may be subjective in the abstract. But the objective facts established by the evidence demonstrate very clearly that the economies Comair seeks in its November 16 proposal are absolutely "necessary" within the meaning of Section 1113(b)(1)(A) if Comair is to compete successfully in the marketplace.

**B.**    **"assures that . . . all of the affected parties are treated fairly and equitably"**

Section 1113(b)(1)(A) requires that the debtor's proposal is one that "assures that . . . all of the affected parties are treated fairly and equitably." As this Court observed in the April 26 decision,

the Second Circuit has repeatedly held that the requirement of a proposal that treats all affected parties

fairly and equitably means that all of the debtor's cost constituencies must share in the cost reductions

which are necessary to achieve reorganization.  *See, e.g.*, *In re Century Brass Prods., Inc.,* 795 F.2d 265,

273 (2d Cir. 1986) ("The purpose [of the "fairly and equitably" requirement] is to spread the burdens of

saving the company to every constituency while ensuring that all sacrifice to a similar degree."); *In re

Carey Transp. Inc.*, 816 F.2d at 90 ("The purpose of this provision [Section 1113(b)(1)(A)], according to

*Century Brass*, 795 F.2d at 273, 'is to spread the burden of saving the company to every constituency

while ensuring that all sacrifice to a similar degree.'"); *In re Maxwell Newspapers, Inc.*, 981 F.2d 85, 89

(2d Cir. 1992) (Section 1113(b)(1)(A) "requires all affected parties to compromise in the face of financial

hardship").

Today, as a result of the rejection of the January 2006 LOA, the pilots are the only

employee constituency which has contributed no concession in wages, benefits or work rules toward

Comair's attempt to reorganize and emerge from bankruptcy.

Earlier this year Comair's flight attendants, then the only employee constituency which

had made no concession in wages or benefits, argued that Comair's $8.9 million and later $7.9 million

proposed concessions were not "necessary" because the Company had already achieved sufficient

economies to facilitate reorganization.  The same argument is now made by ALPA, asserting that since

Comair has become "profitable" the pilots need not make their proportionate contribution to the debtor's

long-term prospects for success.

I reject ALPA's argument here, as I rejected the flight attendants' similar argument in my

prior decisions.   As stated in the April 26 decision:

> Thus, I reject the IBT's contentions that the flight attendants cannot or should not
> be called upon to accept a proposal merely because their requested sacrifice will not make
> or break the reorganization.  The "last man standing" argument that one relatively minor
> holdout cost constituency is not economically "necessary" to the reorganization cannot be
> sustained in the face of the requirement that all affected parties be treated "fairly and
> equitably" and the correlative requirement of the governing case law that all constituencies,
> great and small, bear their fair share of the cost of reorganization.  The statute does not
> contemplate that any single group of employees such as the flight attendants will be
> subsidized by the sacrifices of others.

Comair's November 16 proposal fully comports with the "fairly and equitably" require-

ment of Section 1113(b)(1)(A) by asking of the pilots their fair, proportionate contribution to the debtor's

reorganization.

The evidence does not support ALPA's contention that Comair's November 16 proposal

is not "fair and equitable" when compared with the reorganization concessions of other employee groups.

As noted in the April 26 decision:

> The rule in this Circuit is that the debtor's proposal must "spread the burden of saving the
> company to every constituency while ensuring that all sacrifice to a similar degree."

> The key phrase here is "to a similar degree." "Similar" cannot mean identical —
> indeed, there are too many subjective variables at play to determine what an identical
> sacrifice would be for flight attendants as compared, say, with pilots, or mechanics, or
> executives. In the end, the Court must fall back on the subjective statutory standard of fair
> and equitable.

* * *

> . . . As noted above, the word "similar" does not mean identical, and "fairly and
> equitably" surely admits of differences in treatment where justified by the particular facts
> of the case.

With respect to non-unionized employees, the evidence compels the conclusion that, after

years of pay freezes and pay cuts, Comair's non-union employees from top management on down are

uniformly at the low end of industry compensation. ALPA makes no argument with respect to the

machinists. As to the flight attendants, ALPA argues that their agreement leaves their pay rates at higher

than industry levels. Ignored is the fact that the flight attendants agreed to very substantial work rule

savings for Comair, and ALPA has not been receptive to Comair's willingness to negotiate work rule

economies in lieu of pay scale concessions. Moreover the pilots are compensated at the highest levels in

the Company, whereas the flight attendants are paid at the lower end of the spectrum at Comair.

Considering all of the evidence, I can find no basis to conclude that Comair's

November 16 proposal does not comport with the "fairly and equitably" statutory requirement.

## C.    <u>"confer in good faith"</u>

By any measure Comair has complied with its statutory obligation to "confer in good

faith," and ALPA does not argue to the contrary. The starting point for considering this issue must be the

$17.3 million concession to which ALPA and the pilots agreed in the January 2006 LOA. As shown

above, Comair has reduced the cumulative four-year value of its proposal from $62 million in the January

2006 LOA to approximately $40.3 million in Comair's November 16 proposal.  As noted by Jerrold

Glass, "Comair's proposal to ALPA would provide pilot wage rates that either exceed, match or are very

near the average rates of all other Delta Connection carriers and all other ALPA-represented carriers."  In

addition, Comair has proposed new "upsides" to allow the pilots to share in any future economic success

of the Company ("Comair's proposed profit sharing plan would be industry leading," per Jerrold Glass),

and it has repeatedly shown its bargaining flexibility on all issues.

This statutory requirement has been fulfilled.

**D.**      **the "refused to accept without good cause" requirement**

Section 1113(c) requires a finding that ALPA "has refused to accept such proposal

without good cause."  It is important to reiterate here, as above and in the July 21 decision, that the issue

is not whether ALPA made a reasonable proposal or negotiated in good faith.  The focus in Section 1113

is on the debtor's proposal, and the issue is solely whether ALPA had good cause to reject Comair's

proposal.

In this connection, ALPA argues that "a union has good cause to reject a debtor's

proposal where the union's own proposal satisfies the Section 1113 test," and it argues that "ALPA's

proposal would give Comair annual savings far exceeding the $9.4 million that Comair says its proposal

would produce and that it apparently believes it needs."  As shown above, ALPA's appraisal of its

proposal is based on insupportable costing assumptions.  When Comair's November 16 proposal is

compared to ALPA's November 15 proposal using the same set of base assumptions, so that the

comparison is meaningful, the concessions under the ALPA proposal equate to less than one-third the

concessions called for under the Comair proposal.  On the trial evidence this Court could not conclude

that the final ALPA proposal would suffice to bring the Comair pilot wage and benefit costs to levels

competitive with Comair's Delta Connection and other regional airline competitors, nor could I conclude

that the ALPA proposal would be "fair and equitable" when compared to the concessions required of or

agreed to by Comair's other employee constituencies.  In short, the ALPA proposal does not comport

with what is "necessary" to make Comair's pilot costs competitive.

But it bears repeating that Section 1113 focuses on the debtor-employer's proposal, not the union's. It is Comair's proposal which must pass muster under the several requirements of the statute, and Congress has not authorized the Court to decide a Section 1113 motion by acting as a sort of super-arbiter choosing between competing proposals. The Court is required to focus on the debtor's proposal and to grant or deny the motion based upon its conclusions as to whether the debtor's proposal meets the statutory criteria.

ALPA argued in its initial "Objection" to the motion that the Comair proposal was un-acceptable because it offered no future wage increases. In fact, the October 31 Comair proposal called for an indexing mechanism to award pay scale increases to match average pilot wage scale increases at other regional carriers, which Comair projected would equate to annual increases of 1.75%. Nevertheless, acceding to ALPA's demand for fixed cost increases Comair's November 16 proposal included fixed wage scale increases of 1.0% after twelve months, 1.5% after twenty-four months and 1.5% after thirty-six months. Moreover, Comair's proposal includes a profit sharing plan described by Mr. Glass as "industry leading."

In its Post-Hearing Brief ALPA argues that it had good cause to reject Comair's proposal because:

> [T]he Company's proposal gives no meaningful and enforceable commitment to preserve Comair's existing flying. It gives no commitment to preserve *any* of the 50-seat jets that constitute the vast majority of Comair's fleet. [citation] As to the 70-seaters, the proposal gives only a shaky commitment, contingent, among other things, on Comair getting financing for aircraft acquisition comparable to financing obtained by other DCI carriers. [citation, footnote] But then the proposal makes even that commitment unenforceable, leaving ALPA's only "remedy" for breach of the commitment to the right to re-open the contract [citation] and enter into what could be years of contract negotiations in which Comair would have no obligation to agree to any particular terms.

I cannot conclude that ALPA had "good cause" to reject Comair's proposal because Comair refused to provide a commitment to expand or maintain its fleet capacity at existing levels, or agree to a no-furlough clause or other guaranteed adverse economic consequences in terms of pilot costs if it turns out that Comair cannot honor such commitments. Obviously it is in the interests of both Comair and Delta not only to maintain but increase Comair's fleet capacity and regional lift (with the caveat that Delta perceives its future emphasis to be on 70-seat, rather than 50-seat, aircraft). But

- 25 -

experience has shown that Delta/Comair may be incapable of maintaining or increasing the Comair fleet

capacity.   It is an eminently reasonable exercise of business judgment to refuse contractual commitments

which subsequent events beyond the airline's control may render impossible to fulfill, particularly where

such a commitment is enforceable by economic consequences which could further erode the airline's

ability to compete.   The expert testimony of Jerrold Glass on job security and no-furlough clauses is

instructive.   He stated:

> 14. . . In my judgment, it is not prudent for airline management to agree to no-furlough clauses–or
> to allow them to remain in agreements.  Indeed, ALPA agreed at United, US Airways and Delta to
> eliminate the no-furlough clauses in each of the restructuring agreements reached in those
> bankruptcies.  Within the regional industry, such clauses are rare exceptions, rather than the rule.

His ultimate conclusion was that "[i]n this day and age, the only real job protection to airline employees is

to be employed at a profitable, growing airline."

Finally, ALPA has argued that it had good cause to reject the Comair proposal because

the proposal would not have been ratified by the pilots.  In this connection, it must be observed that

ALPA itself has a great deal to do with the likelihood or not of pilot ratification.  Neither ALPA nor the

pilots were happy about the far more substantial concessions provided for in the January 2006 LOA.  But

the pilots voted to ratify the January 2006 LOA, albeit by a slender margin, undoubtedly influenced by

the candid and accurate assessment of market conditions faced by mainline and regional carriers as

articulated in ALPA's January 2006 letter to its members.  Although Comair's economics may show

current improvement under the cost-plus-profit accounting modality, the fundamentals of competition in

the airline business have not changed in the last three years, as shown by Delta's economic decision

announced just last month to transfer almost half of Comair's 70-seat fleet to SkyWest.

If ALPA's pilots were fully and fairly informed of the economic and competitive *facts*

summarized in point A., above, it is by no means certain that the pilots would vote to reject the Comair

proposal, which is far more favorable to the pilots than the January 2006 LOA which they ratified.

But ultimately the Court must look to the statute in making its determinations under

Section 1113.  Perhaps recognizing that the union has a great deal of influence over whether or not its

members ratify a proposal, Congress did not include the likelihood of ratification amongst the criteria for

determination of a motion to reject under Section 1113.   If the proposal comports with the statutory

requirements, the Court must grant the motion even if the union chooses to give assurance that its

members will reject it.

**E.      the "balance of the equities"**

The final statutory test, under Section 1113(c)(3) requires the Court to find that "the

balance of the equities clearly favors rejection of such agreement."

The trial evidence compellingly demonstrates that the balance of the equities requires

rejection of the Pilot Agreement.

No one can be gratified at the prospect of reducing established wages and benefits.  No

one questions the worthiness of these skilled and dedicated pilots or the heavy responsibilities that they

bear in the air.  And no one can doubt the economic hardship of pay cuts for some whose family needs

may exceed their earning capacity in this job.  But it is in the nature of bankruptcy that, as a simple matter

of economics and competition, the debtor *cannot* meet pre-petition contract rights and expectations.  It is

the essence of a Chapter 11 reorganization that all economic constituencies of a debtor must make their

appropriate and proportionate contribution to the debtor's reorganization in order that all may benefit

from the continued viability and future success of the debtor.

In this case there is no dispute that Comair's pilot costs are materially higher than the rest

of the regional airline industry.  This competitive disadvantage has cost the airline dearly since 2003 and

threatens the jobs of every employee in the company.  Comair has seen its share of Delta regional lift

decline from 52% to 32%.  Its fleet has been reduced by 21 aircraft and it has been unable to compete for

regional lift from other mainline carriers.  Last month it lost twelve of its 25 70-seat jets to a competitive

Delta Connection carrier.  Effective January 1 Delta's annual pilot costs will increase by $8 million

annually and it will be required to contribute an additional $3.5 million to its pilot defined contribution

plan, all of which will greatly increase Comair's competitive disadvantage.

Finally, the pilots are the only employee constituency which has made no concessionary

contribution to Comair's reorganization.  Every other labor group, both union and non-union, has made

substantial financial sacrifices to support the ongoing viability of the enterprise, except the pilots.

Comair's November 16 proposal is absolutely "necessary." It is proportionate and "fair and equitable." It would leave the pilots in the mid-range of compensation and benefits amongst its competitive regional airlines, and it guarantees pay increases within the four year term and includes "industry leading" profit sharing.

As noted above, this Court cannot make a new agreement for the parties, and both sides must return to the bargaining table if they are to resolve their differences consensually. But on a motion to reject under Section 1113 this Court is called upon to decide whether Comair must continue to perform in accordance with the existing Pilot Agreement during the pendency of their future negotiations, which both sides have assured the Court may last for many months. It is in this context that the Court must be mindful of the context of its decision and the fundamental objectives of Chapter 11.

The objective facts established at trial demonstrate that Comair's pilot wage rates are not competitive and, consequently, that it cannot compete successfully in the highly-competitive world of the regional airline industry. The most dramatic evidence of this is Comair's loss of twelve 70-seat jets to a Delta Connection competitor at a time when the only significant competitive cost disadvantage remaining is Comair's pilot costs. Under the Pilot Agreement that competitive disadvantage will substantially increase upon the new year. The trial evidence leaves no doubt that the prospects for Delta's reorganization and future viability as a competitor in this industry are materially at risk as a result of Comair's existing pilot cost obligations. The sacrifice and, ultimately, jobs of all of Comair's other employee groups cannot be jeopardized by the hold-out of one labor constituency.

On this evidence, the "balance of the equities" requires that Comair be permitted to reject the Pilot Agreement.

**<u>Conclusion</u>**

For the foregoing reasons, Comair's motion to reject the Pilot Agreement is granted.

Counsel for the debtor will promptly submit an appropriate order consistent with this decision.


Dated:   White Plains, NY
             December 21, 2006


/s/Adlai S. Hardin, Jr.
                     U.S.B.J.