DEBEVOISE & PLIMPTON LLP

919 Third Avenue

New York, New York 10022

Telephone: (212) 909-6000

Facsimile: (212) 909-6836

Michael E. Wiles (MW 0962)

Richard F. Hahn (RH 5391)

Special Aircraft Attorneys for Debtors and
 Debtors in Possession

AKIN GUMP STRAUSS HAUER & FELD LLP

590 Madison Avenue

New York, NY 10022

Telephone: (212) 872-1000

Facsimile: (212) 872-1002

Daniel H. Golden (DG 5624)

David H. Botter (DB 2300)

Mitchell P. Hurley (MH 0740)

Counsel for the Official Committee of
Unsecured Creditors of Delta Air Lines, Inc., *et al.*

**Response Deadline: March 22, 2007**
**Hearing Date: March 30, 2007; 9:30 a.m. EDT**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------------- x

|  |  |  |
|---|---|---|
|  | : |  |
| **In re:** | : | **Chapter 11** |
|  | : |  |
| **DELTA AIR LINES, INC. et al.,** | : | **Case No. 05-17923 (ASH)** |
|  | : |  |
| Debtors.[1] | : | **(Jointly Administered)** |

------------------------------------------------------------------------------- x

**TIA/SLV OBJECTION 1: OBJECTION BY DELTA AIR LINES, INC. AND THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS TO CERTAIN CLAIMS FILED BY DFO
PARTNERSHIP AND THE BANK OF NEW YORK FOR TAX INDEMNITIES AND
STIPULATED LOSS VALUES**

**This Objection Relates To:**

**Tail Numbers: N914DL, N915DL, N916DL, N954DL, N955DL, N956DL, N957DL and N958DL**

| | |
|---|---|
| **Claim Nos.:** | **5330, 5335, 6694, 6741, 6976, and 6978** |
| **Filed by:** | **The Bank of New York, as Indenture Trustee** |

| | |
|---|---|
| **Claim Nos.:** | **4914, 4915, 4916, 4921, 4925, 4929, 4930 and 4938** |
| **Filed by:** | **DFO Partnership** |

---

[1]    The Debtors are: ASA Holdings, Inc.; Comair Holdings, LLC; Comair, Inc.; Comair Services, Inc.; Crown
Rooms, Inc.; DAL Aircraft Trading, Inc.; DAL Global Services, LLC; DAL Moscow, Inc.; Delta AirElite
Business Jets, Inc.; Delta Air Lines, Inc.; Delta Benefits Management, Inc.; Delta Connection Academy, Inc.;
Delta Corporate Identity, Inc.; Delta Loyalty Management Services, LLC; Delta Technology, LLC; Delta
Ventures III, LLC; Epsilon Trading, Inc.; Kappa Capital Management, Inc.; and Song, LLC.

Delta Air Lines, Inc. ("**Delta**"), together with the Official Committee of Unsecured Creditors (the "Committee"), through their undersigned counsel, hereby submit this objection (the "**Objection**") to Proof of Claim Nos. 4914, 4915, 4916, 4921, 4925, 4929, 4930 and 4938 (the "**DFO Claims**"), asserted by DFO Partnership ("**DFO**"), seeking tax indemnities with respect to leveraged lease transactions involving the aircraft bearing the registration ("tail") numbers identified above (the "**Aircraft**"); and Proof of Claim Nos. 5330, 5335, 6694, 6741, 6976, and 6978 (the "**BNY Claims**") by The Bank of New York ("**BNY**") as indenture trustee, seeking payment of stipulated loss values with respect to the same transactions.

### Summary of the Objection

As explained below, the DFO Claims and the BNY Claims overlap and seek recovery for the same matters.  As further explained below, a single loss gives rise to a single claim, and overlapping claims cannot be allowed.  In addition, the agreements that govern the transactions that are the subject of this objection provide explicitly that no tax indemnity claim exists if Delta is "required to pay" SLV.  Delta and the Committee therefore seek entry of an Order pursuant to section 502(b)(1) of the Bankruptcy Code, disallowing DFO's TIA claims.  In the alternative, Delta and the Committee seek an Order reducing the DFO Claims and/or the BNY Claims to eliminate the overlaps among them.

### Reservation of Other Objections

This Objection applies only to the extent that the DFO Claims seek payments pursuant to tax indemnity agreements and to the extent that the BNY Claims seek payments of stipulated loss value.  Delta and the Committee reserve the right to assert additional objections to the DFO Claims and the BNY Claims at a later date, including without limitation (i) additional objections to the DFO Claims pursuant to tax indemnity agreements, (ii) additional objections to the BNY

2

Claims to the extent they seek stipulated loss value with respect to the Aircraft with Tail

Numbers N954DL, N955DL, N956DL, N957DL and N958DL,[2] and (iii) objections to other

amounts, such as for legal fees or general indemnity, encompassed within the DFO Claims and

the BNY Claims.

## Background

### A.    Procedural History and Jurisdiction

1.    On September 14, 2005, Delta and a number of its affiliates (collectively, the

"**Debtors**") each filed a voluntary Chapter 11 petition.  The Debtors are debtors in possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On September 28, 2005, the

Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the

"**Committee**") pursuant to section 1102 of the Bankruptcy Code.

2.    The Debtors and the Committee previously sought to resolve certain issues

relating to leveraged lease claims pursuant to procedures that were approved by the Court in an

Order entered October 12, 2006.  During a conference on January 31, 2007, the Court suggested

that it would prefer that the Debtors assert objections to individual claims, with the aim of

identifying different transactions that would provide representative samples of the ways in which

various of the Debtors' leveraged lease agreements were worded.  This objection is the first of

the objections that are being asserted in accordance with the Court's suggestion.  The Debtors

also plan to file other objections with respect to transactions in which the underlying agreements

contain different language.

---

[2]    Pursuant to a court-approved term sheet, Delta has previously agreed not to object to claims seeking stipulated loss value with respect to the Aircraft with tail numbers N914DL, N915DL and N916DL, except to the extent set forth in this Objection.  Delta believes that DFO's rights as to these Aircraft may have been transferred, but the official claims records do not reflect any such transfer.

3

3.       This objection is asserted under section 502 of the Bankruptcy Code and

Bankruptcy Rule 3007.  This Court has subject matter jurisdiction to consider this matter under

28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue is

proper in this District under 28 U.S.C. §§ 1408 and 1409.

**B.       Leveraged Leases Generally**

4.       Many of the Debtors' aircraft are subject to leveraged lease financing

transactions.  A typical leveraged lease transaction includes these components:

a.       The parties enter into a master agreement (called a "**Participation

Agreement**") that, among other things, specifies the roles of the parties and that

identifies the other agreements that are to be executed.

b.       A trust (the "**Owner Trust**") obtains ownership of one or more aircraft.

The Owner Trust finances its acquisition of the aircraft through (i) an equity contribution

from the entity that is the beneficiary of the Owner Trust (the "**Owner Participant**") and

(ii) borrowings from one or more lenders (the "**Lenders**" or "**Lender Participants**").  In

more complicated structures, the borrowings may include various forms of public debt

financing.

c.       The Owner Trust enters into an aircraft lease (the "**Lease**") with Delta

and/or Comair, Inc.  The Lease is usually a "net" lease which requires the lessee to pay

all taxes and operating expenses.  Basic rent payments are normally sufficient to amortize

the debt payments to the Lenders, and often also provide a cash return – referred to as

"equity free cash" – for the Owner Participant.

d.       In order to provide security for the borrowed funds, the Owner Trustee

typically grants a security interest in its ownership interests in the aircraft, and also

assigns (for security purposes) its interests in the Lease (subject to certain exceptions), to

4

22392972v5

an indenture trustee acting for the lenders (the "**Indenture Trustee**").  The Indenture

Trustee makes debt payments from the lease rentals and distributes the excess (if any) to

the Owner Trust.  The Indenture Trustee usually is entitled to control the exercise of

remedies upon the occurrence of an event of a default.

5.      Leveraged lease transactions provide significant tax benefits to Owner

Participants.  Rental payments are treated as income, but interest payments on the outstanding

debt are deductible, as are transaction expenses (over time).  More importantly, the Owner

Participant in a leveraged lease transaction is entitled to take accelerated depreciation deductions

with respect to the aircraft.  The excess of these deductions over the rental income may be used

to offset other income that the Owner Participant has, or other income in the consolidated tax

group of which the Owner Participant is a member.

6.      Leases in leveraged lease transactions typically provide for the payment of a

"stipulated loss value" or a "termination value" ("**SLV**") in the event the leases are terminated

prior to their scheduled expirations.  SLV is usually determined by reference to a schedule

attached to the Lease that lists either dollar amounts to be paid (depending on the date of a

triggering event) or SLV percentages which are multiplied by a fixed number (such as the

Lessor's cost) to generate the dollar amount of SLV.  SLV can be calculated in different ways,

but typically it is calculated (i) to permit the payoff of the remaining debt, and (ii) to allow the

Owner Participant to earn an agreed-upon return through the date of termination.  The

calculation of SLV takes account of, among other things, the adverse tax consequences to the

Owner Participant from the premature termination of the lease or other events.

7.      Lessees in leveraged lease transactions usually enter into Tax Indemnity

Agreements ("**TIAs**") with Owner Participants that also relate to the potential tax consequences

of a lease termination.  Some TIAs provide either (a) indemnification to the Owner Participant if

the Lessee's acts or omissions result in the "recapture" of prior depreciation deductions or (b)

indemnification for unexpected inclusions in the Owner Participant's taxable income as a result

of certain listed causes.  Other TIAs provide indemnification to the Owner Participant for both

(a) and (b) above.

8.      As noted above, Leases typically are assigned to an Indenture Trustee.  The

assignments usually include an assignment (in whole or in part) of rights to collect SLV Claims

to use payments on SLV Claims to repay principal and interest on the outstanding debt plus

certain fees and expenses.  The assignment documents typically provide that the balance of any

SLV payment is to be returned to the Owner Trustee.  On the other hand, TIAs usually are not

assigned to other parties.

9.      A diagram of a typical leveraged lease structure is set forth below:

**Leveraged Leases**



6

22392972v5

10.     As described above, SLV Claims and TIA Claims each typically address the tax

consequences, to an Owner Participant (or the tax group of which it is a member), that result

from a premature termination of the transaction or from other specified events.  In fact, the

governing contracts usually contain provisions that recognize the overlaps between SLV Claims

and TIA Claims.  Regardless of whether or not the overlap is discussed in the contracts

themselves, however, the fact remains that SLV Claims and TIA Claims typically include

contractual rights to recovery for the same matters.  *See* William A. Macan IV, "Review of US

Tax Issues That Drive the Deals," Thirteenth Annual US Cross-Border Leasing & Structured

Finance Conference, p.19 (2002) ("Also noted is the somewhat duplicative claim to which the

documents entitle the Investor when a T[ermination ]V[alue]/SLV event occurs – the right to

receive a TIA payment for the adverse tax consequences unless and until T[ermination]

V[alue]/SLV has been paid in full.").

**C.     The Leveraged Leases At Issue in This Objection**

11.     In 1988, Delta entered into leveraged lease transactions for three McDonnell

Douglas MD-88 aircraft with tail numbers N914DL, N915DL and N916DL.  In each of the

transactions, Ford Motor Credit Company ("**FMCC**") was the Owner Participant, Wilmington

Trust Company ("**WTC**") was the Owner Trustee, and The Citizens and Southern National Bank

(later replaced by one of its affiliates) ("**C&S**") was the Indenture Trustee.  The Lender

Participant was The Trust Company Bank.

12.     In 1990, Delta entered into leveraged lease transactions for five additional

McDonnell Douglas MD-88 aircraft with tail numbers N954DL, N955DL, N956DL, N957DL,

and N958DL.  Again, in each of the transactions, FMCC was the Owner Participant, WTC was

the Owner Trustee, and C&S was the Indenture Trustee.  The Lender Participant was The

7

22392972v5

Sumitomo Bank, Limited, New York Branch, on all of the transactions except N958DL, on
which the Lender Participant was Diamond Lease (U.S.A.), Inc.

13.     In the relevant respects, the governing documents for these eight transactions
contain substantially the same provisions.  The eight transactions involved primarily the
following agreements:

a.     Delta, FMCC, the Lender, WTC (as Owner Trustee), and C&S (as
Indenture Trustee) all entered into a Participation Agreement for each of the Aircraft.

b.     WTC (as Owner Trustee) and Delta entered into a Lease for each of the
Aircraft.

c.     For each of the Aircraft, WTC and C&S entered into a Trust Indenture and
Security Agreement (a "**Trust Indenture**") granting to C&S a security interest in WTC's
ownership interests in the Aircraft and assigning for security purposes WTC's interests in
the Leases to C&S.  From the lease rentals, C&S made debt payments to the Lenders and
distributed any excess to FMCC.

d.     In each case, Delta entered into an Indemnity Agreement (as previously
defined, a "TIA") with FMCC, as described in the following paragraphs.[3]

14.     Delta understands that FMCC has sold its interests as Owner Participant in each
of the foregoing transactions to DFO, and that DFO has replaced FMCC as Owner Participant.
Delta further understands that BNY is the successor to C&S as Indenture Trustee in each of the
foregoing transactions.

---

[3]     Upon execution of appropriate confidentiality agreements, copies of the Leases, Participation
Agreements, Trust Indentures and TIAs for these transactions will be supplied to the parties named
in this Objection and to other parties who have claims in connection with leveraged lease
transactions and who wish to obtain copies.

22392972v5

15.    Each of the DFO Claims seeks payment pursuant to a TIA.  BNY has also filed

proofs of claim, identified above, seeking SLV under the Leases.

### Grounds for the Objection

16.    DFO's TIA Claims and BNY's SLV Claims seek compensation for the same

alleged loss and overlap with each other.  In fact, this overlap is recognized in the contracts

themselves.  Section 1 of each Lease includes a definition of "Net Economic Return" that makes

clear that the calculation of SLV includes an amount that is calculated to take the Owner

Participant's taxes into account and to preserve the Owner Participant's anticipated after-tax

returns:

> "Net Economic Return" means Owner Participant's internal rate of return,
> as calculated by the Owner Participant, and anticipated after-tax yield and
> aggregate after-tax cash flow utilizing the multiple investment sinking fund
> method of analysis and after-tax cash flow as a percentage of equity
> investment, all as computed in accordance with the same methodology and
> assumptions as were utilized by the Owner Participant in determining Basic
> Rent, Stipulated Loss Value and Termination Value percentages as of the
> Refunding Date.

*See* Leases, § 1.  In addition, Section 7 of the TIA in each transaction states that no TIA Claim

can be made if the Lessee is "required to pay" SLV.  Each Participation Agreement similarly

provides that SLV must be recalculated in the event that any payments are made pursuant to the

TIA. (Those provisions are found in Section 6 of some of the Participation Agreements and in

Section 8 of the other Participation Agreements.)

17.    Delta and the Committee submit that to the extent the DFO Claims and the BNY

Claims overlap and seek compensation for the same loss, only one such claim may be allowed.

In addition, based on the language of the contracts in these transactions, the DFO Claims should

be disallowed.  Alternatively, the Court should reduce the DFO Claims and/or the BNY Claims

to eliminate the overlaps among them.

22392972v5

**A.    TIA Claims and SLV Claims Overlap And Seek Recovery For The Same Loss, And To The Extent Of That Overlap Only One Claim Can Be Allowed**

18.    It is common, in the law, that a claimant may be entitled to recover for a single injury based on multiple legal theories.  Persons injured by defective products, for example, may be entitled to recover compensation under theories of strict product liability, negligence, and/or breach of warranty.  Persons who are deceived in connection with financial investments may be entitled to recover compensation under claims of fraud, negligent misrepresentation, breach of fiduciary duty, breach of contractual representations or warranties, and/or violations of federal or state disclosure statutes.  Officers and directors who seek indemnification may be entitled to rely on statutory principles, corporate by-laws or individual employment contracts to provide such indemnification.  There are a host of other examples that can easily be identified and that commonly arise both within bankruptcy and outside bankruptcy.

19.    It is generally recognized that a loss provides a claimant with only one right of payment, no matter now many separate legal theories may be invoked in support of that right of payment.  *See Diversified Graphics, Ltd. v. Groves*, 868 F.2d 293, 295 (8th Cir. 1989) ("Regardless of whether the harm was the result of negligence or breach of fiduciary duty or a combination of both, there is only a single injury and there may only be a single recovery").  This rule applies in bankruptcy cases as well.  For bankruptcy purposes, a claim constitutes a "right to payment."  *See* 11 U.S.C. § 101.  The existence of multiple *theories* under which recovery may be sought from a debtor does not change the fact that a single loss gives rise to a single right to payment and therefore a single "claim" against the debtor for bankruptcy purposes.

20.    In bankruptcy, therefore, "multiple recoveries for an identical injury are generally disallowed."  *See In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*,

10

160 B.R. 882, 894 (Bankr. S.D.N.Y. 1993).  In *Finley*, the debtor had failed to make required

pension plan contributions, resulting in an underfunding of its pension plan.  *Id.* at 893.  The

pension plan trustee, on one hand, filed a claim against the debtor to collect the unpaid plan

contributions.  *Id.* at 887.  The Pension Benefit Guarantee Corporation ("PBGC"), on the other

hand, filed a claim against the debtor for the amount of the debtor's unfunded benefit liabilities

that were insured by the government.  *Id.*  Each claim was based on a different legal theory, but

each claim related to the same "loss": that is, the economic effect (on the pension plan) of the

debtor's failure to make a required payment.  The bankruptcy trustee objected to the claims,

arguing that both claims sought recovery for an identical injury.  *Id.* at 893.

21.     The pension plan trustee and PBGC argued in *Finley* that their claims arose from

different legal rights and that, even if they overlapped, the claims should only be reduced to the

extent that the debtor's estate actually paid the separate claims in "tiny bankruptcy dollars," not

to the extent that the claims were allowed in prebankruptcy dollars.  *Id.*  The Bankruptcy Court

rejected this position, finding it to be "entirely at odds with fundamental bankruptcy policy

favoring equality of distribution among similarly situated creditors."  *Id*. at 894.  The Bankruptcy

Court noted that the claims sought compensation for the same loss (the debtor's missed pension

contribution), and that the allowance of both claims, or the reduction of the claims only to the

extent of actual payment in "tiny bankruptcy dollars," would result in a ratable distribution with

respect to that loss that would exceed the ratable distribution to all other unsecured creditors.  *Id.*

at 894.  The Bankruptcy Court held that such an outcome would be "inconsistent with the letter

and spirit of Title 11," and disallowed the claims to the extent that they sought compensation for

the same loss.  *Id.*

11

22392972v5

22.     Guided by the principles of ratable distribution and of uniform treatment for creditors, other bankruptcy courts also have stricken claims to the extent they overlap and to the extent they seek recovery for the same loss.  *See, e.g., In re Simetco, Inc.*, No. 93-61772, 1996 WL 651001, at *3  (Bankr. N.D. Ohio Feb. 15, 1996) (disallowing claim to the extent it related to the same loss that was covered by another claim in light of the potential windfall to the creditor, and holding that multiple recoveries for the same loss "would violate the principles of ratable distribution and offend the notion of uniform treatment for creditors"); *In re Chateaugay Corp.*, 115 B.R. 760, 784 (Bankr. S.D.N.Y. 1990), *aff'd,* 130 B.R. 690 (Bankr. S.D.N.Y. 1991), *vacated by agreement of the parties,* 17 Employee Benefits Cas. (BNA) 1102 (S.D.N.Y. 1993)[4] (holding that claims for unpaid contributions and claims for "plan insufficiency" were duplicative of each other, and that allowing "two dollars of claims against the same Debtor for one dollar of loss violates the principles of equality of distribution and uniformity of treatment of creditors that are fundamental to the Code"); *In the Matter of Brinke Transp., Inc.*, No. 87-03785, 1989 WL 233147, at *3 (Bankr. D.N.J. Jan. 23, 1989) (where claims substantially overlapped, striking claim that was subsumed in other claims).

23.     The same result is necessary in the present case to prevent the affront to bankruptcy policy identified in *Finley* and in the other cases cited above.  An example helps to illustrate this:

    a.     Assume, for purposes of illustration, that the required SLV payment in a given transaction were $100, of which $75 represented payment of outstanding debt and $25 represented compensation to the Owner Participant for its anticipated actual losses.

---

[4]     Although the bankruptcy court's decision in *Chateaugay* was vacated by agreement, the *Simetco* court still found the reasoning persuasive with respect to its holding that duplicative claims should be disallowed based on bankruptcy policy.  *In re Simetco, Inc.*, 1996 WL 651001, at *3 n.3.

Assume also that Delta's distributions to unsecured creditors (in bankruptcy) would be equal to 60% of creditors' claims.

       b.      Outside of bankruptcy, if Delta satisfied the $100 SLV obligation, then (i) $75 would be used to repay lenders, (ii) the remaining $25 would be paid to the Owner Participant to cover its losses, and (iii) the TIA Claim would be extinguished.  In that case,  Delta's total out-of-bankruptcy payment obligation – or the collective "right of payment" possessed by the Indenture Trustee and the Owner Participant – would be $100.

       c.      In bankruptcy, the collective "claims" asserted by the Indenture Trustee and the Owner Participant similarly should be equal to $100 – the amount of the collective "right to payment" that they would have outside of bankruptcy.  If the Court were instead to allow an SLV Claim in the amount of $100, and also to allow a TIA Claim in the amount of $25, then Delta would distribute a total of $75 with respect to those two claims (60% times $125).  That would mean a distribution of 75% with respect to an out-of-bankruptcy payment obligation of $100, or a recovery of 75% – compared  to a recovery by other unsecured creditors of only 60%.

As the courts have consistently found, such an inequitable distribution would be entirely "inconsistent with the letter and spirit of Title 11." *See Finley,* 160 B.R. at 894.

       24.      The policy against duplicative recoveries is also reflected in 11 U.S.C. § 502(e), which bars duplicative claims by a creditor and by a guarantor of the creditor's claim. *See* S. Rep. No. 95-989,  95th Cong., 2d Sess. 65 (1978), *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 5851; H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 354 (1977), *reprinted in* 1978 U.S. Code Cong. & Admin. News 5963, 6310 (stating that Section 502(e) "prevents competition

13

between a creditor and its guarantor for the limited proceeds in the estate"); *Fine Organics Corp. v. Hexcel Corp. (In re Hexcel Corp.)*, 174 B.R. 807, 811 (Bankr. N.D. Cal. 1994) ("The legislative history surrounding the enactment of 11 U.S.C. § 502(e)(1)(B) reveals that § 502(e)(1)(B) was primarily intended to protect the limited assets of a bankruptcy estate from duplicative claims").

25.   The SLV Claims asserted by BNY, and the TIA Claims asserted by DFO, are set forth in separate contracts.  However, to the extent that SLV Claims and TIA Claims provide compensation for the same economic consequences (the effect of a triggering event on the expected economic returns of the Owner Participant and the tax group of which the Owner Participant is a member), they simply represent multiple legal theories upon which the same loss may be recovered.  For bankruptcy purposes, a single loss can give rise to only one "right to payment" and only one claim against the debtor, regardless of how many separate contractual theories of recovery may be asserted.

26.   In the transactions at issue in this Objection, Leases (and SLV Claims) were assigned to the Indenture Trustee (now BNY) as security for loans that were made, with the result that TIA Claims and SLV Claims have been asserted by different parties.  However, to the extent that the SLV Claims and TIA Claims address the same losses, only one claim may be allowed, and that is true regardless of whether one of the overlapping contract claims was assigned to a different party.  The fact that the same loss is addressed in two separate contracts, and the fact that one contract is assigned to an Indenture Trustee while another is retained by the Owner Participant, cannot convert a single right to payment into two separate rights to payment.

14

**B.    By Their Terms, the TIAs Extinguish DFO's TIA Claims If
Any Amount Is Due for SLV**

27.    In the transactions covered by this Objection, the parties' agreements address the

overlap between TIA Claims and SLV Claims, and make clear that the TIA Claim must be

disallowed whenever SLV is due.  In particular, Section 7 of each TIA provides, in pertinent

part, as follows:

> "[T]he Owner Participant shall not be entitled to any payment . . . in respect
> of any Loss or any Foreign Tax Credit Loss arising as a result of one or more
> of the following events:
>
> . . . .
>
> (c) any event whereby a party to any of the Operative Documents is
> required to pay Stipulated Loss Value or Termination Value, except to the
> extent that the calculation of Stipulated Loss Value or Termination Value
> does not accurately reflect the timing of the loss of any tax benefit reflected
> in the calculation of Stipulated Loss Value or Termination Value. . . ."

The foregoing language left open the possibility of a claim in a limited circumstance (that is, if

the SLV calculation did not accurately account for the actual timing of a tax loss), but otherwise

makes clear that there is no tax indemnity claim if Delta is "required to pay" Stipulated Loss

Value.

28.    BNY has filed claims to recover SLV under each of the Leases.  The bases for

these claims is that Delta is "required to pay" SLV under Section 15(e) of each of the Leases.

Section 7 of each of the TIAs therefore bars the DFO Claims.

29.    Each of the TIAs is governed by New York law.  The terms of the TIAs are clear

and unambiguous, and they must be enforced as written.  *See Schmidt v. Magnetic Head Corp.*,

97 A.D.2d 151, 157, 468 N.Y.S.2d 649, 654 (2d Dep't 1983); *805 Third Ave. v. M.W. Realty

Assoc.*, 58 N.Y.2d 447, 451, 448 N.E.2d 445, 461 N.Y.S.2d 778 (1983); *Rowe v. Great Atl. &

Pac. Tea Co.,* 46 N.Y.2d 62, 69, 412 N.Y.S.2d 827, 831 (N.Y. 1978).

30.    For these reasons, DFO's claims should be disallowed to the extent they assert tax indemnity claims for any of the Aircraft.

**C.    Alternatively, the Participation Agreements Require Adjustment of The SLV Claims Asserted By BNY If Any Amount Is Due under the TIAs**

31.    Each of the Participation Agreements with respect to the foregoing transactions provides (either in section 6 or section 8 of the Participation Agreement) that if any payment is made pursuant to an indemnity agreement, SLV must be recomputed "to the extent any such payment affects such Stipulated Loss Value and Termination Value amounts."  Thus, to the extent this Court were to hold that any amount is due under the TIAs despite Section 7 of the TIAs, the Participation Agreements would require that the SLV Claims asserted by BNY be recomputed to eliminate their overlap with the DFO Claims.

**Procedure for Responses to Objection**

32.    Any party wishing to oppose the relief requested herein must file a response in accordance with the Court's Order Establishing Procedures for Claims Objections entered October 12, 2006, docket number 3381 (the "**Claims Objection Procedures Order**"), a copy of which is available at no charge on the Debtors' Case Information Website (located at *www.deltadocket.com*).  In the event a party does not wish to oppose the relief requested herein, it is not necessary for such party to file any response with the Court, notify Delta and the Committee or their counsel or undertake any further action.

33.    The deadline to file a response to this Objection is noted on the cover page hereof. Consistent with the Claims Objection Procedures Order, no response shall be accepted or considered unless, prior to such deadline, it is filed with the Court, 300 Quarropas Street, White Plains, New York 10601 and actually received by (a) counsel to the Debtors, Debevoise & Plimpton LLP, 919 Third Avenue, New York, NY 10022, Attn: Michael E. Wiles, and (b) the

16

22392972v5

attorneys for the Official Committee of Unsecured Creditors, Akin Gump Strauss Hauer & Feld

LLP, 590 Madison Avenue, New York, New York 10022, attn: David H. Botter, Esq.  In

addition, as set forth in the Claims Objection Procedures Order, no response shall be accepted or

considered by the Court unless it includes, among other things, the following:

>           a.          an appropriate caption, including the title and date of the objection to
>
> which the response is directed;
>
>           b.          the name of the claimant, the claim number of the proof of claim (as
>
> identified on the claims register maintained on the Debtors' case information website
>
> (located at *www.deltadocket.com*)) and a description of the basis for the amount of the
>
> proof of claim;
>
>           c.          a concise statement setting forth the reasons why the Court should not
>
> sustain the objection, including, but not limited to, the specific factual and legal bases
>
> upon which the claimant relies in opposing the objection;
>
>           d.           copies of any documentation and other evidence upon which the claimant
>
> will rely in opposing the objection at a hearing;[5]
>
>           e.          sworn declarations of persons with personal knowledge of any new facts
>
> relied upon to support the response;[6] and
>
>           f.          the name, address, telephone number and facsimile number of a person
>
> authorized to reconcile, settle or otherwise resolve the claim on the claimant's behalf.

---

[5]    If the claimant cannot timely provide such documentation and other evidence, the claimant is required to provide a detailed explanation in the response as to why it was not possible to timely provide such documentation and other evidence.

[6]    If the claimant cannot timely provide such declarations, the claimant is required to provide a detailed explanation in the response as to why it was not possible to timely submit such declarations.

17

22392972v5

34.     A failure by the Claimant to file a response in such manner shall be deemed a waiver by the Claimant of all rights to respond to this Objection and consent by the Claimant to the relief requested in this Objection with respect to the Claim.

35.     Pursuant to the Claims Objection Procedures Order, if a proper and timely response with respect to the Claim is not filed and served in compliance with the procedures specified therein, the Court may sustain this Objection with regard to the Claim without further notice or a hearing.

36.     If the relief requested herein is granted, Bankruptcy Services, LLC, as the Debtors' authorized claims agent, will be authorized and directed to amend the claims register accordingly.

### Service of Notice

37.     Delta and the Committee have served notice of this Objection consistent with the procedures set forth in the Claims Objection Procedures Order.  In addition, consistent with the procedures described in the Court's Order Approving Notice, Case Management and Administrative Procedures entered October 6, 2005 (the "**Case Management Order**"), Delta and the Committee have served notice of this Objection on (a) the Core Parties (as that term is defined in the Case Management Order) and (b) the Non-ECF Service Parties (as that term is defined in the Case Management Order).

22392972v5

## **Relief Requested**

38.     For the foregoing reasons, Delta and the Committee respectfully request (<u>a</u>) the

disallowance of the DFO Claims; (<u>b</u>) in the alternative, the reduction of the DFO Claims and/or

the BNY Claims to eliminate the overlap among them; and (<u>c</u>) such other and further relief as is

deemed just and proper.

Dated:  New York, New York
        February 20, 2007

                                        Respectfully submitted,

                                        DEBEVOISE & PLIMPTON LLP


                                        /s/ Michael E. Wiles                          _____
                                        Michael E. Wiles (MW 0962)
                                        Joseph P. Moodhe (JM 6068)
                                        Richard F. Hahn (RH 5391)
                                        919 Third Avenue
                                        New York, New York 10022
                                        Telephone:  (212) 909-6000
                                        Facsimile:   (212) 909-6836
                                        Special Aircraft Attorneys for Debtors and
                                          Debtors in Possession


                                        AKIN GUMP STRAUSS HAUER & FELD LLP


                                        /s/ Mitchell P. Hurley
                                        Daniel H. Golden (DG 5624)
                                        David H. Botter (DB 2300)
                                        Mitchell P. Hurley (MH 0740)
                                        590 Madison Avenue
                                        New York, NY 10022
                                        Telephone: (212) 872-1000
                                        Facsimile: (212) 872-1002
                                        Counsel for the Official Committee of Unsecured
                                        Creditors of Delta Air Lines, Inc., *et al.*

19

22392972v5