Daniel H. Golden (DG-5624)
Lisa G. Beckerman (LB-9655)
David H. Botter (DB-2300)
AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue
New York, NY 10022
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

Attorneys for the Official Committee of Unsecured
Creditors of Delta Air Lines, Inc., et al.

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                          :
In re:                                    :        Chapter 11
                                          :
DELTA AIR LINES, INC., et al.,            :        Case No. 05-17923 (ASH)
                                          :
                            Debtors.      :        (Jointly Administered)
------------------------------------------------------------x

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
MEMORANDUM OF LAW IN (I) SUPPORT OF CONFIRMATION OF
DEBTORS' JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11
OF THE BANKRUPTCY CODE AND (II) RESPONSE TO CERTAIN OBJECTIONS**

# TABLE OF CONTENTS

**Page**

**I.**     PRELIMINARY STATEMENT ....................................................................................1

**II.**    BACKGROUND ........................................................................................................2

**III.**   ARGUMENT ............................................................................................................4

    A.   The Debtors Satisfy the Burden of Proof Under Section 1129 of the Bankruptcy Code ..................................................................................................4

    B.   The Plan Complies with Section 1122 of the Bankruptcy Code: Classification of Claims and Interests ........................................................................6

    C.   The Plan Complies with Section 1123 of the Bankruptcy Code: Contents of the Plan ......................................................................................................8

        **1.**   11 U.S.C. § 1123(a) ......................................................................................8

        **2.**   11 U.S.C. § 1123(b) ....................................................................................12

    D.   The Plan Satisfies the Requirements Under Section 1129(a) of the Bankruptcy Code ................................................................................................15

        **1.**   The Plan Satisfies the Requirements of 11 U.S.C. § 1129(a)(1) .......................15

        **2.**   The Plan's Proponents Have Complied with the Provisions of Title 11 as Required by 11 U.S.C. § 1129(a)(2) .....................................................15

        **3.**   The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law – 11 U.S.C. § 1129(a)(3) ...................................................17

        **4.**   The Plan Provides for Court Approval of Payment of Services and Expenses – 11 U.S.C. § 1129(a)(4) .................................................................19

        **5.**   All Necessary Information Regarding the Directors and Officers of the Debtors Under the Plan Has Been Disclosed – 11 U.S.C. § 1129(a)(5) ..........20

        **6.**   The Plan Does Not Contain Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission – 11 U.S.C. § 1129(a)(6) ................................................................................................21

        **7.**   The Plan is in the Best Interests of Creditors and Interest Holders – 11 U.S.C. § 1129(a)(7) .................................................................................22

        **8.**   Acceptance by All Impaired Classes – 11 U.S.C. § 1129(a)(8) .......................23

        **9.**   The Plan Provides for Payment in Full of All Allowed Priority Claims – 11 U.S.C. § 1129(a)(9) .................................................................................23

        **10.**  The Plan Has Been Accepted by at Least One Impaired Class that is Entitled to Vote – 11 U.S.C. § 1129(a)(10) ......................................................25

        **11.**  The Plan is Not Likely to be Followed by Liquidation or the Need for Further Financial Reorganization – 11 U.S.C. § 1129(a)(11) ..........................25

**12.**   The Plan Provides for Full Payment of All Statutory Fees – 11 U.S.C. § 1129(a)(12) .................................................................................28

**13.**   The Plan Provides for the Treatment of Retiree Benefits in Accordance with 11 U.S.C. § 1129(a)(13) ...........................................................29

E.   The Plan Satisfies the "Cram Down" Requirements Under Section 1129(b) of the Bankruptcy Code...............................................................................29

**1.**   The Plan Does Not Discriminate Unfairly with Respect to the Deemed Rejected Classes...............................................................................30

**2.**   The Plan is Fair and Equitable with Respect to the Deemed Rejected Classes.................................................................................................30

F.   The Limited Release, Exculpation, and Injunction Provisions of the Plan Should be Approved....................................................................................30

**1.**   Exculpation ...........................................................................................30

**2.**   Injunction ..............................................................................................30

**3.**   Release By the Debtors .........................................................................30

**4.**   Voluntary Releases by the Holders of Claims and Interests .................30

IV.   RESPONSE TO 10% BONDHOLDER OBJECTION....................................................30

A.   The 10% Holders Do Not Have Standing to Contest the Trustee's Claim....................30

B.   The Plan's Description of the Treatment of Claims in Delta Class 4 is Sufficient, and Therefore the Timing of the Settlement Motion Does Not Cause the Plan to Violate Section 1123(a)(3) ............................................................30

C.   The Plan Treats the Bondholder Claims the Same as All Other Allowed Claims in Delta Class 4, and Therefore Complies with Section 1123(a)(4) ............................30

D.   The Debtors Proposed the Plan in Good Faith and in Compliance with Applicable Laws, and Therefore the Plan Complies with Section 1129(a)(3)..............30

E.   Neither the Settlement Motion or Approval Thereof Will Modify the Plan for Purposes of Section 1127(c), and Therefore No Resolicitation is Required................30

F.   The Plan's Release Provisions are Proper and Consistent with Settled Law................30

V.   RESPONSE TO *PRO SE* OBJECTIONS .........................................................................30

CONCLUSION...................................................................................................................30

## I.   PRELIMINARY STATEMENT

1.      The Official Committee of Unsecured Creditors (the "Committee") of Delta Air

Lines, Inc., et al. (the "Debtors") submit this memorandum of law (the "Memorandum") in

support of confirmation of the Debtors' Joint Plan of Reorganization Under Chapter 11 of the

Bankruptcy Code (collectively, and as may be amended, supplemented, or otherwise modified

from time to time, the "Plan") pursuant to section 1129 of the Bankruptcy Code.[1]

2.      On February 7, 2007, this Court approved the Debtors' Disclosure Statement For

Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the

"Disclosure Statement") as containing adequate information of a kind and in sufficient detail to

enable a hypothetical investor of the relevant classes under the Plan to make an informed

judgment whether to accept or reject the Plan.  Thereafter, the Debtors commenced their

solicitation of votes to accept or reject the Plan.  As evidenced by the Sullivan Affidavit (as

defined below), the classes of Claims entitled to vote on the Plan overwhelmingly voted to

accept the Plan by a margin ranging between 97% and 99% (in value) and 95% and 99% (in

number).

3.      Indeed, only twenty-five objections to the Debtors' proposed confirmation of the

Plan were filed, which is astonishing given the sheer size of the Debtors' chapter 11 cases.  Of

these objections, the Debtors were successful in resolving all of them except:

- the Limited Objection to Confirmation of the Debtors' Proposed Joint Plan of

    Reorganization by Aircraft Creditors (the "Aircraft Creditor Objection")[2];

---

[1] All capitalized terms used, but not defined herein shall have the meaning given to such terms in the Plan.

[2] The Aircraft Creditor Objection to confirmation has been partially resolved.  The portion of the Aircraft Creditor Objection that still remains unresolved is the argument that the Debtors cannot legally defer the decision to assume or reject executory contracts or leases to the post-Effective Date period and that the Plan violates section 365 of the Bankruptcy Code.  Similar treatment objections were filed by National City Bank and National City Commercial

- Corrected Objection of the Ad Hoc Committee of Kenton County Bondholders to the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "10% Bondholder Objection"); and

- three *pro se* objections filed by: (i) Mr. J. Anthony Guajardo, (ii) Ms. Dana Mehen, and (iii) Ms. Laverne Kelly Lusk, respectively (the 10% Bondholder Objection, along with those of Guajardo, Mehen and Lusk, are collectively referred to as the "Objections"). Upon information and belief, Ms. Mehen and Ms. Lusk are former Delta employees.

4.      Through the course of these cases, the Debtors, with the active participation of the Committee, have achieved the very result envisioned by Congress in enacting the Bankruptcy Code – reorganization of a debtor enterprise with the attendant preservation of jobs and deployment of estate resources to maximize asset values for the debtor's creditor constituencies. The Plan is the product of intense and, at times, arduous negotiations among the Debtors, the Committee, and numerous other constituencies to reach a fair, equitable, and value-maximizing resolution of the complex business and legal issues presented by the Debtors' chapter 11 cases.

5.      For these reasons and those set forth below, the Committee believes that the Plan satisfies all of the confirmation requirements of the Bankruptcy Code, including sections 1122, 1123, 1125, 1126, and 1129 and, therefore, that the Objections should be overruled and the Plan confirmed.

## II.      BACKGROUND

6.      Delta Air Lines, Inc., and those of its subsidiaries that are Debtors in the above-captioned chapter 11 cases, constitute one of the largest commercial airline networks in the world.  However, Delta was not spared from the economic downturn that the commercial airline

---

Capital Company, LLC, and The Bank of New York.  The Debtors will be addressing these objections in a separate

industry in the United States has faced since early 2001. The financial impact of 9/11, the expansion of low-cost carriers, the decline in business travel, the growth of the Internet as an outlet for ticket sales, and the continually escalating cost of fuel all contributed to what became the worst financial crisis in Delta's history. Indeed, from January 1, 2001 through June 30, 2005 Delta's net losses totaled approximately $10 billion.

7.       Accordingly, on September 14, 2005 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code. As of the Petition Date, the Debtors had approximately $7.8 billion principal amount of secured debt outstanding, approximately $6.2 billion of secured aircraft-related debt outstanding, and approximately $3.7 billion of unsecured debt outstanding.

8.       On September 28, 2005, pursuant to section 1102 of the Bankruptcy Code, the United States Trustee appointed the Committee. The Committee currently consists of nine members.[3]

9.       The Committee has been very active throughout these cases and has worked tirelessly with the Debtors to achieve the best recovery possible for unsecured creditors. During the course of these cases, the Debtors and the Committee have:

- reached a settlement with the Air Line Pilots Association, International ("ALPA"), the collective bargaining representative of the Debtors' approximately 6,800 pilots, regarding a new collective bargaining agreement for the Debtors' pilots after a prolonged 1113 process both in court and through arbitration;

---

pleading to be filed with the Court. Thus, this memorandum does not address those issues.

[3] The Committee is comprised of the following entities: U.S. Bank National Association and U.S. Bank Trust National Association; Boeing Capital Corp.; Pension Benefit Guaranty Corporation; The Coca-Cola Company; Pratt & Whitney, a division of United Technologies Corporation; Air Line Pilots Association, International; Carval Investors, LLC; Fidelity Advisor Series II: Fidelity Advisor High Income Advantage Fund; and The Bank of New York. In addition, the Kenton County Airport Board (Cincinnati/Northern Kentucky Airport) and the Hartsfield-Jackson Atlanta International Airport are *ex officio* members of the Committee.

- undertaken a comprehensive fleet restructuring plan to better reflect current market rates and to right-size the Debtors' fleet to more closely match its needs;

- renegotiated and restructured the Debtors' operations and obligations at many airports in order to reduce costs and better serve the Debtors' future network plans;

- significantly reduced the Debtors' operating expenses, including renegotiating and rejecting many unfavorable contracts and leases;

- reached a comprehensive settlement with the Pension Benefit Guaranty Corporation (the "PBGC") that consensually resolved virtually all of the outstanding issues between the Debtors and the PBGC with respect to the termination of the Delta Pilots Retirement Plan;

- negotiated a settlement with both the Debtors' pilot and non-pilot retiree committees regarding modifications to the healthcare benefits of each constituency that allow the Debtors to reduce their overall retiree healthcare costs while maintaining a significant level of benefits for retirees;

- reached a settlement with Comair, Inc.'s pilots, flight attendants, and machinists unions after an arduous 1113 process that reduced the labor costs associated with each group;

- determined, after an extensive due diligence process and extensive discussions, not to pursue an offer made for Delta by US Airways;

- negotiated a Plan that has received overwhelming support from all voting constituencies; and

- selected a new and dynamic board of directors to govern the Debtors going forward.

## III.    ARGUMENT

### A.    The Debtors Satisfy the Burden of Proof Under Section 1129 of the Bankruptcy Code

10.    To confirm the Plan, the Debtors must demonstrate that the Plan satisfies the applicable provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.  As set forth by the United States Court of Appeals for the Fifth Circuit in *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enter., Ltd. II (In re Briscoe Enter., Ltd. II)*:

> The combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof under both § 1129(a) and in a cramdown.

994 F.2d 1160, 1165 (5th Cir. 1993); *see also In re Spiegel, Inc.*, No. 03-11540, 2005 WL 1278094, *4 (Bankr. S.D.N.Y. May 25, 2005) ("The Debtors, as proponents of the Plan, have met their burden of proving the elements of sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence."); *In re Penn Traffic Co.*, No. 03-22945, 2005 Bankr. LEXIS 785, at *10 (Bankr. S.D.N.Y. Mar. 11, 2005) ("The Debtors, as proponents of the Plan, have met their burden of proving the elements of sections 1129(a) and (b) of the Bankruptcy Code . . . by a preponderance of the evidence, which is the applicable evidentiary standard in this Court for confirmation of the Plan."); *5 Collier on Bankruptcy* ¶ 1129.02[4], at 1129-22 (15th rev. ed. 1993) ("[T]he proponent bears the burden of both introduction of evidence and persuasion that each subsection of section 1129(a) has been satisfied.").

11.     Based upon: the Disclosure Statement and all exhibits thereto, including the financial projections, the valuation and liquidation analyses; the Affidavit of James Katchadurian of Bankruptcy Services LLC Regarding Methodology for the Tabulation of and Results of Voting with Respect to the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated April 18, 2007 (the "Katchadurian Affidavit"); the Certification of Jane Sullivan of Financial Balloting Group LLC with Respect to the Tabulation of Votes on the Debtor's Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated April 18, 2007 (the "Sullivan Affidavit"); and the declarations of Edward H. Bastian and Timothy R. Coleman in support of the Plan, filed on April 23, 2007, the Debtors have proven by a preponderance of the evidence that all subsections of section 1129 of the Bankruptcy Code have been satisfied in respect of the Plan.

### B.   The Plan Complies with Section 1122 of the Bankruptcy Code:  Classification of Claims and Interests

12.    Section 1122 of the Bankruptcy Code governs the classification of claims or interests under a plan and provides, in pertinent part, as follows:

> (a)    Except as provided in subsection (b) of this section, a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

> (b)    A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

11 U.S.C. § 1122.  Under this section, the relevant inquiries are (i) whether all claims and interests in a class have substantially similar rights with respect to the debtor's assets, and (ii) whether there are sufficient business or legal justifications to justify separate classes of similar claims or interests.  *See In re Chateaugay Corp.,* 89 F.3d 942, 949 (2d Cir. 1996).

13.    Section 4.1 of the Plan provides for the classification of Claims and Interests in sixteen individual Classes, each based upon the legal nature and/or priority of such Claims and Interests.  DIP Facility Claims, Amex Post-Petition Facility Claims, Other Administrative Claims, Professional Fee Claims, and Priority Tax Claims are not classified and are separately treated in sections 3.1 and 3.2 of the Plan, respectively.  The Classes of Claims and Interests are as follows:

### Claims and Interests in Delta Debtors

| | |
|---|---|
| **Delta Class 1** | Other Priority Claims against the Delta Debtors. |
| **Delta Class 2** | Secured Aircraft Claims against the Delta Debtors. |
| **Delta Class 3** | Other Secured Claims against the Delta Debtors. |
| **Delta Class 4** | General Unsecured Claims against the Delta Debtors. |
| **Delta Class 5** | Non-Convenience Class Retiree Claims against Delta. |
| **Delta Class 6** | Convenience Class Claims against the Delta Debtors. |

**Delta Class 7a**        Interests in Delta.

**Delta Class 7b**        Interests in the Delta Subsidiary Debtors.

**Delta Class 8**         Securities Litigation Claims against the Delta Debtors.

### Claims and Interests in Comair Debtors

**Comair Class 1**        Other Priority Claims against the Comair Debtors.

**Comair Class 2**        Secured Aircraft Claims against the Comair Debtors.

**Comair Class 3**        Other Secured Claims against the Comair Debtors.

**Comair Class 4**        General Unsecured Claims against the Comair Debtors.

**Comair Class 5**        Convenience Class Claims against the Comair Debtors.

**Comair Class 6**        Interests in the Comair Debtors.

**Comair Class 7**        Securities Litigation Claims against the Comair Debtors.

14.    Each of the Claims or Interests in each particular Class is substantially similar to the other Claims or Interests in such Class.  Accordingly, the Debtors' classification of Claims and Interests does not prejudice the rights of holders of such Claims and Interests.  *See In re Holywell Corp.,* 913 F.2d 873, 880 (11th Cir. 1990) (plan proponent allowed considerable discretion to classify claims and interests according to facts and circumstances of case so long as classification scheme does not violate basic priority rights or manipulate voting).  The classification of Claims and Interests in the Plan complies with section 1122(a) of the Bankruptcy Code.

15.    In addition, in accordance with Bankruptcy Code section 1122(b), for purposes of administrative convenience, general unsecured claims against the Debtors in an amount of $2,000 or less have been classified together in Delta Class 6 and Comair Class 5, respectively.

C.    **The Plan Complies with Section 1123 of
the Bankruptcy Code:  Contents of the Plan**

1.    *11 U.S.C. § 1123(a)*

16.    Section 1123(a) of the Bankruptcy Code sets forth seven (7) requirements[4] with

which this Plan must comply.  *See* 11 U.S.C § 1123(a).  As demonstrated below, the Plan fully

complies with those requirements.

a.    ***The Plan Designates Classes of Claims
and Interests – 11 U.S.C. § 1123(a)(1)***

17.    Section 1123(a)(1) of the Bankruptcy Code requires that a plan designate classes

of claims, other than claims of a kind specified in Bankruptcy Code sections 507(a)(1)

(administrative expense claims), 507(a)(2) (claims arising during the "gap" period in an

involuntary case), or 507(a)(8) (priority tax claims).  *See* 11 U.S.C. § 1123(a)(1).  As set forth

above, section 4.1 of the Plan designates thirteen Classes of Claims and three Classes of Interests

and therefore complies with section 1123(a)(1) of the Bankruptcy Code.

b.    ***The Plan Specifies Unimpaired Classes – 11 U.S.C. § 1123(a)(2)***

18.    Section 1123(a)(2) of the Bankruptcy Code requires that a plan "specify any class

of claims or interests that is not impaired under the plan."  *See* 11 U.S.C. § 1123(a)(2).  Section

4.1 of the Plan specifies the Classes of Claims and Interests that are Unimpaired under the Plan

and thus the Plan complies with section 1123(a)(2) of the Bankruptcy Code.

c.    ***The Plan Adequately Specifies the
Treatment of Impaired Classes – 11 U.S.C. § 1123(a)(3)***

19.    Section 1123(a)(3) of the Bankruptcy Code requires that a plan "specify the

treatment of any class of claims or interests that is impaired under the plan."  *See* 11 U.S.C.

§ 1123(a)(3).  Section 4.2 of the Plan specifies the treatment of those Claims and Interests that

are Impaired under the Plan and thus the Plan complies with section 1123(a)(3) of the

Bankruptcy Code.

### d.    The Plan Provides for the Same Treatment for Claims or Interests Within the Same Class – 11 U.S.C. § 1123(a)(4)

20.    Section 1123(a)(4) of the Bankruptcy Code requires that a plan "provide the same

treatment for each claim or interest of a particular class, unless the Holder of a particular claim or

interest agrees to a less favorable treatment of such particular claim or interest."  11 U.S.C.

§ 1123(a)(4).  This provision provides creditors of the same class with a right to equality of

treatment.  Section 4.2 of the Plan provides for equality of treatment for each Claim or Interest

within a particular Class, except to the extent that a holder of a Claim and the Debtors have

agreed to a different treatment, and thus the Plan complies with section 1123(a)(4) of the

Bankruptcy Code.

### e.    The Plan Provides Adequate Means for its Implementation – 11 U.S.C. § 1123(a)(5)

21.    Section 1123(a)(5) of the Bankruptcy Code requires a plan of reorganization to

"provide adequate means for the plan's implementation" and sets forth several examples of such

means, including retention by the debtor of property of the estate, sales of the debtor's property,

satisfaction or modification of any lien, and issuance of securities of the debtor in exchange for

claims or interests.  11 U.S.C. § 1123(a)(5).  Article 6 of the Plan provides for, among other

things: (i) any restructuring transaction deemed necessary or appropriate to implement the

provisions of the Plan or to perform Roll-Up Transactions, including, but not limited to, the

merger, dissolution, or transfer of assets between or among the Debtors (*See* Plan § 6.2); (ii)

entry into the New Credit Facility (*See* Plan § 6.3); (iii) the issuance of the New Delta ALPA

---

[4] Section 1123(a)(8) does not apply to the Debtors and is therefore not discussed herein.

Notes (*See* Plan § 6.4); (iv) the cancellation of existing securities and notes, including the Old

Notes, the Old Aircraft Securities, and the Old Stock (*See* Plan § 6.6); (v) the issuance by the

Reorganized Debtors of the New Plan Securities (*See* Plan § 6.7); (vi) the listing of the New

Delta Common Stock on either the New York Stock Exchange or NASDAQ (*See* Plan § 6.10);

(vii) restrictions on the Transfer of New Delta Common Stock to protect Delta's NOLs; and (viii)

the implementation of the Compensation Programs.  Moreover, the Debtors have filed with this

Court many of the documents that will govern the operations of Reorganized Delta.  Thus, the

Plan complies with section 1123(a)(5) of the Bankruptcy Code.

> ### f.    Prohibition of the Issuance of Nonvoting Equity Securities – 11 U.S.C. § 1123(a)(6)

22.    Section 1123(a)(6) of the Bankruptcy Code requires a plan of reorganization to

provide for the inclusion in a debtor's corporate charter of provisions prohibiting the issuance of

non-voting equity securities and arranging "an appropriate distribution" of power among the

classes of securities possessing voting power.  *See* 11 U.S.C. § 1123(a)(6).  Section 12.2(a) of the

Plan expressly provides that:

> The New Delta Certificate of Incorporation shall be amended, and
> each of the Reorganized Subsidiary Debtors' Certificates of
> Incorporation shall be deemed, without further action, to be
> amended, to include (i) a provision prohibiting the issuance of
> nonvoting equity securities to the extent required by section
> 1123(a)(6) of the Bankruptcy Code and (ii) a provision setting
> forth an appropriate distribution of voting power among classes of
> equity securities possessing voting power, including, in the case of
> any class of equity securities having a preference over another
> class of equity securities with respect to dividends, adequate
> provisions for the election of directors representing such preferred
> class in the event of default in the payment of such dividends.

*See* Plan § 12.2(a).  The Plan therefore complies with section 1123(a)(6) of the Bankruptcy Code.

g.      ***The Plan Contains Appropriate Provisions with
Respect to the Selection of Post-Confirmation
Directors and Officers – 11 U.S.C. § 1123(a)(7)***

23.      Section 1123(a)(7) of the Bankruptcy Code provides that a plan may "contain
only provisions that are consistent with the interests of creditors and equity security holders and
with public policy with respect to the manner of selection of any officer, director, or trustee under
the plan and any successor to such officer, director, or trustee." 11 U.S.C. § 1123(a)(7).

24.      Section 12.3(d) of the Plan provides that the principal officers of each Debtor
immediately prior to the Effective Date shall serve as the initial officers of the respective
Reorganized Debtor as of the Effective Date. *See* Plan § 12.3(d). Section 12.3(b) of the Plan
provides that the initial board of directors of Reorganized Delta shall consist of eleven members
whose names and biographical information are set forth in a list filed by the Debtors on March
30, 2007. *See* Plan § 12.3(b). Section 12.3(c) of the Plan provides that the board of directors of
each Debtor other than Delta immediately prior to the Effective Date shall continue to serve in
their current capacities as of the Effective Date, except as specified by the Debtors in a Plan
Supplement. *See* Plan § 12.3(c). The provisions of the Plan for the selection of directors and
officers are consistent with the interests of creditors and equity security holders and with public
policy as to the manner and selection of any officer, director, or trustee and any successor
thereto. Moreover, as described further below, such Plan provisions satisfy the requirements in
section 1129(a)(5) of the Bankruptcy Code in that the Debtors have disclosed, on or prior to the
Confirmation Date, the identity and affiliations of any Person proposed to serve on the initial
boards of directors of Reorganized Delta and, to the extent such Person is an insider, the nature
of any compensation to be paid to such Person. *See* List of New Delta Board Members filed
March 30, 2007; Summary of Emergence Compensation Programs filed March 20, 2007. The
classification and composition of the boards of directors of each of the Reorganized Debtors are

consistent with each Reorganized Debtor's amended or restated certificate of incorporation, as applicable, the other applicable constituent documents of each Reorganized Debtor, and applicable law. The Plan therefore complies with section 1123(a)(7) of the Bankruptcy Code.

### 2. *11 U.S.C. § 1123(b)*

25.      Section 1123(b) of the Bankruptcy Code sets forth the permissive provisions that may be incorporated into a chapter 11 plan, including any "provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." *See* 11 U.S.C. § 1123(b)(6).

### a. *The Plan Impairs Certain Classes and Leaves Others Unimpaired – Section 1123(b)(1)*

26.      Section 1123(b)(1) provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests." 11 U.S.C. § 1123(b)(1). Pursuant to section 4.1 of the Plan, (a) Delta Classes 1, 2, 3, and 7b and Comair Classes 1, 2, 3, and 6 are Unimpaired, and (b) Delta Classes 4, 5, 6, 7a, and 8 and Comair Classes 4, 5, and 7 are Impaired. The Plan complies with section 1123(b)(1) of the Bankruptcy Code.

### b. *Treatment of Executory Contracts and Unexpired Leases – Section 1123(b)(2)*

27.      Section 1123(b)(2) allows a Plan to provide for the assumption, assumption and assignment, or rejection of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code. Article 10 of the Plan provides for the rejection of all executory contracts and unexpired leases that exist between the Debtors and any other person or entity as of, and subject to the occurrence of, the Effective Date except for any executory contract or unexpired lease that (i) has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (ii) is listed on Schedule 10.2(a), 10.2(b), 10.2(c), or 10.3(d) to the Plan, (iii) is the subject of a separate motion filed under section 365 of the Bankruptcy Code by the Debtors prior to the Effective Date; (iv) is assumed, rejected, or otherwise treated under

sections 10.3 and 10.4 of the Plan; or (v) as to which a Treatment Objection has been filed and

properly served prior to the Treatment Objection Deadline.  On March 30, 2007, the Debtors

filed Plan Supplements which listed many of the executory contracts and unexpired leases to be

assumed or rejected by the Debtors in connection with the Plan.  Prior to the confirmation

hearing, the Debtors will be filing additional schedules with the Court.

### c.    *Settlement or Retention of Claims or Interests – Section 1123(b)(3)*

28.    Section 1123(b)(3) provides that a plan may provide for settlement or retention of

any claim or interest belonging to the debtor.  Section 13.10 of the Plan provides that

Reorganized Delta shall have the right to prosecute any avoidance or recovery actions that

belong to the Debtors or debtors in possession and that are listed on Schedule 13.10.  The Plan

provides, however, that the Debtors will waive all other avoidance or recovery actions, except

that the Debtors reserve their rights to assert such claims as a defense or counterclaim in any

Cause of Action brought by any creditor.  *See* Plan at § 13.10.

### d.    *Other Appropriate Measures – Section 1123(b)(6)*

29.    Section 1123(b)(6) is a catch-all provision that permits inclusion of any

appropriate provision so long as it is consistent with the applicable provisions of the Bankruptcy

Code.  Article 16 of the Plan provides that, among other things, the Court shall retain jurisdiction

over all matters arising in, arising under, and related to the Reorganization Cases and the Plan.

This provision is appropriate because the Court otherwise has jurisdiction over all of these

matters during the pendency of the Reorganization Cases, and case law establishes that a

bankruptcy court may retain jurisdiction over the debtor or the property of the estate following

confirmation.  *See Universal Oil Ltd. v. Allfirst Bank (In re Millenium Seacarriers, Inc.)*, 419

F.3d 83, 96 (2d Cir. 2005) ("a bankruptcy court retains post-confirmation jurisdiction to interpret

and enforce its own orders, particularly when disputes arise over a bankruptcy plan of

reorganization.") (quoting *In re Petrie Retail*, 304 F.3d 223 (2d Cir. 2002)).  Accordingly, the

continuing jurisdiction of the Court is consistent with applicable law and is therefore permissible

under section 1123(b)(6) of the Bankruptcy Code.

30.      Sections 2.1 through 2.5 of the Plan provide for a deemed consolidation of the

Delta Debtors and the Comair Debtors for plan purposes.  The effect of this deemed

consolidation will be that the assets of the Delta Debtors shall be treated as merged, all

guarantees of any Delta Debtor of an obligation of another Delta Debtor shall be eliminated, and

all Claims against one or more Delta Debtors shall be treated as a single claim against the

deemed consolidated Delta Debtors.  The deemed consolidation will not affect the (i) legal

structure of the Delta Debtors, (ii) pre- or postpetition Liens or security interests, (iii) pre- or

postpetition guarantees required to be maintained (a) in connection with executory contracts or

leases entered into postpetition or which have or will be assumed or (b) by the Plan; or

(iv) defenses to any Cause of Action; or (v) distributions out of insurance policies or the proceeds

of such policies.  The deemed consolidation of the Comair Debtors will be accomplished in the

same manner and will have the same effect.  No creditor has objected to the deemed

consolidations.

31.      Based upon the foregoing, the Plan fully complies with the requirements of

sections 1122 and 1123, as well as with all other provisions of the Bankruptcy Code, and thus

satisfies the requirement of section 1129(a)(1) of the Bankruptcy Code.

**D.    The Plan Satisfies the Requirements
Under Section 1129(a) of the Bankruptcy Code**[5]

>    ***1.    The Plan Satisfies the Requirements of 11 U.S.C. § 1129(a)(1)***

32.    Section 1129(a)(1) of the Bankruptcy Code requires that "[t]he plan compl[y] with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). Section 1129(a)(1) has been interpreted by the courts as requiring that a plan comply with section 1122 (governing classification of claims) and 1123 (governing the contents of a plan). *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 757 ("Drexel I") (Bankr. S.D.N.Y. 1992) (noting that "[t]he legislative history of § 1129(a)(1) explains that this provision embodies the requirements of §§ 1122 and 1123, respectively, governing classification of claims and the contents of the Plan"); S. Rep. No. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787 (stating that "[p]aragraph (1) [of 1129(a)] requires that the plan comply with the applicable provisions of chapter 11, such as §§ 1122 and 1123, governing classification of [a] plan"); H.R. REP. NO. 95-595, at 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5963 (same). As discussed above, the Plan complies fully with the requirements of both sections 1122 and 1123, as well as other provisions of the Bankruptcy Code.

>    ***2.    The Plan's Proponents Have Complied
>    with the Provisions of Title 11 as Required by 11 U.S.C. § 1129(a)(2)***

33.    Section 1129(a)(2) of the Bankruptcy Code requires the proponent of a plan to comply "with the applicable provisions of this title." *See* 11 U.S.C. § 1129(a)(2). Whereas section 1129(a)(1) of the Bankruptcy Code focuses on the form and content of a plan itself, section 1129(a)(2) is concerned with the applicable activities of a plan proponent under the Bankruptcy Code. *See* Lawrence P. King, 7 *Collier on Bankruptcy* ¶ 1129.03[2], at 1129-26

---

[5] Sections 1129(a)(14), 1129(a)(15) and 1129(a)(16) of the Bankruptcy Code are inapplicable to these cases and,

(15th ed. Rev. 2006).  In determining whether a plan proponent has complied with this section, courts focus on whether the disclosure and solicitation requirements adhere to sections 1125 and 1126 of the Bankruptcy Code.  *See, e.g., Drexel I*, 138 B.R. at 759 (noting that the legislative history of section 1129(a)(2) explains that this provision embodies the disclosure and solicitation requirements under section 1125 and 1126); *In re Johns-Manville Corp.*, 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part, on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, 843 F.2d 636 (2d Cir. 1988) (stating that "[o]bjections to confirmation raised under § 1129(a)(2) generally involve the alleged failure of the plan proponent to comply with § 1125 and § 1126 of the Code"); *see also* S. REP. NO. 95-989, 95th Cong., 2d Sess. 126 (1978) (stating that section 1129(a)(2) "requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure"); H.R. REP. NO. 95-595, 95th Cong., 1st Sess. 412 (1977).  The Debtors have complied with the applicable provisions of title 11, including the provisions of sections 1125 and 1126 regarding the adequacy of disclosure and plan solicitation.

34.    Pursuant to the Disclosure Statement Order, entered on February 7, 2007, after notice and a hearing, this Court approved the Disclosure Statement pursuant to section 1125(b) of the Bankruptcy Code as containing "adequate information" of a kind and in sufficient detail to enable hypothetical reasonable investors typical of the holders of Claims and Interests to make an informed judgment whether to accept or reject the Plan.  As evidenced by the Affidavit of Service of Jane Sullivan (the "February Sullivan Affidavit"), filed February 28, 2007, each holder of a Claim or Interest received the material required by the Disclosure Statement Order, including, for holders of Claims entitled to vote, the Disclosure Statement (which includes, as an

---

therefore, a discussion of those sections of the Bankruptcy Code is not included herein.

exhibit, a copy of the Plan), and a Ballot.  The Solicitation Packages were transmitted in
connection with the solicitation of votes to accept or reject the Plan in compliance with section
1125 of the Bankruptcy Code and the Disclosure Statement Order.  *See* 11 U.S.C. § 1125(b), (c).
The Debtors did not solicit votes on the Plan prior to the transmission of the Disclosure
Statement.

35.    Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of
the Plan.  Under section 1126 of the Bankruptcy Code, only holders of allowed claims in
impaired classes of claims that will receive or retain property under a plan of reorganization on
account of such claims may vote to accept or reject the Plan.  As set forth in the Sullivan
Affidavit and the Katchadurian Affidavit, in accordance with section 1126 of the Bankruptcy
Code, the Debtors solicited acceptances of the Plan from the holders of all Claims in each Class
of Impaired Claims that is to receive distributions under the Plan.  The Impaired Classes entitled
to vote under the Plan are Delta Classes 4, 5, and 6 and Comair Classes 4 and 5.  *See* Plan § 4.1.
The Plan reflects that Delta Classes 1, 2, 3, and 7b and Comair Classes 1, 2, 3, and 6 are
Unimpaired and thus are conclusively presumed to have accepted the Plan.  *See* Plan § 4.1.  The
Plan also reflects that holders of Claims and Interests in Delta Classes 7a and 8 and Comair Class
7 will receive no property under the Plan and are conclusively presumed to have rejected the
Plan.  *See* Plan § 4.1.  In accordance with section 5.3 of the Plan, the Debtors did not solicit
acceptances from the holders of Claims and Interests in such Classes.  Based upon the foregoing,
the requirements of section 1129(a)(2) of the Bankruptcy Code have been satisfied.

> **3.    *The Plan Has Been Proposed in Good Faith and Not by Any Means
> Forbidden by Law – 11 U.S.C. § 1129(a)(3)***

36.    Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in
good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  The Second Circuit

has defined the good faith standard as requiring a showing that "the plan was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected." *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) (citing *Koelbl v. Glessing* (*In re Koelbl*), 751 F.2d 137, 139 (2d Cir. 1984) (quoting *Manati Sugar Co. v. Mock*, 75 F.2d 284, 285 (2d Cir. 1935)). In the context of a chapter 11 plan, courts have held that "a plan is proposed in good faith if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." *In re WorldCom, Inc.*, 2003 Bankr. LEXIS 1401 at *151-52, 155-56 (Bankr. S.D.N.Y. Oct. 31, 2003); *see also In re Leslie Fay Cos.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 107 (Bankr. D. Del. 1999). Moreover, "[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied." *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985). The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan. *See id.* The Plan achieves these goals by enabling the Debtors to emerge from bankruptcy and continue in the operation of their businesses while providing creditors with substantial satisfaction of their claims.

37. The Committee and the Debtors negotiated with respect to the formulation of the Plan over many months. The negotiations were spirited and, at times, even contentious. Simultaneously therewith, the Committee spent several months analyzing whether pursuit of a possible merger with US Airways Inc. or pursuit of the standalone plan of reorganization proposed by the Debtors was the best course for unsecured creditors and for a successful reorganization of the Debtors. The Committee ultimately determined to support the Plan, which is the result of these extensive arm's-length negotiations and negotiations with many other

constituencies, and the Plan reflects the terms of a consensual agreement as to the treatment of

the various constituencies' claims.  The support of these constituencies reflects the collective

acknowledgement by the Debtors' major creditors that the Plan provides fundamental fairness

and the greatest possible recovery to all creditors.  *See In re Eagle-Picher Indus.*, 203 B.R. 256,

274 (Bankr. S.D. Ohio 1996), *aff'd*, 172 F.3d 48 (6th Cir. 1998) (finding that a plan of

reorganization was proposed in good faith when, among other things, it was based on extensive

negotiations among the plan proponents and other parties in interest).

> ### 4.    The Plan Provides for Court Approval of Payment of Services and Expenses – 11 U.S.C. § 1129(a)(4)

38.    Section 1129(a)(4) of the Bankruptcy Code provides that "[a]ny payment made or

to be made by the proponent, by the debtor, or by a person issuing securities or acquiring

property under the plan, for services or for costs and expenses in or in connection with the case,

or in connection with the plan and incident to the case, has been approved by, or is subject to the

approval of, the court as reasonable."  *See* 11 U.S.C. § 1129(a)(4).  This subsection requires that

any and all post-petition fees in the bankruptcy case be disclosed and subject to the court's

review.  *See In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986)

(noting that before a plan may be confirmed, "there must be a provision for review by the Court

of any professional compensation."); *In re Southern Indus. Banking Corp.*, 41 B.R. 606, 612

(Bankr. E.D. Tenn. 1984) (noting that, even absent challenge, the bankruptcy court has an

independent duty to determine reasonableness of fees).

39.    Pursuant to the interim application procedures established in these chapter 11

cases, the Court has authorized and approved the payment of certain fees and expenses of

professionals retained in these chapter 11 cases.  Except as otherwise ordered by this Court, all

such fees and expenses, as well as all other accrued fees and expenses of professionals through

the Effective Date, remain subject to final review for reasonableness by the Court under section

330.  In addition, pursuant to sections 503(b)(3) and (4), the Court must review any application

for substantial contribution to ensure compliance with the statutory requirements and that the

fees requested are reasonable.  Section 8.1 of the Plan requires that all entities seeking an award

of compensation or reimbursement for services rendered or reimbursement of expenses incurred

during the period from the Petition Date through and including the Confirmation Date must file

their final applications for allowance of such compensation or reimbursement no later than 60

days after confirmation of the Plan.

40.     The foregoing procedures for the Court's review and ultimate determination of the

fees and expenses to be paid by the Debtors satisfy the objectives of section 1129(a)(4).  *See In

re Elsinore Shore Assocs.*, 91 B.R. 238, 268 (Bankr. D.N.J. 1988) (requirements of section

1129(a)(4) satisfied where plan provided for payment of only "allowed" administrative

expenses); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988) ("Court

approval of payments for services and expenses is governed by various Code provisions – e.g. §§

328, 329, 330, 331, and 503(b) – and need not be explicitly provided for in a Chapter 11 plan.");

*5 Collier on Bankruptcy* ¶ 1129.02[4], at 1129-33, 1129-34 (15th ed. rev. 1993).  Based upon the

foregoing, the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy

Code.

### 5.     *All Necessary Information Regarding the Directors and Officers of the Debtors Under the Plan Has Been Disclosed – 11 U.S.C. § 1129(a)(5)*

41.     Section 1129(a)(5) of the Bankruptcy Code requires that the plan disclose the

identity and affiliations of the proposed officers and directors of the Reorganized Debtors; that

the appointment or continuance of such officers and directors be consistent with the interests of

creditors and equity security holders and with public policy; and that there be disclosure of the

identity and compensation of any insiders to be retained or employed by the Reorganized

Debtors. *See* 11 U.S.C. § 1129(a)(5).

42.    The Debtors have satisfied the foregoing requirements.  In accordance with

section 12.3 of the Plan, the Debtors filed with the Bankruptcy Court a list of directors of

Reorganized Delta (as amended, the "List of Directors").  As set forth in the List of Directors, the

initial board of directors of Reorganized Delta will be comprised of eleven members.  With

respect to officers, section 12.3(d) of the Plan provides that the principal officers of each Debtor

immediately prior to the Effective Date shall serve as the initial officers of such Reorganized

Debtor as of the Effective Date in accordance with applicable non-bankruptcy law.  In addition,

the Debtors have disclosed the nature of compensation payable to the members of the New Delta

Board, as well as the compensation payable to Reorganized Delta's chief executive officer, chief

financial officer, and three other most highly compensated officers, in a filing made with the

Court on March 20, 2007.  *See* Summary of Emergence Compensation Programs, dated March

20, 2007.

43.    Based upon the foregoing, the Plan satisfies the requirements of section

1129(a)(5) of the Bankruptcy Code.

**6.    *The Plan Does Not Contain Rate Changes Subject to the Jurisdiction
of Any Governmental Regulatory Commission – 11 U.S.C. § 1129(a)(6)***

44.     Section 1129(a)(6) of the Bankruptcy Code requires that any regulatory

commission having jurisdiction over the rates charged by a reorganized debtor in the operation of

its business approve any rate change provided for in a plan of reorganization.  *See* 11 U.S.C.

§ 1129(a)(6).  Section 1129(a)(6) of the Bankruptcy Code is inapplicable because the Plan does

not provide for a change in any rates subject to regulatory approval.  As this provision is

inapplicable to the Plan, the requirements of section 1129(a)(6) of the Bankruptcy Code have

been satisfied.

### 7.    The Plan is in the Best Interests of Creditors and Interest Holders – 11 U.S.C. § 1129(a)(7)

45.    Section 1129(a)(7) of the Bankruptcy Code requires that a plan be in the best

interests of creditors and stockholders.  The best interests test focuses on individual dissenting

creditors rather than classes of claims.  *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N.*

*LaSalle St. P'ship*, 526 U.S. 434 (1999).  Under the best interests test, the court must find that

each non-accepting creditor will receive or retain value that is not less than the amount he would

receive if the debtor were liquidated.  *See 203 N. LaSalle*, 526 U.S. at 441; *United States v.*

*Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 228 (1996).  As section 1129(a)(7)

of the Bankruptcy Code makes clear, this liquidation analysis applies only to non-accepting

impaired claims or equity interests.  If a class of claims or equity interests unanimously accepts

the plan, the best interests test automatically is deemed satisfied for all members of that class.

46.    The best interests test is satisfied as to each Unimpaired Class of Claims.

Pursuant to section 1126(f) of the Bankruptcy Code, each holder of a Claim in Delta Classes 1, 2,

3, and 7b and Comair Classes 1, 2, 3, and 6 is deemed to have accepted the Plan.  *See* 11 U.S.C.

§ 1126(f).  Therefore, the best interests test is satisfied with respect to those Classes.  Further, as

noted above, the best interests test is deemed satisfied for all holders of Claims in Delta Classes

4, 5, and 6 and Comair Classes 4 and 5 who voted to accept the Plan.  Because a chapter 7

liquidation of the Debtors' estates would result in a distribution that is the same as or lower than

the distributions described for each holder of a Claim in Delta Classes 4, 5, 6, 7a, and 8 and

Comair Classes 4, 5, and 7, the best interest test is likewise satisfied as to (a) each holder of a

Claim in Delta Classes 4, 5, and 6 and Comair Classes 4 and 5 who voted to reject the Plan; and

(b) each holder of a Claim in Delta Classes 7a and 8 and Comair Class 7, who were deemed to have rejected the Plan.

47.    Appendix C to the Disclosure Statement sets forth the liquidation analysis for the Company (the "Liquidation Analysis").  The Liquidation Analysis demonstrates that each holder of an Impaired Claim against or Interest in the Debtors will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

48.    Based on the foregoing, the Plan satisfies the requirements of section 1129(a)(7).

### 8.    *Acceptance by All Impaired Classes – 11 U.S.C. § 1129(a)(8)*

49.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired claims or interests accept the plan:  "With respect to each class of claims or interests - (A) such class has accepted the plan; or (B) such class is not impaired under the plan."  11 U.S.C. § 1129(a)(8).  Regardless of the outcome of the votes on the Plan, the Claims and Interests in Delta Classes 7a and 8 and Comair Class 7 are Impaired and deemed to reject the Plan under section 1126(f) of the Bankruptcy Code due to a lack of any recovery under the Plan, and thus section 1129(a)(8) is not satisfied.  As a result, the Debtors must satisfy the "cram down" requirements of section 1129(b) (as discussed below) to confirm the Plan.

### 9.    *The Plan Provides for Payment in Full of All Allowed Priority Claims – 11 U.S.C. § 1129(a)(9)*

50.    Section 1129(a)(9) of the Bankruptcy Code requires that persons holding Allowed Claims entitled to priority under section 507(a) receive specified cash payments under the plan. Unless the holder of a particular claim agrees to a different treatment with respect to such claim, section 1129(a)(9) requires a plan to provide as follows:

(A)    with respect to a claim of a kind specified in section 507(a)(1) or 507(a)(2) of [the Bankruptcy Code], on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(B)    with respect to a class of claims of a kind specified in section 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of [the Bankruptcy Code], each holder of a claim of such class will receive -

(i)    if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii)    if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

(C)    with respect to a claim of a kind specified in section 507(a)(8) of [the Bankruptcy Code], the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

11 U.S.C. § 1129(a)(9).

51.    In accordance with sections 1129(a)(9)(A) and (B), Article 3 of the Plan provides that all Allowed Administrative Claims shall be paid in full in Cash on the Effective Date or as soon thereafter as practicable, except for Professional Fee Claims, which will receive payment in accordance with section 8.1 of the Plan.  Allowed Administrative Expenses relating to liabilities incurred in the ordinary course of business by the Debtors, as debtors in possession, shall be paid by the Debtors or by the Reorganized Debtors in the ordinary course of business and subject to the conditions of the agreements governing or relating to such obligations.  Thus, the Plan satisfies the requirements of sections 1129(a)(9)(A) and (B) of the Bankruptcy Code.

52.    The Plan also satisfies the requirements of section 1129(a)(9)(C) of the Bankruptcy Code with respect to the treatment of Priority Tax Claims.  Pursuant to section 3.2 of the Plan, holders of allowed Priority Tax Claims will be paid, at the option of the Debtors, either (a) Cash in an amount equal to such Allowed Priority Tax Claim, (b) equal Cash payments on the

fifth and sixth anniversary of the date of the assessment of such Allowed Priority Tax Claim in an

aggregate amount equal to such Allowed Priority Tax Claim, together with interest as provided in

the Plan, or (c) upon such other terms determined by the Bankruptcy Court to provide the holder

of an Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective

Date, equal to such Allowed Priority Tax Claim.  Based on the foregoing, the Plan satisfies the

requirements of section 1129(a)(9) of the Bankruptcy Code.

> **10.    The Plan Has Been Accepted by at Least One Impaired Class that is
> Entitled to Vote – 11 U.S.C. § 1129(a)(10)**

53.    Section 1129(a)(10) of the Bankruptcy Code requires that, if a class of claims is

impaired under a plan, at least one class of impaired claims must have voted to accept the plan.

*See* 11 U.S.C. § 1129(a)(10).  The Plan satisfies that requirement.  Five Classes of Impaired

Claims have voted to accept the Plan.  These Classes, therefore, qualify as impaired accepting

classes and satisfy the requirement of section 1129(a)(10).

> **11.    The Plan is Not Likely to be Followed by Liquidation or the Need for
> Further Financial Reorganization – 11 U.S.C. § 1129(a)(11)**

54.    Section 1129(a)(11) of the Bankruptcy Code requires that, as a condition

precedent to confirmation, the Court determine that the Plan is feasible.  Specifically, the Court

must determine that:

> Confirmation of the plan is not likely to be followed by the
> liquidation, or the need for further financial reorganization, of the
> debtor or any successor to the debtor under the plan, unless such
> liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).  As discussed in section 6.4 of the Disclosure Statement, the Plan is

feasible within the meaning of this provision.

55.    The feasibility test set forth in section 1129(a)(11) requires the Court to determine

whether the Plan is workable and has a reasonable likelihood of success.  *See United States v.*

*Energy Res. Co., Inc.*, 495 U.S. 545, 549 (1990); *Kane v. Johns-Manville Corp* (*In re Johns-Manville Corp.*), 843 F.2d 636, 649 (2d Cir. 1988).

56.    The Second Circuit has stated that "the feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed."  *Id.; see also In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985) ("Feasibility does not, nor can it, require the certainty that a reorganized company will succeed."), *aff'd*, 800 F.2d 581 (6th Cir. 1986); *In re WorldCom, Inc.*, 2003 Bankr. LEXIS 1401 at *168 ("The feasibility test set forth in section 1129(a)(11) requires the Court to determine whether the Plan is workable and has a reasonable likelihood of success."); *In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 709 (Bankr. S.D.N.Y. 1993) ("It is not necessary that the success be guaranteed, but only that the plan present a workable scheme of reorganization and operation from which there may be a reasonable expectation of success.") (quoting *5 Collier on Bankruptcy* ¶ 1129.02[11], at 1129-54 (15th ed. 1992)); *In re Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986) ("Guaranteed success in the stiff winds of commerce without the protection of the [Bankruptcy] Code is not the standard under § 1129(a)(11).").

57.    The key element of feasibility is whether there exists a reasonable probability that the provisions of the plan can be performed.  The purpose of the feasibility test is to protect against visionary or speculative plans.  *See In re Kent Terminal Corp.*, 166 B.R. 555, at 560 (Bankr. S.D.N.Y. 1994).  "Just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility.  The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds." *In re Drexel I*, 138 B.R. at 762.

58.    Applying the foregoing standards of feasibility, courts have identified the following factors as probative:

(1)    the adequacy of the capital structure;

(2)    the earning power of the business;

(3)    economic conditions;

(4)    the ability of management;

(5)    the probability of the continuation of the same management; and

(6)    any other related matters which will determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*See In re Leslie Fay Cos., Inc.*, 207 B.R. at 789 (citing *7 Collier on Bankruptcy* ¶ 1129.LH[2], at 1129-82 (15th ed. rev. 1996)); *see also In re Texaco*, 84 B.R. at 910; *Prudential Energy*, 58 B.R. at 862-63. The foregoing list is neither exhaustive nor exclusive. *Drexel I*, 138 B.R. at 763. The Plan satisfies these standards of feasibility.

59.    For purposes of determining whether the Plan satisfies the above-described feasibility standards, the Debtors have analyzed their ability to fulfill their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their businesses. As part of this analysis, the Debtors have prepared financial projections for the Reorganized Debtors and for the Comair Debtors for the years 2006 through 2010 (the "Projections"). The Projections are annexed as Appendix D to the Disclosure Statement and are discussed in detail in Section 6.4 of the Disclosure Statement. Based upon the information contained in the Disclosure Statement and the Projections, the Debtors anticipate that their cash on hand upon emergence will provide sufficient liquidity to make all required payments under the Plan and to satisfy all ongoing capital requirements.

60.    In addition, the market's strong reaction in favor of financing the Debtors' New Credit Facility indicates that sophisticated third party lenders believe that the Debtors'

projections are credible.  There was great competition within the financial markets to underwrite

the Debtors' New Credit Facility and, ultimately, the underwriting of the New Credit Facility that

will total $2.5 billion will be led by six financial institutions (JPMorgan, Goldman, Sachs & Co.,

Merrill Lynch, Lehman Brothers, UBS and Barclays Capital).  In addition to the more than $2

billion in cash that the Debtors currently have on hand, the New Credit Facility will provide

sufficient liquidity to allow the Debtors to repay all of the outstanding loans under the DIP

Facility and other chapter 11 expenses, provide working capital, and support other general

corporate purposes.

61.     Based upon the foregoing, the Plan is feasible because there is a reasonable

likelihood that the Reorganized Debtors will meet their financial obligations under the Plan in

the ordinary course of business and because confirmation of the Plan is not likely to be followed

by the liquidation or need for further financial reorganization of the Reorganized Debtors.  The

Plan therefore satisfies the feasibility standard of section 1129(a)(11).

### 12.     The Plan Provides for Full Payment of All Statutory Fees – 11 U.S.C. § 1129(a)(12)

62.     Section 1129(a)(12) requires the payment of "[a]ll fees payable under section

1930 [title 28, the United States Code], as determined by the court at the hearing on confirmation

of the plan . . . ."  11 U.S.C. § 1129(a)(12).  Section 507 of the Bankruptcy Code provides that

"any fees and charges assessed against the estate under [section 1930,] chapter 123 of title 28"

are afforded priority as administrative expenses.  *Id*. at § 507(a)(2).  In accordance with sections

507 and 1129(a)(12) of the Bankruptcy Code, section 17.3 of the Plan provides that all such fees

and charges will be paid in Cash on the Effective Date and thereafter as may be required.  Thus,

the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

### 13.    The Plan Provides for the Treatment of Retiree Benefits in Accordance with 11 U.S.C. § 1129(a)(13)

63.    Section 1129(a)(13) of the Bankruptcy Code requires a plan to provide for retiree benefits at levels established pursuant to section 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code "for the duration of the period the debtor has obligated itself to provide such benefits."  11 U.S.C. § 1129(a)(13).  During the Debtors' chapter 11 cases, the Debtors, with the support of the Committee, reached a settlement pursuant to section 1114(e)(1)(B) regarding retiree benefits for the Debtors' pilot and non-pilot retirees (the "1114 Settlement") with the two committees appointed pursuant to section 1114 (the "Retiree Committees").  The Court entered an order approving the 1114 Settlement on October 19, 2006.

64.    Section 10.4(d) of the Plan provides that Reorganized Delta will continue to pay the retiree health and welfare benefits of the Debtors addressed in the 1114 Settlement for the period provided in the 1114 Settlement.  Thus, the Plan satisfies section 1129(a)(13) of the Bankruptcy Code.

### E.    The Plan Satisfies the "Cram Down" Requirements Under Section 1129(b) of the Bankruptcy Code

65.    Section 1129(b) of the Bankruptcy Code provides a mechanism for confirmation of a plan in circumstances where the plan is not accepted by all impaired classes of claims and equity interests.  This mechanism is commonly referred to as "cram down."  Section 1129(b) provides in pertinent part:

> Notwithstanding section 510(a) of [the Bankruptcy Code], if all of the applicable requirements of [section 1129(a) of the Bankruptcy Code] other than [the requirement contained in section 1129(a)(8) that a plan must be accepted by all impaired classes] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph *if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.*

11 U.S.C. § 1129(b)(1) (emphasis supplied). Thus, under section 1129(b) of the Bankruptcy

Code, the Court may "cram down" a plan over the deemed rejection by impaired classes of

claims or equity interests that receive no distributions under the plan as long as the plan does not

"discriminate unfairly" and is "fair and equitable" with respect to such classes.

> ### 1.    The Plan Does Not Discriminate Unfairly with Respect to the Deemed Rejected Classes

66.    Section 1129(b)(1) of the Bankruptcy Code does not prohibit discrimination

between classes; it prohibits only discrimination that is *unfair*. *See In re 11,111, Inc.*, 117 B.R.

471, 478 (Bankr. D. Minn. 1990). The weight of judicial authority holds that a plan unfairly

discriminates in violation of section 1129(b) of the Bankruptcy Code only if similar classes are

treated differently without a reasonable basis for the disparate treatment. *See In re Buttonwood

Partners, Ltd.*, 111 B.R. 57 (Bankr. S.D.N.Y. 1990); *Johns-Manville*, 68 B.R. 618. Accordingly,

as between two classes of claims or two classes of equity interests, there is no unfair

discrimination if (i) the classes are comprised of dissimilar claims or interests, *see, e.g., Johns-

Manville*, 68 B.R. at 636, or (ii) taking into account the particular facts and circumstances of the

case, there is a reasonable basis for such disparate treatment, *see, e.g., Buttonwood Partners*, 111

B.R. at 63; *In re Rivera Echevarria*, 129 B.R. 11, 13 (Bankr. D.P.R. 1991).

67.    The Plan does not "discriminate unfairly" with respect to impaired Classes of

claims and equity interests that are deemed to have rejected the Plan. Delta Class 7a (Interests in

Delta) and Delta Class 8 (Securities Litigation Claims against the Delta Debtors) consists of

equity interests (Delta Class 7a) or claims subordinated to equity interests pursuant to section

510(b) of the Bankruptcy Code (Delta Class 8). These Claims are dissimilar in their legal nature

from, and subordinate to, the secured and unsecured Claims receiving distributions under the

Plan. Further, there is a reasonable basis for the disparate treatment of the Claims in Delta

Classes 7a and 8 and the Claims in Delta Class 7b (Interests in Delta Subsidiary Debtors).  First,

section 1129(b) does not require the dismemberment of the Delta enterprise.  Delta Class 7b

contains Delta's equity interest in the Delta Subsidiary Debtors, and Delta's retention of

ownership in these subsidiaries will benefit all of the Delta Debtors' creditors.  Second, Delta's

ownership interest in the Delta Subsidiary Debtors is being reinstated in exchange for

Reorganized Delta (a) making distributions under the Plan to Creditors of the Delta Subsidiary

Debtors and (b) using certain funds and assets, to the extent authorized in the Plan, to satisfy

certain obligations of the Delta Subsidiary Debtors, including, without limitation, those owed to

PBGC.  Accordingly, the disparate treatment of the Claims in Delta Class 7b is reasonable and

appropriate.

68.    Similarly, the Plan does not unfairly discriminate against the Claims in Comair

Class 7 (Securities Litigation Claims against the Comair Debtors).  First, there do not appear to

be any claims in Comair Class 7.  Second, the Claims in Comair Class 7, to the extent any exist,

are, due to section 510(b) of the Bankruptcy Code, legally distinct from each other class of

Comair Claims and Interests.

69.    Under the foregoing standards, the Plan does not "discriminate unfairly," as the

holders of Claims and Interests, whose Classes rejected the Plan, shall be treated in the exact

same manner as the other Claims or Interests in such Classes.

**2.    *The Plan is Fair and Equitable with Respect to the Deemed Rejected Classes***

70.    Section 1129(b) of the Bankruptcy Code defines the phrase "fair and equitable" as

follows:

> (a)    As to secured creditors:  Either (i) each impaired secured creditor retains
> its liens securing its secured claim and receives on account of its secured
> claim deferred cash payments having a present value equal to the amount
> of its allowed secured claim, (ii) each impaired secured creditor realizes

the "indubitable equivalent" of its allowed secured claim or (iii) the property is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds is provided in clause (i) or (ii) of this subparagraph.

(b)    As to unsecured creditors:  Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c)    As to equity interest holders:  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

11 U.S.C. § 1129(b)(2).  In the instant case, the "fair and equitable" rule is satisfied as to the holders of (i) Interests in Delta Class 7a; (ii) Claims in Delta Class 8; or (iii) Claims in Comair Class 7 because, as a result of the valuation of the Debtors, these holders are not entitled to any recovery under the Plan and no Classes junior to Delta Classes 7a and 8 and Comair Class 7 will receive any distributions or retain any property under the Plan.

## F.    The Limited Release, Exculpation, and Injunction Provisions of the Plan Should be Approved

71.    The Plan provides for (i) the release of certain causes of action of the Debtors and their estates, (ii) the voluntary release of certain causes of action by certain holders of Claims who voted on the Plan, (iii) the exculpation of claims for certain parties, and (iv) a permanent injunction precluding holders of a Claim or Interest from asserting those Claims or Interests, or claims or actions based upon such Claims or Interests, against the Debtors.  These releases are proper because, among other things, such releases are the product of arm's-length negotiations and have been critical to the formulation of a Plan that has been overwhelmingly supported by

each Class entitled to vote.  Moreover, the releases are limited in scope and are restricted to acts in connection with, related to, or arising out of the Reorganization Cases.

### 1.    *Exculpation*

72.    Pursuant to section 13.5 of the Plan (the "Exculpation"), none of the Debtors, Reorganized Debtors, the Committee, the DIP Agent, the Amex Entities, the Indenture Trustees, the Retiree Committees, the ALPA Released Parties, PBGC, DP3, Inc., or any of their respective Affiliates, members, officers, directors, employees, advisors, actuaries, accountants, attorneys, financial advisors, investment bankers, consultants, professionals or agents, shall have or incur any liability to any holder of a Claim or Interest for any act or omission in connection with, related to or arising out of, the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan, the preparation or distribution of the Disclosure Statement, the offer, issuance, and distribution of the Disclosure Statement pursuant to the Plan (including pursuant to or in connection with any Post-Petition Aircraft Agreement) or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct, ultra vires acts, or gross negligence.

73.    The Exculpation is limited to those parties that were instrumental to the Debtors' restructuring efforts and to the formulation of the Plan, and the Exculpation is limited solely to acts in connection with, related to, or arising out of the Chapter 11 Cases.  Thus, the Exculpation, which "generally follows the text that has become standard in this district, is sufficiently narrow to be unexceptionable."  *In re Oneida Ltd.*, 351 B.R. 79, 94 n.22 (Bankr. S.D.N.Y. 2006); *See also In re Enron Corp.*, 326 B.R. 497, 504 (S.D.N.Y. 2005).

74.    Further, the Exculpation is appropriately limited to a qualified immunity for acts of negligence, but does not relieve any party of willful misconduct, ultra vires acts, or gross negligence.  *See In re PWS Holding Corp.*, 228 F.3d 224, 246-47 (3d Cir. 2000) (similar

exculpation provision reflecting Bankruptcy Code's limitation of liability did not violate third

party release prohibition of section 524(e)); *Drexel I*, 138 B.R. at 722.

75.     Exculpation for participating in the plan process is appropriate where plan

negotiation could not have occurred without protection from liability.  As recognized by the

Second Circuit in *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 293 (2d Cir. 1992)

("Drexel II"), where a debtor's plan of reorganization requires the settlement of numerous

complex issues, protection of third parties against legal exposure may be a key component of the

settlement.  *See Drexel II*, 960 F.2d at 293; *In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y.

2005) (excising similar exculpation provision would "tend to unravel the entire fabric of the

Plan, and would be inequitable to all those who participated in good faith to bring it into

fruition").

### 2.    *Injunction*

76.     Section 13.3[6] of the Plan (the "Injunction") provides that, except as otherwise

expressly provided in the Plan, all persons or entities who have held, hold, or may hold Claims or

Interests and all other parties in interest, along with their respective present or former employees,

agents, officers, directors, principals, representatives and Affiliates, are permanently enjoined,

from and after the Effective Date, from (i) commencing or continuing in any manner any action

or other proceeding of any kind on any such Claim (including, without limitation, a Securities

Litigation Claim) or Interest against the Debtors, the Reorganized Debtors, or property of the

Debtors or Reorganized Debtors, other than to enforce any right to a distribution pursuant to this

Plan, (ii) the enforcement, attachment, collection, or recovery by any manner or means of any

judgment, award, decree, or order against the Debtors, the Reorganized Debtors, or property of

---

[6] As amended in the Plan filed April 23, 2007.

the Debtors or Reorganized Debtors, with respect to any such Claim or Interest, other than to

enforce any right to a distribution pursuant to this Plan, (iii) creating, perfecting, or enforcing any

Lien or encumbrance of any kind against any Reorganized Debtor or against the Debtors, the

Reorganized Debtors, or the property or interests in property of the Debtors or Reorganized

Debtors, other than to enforce any right to a distribution pursuant to this Plan, or (iv) asserting

any right of setoff, subrogation, or recoupment of any kind against any obligation due from the

Debtor or Reorganized Debtors or against the property or interests in property of the Debtors or

Reorganized Debtors, with respect to any such Claim or Interest, *provided* that the Injunction

shall have no effect on any right of setoff, subrogation, or recoupment of the Indenture Trustees

associated with the Municipal Bond Indentures.  In addition, this provision shall have no effect

on the rights of (a) the California Franchise Tax Board, (b) the Oregon Department of Revenue,

(c) the Texas Comptroller of Public Accounts or (d) the Texas Workforce Commission to setoff

defensively against any pre-petition refund or similar Claim that the Debtors might raise for the

first time after the Effective Date.  Such injunction shall extend to any successors or assignees of

the Debtors and Reorganized Debtors and their respective properties and interest in properties.

77.     The injunction is necessary to preserve and enforce the releases and discharges

granted by the Plan and is narrowly tailored to achieve that purpose.

### *3.     Release By the Debtors*

78.     Section 13.6 of the Plan (the "Debtor Releases"), provides that, for good and

valuable consideration supplied by certain parties listed in the Plan (the "Released Parties"),

including, among other parties, (a) all present officers and directors of the Debtors; (b) all present

and former members of the Committee; (c) the DIP Agent; (d) the Indenture Trustees; (e) the

ALPA Released Parties; (f) PBGC; (g) DP3, Inc., and (h) their respective Affiliates, employees,

and advisors, the Released Parties shall be forever released and discharged from any and all

Cause of Action held by the Debtors that are related to, among other things, the Debtors, the

Debtors' restructuring, and the Chapter 11 Cases, which Causes of Action are based in whole or

in part on any act, omission, transaction, event or other occurrence taking place before the

Effective Date.  The Debtor Releases do not include, however, a waiver of or release from any

causes of action arising out of willful misconduct, ultra vires acts, or gross negligence.

79.    Notably, the Debtor Releases in section 13.6 of the Plan are limited solely to

claims or causes of action that belong to the Debtors.  *In re Oneida Ltd.*, 351 B.R. at 94 n.21

("Under the Plan, the Debtors also released their own claims against third parties, but these do

not raise any "third-party release" issues of the type discussed here.")  As no third-party rights

are impacted by this provision, and a debtor is authorized to settle claims in the plan of

reorganization, this provision is consistent with applicable law.

80.    A plan that proposes to release a claim or action that belongs to the debtor is

considered a "settlement" for purposes of satisfying section 1123(b)(3)(A) of the Bankruptcy

Code.  *See, e.g.*, *In re WCI Cable, Inc.*, 282 B.R. 457, 469 (Bankr. D. Ore. 2002) ("I find that the

release and injunction provisions of . . . the WCI plan are submitted for approval by the court

pursuant to § 1123(b)(3)(A) and [Rule 9019(a) of the Federal Rules of Bankruptcy Procedure]");

*Resolution Trust Corp. v. Best Prods. Co.* (*In re Best Prods. Co.*), 68 F.3d 26, 33 (2d Cir. 1995)

(same); *In re WorldCom, Inc.*, 2003 Bankr. LEXIS 1401 at *117 (same); *In re Cellular Info. Sys.*,

171 B.R. 926, 947-948 (Bankr. S.D.N.Y. 1994) (same).  In reviewing a plan settlement and

releases of the Debtors' Claims pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, the

Court should be guided by the "reasonable business judgment" standard of Rule 9019 of the

Federal Rules of Bankruptcy Procedure.  *See In re WorldCom, Inc.*, 2003 Bankr. LEXIS 1401 at

* 117; *Drexel I*, 138 B.R. at 750-760.

81.    It is also clear that, subject to the debtor's reasonable business judgment, the release may include not only claims assertable directly by the debtor, but also claims assertable on behalf of, or derivative of the rights of, the debtor, i.e., all claims belonging to the estate or that may be brought by the chapter 11 debtor (including shareholder derivative actions, fraudulent conveyance claims, preference actions, and other similar types of actions subject to settlement by the debtor). *See In re PWS Holding Corp.*, 303 F.3d 308, 315 (3d Cir. 2002), *cert. denied*, 538 U.S. 924 (2003); *In re Texaco*, 84 B.R. at 900; *In re Allegheny Int'l, Inc.*, 118 B.R. 282, 311-312 (Bankr. W.D. Pa. 1990); *Huddleston v. Nelson Bunker Hunt Trust Estate*, 117 BR. 231, 233-34 (N.D. Tex. 1990) (confirming plan containing release of claims against banks to the extent they were derivative of the debtor's claims).

82.    Throughout these chapter 11 cases, the Released Parties have contributed substantial value to the Debtors and the formulation of the Plan.  The Released Parties' efforts in negotiating and ultimately formulating the Plan enabled the Debtors to file the Plan.  The recoveries negotiated by the key constituencies in the chapter 11 cases are better than would likely be available if other alternatives were pursued.

83.    Significantly, and as evidenced by the voting results confirmed in the Sullivan Affidavit, the Plan was approved by a substantial majority of holders of Claims voting on the Plan and no creditor has objected to these provisions.

### *4.    Voluntary Releases by the Holders of Claims and Interests*

84.    Section 13.8 of the Plan (the "Voluntary Releases"), provides that, for good and valuable consideration, on and after the Effective Date, holders of Claims that (a) vote to accept or reject the Plan and (b) do not elect (as permitted by the Ballots) to opt out of the releases contained in Section 13.8 of the Plan, shall be deemed to have released and discharged the Released Parties from any and all Causes of Action whatsoever, including derivative Claims

asserted on behalf of the Debtor, that are related to, among other things, the Debtors, the Debtors'

restructuring, and the Chapter 11 Cases, which Causes of Action are based in whole or in part on

any act, omission, transaction, event or other occurrence taking place before the Effective Date.

The Voluntary Releases do not include, however, a waiver of or release from any causes of action

arising out of willful misconduct, ultra vires acts, or gross negligence.

85.     The Voluntary Releases are third-party releases of the type addressed by the

Second Circuit in *Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc.* (*In re

Metromedia Fiber Network, Inc.*), 416 F.3d 136 (2d Cir. 2005), where the Court of Appeals,

while noting that third-party releases are proper only in rare cases, identified particular situations

where a third-party release is permissible.  One of these permissible situations is where the

creditors that are granting the release have consented to the release.  *Id.* at 142 ("Nondebtor

releases may also be tolerated if the affected creditors consent.")  The Voluntary Releases fits

into this category of consensual third-party releases, as the only parties granting the release are

those holders who submitted Ballots and did not elect to opt out of the Voluntary Releases.  Thus,

the Voluntary Releases in the Plan are appropriate and consistent with applicable law.

## IV.    RESPONSE TO 10% BONDHOLDER OBJECTION[7]

86.     In the 10% Bondholder Objection, a group of holders (the "10% Holders") of

approximately 10% of the $419 million Kenton County Airport Board, Special Facilities

Revenue Bonds, 1992 Series A (Delta Air Lines, Inc. Project) and the $19 million Kenton County

Airport Board, Special Facilities Revenue Bonds, 1992 Series B (Delta Air Lines, Inc. Project)

(collectively, the "Bonds") objected to confirmation of the Plan on multiple grounds.  Each of the

---

[7] The Committee joins and supports, in full, the arguments set forth in the Debtors' Omnibus Reply to Unresolved Non-Aircraft Objections to Confirmation of Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, filed on April 23, 2007.

arguments made by the 10% Holders arguments are meritless and should be disregarded by this Court.

87.     As the Court is aware, on March 8, 2007, the Debtors filed a motion (the "Settlement Motion") to approve a settlement (the "Settlement") between Delta Air Lines, Inc., ("Delta"), the Kenton County Airport Board ("KCAB"), and U.M.B. Bank, N.A., as indenture trustee for the Bonds (the "Trustee"), which would resolve all pending issues between the parties relating to Delta's proposed rejection of certain facilities at the Cincinnati/Northern Kentucky International Airport (the "Airport").  Approximately 60% of the holders of the Bonds (the "Bondholders") directed the Trustee to execute the Settlement, while over 97% (in amount) of the Bondholders voted in favor of the Plan.

88.     In a blatant effort to extract more value, the 10% Holders, however, filed two objections to the Settlement Motion (collectively, the "10% Holder Settlement Objection").  The Debtors, the Committee, KCAB, and the Trustee filed separate responses to the 10% Holder Settlement Objection, and this Court held a hearing on the Settlement Motion on April 19, 2007. Currently, the Settlement Motion is *sub judice*.  Because the facts and arguments regarding the Settlement Motion have been described in detail in the pleadings referenced above and at the April 19, 2007 hearing, the Committee will not recite them again in this pleading.

89.     As with their objections to the Settlement, the objections to the Plan by the 10% Holders are wholly without merit.  Their arguments are discussed below.

### A.     The 10% Holders Do Not Have Standing to Contest the Trustee's Claim

90.     First and foremost, the 10% Holders, who repeatedly refer to the Bondholders' "claims" in the 10% Holder Settlement Objection, are simply without standing to assert that the

Settlement Agreement or the Plan has in any way inappropriately modified their rights or claims. Specifically, the Guaranty provides that only the Trustee may enforce the Guaranty to preserve and protect its interests and the interest of the Bondholders. *See* Guaranty at ¶3(e). The Guaranty provides that the Trustee (and no other party) may only bring such an action upon the written request of the registered owners of at least a majority in aggregate principal amount of the Bonds then outstanding. *Id.* at ¶3(d). In addition, the 10% Holders have no right to relet proceeds under the Facilities Agreement, since neither the Trustee nor the Bondholders are parties to the Facilities Agreement. Thus, the 10% Holders are wholly without standing to object to the Settlement Agreement, or to confirmation of the Plan, on the grounds that the 10% Holders have any rights or interests under either the Guaranty of the Facilities Agreement.

**B.      The Plan's Description of the Treatment of Claims in Delta Class 4 is Sufficient, and Therefore the Timing of the Settlement Motion Does Not Cause the Plan to Violate Section 1123(a)(3)**

91.      Contrary to the arguments made by the 10% Holders, the Plan clearly complies with sections 1129(a)(1) and (a)(3) of the Bankruptcy Code with regard to the description of the treatment to be afforded the Bondholders on their claims. In their Objection, the 10% Holders boldly and inappropriately contend that the Disclosure Statement filed by the Debtors did not adequately disclose the treatment that the 10% Holders would receive under the Plan. The Plan classifies the Trustee's Claim in Delta Class 4, and the Trustee's Claim will (and would) receive the same <u>treatment</u> as all other Claims in that class regardless of the outcome of the Settlement Motion.[8]

---

[8] Section 4.2(d) of the Plan provides that allowed Claims in Delta Class 4 will receive their pro rata share of New Delta Common Stock pursuant to a simple formula described in the Plan.

92.     In their argument, the 10% Holders conveniently ignore the significant notice of the Settlement that was provided to all Bondholders.  First, the Disclosure Statement specifically described the history of negotiations between KCAB, the Trustee and the Debtors, as well as the Debtors' view that section 502(b)(6) of the Bankruptcy Code would apply to cap any rejection damage Claim the Trustee might have if Delta rejected the Facilities Agreement.  The Disclosure Statement further explained that while, as of the time of filing of the Disclosure Statement, the Debtors had re-noticed their motion to reject the Facilities Agreement, the Debtors could elect to enter into a settlement agreement pursuant to which the holders of the Bonds would receive payments in accordance with such settlement.  *See* Disclosure Statement at 56-57.  In addition, notice of the Settlement was provided by: (i) announcement by Debtors' counsel of the terms of the Settlement before this Court during the omnibus hearing held on February 22, 2007; (ii) the Trustee, upon the electronic posting of notice of the Settlement and the terms thereof on its web site on February 23, 2007; (iii) a Form 8-K filed by the Debtors on March 8, 2007 that included all of the pertinent documents to the Settlement and Settlement Motion; (iv) a posting of the Settlement Motion on the Debtors' case information web site, www.deltadocket.com; and (v) notices of the Settlement sent by the Trustee to the Bondholders on or about March 13, 2007.

93.     Based on the foregoing, it is clear that the Bondholders were on notice that they would not receive 100% payment on account of the Trustee's Claim and had sufficient notice of the Settlement, such that the Bondholders were in no way prejudiced during the voting process.

**C.     The Plan Treats the Bondholder Claims the Same as All Other Allowed Claims in Delta Class 4, and Therefore Complies with Section 1123(a)(4)**

94.     The 10% Holders also contend that the Plan "does not provide for the same treatment of the Bondholders' claims as it does for other general unsecured claims, even though those claims are all placed in the same class." *Id.* at 16.  This argument is simply nonsensical,

because: (a) the 10% Holders are bound, like all of the other Bondholders, to the Trustee's entry

into the Settlement Agreement, as briefed and discussed *ad nauseam* before this Court; and (b)

the 10% Holders' argument would require the Debtors to place every settled Claim into a

separate class, which is simply impossible and would turn the plan confirmation process on its

head in every large chapter 11 case.  Indeed, the 10% Holders continue to ignore the fact that,

under the Settlement, the Trustee will receive a much larger Claim than it would have received

had the Debtors proceeded with their motion to reject the Facilities Agreement.  If the parties

were to litigate the damages arising from the rejection of such agreement, the Committee

believes that there are strong arguments that the resulting Claim would not exceed $125 million,

at most, due to the cap on rejection damages set forth in Bankruptcy Code section 502(b)(6).

95.     Finally, as demonstrated above in section III. C. 1. d., the Plan provides for all

allowed Claims in Delta Class 4 to receive the same treatment and does not discriminate against

the Trustee or the 10% Holders in any way.

96.     Accordingly, the Plan complies with section 1123(a)(4)'s direction to "provide the

same treatment for each claim or interest of a particular class . . . ."  11 U.S.C. § 1123(a)(4).

**D.      The Debtors Proposed the Plan in Good Faith and in Compliance with
          Applicable Laws, and Therefore the Plan Complies with Section 1129(a)(3)**

97.     The 10% Holders' most offensive argument is that the Debtors did not propose the

Plan in good faith because the Debtors allegedly attempted "to disguise the true effect of the

terms of the Settlement Agreement on the treatment of the Bondholders' claims without affording

the basic protections of the chapter 11 process . . . ."  *10% Bondholder Objection* at 18.  Further,

the 10% Holders allege that the Debtors entered into the Settlement with the Trustee even though

"[the Debtors] knew the Bond Trustee ha[d] no authority to execute the agreement on behalf of

the Bondholders . . . ."  *Id.* at 19.

98.    These allegations are so groundless that they push the limits of permissible

advocacy.  Despite extensive discovery, the 10% Holders present no evidence whatsoever to

support their scurrilous accusation that the Debtors attempted to disguise the terms and potential

effects of the Settlement Motion.  This allegation is particularly repugnant because of the

extensive evidence to the contrary, all of which is known to the 10% Holders.  As noted above,

the Debtors and the Trustee took great efforts to publicize the Settlement Motion:

- on February 22, 2007, the terms of the Settlement were described openly before
  this Court;

- on February 23, 2007, a notice of the Settlement that described its key terms was
  posted to the Trustee's website;

- on March 8, 2007, the Settlement Motion and all relevant documents were posted
  to the Court's publicly available electronic docket and included in a Form 8-K
  SEC filing available to the general public; and

- on or around March 13, 2007, nearly three weeks prior to the voting deadline for
  the Plan, a notice of the Settlement was sent to all of the Bondholders.

Thus, the facts demonstrate that, contrary to the 10% Holders' baseless allegation, the Debtors

did not try to "disguise" the Settlement Motion, and indeed took significant steps, with the

assistance of the Trustee, to alert the Bondholders to the proposed Settlement.  Further, it is

difficult to understand how the Debtors would "disguise" the impact of a settlement which was

filed as an attachment to a public document.  Indeed, based on all of the notice of the Settlement

provided to Bondholders and the timing of such notice, it is clear that the Bondholders, who

voted overwhelmingly in favor of the Plan, were aware of the Settlement well before they had to

vote on the Plan.

99.    The 10% Holders' second allegation is arguably even worse than their first

allegation.  One of the issues that this Court heard the most oral argument about during the

Settlement Hearing was whether the Trustee had the authority to enter into the Settlement at the

direction of 60% of the Bondholders.  As demonstrated at the hearing on April 19, 2007 and at

length in the pleadings filed with this Court, including exhibits, there is clear evidence that,

indeed, the Trustee was authorized to enter into the Settlement.[9]  The 10% Holders are well

aware of these arguments, as they are the sole opponent of the Settlement Motion.

100.    The 10% Holders' allegations regarding good faith are not supported by any

evidence.  Accordingly, and as discussed above, the Plan complies with section 1129(a)(3) of the

Bankruptcy Code.

> **E.    Neither the Settlement Motion or Approval Thereof Will Modify the Plan for Purposes of Section 1127(c), and Therefore No Resolicitation is Required**

101.    Contrary to the 10% Holders' contentions, the Debtors' proposal of the Settlement

Agreement does not constitute a material modification of the Plan and certainly does not require

resolicitation of the Plan.  First, the Trustee's Claim, if the Settlement Agreement is approved,

will account for less than 2% of the expected Claims in the Debtors' chapter 11 cases.  Second,

the 10% Holders ignore the significant amount of notice that was provided to the Bondholders

long before the voting deadline for the Plan, though such notice is critical to determining the

materiality of a modification.  The Committee believes that the Settlement is quite important; it

is does not, however, constitute a material modification to the Plan.

102.    The standard for whether a modification is "material" is whether the modification

"so affects a creditor or interest holder who accepted the plan that such entity, *if it knew of the

modification*, would be likely to reconsider its acceptance."  *Solar King*, 90 B.R. at 824 (citing 8

*Collier on Bankruptcy,* ¶ 3019.03, at 3019-3 (15th ed. 1987)) (emphasis added).  As described in

section IV. D. above, the Bondholders were provided with significant notice of the Settlement up

---

[9] As discussed in detail in the Committee's joinder to the Debtors' response to the 10% Holders' Settlement Objection, it is the Committee's position that the Trustee had the authority to enter into the Settlement.

to three weeks prior to the voting deadline.  Thus, the Bondholders were well aware of the

Settlement when they voted on the Plan, and approximately 97% (in amount) and 89% (in

number) of the Bondholders voted to support the Plan.

103.     Accordingly, the modification proposed to the Plan in the Settlement Agreement

is not material and does not require a resolicitation of the Plan.

### F.     The Plan's Release Provisions are Proper and Consistent with Settled Law

104.     Finally, the 10% Holders attack the releases and exculpations in the Plan,

asserting a hodgepodge of arguments.  However, their true concern lies in the releases provided

to, among others, the Trustee and KCAB under the Settlement Agreement and in the Plan.

105.     As described in detail above in section III. F., the Exculpation, Injunction, Debtor

Releases, and Voluntary Releases in the Plan are consistent with applicable law and the precedent

in the Second Circuit.  Further, as discussed above in section III. F. 4., the Voluntary Releases are

consistent with the *Metromedia* decision, in which the Second Circuit expressly stated that

"[n]ondebtor releases may also be tolerated if the affected creditors consent."  *Metromedia*, 416

F.3d at 142.

106.     Finally, the releases provided to the Trustee and KCAB under the Settlement

Agreement and the Plan are appropriate, as discussed in the pleadings filed with this Court

regarding the Settlement Motion.  Moreover, the releases provided to the Trustee and KCAB are

only pertinent if this Court grants the Settlement Motion.

107.     Accordingly, the Plan's release provisions comply with applicable law.

## V.     RESPONSE TO *PRO SE* OBJECTIONS

108.     Each of the *pro se* Objections should be overruled by this Court.  First, Mr.

Guajardo, as a Delta shareholder, would prefer that he receive some value for his stock.

However, under the absolute priority rule, unless unsecured creditors are paid in full, and they

are not being paid in full, he is not entitled to retain or receive any property.  In her Objection,

Ms. Lusk argues that she has been denied her due process rights because she was not allowed to

vote on the Plan.  However, because the Debtors have objected to the claim filed by Ms. Lusk,

pursuant to the voting and solicitation procedures approved by this Court, Ms. Lusk was not

permitted to vote on the Plan.  Finally, upon information and belief, the Committee understands

that counsel for the Debtors have contacted Ms. Mehen and believe that Ms. Mehen's putative

objection to the Plan is, in substance, a response to a pending objection against one of her claims.

The Committee submits that, if this is the case, Ms. Mehen's objection is not an objection to

confirmation of the Plan.

## CONCLUSION

The Plan complies with and satisfies all applicable requirements of section 1129

of the Bankruptcy Code, and thus the Court should overrule the Objections and confirm the Plan.

Dated:  April 23, 2007
         New York, New York

                                        AKIN GUMP STRAUSS HAUER & FELD LLP

                                        By:   /s/  Lisa G. Beckerman
                                              Daniel H. Golden (DG-5624)
                                              Lisa G. Beckerman (LB-9655)
                                              David H. Botter (DB-2300)
                                              590 Madison Avenue
                                              New York, NY 10022
                                              (212) 872-1000 (Telephone)
                                              (212) 872-1002 (Facsimile)

                                        **ATTORNEYS FOR THE OFFICIAL
                                        COMMITTEE OF UNSECURED
                                        CREDITORS OF DELTA AIR LINES,
                                        INC., ET AL.**