In re:

DELTA AIR LINES, INC., *et al.*,

                            Debtors.

Chapter 11

Case No. 05 B 17923 (ASH)

(Jointly Administered)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**A P P E A R A N C E S :**

**DAVIS POLK & WARDWELL**
**Attorneys for Debtors**
**By:** Marshall S. Huebner, Esq.
     James I. McClammy, Esq.
     Andrew Dean, Esq.
**450 Lexington Avenue**
**New York, NY 10017**

**WHITE & CASE, LLP**
**Attorneys for Ad Hoc Committee of Bondholders**
**By:** John K. Cunningham, Esq.
**1155 Avenue of the Americas**
**New York, NY 10036-2787**

**MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO, P.C.**
**Attorneys for UMB Bank, N.A.**
**By:** William W. Kannel, Esq.
     Daniel S. Bleck, Esq.
     Ian A. Hammel, Esq.
**One Financial Center**
**Boston, MA 02111**

**EDWARDS ANGELL PALMER & DODGE LLP**
**Attorneys for Kenton County Airport Board**
**By:** Selinda A. Melnik, Esq.
**750 Lexington Avenue**
**New York, NY 10022**

**AKIN GUMP STRAUSS HAUER & FELD LLP**
**Attorneys for Official Committee of Unsecured Creditors**
**By:** Daniel H. Golden, Esq.
    Lisa G. Beckerman, Esq.
    David H. Botter, Esq.
    Abid Qureshi, Esq.
**590 Madison Avenue**
**New York, NY 10022-2524**

**ADLAI S. HARDIN, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

**DECISION GRANTING RULE 9019 MOTION**
    **AND APPROVING SETTLEMENT**

Debtor Delta Air Lines, Inc. ("Delta")[1] and Kenton County Airport Board ("KCAB") are parties to a lease (the "Lease") and various other agreements (collectively with the Lease, the "Facilities Agreements") governing Delta's use and occupancy of certain facilities and improvements at the Cincinnati/Northern Kentucky International Airport (the "Airport") dated February 1, 1992. The Lease calls for rental payments over thirty years equal to amounts due on certain special facilities revenue bonds — the $419 million Kenton County Airport Special Facilities Revenue Bonds, 1992 Series A and the $19 million Kenton County Airport Special Facilities Revenue Bonds, 1992 Series B (together, the "Bonds" and holders thereof the "Bondholders"). The Bonds were issued under a Trust Indenture (the "Indenture") dated as of February 1, 1992 between KCAB an issuer and Star Bank, N.A., predecessor-in-interest to UMB Bank, N.A. as trustee (the "Bond Trustee"), pursuant to which KCAB assigned to the Bond Trustee certain of its rights under the Lease including the right to receive the rental payments from Delta.

In late 2005 Delta informed KCAB and the Bond Trustee that Delta intended to reject certain of the Facilities Agreements including the Lease. After more than a year of complex, hard fought, arms' length negotiations, Delta, KCAB and the Bond Trustee reached a global settlement (the "Settlement") resolving all issues between the parties arising from Delta's rejection of the Lease and other Facilities Agreements.

Before the Court is Delta's motion under Bankruptcy Rule 9019, joined in by KCAB and the Bond Trustee and supported by the Official Committee of Unsecured Creditors, seeking entry of an order to implement the Settlement by (1) approving the parties' Settlement Agreement, (2) approving Delta's rejection of the Lease and certain other Facilities Agreements and (3) authorizing Delta and KCAB to enter into a new lease (the "New Lease") and other agreements.

The only objection to the 9019 motion and the Settlement was filed by five holders of Bonds said to aggregate approximately $51 million, four of which acquired their Bonds after January 1,

---

[1] Delta and certain of its affiliates filed their petitions under Chapter 11 in September 2005.

2006.[2] Self-styled the "Ad Hoc Committee of Kenton County Bondholders," the five objecting Bondholders will be referred to here as the "Objectors" and their objection the "Objection."

The Objectors do not assert that the Settlement is not reasonable or beneficial for Delta and its creditor constituency, nor would one expect such an argument. But what is surprising is that the Objectors did not make any argument that the Settlement is not reasonable or beneficial from the perspective of the Bondholders, even after the Court noted the point at the oral argument (Tr. 106-107). Instead, the Objectors oppose the Settlement on eight strictly legal grounds, summarized as follows:

(i) The Bond Trustee lacks authority to bind the Objectors to a settlement for less than 100% of their entitlement to principal and interest on the Bonds without their consent.

(ii) The Court lacks subject matter jurisdiction to modify the Indenture, which is an agreement between two non-debtor parties, KCAB and the Bond Trustee.

(iii) The global settlement violates Kentucky law which requires full payment of principal and interest on all Kentucky bonds.

(iv) The settlement purports to allow Delta to "rip up its original 30-year Lease Agreement dated February 1, 1992" and sign a new facilities agreement allowing Delta to continue to use the facilities "rent free" for the remaining 15-year term of the original Facilities Agreements.

(v) The settlement is an illegal *sub rosa* plan.

(vi) The settlement is dependent upon an unlawful release of claims of Bondholders against the three settling parties.

(vii) Modification of the Indenture violates the impairment of contract clause of the United States Constitution.

---

[2] The total outstanding Bonds presently aggregate $413,570,000 principal amount held by substantially more than 546 Bondholders. The Bonds are held in street name and thus holders cannot be numbered. But 546 Bondholders holding $168.5 million face amount of Bonds have recently voted timely and properly on the Plan.

(viii) The Federal Trust Indenture Act prohibits any impairment of the Bondholders' rights under the Indenture.

Each of these arguments is considered below.

## Jurisdiction

As amplified below, this Court has jurisdiction over this case and this contested matter under 28 U.S.C. §§ 1334(a) and (b) and 157(a) and the standing order of referral to bankruptcy judges signed by Acting Chief Judge Robert J. Ward on July 10, 1984. The pending motion is a core proceeding under 28 U.S.C. § 157(b)(2).

## Basic Facts Ignored by Objectors

There is an aura of unreality that pervades the Objectors' arguments and stems from their failure to take cognizance of two real world, fundamental facts of life in this Chapter 11 case which cannot be ignored.

First, it is an oft-repeated premise of the Objectors' position on this motion that they cannot be deprived of their contractual right to 100% of their entitlement to principal interest under the Indenture without their consent, and they do not consent. What is ignored is the fact that this is a bankruptcy case, and whether the Settlement is approved by this Court or not, the Bondholders including Objectors are not going to receive 100% of the amount to which they are entitled under the Indenture. Bondholders and the Bond Trustee have no claim against KCAB, the issuer of the Bonds, which are expressly made non-recourse under the Indenture. The sole source of funding for the Bonds is the stream of rental payments under the Lease running from 1992 through 2022. As a Chapter 11 debtor, Delta has the extraordinary power under Section 365(a) of the Bankruptcy Code to reject the Lease, leaving KCAB, and thus the Bond Trustee, and thus the Bondholders, with an unsecured, pre-petition claim for damages under Section 365(g), which (Delta argues but the Court need not decide) may be capped under Section 502(b)(6). Whether capped or not under Section 502(b)(6), it is a practical certainty that the Bondholders will receive less than their contractual entitlement under the Indenture. The only question is how much less, and that was precisely the subject of the negotiations leading to the Settlement.

A second premise underlying the Objection is that the Court lacks subject matter jurisdiction to modify the Indenture because it is a contract between two non-debtors. The legal defects in this argument are addressed below. The practical reality which the argument ignores is that the Bond Trustee's rights against KCAB under the Indenture to receive the rent paid by Delta to KCAB will inevitably be modified, whether or not this Court approves the Settlement. When Delta rejects the Lease, the rent payments will terminate, leaving the Bond Trustee with an unsecured pre-petition claim to be paid in Delta stock *pari passu* with all other unsecured creditors.

In short, the putative entitlement which the Objection seeks to vindicate — preservation of the Indenture and the Bondholders' right to 100% payment thereunder — is sheer fantasy in the context of this case under the Bankruptcy Code. Even if this Court does not approve the Settlement, Delta will reject the Lease and thereby terminate all future payments under the Lease, leaving KCAB and the Bond Trustee with an unsecured pre-petition claim. The settling parties' negotiations concerned the amount and composition of that claim, with the Bond Trustee and KCAB asserting every argument against Delta which the Bondholders themselves could have asserted if the Bondholders had standing to make claim against Delta, which they do not, as amplified below. If Delta's position on the key issues in the negotiations (especially the Section 502(b)(6) issue) were litigated and sustained by a court, the unsecured pre-petition claim would result in recovery by the Bondholders of only a fraction of their entitlement *under the Settlement*. But in no event would the Indenture and the Bondholders' rights thereunder survive unmodified.

**The Negotiations and Settlement**

After Delta notified the parties in late 2005 of its intent to reject the Lease and certain of the Facilities Agreements, Delta, KCAB and the Bond Trustee agreed to a stipulation on December 30, 2005 providing for a 60-day period for the parties to attempt to reach a consensual agreement, with the further agreement that any motion prior to expiration of the negotiation period to approve rejection would result in rejection effective January 19, 2006 if and when approved by the Court. On February 17, 2006 the parties agreed to extend the negotiation period from March 1 to May 1, 2006. On April 28, 2006,

having been unable to negotiate an agreement, Delta filed a motion (the "Rejection Motion") seeking rejection of the Lease and certain of the Facilities Agreements. The parties continued to negotiate, however, and on July 17, 2006 Delta, KCAB and the Bond Trustee entered into a forbearance agreement (the "Forbearance Agreement") providing for Delta to make an initial payment to the Bond Trustee on behalf of the Bondholders on August 1, 2006 of $9 million for use and occupancy of the airport facilities for the period from January 1 to August 31, 2006, and monthly payments equal to $1,125,000 for use of the facilities thereafter. The Forbearance Agreement provided that payments pursuant thereto would be credited against any obligation Delta may have to pay for the facilities under the Lease or otherwise, and each of the parties would forbear from exercising any rights or remedies available to them for Delta's failure to make whatever payments were contractually due under the Lease. On November 26, 2006 and again on December 29, 2006 the Forbearance Agreement was extended, ultimately to February 15, 2007. Under the Settlement Agreement, the forbearance period was extended until the "Issuance Date" as defined therein.

The negotiations between the settling parties were carried on from December 2005 until mid-February 2007. As described by the Bond Trustee in its Reply Memorandum (page 4) "the parties were engaged in long and contentious negotiations and legal battles over their respective rights, obligations and claims." The Bond Trustee was represented by "a team of professionals to provide guidance and advice concerning the myriad of legal, regulatory and economic issues faced during this chapter 11 case." *Id*. The team included experienced bankruptcy counsel, experienced FAA counsel, experienced Kentucky law counsel and an experienced airline industry consultant.

The Bond Trustee "developed an exceptionally full and open process of communication with all of the 1992 Bondholders" and "took all reasonable efforts to insure that the 1992 Bondholders were timely informed of the status of the various matters involved in these bankruptcy proceedings." *Id.* at 5. This "process of communication" included sixteen Bondholder notices during the course of the bankruptcy case to report on material events including, *inter alia*, Delta's threats to reject the Lease and ongoing negotiations concerning the potential settlement of the issues. The Bond Trustee also established

a website "solely dedicated to the interests of the 1992 Bondholders," which reported on all material events and pleadings "and finally all of the documents associated with the Settlement — which were posted over a month before the objection deadline concerning the Settlement and weeks before the voting deadline on Delta's plan of reorganization." *Id.* at 5. The Bondholder notices were also provided to Depository Trust Company for distribution to beneficial holders and posted on Bloomberg.

An unofficial "Bondholders' Committee" was formed constituted of Bondholders holding approximately 60% of the outstanding principal amount of the Bonds. "Through this Bondholder Committee, the Indenture Trustee was able to review critical issues with a majority of the ultimate stakeholders and to access their viewpoints and judgments as to the strategic and business issues. Pursuant to the Bondholder Notices, all 1992 Bondholders were invited to join the Bondholders' Committee to assist in the process." *Id.* at 6, footnotes omitted.

The Settlement materials were posted on the Bondholders' website, and full information concerning the Settlement was also (i) sent directly to the Bondholders through Delta's balancing agent, (ii) published on Delta's website, (iii) published in the *Wall Street Journal* National Edition and the *Cincinnati Inquirer*, (iv) provided to four Nationally-Recognized Municipal Securities Information Repositories and (v) set forth in an 8K filed by Delta on March 8, 2007 with the Securities and Exchange Commission. The Bond Trustee disclosed the terms of the Settlement in open court on February 22, 2007 and followed up with a Bondholder Notice posted on the Bondholder website, published on Bloomberg on February 23, 2007 and sent to DTC for distribution the same day.

Among the legal issues which were hotly contested in the Settlement negotiations and resolved by the Settlement Agreement were the following:

- Delta's ability to reject the Facilities Agreement;

- Whether the obligations under the Guaranty are capped under Section 502(b)(6) of the Bankruptcy Code;

- Whether the Facilities Agreement itself is a disguised financing transaction;

- Whether the Indenture Trustee had a claim to "re-let proceeds" to the extent that the Facilities Agreement was rejected;

- Whether Kentucky law was an obstacle to Delta's plans to reject the Facilities Agreement or otherwise occupy the Facilities at a reduced rental rate even if the Rejection Motion was approved;

- The viability of the Indenture Trustee's claims against KCAB.

*Id.* at 33.

The "re-let proceeds" question was not only a legal but a factual issue of significance to the economic negotiations. It appears that the rent paid by Delta to KCAB under the Lease was substantially higher than the market values for the facilities. Moreover, counsel for the Bond Trustee revealed at the hearing on the 9019 motion that the Trustee's marketing professionals had determined after lengthy study that it would be difficult if not impossible to find replacement tenants for the facilities occupied by Delta under the Lease at the Airport.

The Bondholders' Committee, comprising holders of 60% of the face amount of the Bonds, which was kept fully informed of the negotiations, gave written instructions authorizing the Bond Trustee to agree to the terms of the Settlement. The Settlement Agreement and its constituent elements resolved all outstanding issues between the parties. The Settlement Agreement is well summarized in Delta's Rule 9019 motion as follows:

10. The Settlement Agreement sets forth the Parties' agreement that, *inter alia*,

(i) the Rejected Agreements shall be deemed rejected as of the dates set forth in Exhibit A to the Settlement Agreement;

(ii) the Rejected Agreements shall be terminated by agreement of the Parties as of the Closing Date, and the 1992 Bond Indenture shall be [sic] remain in effect solely as set forth in the Settlement Agreement and shall otherwise be of no force or effect;

(iii) Delta and KCAB will enter into a new lease agreement substantially in the form of the draft attached as Exhibit F to the Settlement Agreement (the "**New Lease**") and such other agreements as Delta and KCAB shall deem necessary or appropriate in connection therewith, including a Maintenance and Operations Services Agreement in form and substance similar to the form attached as Exhibit G to the Settlement Agreement (the "**New M&O Agreement**") and a Bulk Storage Facilities Lease in form and substance similar to the form attached as Exhibit B to the Settlement Agreement;

(iv) Delta shall issue a note (the "**Delta Note**")[7] to the Bond Trustee, on behalf of the 1992 Bondholders, the original principal amount of which shall be $85,000,000 less amounts paid by Delta under the Forbearance Agreement, as amended, and less amounts

made as a prepayment of all or a portion of the Delta Note Value, and bearing a fixed interest rate of eight (8) percent per annum, as provided for in the Settlement Agreement;

(v) the Bond Trustee, as trustee and on behalf of all 1992 Bondholders, shall have a $260,000,000 allowed pre-petition, non-priority, unsecured claim against Delta (the "**Bankruptcy Claim**");

(vi) Delta, KCAB, the Bond Trustee, and the 1992 Bondholders will forever release, discharge, waive and abandon any claims or rights that each may have against the others with respect to the 1992 Bonds, 1992 Bond Facilities and the 1992 Bond Agreements as set forth in the Settlement Agreement;

(vii) Delta shall reimburse the Bond Trustee for the actual and reasonable fees and expenses of the Bond Trustee incurred in connection with the 1992 Bonds, the Settlement Agreement and Delta's bankruptcy case, with such reimbursement, in the aggregate, not to exceed $2,000,000;

(viii) Delta will be deemed to have assumed at Closing the Airport Use Agreement, as amended, including prepetition and postpetition obligations pursuant thereto; and

(ix) the Guaranty and Tax Certificate are pre-petition obligations of Delta that, as such, shall be fully discharged and terminated in connection with Delta's exit from bankruptcy, according to the terms set forth in the Settlement Agreement.

---

[7] The Delta Note shall be and shall be deemed issued under Delta's Plan and, pursuant to 11 U.S.C. § 1145, shall qualify for exemption from any Federal or State law requiring registration for offer or sale of a security.

The Delta Note and the payments of amounts under Section 3.02(c)(iii) of the Settlement Agreement are provided in consideration of (i) the consent to certain relief sought in the Rejection Motion as modified by the terms of this Agreement, and (ii) the release of all claims with respect to the post-rejection occupancy of the 1992 Bond Facilities, including any purported rights to receive relet proceeds.

The Settlement appears to this Court to be clearly in the best interests of *both* Delta and the Bondholders. Under the existing Lease, Delta currently is required to pay $29.1 million in rent each year in interest only on the Bonds. Principal payments on the Bonds would be due in 2012, 2020, 2021 and 2022 in the amounts of $50 million, $135,210,000, $130 million and $98,360,000, respectively, aggregating $413,570,000. In lieu of these liabilities for rent under the Lease payable between now and 2022, the Settlement Agreement provides for Delta's note in the amount of $85 million less amounts previously paid under the Forbearance Agreement, and a pre-petition, non-priority, unsecured claim of $260 million payable in Delta equity securities. In addition to these very substantial savings, the Settlement Agreement will avoid prolonged and costly litigation.

The terms of the Settlement Agreement also appear to be favorable for the Bondholders. Delta's Rejection Motion, resolved by the Settlement Agreement, would be virtually assured of approval if the Court were to sustain the Objection and disapprove the Settlement Agreement. The right to reject executory leases and other contracts under Section 365(a) is one of the powerful tools given to debtors-in-possession to facilitate reorganization under the Bankruptcy Code. Rejection is routinely granted where, as here, it is in the debtor's interest under the business judgment rule, and there has been no suggestion by Objectors that any ground would exist for the Court to deny Delta's motion to reject. In the event of rejection, the Bondholders would receive an unsecured, pre-petition claim which could not approach their entitlement under the Indenture. It bears repeating that the Objectors have not argued that the Settlement is not beneficial to the Bondholders. As summarized by Delta in its Reply Memorandum (page 4), unrebutted by the Objectors at oral argument:

> [W]ithout the Settlement Agreement, the 1992 Bondholders faced receiving, as their *total* recovery, a single claim capped by section 502(b)(6) of the Bankruptcy Code in the amount of either (approximately) $75.5 million or $127.5 million. Under the Settlement Agreement, however, they will receive a claim of $260 million, cash or notes with a present value of $85 million (the "**Delta Note**") and $2 million in legal fees. Assuming a 65 cent recovery for general unsecured creditors,[5] the 1992 Bondholders will receive consideration equivalent to an unsecured claim of approximately $394 million — **3 to 5 times** what they might well have recovered absent the Settlement Agreement. The 10% Bondholders' erroneous suggestion that Delta's new lease is "rent free" also ignores the hundreds of millions of dollars of value that Delta is paying to the 1992 Bondholders in additional consideration under the Settlement Agreement. As discussed below (and as was made clear in discovery), the majority of the 1992 Bondholders and the Bond Trustee chose to receive these payments up front and in the form of freely tradable securities, rather than having them structured as future rent and spread out over the course of the lease term.

---

[5] The estimated recovery range for holders of general unsecured claims against Delta included in Delta's Disclosure Statement was 62% to 78% with a mid-point of 70%. Recent claim trading activity also suggests a market estimate of a 60 cents recovery.

### **Delta's Plan and Bondholder Approval**

The Settlement Agreement expressly provides that the terms of the Settlement (which was fully and timely disclosed to all creditors including Bondholders) are incorporated in and made part of Delta's Plan of Reorganization and subject to creditor approval of the Plan. The Bondholders have voted overwhelmingly both in dollar amount (97.35%) and number (89.19%) to accept the Plan. The

certification of ballots shows that 546 Bondholders holding $168,520,535 of Bonds filed timely and proper claims. Of these, 487 Bondholders holding $164,052,671 of Bonds voted to accept the Plan, with only 59 Bondholders holding $4,467,864 of Bonds voting to reject the Plan. A number of untimely or improper votes were also cast, some or all of which voted to reject the Plan. But even counting these improper votes, 89.49% in amount and 88.69% in number voted in favor of the Plan.

Bondholders voting on the Plan obviously have no interest under the Plan other than what is provided under the Settlement. Thus, the actual vote reflects the Bondholders' overwhelming support for the Settlement.

### The Objectors' Legal Arguments

**I.     The Bond Trustee's authority to bind the Objectors to the Settlement**

The Objectors rely on Sections 9.06, 12.03(a), 12.06 and 12.07 of the Indenture to argue that "the Bond Trustee lacks authority to enter into the Settlement Agreement." These so-called "non-impairment provisions" do indeed purport to preclude any impairment of Bondholders' rights under the Indenture. Thus, for example, Section 9.06 states:

> SECTION 9.06. <u>No Impairment of Right to Enforce Payment</u>. Notwithstanding any other provision of this Indenture, the right of any Owner to receive payment of the principal of or purchase price of an interest and any premium on his bond, on or after the respective due dates expressed therein, or to institute suit for the enforcement of any such payment on or after such respective date, shall not be impaired or affected without the consent of such Owner.

Article XII is titled "MODIFICATION OF THIS INDENTURE AND THE AGREEMENT." Section 12.03 is titled "Supplemental Indenture with Consent of Owners;" Section 12.06 is titled "Amendment of Agreement or Guaranty without Consent of Owners;" Section 12.07 is titled "Amendment of Agreement or Guaranty with Consent of Owners."

Viewed in the abstract, and without reference to the facts and circumstances under which they may be applicable, these provisions appear to support the Objectors' argument. But what the argument ignores is that the sole source of payment of the Bonds is a Lease between the issuer, KCAB, and a debtor-in-possession in bankruptcy. The Bankruptcy Code, which overrides private agreements, grants Delta the right to reject the Lease and terminate future payments under the Lease to KCAB, which will

terminate payments under the Indenture to the Bondholders. In short, the Bondholders' rights under the Indenture *will be impaired* in this bankruptcy case despite all the provisions of the Indenture relied upon by the Objectors.

Article XII is not concerned with default or bankruptcy or other events beyond the control of KCAB or the Bond Trustee — it relates to consensual modifications of the Indenture and the Agreement. We are not concerned here with a "supplemental indenture" (Section 12.03) or amendments of the agreement or guaranty with or without consent of the owners (Sections 12.06, 12.07), and those provisions are simply irrelevant here. The impairment which the Objectors complain of results not from any agreement of the Bond Trustee, but from operation of the Bankruptcy Code and the simple economic fact that this insolvent debtor *cannot* pay its creditors unimpaired.

Article IX of the Indenture titled "DEFAULTS AND REMEDIES," is relevant, and it is here that we find apparent ambiguity. But the ambiguity is more apparent than real. Section 9.06, relied upon by Objectors, is titled "No Impairment of **Right** to Enforce Payment." I have emphasized the word "Right" because the legal "right" to payment, or to try to enforce payment, must be distinguished from the quite separate factual question of whether the issuer will have the *capacity* to pay. Once Delta filed for bankruptcy, defaulted in its payment obligations under the Lease and declared its certain intention to reject the Lease, the Bondholders' "right" to 100% payment under the Indenture became academic. The non-impairment provisions including Section 9.06 are meaningless in bankruptcy because, unless the debtor is solvent and able to pay all creditors 100 cents, all creditors are impaired whether they consent or not. It bears repeating that the impairment of which the Objectors complain was not the consequence of any consensual relinquishment of Bondholder rights by the Bond Trustee. All the Bond Trustee did was to negotiate the amount and timing of the impairment which the Bondholders would suffer after the fact of impairment was a *fait accompli* by reason of Delta's bankruptcy, default and decision to reject the Lease.

The real issue under Article IX of the Indenture was not whether the Bondholders would be impaired — they *were* impaired — but what remedies could be exercised by or on behalf of the Bondholders, by whom and under what authority.

The Indenture clearly vests in the Bond Trustee alone the power to exercise the Bondholders' remedies in the event of a default, subject to instruction by a majority in principal amount of Bondholders. Section 9.01 provides:

> Upon the occurrence and continuance of any Event of Default . . . the Trustee may, and at the written request of Owners of a majority in principal amount of Bonds then Outstanding shall, by written notice to the Issuer and the Company, declare the Bonds to be immediately due and payable. . . .

Section 9.02 provides as follows:

> SECTION 9.02. Remedies. In addition to the rights conferred, or obligations imposed, upon the Trustee under Section 9.01 to accelerate the principal of the Bonds, upon the occurrence and continuance of any Event of Default, then and in every such case the Trustee in its discretion may, and upon written request of the Owners of a majority in principal amount of the Bonds then Outstanding and receipt of indemnity to its satisfaction shall, in its own name and as the Trustee of an express trust:
>
> (a) by mandamus, or other suit, action or proceeding at law or in equity, enforce all rights of the Owners of the Bonds, and require the Issuer and the Company to carry out any agreements with or for the benefit of the Owners and to perform their duties under the Act, the Agreement and this Indenture;
>
> (b) take all such actions as may be permitted under the Letter of Credit or other Credit Facility;
>
> (c) bring suit upon the Agreement, the Bonds or any Credit Facility; or
>
> (d) by action or suit in equity enjoin any acts or things which may be unlawful or in violation of the rights of the Owners of the Bonds.

Section 9.04 grants a majority in amount of Bondholders power to direct the Trustee's remedial proceedings. Section 9.04 provides, in relevant part:

> SECTION 9.04. Owners' Right to Direct Proceedings. Anything in this Indenture to the contrary notwithstanding, the Owners of a majority in principal amount of the Bonds then outstanding hereunder shall have the right, by an instrument in writing executed and delivered to the Trustee, to direct the time, method and place of conducting all remedial proceedings available to the Trustee under this Indenture or exercising any trust or power conferred on the Trustee by this Indenture; provided, however [not relevant].

Section 9.05 titled "Limitation on Owner's Right to Institute Proceedings" expressly limits the right of any Bondholder to institute any suit, action or proceeding to enforce the Bonds unless and until the owner of a majority in amount of the Bondholders shall have made written request of the Trustee to do so and the Trustee shall not have complied. This Section concludes with the language "it being understood and intended that no one or more of the Owners shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of this Indenture, or to enforce any right hereunder or under the Bonds, except in the manner herein provided. . . ."

Section 9.07 provides that the Trustee may exercise its rights of enforcement under the Indenture without the possession of any of the Bonds and concludes:

> Any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the equal and ratable benefit of the Owners subject to the provisions of this Indenture.

These provisions, individually and collectively, make absolutely clear that, when there is a default by the issuer, the Bond Trustee alone has the power and authority to commence remedial procedures on behalf of all Bondholders, constrained only by the direction in writing of a majority in amount of the Bondholders. No individual Bondholder and no group of Bondholders, large or small, has the right or power on its own behalf or on behalf of other Bondholders to exercise remedial procedures unless the Bond Trustee refuses to act.

Implicit in the authority to commence proceedings to remedy defaults is the power to negotiate and agree upon settlements, subject to the power to direct in writing by a majority in amount of the Bondholders. This basic postulate has been recognized by the courts. *See In re Smart World Tech., LLC*, 423 F.3d 166, 174-75 (2d Cir. 2005) (power to sue conferred by Bankruptcy Code "presumably includes the derivative power to settle suits"); *Kelton Corp v. County of Worcester*, 688 N.E.2d 941, 944 (Mass. 1997) (the power of a municipal government to compromise disputed claims is necessarily incident to the power to sue); *Evans v. Tucker*, 135 So. 305, 309 (Fla. 1931) (citing "general rule" that the right to compromise is an incident to the power to sue and collect); *Codman v. Dumaine*, 144 N.E. 408, 411 (Mass. 1924) (the power to sue and be sued carried with it as a necessary incident the power to com-

promise); *Farnham v. City of Lincoln,* 106 N.W. 666, 667 (Neb. 1906) ("The power to compromise grows out of, and is incident to, the power to sue and be sued.").

In default situations where contractual rights are already impaired by exogenous events, non-impairment clauses are moot and the Trustee's power to sue and settle subject to direction by a majority in amount or a specified minimum percentage will be sustained over the objection of a minority or individual. *See MBank Dallas v. LaBarge, Inc.*, Case No. 86 C 9583 (N.D. Ill. 1986) and *Kemper Investors Life Ins. Co. v. Las Colinas Corp.*, Case No. 88 C 9152 (N.D. Ill. 1989). *See also Beal Savings Bank v. Sommer*, 2007 WL 844857, 2007 N.Y. LEXIS 267, at *13 - *26 (N.Y. March 22, 2007); *First National Bank of Louisville v. Continental Illinois National Bank & Trust. Co.*, 933 F.2d 466, 470 (7th Cir. 1991); *Friedman v. Chesapeake & Ohio Ry. Co.*, 261 F. Supp. 728 (S.D.N.Y. 1966), *aff'd* 395 F.2d 663 (2d Cir. 1968), *cert. denied*, 393 U.S. 1016 (1969); *Home Mortgage Co. v. Ramsey*, 49 F.2d 738 (4th Cir. 1931); *Quirke v. St. Louis-San Francisco R.R. Co.*, 277 F.2d 705 (8th Cir. 1960); Restatement (Second) of Trusts § 192 (1959); *Palmer v. Bankers' Trust Co.*, 12 F.2d 747, 754 (8th Cir. 1926).

## II. The Court's subject matter jurisdiction

Little need be said of the Objectors' argument that this Court lacks subject matter jurisdiction to modify the Indenture because it is an agreement between two non-debtors.

Jurisdiction is granted in Title 28 of the United States Code. Section 1334(a) provides that "the district courts shall have original and exclusive jurisdiction of all cases under title 11." Section 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." The Bankruptcy Court has jurisdiction by referral from the District Court under 28 U.S.C. § 157(a) and (b).

It is frivolous to argue that this Court does not have jurisdiction to grant or withhold approval of the Settlement, including that aspect of the Settlement providing for modification of the contractual relationship between KCAB and the Bond Trustee under the Indenture. Both KCAB and the Bond Trustee are direct creditors of Delta, KCAB based on the Lease and the Bond Trustee based on Delta's February 1, 1992 Guaranty of the Lease, which is the only source of funding of KCAB's obliga-

tion to the Bond Trustee under the Indenture. All three of these agreements — the Lease, the Indenture and the Guaranty — are inextricably related to each other. KCAB's Section 365(g) claim against Delta for rejection of the Lease and the Bond Trustee's claim against Delta under the Guaranty cannot be resolved without a corresponding resolution of the KCAB-Bond Trustee relationship under the Indenture. The Settlement resolves all claims between the three parties arising from Delta's rejection of the Lease under Section 365(a) of the Bankruptcy Code.

In short, there can be no question that this Court has jurisdiction with regard to the Settlement in its entirety under both the "arising under title 11" and the "arising in or related to cases under title 11" clauses of 28 U.S.C. § 1334(b).

### III. Kentucky law, the Trust Indenture Act and the Constitution

Equally without support are the Objectors' arguments that Kentucky Revised Statute § 103.260(2), Section 316(b) of the Federal Trust Indenture Act of 1939, 15 U.S.C. § 77ppp(b), or the non-impairment clause of United States Constitution, Article I, Section 10, preclude Court approval of the Settlement.

KRS § 103.260 applies to the initial structuring of revenue bond transactions. It does not purport and has never been construed by any court to preclude restructuring of revenue bond debt in the context of default and bankruptcy proceedings, where it is impossible for the debtor to perform in accordance with the bond indenture.

The same may be said for Section 316(b) of the Trust Indenture Act. Section 316(b) was passed out of a "concern about the motivation of insiders and quasi-insiders to destroy a bond issue through insider control. . . ." *UPIC & Co. v. Kinder-Care Learning Ctrs, Inc.*, 793 F. Supp. 448, 452 (S.D.N.Y. 1992). As the Objectors note in their Supplemental Objection, "The court in *UPIC* further noted that in enacting Section 316(b), the SEC was 'undoubtedly aware that requiring unanimity in bondholder voting — rather than mere majority action — would frustrate consensual workouts and help induce bankruptcy . . . [and] welcomed the prospect.' Id. at 453." It is self-evident that Section 316(b) could not have been intended to impair the capacity of a debtor and its creditors to restructure debt in the

context of bankruptcy. The cases have uniformly recognized that reorganization proceedings in Chapter 11 are not within the purview of TIA Section 316(b). *See*, *e.g.*, *In re Bd. of Dirs. of Telecom Argentina, S.A.*, Case No. 06 CIV 2352, 2006 WL 3378687 at *6 (S.D.N.Y. Nov. 20, 2006) (stating that "the TIA cannot prevent the reorganization of a debtor under U.S. bankruptcy laws.") (citations omitted); *UPIC & Co. v. Kinder-Care Learning Ctrs.*, 793 F. Supp. 448, 452-453 (S.D.N.Y. 1992) (noting the SEC's intent to bring contractual recapitalizations under Bankruptcy Court jurisdiction); *In re Bd. of Dirs. of Multicanal S.A.*, 307 B.R. 384, 388-90 (Bankr. S.D.N.Y. 2004) (holding that the plaintiff "conceded, as it must, that the rights of holders to principal and interest on bonds issued under a TIA-qualified indenture can be impaired by bankruptcy proceedings."); S. Rep. No. 248, 76th Cong., 1st Sess. 26 (1939) (stating that the "[e]vasion of judicial scrutiny of the fairness of debt-readjustment plans is [intended to be] prevented by [Section 316(b)'s] prohibition."); H.R. Rep. 1016, 76th Cong., 1st Sess. 56 (1939) (same).

Article I, Section 10 of the United States Constitution provides in pertinent part: "no state shall . . . pass any . . . law impairing the obligation of contracts." This provision does not override Article I, Section 8, Clause 4 providing that "the Congress shall have power . . . to establish . . . uniform laws on the subject of bankruptcies throughout the United States," and it obviously has nothing whatever to do with consensual agreements of private parties resolving disputes arising under provisions of the Bankruptcy Code.

## IV. Delta's power to reject the Lease

The Objectors' rhetoric in asserting that the Settlement purports to allow debtor to "rip up its original 30-year Lease Agreement" and continue to use the Facilities "rent free" neither illuminates nor supports their Objection. Section 365 does indeed grant Delta the power to reject the Lease, leaving KCAB, and therefore the Bond Trustee and Bondholders, with a pre-petition, unsecured claim. But the Settlement Agreement does not permit Delta to continue to use the Facilities "rent free." The Settlement Agreement recognizes the statutory claim for breach provided under Section 365(g) by granting KCAB, and thereby the Bond Trustee and Bondholders, an $85 million note net of payments under the Forbearance Agreement and a $260 million claim in Delta's bankruptcy in the form of Delta stock. The Settlement reflects the preference of the great majority of Bondholders for payment of the Section 365(g) claim

in a form which can be monetized immediately, in lieu of "rent" payments stretched out over fifteen years.

## V. The Settlement and the Plan approval process

The Objectors' arguments that the Settlement constitutes a *sub rosa* plan and evades the protections afforded under the plan approval process under the Bankruptcy Code must be rejected for two fundamental reasons.

First, the Settlement is not a *sub rosa* plan. It is a settlement of a bankruptcy claim arising under Section 365(g). Claims both large and small are routinely negotiated, settled and approved under Bankruptcy Rule 9019 in bankruptcy cases without invoking the classification and voting procedures applicable in the plan approval process.

Second, as a practical matter the Settlement has been subjected to the Bankruptcy Code procedures for plan approval in every respect except the creation of a separate class of Bondholders, by reason of the provision in the Settlement Agreement making the Settlement expressly conditioned on confirmation of Delta's Plan of Reorganization. As noted above, the provisions of the Settlement were widely disclosed to all creditor constituencies including all Bondholders long in advance of the deadline to submit ballots, and the Bondholders voted overwhelmingly to accept the Plan both in number and amount.

## VI. The release issue

The release provision, Section 3.02(f) of the Settlement Agreement, is binding upon only Delta, KCAB, the Bond Trustee and the Bondholders. The release is extremely narrow in scope, does not release claims against third parties, and releases only those claims amongst the Releasing Parties, as defined, which are necessary to prevent further litigation with respect to the claims covered and resolved by the Settlement Agreement. The release does not implicate any of the concerns expressed by the Second Circuit in *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005).

All the parties to the release, including Delta and the Bondholders, have received substantial consideration from each other, and the only claims being released by any party are from those

necessary to effect the Settlement and preclude further litigation with respect to issues resolved and foreclosed by the Settlement.

## Conclusion

The Bond Trustee had the exclusive right under the Indenture to act on behalf of all Bondholders to conduct appropriate proceedings in response to an event of default under the Indenture, subject only to direction by a majority in amount of the Bondholders. Implicit in the power to conduct proceedings to remedy a default is the essential power to negotiate a settlement, again subject to direction by a majority in amount of the bondholders. In agreeing to the Settlement, the Bond Trustee acted in accordance with the written direction of a majority in amount of the Bondholders. The Settlement, which by its terms was incorporated in and subject to approval of Delta's Plan of Reorganization, has been approved by an overwhelming majority of the Bondholders, both in amount and number, who have voted to accept Delta's Plan. The Settlement is fair and reasonable both for Delta and for the Bondholders.

Upon all of the foregoing, the Objection is overruled, Delta's motion under Bankruptcy Rule 9019 is granted and the Settlement is approved.

Dated: White Plains, NY
April 25, 2007

                                                        /s/ Adlai S. Hardin, Jr.
                                                             U.S.B.J.