UNITED STATES BANKRUPTCY COURT **FOR PUBLICATION**

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

In re:

DELTA AIR LINES, INC., *et al.*,

                          Debtors.

Chapter 11

Case No. 05 B 17923 (ASH)

(Jointly Administered)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**A P P E A R A N C E S :**

**DEBEVOISE & PLIMPTON LLP**
**Special Aircraft Attorneys for Debtors**
By: Michael E. Wiles, Esq.
     Richard F. Hahn, Esq.
919 Third Avenue
New York, NY 10022

**STROOCK & STROOCK & LAVAN LLP**
**Conflicts Counsel for Debtors**
By: Lawrence M. Handelsman, Esq.
     Kristopher M. Hansen, Esq.
     Jayme T. Goldstein, Esq.
180 Maiden Lane
New York, NY 10038

**AKIN GUMP STRAUSS HAUER & FELD LLP**
**Counsel for Official Committee of Unsecured Creditors**
By: Daniel H. Golden, Esq.
     David H. Botter, Esq.
     Mitchell P. Hurley, Esq.
590 Madison Avenue
New York, NY 10022-2524

**BINGHAM McCUTCHEON LLP**
**Attorneys for Williamson Trust Company as Owner Trustee**
  **and Cargill Financial Services International, Inc.**
By: Mark M. Elliott, Esq.
     Michael J. Reilly, Esq.
     Joshua Dorchak, Esq.
399 Park Avenue
New York, NY 10022

**VEDDER, PRICE, KAUFMAN & KAMMHOLZ, P.C.**
**Attorneys for Strategic Value Partners, LLC**
  **and Bank of America, N.A.**
By: Douglas J. Lipke, Esq.
     Jonathan H. Bogaard, Esq
222 North LaSalle Street, Suite 2600
Chicago, IL 60601
  -and-
By: Michael J. Edelman, Esq.
     Ariel Levy, Esq.
805 Third Avenue
New York, NY 10022

DEWEY BALLANTINE LLP
**Attorneys for Northwestern Mutual Life Insurance Company**
By: Lisa Hill Fenning, Esq.
333 South Grand Avenue, 26th Floor
Los Angeles, CA 90071-1530
  - and -
By: Elizabeth M. Guffey, Esq.
401 Congress Avenue, Suite 3200
Austin, TX 78701
  - and -
By: Alexander M. Kayne, Esq.
    Irena Goldstein, Esq.
1301 Avenue of the Americas
New York, NY 10019-6092

PILLSBURY WINTHROP SHAW PITTMAN LLP
**Attorneys for Bank of New York as Indenture Trustee**
By: Leo T. Crowley, Esq.
    Eric Fishman, Esq.
    Margot P. Erlich, Esq.
1540 Broadway
New York, NY 10036

**ADLAI S. HARDIN, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

## DECISION ON TIA/SLV OBJECTIONS 1 AND 2

These claims Objections arise out of leveraged lease transactions involving aircraft. Claims have been filed by "owner participants" based on the obligations of debtor Delta Air Lines, Inc. ("Delta") under tax indemnification agreements ("TIA") to compensate for adverse tax consequences ("tax consequences") resulting from premature lease termination. Other claims have been filed by "indenture trustees" acting on behalf of lenders based on "stipulated loss values" ("SLV") payable by Delta under the aircraft leases (the "Lease" or "Leases") which are assigned to the indenture trustees as collateral security. A component of SLV is an amount designed to compensate for the same tax consequences triggered by early termination of the Leases as that covered by the TIAs.

Delta objects to the putative overlap of compensation for tax consequences in both TIA and SLV claims and seeks an order disallowing the owner participants' TIA claims or, in the alternative, an order reducing the owner participant TIA claims and/or the indenture trustee SLV claims to eliminate the overlaps among them.

**Jurisdiction**

The Court has jurisdiction over these contested matters under 28 U.S.C. §§ 1334(b) and 157(a) and the standing order of referral to bankruptcy judges signed by Acting Chief Judge Robert J. Ward on July 10, 1984. The Objections now before the Court are core proceedings under 28 U.S.C. § 157(b)(2)(B).

**Leveraged Lease Transactions Generally**

It is perhaps unnecessary to state, but important to make clear, that each leveraged lease transaction is the product of, and must be construed in accordance with, the specific contracting documents which govern the parties. Each set of contractual documents comprising a transaction may contain different provisions which may dictate different outcomes of similar controversies.

Having said that, Delta's TIA/SLV Objection 1 contains a concise summary description of "Leveraged Leases Generally" which provides a helpful overview for persons who do not deal on a daily basis with such transactions, such as judges. As background, therefore, it will be useful to set forth paragraphs 4-8 and 10 of Delta's TIA/SLV Objection 1 in their entirety.

> 4. Many of the Debtors' aircraft are subject to leveraged lease financing transactions. A typical leveraged lease transaction includes these components:
>
> a. The parties enter into a master agreement (called a "**Participation Agreement**") that, among other things, specifies the roles of the parties and that identifies the other agreements that are to be executed.
>
> b. A trust (the "**Owner Trust**") obtains ownership of one or more aircraft. The Owner Trust finances its acquisition of the aircraft through (i) an equity contribution from the entity that is the beneficiary of the Owner Trust (the "**Owner Participant**") and (ii) borrowings from one or more lenders (the "**Lenders**" or "**Lender Participants**"). In more complicated structures, the borrowings may include various forms of public debt financing.
>
> c. The Owner Trust enters into an aircraft lease (the "**Lease**") with Delta and/or Comair, Inc. The Lease is usually a "net" lease which requires the lessee to pay all taxes and operating expenses. Basic rent payments are normally sufficient to amortize the debt payments to the Lenders, and often also provide a cash return – referred to as "equity free cash" – for the Owner Participant.
>
> d. In order to provide security for the borrowed funds, the Owner Trustee typically grants a security interest in its ownership interests in the aircraft, and also assigns (for security purposes) its interests in the Lease (subject to

certain exceptions), to an indenture trustee acting for the lenders (the "**Indenture Trustee**"). The Indenture Trustee makes debt payments from the lease rentals and distributes the excess (if any) to the Owner Trust. The Indenture Trustee usually is entitled to control the exercise of remedies upon the occurrence of an event of a default.

5. Leveraged lease transactions provide significant tax benefits to Owner Participants. Rental payments are treated as income, but interest payments on the outstanding debt are deductible, as are transaction expenses (over time). More importantly, the Owner Participant in a leveraged lease transaction is entitled to take accelerated depreciation deductions with respect to the aircraft. The excess of these deductions over the rental income may be used to offset other income that the Owner Participant has, or other income in the consolidated tax group of which the Owner Participant is a member.

6. Leases in leveraged lease transactions typically provide for the payment of a "stipulated loss value" or a "termination value" ("**SLV**") in the event the leases are terminated prior to their scheduled expirations. SLV is usually determined by reference to a schedule attached to the Lease that lists either dollar amounts to be paid (depending on the date of a triggering event) or SLV percentages which are multiplied by a fixed number (such as the Lessor's cost) to generate the dollar amount of SLV. SLV can be calculated in different ways, but typically it is calculated (i) to permit the payoff of the remaining debt, and (ii) to allow the Owner Participant to earn an agreed-upon return through the date of termination. The calculation of SLV takes account of, among other things, the adverse tax consequences to the Owner Participant from the premature termination of the lease or other events.

7. Lessees in leveraged lease transactions usually enter into Tax Indemnity Agreements ("**TIAs**") with Owner Participants that also relate to the potential tax consequences of a lease termination. Some TIAs provide either (a) indemnification to the Owner Participant if the Lessee's acts or omissions result in the "recapture" of prior depreciation deductions or (b) indemnification for unexpected inclusions in the Owner Participant's taxable income as a result of certain listed causes. Other TIAs provide indemnification to the Owner Participant for both (a) and (b) above.

8. As noted above, Leases typically are assigned to an Indenture Trustee. The assignments usually include an assignment (in whole or in part) of rights to collect SLV Claims to use payments on SLV Claims to repay principal and interest on the outstanding debt plus certain fees and expenses. The assignment documents typically provide that the balance of any SLV payment is to be returned to the Owner Trustee. On the other hand, TIAs usually are not assigned to other parties.

9. A diagram of a typical leveraged lease structure is set forth below:
[omitted]

10. As described above, SLV Claims and TIA Claims each typically address the tax consequences, to an Owner Participant (or the tax group of which it is a member), that result from a premature termination of the transaction or from other specified events. In fact, the governing contracts usually contain provisions that recognize the overlaps between SLV Claims and TIA Claims. Regardless of whether or not the overlap is discussed in the contracts themselves, however, the fact remains that SLV Claims and TIA Claims typically include contractual rights to recovery for the same matters.   . . .

**Certain Facts Not at Issue**

Specific contractual provisions necessary to resolve TIA/SLV Objections 1 and 2 will be quoted and analyzed under point II, below. The parties disagree on the outcome of both Objections as a matter of contract interpretation. But for purposes of this ruling at least they do not disagree on two points of potential controversy.

SLV is defined under the governing agreements formulaically as the product of a series of calculations. It is not self-evident to the uninitiated that the product of those calculations to determine SLV necessarily includes a tax consequence component producing a number which is equivalent in amount to Delta's obligations under the TIAs. The point is not at issue, however, because the parties agree (or at least they have not contested) that the SLV calculations in the Leases do in fact include a tax consequence component resulting in a sum payable under the Leases as part of SLV which is intended to be, and is, equivalent to Delta's obligations under the TIAs.

A second point of potential dispute arises from Delta's assertion that "the fact remains that SLV Claims and TIA Claims typically include contractual rights to recovery for the same matters." For purposes of this ruling on Objections 1 and 2, it is assumed (without deciding) that the SLV claims include the calculations representing the tax consequence components which are equivalent to the TIA claims in amount.

**Delta's Contentions**

In its Objections, Delta advances two basic positions. First, Delta posits the legal premise that "a single loss [in this case, a tax loss] gives rise to a single claim, and overlapping claims cannot be allowed." I referred to this position as Delta's "cosmic" argument at the oral hearing because it purports to proceed from a universal legal principle or ethic which governs irrespective of the parties' contractual arrangements and, moreover, which overrides contractual provisions which may dictate a contrary result. In the alternative, Delta argues that by their express terms the governing contracts between the parties extinguish TIA claims if any amount is due for SLV.

- 5 -

I shall examine each of these arguments in the Discussion which follows, focusing first on the cosmic argument that overlapping claims cannot be allowed as a matter of law.

### Discussion

**I.    The cosmic argument against overlapping claims**

In support of its cosmic argument, Delta relies on a general principle of common law and several cases which are unexceptionable but which have no application to the facts here.  Thus, Delta asserts that "[i]t is common, in the law, that a claimant may be entitled to recover for a single injury based upon multiple legal theories," referring to tort claims based on defective products or fraud, but the law allows only one recovery for a single injury no matter how many theories may justify relief (Objection 1, p. 10, ¶ 18).  The argument proceeds (¶ 19): "It is generally recognized that a loss provides a claimant with only one right of payment, no matter how many separate legal theories may be invoked in support of that right of payment," citing and quoting *Diversified Graphics Ltd. v. Groves*, 868 F.2d 293, 295 (8th Cir. 1989) ("Regardless of whether the harm was the result of negligence or breach of fiduciary duty or a combination of both, there is only a single injury and there may only be a single recovery").  Delta continues (¶ 19): "The existence of multiple *theories* under which recovery may be sought from a debtor does not change the fact that a single loss gives rise to a single right to payment and therefore a single 'claim' against the debtor for bankruptcy purposes." (emphasis in original).

On the same theme, Delta asserts "In bankruptcy, therefore, 'multiple recoveries for an identical injury are generally disallowed.'" (*id.* at ¶ 20), quoting from *In re Finley, Kumble, Wagner, Heine, Underburg, Manley, Myerson & Casey*, 160 B.R. 882, 894 (Bankr. S.D.N.Y. 1993).[1]  And in its reply Delta argues: "The existence of two legal bases for the same recovery constitutes only one 'claim,' and this is true regardless of whether the theories are asserted by a single creditor or by different creditors." (Reply Memorandum at 5).

---

[1]    In the *Finley, Kumble* case the debtor had failed to make required pension plan contributions resulting in an underfunding of its pension plan.  Both the pension plan trustee and the Pension Benefit Guaranty Corporation ("PBGC") filed claims against the debtor for the same amount of the debtor's unfunded pension liabilities that were insured by the government.  Not surprisingly, the Bankruptcy Court disallowed the claims to the extent that they sought compensation for the same underfunding of the pension plan.

- 6 -

Delta's cosmic argument fails because the general legal principle that precludes double liability for a single injury or loss has never been applied by any court to void separate *contract* obligations owed to different parties under different contracts. The flaw in Delta's analysis is that in this case there is no injury which gives rise to a claim for compensatory damages under multiple theories of recovery. Indeed, we are not dealing with an "injury" which gives rise to any claim at all *in the absence of a contract right*. The "injury" here — adverse tax consequences to the owner participant from premature lease termination — does not give rise to any common law right of recovery by the owner participant against the lessee. There is indeed the risk that the owner participant will suffer adverse tax consequences if the lessee defaults and the Lease terminates. But the owner participant has no right to be compensated for its tax risk *unless* it contracts for such protection from the lessee in a TIA. It is not the injury (adverse tax consequences) which gives rise to a claim — it is the TIA alone which gives the owner participant a right to indemnification measured by the injury, but only to the extent agreed upon in the TIA.

The indenture trustee and its lenders of course do not suffer any injury from adverse tax consequences. They do risk loss from early Lease termination because the income to pay the indenture trustee is derived solely from the Lease, and so the Lease is assigned to the indenture trustee as additional collateral security for that risk. In the event of default the indenture trustee has the contract right to collect and retain for the lenders all payments due under the Lease, including all SLV payments whether calculated on putative adverse tax consequences or not, unless there is an express exclusion or reduction in the Lease or Participation Agreement.

Delta's contention that the owner participants' TIA claims and the indenture trustees' Lease claims including SLV "simply represent multiple legal theories upon which the same loss may be recovered" (Objection 1, p. 14, ¶ 25) is factually and legally wrong. We are not dealing with an injury giving rise to a single claim based on multiple theories — the "injury" (tax consequence) by itself does not give any party any right against any other party on any theory. We are concerned here with contract claims by different parties based on different contracts in which the lessee agreed to pay the owner participant under the TIA, and separately agreed to pay the indenture trustee as assignee under the Lease.

- 7 -

Delta made an agreement to pay what it agreed to pay to the owner participant under the TIA.  Delta also made a separate agreement requiring it to pay SLV under the Lease knowing that the Lease would be assigned to the indenture trustee as collateral security for the owner trustee's debt to the lenders.  Each agreement was freely negotiated and fully supported by fair consideration on both sides. If a component of the SLV claim under the Lease is calculated by reference to the owner participant's tax consequences which are indemnified under the TIA (the "overlap" Delta objects to), so be it.  That is what Delta agreed to and what both the owner participant and the indenture trustee relied upon in negotiating the agreements.  If Delta has contracted to pay duplicative claims, then it must pay both — it cannot repudiate its duty to party A under contract A by asserting that it contracted to pay the same amount to party B under contract B.

Of course, Delta can protect itself from the overlap by the simple expedient of not agreeing to it.  But Delta cannot now avoid its contractual obligations either to the owner participants for TIA or to the indenture trustee for SLV under the Lease by resort to a general rule of law which has never been applied to impair contract rights.  The contractual "overlap" is avoided only if the contracts so provide.

To that question, we now turn in point II.

## II.     The governing contract provisions

### A.     Objection 1

There are three contract provisions which resolve Objection 1.  They are Sections 14 and 15 of the Lease and Section 7 of the TIA.

In this case there are several events of default under the Lease on the part of Delta as lessee, to wit, failure to make payment of the rent, filing of a voluntary petition in bankruptcy and rejection of the Lease under Section 365(a) of the Bankruptcy Code.  These events of default invoke Section 14 of the Lease entitled "Lease Events of Default."  Section 14 provides in relevant part as follows:

SECTION 14. <u>Lease Events of Default</u>.    Each of the following events shall constitute a Lease Event of Default (whether any such event shall be voluntary or involuntary or come about or be effected by operation of law or pursuant to or in compliance with any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)  Lessee shall fail to make any payment of Basic Rent, Stipulated Loss Value or Termination Value within ten Business Days after the same shall have become due; or

* * *

(f)  Lessee shall . . . file, a voluntary petition in bankruptcy. . . .

The remedies available to the lessor and, therefore, the indenture trustee as assignee of the Lease, are enumerated in Section 15, entitled "Remedies."    Section 15 sets forth a panoply of remedies and provides in pertinent part as follows:

SECTION 15. <u>Remedies</u>.    Upon the occurrence of any Lease Event of Default and at any time thereafter so long as the same shall be continuing, Lessor may, at its option . . . do, and Lessee shall comply with, one or more of the following with respect to all or any part of the Airframe and the Engines, as Lessor in its sole discretion shall elect . . .:

* * *

(e)  so long as the Aircraft has not been sold pursuant to paragraph (b) above, by notice to Lessee, require Lessee to pay on demand to Lessor and Lessee hereby agrees that it will so pay to Lessor, as liquidated damages for loss of a bargain and not as a penalty (in lieu of Basic Rent for the Aircraft for any period commencing on or after the date of such notice) any unpaid Basic Rent for the Aircraft for any period prior to and including (if payable in arrears but not if payable in advance) the date of such notice, plus an amount equal to Stipulated Loss Value for the Aircraft computed as of the date specified in Exhibit B. . . .

As noted above there is no dispute that Lease Events of Default under Section 14 of the Lease have occurred by reason of Delta's defaults under the Lease, thereby invoking the Remedies Section 15 of the Lease.    Nor is there any dispute that the indenture trustee as assignee of the lessor has invoked its right under Section 15(e) of the Lease by demanding that debtor pay Stipulated Loss Value under the Lease.    The indenture trustee's claim filed in the bankruptcy includes an amount calculated in accordance with Stipulated Loss Value, including that component of SLV calculated with reference to the owner participant's tax consequences.

- 9 -

Thus, we must turn to the TIA to determine what effect, if any, Delta's obligation to the indenture trustee under the Lease has upon Delta's obligation under the TIA to the owner participant. The relevant provision is Section 7 entitled "Excluded Events." Section 7(c) of the TIA provides as follows:

> SECTION 7.  <u>Excluded Events</u>.  Notwithstanding any provision to the contrary contained in Section 6 hereof, the Owner Participant shall not be entitled to any payment under Section 6 or 8 hereof in respect of any Loss or any Foreign Tax Credit Loss [*i.e.*, the indemnity for tax consequence] arising as a result of one or more of the following events:
>
> * * *
>
> (c)  any event whereby a party to any of the Operative Documents is required to pay Stipulated Loss Value or Termination Value, except to the extent that the calculation of Stipulated Loss Value or Termination Value does not accurately reflect the timing of the loss of any tax benefit reflected in the calculation of Stipulated Loss Value or Termination Value;

Section 7 states clearly that "the Owner Participant shall not be entitled to any payment" of tax indemnification under the TIA in respect of any tax loss "arising as a result of any one or more of the following events." The "Excluded Event" in subparagraph (c) is "any event whereby a party to any of the Operative Documents is required to pay Stipulated Loss Value or Termination Value." There can be no dispute that a subsection (c) "event" has happened — by reason of Delta's Lease Events of Default under Section 14 of the Lease, the indenture trustee has demanded that Delta pay, and Delta "is required to pay," SLV under Section 15(e) of the Lease. The indenture trustee's claim filed in this bankruptcy includes SLV.

Accordingly, under Section 7(c) of the TIA the owner participant is barred from asserting a TIA claim against Delta.

The owner participant's arguments to the contrary do not withstand analysis. For example, the owner participant argues that "the exclusion [in Section 7(c)] is intended to apply only when the Owner Participant actually receives the Tax Portion of SLV." (Response of DFO Partnership 16). Nothing in any of the operative documents supports this contention. Indeed, it is clear that the entirety of SLV, including the tax component and the owner participant's equity component, constitutes collateral

security for the indebtedness owed to the lenders.  The indenture trustee is entitled to pass on to the owner trustee and thence to the owner participant only that portion of SLV, if any, which may remain after the lenders have been paid principal and interest in full.  In this case, under Delta's confirmed plan the lenders will receive Delta equity securities valued at an amount less than principal and interest.

At page 14 of its Response, the owner participant observes that under Section 8(c) of the Participation Agreement SLV is adjusted downward, and the indenture trustee's SLV claim adjusted accordingly, in the event of payment of an indemnity claim by the lessee to the owner participant under the TIA.[2]  Significantly, the owner participant acknowledges at page 14 that

> The only constraint on such recomputation of SLV is that after making the adjustments, SLV cannot be reduced below an amount equal to principal and interest, and premium (if any), on the debt.   See Lease, Section 1 (Definition of "Stipulated Loss Value"), clause (y); Section 23.

However, the fact that SLV payments can be reduced under Section 8(c) of the Participation Agreement as a consequence of payments to the owner participant under the TIA is not relevant in this case because there have not been any payments by Delta to the owner participant under the TIA.

At pages 18-19 of its Response, the owner participant makes a series of assertions which do not lend themselves to summarization.   Thus, it is argued:

> Until the Indenture Trustee makes its demand, however, the Debtor is not "required to pay" SLV under Section 15(e) of the Lease and the exclusion in Section 7(c) of the Indemnity Agreement does not apply.  Thus, even if the Debtor's and the Committee's interpretation of Section 15(e) were correct, before the Indenture Trustee makes its demand under Section 15(e), DFO could demand payment under the Indemnity Agreement and adjust SLV under the Lease, with the result that the Indenture Trustee would be deprived of the Tax Portion of SLV which the Debtors and the Committee contend is pledged to secure the debt.

This hypothetical argument is meaningless because, as already noted, prior to bankruptcy the owner participant did not demand payment under the TIA.   The argument proceeds (*id.* at 19):

---

[2]     As explained at pages 4-5 of Delta's Reply Memorandum, there are a number of situations in which the lessee could be required to make tax indemnification payments to the owner participant under the TIA without triggering the lessor's right to demand SLV under the Lease.  This would under Section 8(c) of the Participation Agreement reduce the amount of the tax component of SLV which might subsequently become payable.

- 11 -

> In fact, although Section 15(e) of the Lease at first appears to require payment of SLV, an examination of the entire provision reveals that such payment triggers a sale of the Aircraft by the Indenture Trustee **and** a return of the net proceeds of sale to the Debtor. Hence, the Debtor is not really "required to pay" SLV under this provision at all. . . .
>
> Thus, contrary to the assertion in TIA/SLV Objection 1 and to the situation that applies if an Event of Loss occurs, there is no provision in the remedies section of the Lease under which the Debtor actually is "required to pay" SLV. (emphasis in original)

These unsupported contentions are unintelligible and must be rejected.

Finally, the Court rejects the owner participant's reliance on its overriding intentions and objectives with respect to preserving its right to payment under the TIA. The objectives and intentions of all parties to any particular agreement or series of agreements must necessarily conflict. The inherent adversity of objectives between contracting parties is precisely what is resolved by the process of negotiation reducing the parties' respective compromises in their negotiating demands to a consensus reflected in a written agreement. It is the written agreement, not the differing objectives or intentions of the parties, that must govern. Thus, in this case the owner participant wanted protection from adverse tax consequences; for a variety of reasons sufficient to all the participants, tax protection was included in the TIA and also as a component of SLV in the Lease; it was the indenture trustee's objective that all amounts payable under the lease including the entirety of SLV stand as collateral security for the indebtedness owed to the lenders; it was Delta's objective to avoid liability for payment of tax consequences twice, and to accomplish this Section 8(c) of the Participation Agreement and Section 7(c) of the TIA were included and agreed to by all parties, including the owner participant.

Under the undisputed facts in this case, Section 7(c) of the TIA is applicable and Section 8(c) of the Participation Agreement is not. Section 7(c) is unambiguous and it must be applied as written. Delta's TIA/SLV Objection 1 is sustained to the extent that the owner participant's claim under the TIA is disallowed.

### B. Objection 2 other than Tail No. N182DN

It appears that the leveraged lease transactions and their constituent agreements involved in Objection 2 are generally within the description in paragraphs 4-10 of Objection 1 quoted above. "In

- 12 -

the relevant respects, the governing documents of these twelve transactions contain substantially the same provisions." (Delta Objection 2, p. 8, ¶ 13). Delta makes the same arguments based on (i) cosmic principles of law and (ii) the provisions of the written agreements, and the claimants assert some similar arguments in opposition. To this extent the Court reaches the same conclusions on the same analyses.

There is a difference in the critical contract provision determining the outcome of each Objection. The analog of Section 7(c) of the TIA in Objection 1 is Section 6(c) of the TIA in Objection 2, and it is not the same as Section 7(c). Section 6(c) of the TIA in Objection 2 provides in relevant part as follows:

> <u>Exclusions</u>. Notwithstanding any provision to the contrary contained in Section 5 hereof [setting forth the right to tax consequence indemnification], the Owner Participant shall not be entitled to any payment under Section 5 hereof in respect of any Loss . . . arising as a result of one or more of the following events:
>
> * * *
>
> (c) Any event whereby the Lessee pays Stipulated Loss Value or Termination Value or an amount determined by reference thereto, except to the extent that the calculation of the Stipulated Loss Value or Termination Value does not accurately reflect the timing of any such event for Federal income tax purposes.

In opposing Objection 2, the owner participant focuses on the word "pays" in subsection (c) and seeks to import into TIA Section 6(c) provisions from Section 3 of the Lease. It argues:

> This exception [in Section 6(c)] has two prerequisites: first, that the lessee, *i.e.*, Delta, **pays** the Indenture Trustee, and second, that Delta pays the Stipulated Loss Value **amount in cash in full**, in accordance with the Operative Documents. **If** Delta actually had paid all the SLV amount here (and, of course, it has not) . . . Lessee's payment obligations under the TIA would have been extinguished. But such payment in full has not and will not ever happen here. Thus, the Section 6(c) conditions have not and will not ever be satisfied in this case.

(Response of the Northwest Mutual Life Insurance Company p. 15, ¶ 25; emphasis in original). The argument proceeds that SLV falls within the definition of Supplemental Rent under the Lease, and the Lease provides that "Lessee shall pay any and all Supplemental Rent as it shall become due and owing" (Lease Section 3(b)) and "All payments pursuant to this Lease shall be received by 12:00 noon Eastern Standard (or Daylight) Time on the date payment is due in U.S. Dollars and in immediately available

- 13 -

funds" (Lease Section 3(d)).   The contention is that "Section 6(c) of the TIAs is triggered only **when the Lessee actually pays all of the SLV** or the Termination Value or a payment calculated with reference to either, **in U.S. Dollars**" (Response p. 16, ¶ 29).   Payment of a fraction of SLV in Delta common stock, rather than U.S. dollars, does not trigger the Section 6(c) Exclusion, it is argued.

In asserting that Section 6(c) is triggered only if Delta pays the *full amount* of SLV in *U.S. dollars*, the owner participant ignores an important clause contained in Section 6(c) and imports into that provision conditions which are not found there.   The argument that the lessee must pay the full amount of SLV ignores the clause "or an amount determined by reference thereto."   The disjunctive "or an amount" makes clear that the amount paid need not be the full amount of SLV, provided that it is "determined by reference" to SLV.   Moreover, there can be no doubt that the parties contemplated the possibility of bankruptcy on the part of the lessee, since the constituent contracting documents refer in various ways to "bankruptcy [or] other proceedings for the relief of debtors."[3]   The word "pays" and the phrase "or an amount determined by reference thereto" must be construed in such a manner as to comport with the meaning of payment in the context of bankruptcy, which the parties expressly contemplated in the TIA, as well as in the other agreements.   There is rarely likely to be full payment of claims in bankruptcy, and in the ordinary course of any Chapter 11 case payment of claims under a plan may be in cash or equity or debt securities of the debtor or a combination of cash and securities.

The fact that Section 3(d) of the Lease expressly requires payment in U.S. dollars certainly demonstrates that the parties knew how to expressly provide for payment in U.S. dollars when that is what they intended.   But it does not support the argument that this provision in Section 3(d) of the Lease should be exported to Section 6(c) of the TIA, which does not so provide.   Section 6(c) could have required payment in cash, but it does not.

The indenture trustee's filed claim for SLV is calculated in accordance with the prescribed contractual formula for SLV.   It will be paid in accordance with Delta's confirmed plan *pro rata*

---

[3] The quotation is from Section 6(a) in the TIA for Tail N914DL in Objection 1. The parties have not favored the Court with copies of the constituent agreements involved in the leveraged lease transactions in Objection 2.

with other similar allowed claims.  When distribution is made on the indenture trustee's SLV claim, whether made in securities or cash or a combination of both, the claim will have been paid in "an amount determined by reference" to SLV within the meaning of Section 6(c) and in an amount and manner contemplated by the parties in the context of a bankruptcy.

Accordingly, the Exclusion in Section 6(c) will apply to bar a claim for indemnity under the TIA.

### C. Objection 2 Tail No. N182DN

The Court agrees with the owner participant that Tail No. N182DN does not fall within the exclusion of Section 6(c) of the TIA.  N182DN is one of 89 aircraft which were the subject of this Court's Order Approving a Modified Term Sheet dated February 15, 2006.  The Modified Term Sheet does not mention SLV or Termination Value, but references a formula agreed to by Delta and the counterparties to the Term Sheet which results in a claim by the indenture trustee in respect of each of the covered aircraft which is not based upon any calculation authorized under the terms of the Lease.  Indeed, Delta acknowledges that the amount calculated under the Term Sheet formula is far lower than the SLV amount would be under the Lease.  Since the indenture trustee's Term Sheet claim with respect to N182DN is not "determined by reference" to Stipulated Loss Value or Termination Value, the exclusion in Section 6(c) of the TIA does not apply.

Accordingly, Delta's Objection to the owner participant's TIA claim with respect to N182DN is overruled.

\* \* \*

Counsel for Delta is directed to prepare, circulate to the parties in interest for approval as to form (without waiving any party's right to appeal) and submit to the Court for signature appropriate orders consistent with this Decision.

Dated:  White Plains, NY
        May 16, 2007

                                            /s/ Adlai S. Hardin, Jr.
                                                  U.S.B.J.