**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 Case No. |
| **DELTA AIR LINES, INC., et al.,** | 05-17923 (PCB) |
| | (Jointly Administered) |
| **Debtors.** | |

**FIFTH INTERIM AND FINAL APPLICATION OF BLACKSTONE ADVISORY SERVICES L.P.
AS FINANCIAL ADVISOR TO THE DEBTORS FOR FINAL ALLOWANCE OF
COMPENSATION FOR ACTUAL AND NECESSARY SERVICES RENDERED AND
REIMBURSEMENT OF ACTUAL AND NECESSARY OUT-OF-POCKET EXPENSES
INCURRED FOR THE PERIOD OF SEPTEMBER 14, 2005 THROUGH MARCH 31, 2007**

## SUMMARY SHEET

Name of Applicant:                    Blackstone Advisory Group L.P.

Authorized to Provide
Professional Services to:             Delta Air Lines, Inc., et al.

Date of Retention:                    September 14, 2005

**Fifth Interim and Final Period:**   February 1, 2007 through March 31, 2007

Compensation Requested:              $10,900,000.00

Expenses Incurred:                   $37,757.31

Cash Payment Sought:                 $10,560,118.64


**All Compensation Periods:**         September 14, 2005 through March 31, 2007

Total Compensation Requested:        $14,213,333.33

Total Expenses Incurred:             $312,268.33

Total Cash Payment Sought:           $10,560,118.64

The total time expended for the preparation of this application was 25 hours and the corresponding
compensation requested is $0.00.

This is a ___ monthly      _x_ interim       _x_ final application

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11 Case No.** |
| **DELTA AIR LINES, INC., et al.,** | **05-17923 (PCB)** |
| | **(Jointly Administered)** |
| **Debtors.** | |

**FIFTH INTERIM AND FINAL APPLICATION OF BLACKSTONE ADVISORY SERVICES L.P.
AS FINANCIAL ADVISOR TO THE DEBTORS FOR FINAL ALLOWANCE OF
COMPENSATION FOR ACTUAL AND NECESSARY SERVICES RENDERED AND
REIMBURSEMENT OF ACTUAL AND NECESSARY OUT-OF- POCKET EXPENSES
INCURRED FOR THE PERIOD OF SEPTEMBER 14, 2005 THROUGH MARCH 31, 2007**

**TO THE HONORABLE ADLAI S. HARDIN JR.**
**UNITED STATES BANKRUPTCY JUDGE:**

Blackstone Advisory Services L.P. ("Blackstone"), formerly The Blackstone Group L.P.,

financial advisor to the above captioned debtors and debtors-in-possession (collectively, the "Debtors"),

respectfully represents:

## I. <u>Background</u>

1. On September 14, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition

for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 <u>et</u> <u>seq</u>., as

amended (the "Bankruptcy Code").

2. The Debtors continue in possession of their property, and operate and manage their

businesses as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108 of the Bankruptcy

Code.

3. On September 14, 2005, the Debtors applied to this Court for an order authorizing the

retention of Blackstone as their financial advisor pursuant to an engagement agreement (the

"Engagement Agreement") dated September 12, 2005.  A copy of the Engagement Agreement is attached hereto as Appendix A.

4.    On September 16, 2005, this Court entered an interim order pursuant to 11 U.S.C. §§ 327(a) and 328(a) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 2014(a) authorizing the employment and retention of Blackstone as financial advisor to the Debtors effective as of the Petition Date.

5.    On October 6, 2005, this Court entered an order (the "Interim Compensation Order") establishing procedures for interim monthly compensation and reimbursement of expenses of professionals pursuant to 11 U.S.C. §§ 105(a) and 331, and Bankruptcy Rule 2016(a).

6.    On December 15, 2006, this Court entered a final order pursuant to 11 U.S.C. §§ 327(a) and 328(a) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 2014(a) authorizing the employment and retention of Blackstone as financial advisor to the Debtors (the "Final Retention Order"), effective as of the Petition Date.  A copy of the Final Retention Order is attached hereto as Appendix B.

7.    On April 25, 2007, the Joint Plan of Reorganization of the Debtors was confirmed by order of this Court.

8.    This is the fifth interim and final application (the "Fifth Interim & Final Application") of Blackstone for (i) allowance of compensation (and final approval) for services rendered during the period of February 1, 2007 through March 31, 2007, 2007 (the "Fifth Interim & Final Period"); (ii) the reimbursement of out-of-pocket expenses recognized during the Fifth Interim & Final Period; and (iii) final approval of Blackstone's fees and out-of-pocket expenses previously approved by this Court in connection with its first interim fee application (the "First Interim Application") for the period of September 14, 2005 through January 31, 2006 (the "First Interim Period"), second interim application (the "Second Interim Application") for the period of February 1, 2006 through May 31,

3

2006 (the "Second Interim Period"), third interim application (the "Third Interim Application") for

the period of June 1, 2006 through September 30, 2006 (the "Third Interim Period"), and fourth

interim application (the "Fourth Interim Application") for the period of October 1, 2006 through

January 31, 2007 (the "Fourth Interim Period").

9.   This Fifth Interim & Final Application is made pursuant to the provisions of Sections

328(a), 330 and 331 of the Bankruptcy Code, the Final Retention Order and the Interim

Compensation Order.

## II. <u>The Blackstone Engagement</u>

10. Blackstone was retained by the Debtors as financial advisor to provide the following

financial advisory services in connection with a possible Restructuring[1] of certain liabilities of the

Debtors:

(a)    Assist in the evaluation of the Debtors' businesses and prospects, including as it pertains to the Debtors' strategic review process;

(b)    Assist in the development of the Debtors' long-term business plan and related financial projections;

(c)    Assist in the development of financial data and presentations to the Debtors' Board of Directors, management, various creditors and other third parties including the Pilots and their representatives;

(d)    Analyze the Debtors' financial liquidity and evaluate alternatives to improve such liquidity;

(e)    Analyze various restructuring scenarios and the potential impact of these scenarios on recoveries of various stakeholders;

(f)    Provide strategic advice with regard to restructuring or refinancing the Debtors' Obligations;

(g)    Evaluate the Debtors' debt capacity and alternative capital structures;

---

[1] As used in the Engagement Agreement, a Restructuring shall mean "(i) any restructuring, reorganization, and/or recapitalization of the [Debtors] * * * affecting a substantial amount of existing or potential debt obligations or other claims, including, without limitation, senior debt, junior debt, lease obligations, trade claims and general unsecured claims * * *, and/or (ii) any repurchase, refinancing, extension or repayment by the [Debtors] of a substantial amount of the Obligations, and/or (iii) any sale of all or substantially all of the [Debtors]."

(h)    Participate in negotiations among the Debtors and its creditors, suppliers, lessors and other interested parties;

(i)    Value securities offered by the Debtors in connection with a Restructuring;

(j)    Advise the Debtors and negotiate with lenders with respect to potential waivers or amendments of various credit facilities;

(k)    Assist in arranging new financings including debtor-in-possession ("DIP") financing for the Debtors, as requested;

(l)    Provide expert witness testimony concerning any of the subjects encompassed by the other financial advisory services; and

(m)    Provide such other advisory services as are customarily provided in connection with the analysis and negotiation of a Restructuring as reasonably requested.

11. Pursuant to the terms of the Engagement Agreement as approved by the Final Retention Order, the Debtors agreed to pay the following fees to Blackstone for its financial advisory services:

(a)    A monthly advisory fee ("Monthly Fee") in the amount of $200,000.00 (as further defined in the Engagement Agreement);

(b)    A Restructuring Fee equal to $10.5 million (as further defined in the Engagement Agreement); and

(c)    Reimbursement of all reasonable out-of-pocket expenses (as further defined in the Engagement Agreement).

### III. Services Provided By Blackstone During The Fifth Interim & Final Period

12. During the Fifth Interim & Final Period, Blackstone provided financial advisory services to the Debtors, and as provided for under the Engagement Agreement, earned an advisory fee of $200,000.00 per month.  The nature of the work performed by Blackstone during the Fifth Interim & Final Period included the following:

13. The nature of the services provided by Blackstone during the Fifth Interim & Final Period included the following:

- Directed the due diligence process for the financial advisors to the creditors committee and other interested parties, including arranging in-person meetings and conference calls with the Debtors' representatives, conducting meetings between Blackstone and the financial

advisors to the creditors committee, and supplying these advisors with due diligence materials to help them with their work;

- Analyzed the Debtors' liquidity position and assisted in exploring various alternatives and financings to increase liquidity;

- Assisted in the development of the Debtors' financial projections and financial model to be shared with various constituents, including the advisors to the creditors committee;

- Performed valuation analyses on the Debtors' businesses;

- Analyzed debt capacity of the Debtors;

- Estimated recoveries to the unsecured creditors of the Debtors;

- Evaluated the Debtors' businesses and prospects on an ongoing basis including reviewing various strategic scenarios and evaluating potential strategic decisions;

- Provided assistance in the creation of presentations to the Creditors Committee and other interested parties; and

- Provided strategic advice with regard to the overall restructuring process.

## IV. <u>Services Provided By Blackstone During The First Through Fourth Interim Periods</u>

14. During the First through Fourth Interim Periods, Blackstone professionals devoted significant time and attention to assisting the Debtors in the implementation of its Restructuring. The services provided during this time included, but were not limited to, the following:

### A. Advisory Services Rendered During The First Interim Period

- Assisted in arranging the Company's debtor-in-possession ("DIP") financing including negotiating terms and definitive documentation, conducting due diligence, and preparing presentations for syndication and rating agency purposes;

- Assisted in the development of the Debtors' 1113 filings with the Court, including where applicable, preparing accompanying declarations as well as providing testimony as requested;

- Assisted the Debtors in various negotiations with aircraft lessors;

- Provided testimony regarding the debtor-in-possession financing in court;

- Directed the due diligence process for the financial advisors to the creditors committee, the PBGC and ALPA including arranging in-person meetings and conference calls with the Debtors' representatives, conducting meetings between Blackstone and the financial

advisors to the creditors committee, and supplying these advisors with due diligence materials to help them with their work;

- Provided assistance in the creation of presentations to the Creditors Committee;

- Assisted in the development of the Company's financial projections and financial model to be shared with various constituents, including the advisors to the creditors committee;

- Evaluated the Company's businesses and prospects on an ongoing basis including reviewing various strategic scenarios and evaluating potential strategic decisions;

- Analyzed the Company's liquidity position and assisted in exploring various alternatives and financings to increase liquidity;

- Assisted in the development of the various filings with the Court, including where applicable, preparing accompanying declarations as well as providing testimony as requested;

- Produced presentations at the request of the Company's Board of Directors;

- Provided assistance in the creation of presentations to the Creditors Committee; and

- Provided strategic advice with regard to the overall restructuring process.

**B. Advisory Services Rendered During The Second Interim Period**

- Assisted in the development of the Debtors' 1113 filings with the Court, including where applicable, preparing accompanying declarations as well as providing testimony as requested;

- Assisted the Debtors in various negotiations with aircraft lessors;

- Assisted the Debtors in various negotiations with ALPA as well as in related arbitration hearings;

- Directed the due diligence process for the financial advisors to the creditors committee, the PBGC and ALPA including arranging in-person meetings and conference calls with the Debtors' representatives, conducting meetings between Blackstone and the financial advisors to the creditors committee, and supplying these advisors with due diligence materials to help them with their work;

- Analyzed the Debtors' liquidity position and assisted in exploring various alternatives and financings to increase liquidity;

- Assisted in the development of the Debtors' financial projections and financial model to be shared with various constituents, including the advisors to the creditors committee;

- Evaluated the Debtors' businesses and prospects on an ongoing basis including reviewing various strategic scenarios and evaluating potential strategic decisions;

- Provided assistance in the creation of presentations to the Creditors Committee; and

- Provided strategic advice with regard to the overall restructuring process.

## C. Advisory Services Rendered During The Third Interim Period

- Directed the due diligence process for the financial advisors to the creditors committee and other interested parties, including arranging in-person meetings and conference calls with the Debtors' representatives, conducting meetings between Blackstone and the financial advisors to the creditors committee, and supplying these advisors with due diligence materials to help them with their work;

- Analyzed the Debtors' liquidity position and assisted in exploring various alternatives and financings to increase liquidity;

- Assisted in the development of the Debtors' financial projections and financial model to be shared with various constituents, including the advisors to the creditors committee;

- Evaluated the Debtors' businesses and prospects on an ongoing basis including reviewing various strategic scenarios and evaluating potential strategic decisions;

- Provided expert testimony in the Debtors' pilot pension termination proceeding;

- Assisted in negotiations with various creditors;

- Provided assistance in the creation of presentations to the Creditors Committee; and

- Provided strategic advice with regard to the overall restructuring process.

## D. Advisory Services Rendered During The Fourth Interim Period

- Directed the due diligence process for the financial advisors to the creditors committee and other interested parties, including arranging in-person meetings and conference calls with the Debtors' representatives, conducting meetings between Blackstone and the financial advisors to the creditors committee, and supplying these advisors with due diligence materials to help them with their work;

- Analyzed the Debtors' liquidity position and assisted in exploring various alternatives and financings to increase liquidity;

- Assisted in the development of the Debtors' financial projections and financial model to be shared with various constituents, including the advisors to the creditors committee;

- Performed valuation analyses on the Debtors' businesses;

- Analyzed debt capacity of the Debtors;

- Estimated recoveries to the unsecured creditors of the Debtors;

- Evaluated the Debtors' businesses and prospects on an ongoing basis including reviewing various strategic scenarios and evaluating potential strategic decisions;

- Provided assistance in the creation of presentations to the Creditors Committee and other interested parties; and

- Provided strategic advice with regard to the overall restructuring process.

## V. The Blackstone Team[2]

15. The financial services set forth above were performed primarily by: Timothy Coleman, Senior Managing Director; Nicholas Leone, Senior Managing Director; Michael Dugan, Senior Managing Director; Michael Genereux, Managing Director; Mark Buschmann, Vice President; Joseph Benavides, Vice President; Sebastian Arango, Associate; Tolga Kantarci, Associate; Derek Crevello, Associate; Bo Yi, Associate; Shalin Patel, Analyst; Kevin Galligan, Analyst; and other professionals of Blackstone, as needed.   Details of the background and experience of the professionals are provided in Appendix C.

## VI. Blackstone's Interim Applications For Compensation And Reimbursement of Expenses

## A. Blackstone's Allocation of Payments Received Prior to the Petition Date against Amounts Requested Post-Petition

16. As described in the Debtors' application for authority to employ Blackstone as its financial advisor, Blackstone served as financial advisor to the Debtors' prior to the Petition Date.  During that pre-petition retention, the Debtors paid Blackstone a sum total of $1,119,989.03, which includes $43,506.17 received as an expense deposit (the "Pre-Petition Expense Deposit"), for the period of May 1, 2005 through September 30, 2005.  The last fee payment Blackstone received prior to the

---

[2] As of the date of this Fifth Interim & Final Application, the following individuals are no longer employed at Blackstone: Christopher Boyle, Jason Costi, Michael Kovacs, Derek Crevello, Bo Yi, Shawn Badlani, Greg Eisner and Christopher Koranda.

Petition Date was in the amount of $200,000.00 for the monthly period of September 1, 2005 through September 30, 2005 (the "September Fee Payment").

17. Of the $1,119,989.03 Blackstone received during its pre-petition retention, Blackstone earned pre-petition fees totaling $886,666.67 and was reimbursed for $76,482.86[3] of reimbursable pre-petition out-of-pocket expenses.  Thus, after crediting the earned pre-petition fees and reimbursable out-of-pocket expenses from the total amount of pre-petition payments received by Blackstone (i.e., $963,149.53), Blackstone was holding $113,333.33 related to a portion of the September Fee Payment (covering the period of September 14, 2005 through September 30, 2005) and the $43,506.17 Pre-Petition Expense Deposit as of the Petition Date.  Accordingly, Blackstone has applied the remaining portion of the September Fee Payment towards the payment of the fees requested in its First Interim Application.

18. With respect to the Pre-Petition Expense Deposit, and prior to the Petition Date, Blackstone identified unbilled pre-petition out-of-pocket expenses in the amount of $18,213.30.[4]  Accordingly, Blackstone has applied $18,213.30 of the Pre-Petition Expense Deposit against said unbilled pre-petition out-of-pocket expenses leaving a balance of $25,292.87 of the Pre-Petition Expense Deposit. Blackstone has applied the remaining balance of the Pre-Petition Expense Deposit (i.e., $25,292.87) against the post-petition out-of-pocket expenses requested in this Fifth Interim & Final Application.

## B. Blackstone's First Interim Application

19. During the First Interim Period, Blackstone provided advisory services to the Debtors and earned fees for such services totaling $913,333.33, and recognized actual and necessary out-of-pocket expenses in the amount of $36,637.01.  On March 6, 2006, Blackstone filed its First Interim

---

[3] Amount consists of out-of-pocket expenses incurred in the amounts of $57,439.74 and $19,043.12 in connection with advisory services rendered by Blackstone on behalf of the Debtors for the months of August and September 2005, respectively.

[4] In its First Interim Application, Blackstone reported that it identified $18,506.17 of unbilled pre-petition out-of-pocket expenses.  The actual amount of unbilled pre-petition out-of-pocket expenses identified by Blackstone prior to the Petition Date was $18,213.30.

Application for the allowance of $913,333.33 of fees earned and the reimbursement of $36,637.01 of out-of-pocket expenses recognized during the First Interim Period.

20. On June 5, 2006, this Court entered an order approving Blackstone's First Interim Application for $913,333.33 of all fees earned and the reimbursement of $36,637.01 of out-of-pocket expenses recognized during the First Interim Period. As of the date of this Fifth Interim & Final Application, Blackstone has received $913,333.33[5] (or 100%) of all fees earned and $36,637.01 (or 100%) of all out-of-pocket expenses recognized during the First Interim Period. Blackstone respectfully requests that this Court grant approval of all fees and out-of-pocket expenses applied for in connection with Blackstone's First Interim Application, and deem said approval as final.

## C. Blackstone's Second Interim Application

21. During the Second Interim Period, Blackstone provided advisory services to the Debtors and earned fees for such services totaling $800,000.00, and recognized actual and necessary out-of-pocket expenses in the amount of $76,610.22. On July 13, 2006, Blackstone filed its Second Interim Application for the allowance of $800,000.00 of fees earned and the reimbursement of $76,610.22 of out-of-pocket expenses recognized during the Second Interim Period.

22. On August 23, 2006, this Court entered an order approving Blackstone's Second Interim Application for $800,000.00 of all fees earned and the reimbursement of $76,610.22 of out-of-pocket expenses recognized during the Second Interim Period. As of the date of this Fifth Interim & Final Application, Blackstone has received $800,000.00 (or 100%) of all fees earned and $76,610.22 (or 100%) of all out-of-pocket expenses recognized during the Second Interim Period. Blackstone

---

[5] Amount includes the September Fee Payment.

respectfully requests that this Court grant approval of all fees and out-of-pocket expenses applied for in connection with Blackstone's Second Interim Application, and deem said approval as final.

### D. Blackstone's Third Interim Application

23. During the Third Interim Period, Blackstone provided advisory services to the Debtors and earned fees for such services totaling $800,000.00, and recognized actual and necessary out-of-pocket expenses in the amount of $61,040.85. On November 9, 2006, Blackstone filed its Third Interim Application for the allowance of $800,000.00 of fees earned and the reimbursement of $61,040.85 of out-of-pocket expenses recognized during the Third Interim Period.

24. On December 20, 2006, this Court entered an order approving Blackstone's Third Interim Application for $800,000.00 of all fees earned and the reimbursement of $61,040.85 of out-of-pocket expenses recognized during the Third Interim Period. As of the date of this Fifth Interim & Final Application, Blackstone has received $800,000.00 (or 100%) of all fees earned and $61,040.85 (or 100%) of all out-of-pocket expenses recognized during the Third Interim Period. Blackstone respectfully requests that this Court grant approval of all fees and out-of-pocket expenses applied for in connection with Blackstone's Third Interim Application, and deem said approval as final.

### E. Blackstone's Fourth Interim Application

25. During the Fourth Interim Period, Blackstone provided advisory services to the Debtors and earned fees for such services totaling $800,000.00, and recognized actual and necessary out-of-pocket expenses in the amount of $100,222.94. On March 16, 2007, Blackstone filed its Fourth Interim Application for the allowance of $800,000.00 of fees earned and the reimbursement of $100,222.94 of out-of-pocket expenses recognized during the Fourth Interim Period.

26. On April 19, 2007, this Court entered an order approving Blackstone's Fourth Interim Application for $800,000.00 of all fees earned and the reimbursement of $100,222.94 of out-of-pocket expenses recognized during the Fourth Interim Period. As of the date of this Fifth Interim &

Final Application, Blackstone has received $800,000.00 (or 100%) of all fees earned and $100,222.94 (or 100%) of all out-of-pocket expenses recognized during the Fourth Interim Period. Blackstone respectfully requests that this Court grant approval of all fees and out-of-pocket expenses applied for in connection with Blackstone's Fourth Interim Application, and deem said approval as final.

**F. Blackstone's Request For Fees And Expenses For The Fifth Interim & Final Period**

27. During the Fifth Interim & Final Period, Blackstone has provided advisory services to the Debtors and earned advisory fees for such services totaling $400,000.00. In connection with the advisory services rendered during the Fifth Interim & Final Period, Blackstone has recognized actual and necessary out-of-pocket expenses in the amount of $37,757.31, which includes $5,411.51 of out-of-pocket expenses incurred but not reflected in Blackstone's prior interim applications due to timing. As of the date of this Fifth Interim & Final Application, Blackstone has received $320.000.00 (or 80%) of all fees earned and $32,345.80 (or 86%) of all out-of-pocket expenses recognized during the Fifth Interim & Final Period.

28. Further, and as described in the Engagement Agreement, which was approved by the Final Retention Order, Blackstone is entitled to a Restructuring Fee equal to $10,500,000.00 payable in cash upon the consummation and confirmation of the Debtors' Restructuring which occurred on April 25, 2007.

29. Blackstone respectfully submits that the compensation sought in this Fifth Interim & Final Application for services rendered by Blackstone to the Debtors during the Fifth Interim & Final Period is fully justified and reasonable based upon (a) the time and labor required, (b) the complexity of the issues presented, (c) the skill necessary to perform the financial advisory services properly, (d) the preclusion of other employment, (e) the customary fees charged to clients in non-

bankruptcy situations for similar services rendered, (f) time constraints required by the exigencies of the case and (g) the experience, reputation and ability of the professionals rendering services.

30. Blackstone respectfully submits that the services it has rendered to the Debtors have been necessary and in the best interest of the Debtors and have furthered the goals of all parties in interest. The effort expended by Blackstone in representing the Debtors, the complexity of the issues and the difficulty in negotiating these cases have been substantial.

31. Blackstone respectfully submits that under all of the criteria normally examined in chapter 11 reorganization cases, the compensation requested by Blackstone is reasonable in light of the work performed by Blackstone in these cases.

### VII. Blackstone's Application For Reimbursement Of Actual And Necessary Out-Of-Pocket Expenses

32. Out-of-pocket expenses incurred by Blackstone are charged to a client if the expenses are incurred for the client or are otherwise necessary in connection with services rendered for such particular client. Blackstone does not factor general overhead expenses into disbursements charged to its clients in connection with chapter 11 cases. Blackstone has followed its general internal policies with respect to out-of-pocket expenses billed to the Debtors as set forth below, with any exceptions specifically explained:

(a) Blackstone's general policy permits its professionals to charge in-office dinner meals to a client after 8:00 p.m. if the employee is required to provide services to the client during such dinnertime. According to Blackstone general policy, meals charged to a client are capped at $25.00 per meal; however, for purposes of this Application, all in-office meals included herein have been capped at $20.00.

(b) All airfare charges billed to the Debtors are based on coach rates.

(c) The External Research category of expenses includes charges from outside computer/electronic service companies that supply, for a fee, research and/or financial documents to Blackstone. The services provided by these companies primarily consist of the retrieval of financial documents from regulatory agencies and/or the retrieval of research that would not otherwise be available to Blackstone. The Internal Research category of expenses are the charges for time spent by Blackstone research staff in

14

operating the computer/electronic terminals related to these computer/electronic service companies.

(d)     The Document Production category of expenses includes charges from outside service companies that provide, for a fee, high volume photocopying services on an expedited basis to Blackstone; and charges for internal photocopying services provided by Blackstone. Blackstone bills internal Document Production charges at the rate of $0.17 per page for black and white copies, and $0.32 per page for color copies.

(e)     The Publishing Services category of expenses includes charges for the production of text-based publications such as reports and presentations, and printing and binding services.

(f)     With respect to local travel, Blackstone's general policy enables employees to travel by taxi or, in certain circumstances private car service, to and from meetings while rendering services to a client on a client related matter, for which the client is charged. Further, and primarily for safety reasons, employees are permitted to charge to a client the cost of transportation home if an employee is required to work past 9:00 p.m. on client specific matters.

(g)     Blackstone bills outgoing long-distance facsimile charges at a rate of $1.25 per page. Blackstone does not bill local or incoming facsimile charges to clients.

33. Blackstone respectfully submits that the out-of-pocket expenses recognized during the Fifth Interim & Final Period, for which Blackstone seeks allowance and reimbursement of, were necessary and reasonable both in scope and amount. Details of the expenses recognized during the Fifth Interim & Final Period are provided in Appendix D. Details of the out-of-pocket expenses incurred by Blackstone professionals during the First, Second, Third, and Fourth Interim Periods are provided for reference purposes only in Appendix E.

34. Summarized below are all fees and out-of-pocket expenses applied for and received to date:

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| | | | =A – B | | | = (A + D) - E |
| Interim Fee Periods | Monthly Fees | Holdback @ 20% | Fees, Net of Holdback | Out-of-Pocket Expenses | Amount Paid | Amount(s) Due |
| **First Interim Period** | | | | | | |
| September 14 – 30, 2005 | $113,333.33 | $-- | $113,333.33 | $-- | $113,333.33 | $-- |
| October 1 – 31, 2005 | 200,000.00 | -- | 200,000.00 | 5,463.72 | 205,463.72 | -- |
| November 1 – 30, 2005 | 200,000.00 | -- | 200,000.00 | 11,993.91 | 211,993.91 | -- |
| December 1 – 31, 2005 | 200,000.00 | -- | 200,000.00 | 14,738.92 | 214,738.92 | -- |
| January 1 – 31, 2006 | 200,000.00 | -- | 200,000.00 | 4,440.46 | 204,440.46 | -- |
| | 913,333.33 | | 913,333.33 | 36,637.01 | 949,970.34 | -- |
| **Second Interim Period** | | | | | | |
| February 1 – 28, 2006 | 200,000.00 | -- | 200,000.00 | 4,536.53 | 204,536.53 | -- |
| March 1 – 31, 2006 | 200,000.00 | -- | 200,000.00 | 19,450.87 | 219,450.87 | -- |
| April 1 – 30, 2006 | 200,000.00 | -- | 200,000.00 | 22,051.57 | 222,051.57 | -- |
| May 1 – 31, 2006 | 200,000.00 | -- | 200,000.00 | 30,571.25 | 230,571.25 | -- |
| | 800,000.00 | | 800,000.00 | 76,610.22 | 876,610.22 | |
| **Third Interim Period** | | | | | | |
| June 1 – 30, 2006 | 200,000.00 | -- | 200,000.00 | 17,948.84 | 217,948.84 | -- |
| July 1 – 31, 2006 | 200,000.00 | -- | 200,000.00 | 10,311.43 | 210,311.43 | -- |
| August 1 – 31, 2006 | 200,000.00 | -- | 200,000.00 | 19,479.61 | 219,479.61 | -- |
| September 1 – 30, 2006 | 200,000.00 | -- | 200,000.00 | 13,300.97 | 213,300.97 | -- |
| | 800,000.00 | | 800,000.00 | 61,040.85 | 861,040.85 | |
| **Fourth Interim Period** | | | | | | |
| October 1 – 31, 2006 | 200,000.00 | -- | 200,000.00 | 14,037.04 | 214,037.04 | -- |
| November 1 – 30, 2006 | 200,000.00 | -- | 200,000.00 | 18,302.74 | 218,302.74 | -- |
| December 1 – 31, 2006 | 200,000.00 | -- | 200,000.00 | 8,791.23 | 208,791.23 | -- |
| January 1 – 31, 2007 | 200,000.00 | -- | 200,000.00 | 59,091.93 | 259,091.93 | -- |
| | 800,000.00 | | 800,000.00 | 100,222.94 | 900,222.94 | -- |
| **Fifth Interim & Final Period** | | | | | | |
| February 1 – 28, 2007 | 200,000.00 | 40,000.00 | 160,000.00 | 26,334.05 | 186,334.05 | 40,000.00 |
| March 1 – 31, 2007 | 200,000.00 | 40,000.00 | 160,000.00 | 6,011.75 | 166,011.75 | 40,000.00 |
| Restructuring Fee | 10,500,000.00 | -- | 10,500,000.00 | -- | -- | 10,500,000.00 |
| Expenses | -- | -- | -- | 5,411.51 | | 5,411.51 |
| | 10,900,000.00 | 80,000.00 | 10,820,000.00 | 37,757.31 | 352,345.80 | 10,585,411.51 |
| Subtotal | 14,213,333.33 | 80,000.00 | 14,133,333.33 | 312,268.33 | 3,940,190.15 | 10,585,411.51 |
| Less: Expense Deposit | -- | -- | -- | (25,292.87) | -- | (25,292.87) |
| **Total** | **$14,213,333.33** | **$80,000.00** | **$14,133,333.33** | **$286,975.46** | **$3,940,190.15** | **$10,560,118.64** |

35. The amount of the fees and out-of-pocket expenses sought in this application and Blackstone's billing processes are consistent with market practices both in and out of a bankruptcy context. Blackstone has never billed its clients based on the number of hours expended by its

professionals.  Blackstone has, however, maintained contemporaneous time records in the Debtors'

case in one-half hour increments.  A summary of the hours expended by Blackstone professionals by

interim period is summarized below:

| | Summary of Hours Expended By Interim Period | | | | | |
|---|---|---|---|---|---|---|
| Professional | First | Second | Third | Fourth | Fifth | Total(s) |
| Timothy Coleman | 450.5 | 362.0 | 331.5 | 494.0 | 77.5 | 1,715.5 |
| Nicholas Leone | 384.0 | 300.5 | 346.5 | 364.5 | 10.5 | 1,406.0 |
| Michael Dugan | -- | 130.0 | -- | -- | -- | 130.0 |
| Michael Genereux | 433.5 | 481.0 | 355.0 | 427.5 | 60.5 | 1,757.5 |
| Mark Buschmann | 248.0 | 382.0 | 622.5 | 152.5 | -- | 1,405.0 |
| Joseph Benavides | -- | 293.0 | -- | -- | -- | 293.0 |
| Sebastian Arango | -- | -- | 162.5 | 342.0 | 10.0 | 514.5 |
| Tolga Kantarci | -- | 816.0 | -- | -- | -- | 816.0 |
| Derek Crevello | 461.5 | 29.5 | -- | -- | -- | 491.0 |
| Bo Yi | -- | -- | 158.0 | -- | -- | 158.0 |
| Shalin Patel | 515.0 | 617.0 | 648.5 | 833.0 | 98.5 | 2,712.0 |
| Kevin Galligan | -- | 822.0 | -- | -- | -- | 822.0 |
| | **2,492.5** | **4,233.0** | **2,624.5** | **2,613.5** | **257.0** | **12,220.5** |

36. A detailed breakdown of the number of hours expended by each professional during the

Fifth Interim & Final Period is attached hereto as Appendix F.  Details of the hours worked by

Blackstone professionals during the First, Second, Third, and Fourth Interim Periods are provided

for reference purposes only in Appendix G.

37. All services provided by Blackstone for which compensation is requested were performed

for, and on behalf of, the Debtors after the filing of these cases and were not rendered on behalf of

any other person.

## VIII. <u>Requested Relief</u>

**WHEREFORE**, Blackstone requests the Court to:

(a)     Approve the allowance of Blackstone's (i) monthly advisory fees in the amount of $400,000.00, (ii) Restructuring Fee in the amount of $10,500,000.00, and (iii) the reimbursement of out-of-pocket expenses in the amount of $37,757.31 for the Fifth & Final Period;

(b)     Authorize and direct the Debtors to pay Blackstone's advisory fees and out-of-pocket expenses for the Fifth & Final Period as follows:

| | |
|---|---:|
| Total Advisory Fees | $400,000.00 |
| Total Expenses | 37,757.31 |
| Restructuring Fee | 10,500,000.00 |
| Less: Payments Received | (352,345.80) |
| Less: Pre-Petition Expense Deposit | (25,292.87) |
| **Amount Due Blackstone** | **$10,560,118.64** |

(c)     Deem all fees and out-of-pocket expenses applied for in this Fifth Interim & Final Application and in connection with Blackstone's First, Second, Third, and Fourth Interim Applications, as final. In summary, the following are the total of fees and out-of-pocket expenses due to Blackstone:

| | |
|---|---:|
| First Interim Application | $949,970.34 |
| Second Interim Application | 876,610.22 |
| Third Interim Application | 861,040.85 |
| Fourth Interim Application | 900,222.94 |
| Fifth Interim & Final Application | 10,937,757.31 |
| Total Fees and Out-Of-Pocket Expenses Sought | 14,525,601.66 |
| Less: Payments Received | (3,940,190.15) |
| Less: Pre-Petition Expense Deposit | (25,292.87) |
| **Total Amount Due Blackstone** | **$10,560,118.64** |

(d)     Grant such other and further relief as this Court deems just and proper.

Dated:   June 25, 2007

                                        Blackstone Advisory Services L.P.
                                        Financial Advisor to the Debtors

                                        By: _____
                                        Timothy R. Coleman
                                        Senior Managing Director
                                        345 Park Avenue
                                        New York, NY 10154

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:                                                                   Chapter 11 Case No.

**DELTA AIR LINES, INC., et al.,**                                       **05-17923 (PCB)**

                                                                         **(Jointly Administered)**

Debtors.

<u>**AFFIDAVIT**</u>

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK)

     Timothy R. Coleman, being duly sworn, deposes and says:

     1.   I am a Senior Managing Director of Blackstone Advisory Services L.P. ("Blackstone"), formerly The Blackstone Group L.P., which firm maintains offices for providing financial advisory services at 345 Park Avenue, New York, New York 10154. Blackstone has acted as financial advisor to, and rendered professional services on behalf of, the above captioned debtors and debtors-in-possession, and its affiliates (collectively, the "Debtors").

     2.   This affidavit is submitted pursuant to Bankruptcy Rule 2016 in connection with Blackstone's fifth interim and final application (the "Fifth Interim & Final Application") for (i) allowance of compensation for advisory services rendered to the Debtors for the period of February 1, 2007 through March 31, 2007 in the amount of $400,000.00; (ii) a Restructuring Fee in the amount of $10,500,000.00; (iii) reimbursement of out-of-pocket expenses incurred in connection therewith in the amount of $37,757.31; and (iv) all fees and out-of-pocket expenses applied for in this Fifth Interim & Final Application and those previously applied for in

connection with Blackstone's first, second, third, and fourth interim applications covering the

combined period of September 14, 2005 through March 31, 2007 as final.

3.  All of the services provided by Blackstone for which compensation is sought were

performed for, and on behalf of, the Debtors and not on behalf of any other person.

_____
Timothy R. Coleman
Senior Managing Director

Sworn to before me this 25 day of June 2007

_____

LINDA H. KRUSE
NOTARY PUBLIC, State of New York
No. 01KR4862933
Qualified in Richmond County
Certificate filed in New York County
Commission Expires June 23, 2010

**APPENDIX A**



The Blackstone Group®

September 12, 2005

Mr. Edward H. Bastian
Executive Vice President and Chief Financial Officer
Delta Air Lines, Inc.
1030 Delta Boulevard
Atlanta, GA  30320-6001

Dear Ed:

This letter confirms the understanding and agreement (the "Agreement") between The Blackstone Group L.P. ("Blackstone") and Delta Air Lines, Inc. (together with any affiliates and subsidiaries, the "Company") regarding the retention of Blackstone by the Company, effective as of September 12, 2005 (the "Effective Date"), as its financial advisor for the purposes set forth herein. This letter amends and supercedes the previous letter agreement dated May 1, 2005.

Under this Agreement, Blackstone will provide financial advisory services to the Company in connection with a possible restructuring of certain liabilities of the Company and will assist the Company in analyzing, structuring, negotiating and effecting the Restructuring pursuant to the terms and conditions of this Agreement. As used in this Agreement, the term Restructuring shall mean, collectively, (i) any restructuring, reorganization, and/or recapitalization of the Company (whether or not pursuant to Chapter 11 of the United States Bankruptcy Code ("Chapter 11")) affecting a substantial amount of existing or potential debt obligations or other claims, including, without limitation, senior debt, junior debt, lease obligations, trade claims and general unsecured claims (collectively, the "Obligations"), and/or (ii) any repurchase, refinancing, extension or repayment by the Company of a substantial amount of the Obligations, and/or (iii) any sale of all or substantially all of the Company.

The scope of the financial advisory services to be rendered by Blackstone will include the following:

(a) Assist in the evaluation of the Company's businesses and prospects, including as it pertains to the Company's strategic review process;

(b) Assist in the development of the Company's long-term business plan and related financial projections;

(c) Assist in the development of financial data and presentations to the Company's Board of Directors, management, various creditors and other third parties including the Pilots and their representatives;

Edward H. Bastian
September 12, 2005
Page 2

(d) Analyze the Company's financial liquidity and evaluate alternatives to improve such liquidity;

(e) Analyze various restructuring scenarios and the potential impact of these scenarios on the recoveries of various stakeholders;

(f) Provide strategic advice with regard to restructuring or refinancing the Company's Obligations;

(g) Evaluate the Company's debt capacity and alternative capital structures;

(h) Participate in negotiations among the Company and its creditors, suppliers, lessors, and other interested parties;

(i) Value securities offered by the Company in connection with a Restructuring,

(j) Advise the Company and negotiate with lenders with respect to potential waivers or amendments of various credit facilities;

(k) Assist in arranging new financings including debtor-in-possession ("DIP") financing for the Company, as requested;

(l) Provide expert witness testimony concerning any of the subjects encompassed by the other financial advisory services; and

(m) Provide such other advisory services as are customarily provided in connection with the analysis and negotiation of a Restructuring as reasonably requested.

Notwithstanding anything contained in this Agreement to the contrary, Blackstone shall have no responsibility for designing or implementing any initiatives to improve the Company's operations, profitability, cash management or liquidity. Blackstone makes no representations or warranties about the Company's ability to (i) successfully improve its operations, (ii) maintain or secure sufficient liquidity to operate its business, or (iii) successfully complete a Restructuring. Blackstone is retained under this Agreement solely to provide advice regarding a Restructuring and is not being retained to provide "crisis management."

Blackstone shall commit the personnel and resources necessary and appropriate to perform the services set forth herein and to work with the Company and its advisors. Blackstone agrees that Timothy Coleman, Nick Leone and Michael Genereux will be actively involved in and devote significant time towards the engagement described herein.

The Company will pay the following fees to Blackstone for its financial advisory services:

(i)     A monthly advisory fee (the "Monthly Fee") in the amount of $200,000 in cash, with such Monthly Fee payable in advance on each monthly anniversary of the Effective Date.

(ii)    An additional fee (the "Restructuring Fee") equal to $10.5 million in the event the Company completes a Restructuring following a Chapter 11 filing. A Restructuring Fee shall only be deemed earned and payable following (a) the execution, confirmation, consummation and effectiveness of a Plan of Reorganization pursuant to an order of the Bankruptcy Court; or b) in the case of

Edward H. Bastian
September 12, 2005
Page 3

a sale of all or substantially all of the Company, pursuant to an order of the Bankruptcy Court (a "Court Restructuring").

(iii) Reimbursement of all reasonable out-of-pocket expenses incurred during this engagement, including, but not limited to, travel and lodging, direct identifiable data processing and communication charges, courier services, working meals, reasonable fees and expenses of Blackstone's counsel (in the case of counsel and other third party advisors, except as provided in the attached Indemnification Agreement and/or in connection with a Chapter 11 filing by the Company, not to exceed $25,000 without the Company's prior written consent) and other necessary expenditures, payable upon rendition of invoices setting forth in reasonable detail the nature and amount of such expenses. In connection therewith, the Company shall pay Blackstone on the Effective Date and maintain thereafter a $25,000 expense advance for which Blackstone shall account upon termination of this Agreement.

In the event that the Company is or becomes a debtor under Chapter 11 of the Bankruptcy Code, the Company shall use its best efforts to promptly apply to the bankruptcy court having jurisdiction over the Chapter 11 case or cases (the "Bankruptcy Court") for the approval pursuant to sections 327 and 328 of the Bankruptcy Code of (A) this Agreement, including the attached indemnification agreement, and (B) Blackstone's retention by the Company under the terms of this Agreement and subject to the standard of review provided in section 328(a) of the Bankruptcy Code and not subject to any other standard of review (including, without limitation, under section 330 of the Bankruptcy Code). The Company shall supply Blackstone with a draft of such application and any proposed order authorizing Blackstone's retention sufficiently in advance of the filing of such application and proposed order to enable Blackstone and its counsel to review and comment thereon. Blackstone shall have no obligation to provide any services under this Agreement in the event that the Company becomes a debtor under the Bankruptcy Code unless Blackstone's retention under the terms of this Agreement is approved under section 328(a) of the Bankruptcy Code by a final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which order is acceptable to Blackstone in all respects. Blackstone acknowledges that in the event that the Bankruptcy Court approves its retention by the Company, Blackstone's fees and expenses shall be subject to the jurisdiction and approval of the Bankruptcy Court under section 328(a) of the Bankruptcy Code and any applicable fee and expense guideline orders. In the event that the Company becomes a debtor under the Bankruptcy Code and Blackstone's engagement hereunder is approved by the Bankruptcy Court, the Company shall pay all fees and expenses of Blackstone hereunder as promptly as practicable in accordance with the terms hereof. Prior to commencing a Chapter 11 case, the Company shall pay all invoiced amounts to Blackstone in immediately available funds by wire transfer.

With respect to Blackstone's retention under sections 327 and 328 of the Bankruptcy Code, the Company acknowledges and agrees that Blackstone's restructuring expertise as well as its capital markets knowledge, financing skills and mergers and acquisitions capabilities, some or

Edward H. Bastian
September 12, 2005
Page 4

all of which may be required by the Company during the term of Blackstone's engagement
hereunder, were important factors in determining the amount of the various fees set forth herein,
and that the ultimate benefit to the Company of Blackstone's services hereunder could not be
measured merely by reference to the number of hours to be expended by Blackstone's
professionals in the performance of such services. The Company also acknowledges and agrees
that the various fees set forth herein have been agreed upon by the parties in anticipation that a
substantial commitment of professional time and effort will be required of Blackstone and its
professionals hereunder over the life of the engagement, and in light of the fact that such
commitment may foreclose other opportunities for Blackstone and that the actual time and
commitment required of Blackstone and its professionals to perform its services hereunder may
vary substantially from week to week or month to month, creating "peak load" issues for the
firm. In addition, given the numerous issues which Blackstone may be required to address in the
performance of its services hereunder, Blackstone's commitment to the variable level of time and
effort necessary to address all such issues as they arise, and the market prices for Blackstone's
services for engagements of this nature in an out-of-court context, the Company agrees that the
fee arrangements hereunder (including the Monthly Fee and Restructuring Fee) are reasonable
under the standards set forth in 11 U.S.C. Section 328(a).

The advisory services and compensation arrangements set forth in this Agreement do not
encompass other investment banking services or transactions that may be undertaken by
Blackstone at the request of the Company, including the arranging of debt or equity capital
(except as provided above), providing mergers and acquisitions advice (except as provided as
part of the restructuring activities contemplated in (a) through (m) above), issuing fairness
opinions or any other specific services not set forth in this Agreement. The terms and conditions
of any such investment banking services, including compensation arrangements, would be set
forth in a separate written agreement between Blackstone and the appropriate party. The
Company is permitted, in its sole discretion, to engage other financial advisors for services
outside of the scope of this Agreement.

Except as contemplated by the terms hereof or as required by applicable law or legal
process, Blackstone shall keep confidential all non-public information provided to it by or at the
request of the Company, and shall not disclose such information to any third party or to any of its
employees or advisors except to those persons who have a need to know such information in
connection with Blackstone's performance of its responsibilities hereunder and who are advised
of the confidential nature of the information and who agree to keep such information
confidential.

The Company will furnish or cause to be furnished to Blackstone such information as
Blackstone believes appropriate to its assignment (all such information so furnished being the
"Information"). The Company recognizes and confirms that Blackstone (a) will use and rely
primarily on the Information and on information available from generally recognized public
sources in performing the services contemplated by this Agreement without having
independently verified the same, (b) does not assume responsibility for the accuracy or
completeness of the Information and such other information, (c) is entitled to rely upon the

Edward H. Bastian
September 12, 2005
Page 5

Information without independent verification, and (d) will not make an appraisal of any assets in connection with its assignment. Subject to Blackstone's compliance with all applicable laws, within 30 days after written request by the Company following the termination of this Agreement, Blackstone shall return or destroy, at the direction of the Company, all Information received from the Company during the course of its engagement and, in the case of destruction, Blackstone shall certify that all Information has been so destroyed.

In the event that the Information belonging to the Company is stored electronically on Blackstone's computer systems, Blackstone shall not be liable for any damages resulting from unauthorized access, misuse or alteration of such information by persons not acting on its behalf, provided that Blackstone exercises the same degree of care in protecting the confidentiality of, and in preventing unauthorized access to, the Company's information that it exercises with regard to its own most sensitive proprietary information.

Except as required by applicable law, regulation or legal process, including in connection with seeking creditor or security holder approval and regulatory and governmental consents with respect to any restructuring transaction, any advice to be provided by Blackstone under this Agreement shall not be disclosed publicly or made available to third parties (other than the Company's other professional advisors or, if appropriate in the Company's judgment, in any filings in a Chapter 11 proceeding) without the prior consent of Blackstone. All services, advice and information and reports provided by Blackstone to the Company in connection with this assignment shall be for the sole benefit of the Company and shall not be relied upon by any other person.

The Company acknowledges and agrees that Blackstone will provide its financial advice exclusively to the members of the Board of Directors and management of the Company and not to the Company's shareholders or other constituencies. The Board of Directors and senior management will make all decisions for the Company regarding whether and how the Company will pursue a Restructuring and on what terms and by what process. The Company acknowledges that it will not rely on Blackstone for legal or tax advice. The Company further acknowledges and agrees that Blackstone has been retained to act solely as financial advisor to the Company and does not in such capacity act as a fiduciary for the Company or any other person. Blackstone shall act as an independent contractor and any duties of Blackstone arising out of its engagement pursuant to this Agreement shall be owed solely to the Company. Upon the request of the Company, Blackstone will provide the Company with any financial models or tools developed in the course of the engagement hereunder, along with related documentation and supporting materials.

In consideration of Blackstone's agreement to provide financial advisory services to the Company in connection with this Agreement, it is agreed that the Company will indemnify Blackstone and its agents, representatives, members and employees. A copy of our standard form of indemnification agreement is attached to this Agreement as Attachment A.

Blackstone's engagement hereunder may be terminated upon 30 days' written notice without cause by either the Company or Blackstone; termination for cause by either party shall

Edward H. Bastian
September 12, 2005
Page 6

be effective immediately. In the event of a termination, whether for cause or without cause, by either the Company or Blackstone, if requested by the Company, Blackstone agrees to continue the services under the Agreement for a period of up to 90 days from notice for purposes of transitioning a new advisor(s) engaged by the Company. Blackstone shall be entitled to Monthly Fees during such extension period. Notwithstanding the foregoing, (a) the provisions of this Agreement relating to the payment of fees and expenses accrued through the date of termination, the status of Blackstone as an independent contractor and the limitation as to whom Blackstone shall owe any duties will survive any such termination, (b) any such termination shall not affect the Company's obligations under the indemnification agreement attached as Attachment A or Blackstone's confidentiality obligations hereunder, and (c) Blackstone shall be entitled to the Restructuring Fee in the event that a Restructuring is consummated at any time prior to the expiration of 12 months following the termination of this Agreement; provided, however, in the event that Blackstone is terminated for cause, Blackstone shall not be entitled to any Restructuring Fee. For the purpose of this paragraph, "cause" shall include gross negligence, willful misconduct, bad faith or a material breach of the terms of this Agreement by Blackstone.

The Company does not appear on the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control of the United States Department of the Treasury, nor is it a prohibited party according to other U.S. government regulatory or enforcement agencies.

Notwithstanding anything to the contrary provided elsewhere herein, none of the provisions of this Agreement shall in any way limit the activities of Blackstone Group Holdings L.L.C. and its affiliates in their businesses distinct from the restructuring advisory business of The Blackstone Group L.P., provided that no Information is made available to representatives of Blackstone Group Holdings L.L.C. and its affiliates who are not involved in the restructuring advisory business of The Blackstone Group L.P. and that appropriate "Chinese wall" measures are taken to insure confidentiality. Notwithstanding the immediately preceding sentence neither Blackstone Group Holdings L.L.C. nor any of its affiliates shall (i) without the written consent of the Company, provide advisory services to any of the companies listed in the following sentence ("Competitors") similar to those provided to the Company under this Agreement during the term of this Agreement, or (ii) purchase, advise any third party regarding a purchase or otherwise participate in the purchase of the Company's or any of its subsidiaries' stock, assets, claims or securities without the prior written consent of the Company. For the purpose of this paragraph, Competitors shall mean only the following companies including their subsidiaries: AirTran Holdings, Inc., Alaska Air Group, Inc., America West Holdings Corp., AMR Corp., Continental Airlines, Inc., JetBlue Airways Corporation, Northwest Airlines Corporation, Southwest Airlines Co., UAL Corp. and US Airways Group, Inc.

This Agreement (including the attached indemnification agreement) embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof. If any provision of this Agreement is determined to be invalid or unenforceable in any respect, such determination will not affect the Agreement in any other respect, which will remain in full force and effect. No waiver,

Edward H. Bastian
September 12, 2005
Page 7

amendment or other modification of this Agreement shall be effective unless in writing and signed by each party to be bound thereby. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts executed in and to be performed in that state.

The Company hereby agrees that any action or proceeding brought by the Company against Blackstone based hereon or arising out of Blackstone's engagement hereunder, shall be brought and maintained by the Company exclusively in the courts of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York; provided, if the Company commences a Chapter 11 case, all legal proceedings pertaining to this engagement arising after such case is commenced may be brought in the Bankruptcy Court handling such case. The Company irrevocably submits to the jurisdiction of the courts of the State of New York located in the City and County of New York and the United States District Court for the Southern District of New York and appellate courts from any thereof for the purpose of any action or proceeding based hereon or arising out of Blackstone's engagement hereunder and irrevocably agrees to be bound by any judgment rendered thereby in connection with such action or proceedings. The Company hereby irrevocably waives, to the fullest extent permitted by law, any objection it may have or hereafter may have to the laying of venue of any such action or proceeding brought in any such court referred to above and any claim that such action or proceeding has been brought in an inconvenient forum and agrees not to plead or claim the same.

Edward H. Bastian
September 12, 2005
Page 8

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to Blackstone the duplicate copy of this Agreement and the indemnification agreement attached hereto as Attachment A.

Very truly yours,

THE BLACKSTONE GROUP L.P.

By: _____

Name: Timothy R. Coleman
Title: Senior Managing Director

BLACKSTONE GROUP HOLDINGS L.L.C.

By: _____

Name: Dennis J. Walsh
Title: Managing Director, Controller

Accepted and Agreed to as
of the date first written above:

DELTA AIR LINES, INC.

By: _____

Name: Edward H. Bastian
Title: EVP & CFO

ATTACHMENT A

September 12, 2005


The Blackstone Group L.P.
345 Park Avenue
New York, NY 10154

INDEMNIFICATION AGREEMENT

Gentlemen:

This letter will confirm that we have engaged The Blackstone Group L.P. ("Blackstone") to advise and assist us in connection with the matters referred to in our letter of agreement dated as of September 12, 2005 (the "Engagement Letter"). In consideration of your agreement to act on our behalf in connection with such matters, we agree to indemnify and hold harmless you and your affiliates and your and their respective partners (both general and limited), members, officers, directors, employees and agents and each other person, if any, controlling you or any of your affiliates (you and each such other person being an "Indemnified Party") from and against any losses, claims, damages, expenses and liabilities whatsoever, whether they be joint or several, related to, arising out of or in connection with the engagement (the "Engagement") under the Engagement Letter and will reimburse each Indemnified Party for all expenses (including reasonable fees, expenses and disbursements of counsel) as they are incurred in connection with investigating, preparing, pursuing, defending or assisting in the defense of any action, claim, suit, investigation or proceeding related to, arising out of or in connection with the Engagement or this agreement, whether or not pending or threatened, whether or not any Indemnified Party is a party, whether or not resulting in any liability and whether or not such action, claim, suit, investigation or proceeding is initiated or brought by us. We will not, however, be liable under the foregoing indemnification provision for any losses, claims, damages or liabilities (or expenses relating thereto) that are finally judicially determined by a court of competent jurisdiction to have primarily resulted from the gross negligence or willful misconduct of Blackstone. We also agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to us or our owners, parents, affiliates, security holders or creditors for or in connection with the Engagement except for any such liability for losses, claims, damages or liabilities incurred by us that are finally judicially determined by a court of competent jurisdiction to have primarily resulted from the gross negligence or willful misconduct of Blackstone.

If the indemnification provided for in the preceding paragraph is for any reason unavailable to an Indemnified Party in respect of any losses, claims, damages or liabilities

Edward H. Bastian
September 12, 2005
Page 2

referred to herein, then, in lieu of indemnifying such Indemnified Party hereunder, we shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages or liabilities (and expenses relating thereto) (i) in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by you, on the one hand, and us, on the other hand, from the Engagement or (ii) if and only if the allocation provided by clause (i) above is for any reason not available, in such proportion as is appropriate to reflect not only the relative benefits referred to in such clause (i) but also the relative fault of each of you and us, as well as any other relevant equitable considerations; provided, however, to the extent permitted by applicable law, in no event shall your aggregate contribution to the amount paid or payable exceed the aggregate amount of fees actually received by you under the Engagement Letter. For the purposes of this agreement, the relative benefits to us and you of the Engagement shall be deemed to be in the same proportion as (a) the total value paid or contemplated to be paid or received or contemplated to be received by us, our security holders and our creditors in the transaction or transactions that are subject to the Engagement, whether or not any such transaction is consummated, bears to (b) the fees paid or to be paid to Blackstone under the Engagement Letter (excluding any amounts paid as reimbursement of expenses).

Neither party to this agreement will, without the prior written consent of the other party (which consent will not be unreasonably withheld), settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (a "Judgment"), whether or not we or any Indemnified Party are an actual or potential party to such claim, action, suit or proceeding. In the event that we seek to settle or compromise or consent to the entry of any Judgment, we agree that such settlement, compromise or consent shall include an unconditional release of Blackstone and each other Indemnified Party hereunder from all liability arising out of such claim, action, suit or proceeding

Promptly after receipt by an Indemnified Party of notice of any complaint or the commencement of any action or proceeding with respect to which indemnification is being sought hereunder, such person will notify us in writing of such complaint or of the commencement of such action or proceeding, but failure to so notify us will not relieve us from any liability which we may have hereunder or otherwise, except to the extent that such failure materially prejudices our rights. If we so elect or are requested by such Indemnified Party, we will assume the defense of such action or proceeding, including the employment of counsel reasonably satisfactory to Blackstone and the payment of the fees and disbursements of such counsel

In the event, however, such Indemnified Party reasonably determines in its judgment that having common counsel would present such counsel with a conflict of interest or if we fail to assume the defense of the action or proceeding in a timely manner, then such Indemnified Party may employ separate counsel reasonably satisfactory to us to represent or defend it in any such action or proceeding and we will pay the reasonable fees and disbursements of such counsel; provided, however, that we will not be required to pay the fees and disbursements of more than

Edward H. Bastian
September 12, 2005
Page 3

one separate counsel for all Indemnified Parties in any jurisdiction in any single action or proceeding. In any action or proceeding the defense of which we assume, the Indemnified Party will have the right to participate in such litigation and to retain its own counsel at such Indemnified Party's own expense

The foregoing reimbursement, indemnity and contribution obligations of the Company under this agreement shall be in addition to any rights that an Indemnified Party may have at common law or otherwise, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company and such Indemnified Party.

The provisions of this agreement shall apply to the Engagement and any written modification of the Engagement and shall remain in full force and effect regardless of any termination or the completion of your services under the Engagement Letter.

This Agreement and the Engagement Letter shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts executed in and to be performed in that state.

Very truly yours,

DELTA AIR LINES, INC.

Name: Edward H. Bastian
Title: EVP & CFO

Accepted and Agreed
to as of the date first
written above:
THE BLACKSTONE GROUP L.P.

By: _____
Senior Managing Director

**APPENDIX B**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re: | : |
| | : |
| | : **Chapter 11 Case No.** |
| | : |
| **DELTA AIR LINES, INC., et al.,** | : **05-17923 (ASH)** |
| | : |
| | : **(Jointly Administered)** |
| **Debtors.** | : |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### FINAL ORDER PURSUANT TO SECTIONS 327(a) AND 328(a) OF THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 2014(a) AUTHORIZING THE EMPLOYMENT AND RETENTION OF BLACKSTONE AS FINANCIAL ADVISOR FOR THE DEBTORS

Upon the application dated September 14, 2005 (the "**Application**")[1] of Delta Air Lines, Inc. and those of its subsidiaries that are debtors and debtors in possession in these proceedings (collectively, the "**Debtors**"),[2] pursuant to sections 327(a) and 328(a) of the Bankruptcy Code and Bankruptcy Rule 2104(a) for an interim order (the "**Interim Order**") authorizing the employment and retention of The Blackstone Group L.P. ("**Blackstone**") as financial advisor for the Debtors, pursuant to the terms of that certain engagement letter (the "**Engagement Letter**"), dated September 12, 2005, which has

---

[1] Unless otherwise defined herein, each capitalized term shall have the same meaning ascribed to it in the Application.

[2] The Debtors are the following entities:  ASA Holdings, Inc.; Comair Holdings, LLC; Comair, Inc.; Comair Services, Inc.; Crown Rooms, Inc.; DAL Aircraft Trading, Inc.; DAL Global Services, LLC; DAL Moscow, Inc.; Delta AirElite Business Jets, Inc.; Delta Air Lines, Inc.; Delta Benefits Management, Inc.; Delta Connection Academy, Inc.; Delta Corporate Identity, Inc.; Delta Loyalty Management Services, LLC; Delta Technology, LLC; Delta Ventures III, LLC; Epsilon Trading, LLC; Kappa Capital Management, Inc.; and Song, LLC.

subsequently been amended pursuant to that certain amendment letter (the

"**Amendment**"), dated July 26, 2006, all as more fully set forth in the Application and

herein; and upon the Declaration of Timothy R. Coleman, Senior Managing Director of

Blackstone, annexed to the Application as Exhibit B (the "**Coleman Declaration**") and

the Declaration of Robert Gentile, Compliance Manager of Blackstone, annexed to the

Application as Exhibit C (the "**Gentile Declaration**"; together with the Coleman

Declaration, the "**Blackstone Declarations**"); and the Court being satisfied, based on the

representations made in the Application and the Blackstone Declarations, that Blackstone

is "disinterested" as such term is defined in section 101(14) of the Bankruptcy Code, as

modified by section 1107(b) of the Bankruptcy Code, and represents no interest adverse

to the Debtors' estates with respect to the matters upon which it is to be engaged; and

upon consideration of the Declaration of Edward H. Bastian Pursuant to Rule 1007-2 of

the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**")

in Support of First-Day Motions and Applications, dated as of the Petition Date; and the

Court having jurisdiction to consider the Application and the relief requested therein

pursuant to 28 U.S.C. § 1334 and the Standing Order of Referral of Cases to Bankruptcy

Court Judges of the District Court for the Southern District of New York, dated July 10,

1984 (Ward, Acting C.J.); and consideration of the Application and the requested relief

being a core proceeding the Bankruptcy Court can determine pursuant to 28 U.S.C. §

157(b)(2); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409; and due and proper notice of the Application, the Interim Order and the Final

Order, including with respect to the Amendment, having been provided and it appearing

2

that no other or further notice need be provided; and the relief requested in the

Application being in the best interests of the Debtors and their estates and creditors; and

the Court having reviewed the Application and having held an interim hearing with

appearances of parties in interest noted in the transcript thereof to consider the interim

relief requested in the Application (the "**Interim Hearing**"); and the Court having

determined that the legal and factual bases set forth in the Application and at the Interim

Hearing established just cause for the granting of the interim relief requested in the

Application and having issued and entered the Interim Order on September 16, 2005; and

no objections having been received by the Court; and after due deliberation and sufficient

cause appearing therefor, it is

ORDERED that the Application is approved, as modified by this Order; and it is

further

ORDERED that the Debtors are hereby authorized to retain Blackstone as their

financial advisor in the Debtors' chapter 11 cases, as contemplated by the Application

and on the terms provided in the Engagement Letter (as amended pursuant to the

Amendment); and it is further

ORDERED that Blackstone shall apply to the Court for allowance of

compensation and reimbursement of expenses in compliance with this Order and in

accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy

Rules, the Local Rules and orders of the Court (including the Court's October 6, 2005

Order Establishing Procedures for Interim Monthly Compensation and Reimbursement of

Expenses of Professionals); and it is further

3

ORDERED that Blackstone's fees and expenses in these cases shall be subject only to the standard of review set forth in section 328(a) of the Bankruptcy Code, and shall not be subject to the standard of review set forth in section 330 of the Bankruptcy Code; and it is further

ORDERED that, notwithstanding any other provision of this Order, the U.S. Trustee shall retain all rights to object to Blackstone's interim and final fee applications on all grounds including but not limited to the reasonableness standard provided in Section 330 of the Bankruptcy Code; and it is further

ORDERED that the Debtors are authorized to indemnify and hold harmless Blackstone and its affiliates and their respective partners (both general and limited), members, officers, directors, employees and agents and each other person, if any, controlling Blackstone or any of its affiliates (collectively the "**Indemnified Parties**"), pursuant to the indemnification provisions of the Engagement Letter and, during the pendency of these bankruptcy proceedings, subject to the following conditions:

> (a)     all requests of Indemnified Parties for payment of indemnity, contribution or otherwise pursuant to the indemnification provisions of the Engagement Letter shall be made by means of an interim or final fee application and shall be subject to the approval of, and review by, the Court to ensure that such payment conforms to the terms of the Engagement Letter, the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and the orders of this Court and is reasonable based upon the circumstances of the litigation or settlement in respect of which indemnity is sought; *provided, however,* that in no event shall an Indemnified Party be indemnified or receive contribution to the extent that any claim or expense has resulted from the bad faith, self-dealing, breach of fiduciary duty, if any, gross negligence or willful misconduct on the part of that or any other Indemnified Party; and

> (b)     in no event shall an Indemnified Party be indemnified or receive contribution or other payment under the indemnification provisions of the Engagement Letter if the Debtors, their estates, or the statutory committee of

4

unsecured creditors assert a claim, to the extent that the Court determines by final order that such claim arose out of bad-faith, self-dealing, breach of fiduciary duty, if any, gross negligence, or willful misconduct on the part of that or any other Indemnified Party; and

(c)    in the event an Indemnified Party seeks reimbursement for attorneys' fees from the Debtors pursuant to the Engagement Letter, the invoices and supporting time records from such attorneys shall be annexed to Blackstone's own interim and final fee applications, and such invoices and time records shall be subject to the United States Trustee's guidelines for compensation and reimbursement of expenses and the approval of the Bankruptcy Court under the standards of section 330 of the Bankruptcy Code without regard to whether such attorney has been retained under section 327 of the Bankruptcy Code; and it is further

ORDERED that to the extent that there may be any inconsistency between the terms of the Application, the Engagement Letter, the Amendment or this Order, the terms of this Order shall govern.

Dated: December 15, 2006
White Plains, New York

/s/Adlai S. Hardin,  Jr.
UNITED STATES BANKRUPTCY JUDGE

5

**APPENDIX C**

### Biographies of Blackstone Professionals

- **Timothy R. Coleman.** Timothy Coleman is a Senior Managing Director in the Restructuring & Reorganization Advisory group. Since joining Blackstone in 1992, Mr. Coleman has worked on a variety of Restructuring and Reorganization assignments. These include serving as Plan Facilitator in Bidermann Industries USA, Inc.; representing AT& T in AT& T Canada, Alestra, AT& T Broadband and Excite@ Home; representing Mirant Corp., Cable & Wireless Holdings, Xerox Corporation, Williams Communications, FLAG Telecom, Harnischfeger Industries, Vencor, Inc., Teligent, Inc., Russell- Stanley Holdings, Inc., Indesco International, Inc., Safelite Glass Corp., R. H. Macy & Co., Camelot Music, Inc., Barneys Inc., Plaid Clothing Group Inc., Alliance Entertainment Corporation, Geneva Steel Company, Garden Way, Inc., Big V Supermarkets, Ermis Maritime Shipping, JPS Textile Group, Inc., Molten Metal Technology, Inc., and CellNet Data Systems Inc.; and advising various creditors of Camelot Music, Inc., Edison Brothers Stores, Inc., Wherehouse Entertainment, Inc., Guangdong Enterprises, Koll Real Estate, Criimi Mae, Harrah's Jazz Company, Stratosphere Company, Weiner's Stores, Inc., Woodward & Lothrop, Inc., Stokely USA, Inc., Supercanal Holding, S. A., Vista Properties, Inc., Caterair International Corporation, Trans World Airlines, Inc., Carson Pirie Scott & Co., Liberté Investors, and Special Committees of the Boards of Sunbeam Corp. and Hechinger Company. Before joining Blackstone, Mr. Coleman was a Vice President at Citibank N. A. for twelve years, where he divided his time between corporate restructuring, real estate restructuring, and loan syndications. Mr. Coleman received a BA from the University of California at Santa Barbara, and an MBA from the University of Southern California.

- **Nicholas P. Leone.** Nicholas Leone is a Senior Managing Director in the Restructuring & Reorganization Advisory group. Since joining Blackstone in 1995, Mr. Leone has been involved in a variety of restructuring transactions, including Chiquita Brands International, AMF Bowling Worldwide, Arch Wireless, Mirant Corporation, Net Serviços, CellNet Data Systems, MobileMedia Communications, G. Heileman Brewing Company, Barneys New York, County Seat Stores, Geneva Steel, CRIIMI MAE, American White Cross, Koll Real Estate, Unicapital, Horsehead Industries, and Energy Fuels. In addition, Mr. Leone has advised companies in Merger/ Acquisition transactions, including the acquisition of LIN Broadcasting by McCaw Cellular, the acquisition of McCaw Cellular by AT& T and the recent acquisition of Calvin Klein Industries by Phillips- Van Heusen. Before joining Blackstone, Mr. Leone worked in the Leveraged Finance Group of Salomon Brothers Inc. Prior to working at Salomon Brothers, Mr. Leone was an Analyst in the Corporate Finance Group of Drexel Burnham Lambert. Mr. Leone received a BA from Columbia University and an MBA from the University of Chicago Graduate School of Business.

- **Michael P. Dugan.** Michael Dugan is a Senior Managing Director in the Corporate Advisory Services group and is based in New York and London. Before joining Blackstone in May 2004, Mr. Dugan was at CSFB, where he was Head of the London- based European Capital Goods Investment Banking Group and Managing Director in the New York- based Global Industrial & Services Group. While at CSFB, he was instrumental in the successful execution of some of the largest industrial transactions, including the acquisition and financing of Legrand, Europe's largest leveraged buyout. Prior to CSFB, Mr. Dugan was a Managing Director in Donaldson, Lufkin, & Jenrette's M& A group, and President and CEO of Metzler Corporation. Prior to that,

he held senior positions w`ith Smith Barney and Bankers Trust Securities. Mr. Dugan received a BS in Accounting from Villanova University.

- **Michael Genereux.**  Michael Genereux is a Managing Director in the Restructuring & Reorganization Advisory group. Since joining Blackstone in 2003, Mr. Genereux has worked on several restructuring assignments in various industries, including Bally Total Fitness, Fleming Companies and Delta Air Lines, Inc. Before joining Blackstone, Mr. Genereux was a Director at Credit Suisse First Boston in the media and telecom group where he worked on various transactions, including acting as financial advisor to AT& T regarding all key elements of its restructuring from 2000 through 2002, as well as advisory and capital raising transactions for other major telecom companies, including Qwest and BCE, Inc. He previously was a Vice President at Merrill Lynch & Co. working with industrial, consumer product and financial sponsor clients, including Alaska Air, General Motors, PepsiCo and Yum! Brands. Mr. Genereux received a BS from the School of Business and Accountancy at Wake Forest University and an MBA from Columbia Business School. Mr. Genereux is also a Certified Public Accountant.

- **Mark Buschmann.** Mark Buschmann is a Vice President in the Restructuring & Reorganization Advisory group. Since joining Blackstone in 2001, Mr. Buschmann has worked on restructuring activities involving Alestra, Excite@ Home, Cable & Wireless America, Delta Air Lines, Levitz Furniture, Inc., Mattress Discounters, Russell-Stanley Holdings, and Williams Communications. Before joining Blackstone, Mr. Buschmann worked in the Financial Institutions Group of Salomon Smith Barney where he executed various mergers and acquisitions and financing assignments. Mr. Buschmann received a BA in Economics and German Literature from Dartmouth College and an MBA with a concentration in Finance from The Kellogg School of Management at Northwestern University.

- **Sebastian Arango.** Sebastian Arango is an Associate in the Restructuring & Reorganization Advisory group. Since joining Blackstone in 2006, Mr. Arango has assisted in advising on a variety of restructuring transactions. Before joining Blackstone, Mr. Arango worked in the Global Power Group at Salomon Smith Barney where he executed various mergers and acquisitions and financing assignments. Additionally, Mr. Arango also worked in the Global Structured Bonds Group at Salomon Smith Barney where he executed a number of equipment and infrastructure financing transactions. Mr. Arango received a BA in History and Political Science at Vanderbilt University, where he graduated magna cum laude as a Chancellor's and Dean's Select Scholar. Mr. Arango also received a JD from the Northwestern University School of Law and an MBA from the Kellogg School of Management at Northwestern University.

- **Tolga Kantarci.** Tolga Kantarci is an Associate in the Corporate Advisory Services group. Before joining Blackstone in 2004, Mr. Kantarci worked in the Mergers & Acquisitions Group at Morgan Stanley in New York where he advised US and foreign corporations in their mergers, acquisitions, divestitures, leveraged buyouts, restructurings and other strategic transactions. Prior to working at Morgan Stanley, Mr. Kantarci was a project analyst in the Business Development Group of Sabanci Holding in Istanbul, Turkey. Mr. Kantarci received a BS in Industrial and Operations Engineering from the University of Michigan, where he graduated magna cum laude , and an MBA from Columbia Business School with a concentration in finance and management.

- **Scott Simon.**  Scott Simon is an Associate in the Corporate Advisory Services group. Mr. Simon joined Blackstone in 2006 from General Motors, where he had worked since 1997. While at General Motors, Mr. Simon worked in a variety of financial and strategic assignments. Most recently, he was Manager of Business Development at General Motors' New York Treasurer's Office where he executed several divestitures and strategic business partnerships including General Motors' sale of its locomotive manufacturing business to Greenbriar Equity Group and its hybrid engine development partnership with DaimlerChrysler and BMW. Mr. Simon received a BA in Engineering from Dartmouth College and an MBA from Harvard Business School.

- **Shalin Patel.**  Shalin Patel is an Analyst in the Restructuring & Reorganization Advisory group. Since joining Blackstone in 2005, Mr. Patel has assisted in advising on a variety of restructuring transactions. Mr. Patel graduated summa cum laude from the University of Pennsylvania's Jerome Fisher Program in Management & Technology with a BS in Economics from The Wharton School and a BAS from the School of Engineering and Applied Science.

- **Kevin G. Galligan.** Kevin G. Galligan is an Analyst in the Corporate Advisory Services group. Since joining Blackstone in 2005, Mr. Galligan has worked on several transactions in various industries. Before joining Blackstone, Mr. Galligan worked in the energy group at Credit Suisse First Boston, specifically focusing on merger and acquisition activity in the oil and gas, refining, and chemicals spaces. Prior to that, he worked at Mimeo. com in a variety of financial and business development roles. Mr. Galligan graduated with honors from Columbia University, where he received a BA in Economics.

# APPENDIX D

**[Fee and expense details for the period of February 1, 2007 through March 31, 2007 are not being filed but are being provided to the Debtors, the Court, the Office of the United States Trustee and the Official Committee of Unsecured Creditors. Parties in interest required to be served with monthly fee statements pursuant to the Interim Compensation Order have previously received such details. Copies of these details will be made available to other parties in interest upon request. The Office of the United Stated Trustee has been conferred with regarding this procedure.]**

# APPENDIX E

**[Fee and expense details for the period of September 14, 2005 through January 31, 2007 are not being filed but are being provided to the Debtors, the Court, the Office of the United States Trustee and the Official Committee of Unsecured Creditors. Parties in interest required to be served with monthly fee statements pursuant to the Interim Compensation Order have previously received such details. Copies of these details will be made available to other parties in interest upon request. The Office of the United Stated Trustee has been conferred with regarding this procedure.]**

# APPENDIX F

**[Time records for the period of February 1, 2007 through March 31, 2007 are not being filed but are being provided to the Debtors, the Court, the Office of the United States Trustee and the Official Committee of Unsecured Creditors. Parties in interest required to be served with monthly fee statements pursuant to the Interim Compensation Order have previously received such records. Copies of these records will be made available to other parties in interest upon request. The Office of the United Stated Trustee has been conferred with regarding this procedure.]**

## APPENDIX G

**[Time records for the period of September 14, 2005 through January 31, 2007 are not being filed but are being provided to the Debtors, the Court, the Office of the United States Trustee and the Official Committee of Unsecured Creditors. Parties in interest required to be served with monthly fee statements pursuant to the Interim Compensation Order have previously received such records. Copies of these records will be made available to other parties in interest upon request. The Office of the United Stated Trustee has been conferred with regarding this procedure.]**