| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**SOUTHERN DISTRICT OF NEW YORK** | <u>**NOT FOR PUBLICATION**</u> |
| ------------------------------------------------------------------x<br>In re:<br><br>DELTA AIR LINES, INC., *et al.*,<br><br>                           Reorganized Debtors.<br><br>------------------------------------------------------------------x | Chapter 11<br><br>Case No. 05-17923 (ASH)<br><br>(Jointly Administered) |

**<u>A P P E A R A N C E S</u>:**

**DEBEVOISE & PLIMPTON, LLP**
**Attorneys for the Reorganized Debtors**
**By:     Michael E. Wiles, Esq.**
**919 Third Avenue**
**New York, New York 10022**

**KAYE SCHOLER, LLP**
**Attorneys for Lone Star Air Partners, Inc.**
**By:     Piper A. Brock, Esq.**
**425 Park Avenue**
**New York, New York 10022**

**AKIN, GUMP, STRAUSS, HAUER & FELD, LLP**
**Attorneys for the Post-Effective Date Committee**
**By:     David H. Botter, Esq.**
**590 Madison Avenue**
**New York, New York 10022**

**HUNTON & WILLIAMS, LLP**
**Attorneys for Verizon**
**By:     Peter S. Partee, Esq.**
**          Benjamin C. Ackerly, Esq.**
**200 Park Avenue**
**New York, New York 10166**

**KAYE SCHOLER, LLP**
**Attorneys for AT&T Credit Holdings**
**By:     Richard G. Smolev, Esq.**
**425 Park Avenue**
**New York, New York 10022**

1

**PILLSBURY, WINTHROP, SHAW & PITTMAN, LLP**
**Attorneys for Bank of New York as Indenture Trustee**
**By:    Leo T. Crowley, Esq.**
**1540 Broadway**
**New York, New York 10036**

**VEDDER, PRICE, KAUFMAN & KAMMHOLZ, P.C.**
**Attorneys for various aircraft financers**
**By:    Michael J. Edelman, Esq.**
**805 Third Avenue**
**New York, New York 10022**

**BINGHAM MCCUTCHEN, LLP**
**Attorneys for Wilmington Trust Company and Cargill**
**By:    Mark M. Elliott, Esq.**
**       Joshua Dorchak, Esq.**
**399 Park Avenue**
**New York, New York 10022**

**DLA PIPER**
**Attorneys for Marriott International**
**By:    Vincent J. Roldan, Esq.**
**1251 Avenue of the Americas**
**New York, New York 10020**

**WEIL, GOTSHAL & MANGES, LLP**
**By:    Philip Weintraub, Esq.**
**767 Fifth Avenue**
**New York, New York 10153**

**REED SMITH, LLP**
**By:    Scott M. Esterbrook, Esq.**
**2500 One Liberty Place**
**1650 Market Street**
**Philadelphia, Pennsylvania 19103**

**GREENBERG TRAURIG, LLP**
**By:    Diane E. Vuocolo, Esq.**
**Two Commerce Square, Suite 2700**
**2001 Market Street**
**Philadelphia, Pennsylvania 19103**

**ADLAI S. HARDIN, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

**DECISION ON TIA TRANSFER OBJECTION 1**

This claim objection arises out of leveraged lease transactions involving aircraft. Claims have been filed by an "Owner Participant" based on the obligations of debtor Delta Air Lines, Inc. ("Delta") under tax indemnification agreements ("TIAs") to compensate for adverse tax consequences ("tax losses") resulting from a sale of the Owner Participant's interests in the trust estates that own the aircraft. Delta objects to the claims on the grounds that the TIAs in question excuse Delta from indemnification on the facts of this case and seeks an order disallowing the Owner Participant's TIA claims.

## Jurisdiction

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(b) and 157(a) and the standing order of referral to bankruptcy judges signed by Acting Chief Judge Robert J. Ward on July 10, 1984. The objection now before the Court is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

## Facts

*A. Background Information*

Delta and a number of its affiliates filed for Chapter 11 bankruptcy on September 14, 2005. This objection relates to three claims – numbered 4933, 4948, and 4950 – filed by Lone Star Air Partners LLC ("Lone Star") on the basis of TIAs relating to leases covering the airplanes with tail numbers N636DL, N637DL, and N638DL (the "Leases"). Each TIA was part of a leveraged lease transaction with identical operative terms.[1] In these transactions, a trust (the "Trust Estate") that was controlled by an Owner Trustee purchased an airplane and the Owner Trustee then leased it to Delta. The Owner

---

[1] For an overview of leveraged lease transactions generally, see this Court's opinion in In re Delta Air Lines, Inc., 370 B.R. 552 (Bankr. S.D.N.Y. 2007).

3

Participant advanced approximately 25% of the funds needed to purchase the airplane to the Trust Estate and the remaining 75% was financed pursuant to a Trust Indenture and Security Agreement (the "Trust Indenture"). The Trust Indenture granted to an Indenture Trustee, *inter alia*, a security interest in the Owner Trustee's ownership interest in the aircraft and assigned to it the Owner Trustee's rights under the Lease.

In each of the original transactions, Wilmington Trust Company ("WTC") was the Owner Trustee and EDS Financial Corporation ("EDS") was the Owner Participant. The Indenture Trustee in these transactions was The Citizens and Southern National Bank ("C&S") and the Lender was Trust Company Bank. As part of these leveraged lease transactions, Delta, EDS, WTC, C&S, and Trust Company Bank entered into Participation Agreements. In addition, the following agreements were executed: WTC and Delta entered into the Leases with WTC, in its capacity as the Owner Trustee, being the Lessor and Delta being the Lessee; WTC, C&S, and Delta entered into Trust Indentures that granted C&S a security interest in the Owner Trustee's ownership interests in the Aircraft and assigned to C&S, for security purposes, WTC's rights under the Leases; and Delta entered into TIAs with EDS. Subsequently, Lone Star became the successor in interest to EDS' rights as Owner Participant and Wells Fargo Bank Northwest, National Association ("Wells Fargo") became the successor in interest to C&S as Indenture Trustee.

Thus, at the time of Delta's Chapter 11 filing Wells Fargo, as Indenture Trustee and assignee of the Leases from WTC, possessed the rights of the Lessor in the Lease Agreement with Delta, and each of the three TIAs at issue in this claim objection represented a binding contract between Delta and Lone Star.

4

The leveraged lease transaction in the context of aircraft leasing allows the owner participant to take accelerated depreciation tax deductions on the aircraft, which can be used to offset other income that the owner participant might have. This allows the owner participant (via the owner trustee) to lease the planes to Delta at a lower price than would otherwise be available. The potential downside to this type of transaction is that after having taken the accelerated depreciation tax deductions, the owner participant may be forced to 'recapture' prior depreciation deductions on the occurrence of certain events and may incur unexpected inclusions in its taxable income arising from early termination of the leveraged lease transaction. To protect against these occurrences, the Owner Participant in this case entered into indemnity agreements (the TIAs) with Delta which provided that Delta would indemnify the Owner Participant if Delta, as a result of certain specified acts or omissions of Delta and the Indenture Trustee, caused the Owner Participant to incur a tax loss as defined in the agreement. (See Indemnity Agreement, Section 6.) The precise scope and applicability of the TIAs is the crux of the present objection.

*B. Operative Facts*

As part of the reorganization, Delta and Wells Fargo (the Indenture Trustee) agreed to a Modified Restructuring Term Sheet (the "Bingham Term Sheet") with respect to many of Delta's leased aircraft, including the Lone Star tails, and the agreement was approved by this Court on February 15, 2006. The Bingham Term Sheet called for a restructuring of the Leases at issue here – either with the consent of the Owner Participant and Owner Trustee, or after the interests of the Owner Participant and Owner

5

Trustee had been foreclosed upon. Lone Star[2] opted not to give its consent to the restructuring, whereupon the following took place:[3]

> 6. On or about March 19, 2006, Lone Star was contacted on behalf of the holders of the outstanding loans (the "Debtholders") relating to the aircraft and asked if Lone Star would be willing to purchase the outstanding debt on the Lone Star Aircraft or, alternatively, enter into consensual foreclosure agreements pursuant to which title to the Aircraft and the Owner Trustee's interests in the Leases would be surrendered to the related Indenture Trustees in exchange for a cancellation of the outstanding debt. Lone Star was told that the Debtholders were unwilling to sell their debt at any discount to par. Lone Star was unwilling to purchase that debt without a discount, or to enter into consensual foreclosure agreements with the Indenture Trustee, and so advised the Debtholders, with the understanding that the Debtholders then would proceed to attempt a public sale or auction of the Aircraft.
>
> 7. Subsequently…[Lone Star went] to the market and attempt[ed] to locate a purchaser for the Aircraft, to ensure that the sales price for the Aircraft at the anticipated auction would be the highest price achievable in the market.
>
> 8. On or about May 26, 2006, Lone Star received notice from Wells Fargo that, unless a consensual foreclosure was negotiated, the Indenture Trustee had elected to foreclose upon and sell the Owner Trustee's title to Lone Star Aircraft N637DL and N638DL, and the rights under the related Leases, together with the other property and interests comprising the Indenture Estate. The date set in the notice for the foreclosure and auction was June 29, 2006.
>
> ***
>
> 10. As a result of its efforts described above to find potential purchasers for the Aircraft at the expected foreclosure sale, Lone Star had identified Vx Capital Partners ("Vx") as a prospective buyer of the Aircraft on terms that would generate an acceptable recovery by Lone Star, after the outstanding debt on the Aircraft had been repaid at par.

Thereafter, Lone Star was able to enter into an agreement with Vx Capital Partners ("Vx"), dated May 30, 2006, to sell its interests in the three planes to Vx,

---

[2] And hence, the Owner Trustee who was controlled by Lone Star.
[3] Quoting from the Affidavit of David B. Gebler in Support of Surreply of Lone Star Air Partners LLC to TIA/SLV Transfer Objection 1, at 3-4 (the "Gebler Affidavit").

6

contingent upon the holders of the outstanding loans relating to the aircraft (the "Debtholders") agreeing to a repayment of their debt at par – that is, without any premium. However, the Debtholders were not willing to accept payment at par and were demanding to be paid a premium. Thus Lone Star and Vx agreed to postpone consummation of the sale so that an agreement on the premium issue might be reached between the Debtholders and Lone Star. No such agreement was ever reached, and on July 17, 2006 the Indenture Trustee held a foreclosure auction of two of the aircraft – tails N637DL and N638DL – in an effort to determine the highest bidder with respect to those planes.[4]

Vx was the highest bidder, but the actual sale of the aircraft was contingent upon the successful negotiation and execution of sales documentation. On July 31, 2006, Vx indicated that it had complied with all conditions precedent to the sale and would insist that the Indenture Trustee consummate the sale. Nonetheless, as late as August 2, 2006, the Indenture Trustee informed Lone Star through Mr. Gebler that the Debtholders had not yet decided whether to proceed with the sale to Vx because the dispute involving the premium issue had not been resolved. Lone Star's understanding is expressed in the Gebler Affidavit:

> I understood the implication…to be that if Lone Star continued to resist the Debtholders' demands for payment of a premium, then the Debtholders would 'let the sale to Vx get away'–and Lone Star would lose the prospect of recovering the excess of the sales price over the amount required to repay the debt, which by the Debtholders' estimates, even after payment of the premium they were demanding, would exceed several million dollars.

---

[4] Tail number N636DL was never auctioned but the Debtholders apparently indicated that they expected to pursue a similar course of action with respect to that plane.

7

Therefore, Lone Star decided to sell its Owner Participant interests in the Trust Estates for all three aircraft to Vx, which it ultimately did on October 19, 2006. According to Mr. Gebler, it did so "in order to provide certainty to Vx that it would obtain the equity interests in the Aircraft" and "to monetize Lone Star's interest in the Aircraft and circumvent the threat of the Debtholders to withhold any distributions to Lone Star until Lone Star had agreed to the premium they had demanded." (Id.) Importantly, however, Lone Star's sale of its Owner Participant interests did not disturb WTC's ownership of the aircraft as Owner Trustee – it merely transferred Lone Star's beneficial interests in the Trust Estates to Vx.

As a result of its sale to Vx, Lone Star incurred various tax losses for which it now seeks indemnification under the TIAs. The basis for Lone Star's claim is that the TIAs mandate Delta to indemnify Lone Star's losses where those losses arise due to a sale of its ownership interests that was "attributable to" the exercise of remedies under Section 15 of the Leases. (Indemnity Agreement Section 7(a).)

The present dispute is one of contract interpretation in which this Court is called upon to answer the question whether the TIAs do, in fact, require Delta to indemnify Lone Star for its tax losses under these circumstances. I hold that they do not for the reasons set forth below.

## Discussion

The starting point for analysis is Section 6 of the TIAs. This section establishes the basic obligation Delta owes to the Owner Participant to indemnify it where Delta's actions result in a tax loss. In relevant part, Section 6 states:

SECTION 6. <u>Indemnity for Acts or Misrepresentations of Lessee</u>.

8

> (a) If for any taxable year, as the result of (i) any act or omission…by any Lessee Person during the Interim Term, the Basic Term or any Renewal Term…the Owner Participant shall suffer a disallowance of, shall suffer a delay in claiming, shall not…have the right to claim, or shall be required to recapture all or any portion of the ACRS Deductions and Investment Tax Credit, the Interest Deductions or the Amortization Deductions…then Lessee shall pay to the Owner Participant as an indemnity…an amount which, after deduction of the net amount of all additional Federal, state, local and foreign taxes required to be paid by the Owner Participant in respect of the receipt of such amount…shall be equal to the increase in Federal income taxes payable by the Owner Participant for such taxable year as the result of such Loss…plus the new amount of any actual interest, penalties or additions to tax payable….

Under this provision Delta is required to indemnify Lone Star if Lone Star suffers any described tax loss "as the result of…any act or omission" by Delta as lessee. Section 7 excludes certain events from the Section 6 indemnification obligation. In relevant part, Section 7(a) states:

> SECTION 7. <u>Excluded Events</u>. Notwithstanding any provision to the contrary contained in Section 6 hereof, the Owner Participant shall not be entitled to any payment under Section 6 hereof to the extent any Loss or Foreign Tax Credit Loss arises as a result of one or more of the following events:
>     (a) any voluntary or involuntary sale or other disposition (other than a substitution or replacement) by the Owner Participant of the Aircraft or any interest or beneficial interest therein or in the Trust Estate or any part thereof, unless a Lease Event of Default shall have occurred and be continuing at the time of such sale or disposition and such sale or disposition is attributable to the exercise of a remedy available to the Owner Participant pursuant to Section 15 of the Lease in response to the occurrence of such Lease Event of Default….

The relevant "Excluded Event" here is "any voluntary sale…by the Owner Participant of…any…beneficial interest…in the Trust Estate." There is no dispute that Lone Star's voluntary sale of its interests in the Owner Trusts constituted an Excluded Event under Section 7(a). To be entitled nevertheless to indemnification Lone Star must show that both requirements of the "unless" clause of subsection (a) are applicable.

9

There is no dispute that the first requirement of the "unless" clause is satisfied – a Lease Event of Default had occurred and was continuing at the time of sale. The second requirement – that the "sale…is attributable to the exercise of a remedy available to the Owner Participant pursuant to Section 15 of the Lease" – is disputed by the parties.

Two basic points are at issue:

- Was there any "exercise of a remedy" under Section 15 of the Leases?[5]

- Was Lone Star's sale of its interests in the Trust Estates "attributable" to the exercise of a remedy?

*A. Was there any "exercise of a remedy" under Section 15 of the Leases?*

There is no dispute that the sale from Lone Star to Vx was not the exercise of a remedy under the Leases. Nowhere in Section 15 of the Leases is the sale of an Owner Participant's interest in the Trust Estate listed as a remedy.

Lone Star points to two acts that it claims were exercises of remedies under the Leases: 1) this Court's approval of the Bingham Term Sheet, and 2) the unconsummated auction of the aircraft by the Indenture Trustee. Neither of these two acts constituted the exercise of a remedy under the Leases.

Lone Star argues that because the Bingham Term Sheet "contemplated that the Indenture Trustee *would* foreclose on Lone Star's Aircraft," and this "set in motion a series of events…that resulted in Lone Star's attempt to find a buyer for the Aircraft," the

---

[5] Lone Star argues that the provision is incoherent on its face because it refers to the "exercise of a remedy available to the Owner Participant pursuant to…the Lease," even though the Owner Participant is not itself a party to the Lease. (Indemnity Agreement Section 7(a).) However, Section 11 of the Indemnity Agreement defines the term "Owner Participant" to "include the affiliated group…of which the Owner Participant or Lessee, respectively, is a member." (Indemnity Agreement Section 11.) Since the "affiliated group" referred to includes the Owner Trustee and the Indenture Trustee, the provision is not incoherent on its face. But, even if it were incoherent, the appropriate solution would be to substitute the phrase "Owner Trustee or Indenture Trustee" for the term "Owner Participant" to give effect to the drafters' clear intent (which was to require that the party who could be exercising remedies under the Lease was indeed exercising a remedy) – not, as Lone Star suggests, to engage in a wholesale redrafting of the entire agreement.

10

adoption of the Bingham Term Sheet was itself an exercise of a remedy under the Leases. (Surreply of Lone Star Air Partners LLC to TIA Transfer Objection 1 at 3 (emphasis added) [hereinafter "Surreply"].) This assertion is factually wrong. At most, the Bingham Term Sheet contemplated the *future* exercise of a remedy under the Leases when there would be a *future* foreclosure on the aircraft. This mere *expectation* of the exercise of a remedy is not enough. Section 7(a) plainly states that the sale must be "attributable to *the exercise* of a remedy," meaning there must have been an actual exercise of a remedy before the clause can apply. (Indemnity Agreement Section 7(a) (emphasis added).) The Indemnity Agreement is unequivocal in saying "the exercise," not the 'expectation' or even the 'inevitable chance' that 'remedies will be exercised in the future.'

Lone Star also suggests that the Indenture Trustee's very authority to enter into the Bingham Term Sheet was grounded in the remedies section of the Leases[6] and that therefore its adoption must be viewed as the exercise of a remedy under the Leases.[7] However, the Indenture Trustee's authority to enter into the restructuring agreement did not derive from the remedies section of the Leases but rather from the inherent power of any party to contractual arrangements to renegotiate the terms of those arrangements.

Lone Star further posits that when the Indenture Trustee gave notice of and held an auction to sell the aircraft, this constituted the exercise of the Lessor's remedy

---

[6] Specifically, it is suggested that the Indenture Trustee's authority sprang from Section 15(f) of the Leases – a remedies provision – that gives the Lessor the authority to "exercise any… right or remedy which may be available under applicable law…." (Lease Agreement Section 15(f).)

[7] Lone Star contends that because Delta "has argued consistently that by entering into the [Bingham Term Sheet], the indenture trustees were exercising remedies under Section 15(g) of the relevant leases", it "should not be heard to argue now that the Indenture Trustee never exercised remedies under the Lease…." (Surreply at 2-3.) Without attempting to parse the inconsistencies of such arguments by Delta, it is sufficient to note that Lone Star cites no proposition of law that prohibits Delta from taking these supposedly inconsistent positions (assuming they were inconsistent).

11

contained in Section 15(b) of the Leases to "*sell*…the Aircraft…at public or private sale…." (Lease Agreement Section 15(b) (emphasis added).) If the aircraft had been sold, the remedy clearly would have been exercised. But, the planes were never sold – title never changed hands. Merely giving notice of an intent to sell, or even holding an unconsummated auction is not the same thing as selling the planes.

The thrust of Lone Star's argument appears to be, nonetheless, that because the Indenture Trustee had begun the process of selling the planes, a remedy was *being* exercised under the Leases, though it was not completely exerci*sed*. This argument fails because it loses sight of the fact that the sale in question has to be "attributable to" the identified exercise of a remedy. If this Court were to read the provision requiring "the exercise of a remedy" to include 'the attempted exercise of a remedy,' the result would be to effectively eliminate the second condition in its entirety, which of course I cannot do. (See God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assoc., LLP, 6 N.Y.3d 371, 374 (2006) (holding that "a contract 'should be read to give effect to all its provisions'") (quoting Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 63 (1995)).) It would do so because once an Event of Default occurred, there would be no objective limiting principle guiding when an 'attempted' exercise of a remedy has occurred. The urged interpretation would allow the Owner Participant to point to any acts of the Indenture Trustee that might potentially lead to the exercise of a remedy in satisfaction of the "exercise of a remedy" requirement. For example, Lone Star could argue that informal discussions between the Indenture Trustee and potential buyers constitute an 'exercise' of the remedy because the process of selling the planes begins at that point, perhaps even further back in time.

12

In short, the parties drafted an exception with two conditions, one of which was a continuing default under the Lease and the other of which by its plain terms was the actual exercise of a remedy under Section 15 of the Lease. Both of these provisions will be given full effect. Because the aircraft were never sold, the remedy contained in Section 15(b) of the Leases was never exercised, nor were any other remedies contained in Section 15 exercised.

B. *Was Lone Star's sale of its interests in the Trust Estates "attributable" to the exercise of a remedy?*

Even if the aborted auction could be deemed the exercise of a remedy, Lone Star's sale of its interests in the Trust Estates was not "attributable" to any attempted, threatened, aborted or other exercise of a remedy. Lone Star sold to Vx because Vx was willing to pay a very favorable price for the aircraft and Lone Star wanted to monetize its interests in the Trust Estates. The Debtholders were engaged in hard bargaining and took the position that they would not consummate a foreclosure sale to Vx unless Lone Star agreed to pay them a premium. Unwilling to pay the premium and fearing that the Debtholders would "let the sale to Vx get away," Lone Star chose to sell its Trust Estate interests in the planes to Vx "in order to monetize [its] interest in the Aircraft and circumvent the threat of the Debtholders to withhold any distributions to Lone Star until Lone Star had agreed to pay the premium they had demanded." (Gebler Affidavit at 6, 7.) It was motivated to do this because if the sale to Vx 'got away,' Lone Star would have "los[t] the prospect of recovering the excess of the sales price over the amount required to repay the debt, which by the Debtholders' estimates, even after payment of the premium they were demanding, *would exceed several million dollars*." (Id. at 6 (emphasis added).) Clearly, Lone Star's sale of its interests was not attributable to the

13

exercise of a remedy under the Leases, but rather was, by its own admission, attributable to its desire to ensure a sale that would net it several million dollars and allow it to avoid paying the premium that the Debtholders were demanding. The facts reflected in the Gebler Affidavit were reconfirmed at the hearing:

> The Court:   In other words…you looked at the economic alternatives and made a choice –
>
> Ms. Brock:[8]   Yes, we did.

(Tr. 15, Sept. 7, 2007 hearing [hereinafter "Hearing Transcript"].)

It is also undisputed that this voluntary decision to sell was the sole cause of the tax loss incurred by Lone Star. Title to the planes never changed hands, so there was no 'sale' of the aircraft that caused a tax loss. When Vx renegotiated the Leases with Delta there was no tax loss, nor would there have been if Lone Star had done so itself.[9] When Vx bought out the debt there was no tax loss, nor would there have been if Lone Star had done so itself.[10] The only act that caused a tax loss was Lone Star's voluntary decision to sell its interests in the Trust Estates – as noted by Lone Star's counsel: "The tax loss was caused by the actual sale of the Owner Participant's interest to Vx." (Hearing Transcript at 14.) Lone Star, not Delta, should bear the economic consequences resulting from this decision.

## **Conclusion**

The agreement in question is not ambiguous. When the terms are interpreted according to their ordinary, natural meanings the result is clear. The second requirement

---

[8] Ms. Brock represented Lone Star at the hearing.
[9] Lone Star's counsel explained that it would not have caused a tax loss "because we would [have] retained[ed] our ownership interest in the aircraft." (Hearing Transcript at 15.)
[10] Lone Star's counsel explained: "[I]f we had, in fact, been able to buy off the debt, then there would not have been at that moment a tax loss." (Hearing Transcript at 14.)

14

of Section 7(a)'s "unless" clause – that the sale be "attributable to the exercise of a remedy" – is not met in this case and Lone Star's claims are consequently excluded from indemnification by the terms of Section 7(a) of the TIAs.

Accordingly, Delta's objection to Lone Star's indemnity claims is sustained. Counsel for Delta is directed to prepare, circulate to the parties in interest for approval as to form (without waiving any party's right to appeal) and submit to the Court for signature appropriate orders consistent with this decision.


Dated:  White Plains, New York
        October 5, 2007

                                       **/s/ Adlai S. Hardin, Jr.**
                                    UNITED STATES BANKRUPTCY JUDGE