UNITED STATES BANKRUPTCY COURT                    **FOR PUBLICATION**

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

In re:

DELTA AIR LINES, INC., *et al.*,                    Chapter 11

                        Reorganized Debtors.                    Case No. 05 B 17923 (ASH)
                                             (Jointly Administered)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**A P P E A R A N C E S :**

**DEBEVOISE & PLIMPTON LLP**
**Special Aircraft Attorneys for Reorganized Debtors**
**By: Michael E. Wiles, Esq.**
     **Richard F. Hahn, Esq.**
**919 Third Avenue**
**New York, NY 10022**

**KAYE SCHOLER LLP**
**Attorneys for AT&T Credit Holdings, Inc.**
**By: Richard G. Smolev, Esq.**
     **Piper A. Brock, Esq.**
**425 Park Avenue**
**New York, NY 10022-3598**

**HUNTON & WILLIAMS LLP**
**Attorneys for Bell Atlantic Tricon Leasing Corporation,**
  **NCC Golf Company, NCC Key Company, and**
  **NCC Charlie Company**
**By:  Peter S. Partee, Esq.**
      **Scott H. Bernstein, Esq.**
**200 Park Avenue, 53rd Floor**
**New York, NY 10166-0136**
 **- and-**
**By:  Benjamin C. Ackerly, Esq. (admitted *pro hac vice*)**
     **Jason W. Harbour, Esq. (admission *pro hac vice* pending)**
**Riverfront Plaza, East Tower**
**951 East Byrd Street**
**Richmond, VA 23219-4074**

**BINGHAM McCUTCHEN LLP**
**Attorneys for the Ad Hoc Committee of Senior Secured**
  **Holders and The Bank of New York, as Indenture Trustee**
**By: Mark M. Elliott, Esq.**
     **Michael J. Reilly, Esq.**
     **Joshua Dorchak, Esq.**
**399 Park Avenue**
**New York, NY 10022-4689**

**REED SMITH LLP**
**Attorneys for PNC Leasing**
**By: Scott M. Esterbrook, Esq.**
     **Claudia Z. Springer, Esq.**
**2500 One Liberty Place**
**1650 Market Street**
**Philadelphia, PA 19103**

**VEDDER, PRICE, KAUFMAN & KAMMHOLZ, P.C.**
**Attorneys for Värde Investment Partners, L.P.**
**By:   Michael J. Edelman, Esq.**
         **Ariel Levy, Esq.**
**1633 Broadway, 47th Floor**
**New York, NY 10019**

**HUGHES & LUCE, LLP**
**Attorneys for Värde Investment Partners, L.P.**
**By: David Weitman, Esq.**
       **Daniel I. Morenoff, Esq.**
**1717 Main Street, Suite 2800**
**Dallas, TX 75201**

**DLA PIPER US LLP**
**Attorneys for Essex House Condominium Corp.**
   **and Marriott International, Inc.**
**By: Thomas R. Califano, Esq.**
       **Vincent J. Roldan, Esq.**
**1251 Avenue of the Americas**
**New York, NY 10020-1104**

**ADLAI S. HARDIN, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

## DECISION ON TIA/SLV SUBSTITUTE OBJECTION 3 AND OBJECTION 5 I

        Before the Court are two more claims objections by reorganized debtor Delta Air Lines,

Inc. ("Delta") in a series of objections to claims based on entitlements under tax indemnification agree-

ments ("TIA") and entitlements to stipulated loss value under leases ("SLV") arising under aircraft

structured financing agreements.   Substitute Objection 3 and Objection 5 I concern claims filed in Delta's

bankruptcy based on leveraged lease transactions involving fifteen aircraft (the "Aircraft").   Claims have

been filed by "owner participants" based on Delta's obligations under TIAs to compensate for adverse tax

consequences ("tax loss") resulting from premature terminations of the Aircraft leases or foreclosure of

the Aircraft.   Other claims have been filed by the "indenture trustees" acting on behalf of lenders based on

SLV payable by Delta under the same Aircraft leases, which were assigned to the indenture trustees as

collateral security.

        A component of SLV is an amount calculated to equal the same tax loss as that covered

by the TIAs.   Delta objects to this putative "overlap" to the extent that SLV covers the same tax loss as

that indemnified under the TIAs, arguing that it cannot be liable to pay twice for the same "injury."   In its

own words, "Delta seeks entry of an Order pursuant to section 502(b)(1) of the Bankruptcy Code, disallowing and/or reducing the TIA Claims and the SLV Claims to eliminate the overlaps among them."

Delta's position is based on two separate arguments.   Delta's basic position, which I have referred to as its "cosmic" argument, purports to proceed from a universal legal principle or ethic which governs irrespective of the parties' contractual arrangements and, moreover, which overrides contractual provisions which may dictate a contrary result.  In the alternative, Delta asserts that by their express terms the governing contracts between the parties with respect to each Aircraft extinguish TIA claims if Delta is required to pay SLV in respect of that Aircraft.

### The May 16 Decision

This Court previously issued a decision dated May 16, 2007 entitled "Decision on TIA/SLV Objections 1 and 2" (the "May 16 Decision").  *In re Delta Air Lines, Inc.*, 370 B.R. 552 (Bankr. S.D.N.Y. 2007).  The aircraft leveraged lease financing transactions involved in the May 16 Decision resolving Objections 1 and 2 are substantially similar to the leveraged lease transactions involved in TIA/SLV Substitute Objection 3 and Objection 5 I, although the specific language in certain key provisions of the agreements involved in Objections 3 and 5 I differs in certain respects from similar provisions in the transactions involved in Objections 1 and 2.   In order to avoid unnecessary repetition, the May 16 Decision is incorporated herein by reference, and familiarity with that Decision is presumed.[1]

It will be particularly useful to the reader to study the text of the May 16 Decision under the heading "Leveraged Lease Transactions Generally," which sets forth a concise description provided by Delta of the participants and the agreements involved in aircraft leveraged lease transactions of the sort involved in TIA/SLV Objections 3 and 5 I.

---

[1]    The final ruling in the May 16 Decision at point II C entitled "Objection to Tail No. N182DN" was based upon the Court's erroneous understanding of a Modified Term Sheet approved by this Court's order dated February 15, 2006.  On rehearing on August 20, 2007 (ECF docket no. 6643, Tr. at 64), I reversed my ruling in the May 16 Decision concerning Tail No. N182DN and the Modified Term Sheet.

## Jurisdiction

The Court has jurisdiction over these contested matters under 28 U.S.C. §§ 1334(b) and

157(a) and the standing order of referral to bankruptcy judges dated July 10, 1984, signed by Acting

Chief Judge Robert J. Ward.   The claims objections now before the Court are core proceedings under 28

U.S.C. § 157(b)(2)(B).

## Discussion

**I.      The cosmic argument**

For the reasons set forth in the May 16 Decision, I reject Delta's cosmic argument

asserted in its TIA/SLV Substitute Objection 3 and Objection 5 I.   Simply stated, if Delta contracted to

pay an amount equaling tax loss under a TIA and also agreed to pay an amount calculated to equate to tax

loss as part of SLV under a lease in the same structured finance transaction for a particular aircraft, then it

must pay what is required under both contracts.   Delta's protection from the "overlap" is to include

appropriate provisions in the contracts to preclude liability for the "overlap."

Equally unsupportable are Delta's suggestions for dividing the putative tax loss element

between TIA claimants and SLV claimants, because there is no predicate for such a remedy to be found in

the parties' written agreements, and the Court has no power to fashion a remedy not provided in the

parties' agreements.

**II.      The contract provisions**

Before examining the relevant provisions of the parties' several contracts, and at the cal-

culated risk of belaboring the obvious, I think it useful to point out that when the contracts were negoti-

ated each of the three parties involved here (the owner participant represented by the owner trustee, the

lenders represented by the indenture trustee, and Delta as the lessee) had its own interests and objectives

which were and are in direct conflict with one or both of the others.

With respect to the tax loss issue here involved, it was in the owner participant's interest

to recover in full, or to the fullest extent it could negotiate, the tax loss it might suffer.   Two contractual

vehicles were negotiated to this end.   One vehicle was the lease between the owner trustee as lessor and

the airline as lessee, which provides for payment of SLV in the event of default.   SLV is calculated to

provide sufficient funds to enable the owner trustee as lessor to pay the lender in full and to pay the

owner's tax loss in full.   Thus, in the event a solvent airline/lessee were to default but nevertheless were

able to pay SLV in full in cash, the lender would be paid out in full and the "waterfall" of SLV funds in

excess of the debt to the lender would pass to the owner participant in full payment of its tax loss.   The

second vehicle was the TIA between the owner participant and the airline, which obligates the airline to

pay the owner participant directly to indemnify the owner participant for tax loss to the extent provided in

the TIA.

It was in the interest of the lender to be repaid in full the amount of its loan plus interest

and other contractual entitlements.   The owner trustee was contractually bound under its note to pay the

indenture trustee principal, interest and other entitlements to pay out the lender.   The owner trustee's

obligation to the indenture trustee was secured by an assignment to the indenture trustee of both the air-

craft and the lease.   If the airline were to default and were unable to pay the indenture trustee (as assignee

of the lease) SLV in full in cash, there would be no "waterfall" of funds in excess of the lender's debt

available to pay over to the owner participant on account of its tax loss.

The interest and objective of Delta in negotiating this type of financing transaction was

that it not have a liability for the owner participant's tax loss which would be payable to both the owner

participant under the TIA and also to the lender/indenture trustee in the form of SLV under the lease.

The real controversy here is between Delta and the owner participant.   That is because

there is no colorable contractual or cosmic argument for the proposition that the indenture trustee/lender

should be compelled to relinquish to either Delta or the owner participant all or any part of its contractual

entitlement to the entirety of SLV as security for the loan.

One final observation is necessary to illuminate for the parties and any reviewing court

this Court's analytical approach to resolving this controversy.   I perceive no *a priori* or overarching

rationality or logic to the bargaining objective asserted by either side.   In other words, in negotiating the

governing agreements it was quite sensible and reasonable from the owner participant's perspective to

demand indemnification under the TIA from the airline/lessee for the full amount of its possible tax loss upon the airline's default if the payment of SLV were not to result in any "waterfall" to pay over to the owner trustee, even though this would make the defaulting airline liable for the tax loss under both SLV and the TIA. By the same token, it was equally rational for the airline to insist that, if it should suffer economic failure and default, it would not be contractually bound to pay, or be subject to claims in bankruptcy, for the owner participant's tax loss twice, once to the indenture trustee (as assignee of the lease) as part of SLV under the lease, and a second time to the owner participant under the TIA.

This fundamental conflict in interests and objectives is what the parties themselves had to resolve in their written agreements. The Court cannot make an agreement for the parties, nor can it fill in gaps in the parties' written contract in the guise of "interpretation." The Court must take the parties' contract as it is written and construe the words used by the parties in accordance with their common and usual meaning and usage. The object of contract interpretation is to give meaning and effect to the contract in accordance with the expectation and contemplation of the parties *as manifest in the agreement*, having in mind that what the parties intended and contemplated must be judged in light of the factual and legal context in which the parties made their agreement.

Decisions often refer to the court's duty in contract interpretation to determine the "intent of the parties," and this may be realistic when the parties have a common interest or intent. But in situations like the contested matters now before the Court, where the intent (in the sense of economic interest or objective) of each side is diametrically opposed to the other, the Court cannot find a common "intent of the parties" because there is no common intent, and the decision must perforce select one side's intent or objective over the other. That selection must be based upon a fair and objective interpretation of the contract *as it is written*, giving to the words used their normal meaning, and must be consistent with the factual and legal context reflected in the agreements themselves. In a case such as this it is more realistic to speak of the "expectation" or "contemplation" of the parties, which must be common based on the objective facts and circumstances, rather than the "intent" of each party, which is obviously antithetical to the other.

Under New York law, "[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (N.Y. 2002). "'The best evidence of what parties to a written agreement intend is what they say in their writing.'" *Id.* (quoting *Slamow v. Delcol*, 79 N.Y.2d 1016, 1018 (N.Y. 1992)). In interpreting what the parties said in their writing, "[t]he words and phrases used by the parties must, as in all cases involving contract interpretation, be given their plain meaning." *Brooke Group v. JCH Syndicate 488*, 87 N.Y.2d 530, 534 (N.Y. 1996) (citing *Levine v. Shell Oil Co.*, 28 N.Y.2d 205, 211 (N.Y. 1971)); *see also Laba v. Carey*, 29 N.Y.2d 302, 308 (N.Y. 1971); *Elmsmere Assocs. v. Gladstone*, 545 N.Y.S.2d 136, 139-40 (N.Y. App. Div. 1989) ("[I]t is axiomatic that the words and phrases used in a contract must be given their plain meaning.") (citations omitted). A sound method for determining the plain meaning of words is to look at their dictionary definitions. *See Mazzola v. County of Suffolk*, 533 N.Y.S.2d 297, 297 (N.Y. App. Div. 1988) ("[I]t is common practice for the courts of this State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract.").

Though the dictionary definitions of the terms they used is the best evidence of the parties' intent, "as any large dictionary shows, single words do have meanings and often a great many meanings, [and] it is impossible to determine which one of those meanings the parties intended unless each word is considered in its context." 5-24 Corbin on Contracts § 24.21 (2007); *accord* Restatement (Second) of Contracts § 202 cmt. b (1981) ("The meaning of words and other symbols commonly depends on their context."). Thus, "[e]ach word must be considered along with not only all the other words that surround it, but also the history and education of the parties, the nature of the contract, the purposes of the parties, and all other relevant circumstances." 5-24 Corbin on Contracts § 24.21 (2007); *accord Frederick v. Clark*, 541 N.Y.S.2d 660, 662 (N.Y. App. Div. 1989) ("In construing the provisions of a contract courts 'should give due consideration to the circumstances surrounding its execution, to the purpose of the parties in making the contract, and, if possible, [they] should give to the agreement a fair and reasonable interpretation.'") (quoting *Aron v. Gillman*, 309 N.Y. 157, 163 (N.Y. 1955) [brackets in original]); Restatement (Second) of Contracts § 202(1) (1981) ("Words and other conduct are interpreted

in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given

great weight."). Accordingly, the province of the Court in interpreting a contract is to consider the cir-

cumstances surrounding the formation of the contract and to "put itself in the position [the parties] occu-

pied at the time the contract was made." Restatement (Second) of Contracts § 202 cmt. b (1981). In this

regard, it is appropriate for the Court to look at the factual and legal context in which the agreement in

question was made as reflected in the agreement itself, paying particular attention to those facts and cir-

cumstances that undoubtedly were contemplated by the parties at the time they entered into their agree-

ment.

      The factual context that the Court should consider includes those factual and legal cir-

cumstances that the parties indisputably were aware of and contemplated in forming their contract. For

example, in a contract calling for inter-continental delivery of a cargo of goods "as soon as commercially

practicable," the meaning of the quoted phrase would depend upon the nature of the cargo. If the cargo

were of such weight and bulk that it could not be transported by air, the term "as soon as commercially

practicable" would necessarily contemplate the time required for shipment by sea; but if the cargo were

such that delivery by air were appropriate, the contractually-required delivery time would be commensur-

ately reduced. So also with regard to the legal context framing the parties' transaction. If the cargo con-

sisted of hazardous material which federal regulation barred from air traffic, the parties must necessarily

contemplate transportation over land by truck or rail, instead of the greatly abbreviated delivery time re-

quired for transit by air.

      With this background, let us turn to the relevant contract provisions.

### A.     Substitute TIA/SLV Objection 3

      Delta relies on two provisions of the constituent agreements involved in Objection 3

which demonstrate that the parties were aware of the "overlap" and contracted to preclude it. The

provisions are Section 7(c) of the TIA and Section 6(d) of the Participation Agreement with respect to

each of the eight Aircraft involved in Objection 3.

      Section 7 of the TIA for three of the Aircraft contains the following provision:

SECTION 7.  Excluded Events.  Notwithstanding any provision to the contrary contained in Sections [sic] 6 or Section 8 hereof, the Owner Participant shall not be entitled to any payment under Sections 6 or 8 hereof if any Loss or Foreign Tax Credit Loss arises as the result of one or more of the following events:

* * *

(c)    any event whereby a party to any of the Operative Documents is required to pay Stipulated Loss Value or Termination Value, to the extent that such amounts have been paid;[2]

Section 6(d) of the Participation Agreement for each of the eight Aircraft involved in

Objection 3 provides as follows:

(d)  Adjustment of Stipulated Loss Value and Termination Value.   If any amount is paid by the Lessee to the Owner Participant pursuant to the Indemnity Agreement, the amounts of Stipulated Loss Value and Termination Value set forth in Exhibit C to the Lease shall be recomputed in the manner set forth in Section 3(e) of the Lease.

On the face of it, these two provisions clearly demonstrate that the parties intended and

contemplated that, with one exception, Delta would not be required to pay tax loss under both the TIA

and as part of SLV under the Lease.   Thus, Section 7(c) of the TIA states that the owner participant shall

not be entitled to any payment of tax loss if the loss arises as a result of "any event whereby a party to any

of the Operative Documents is required to pay Stipulated Loss Value . . . to the extent that such amounts

have been paid;" and Section 6(d) of the Participation Agreements requires that, if Delta has paid the

owner participant any amount pursuant to the TIA, then SLV must be recalculated and reduced

accordingly.[3]

---

[2]         Section 7(c) of the TIAs for the other five Aircraft are identical to this provision except that subsection (c) concludes with the parenthetical "(except to the extent that the calculation of Stipulated Loss Value or Termination Value does not accurately reflect the timing of any such event for Federal income tax pur- poses)."   Neither side has attributed any significance to this parenthetical language in the context of this controversy.

[3]         The exception is that under Section 23 of the Lease, SLV cannot be reduced "below the amounts required to pay in full, as of the date of payment thereof, the aggregate unpaid principal amount of the Loan Certificates outstanding on such date of payment, together with the accrued and unpaid interest and premium, if any. . . ."  The exception is significant because it is an express contractual refutation of Delta's overarching cosmic argument that it should never be required to pay an amount calculated by reference to the tax loss to both the owner participant and the indenture trustee.   Thus, if Delta had previously paid the owner parti-

(continued...)

I agree with Delta that Section 7(c) of the TIA controls the outcome of Objection 3. The "event" or "events" causing Delta's obligation to pay under the TIA to be "excluded" were its default under the Lease and its bankruptcy filing. As a consequence of its default and bankruptcy, Delta is in fact "required to pay" SLV to the indenture trustee in each transaction, and "such amounts have been paid" or will have been paid upon the completion of distribution of Delta stock in accordance with its confirmed Plan.

The owner participants advance several arguments in opposition. All are predicated on the fact that the indenture trustee's SLV claim, although based on a calculation for the full amount of SLV, will not be paid "in full in cash," but in Delta stock worth less than the debt owed to the lenders. This defense raises one simple question: Did the parties contemplate that Delta's obligation to pay, and payment of, SLV might arise and occur in the context of bankruptcy? The answer is, of course they did. Liability for SLV arises only after a default. Bankruptcy is itself an event of default, and bankruptcy is a likely if not certain consequence of an insolvent airline defaulting on its obligation to pay rent for its aircraft.

The owner participants' principal argument is that "[t]he exclusion provisions [in Section 7(c)] apply . . . only to the extent the corresponding stipulated loss value or 'SLV' is paid in cash in full." Response of Bell Atlantic *et al.* at 3. "[T]he exclusion [in Section 7(c)] applies, and Delta is not required to pay the Verizon OPs' TIA claims, **only to the extent** that the Debtors pay SLV in cash in full. . . . [B]ecause it is undisputed that SLV will not be paid in cash in full under any scenario in Delta's bankruptcy case, the exclusion provisions do not apply, and the Verizon OPs' TIA claims must be allowed in their entirety." *Id.* at 4. The "paid in full in cash" argument is premised on the proposition

---

[3](...continued)
  cipant for some element of tax loss under the TIA, and a subsequent default event under the Lease triggered the obligation to pay SLV, Section 6(d) of the Participation Agreement would reduce or eliminate the tax loss component of SLV. But under Section 23 of the Lease, SLV could not be reduced below the amount necessary to pay off the lender, even if this required Delta to pay the full tax loss component of SLV in order to pay off the lender after Delta had already paid tax loss to the owner participant under the TIA. The issue does not arise in Objections 3 and 5 I because Delta was never called upon to pay anything under the TIAs prior to its default and bankruptcy.

that the exclusion in Section 7(c) becomes operative to bar payment under the TIA only if the payment of SLV is sufficient to create a "waterfall" to make the owner participants "whole" by compensating the owner participants in full for their tax loss.   Thus, it is asserted:  "In other words, only if the SLV is paid in cash in full, which will not happen here, should the TIA claim be disallowed, because only payment in cash in full of SLV will result in the SLV waterfall paying the related equity component in full, thus triggering the exclusion provisions."  *Id.* at 19.   The argument proceeds:  "The Verizon OPs only agreed to waive the TIA claims to the extent the traditional SLV 'waterfall' provides compensation for their exposure" (*id.* at 20); "the owner participants are made whole only when there is actual performance of lessee's obligations under the lease" (*id.* at 21); "only actual payment in cash in full of SLV will cause the owner participants to receive a sufficient level of recompense for their tax and other exposure through the SLV 'waterfall' and, thus, only actual payment in cash in full of SLV renders the 'back stop' or 'safety net' provided by the TIA unnecessary for the protection of the owner participants" (*id.* at 22).

The problem with these contentions is that they do not find support in the actual words used by the parties in their written agreement.  Section 7(c) applies to exclude payment under the TIA where there is an "event" whereby Delta is "required to pay" SLV "to the extent such amounts have been paid."   The contract does ***not*** say paid "in full in cash," and the Court is not free to change the contract by inserting those words.  Moreover, nothing in Section 7(c) conditions the exclusion of the obligation to pay TIA on a finding that the payment of SLV was sufficient to result in a "waterfall" to reimburse the owner participant in full for its tax loss.  Stated differently, there is no language in Section 7(c) which requires that the payment of SLV be sufficient to pay off the owner participant's tax loss as a condition for the Section 7(c) exclusion to be applicable.

The owner participant's arguments require the Court to consider the meaning of the words "pay" and "paid" in Section 7(c).   The word "pay" and its past tense "paid" are words of common usage and meaning in the English language, and no one has suggested that they are words of art or jargon bearing some uncommon or occult connotation known only to aircraft structured finance specialists. While there are a number of meanings of the word "pay" in all dictionaries, every dictionary we have

found defines the word "pay" in words or substance as the satisfaction of a debt by money or property

sufficient in fact or law to discharge the obligation.  For example, *see*:

> *Black's Law Dictionary* 587 (5th ed. abridged 1983) ("[t]o discharge a debt by tender of payment due; to deliver to a creditor the value of a debt, either in money or in goods, for his acceptance");

> *Ballentine's Law Dictionary* (3d ed. 1969), *available at* https://www.lexis.com/ ("[t]o discharge a debt; to deliver a creditor the value of a debt, either in money or goods, to his acceptance, by which the debt is discharged");

> *Dictionary.com Unabridged* (Random House, Inc., v 1.1 2008), http://dictionary.reference.com/browse/pay ("to discharge a debt or obligation");

> *The American Heritage Dictionary of the English Language* (Houghton Mifflin Company, 4th ed. 2004), *available at* http://dictionary.reference.com/browse/pay ("[t]o discharge or settle (a debt or obligation)");

> *The Chambers Dictionary* 1196 (Chambers 1998) ("to give (money etc.) in satisfaction of a debt, in exchange, compensation, remuneration, etc.; to settle or discharge (a claim, bill, debt, etc.)");

> *The Oxford American College Dictionary* 1002 (Oxford UP 2002) ("[to] give (a sum of money) in exchange for goods or work done or in discharge of a debt");

> 11 *The Oxford English Dictionary* 375-76 (Clarendon Press, 2nd ed. 1989) (2a "[t]o give to (a person) what is due in discharge of a debt"; 5a "[t]o give, deliver, or hand over (money or some other thing) in return for goods or services, or in discharge of an obligation"; 6b "[t]o furnish or yield (money, etc.) for the discharge of (a debt or other obligation)"; 7fig. "to discharge (an obligation)"; 9 "[t]o give money or other equivalent in return for something or in discharge of an obligation");

> *Webster's Encyclopedic Unabridged Dictionary of the English Language* 1424 (RHR Press, Deluxe ed. 2001) (3 "to transfer money as compensation or recompense for work done or services rendered; to satisfy the claims of (a person, organization, etc.), as by giving money due"; 14 "to discharge a debt or obligation");

> *Webster's New International Dictionary* 1585 (G. & C. Merriam Company, India Paper ed. 1924) (2 "To satisfy (another person) for service rendered, property delivered, etc.; to discharge one's obligation to; to make due in return to; to compensate; remunerate; recompense; requite; as, to *pay* workmen or servants." 4 "To discharge, as a debt, demand, obligation, or duty, by giving or doing what is due or required; to deliver the amount or value of to the person to whom it is owing; to perform or render duly, as that which has been promised; to discharge a debt by delivering (money owed).");

> *Webster's Third New International Dictionary of the English Language Unabridged* 1659 (Merriam-Webster, Inc. 1993) (2a "to satisfy (someone) for services rendered or property delivered: discharge an obligation to"; 2b "to discharge indebtedness for: settle").

The dictionary definition of "pay" and "paid" looks to whether the payer, Delta, has delivered money or property to the payee, the indenture trustee, sufficient in fact and law to discharge Delta's debt to the indenture trustee.  By contrast, the owner participant's concept of pay/paid focuses on whether a third party, the owner participant, has derived a benefit from the payment and requires the Court to hold that SLV has not been "paid" if the owner participant has not benefitted even though Delta's obligation to pay SLV to the indenture trustee has in fact and law been discharged.   Where A's debt obligation to B has been fully discharged as a matter of fact and law, it is unavailing to argue that A has not "paid" B because B did not derive enough money from the payment to pay C.

In modern commerce many if not most debts are indeed paid by some form of money transfer for the full amount of the debt.  But no definition has been found which would confine the meaning of "pay" or "paid" to a payment "in full in cash" or a payment sufficient to pay off a third party's tax loss under a contractual "waterfall."  This narrow and eccentric meaning of "pay" which the owner participants would require the Court to adopt is refuted by the context in which SLV would most likely be required, namely, bankruptcy.  Bankruptcy itself is an event of default under the Lease, and it is perfectly clear from the agreements themselves that the parties drafted their agreements in contemplation of bankruptcy in the event of default.   SLV arises only as a remedy available after an event of default.  An event of default giving rise to the obligation to pay SLV would almost certainly entail such a payment in the context of bankruptcy, and the parties and their lawyers obviously knew this.  In bankruptcy, the payment of allowed pre-petition, unsecured claims, including claims for rent arrears and SLV under an aircraft lease (or, for that matter, tax loss under a TIA), are never paid "in full in cash," except in the very rare case of a solvent debtor able to confirm a 100% cash plan.  Such claims are "paid" *pro rata* and thereby discharged in cents-on-the-dollar distributions of cash, stock or other property or rights.

To construe the words "pay" and "paid" in Section 7(c) to mean only paid "in full in cash" would fly in the face of the expectation and contemplation of the parties who drafted Section 7(c) of the TIA knowing that payment of SLV would almost certainly be made in the context of a bankruptcy. When full distribution of cash, stock or other property on an allowed claim in a Chapter 11 case has been

- 13 -

made in accordance with a debtor's confirmed plan, the claim has been "paid" and it is legally satisfied and discharged.  That is the dictionary definition of "pay" and "paid," and it is the meaning of those words in the context of bankruptcy.

In seeking to determine the expectation and contemplation of the parties, the Court cannot disregard the factual and legal context in which the parties negotiated their agreement.   A contract calling for a party to pay rent arrears or SLV under a lease in the context of bankruptcy cannot rationally be construed as expecting the airline to make such payments in full in cash because payment in full in cash in bankruptcy is virtually always factually and legally impossible, and the parties cannot be deemed to have contemplated a performance which is factually and legally impossible.

Arguing that the concept of payment in Section 7(c) must be construed to mean "in full in cash," the owner participants ask the rhetorical question "Why would the Verizon OPs ever have agreed to such a provision that has no relationship to the fundamental economics of the transaction?"   Response of Bell Atlantic at 17.  Of course, the "fundamental economics of the transaction" may be fundamental from the owner participant's perspective, but not from Delta's.   As noted at the outset of this discussion, the fundamental intent and objective of the parties on this point was and is diametrically opposed, and the agreement could not be written to accommodate the objectives of both.  The art of rhetoric does not help either side, or the Court, because counsel for Delta can respond "Why would Delta ever agree to pay the owner participants' tax loss twice, especially in a default scenario when it cannot pay any of its creditors in full?"  The reason(s) "why" the parties concluded their negotiations with the final, written contract is irrelevant.   Where the objectives of the contracting parties were and are squarely conflicted, the "intent of the parties" must be defined by the words used in their written agreement and the reasonable expectation as to what will happen in the factual and legal context known to both sides, not by what one party or the other later asserts they intended or meant to say.

The owner participants argue that "the Operative Documents require that all amounts paid by the lessee be paid in immediately available funds" *(id.* at 23), citing Section 3(d) of the Lease and

Section 13 of the TIA.[4]   These payment instructions in the Lease and the TIA are fine for ordinary course payment obligations between the parties.   But in the context of default, insolvency and bankruptcy, are we to construe the parties' expectation and contemplation to be that the ordinary course payment instructions in these agreements would override or supercede the constraints of the Bankruptcy Code, or that a pre-petition claim under the lease or the TIA which is satisfied and discharged in accordance with the debtor's confirmed Plan would nevertheless be deemed not to have been "paid" because it was not paid in full by wire transfer in immediately available funds?   The answer must be, "No."

In its objection Delta suggested that the word "paid" as used in Section 7(c) should be construed to mean "allowed" in the context of a bankruptcy.   The owner participants respond that "'allowed' is not a reasonable interpretation of 'paid'. . . the Debtors cite no authority for the proposition that 'allowance' and 'payment' somehow become the same concept in bankruptcy.   Essentially, the Debtors invite this Court to rewrite the exclusion provisions to delete the word 'paid' and replace it with the word 'allowed' in an effort to create some contractual basis in the language of the TIAs for disallowing or reducing TIA claims." *Id.* at 25.   I agree that the concept of "allowed" is not synonymous with "paid," but the contention misses the point.   The focus here is not merely upon the allowance of the indenture trustee's claim for SLV — the focus must be upon the ***distribution*** in accordance with Delta's confirmed Plan which will result in the satisfaction and discharge of the allowed claim.   It is the distribution in accordance with Delta's Plan which constitutes "paid" as used in Section 7(c).

To summarize with respect to Objection 3, I conclude that Delta's objection to the SLV claims asserted by the indenture trustees must be overruled, and that Delta's objection to the claims for tax losses under the TIAs asserted by the owner participants must be sustained.

---

[4]    Section 3(d) of the Lease provides, in pertinent part, "All payments pursuant to this Lease shall be made by 12:00 Noon Eastern Standard (or Daylight) Time on the date payment is due in U.S. dollars and in immediately available funds."   Section 13 of the TIA provides, in pertinent part, "Payments made by the Lessee or the Owner Participant pursuant to this Indemnity Agreement shall be made by wire transfer of immediately available funds . . . as specified by the other party in written directions to such other party, and if no such directions shall be given, by check payable to the order of such payee and mailed to such other party by certified mail, postage prepaid."

As to SLV, the owner trustee's rights as lessor and owner of the Aircraft are assigned to the indenture trustee as security for the indebtedness. Delta's bankruptcy filing and termination of rent payments were events of default under Sections 14(a) and 14(f) of the leases and under Section 4.02(a) of the indenture. Upon these events of default, the indenture trustee had the sole right to control the exercise of remedies under the Lease, including the right to demand payment of outstanding rent plus SLV, and the right to foreclose on the Aircraft. Upon exercise of remedies under the Lease, any payments received by the indenture trustee from Delta, including SLV, must be distributed by the indenture trustee pursuant to the contractual system of priority (the "waterfall") provided under Section 3.03 of the indenture. Only after payment of the indenture trustee's costs and all principal, interest and other entitlements owing to the lender are paid in full will the "balance, if any," be distributable to the owner trustee for the benefit of the owner participants. Under the constituent agreements, where full payment of SLV is equal to or less than the amount owing to the lender, the owner trustee and its owner participants take nothing. The Modified Term Sheet approved by this Court's February 15, 2006 order did not materially depart from the contractual provisions with respect to SLV. *See* this Court's ruling at the August 20, 2007 hearing (Tr. at 64) on reconsideration of my initial ruling in the May 16 Decision, referred to in footnote 1, above. The only contractual basis for reducing SLV is Section 6(d) of the Participation Agreement. Section 6(d) does not apply here, because there have been no indemnification payments under the TIAs prior or subsequent to Delta's bankruptcy filing, and in any event Section 23 of the leases would preclude reduction of SLV below an amount necessary to pay the lenders in full.

As to the owner participants' claims, Delta's obligation to pay tax loss indemnification is expressly excluded under Section 7(c) of the TIAs. Under Section 7(c) Delta's obligation to pay under the TIAs is "excluded" by reason of an "event" under which Delta is "required to pay" SLV and has or will have "paid" SLV. There is no dispute that the indenture trustees' claims are based upon the entirety of SLV as calculated under the Lease (net of payment credits under the Modified Term Sheet which are entirely consistent with Section 15 of the Lease) — *i.e.*, there is no portion or element of SLV for which claim is not made by the indenture trustees. Under common usage and as defined in virtually every

dictionary, an obligor may "pay" a claim which is then deemed "paid" in any manner such that the claim is satisfied and discharged as a matter of fact and law.  When Delta completes its distributions in satisfaction and discharge of the indenture trustees' claims in accordance with Delta's confirmed Plan, the indenture trustee's claims will have been "paid" as a matter of fact, law and the common and accepted meaning of that term.   There is nothing in Section 7(c) which conditions the exclusion on the payment of SLV "in cash in full" or on the "waterfall" necessary to make the owner participants "whole" on their tax loss.  Of course, the parties could have agreed in their negotiation on a version of Section 7(c) which would apply only if SLV were paid in full in cash so as to fully compensate the owner participants for their tax loss, but they did not.

One final point merits comment.  In support of its contention that the "overlap" of the tax loss element should result in an adjustment to both the TIA claimants and the SLV claimants so that the claims of each should be adjusted to include fifty percent of the tax loss, Delta asserts that "[t]he parties' contracts do not specify whether TIA Claims or SLV Claims take priority where (as here) both claims have been asserted at the same time."  Objection at 12.  The fact that both TIA claims and SLV claims may both be "asserted at the same time" is meaningless because the claims do not arise at the same time.  The owner participants had received no TIA payments and had no entitlement to TIA claims pre-petition. The events of default giving rise to SLV claims arose upon and after Delta's bankruptcy filing and prior to any contractual basis for TIA claims.   The owner participants did not suffer any tax loss giving rise to a putative TIA claim until after, and as a consequence of, the indenture trustees' exercise of their rights following defaults.   In the default scenario here involved, the SLV claims necessarily arose prior to any contractual entitlement of the owner participants under the TIAs.  The putative simultaneity of claims assertion is a factor of the bankruptcy process and does not implicate a question of substantive priority under the parties' agreements.

## B.    TIA/SLV Objection 5 I

The contractual provisions and the arguments of the parties in Objection 5 I are substantially the same as those in Objection 3.  The provisions are Section 6(c) of the TIA and Section 6(d) of the

Participation Agreement, and it appears they are identical in the transactions covering all seven of the

Aircraft involved in Objection 5 I.

Section 6(c) of the TIAs for these Aircraft contain the following provision:

SECTION 6.  Exclusions.  Notwithstanding any provision to the contrary con-
tained in Section 4 hereof, the Owner Participant shall not be entitled to any payment
under Section 5 hereof in respect of any Loss or any Foreign Tax Credit Loss arising as a
result of one or more of the following events:

* * *

(c)  Any event whereby the Lessee pays an amount equal to Stipulated
Loss Value or Termination Value, except to the extent that the calculation of
Stipulated Loss Value or Termination Value does not accurately reflect the
timing of any such event for Federal income tax purposes.

Paragraph 6(d) of the Participation Agreement for each of the seven Aircraft involved in

Objection 5 I is identical to the analogous provision involved in Objection 3 and provides as follows:

(d)  Adjustment of Stipulated Loss Value and Termination Value.   If any
amount is paid by the Lessee to the Owner Participant pursuant to the Indemnity
Agreement, the amounts of Stipulated Loss Value and Termination Value set
forth in Exhibit C to the Lease shall be recomputed in the manner set forth in
Section 3(e) of the Lease.

Once again the determinative provision is the exclusion set forth in Section 6(c) of the

TIA, which provides that the owner participant shall not be entitled to any payment under the TIA arising

from "[a]ny event whereby the Lessee pays an amount equal to stipulated loss value. . . ."[5]   On the face

of it, this provision bars the owner participant's TIA claim for the same reasons already articulated in this

Court's May 16 Decision, the August 22, 2007 oral ruling on the Modified Term Sheet (see footnote 1,

above) and point II.A in this Decision.

The owner participant argues that Delta's objection based on TIA § 6(c) "fails for two

reasons."  AT&T Response at 3.  The first reason is that "Section 6 of each TIA excludes claims only if

AT&T's tax loss arises as a result of one or more of the events described therein."  Id.   A sufficient

answer to this assertion is, "so what?"   In every transaction at issue in Objection 5 I the "event" whereby

Delta must pay SLV was Delta's default under the Lease, and in every transaction the owner participant

---

[5]      As noted in footnote 2, above, neither side has attributed any significance to the clause beginning "except to
the extent. . . ."

suffered a tax loss due to a foreclosure arising from the same "event," namely, Delta's default under the

Lease.

> The owner participant's second argument is as follows, in material part:

> Second, even if Exclusion 6(c) were applicable, . . . [the Court] would have to make a detailed analysis of the *actual payments* being made by Delta under the restructuring agreements and then overrule the Objection unless the sum of those actual payments *equals Stipulated Loss Value*.

*Id.* at 4.

> This second argument of the owner participant actually comprises two conceptually

different components.  One component of the second argument appears in paragraph 19 of the AT&T

Response.   There it is asserted that the "restructuring agreements" (*i.e.*, the Modified Term Sheet referred

to in footnote 1, above, or an agreement substantially similar) involved a calculation of the indenture

trustee's claims which combined SLV with upward adjustments for swap breakage and rent due or paid in

arrears or advance, less credits or offsets for the present value of rent to be paid under the new restruc-

tured leases and the present value of the residual value of the aircraft.   Paragraph 19 concludes:   "The

first question that AT&T respectfully suggests the Court must ask is whether all of these elements con-

stitute 'payments' for purposes of the requirement of Exclusion 6(c) that the Lessee must '*pay*' an amount

equal to SLV."   The answer to this "first question" is that the adjustments referred to do constitute

payment in the sense of satisfaction and discharge of the amount of SLV required to be paid by Delta, for

the reasons already set forth in my prior rulings.   To reiterate, the adjustments called for under the

Modified Term Sheet are substantially the same if not identical to the adjustments provided for under the

"Remedies" sections of the Lease respecting the payment of SLV.   The Modified Term Sheet provided

for the calculation of the indenture trustee's claim in Delta's bankruptcy as follows (emphasis supplied):

> The sum of (i) **stipulated loss value . . .** *plus* (ii) any rent payment which fell due prior to the filing date and which was not paid by Debtor . . . *plus* (iii) any actual swap breakage incurred . . . by the lender . . . *plus* (iv) any portion of arrears rent accrued and unpaid from the table used for determining stipulated loss value or termination value in clause (i) accrued to the filing date . . . ***minus*** the sum of (x) any portion of any advance rent paid but not accrued prior to the filing date . . . *plus* (y) the aggregate rent or other payments . . . . scheduled to be received hereunder after the filing date or under the restructured lease

with Debtor; *plus* (z) the expected residual value [of the Aircraft]. . .  (quoting from Response of The Bank of New York at 6).

Section 15(c) of the Lease provides for the payment of "an amount equal to the excess, if any, of (i) the Stipulated Loss Value for the Aircraft . . . over (ii) the Fair Market Value for the Aircraft. . . ."  Similarly, Section 15(d) of the Lease provides for the payment of "an amount equal to the excess, if any, of (i) the Stipulated Loss Value for the Aircraft . . . over (ii) the net proceeds of [sale of the Aircraft, if it has been sold]."[6]  The Modified Term Sheet calls for the payment of Stipulated Loss Value minus (y) the aggregate rent or other payments scheduled to be received under the restructured lease and (z) the expected residual value of the Aircraft.   The rent payments under the restructured lease plus the residual value of the Aircraft are, by agreement of the parties, the analog to the fair market value for the Aircraft referred to in Section 15(c) of the Lease and the sale proceeds of the Aircraft referred to in Section 15(d) of the Lease.  Accordingly, I conclude that these offsets are quite consistent with the payment of SLV contemplated under Section 15 of the Lease.

Amplifying the position at oral argument, counsel for the owner participant explained that SLV is simply a number resulting from a calculation prescribed in Exhibit C to the lease, and if that number is not paid in full without any deduction, SLV has not been "paid" for purposes of the TIA Section 6(c) exclusion.  The problem with that interpretation is that it would render Section 6(c) a meaningless sham, because every reference to the SLV remedy in Section 15 of the lease requires deductions or refunds which reduce the amount of SLV, as calculated in Exhibit C, actually required to be paid.  Courts are not at liberty to nullify contract provisions in the guise of "interpretation," but must construe the words used by the parties in a manner that will give meaning and effect to all contract provisions.  *See Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 403 (N.Y. 1984) ("In construing a contract, one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless.") (citations omitted); *Corhill Corp. v. S. D. Plants, Inc.*, 9 N.Y.2d 595, 599 (N.Y.

---

[6]     Section 15(e) calls for payment of "an amount equal to Stipulated Loss Value," but subsection (e) also requires the lessor to either return the aircraft or sell the airframe and engine and pay over the net proceeds of said sale to the lessee, resulting in a *de facto* reduction in SLV which is the analog of either subsection (c) or subsection (d), effectively reducing the net amount of SLV required to be paid.

1961) ("It is a cardinal rule of construction that a court should not 'adopt an interpretation' which will

operate to leave a 'provision of a contract . . . without force and effect'") (citations omitted).

        Moreover, owner participants are wrong in asserting that SLV is defined simply as a

single number resulting from a calculation prescribed in Exhibit C without any offsets.  As defined in

Section 1 of the Lease, SLV entails both increases and reductions required by provisions of the agreement

other than Exhibit C.  Section 1 defines "Stipulated Loss Value" as follows:

> 'Stipulated Loss Value' for the Aircraft as of any particular date of computation
> means the greater of (x) the amount determined for such date in accordance with
> Section 10 hereof, as increased or reduced in accordance with the terms of Section 3(c),
> and (y) an amount at least sufficient to pay in full, as of the date of payment thereof, the
> aggregate unpaid principal amount of the Certificates outstanding on such date of pay-
> ment, together with the accrued and unpaid interest thereon.  During any Renewal Term,
> 'Stipulated Loss Value' means the amount determined pursuant to Section 5.

        The second component of the owner participant's second argument is basically the same

as the owner participants' position asserted in Objection 3 — that the exclusion provision in Section 6(c)

of the TIA (the counterpart of Section 7(c) of the TIAs in Objection 3) is applicable only if SLV is paid in

cash in full so that the waterfall is sufficient to indemnify the owner participant for its tax loss.  Thus, in

paragraph 22 of the AT&T Response it is argued that "the parties expressly contemplated that, even if

Delta were in bankruptcy, only a payment by Delta of SLV in U.S. dollars and immediately available

funds would invoke Exclusion 6(c) of the TIAs and extinguish AT&T's tax indemnity claims."  In sup-

port of this contention the owner participant has submitted the affidavit of Gina Kennedy, formerly a tax

attorney at Sidley Austin who, in 1990 and 1991, represented AT&T in negotiating the TIAs involved in

Objection 5 I.  In her affidavit attorney Kennedy states that "my understanding was that the word 'pay'

would be interpreted to mean Delta's payment obligations under each of the AT&T Leases and Tax

Indemnity Agreement" and that under the Leases "payments were to be made in U.S. dollars in immedi-

ately available funds."  She argues that "only a payment in immediately available U.S. dollars of the full

amount of Stipulated Loss Value would trigger the exclusion of Section 6(c) of the Tax Indemnity Agree-

ments," and that "[i]n my professional experience, it was not necessary to add to Section 6(c) a reference

that the payment referenced therein had to be paid 'in cash' or 'without reduction,' and indeed, I would consider such additional language to be redundant. . . ."

For the reasons set forth in point II.A of this Decision, the payment "in cash in full" argument must be rejected. Attorney Kennedy's affidavit underscores the wisdom of the rule requiring courts to construe written contracts based upon the words agreed upon by the parties in their contract, rather than upon *post hoc* arguments and assertions by lawyers or laymen who participated in the negotiations and drafting. For example, attorney Kennedy states in paragraph 8 "the purpose of Section 6(c) of each Tax Indemnity Agreement is to prevent double payment to the Owner Participant. . . ." Since the case law teaches that "purpose" is generally important in construing contracts, this postulate is significant. But Delta would disagree with this "purpose" and would offer the contrary postulate, based on Section 6(c) of the TIA and Section 6(d) of the Participation Agreement, that the "purpose" of these two provisions was not to prevent double payment to the owner participant but to exclude the possibility that Delta could be held liable twice for the owner participant's tax loss, once to the indenture trustee through its claim for SLV under the Lease and a second time to the owner participant under the TIA. In the abstract, each of these conflicting postulates as to "purpose" is reasonable, just as the conflicting objectives of Delta (to avoid double liability for the same tax loss) and the owner participant (to be indemnified in full for its tax loss even if Delta must be liable for the same tax loss twice) are reasonable, although obviously irreconcilable, objectives. But the parties' written agreements are not abstract: TIA § 6(c) and Participation Agreement § 6(c) prevent double payment by Delta to two different parties, not double payment to the owner participant. Attorney Kennedy's statement of the "purpose" of these contract provisions finds no support in, and is refuted by, the provisions themselves.

Attorney Kennedy's statements that "my understanding was that the word 'pay' [as used in Section 6(c) of the TIA] would be interpreted to mean . . . payments were to be made in U.S. dollars in immediately available funds [as required by Section 3(d) of the Lease]" and that "all of Delta's payment obligations are absolute and can not be reduced on account of any circumstances, including bankruptcy" (Affidavit ¶ 10) are simply untenable. Her understanding that "pay" would be interpreted to refer only to

- 22 -

payment "in full in cash or payment only in U.S. dollars in immediately available funds" does not accord with the far broader definitions of "pay" in every dictionary of the English language and every law dictionary.  The fact that paragraph 3(d) of the Lease called for payments to be made in U.S. dollars in immediately available funds simply renders more stark the failure to define "pay" in such terms in TIA § 7(c).

The basic defect in the owner participant's argument on the meaning of "pay" is perhaps most strikingly illustrated in attorney Kennedy's assertion that Delta's SLV payment obligations are absolute and cannot be reduced on account of any circumstances **"including bankruptcy."**  That statement is, of course, quite wrong:  under the Bankruptcy Code, an unsecured pre-petition claim will be satisfied and discharged (*i.e.*, "paid" within the dictionary definition) upon a distribution of stock or other securities or other non-cash property worth pennies on the dollar in accordance with a confirmed plan of reorganization or plan of liquidation, even if the claim was predicated on a contract requiring payment in full in cash or in U.S. dollars in immediately available funds.   Once again, the owner participant's paid-in-full-in-cash argument would require the Court to effectively nullify TIA § 6(c) in the only context in which the exclusion is likely to matter.[7]   That is because SLV gets paid only in a default situation, and the likelihood of SLV being paid in full in cash in a default scenario is almost nil because bankruptcy is almost a certainty.  Of course, the parties could have expressly provided that the exclusion in Section 6(c) would not apply in the event of bankruptcy, where the owner participant would get nothing from the waterfall.  But they did not, and there is nothing in Section 6(c) or elsewhere in the constituent agreements to support such an "interpretation."

---

[7]    Quoting from pages 82-83 of the Transcript:

THE COURT:  . . .  And you acknowledge that it [SLV] cannot be paid in full in bankruptcy; and therefore, in bankruptcy, that exclusion [Section 6(c)] never applies.

MR. PARTEE:  That is exactly right.  . . .  It was not intended to apply in a bankruptcy. It was really intended to apply in other circumstances, where SLV might actually be paid, even though there had been a default by the lessee.

Attorney Kennedy's statement concerning Delta's "payment obligations" that "can not be reduced" does raise a subtle point that merits one final comment. It is important to recognize that there is a distinction between a debt (*i.e.*, an obligation to pay money), on the one hand, and the method or means by which the debt is satisfied and discharged (*i.e.*, "paid"), on the other. In this controversy, the debt involved is the obligation to pay SLV calculated in the manner provided in the Lease. Delta's ***obligation*** to pay SLV to the indenture trustee ***is not reduced*** by Delta's bankruptcy, or the Modified Term Sheet, or Delta's Plan. The obligation to pay SLV in full (net of the offsets provided in lease Section 15 and their analogs in the Term Sheet) is reflected in the claim filed in Delta's bankruptcy by the indenture trustee. Stated another way, Delta's ***liability*** for the full amount of SLV, including the tax loss component, is fully included in the indenture trustee's claim filed in the Delta bankruptcy. But neither that claim nor any other unsecured claim could be satisfied and discharged by payment of the allowed claim in full in cash because Delta was insolvent and had neither cash nor property to satisfy its creditors. Consequently, Delta's Plan provides for the indenture trustee's claim and all other pre-petition unsecured claims to be "paid" (*i.e.*, fully satisfied and discharged) by distributions of Delta new common stock.

Whether satisfied in cash in full or by the distribution of Delta new common stock, Delta's liability and the indenture trustee's claim for the entirety of SLV will have been "paid" within the dictionary and common parlance meaning of that word when distributions are complete under Delta's Plan.

### III.    Ambiguity and the parol evidence rule

The owner participants in Objections 3 and 5 I have argued strenuously that, if "pay/paid" is interpreted to mean anything other than paid in full in cash so as to produce a waterfall to pay their tax loss in full, the Court must conclude that TIA § 7(c) or 6(c) is ambiguous, and they demand a trial preceded by discovery of documents and witnesses going back to the late 1980s and early 1990s when these fifteen transactions were negotiated and signed. An affidavit in support of the ambiguity argument has been submitted on each Objection.

- 24 -

Under New York law, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (N.Y. 2002). "A contract is unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Id.* at 569-70 (quoting *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (N.Y. 1978)) (brackets in original). Conversely, "[c]ontract language is ambiguous if it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (citations omitted).

The determination of whether a contract provision is ambiguous is to be made by the Court as a matter of law. *Greenfield*, 98 N.Y.2d at 569. This determination is made by examining the face of the agreement itself, without considering extrinsic evidence. *Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002) ("Under New York law, the question of ambiguity *vel non* must be determined from the face of the agreement, without reference to extrinsic evidence.") (citing *Kass v. Kass*, 91 N.Y.2d 554, 566 (N.Y. 1998); *Arkin Kaplan LLP v. Jones*, 840 N.Y.S.2d 48, 51 (N.Y. App. Div. 2007) ("Whether a written agreement is ambiguous — that is to say, reasonably susceptible of more than one interpretation — is a question of law to be determined by the court from the face of the document, without reference to extrinsic evidence.").

> Ambiguity is determined by looking within the four corners of the document, not to outside sources. And in deciding whether an agreement is ambiguous courts 'should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought.'

*Kass v. Kass*, 91 N.Y.2d 554, 566 (N.Y. 1998) (quoting *William C. Atwater & Co., Inc. v. Panama R.R. Co.*, 246 N.Y. 519, 524 (N.Y. 1927)) (other citations omitted); *accord Collins v. Harrison-Bode*, 303 F.3d

429, 433 (2d Cir. 2002) (noting that the court must consider the agreement itself as well as its context).

An agreement is not ambiguous merely because the parties assert differing interpretations of the words

used in the agreement.  "Parties to a contract may not create an ambiguity merely by urging conflicting

interpretations of their agreement."  *Sayers*, 7 F.3d at 1095; *accord Seiden Assocs., Inc. v. ANC Holdings,*

*Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) ("The language of a contract is not made ambiguous simply be-

cause the parties urge different interpretations."); *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906

F.2d 884, 889 (2d Cir. 1990).

        Despite pages of briefing and two affidavits, the owner participants have not identified a

single word in TIA § 7(c) or 6(c) or elsewhere in the operative agreements which they claim has arcane or

a specialized meaning generally recognized in the airline finance industry, nor have they suggested that

there is any custom or practice in the industry which would give rise to any ambiguity in the contract

language.  Instead, in Objection 3 they rely on the contention that Section 7(c) is subject to three

"different interpretations" and is therefore ambiguous.

        The "different interpretations" rationale for finding ambiguity has been rejected by the

Second Circuit in the *Sayers* and *Seiden Associates* cases cited and quoted above.  But let us  nevertheless

examine the three "different interpretations" proffered by the owner participants in support of the argu-

ment.  The first "different interpretation"of TIA § 7(c) is this (quoting from the owner participants'

Response of Bell Atlantic at 16):

> (i)    The exclusion provisions could be read to mean that the exclusion applies to
> reduce the Verizon OPs' TIA claims to the extent any portion of SLV is paid on a
> dollar for dollar basis.  For example, under this reading, if $200 is paid on
> account of SLV, the corresponding TIA claim would be reduced by $200,
> regardless of whether any of the $200 is paid to the owner participants through
> the equity component of SLV from the waterfall.

        This is not an interpretation of anything in Section 7(c) — it is an entirely different

contract.  The owner participants recognize this, admitting that this interpretation "conflicts with the

language of the Tax Indemnity Agreements" and "could not possibly comport with the parties' intent."

(*Id.* at 16-17)  The second "different interpretation" is posited as follows:

     (ii)      The exclusion provisions could be read to mean that the exclusion applies to
reduce the Verizon OPs' TIA claims only to the extent the Verizon OPs are paid
as a result of the waterfall from the SLV claims.

          Like the first, this second "interpretation" is substantively unrelated to Section 7(c) as written.   The owner participants acknowledge this by admitting that the second interpretation "does not comport with the language of the Tax Indemnity Agreements or the intent of the parties."  (*Id.* at 17)  This admission is striking, however, because the second "different interpretation" is precisely the rationale proffered by the owner participants in support of their contention that "pay/paid" can only be interpreted to mean "in cash in full."   This leads us to the owner participants' "third interpretation," articulated as follows:

     (iii)     The exclusion provisions could be read, and should be read, to mean that the
exclusion applies only if SLV is paid in cash in full.

          This "third interpretation" is in fact the owner participants' "in cash in full" argument. As noted just above, it is undermined by the owner participants' admission that the "second interpreta-tion" "does not comport with the language of the Tax Indemnity Agreements or the intent of the parties." The "in cash in full" argument has been examined at length in points II.A and B, above, and need not be repeated.  Suffice it to say that "in cash in full" is a reasonable interpretation of "pay/paid" in the context of ordinary course payment obligations under the Lease and even the extraordinary SLV payment obliga-tion in the context of a solvent airline not in bankruptcy, *i.e.*, in a context in which one would ordinarily contemplate and expect that a monetary obligation would be paid in cash or equivalent and in full.  But the "in cash in full" interpretation conflicts with reality in the context of an insolvent airline/lessee in bankruptcy.  It is irrational to suppose that the contracting parties contemplated and expected that Delta would pay SLV in cash and in full in a context where Delta could not pay SLV in cash in full as a matter of practical fact because it did not have the cash to do so and because it was legally precluded from doing so under the Bankruptcy Code.

          At a hearing on January 31, 2007, I declined to authorize any discovery pending deter-mination of the legal issues which might arise in connection with the test case objections, and a deter-

mination of whether there is any ambiguity in the constituent agreements requiring a trial.  The owner

participants now object to my preliminary ruling barring discovery, asserting that the Court must be

"cognizant of the customs, practices, usages and terminology as generally understood in the particular

trade or business," quoting the Second Circuit in *Sayers*, 7 F.3d at 1095.   Although barred from dis-

covery of Delta, the owner participants have had ample time since the hearing on January 31, 2007 to

identify their own fact witnesses and experts to proffer evidence on custom, practice and terminology in

the industry, if there were any, to show ambiguity.  Nevertheless, as noted above, none of the owner parti-

cipants has offered any evidence of custom, practice and terminology.

Two affidavits have been submitted.  The so-called Verizon OPs offered the Declaration

of Peter D. Rutherford, a senior vice president of some or all of the Verizon OPs who "[f]or over twenty

years, [has] been personally involved in structuring leveraged aircraft leasing transactions and purchasing

owner participant interests in such transactions."  His Declaration is based on his personal knowledge and

his knowledge of the Verizon OPs "Books and Records" (not otherwise identified or referred to again in

the Declaration).   The Rutherford Declaration is expressed exclusively in generalities and does no more

than parrot the arguments ably advanced by the owner participants' counsel, both orally and in writing.

Thus, the Declaration asserts in paragraph 13 that "the Verizon OPs only agreed to waive the TIA claims

to the extent the traditional SLV 'waterfall' provides compensation for their exposure."  The argument

continues in paragraph 19 "the exclusion provisions use the phrase 'to the extent' in describing the events

that can trigger the exclusion and eliminate or reduce the TIA claims because the owner participants are

made whole only when there is actual performance of lessee's obligations under the lease."   The

Rutherford Declaration is not testimony or evidence, but argument, and the argument is best summarized

in paragraph 20:

> 20.   The Debtors' strained, self-serving interpretation of the exclusion would
> render the TIAs completely ineffectual at fulfilling their intended function, in the lease
> termination context, of providing a separate and independent mechanism for the Verizon
> OPs to obtain compensation for their increased exposure when the main mechanism for
> obtaining those benefits — the waterfall resulting from payment of SLV in cash in full —
> fails to provide such compensation.

- 28 -

The affidavit submitted in support of the owner participants' response to Objection 5 I, that of attorney Gina Kennedy, has already been discussed in point II.B, above.  The Rutherford Declaration and the Kennedy affidavit do not offer evidence of custom, practice, usage or terminology evidencing ambiguity in the agreements — they simply reprise the same arguments set forth by counsel in the owner participants' briefs and oral arguments.  The owner participants' basic position — that pay/paid in TIA §§ 7(c) and 6(c) must be construed to mean paid in full in cash because otherwise the owner participants will not recover their tax loss and equity — is entirely plausible and understandable from the perspective of the owner participants.  But equally plausible and understandable from the perspective of Delta (and Delta's other creditors) is that the purpose and objective of Section 7(c) or 6(c) was to exclude the danger that Delta would be liable for the owner participants' tax loss twice at a time when Delta was insolvent and could not pay any of its creditors.

It is abundantly clear that a trial in these contested matters would be an exercise in futility and would accomplish nothing, other than substantial delay and inordinate expenditure of professional fees and costs.  There are no customs, practices, usages or terminologies bearing upon TIA §§ 6(c) and 7(c), and no ambiguity has been identified either in the pay/paid terminology or any other words or phrases in TIA § 6(c) or 7(c).

There is no dispute that the owner participants on one side and Delta on the other had and have diametrically opposed objectives, purposes and intents with respect to whether the key words "pay/paid" mean in full in cash, or paid in the ordinary dictionary sense of satisfied and discharged. Testimony by witnesses from each side is unnecessary to establish this.  The task of the Court in this unusual contract dispute is not to decide nearly twenty years after the events whether some for even all of the many lawyers and business persons who worked on these transactions ever had a common under-standing or "meeting of the minds" on the meaning of "pay/paid."  What is clear is that the parties had major financial interests and objectives on the issue which were mutually exclusive.  Whether individual lawyers and business participants discussed, negotiated, horse traded, understood or even thought of the "pay/paid" issue is not relevant.  The parties, whether wittingly or not, agreed upon the language that

must determine the outcome of this dispute, whether their representatives actually had a "meeting of the minds" or not.

   Aside from the foregoing practical considerations, a trial here is barred because the parol evidence rule bars the use of extrinsic evidence to vary or contradict the plain meaning of words used in a contract. "Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (N.Y. 1990). "It is well settled that 'extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.'" *Id.* at 163 (quoting *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 379 (N.Y. 1969)). *See also*, *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 572-73 (N.Y. 1986). "Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous, which is an issue of law for the courts to decide." *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (N.Y. 2002); *see also Seiden Associates, Inc.*, 959 F.2d at 428-29 ("If the language unambiguously conveys the parties' intent, extrinsic evidence may not properly be received, nor may a judicial preference be interjected since these extraneous factors would vary the effect of the contract's terms."). Thus, the contract will be interpreted according to its plain meaning, unadulterated by a "tour through [the parties'] cranium[s], with [the parties] as the guide." *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814 (7th Cir. 1987). The Second Circuit in *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 26-27 (2d Cir. 1988) (citations omitted) summarized the parol evidence rule as follows:

> The parol evidence rule, a substantive rule of contract law and not a rule of evidence, is generally stated as follows: When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing. All state and federal jurisdictions accept this basic statement of the rule, although inter- pretations vary.

* * *

> The parol evidence rule aims to ensure some measure of stability in commercial relations. The purpose and essence of the rule is to avoid the possibility that fraud might be perpetrated if testimony as to subjective intent could be substituted for the plain meaning

- 30 -

of a contract.  In the absence of ambiguity, the effect of admitting extrinsic evidence would be to allow one party "to substitute his view of his obligations for those clearly stated."

To recapitulate, TIA §§ 7(c) in Objection 3 and 6(c) in Objection 5 I, and particularly the terminology "pay/paid" and "pays an amount equal to" in those provisions are not ambiguous.  The pay/paid/pays terminology are words of common usage and understanding with consistent lay and legal dictionary definitions.  To construe pay/paid/pays to mean in cash in full is a rational interpretation of the words in the context of a solvent airline/lessee not in bankruptcy, since a money debt normally would not otherwise be satisfied and discharged.  But to construe pay/paid/pays to mean in cash in full in the context of an airline which is insolvent and in bankruptcy is irrational, because an insolvent airline/lessee in bankruptcy is incapable of paying SLV in cash in full for lack of the cash resources to do so, and it is barred from doing so by the Bankruptcy Code.  Contract provisions must be interpreted in the factual and legal context in which the provisions may be expected to become operative.  The parties to these trans-actions unquestionably understood that SLV would most likely become payable in the context of insol-vency and bankruptcy.  The parties cannot have contemplated or expected SLV to be paid in cash in full, knowing that this would not be practically and legally possible.  The only meaning of pay/paid/pays which can rationally be ascribed to such terminology in the context of an insolvent and bankrupt airline/ lessee is the common dictionary meaning of payment in the sense of discharge of the indebtedness as a matter of fact and law.  This definition is rational and conforms to the parties' reasonable contemplation and expectation in all circumstances, whether SLV is required to be paid by a solvent airline not in bank-ruptcy, or an insolvent airline after filing its bankruptcy petition.[8]  Courts are barred under the parol evidence rule from considering extrinsic evidence to vary or change the unambiguous terms of a written agreement.

Simply put, the exclusion provisions have "'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no

---

[8]     Note that the conclusion that the constituent agreements were negotiated and signed in the context of the parties' necessary contemplation and expectation that SLV might become payable in bankruptcy is predicated on the terms and provisions of the agreements themselves, not upon extrinsic evidence.

reasonable basis for a difference of opinion.'" *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569-70

(N.Y. 2002) (quoting *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (N.Y. 1978)) (brackets in original).

The common and usual dictionary meaning of pay/paid/pays must govern here.   The parties have not

identified any other meaning that can be reasonably ascribed to the words they used, nor can the Court

discern any ambiguity within the contract.   Irrespective of whether the owner participants may have

secretly intended a different result, the contract they agreed to is "complete, clear and unambiguous on its

face" and will be "enforced according to the plain meaning of its terms." *Greenfield v. Philles Records*,

98 N.Y.2d 562, 569 (N.Y. 2002).

<u>**Conclusion**</u>

The "test case" approach to resolving Delta's Objections to TIA/SLV claims arising out

of aircraft leveraged lease financing transactions, as reflected in this Court's rulings on TIA/SLV Objec-

tions 1, 2, Substitute 3 and 5 I, has demonstrated a consistent pattern of contractual provisions and argu-

ments of the parties.   All four Objections are based on two analogous contract provisions, one in the

TIAs and one in the Participation Agreements.   All four Participation Agreement sections are virtually if

not completely identical.   The critical TIA provisions on which Delta relies to exclude its liability for the

TIA claims vary somewhat, and hence the arguments of the parties, addressed in the May 16 Decision and

in this Decision, have also varied and evolved.   Thus, TIA § 7(c) in Objection 1 refers to an event

whereby Delta "is required to pay Stipulated Loss Value;" in Objection 2 TIA § 6(c) it is an event where-

by Delta "pays Stipulated Loss Value . . . or an amount determined by reference thereto;" in Substitute

Objection 3 TIA § 7(c) it is an event whereby Delta "is required to pay Stipulated Loss Value . . . to the

extent that such amounts have been paid;" and in Objection 5 I it is an event whereby Delta "pays an

amount equal to Stipulated Loss Value."

Despite the lack of uniformity, it is evident that all four versions of the determinative TIA

provisions articulate the same basic requirement — that Delta be required to "pay" or have "paid" SLV.

None of these formulations can fairly be read in context to confine the meaning of "pay" to payment "in

full in cash."   Thus, I view the analyses and conclusions expressed in this Decision in response to the

arguments of counsel on Objections 3 and 5 I equally applicable to the contract provisions involved in Objections 1 and 2, and *vice versa*.

Of course, each TIA/SLV objection must depend on the specific contract provisions involved.  But the parties and counsel on both sides will wish to consider carefully whether the contract provisions in other TIA/SLV objections not yet presented to the Court are so materially different from those already ruled upon in the May 16 Decision and this Decision as to warrant further litigation before this Court.

Counsel for Delta are instructed to promptly prepare, circulate to other counsel for approval as to form, and present to the Court appropriate orders resolving Objections 3 and 5 I consistent with this Decision.  The orders when signed will be without prejudice to appeal by any party, including Delta inasmuch as I have again rejected Delta's cosmic arguments.

Dated:  White Plains, NY
        January 16, 2008


                          /s/ Adlai S. Hardin, Jr.
                               U.S.B.J.