**Response Deadline: November 5, 2009 at 4:00 p.m. (prevailing Eastern Time)**
**Hearing Date (if necessary): November 17, 2009 at 12:00 noon (prevailing Eastern Time)**

DAVIS POLK & WARDWELL LLP

450 Lexington Avenue

New York, New York 10017

Telephone: (212) 450-4000

Facsimile:  (212) 607-7539

Marshall S. Huebner

Timothy E. Graulich

Steven C. Krause

*Attorneys for the Reorganized Debtors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                          :
In re:                                                    :
                                                          :  Chapter 11 Case No.
                                                          :
DELTA AIR LINES, INC., et al.,                            :  05-17923 (CGM)
                                                          :
                                                          :  (Jointly Administered)
                   Reorganized Debtors.[1]                :
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NOTICE OF HEARING OF REORGANIZED DEBTORS' OBJECTION TO CLAIM NOS. 6906, 6907, 6908, 6909, 6910, 6912, 6913, 6914, 6915, 6916, 6917, <u>6918, 6919, 6920, 6921, 6922, 6923, 6924, 6925 AND 8478</u>

PLEASE TAKE NOTICE that on October 16, 2009 Delta Air Lines, Inc.

("**Delta**") and those of its subsidiaries that are reorganized debtors in these proceedings

(collectively, the "**Reorganized Debtors**") filed the Reorganized Debtors' Objection to

Claim Nos. 6906, 6907, 6908, 6909, 6910, 6912, 6913, 6914, 6915, 6916, 6917, 6918,

---

[1] The Reorganized Debtors are Delta Air Lines, Inc. and Comair, Inc.  The following Delta subsidiaries were also debtors and debtors in possession in these proceedings: ASA Holdings, Inc.; Comair Holdings, LLC; Comair Services, Inc.; Crown Rooms, Inc.; DAL Global Services, LLC; DAL Moscow, Inc.; Delta AirElite Business Jets, Inc.; Delta Benefits Management, Inc.; Delta Connection Academy, Inc.; Delta Loyalty Management Services, LLC; Delta Technology, LLC; Epsilon Trading, LLC; and Kappa Capital Management, LLC.  On September 26, 2007, the Court entered a final decree closing the chapter 11 cases of each of those entities.

6919, 6920, 6921, 6922, 6923, 6924, 6925 and 8478 (the "**Objection**") in the United

States Bankruptcy Court for the Southern District of New York (the "**Court**") pursuant to

the Court's Order Establishing Procedures for Claims Objections dated October 12, 2006

(the "**Claims Objection Procedures Order**").

PLEASE TAKE FURTHER NOTICE that responses, if any, to the entry of an

order approving the Objection must be filed by November 5, 2009 at 4:00 p.m.

PLEASE TAKE FURTHER NOTICE that the Objection will be heard at 12:00

noon (prevailing Eastern Time) on November 17, 2009 in the United States Bankruptcy

Court for the Southern District of New York, 355 Main Street, Poughkeepsie, New York

12601 before the Honorable Cecelia G. Morris, United States Bankruptcy Judge.

Dated:   New York, New York
         October 16, 2009

By:   /s/ Timothy E. Graulich
      Marshall S. Huebner
      Timothy E. Graulich
      Steven C. Krause

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 607-7539

*Attorneys for the Reorganized Debtors*

**Response Deadline: November 5, 2009 at 4:00 p.m. (prevailing Eastern Time)**
**Hearing Date (if necessary): November 17, 2009 at 12:00 noon (prevailing Eastern Time)**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 607-7539
Marshall S. Huebner
Timothy E. Graulich
Steven C. Krause

*Attorneys for the Reorganized Debtors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|  | : |  |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 Case No. |
| | : | |
| DELTA AIR LINES, INC., et al., | : | 05-17923 (CGM) |
| | : | |
| | : | (Jointly Administered) |
| Reorganized Debtors.[1] | : | |
| | : | |
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## REORGANIZED DEBTORS' OBJECTION
## TO CLAIM NOS. 6906, 6907, 6908, 6909, 6910, 6912, 6913, 6914, 6915, 6916, 6917, <u>6918, 6919, 6920, 6921, 6922, 6923, 6924, 6925 AND 8478</u>

---

[1] The Reorganized Debtors are Delta Air Lines, Inc. and Comair, Inc.  The following Delta subsidiaries were also debtors and debtors in possession in these proceedings: ASA Holdings, Inc.; Comair Holdings, LLC; Comair Services, Inc.; Crown Rooms, Inc.; DAL Global Services, LLC; DAL Moscow, Inc.; Delta AirElite Business Jets, Inc.; Delta Benefits Management, Inc.; Delta Connection Academy, Inc.; Delta Loyalty Management Services, LLC; Delta Technology, LLC; Epsilon Trading, LLC; and Kappa Capital Management, LLC.  On September 26, 2007, the Court entered a final decree closing the chapter 11 cases of each of those entities.

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ............................................................................................ ii

Background and Jurisdiction........................................................................................... 1

Relevant Facts................................................................................................................ 3

Relief Requested ............................................................................................................ 5

Argument ....................................................................................................................... 7

I.    Since Burns Was an Insider, Her Claims Must Be Capped at the Reasonable
      Value of Her Services, Which Is Zero ................................................................... 7

II.   Since Burns Concedes that She Provided No Post-Petition Benefit to the Estate,
      the Post-Petition Claim Must Be Expunged.......................................................... 12

III.  In the Alternative, Since the Consulting Agreement Is an Employment
      Contract, the Claims Must Be Capped at the Value of One Year of Travel
      Benefits................................................................................................................. 14

      A.    The Consulting Agreement Was Terminated ........................................... 15

      B.    The Consulting Agreement Is an Employment Agreement....................... 17

IV.   Since the Indemnification Benefits Are Duplicative of the Non-Debtor
      Defendant Claim, the Claims for Indemnification Benefits Must Be Expunged.... 20

Notice ........................................................................................................................... 21

## TABLE OF AUTHORITIES

### Cases

*Equibank v. Dan-Ver Enterprises, Inc. (In re Dan-Ver Enterprises, Inc.)*, 86 B.R. 443 (Bankr. W.D. Pa. 1988) ................................................................. 11

*In re Acme-Dunham, Inc.*, 50 B.R. 734 (D. Me. 1985) ..................................... 8

*In re All-American Auxiliary Ass'n*, 95 B.R. 540 (Bankr. S.D. Ohio 1989) ..................... 11

*In re Allegheny Intern., Inc.*, 158 B.R. 332 (Bankr. W.D. Pa. 1992) ................................. 8

*In re Bethlehem Steel Corp.*, No. 02-2854 (MBM), 2003 U.S. Dist. LEXIS 12909 (S.D.N.Y. July 23, 2003) ........................................................... 12

*In re Charter Co.*, 82 B.R. 144 (Bankr. M.D. Fla. 1988) ................................. 20

*In re Chateaugay Corp.*, 102 B.R. 335 (Bankr. S.D.N.Y. 1989) ........................ 13

*In re Cincinnati Cordage & Paper Co.*, 271 B.R. 264 (Bankr. S.D. Ohio 2001) ............ 15

*In re EECO Inc.*, 138 B.R. 260 (Bankr. C.D. Cal. 1992) ................................... 8

*In re Globe Metallurgical, Inc.*, 312 B.R. 34 (Bankr. S.D.N.Y. 2004) ........................... 13

*In re Helm*, 335 B.R. 528 (Bankr. S.D.N.Y. 2006) ........................................... 15

*In re Jonick Deli Corp.*, 263 B.R. 196 (S.D.N.Y. 2001) ................................... 12

*In re Malden Mills Indus.*, 302 B.R. 408 (Bankr. D. Mass. 2003) ................................. 14

*In re Patient Educ. Media, Inc.*, 221 B.R. 97 (Bankr. S.D.N.Y. 1998) ............................ 13

*In re Prospect Hill Res., Inc.*, 837 F.2d 453 (11th Cir. 1988) ........................................ 15

*In re Protarga, Inc.*, 329 B.R. 451 (Bankr. D. Del. 2005) ................................... 15

*In re Russell Cave Co.*, 253 B.R. 815 (Bankr. E.D. Ky. 2000) ................................... 8, 10

*In re Segovia*, 387 B.R. 773 (Bankr. N.D. Cal. 2008) *aff'd*, No. 08-60047, 2009 WL 2917750 (9th Cir. Sept. 14, 2009) ........................................................ 8

*In re Teligent, Inc.*, 268 B.R. 723 (Bankr. S.D.N.Y. 2001) ................................. 16

*In re Terry*, 245 B.R. 422 (Bankr. N.D. Ga. 2000) ........................................ 18

*In re Ticketplanet.com*, 313 B.R. 46 (Bankr. S.D.N.Y. 2004) ........................................9, 10

*In re Wilson Foods Corp.*, 182 B.R. 278 (Bankr. D. Kan. 1995) .............................. 17, 20

*In re WorldCom, Inc.*, 361 B.R. 675 (Bankr. S.D.N.Y. 2007) .................................... 17, 19

*Mason v. Official Comm. of Unsecured Creditors (In re FBI Distrib. Corp.)*, 330
    F.3d 36 (1st Cir. 2003) ............................................................................................ 15

*Pepper v. Litton*, 308 U.S. 295 (1939) ............................................................................ 11

*SEC v. Gemstar-TV Guide Int'l, Inc.*, 401 F.3d 1031 (9th Cir. 2005), *cert. denied
    sub nom. Yuen v. SEC*, 546 U.S. 933 (2005) ............................................................. 14

*Sharon Steel Corp. v. Nat'l Fuel Distribution Corp.*, 872 F.2d 36 (3d Cir. 1989). .......... 13

*Smith v. Delta Air Lines, Inc.*, 422 F. Supp. 2d 1310 (N.D. Ga. 2006) ............................ 7

*Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*,
    789 F.2d 98 (2d Cir. 1986) ...................................................................................12, 13

*U.S. v. Noland*, 517 U.S. 535 (1996) .............................................................................. 12

*West Coast Cambridge, Inc. v. Rice*, 262 Ga. App. 106 (Ga. App. 2003) ....................... 18

## Statutes and Rules

11 U.S.C. § 101(31)(B) ..................................................................................................... 9

11 U.S.C. § 502(b) .................................................................................................... 7, 8, 14

11 U.S.C. § 502(b)(4) ...................................................................................................... 8, 9

11 U.S.C. § 502(b)(7) ................................................................................................. passim

11 U.S.C. § 503 ................................................................................................................ 12

11 U.S.C. § 503(b) ........................................................................................................... 12

11 U.S.C. § 507 ................................................................................................................ 12

28 U.S.C. § 157 .................................................................................................................. 2

28 U.S.C. § 157(b) ............................................................................................................. 2

28 U.S.C. § 1334 ................................................................................................................ 2

28 U.S.C. § 1408 ................................................................................................................ 2

28 U.S.C. § 1409........................................................................................................2

Fed. R. Bankr. P. 1015(b) ..........................................................................................1

Delta Air Lines, Inc. ("**Delta**") and those of its subsidiaries that were debtors and debtors in possession in these proceedings (collectively, the "**Reorganized Debtors**"), respectfully represent:

## **Background and Jurisdiction**

1.      On September 14, 2005 (the "**Petition Date**"), each Reorganized Debtor commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Reorganized Debtors' cases are being jointly administered pursuant to rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

2.      On September 15, 2005, the Debtors filed a motion seeking approval of certain procedures (the "**Rejection Procedures**") (i) pursuant to sections 105(a) and 365(a) of the Bankruptcy Code and Bankruptcy Rule 6006 for the ongoing rejection of certain executory contracts and unexpired leases and subleases and (ii) pursuant to sections 105(a) and 554(a) of the Bankruptcy Code for the abandonment of certain of the Debtors' personal property.

3.      By order dated November 10, 2005, the Court approved the Rejection Procedures.

4.      On May 31, 2006, each of the Reorganized Debtors filed a Statement of Financial Affairs and a Schedule of Assets and Liabilities (collectively, as may be amended from time to time, the "**Schedules**").

5.      By order dated June 5, 2006 (the "**Bar Date Order**"), the Court established August 21, 2006 as the last day by which certain proofs of claim could be timely filed in these chapter 11 cases (the "**Bar Date**").  In accordance with the Bar Date

Order, written notice of the Bar Date was mailed to, among others, all creditors listed on the Schedules.

6.      On the Bar Date, M. Michele Burns ("**Burns**"), Delta's former chief financial officer, caused to be filed proofs of claim nos. 6906, 6907, 6908, 6909, 6910, 6912, 6913, 6914, 6915, 6916, 6917, 6918, 6919, 6920, 6921, 6922, 6923, 6924 and 6925 (collectively, the "**Pre-Petition Claims**").  Each Pre-Petition Claim appears to be identical to each other Pre-Petition Claim, with the exception of the name of the Debtor against which it is filed.  A copy of  proof of claim no. 6918 filed against Delta Air Lines, Inc. is annexed hereto as Exhibit B-1.

7.      On October 12, 2006, the Court entered an Order Establishing Procedures for Claims Objections (the "**Claims Objection Procedures Order**").

8.      On April 25, 2007, the Court entered an order confirming the Reorganized Debtors' Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "**Plan**").  On April 30, 2007, the Plan became effective.  Section 1.1(179) of the Plan established May 30, 2007 as the last day by which requests for payment of certain administrative claims must be filed (the "**Administrative Bar Date**").

9.      On the Administrative Bar Date, Burns caused to be filed proof of claim no. 8478, annexed hereto as Exhibit B-2 (the "**Post-Petition Claim**" and, together with the Pre-Petition Claims, the "**Claims**").

10.      The Court has subject matter jurisdiction over this Objection pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and may be determined by the Bankruptcy Court.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Relevant Facts**

11.     Burns was Delta's chief financial officer from August 16, 2000 to May 1,

2004.[1] Prior to the termination of her services as Delta's chief financial officer, Burns

negotiated with Delta the terms of a continuing consulting arrangement.  This

arrangement was memorialized by a letter agreement entered into by Burns and Delta

dated May 3, 2004 (the "**Consulting Agreement**"), annexed hereto as Exhibit C.

Pursuant to the Consulting Agreement, Delta contracted to continue to employ Burns "as

a consultant from May 1, 2004 through May 1, 2009."  *See* Exhibit C.  Specifically,

Burns agreed to "provide such consulting services to Delta's Chief Executive Officer

with respect to any matter within [her] general area of expertise as developed during [her]

employment with Delta that may from time to time arise during the consulting period."

*Id.*  In exchange for such consulting services, Delta agreed to provide (subject to certain

exceptions) unlimited "positive space travel"[2] to Burns and her spouse or domestic

partner (and any dependent children) for the rest of Burns' life (the "**Lifetime Travel**

**Benefit**" or "**Lifetime Travel Benefits**," as the context requires).  *Id.*  Notably, at the

time of Burns' resignation in 2004, Lifetime Travel Benefits were available only to

*retired* Delta executives with 10 or more years of service.  Because she was neither

retired nor did she have 10 years of service with Delta, Burns would not have received

the Lifetime Travel Benefits were it not for the Consulting Agreement.

---

[1] Prior to her promotion to chief financial officer, Burns had held various positions with Delta
since her employment began on January 18, 1999.

[2] "Positive space travel" means that Burns (and her family) could travel first class on Delta (or
any Delta subsidiary or connection carrier) free-of-charge, anywhere in the world.  When using this benefit,
Burns and her family could book seats as if they were paying customers.  In other words, this benefit was
not limited to available vacant seats, nor was it cost-free to Delta.

12.     From the effective date of the Consulting Agreement through the Petition

Date (*i.e.*, less than a year and a half), Burns and her family utilized the Lifetime Travel

Benefit an extraordinary 98 times, representing 98 tickets booked for flights actually

flown[3] to destinations throughout the United States and in Europe.  During this same time

period, Burns provided no consulting services whatsoever to Delta.  Moreover, Burns has

accurately represented to the Court that she provided to Delta no post-petition consulting

services whatsoever, and that Delta declined any post-petition use of the Lifetime Travel

Benefit.

13.     Following the Petition Date, on November 15, 2005, pursuant to the

Court-approved Rejection Procedures, Delta filed a Notice of Rejection of Executory

Contracts and Unexpired Leases and the Abandonment of Personal Property [Docket No.

1231] annexed hereto as Exhibit D (the "**Rejection Notice**") seeking authority to reject,

among other executory contracts and unexpired leases, the Consulting Agreement.

Pursuant to the Rejection Notice, the proposed rejection date of the Consulting

Agreement was September 14, 2005 (the "**Rejection Effective Date**").  *See* Exhibit D,

Schedule A.

14.     Burns timely objected to the Rejection Notice on November 30, 2005

[Docket No. 1361] (the "**Rejection Objection**"), annexed hereto as Exhibit E.  In an

effort to avoid the rejection of the Consulting Agreement (in an ill-conceived[4] attempt to

somehow compel Delta to continue to provide the Lifetime Travel Benefit), Burns

---

[3]  Some of these flights may have been one-way flights.

[4]  Of course, even if the Consulting Agreement were not executory, Burns would still only be entitled to, at most, a pre-petition unsecured claim on account of the Lifetime Travel Benefit (and not specific performance).

4

claimed that the Consulting Agreement had been fully executed by her because any expertise she may have had with respect to Delta and its operations had become stale and she could only at best offer to Delta "*de minimis*" future services. *See* Exhibit E, ¶ 8. As a result, Burns argued that her end of the bargain had been fully performed, notwithstanding that at that time nearly 3-1/2 years remained on the 5-year term of the Consulting Agreement.

15.    As a result of the Rejection Objection, the Debtors did not seek an immediate hearing with respect to the Rejection Notice, hoping that the issue would be resolved consensually. Pursuant to the Rejection Notice and the Rejection Procedures, "[i]f the Debtors and [Burns were] unable to consensually resolve the [Rejection] Objection, the Debtors shall not proceed with the rejection of the [Consulting Agreement], but may seek Court approval of the requested rejection or abandonment. If, after a hearing, the disputed rejection . . . is approved by the Court, the [Consulting Agreement] will be deemed rejected as of [the Rejection Effective Date] . . . ." *See* Exhibit D.

16.    Pursuant to Sections 10.1 and 10.4(a) of the Plan, the Consulting Agreement (which in all events gives rise only to a pre-petition unsecured claim at the very most) was deemed "automatically rejected."

## Relief Requested

17.    The Reorganized Debtors hereby seek an order in the form annexed hereto as Exhibit A disallowing, expunging or reducing with prejudice, as the case may be, each of the Claims.

18.    As set forth below in more detail, the Claims each seek Lifetime Travel

Benefits[5] provided for in the Consulting Agreement that was executed

contemporaneously with Burns' departure as chief financial officer.  The Lifetime Travel

Benefit component of the Pre-Petition Claims is objectionable for at least two

independent reasons.  First, this portion of the Claims must be expunged pursuant to

section 502(b)(4) of the Bankruptcy Code because Burns was an insider of Delta and she

did not perform any services under the Consulting Agreement whatsoever.  Ever.  Indeed,

by November 30, 2005 (*i.e.*, less than one-third of the way into the 5-year term of the

consulting agreement) Burns herself represented to the Court in the Rejection Objection

that even had Delta sought to consult with her (which it did not), such consultation would

be of "*de minimis*" value.[6]  This reality, and admission, is absolutely fatal to the Claims.

Secondly, even were the Pre-Petition Claims not subject to expungement pursuant to

section 502(b)(4), such claims must be reduced pursuant to section 502(b)(7) of the

Bankruptcy Code to the value of travel benefits for one year.[7]

19.    Additionally, the Pre-Petition Claims also seek indemnification and

reimbursement (the "**Indemnification Benefits**") for any liability that Burns may have in

connection with that certain civil proceeding pending in the United States District Court

for the Northern District of Georgia (the "**District Court**"), styled *Dennis Smith,*

---

[5]  The Post-Petition Claim seeks damages for post-petition flight privileges, which Burns has estimated at a value of $200,000.  As set forth below, this Claim must be expunged under both sections 502(b)(4) and 503(b) of the Bankruptcy Code because it is beyond dispute that Burns did not provide beneficial post-petition services to Delta.

[6]  To the extent that Burns now asserts (contrary to her previous written representations to the Court) that her services were beneficial to Delta, the Reorganized Debtors reserve the right to request an evidentiary hearing on this issue at a future date.

[7]  To the extent the Court does not resolve this Objection in favor of the Reorganized Debtors, the Reorganized Debtors reserve all of their rights with respect to the Claims, including with respect to the Lifetime Travel Benefit.

*Individually and on behalf of all others similarly situated v. Delta Air Lines, Inc. et al.*,

Civil Action Number 1:04-cv-2592-ODE (the "**ERISA Litigation**").  As this Court well

knows, the ERISA Litigation has already been dismissed against Burns and each other

non-Debtor defendant.  *Smith v. Delta Air Lines, Inc.*, 422 F. Supp. 2d 1310, 1334 (N.D.

Ga. 2006).

20.      Importantly, the Indemnification Benefits portion of the Pre-Petition

Claims is duplicative of Claim No. 5533 (the "**Non-Debtor Defendant Claim**"), annexed

hereto as Exhibit F.  The Non-Debtor Defendant Claim was filed on behalf of each of the

non-Debtor defendants in the ERISA Litigation.  By way of this Objection, the

Reorganized Debtors seek to expunge the Indemnification Benefits of the Pre-Petition

Claims as duplicative of the Non-Debtor Defendant Claim and for administrative

purposes only.  The Reorganized Debtors are not presently seeking any relief with respect

to the Non-Debtor Defendant Claim, but reserve all of their rights with respect to such

claim and, to the extent not expunged as requested above, with respect to the

Indemnification Benefits portion of the Pre-Petition Claims.

<u>**Argument**</u>

**I.      Since Burns Was an Insider, Her Claims Must Be Capped at the Reasonable
Value of Her Services, Which Is Zero**

21.      The Reorganized Debtors object to the portion of the Claims based on the

Lifetime Travel Benefit on the basis that Burns was a Delta insider and is therefore

entitled to a claim only to the reasonable value of the services provided under the

Consulting Agreement.  Since no services at all were provided, that claim must be zero.

22.      Section 502(b) of the Bankruptcy Code provides, in relevant part, that:

> [i]f an objection to a claim is made, the court, after notice and a
> hearing, shall determine the amount of such claim . . . as of the

7

date of the filing of the petition, and shall allow such claim in such
amount, except to the extent that –

\*\*\*\*

(4) if such claim is for services of an insider . . . of the debtor, such
claim exceeds the reasonable value of such services[.]

11 U.S.C. § 502(b).  Section 502(b)(4) of the Bankruptcy Code "provides that a

prepetition claim based on services performed by an attorney or insider shall be

disallowed to the extent the claim exceeds the reasonable value of the services

performed."  *In re Segovia*, 387 B.R. 773, 779 (Bankr. N.D. Cal. 2008) *aff'd*, No. 08-

60047, 2009 WL 2917750 (9th Cir. Sept. 14, 2009).  Moreover, in applying section

502(b)(4), courts have interpreted the definition of "insider" broadly.  *In re Russell Cave

Co.*, 253 B.R. 815, 821 (Bankr. E.D. Ky. 2000) ("Courts have construed the definition of

an insider flexibly.  An insider has been defined as any entity or person with a

'sufficiently close relationship with the debtor that his conduct is made subject to closer

scrutiny than those dealing at arms length with the debtor.'" (quoting *In re Acme-

Dunham, Inc.*, 50 B.R. 734, 739 (D. Me. 1985))).  Moreover, the relevant time for

establishing the insider status under section 502(b)(4) with respect to a particular person

is the time at which such person entered into the subject agreement.  *Id.* at 821 ("[T]he

relevant time for determining one's status as an insider under [section 502(b)(4)] is the

time services were rendered and when the compensation contracts for such services were

formed."); *In re Allegheny Intern., Inc.*, 158 B.R. 332, 339 (Bankr. W.D. Pa. 1992) ("To

allow an insider to resign immediately before the debtor enters bankruptcy, and escape

the reaches of 11 U.S.C. § 502(b)(4), would defeat the entire purpose of 11 U.S.C.

§ 502(b)(4).  A more faithful reading is to hold accountable all claimants who were

insiders when the advantageous insider employment contract was developed."); *see also In re EECO Inc.*, 138 B.R. 260, 264 (Bankr. C.D. Cal. 1992) (insider who negotiated his own severance payment was deemed an insider for preference purposes despite fact he resigned prior to receiving severance payment).

23.     Thus, section 502(b)(4) of the Bankruptcy Code and the case law interpreting it establish a clear and applicable rule: if Burns was an insider at the time (or just prior to when) she entered into the Consulting Agreement and if her Claims are for the services provided under such Consulting Agreement, Burns is entitled only to a claim in an amount equal to the reasonable value of the services she actually provided thereunder.  Accordingly, as set forth below, because (i) Burns was an insider at the time she entered into the Consulting Agreement and (ii) her Claims seek the Lifetime Travel Benefit provided for under the Consulting Agreement, Burns is entitled to recover only the reasonable value of the services she provided to Delta pursuant to the Consulting Agreement.  Moreover, because the services she provided to Delta were indisputably non-existent or negligible, Burns' Claims for the Lifetime Travel Benefit must be expunged.

24.     First, Burns was unquestionably a Delta insider at the time she entered into the Consulting Agreement.  The Bankruptcy Code defines an insider to include an "officer of the debtor."  11 U.S.C. § 101(31)(B); *see also In re Ticketplanet.com*, 313 B.R. 46, 64 (Bankr. S.D.N.Y. 2004) (noting the statutory list of insiders, which includes an officer, and that the statutory list is not exhaustive and that courts may define the limits of a non-statutory insider by considering all the facts of a given case).  Burns was the chief financial officer of Delta and she entered into the Consulting Agreement in

connection with her resignation as chief financial officer.  Moreover, Burns negotiated the terms of the Consulting Agreement while she was still Delta's chief financial officer and the effective date of the agreement is the very day following the effective date of Burns' resignation as chief financial officer.

25.      Second, the Claims are based upon Burns' services that were to be rendered pursuant to the Consulting Agreement.  Importantly, Burns was able to secure the Lifetime Travel Benefit only because of her status as an insider, and she negotiated the Consulting Agreement while still Delta's chief financial officer.  Specifically, the Lifetime Travel Benefit was exchanged expressly on account of the "exceptional expertise [Burns] developed during [her] service with Delta."  *See* Exhibit C.  In fact, Burns readily admits so herself.  *See* Exhibit E (linking the value Burns might have been able to provide to Delta to her status as an insider with knowledge of Delta's operations).

26.      Moreover, Burns does not dispute that the Claims are predicated on services provided as an insider.  Burns has contended (incorrectly) that "[d]espite the wording of the [Consulting] Agreement, the benefits memorialized in the [Consulting] Agreement – unlimited free travel (*i.e.*, 'positive space travel') in first class for Ms. Burns, her spouse or domestic partner, and dependent children on the Debtors' aircraft for the rest of Ms. Burns' life – are part of Ms. Burns' severance compensation as a former officer of the Debtors."  *See* Exhibit C, ¶ 7.  Even if this contention was factually correct, which it is not,[8] it would only serve to further demonstrate that the Claims are for services rendered by an insider.

---

[8] As set forth above, Burns did not otherwise qualify for Lifetime Travel Benefits because she did not retire and because she had insufficient service time with Delta.

27.     The *Russell Cave* court carefully considered the insider status of a

consultant seeking damages for the rejection of his consulting contract.  *Russell Cave*,

253 B.R. at 821.  In *Russell Cave*, Donald Staley, one of the founders of the J. Peterman

Company, entered into contracts terminating his employment and agreeing to provide

"crucial services" as an independent consultant.  *Id.* at 821.  Because Staley was a

member of the debtor's board of directors and an officer of the company when he

executed the consulting agreement, the court held that Staley's claims were subject to

limitation under section 502(b)(4) of the Bankruptcy Code.  *Id.* at 822.

28.     Moreover, as an insider, Burns bears the burden of proving the reasonable

value of her services.  *Id.*  ("As to a claim for services of an insider the statute enjoins us

not to allow such claims which exceed the reasonable value of any services . . . .  We

conceive the significance of this statutory provision for present purposes to be that it

creates a burden which a claimant must bear in order to succeed in his claim."); *In re All-

American Auxiliary Ass'n*, 95 B.R. 540, 544 (Bankr. S.D. Ohio 1989) ("Where a claim is

asserted by an insider . . . and where the transaction giving rise to the claim is challenged,

it is well-established that the burden is on the insider claimant to show the inherent

fairness and good faith of the challenged transaction." (citing *Equibank v. Dan-Ver

Enterprises, Inc. (In re Dan-Ver Enterprises, Inc.*), 86 B.R. 443 (Bankr. W.D. Pa.

1988))).  Additionally, the value of services alleged by Burns must withstand the strict

scrutiny of the Court.  *All-American Auxiliary*, 95 B.R. at 544 ("Where the claimant is an

insider, or where the creditor exercises control over or domination of the debtor, his

dealings with the debtor are subject to strict scrutiny." (citing *Pepper v. Litton*, 308 U.S.

295 (1939))).

11

29.     Significantly, however, Burns herself has already represented to the Court that her services were of minimal or no value to Delta (and without any post-petition value whatsoever).  Burns' Rejection Objection (filed a mere two months after the Petition Date) asserts that Burns had already satisfied "her material obligations" under the Consulting Agreement and that any "remaining alleged obligations" were "*de minimis*." *See* Exhibit C.  However, between May 3, 2004, the date the Consulting Agreement was executed, and November 30, 2005, the date on which Burns represented that she could provide no more value to Delta, Delta did not call on Burns once.  To state the facts more directly, Burns did not provide *any* services at any time to Delta pursuant to the Consulting Agreement.  Notwithstanding this utter failure to provide any benefit to Delta, Burns and her family utilized the Lifetime Travel Benefit 98 times.  Thus, as a matter of law, she may not have any claim for the rejected Lifetime Travel Benefit.

## II.     Since Burns Concedes that She Provided No Post-Petition Benefit to the Estate, the Post-Petition Claim Must Be Expunged

30.     Pursuant to section 507 of the Bankruptcy Code, administrative expenses allowed under section 503 of the Bankruptcy Code have priority when property of the estate is distributed.  *See, e.g., U.S. v. Noland*, 517 U.S. 535, 536 n.1 (1996); *In re Bethlehem Steel Corp.*, No. 02-2854, 2003 U.S. Dist. LEXIS 12909, at *23 (S.D.N.Y. July 23, 2003) (same); *In re Jonick Deli Corp.*, 263 B.R. 196, 198 (S.D.N.Y. 2001) (same).

31.     Section 503 of the Bankruptcy Code provides, in relevant part, that, "there shall be allowed administrative expenses . . . including . . . the actual, necessary costs and expenses of preserving the estate . . . including . . . wages, salaries, and commissions for services rendered after the commencement of the case." 11 U.S.C. § 503(b); *see Trustees*

*of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986).  In order

to have an allowed administrative claim under section 503 of the Bankruptcy Code, a

claimant must provide post-petition value to the estate and contribute to its preservation.

*See In re Globe Metallurgical, Inc.*, 312 B.R. 34, 39 (Bankr. S.D.N.Y. 2004) (holding

that section 503(b) of the Bankruptcy Code is not a mere formality and limits

administrative expenses to actual and necessary costs of preserving the estate (citing

*Sharon Steel Corp. v. Nat'l Fuel Distribution Corp.*, 872 F.2d 36, 39 (3d Cir. 1989))).

32.    Moreover, the claimant has the burden of proving that its services

provided such a benefit to the debtor.  *See, e.g., In re Chateaugay Corp.*, 102 B.R. 335,

353-54 (Bankr. S.D.N.Y. 1989).  Specifically, the putative administrative claimant has

the burden of proving that its claim arose from a transaction with the debtor or on account

of consideration furnished to the debtor, and that the transaction or consideration directly

benefited the debtor.  *In re Patient Educ. Media, Inc.*, 221 B.R. 97, 101 (Bankr. S.D.N.Y.

1998); *see also Amalgamated*, 789 F.2d at 101 (holding that a claim is entitled to

administrative claim status pursuant to section 503 of the Bankruptcy Code "only to the

extent that the consideration supporting the claimant's right to payment was both

supplied to and beneficial to the debtor-in-possession in the operation of the business").

33.    Here, it is undisputed (and indisputable) that Burns provided no post-

petition benefit of any kind to these estates.  This is not just the judgment of Delta – that

is Burns' own assessment of the "*de minimis*" value of her services.  In an attempt to

avoid the inescapable conclusion that the Consulting Agreement was an executory

contract, Burns (just two months removed from the Petition Date) argued mightily that

any future services provided by her would be of "*de minimis*" value to Delta.  While that

13

factual concession is not dispositive as to whether the Consulting Agreement was

executory, it is absolutely fatal to the Post-Petition Claim.  Burns provided no post-

petition benefit to Delta, a prerequisite in this circuit to any post-petition administrative

claim, and thus the Post-Petition Claim must be expunged.

III.    **In the Alternative, Since the Consulting Agreement Is an Employment Contract, the Claims Must Be Capped at the Value of One Year of Travel Benefits**

34.    In the alternative, the Reorganized Debtors object to the portion of the

Pre-Petition Claims based upon the Lifetime Travel Benefit because the Consulting

Agreement was an employment agreement and, as such, damages sought in connection

with termination thereof are capped pursuant to section 502(b)(7) of the Bankruptcy

Code.

35.    Section 502(b)(7) of the Bankruptcy Code provides, in relevant part, that:

> [i]f an objection to a claim is made, the court, after notice and a
> hearing, shall determine the amount of such claim . . . as of the
> date of the filing of the petition, and shall allow such claim in such
> amount, except to the extent that –
>
> ****
>
> (7) if such claim is the claim of an employee for damages resulting
> from the termination of an employment contract, such claim
> exceeds –
>
> (A) the compensation provided by such contract, without
> acceleration, for one year following . . . the date on which the
> employer directed the employee to terminate, or such employee
> terminated, performance under such contract[.]

11 U.S.C. § 502(b).  Courts first determine the total damages and then apply the section

502(b)(7) cap to such damages.  *In re Malden Mills Indus.*, 302 B.R. 408, 411 (Bankr. D.

Mass. 2003) ("Once the correct termination damages are determined, the next step in a

§ 502(b)(7) analysis is to determine the capped amount.  Section 502(b)(7) limits

damages for breach of employment contracts to a maximum of one year's compensation." (internal quotations omitted)); *see also SEC v. Gemstar-TV Guide Int'l, Inc.*, 401 F.3d 1031, 1052 n.1 (9th Cir. 2005), *cert. denied sub nom. Yuen v. SEC*, 546 U.S. 933 (2005) ("When Congress wants to 'cap' termination payments, it certainly knows how to do it with unquestionable precision."); *Mason v. Official Comm. of Unsecured Creditors (In re FBI Distrib. Corp.)*, 330 F.3d 36, 41 (1st Cir. 2003) (officer's compensation was subject to the one-year cap pursuant to section 502(b)(7)).

36.     The legislative history of section 502(b)(7) provides that this statute was intended to prevent substantial claims in favor of executives arising out of employment agreements providing lavish post-employment benefits. *See In re Protarga, Inc.*, 329 B.R. 451, 465 (Bankr. D. Del. 2005). *See also In re Prospect Hill Res., Inc.*, 837 F.2d 453, 455 (11th Cir. 1988) ("One purpose of section 502(b)(7) was to relieve bankrupt employers of the continuing duty to pay high salaries to officers and owners-managers who had been able to exact favorable terms of tenure and salaries while the business prospered."); *In re Cincinnati Cordage & Paper Co.*, 271 B.R. 264, 269 (Bankr. S.D. Ohio 2001) ("This code section was designed to limit the claims of key executives who had been able to negotiate contracts with very beneficial terms.").

**A.     The Consulting Agreement Was Terminated**

37.     As this Court has previously observed, the Bankruptcy Code is not explicit with regard to what constitutes an executory contract, nor has the Second Circuit adopted a standard definition for determining whether a contract is executory. *In re Helm*, 335 B.R. 528, 534 (Bankr. S.D.N.Y. 2006) (Morris, *J.*). The courts within this circuit have adopted at least three different (but similar) tests. *Id*. at 535. The most commonly applied test in this circuit is based upon Professor Vern Countryman's formulation – a

15

contract is executory if performance is still required by both parties that is sufficiently material such that the failure of either to perform would excuse the other party's performance.  *Id*. at 534.  Importantly, as this Court noted, "if a contract is executory under [the Countryman definition], the contract is necessarily executory under the other two approaches"  *Id.* at 535 (citing *In re Teligent, Inc.*, 268 B.R. 723, 732 (Bankr. S.D.N.Y. 2001)).  Burns has also agreed that the Countryman definition should apply.  *See* Exhibit E, ¶ 6.

38.    Under the Countryman definition, it is clear that the Consulting Agreement was executory.  Clearly, Delta had material unperformed obligations – the Lifetime Travel Benefits.  So too did Burns.  Burns was obligated until May 2009 "to provide such consulting services to Delta's Chief Executive Officer," and not "to violate the rules governing non revenue travel" nor "solicit any person who is at the time an employee of Delta."  *See* Exhibit C, ¶¶ 1-3.  Essentially, Burns argues that the Consulting Agreement was not executory because her services would not be valuable to Delta and thus she had no continuing obligations.  That is completely belied by the Consulting Agreement, which specifically included a five-year term and a five-year non-solicitation provision, both of which ran through May 2009.  *See* Exhibit C, ¶¶ 1, 3.  Thus, the Consulting Agreement was executory[9] as was the agreement in *Helm*, where this Court found that the "characterization of the Agreement as 'fully performed' ignores the plain language of the contract at issue."  *Helm* at 536.

---

[9]  Even if the Consulting Agreement is deemed not to be executory and to the extent any claims at all are allowable thereunder (and Delta believes that there are none), Burns would, at most, be entitled only to a pre-petition claim.

39.     Similarly, it is clear that the Consulting Agreement was terminated.  With

certain exceptions not relevant here, the Plan provided that, "[p]ursuant to sections 365

and 1123 of the Bankruptcy Code, each executory contract and unexpired lease to which

any Debtor is a party shall be deemed automatically rejected by the Debtors effective as

of the Effective Date."  *See* Plan, § 10.1.  For the avoidance of doubt, the Plan further

provided that all "employment agreements" were also deemed rejected.  *See* Plan,

§ 10.4(a).  As such, the Consulting Agreement was rejected and terminated by operation

of the Plan.

### B.     The Consulting Agreement Is an Employment Agreement

40.     Section 502(b)(7) of the Bankruptcy Code does not define "employment

contract;" instead courts have focused on whether the contract at issue creates an

"employment relationship."  *In re Wilson Foods Corp.*, 182 B.R. 278, 282 (Bankr. D.

Kan. 1995).  Although no individual factor is required or dispositive, courts have

considered the following:

> (a) how the agreement is entitled, (b) if the agreement
> identifies job responsibilities, (c) if the agreement provides
> the terms for compensation and benefits, (d) if withholding
> taxes and social security benefits are deducted from pay,
> (e) if the agreement constrains the "employee" from certain
> other activities, (f) if the agreement is not assignable, (g) if
> the debtor had the right to control the activities of the
> "employee," and (h) the amount of hours the "employee"
> needed to devote to the debtor's business per year.

*In re WorldCom, Inc.*, 361 B.R. 675, 682 (Bankr. S.D.N.Y. 2007).[10]  The *WorldCom*

court also focused strongly on policy considerations, *i.e.*, whether the counterparty was

---

[10]  The Reorganized Debtors recognize that the *WorldCom* court ultimately held that a consulting agreement with Michael Jordan did not constitute an employment contract and submit that the facts surrounding that agreement are clearly distinguishable from the facts at bar.  MCI, which subsequently merged with WorldCom, retained Michael Jordan pursuant to an endorsement agreement.  *WorldCom*, 361

an insider who was able to extract a favorable contract at the expense of the now

insolvent debtor (and its creditors).  Both a majority of the factors and the policy

considerations identified in *WorldCom* support the conclusion that the Consulting

Agreement is an employment contract.

41.      First, the Consulting Agreement clearly identifies job responsibilities.

Burns agreed to "provide such consulting services to Delta's Chief Executive Officer

with respect to any matter within [her] general area of expertise as developed during [her]

employment with Delta that may from time to time arise during the consulting period."

Exhibit C, ¶ 1.  Second, Burns was constrained from certain activities by the Consulting

Agreement.  For example, Burns could not solicit any Delta employee for employment

elsewhere.  *See id.*, ¶ 3.  Similarly, Burns could not utilize the Lifetime Travel Benefit for

"any type of business or professional activity."  *Id.*, ¶ 2.  Third, while the Consulting

Agreement is silent as to assignability, applicable law would forbid assignment of this

type of personal services contract.  *In re Terry*, 245 B.R. 422, 426 (Bankr. N.D. Ga.

2000) ("Certain classes of contracts are inherently nonassignable in their character, such

as . . . engagements for personal services, requiring skill, science, or peculiar

qualifications [and] cannot be assigned without the consent of the other party to such

contract."); *West Coast Cambridge, Inc. v. Rice*, 262 Ga. App. 106, 111 (Ga. App. 2003)

---

B.R. at 679.  At or near the height of his fame, Jordan, trading on his popularity rather than any particularly relevant expertise, garnered a highly compensated 10-year "personal services" contract under which he appeared in a variety of advertisements for MCI or WorldCom.  *Id.*  Jordan had not exerted control over the enterprise nor did the terms of his contract relate to any previous relationship with MCI and WorldCom. He was retained in an arm's-length transaction simply to provide services.  The court also carefully considered various factors and policy considerations and determined that "[t]he majority of these factors favor Jordan."  *Id.* at 682.  Jordan's agreement to endorse WorldCom products was plainly not an "employment contract" subject to section 502(b)(7) because Jordan, unlike Burns, was a true independent contractor.  Conversely, Burns entered into an agreement to provide on going services related to the services that she previously provided to Delta as its chief financial officer.

(holding that contracts under which "performance by the delegate would materially vary from the performance required by the original obligor" are not assignable). Moreover, the Consulting Agreement is clear that the Lifetime Travel Benefit is personal to Burns and her family. *See* Exhibit C, ¶ 2. Fourth, Delta had the right to control Burns' activities in that Burns only needed to provide consulting services upon request. In other words, Burns had no independent mandate to perform services of her choosing. Fifth, the Consulting Agreement was treated as an employment agreement for tax purposes and Delta provided Burns with a W-2 in each of 2004 and 2005. While the balance of the *WorldCom* factors are either irrelevant (e.g., the Consulting Agreement has no title) or do not support a finding that the Consulting Agreement is an employment contract (e.g., there was no minimum hours that Burns needed to work), it is clear that all factors need not be present in order to conclude that an agreement is an employment contract. *WorldCom*, 361 B.R. at 682.

42.    Moreover, policy considerations strongly favor the conclusion that the Consulting Agreement is an employment contract. As the *WorldCom* court held, "[section] 502(b)(7) serves a . . . purpose by limiting employee damage claims, especially those of *officers, owner-managers and other key-executives* who had been able to exact favorable long term contracts calling for substantial remuneration." (quotations omitted, emphasis in original). *WorldCom*, 361 B.R. at 683. In *WorldCom*, Judge Gonzalez held that it would be inconsistent with this vital public policy (and common sense) to find that Hall of Fame basketball star Michael Jordan was an employee of telecommunications giant MCI. Here, on the contrary, it is clear that Burns was a statutory insider, a member of the very class of persons that section 502(b)(7) was intended to regulate. Moreover, it

19

is beyond peradventure that the Consulting Agreement was extremely favorable to Burns
(98 domestic and international flights for no consulting services). As such, the
Consulting Agreement is precisely the type of "sweetheart" contract that caused Congress
to enact section 502(b)(7) in the first instance.

43. Additionally, courts have consistently found consulting agreements
entered into with former executives (as opposed to true third parties) to be "employment
contracts" for purposes of section 502(b)(7). *See, e.g.*, *Wilson Foods*, 182 B.R. at 282-4
(consulting agreement requiring former executive to advise and consult as requested held
to be an employment contract because legislative history of section 502(b)(7) indicated
intent to limit exactly those kinds of executive arrangements); *In re Charter Co.*, 82 B.R.
144, 146 (Bankr. M.D. Fla. 1988) (consulting agreement with attorney held to be
employment contract).

44. Because the Consulting Agreement is a terminated employment contract,
to the extent any claims at all are allowable thereunder (and Delta believes that there are
none), they must be capped, pursuant to section 502(b)(7), at the value of one year of
such benefits.[11]

## IV. Since the Indemnification Benefits Are Duplicative of the Non-Debtor Defendant Claim, the Claims for Indemnification Benefits Must Be Expunged

45. As set forth above, counsel for the non-Debtor defendants has already
filed the Non-Debtor Defendant Claim on behalf of each of the non-Debtor defendants in
the ERISA Litigation, including Burns. As such, the Indemnification Benefits are
already subsumed by the Non-Debtor Defendant Claim and the Claims should be

---

[11] The determination of this amount will be the subject of a further motion if the parties cannot agree on such amount.

expunged as duplicative.  After all, it is axiomatic that creditors are not entitled to

multiple recoveries for a single liability against a single debtor.  Here, to the extent there

is any indemnification liability whatsoever, Burns' rights are sufficiently protected by the

Non-Debtor Defendant Claim (subject to the Reorganized Debtors' full reservation of

rights with respect to such claim and, to the extent not expunged as requested above, with

respect to the Indemnification Benefits portion of the Pre-Petition Claims) and the Claims

must be expunged.

### Notice

46.    No trustee or examiner has been appointed in these chapter 11 cases.  The

Reorganized Debtors have served notice of this Objection consistent with the procedures

set forth in the Claims Objection Procedures Order and the Plan.

WHEREFORE the Reorganized Debtors respectfully request the subordination,

disallowance, expungement or reduction with prejudice, as the case may be, of the claims

included on Exhibit B annexed hereto, and such other and further relief as is deemed just

and proper.

Dated:   New York, New York
         October 16, 2009

By:  /s/ Timothy E. Graulich
      Marshall S. Huebner
      Timothy E. Graulich
      Steven C. Krause

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 607-7539

*Attorneys for the Reorganized Debtors*